# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5303**                    **September Term, 2025**

**1:25-cv-01362-PLF**

**Filed On:** September 25, 2025

Federal Education Association, et al.,

      Appellees

    v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

      Appellants

**BEFORE:**   Henderson*, Pan**, and Garcia, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for a stay pending appeal, the opposition thereto, and the reply, it is

**ORDERED** that the administrative stay entered on September 2, 2025, be dissolved.  It is

**FURTHER ORDERED** that the motion for stay be denied.  The government seeks the "extraordinary" relief of a stay pending appeal.  _Citizens for Resp. & Ethics in Washington v. FEC_, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam).  To secure that relief, the government must show that it will face "irreparable injury" if the district court's order is not stayed while the appeal is pending.  _Nken v. Holder_, 556 U.S. 418, 433–35 (2009).  That injury must be "both certain and great," and "of such _imminence_ that there is a clear and present need for equitable relief to prevent irreparable harm."  _Chaplaincy of Full Gospel Churches v. England_, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up).  The government has not met that burden on the facts of this case.  Indeed, it has not made a meaningful attempt to do so.

I

On March 27, 2025, the President issued an Executive Order excluding approximately two-thirds of the federal workforce, including all employees of the

* A statement by Circuit Judge Henderson, dissenting from this order, is attached.

** A statement by Circuit Judge Pan, concurring in this order, is attached.

Department of Defense, from collective bargaining protections under the Federal Service Labor-Management Relations Statute (FSLMRS). *See* Exec. Order No. 14,251, 90 Fed. Reg. 14553, 14553–55 (Mar. 27, 2025). The Order invokes the President's statutory authority to "issue an order excluding any agency or subdivision thereof from coverage under" the FSLMRS "if the President determines" both that "the agency or subdivision has as a primary function . . . national security work" and that "the provisions of [the FSLMRS] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

Several groups of plaintiffs separately sued to enjoin enforcement of the Order. The district court has granted preliminary injunctions in three cases. *See Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 268–69 (D.D.C. 2025); *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 273 (D.D.C. 2025); *Fed. Educ. Ass'n v. Trump*, 2025 WL 2355747, at *20 (D.D.C. Aug. 14, 2025). The first concerned several agencies and subdivisions listed in the Order. *Nat'l Treasury Emps. Union*, 780 F. Supp. 3d at 247, 267–69. The second concerned the State Department, which was also specifically identified in the Order. *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d at 256, 273. In both cases, the government sought, and this court granted, stays pending appeal. *See Nat'l Treasury Emps. Union v. Trump*, 2025 WL 1441563, at *1–3 (D.C. Cir. May 16, 2025) (per curiam); *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *1–4 (D.C. Cir. June 20, 2025) (per curiam).

The plaintiffs in this third case are three unions that represent employees of the Department of Defense Education Activity (DoDEA), a subdivision of the Department of Defense (DoD) that "operates schools for the children of uniformed and civilian DoD personnel stationed in military bases in the United States and abroad." *Fed. Educ. Ass'n*, 2025 WL 2355747, at *2 (citation omitted). Although the Order excludes the entire DoD from FSLMRS coverage, the district court's preliminary injunction prevents implementation of the Order only as to DoDEA. The government appeals, and it requests an immediate stay while we consider that appeal.

II

Assuming without deciding that the government is likely to succeed on the merits, it has not met its burden to separately demonstrate that it will face irreparable injury. That failure alone dooms its request. *See, e.g., KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024) ("[A] showing of irreparable harm is a necessary prerequisite for a stay."); *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., in chambers) (similar).

In its stay motion to this court, the government devotes just one paragraph to articulating its irreparable injury. *See* Mot. 25. That paragraph summarily asserts that the district court's preliminary injunction "inflicts irreparable harm on the President by impeding his national-security prerogatives" and references this court's two prior stays pending appeal. *Id.* (citing *Nat'l Treasury Emps. Union*, 2025 WL 1441563, at *2; *Am. Foreign Serv. Ass'n*, 2025 WL 1742853, at *3); *accord* Reply 12–13.

True, courts are appropriately hesitant to question the President's national security determinations. True also, there is an interest in maintaining consistency in our orders, even non-precedential ones.

But here, the government's allegation of irreparable harm is entirely untethered from the injunction the government asks us to stay. The preliminary injunction here operates only as to DoDEA. Accordingly, the government must show that requiring *DoDEA* to adhere to the FSLMRS's collective bargaining requirements during the pendency of the appeal will harm national security or otherwise irreparably injure the government. It has not done so.

To start, unlike in both prior appeals, the government cannot assert that *the President* determined that applying the FSLMRS to the agency or subdivision covered by the preliminary injunction would be inconsistent with national security requirements. If that were true, the government would have a stronger argument that this preliminary injunction directly undermines *the President's* determination. But in arguing the merits, the government urges that the President made a blanket statutory determination for the Department of Defense as a whole and was not required to "be more granular" by making separate determinations for subdivisions like DoDEA. Reply 11. If the President did not consider DoDEA independently, the Order itself cannot show that an injunction specific to DoDEA causes irreparable harm.

The government offers nothing to address this deficiency. Its stay motion and reply brief do not contain a single word on the central question of how the preliminary injunction *as to DoDEA* imposes irreparable injury. The reply brief illustrates this flaw: The injunction imposes irreparable harm, the government argues, because "Plaintiffs provide no basis to second-guess the President's determination that applying the provisions of the FSLMRS *to DoD* would be inconsistent with national-security requirements." Reply 12 (emphasis added). Again, the government is clear elsewhere that the President made no such determination as to DoDEA, so there is nothing to which we could defer. Because it was the government's burden to demonstrate irreparable harm, it would be entirely appropriate to go no further. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) ("Ordinarily,

arguments that parties do not make on appeal are deemed to have been waived." (collecting cases)).

III

Below, the government did make an argument specific to DoDEA.  That fact serves primarily to underscore the government's failure to do so on appeal.  But even if we were inclined to overlook the government's forfeiture, the theory it presented to the district court is also flawed.

In its request for a stay to the district court, the government attempted to explain how the injunction as to DoDEA would cause irreparable injury.  But that asserted injury was indirect and relied on a chain of inferences.  According to the government, DoDEA supports DoD's "overall national security mission" because delivering quality education to the children of DoD personnel aids DoD's "recruitment and retention efforts."  D. Ct. Dkt. 39 at 7–9 (citation omitted).  And requiring DoDEA to adhere to the FSLMRS's collective bargaining requirements, the government said, would "disrupt[]" its educational mission, including by requiring more instruction by "substitute teachers" and by diverting "resources that DoDEA otherwise could devote to the education of students."  *Id.*  The implication was that the quality of education provided by DoDEA might, over time, lead current or potential DoD personnel to seek other employment, which would harm national security.

Setting aside the merits of this chain of reasoning and granting that the harms would be serious, the theory is still insufficient.  We have long required stay applicants to show that their asserted injuries are imminent, in that those injuries would manifest to a meaningful extent during the pendency of the appeal.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *see also White v. Florida*, 458 U.S. 1301, 1302 (1982) (Powell, J., in chambers) (denying stay application because "[a]lthough [the applicant] establishe[d] that he may suffer irreparable harm at some point in the future, there [wa]s no indication that the harm [wa]s imminent"); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (explaining, in the standing context, that an injury is not "imminent" if it "relies on a highly attenuated chain of possibilities").  The government did not even attempt to demonstrate that the indirect effects on national security it posited could meet that standard, and it is far from self-evident that they would.  Given all of that—and the fact that the government does not so much as mention this argument on appeal—we cannot conclude that the government has met its burden.[1]

_____

[1] By contrast, it arguably is self-evident that, for example, some State Department employees' everyday activities—including "diplomatic negotiations" and the submission of "reports . . . to Washington"—*directly* impact "national security."  *Am. Foreign Serv.*

Page 4

**No. 25-5303**                    **September Term, 2025**

\*   \*   \*

The government, like other litigants, may not simply assume that this court will leap to intervene on its behalf based on generalized assertions of injury.  Stays pending appeal are a rare form of emergency relief reserved for true emergencies.  And it is not enough that the government "stamp[s] the word 'EMERGENCY' on the front cover of its stay application."  _Labrador v. Poe_, 144 S. Ct. 921, 926 n.3 (2024) (Gorsuch, J., concurring in the grant of stay).  In every case, the government must explain why the specific order from which it seeks relief imposes certain, great, and imminent injury while the appeal is pending.  _See Citizens for Resp. & Ethics in Washington_, 904 F.3d at 1019.  It did not do so here.

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Selena R. Gancasz
Deputy Clerk

---

_Ass'n_, 2025 WL 1742853, at \*3 (quoting _Faruki v. Rogers_, 349 F. Supp. 723, 730 (D.D.C. 1972)).

PAN, *Circuit Judge*, concurring:

The Federal Service Labor-Management Relations Statute (FSLMRS) guarantees the benefits of union representation and collective bargaining to federal civil servants. 5 U.S.C. §§ 7101–7135. On March 27, 2025, the President issued Executive Order 14,251, which excludes numerous agencies and subdivisions from the purview of the FSLMRS. *See* Exec. Order No. 14,251, 90 Fed. Reg. 14553 (Mar. 27, 2025). Three Unions that represent employees of the Department of Defense Education Activity (DoDEA) sued the government in district court to challenge the legality of the Executive Order. The district court entered a preliminary injunction barring the government from implementing the Executive Order insofar as it excludes DoDEA from FSLMRS coverage. The preliminary injunction allows DoDEA workers to continue enjoying FSLMRS protections during the pendency of the instant litigation.

The government appeals the district court's preliminary-injunction order and now moves for a stay of the injunction pending the resolution of its appeal. I fully concur with the court's order denying the government's stay motion because the government fails to meet its burden to show that it will be irreparably harmed by the injunction. I write separately to express my view that the government also fails to demonstrate that it is likely to succeed on the merits of its appeal and that the equities and the public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

On the merits, the Unions are likely to succeed in arguing that the President exceeded his statutory authority when he excluded a vast number of government agencies and subdivisions from FSLMRS coverage without making mandatory determinations that each agency or subdivision "has as a primary function intelligence, counterintelligence, investigative, or national security work," and that "the

provisions of [the FSLMRS] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). Although the statute allows exclusions only for national-security-related reasons, the district court found that the Executive Order likely did not rely on such reasons and instead imposed broad exemptions motivated by anti-union animus and policy goals that have nothing to do with the statutory criteria. *See FEA v. Trump*, No. 25-cv-1362, 2025 WL 2355747, at *9 (D.D.C. Aug. 14, 2025). In addition, the Executive Order appears to add a new basis for coverage exclusions that Congress did not include in the statute. *See* 90 Fed. Reg. at 14555 (excluding "any other agency or subdivision [within a Cabinet department] that has information resources management duties as the agency or subdivision's primary duty"). The Executive Order therefore is likely *ultra vires*.

Moreover, the equities and the public interest also weigh in favor of the Unions. The district court found that the Unions have been irreparably harmed by the Executive Order because it has caused the government to "discontinue[] negotiations over successive collective bargaining agreements," to "stop[] engaging in arbitral proceedings on various grievances," and to "disallow[] union representation during employee disciplinary meetings and investigatory interviews," among other things. *FEA*, 2025 WL 2355747, at *16. In addition, the FSLMRS emphasizes that the public has an interest in the protection of public employees' collective-bargaining rights, 5 U.S.C. § 7101, and that interest extends to ensuring that the President does not unlawfully undermine statutory protections.

The government thus utterly fails to meet its burden to justify the relief that it seeks.

## I.

In 1978, Congress enacted the FSLMRS based on its determination that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations . . . (A) safeguards the public interest, (B) contributes to the effective conduct of public business, and (C) facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a). Congress intended the FSLMRS to apply to almost the entire executive branch, excluding only a handful of agencies that it identified by name — most notably, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the Secret Service.[1] *Id.* § 7103(a)(3). Thus, most federal civil servants have enjoyed FSLMRS collective-bargaining protections for nearly half a century.

Congress granted the President limited authority to exempt additional agencies and agency subdivisions from the requirements of the FSLMRS, exclusively for reasons related to national security. Specifically, 5 U.S.C. § 7103(b)(1) allows the President to exclude an agency or subdivision from FSLMRS coverage if, and only if, he makes two mandatory determinations: "(A) [that] the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) [that] the provisions of [the FSLMRS] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

---

[1] The FSLMRS also excludes the Departments of State, Agriculture, and Commerce, but employees at those agencies enjoy protection under a materially identical statute, the Foreign Service Labor-Management Relations Statute. *See* 22 U.S.C. §§ 4101, 4103.

On March 27, 2025, the President issued Executive Order 14,251, which invokes § 7103(b)(1) to exclude a long list of federal agencies and subdivisions from FSLMRS coverage. Although the Executive Order parrots the statute's language, it does not make any specific findings regarding the "primary function[s]" of any of the excluded agencies or explain why the provisions of the FSLMRS cannot be applied to those agencies without compromising "national security requirements and considerations." 5 U.S.C. § 7103(b)(1). The Executive Order makes the following conclusory statements: "The agencies and agency subdivisions set forth [below] are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that [the FSLMRS] cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." 90 Fed. Reg. at 14553. The Executive Order then lists six entire Cabinet departments (with only minor caveats), twenty-six subdivisions within five other Cabinet departments, seven entire independent agencies, and every Office of the Chief Information Officer within any Cabinet department. *Id.* at 14553–55. Further, it includes, with no apparent statutory basis, "any other agency or subdivision [within a Cabinet department] that has information resources management duties as the agency or subdivision's primary duty." *Id.* at 14554. The Executive Order's extremely broad list of agencies and subdivisions encompasses two-thirds of the federal civil service, or well over one million federal workers.[2]

---

[2]    The Executive Order excludes those agencies and subdivisions pursuant to substantively identical provisions in the FSLMRS and the Foreign Service Labor-Management Relations Statute, *see supra* n.1.

The Unions have sued the President, the Department of Defense (DoD), the Office of Personnel Management (OPM), and the respective heads of those agencies.[3] The Unions contend that the Executive Order violates the Administrative Procedure Act (APA), the First Amendment, the Fifth Amendment, and their members' rights to procedural due process. They also press an *ultra vires* claim, alleging that the President exceeded his statutory authority by (1) excluding agencies and subdivisions from FSLMRS coverage without applying the national-security criteria set forth in § 7103(b)(1); and (2) using the exclusion provision for improper purposes, such as to retaliate against unions that have challenged the Administration and to promote policy objectives unrelated to the statutory requirements.

Focusing on the *ultra vires* claim, the district court granted the Unions' request for a preliminary injunction. The preliminary injunction bars the DoD, OPM, and their respective officials from excluding DoDEA from FSLMRS coverage during the pendency of this case.

## II.

The district court concluded that the four preliminary-injunction factors — the likelihood of success on the merits, irreparable harm, the balance of equities, and the public interest

---

[3] Other unions — including the National Treasury Employees Union (NTEU), American Foreign Service Association (AFSA), and American Federation of Government Employees (AFGE) — have also filed lawsuits challenging the Executive Order. *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (per curiam); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *1 (D.C. Cir. June 20, 2025) (per curiam); *Am. Fed'n of Gov't Emps. v. Trump*, 148 F.4th 648, 653 (9th Cir. 2025) (per curiam).

— favor the Unions. *See FEA*, 2025 WL 2355747, at *6, *19. In seeking a stay of the injunction, the government bears the burden with respect to the same four factors. *See Nken*, 556 U.S. at 433–34.

The court's order properly denies the government's request for a stay on the ground that the government fails to demonstrate irreparable harm. Notably, the government also fails to meet its burden to show that it is likely to succeed on the merits of its appeal, and that the equities and the public interest weigh in its favor.

## A. Likelihood of Success on the Merits

The government argues that the Unions likely will not succeed on the merits of their *ultra vires* claim because (1) the district court lacks jurisdiction; (2) the President has unreviewable discretion to exempt agencies and subdivisions from the FSLMRS; and (3) even if *ultra vires* review is available, the Executive Order passes muster. In my view, all three arguments likely fail.

## 1. Jurisdiction

The Executive Order excludes the Unions' members from FSLMRS coverage. But the government nevertheless argues that the district court lacks jurisdiction over this case because the FSLMRS requires the Unions to litigate their claims before the Federal Labor Relations Authority (FLRA), and then appeal any adverse ruling to a U.S. Court of Appeals. *See* 5 U.S.C. § 7123. The government asserts that this case is governed by our decision in *AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019). There, we held that certain plaintiffs covered by the FSLMRS had to bring their claims to the FLRA even if the FLRA could not provide complete relief. *See id.* at

755–59.  We reasoned that the FLRA offered "much of the review and relief that [the plaintiffs] sought from the district court,"[4] and although the FLRA lacked jurisdiction over some of the claims, the plaintiffs could still raise those claims on appeal.  *Id.* at 757, 759 ("[W]e may review . . . claims on appeal from an FLRA proceeding even if the FLRA [could not address them].").

The government's theory is unavailing because Congress likely did not intend to require unions to bring futile claims to the FLRA.  *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (considering "whether the particular claims brought were 'of the type Congress intended to be reviewed within this statutory structure'" (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994))).  If the Unions went to the FLRA in the first instance, the FLRA would almost certainly rely on the Executive Order to dismiss their case for lack of jurisdiction, just like it has handled similar cases.  *See, e.g.*, 57 F.L.R.A. 750 (Apr. 25, 2002) (dismissing several cases involving a U.S. Attorney's Office for lack of jurisdiction because an executive order had excluded U.S. Attorneys' Offices from the FSLMRS).  Indeed, the district court noted that the government currently takes the position in an ongoing DoDEA grievance proceeding that, pursuant to the Executive Order, the FLRA lacks authority to adjudicate that proceeding because it concerns DoDEA.  *See FEA*, 2025 WL 2355747, at *5.

---

[4]     Specifically, the *AFGE* plaintiffs could secure much of their desired relief by arguing to the FLRA that their employer had engaged in "bad-faith bargaining in violation of the" FSLMRS, "refused to bargain over mandatory matters in violation of the" FSLMRS, or "refuse[d] to bargain over permissive subjects" in the manner required by the FSLMRS.  929 F.3d at 757.

Moreover, even if the FLRA had jurisdiction over the Unions, the FSLMRS likely does not empower the FLRA to award relief for the claims that the Unions advance against the Executive Order: The Unions bring *ultra vires*, APA, and constitutional claims, but the FLRA generally hears only traditional labor-management disputes. *See* 5 U.S.C. § 7105(a)(2) (delineating the limited powers and duties of the FLRA). The government offers no authority suggesting that the FLRA can adjudicate *ultra vires*, APA, or constitutional challenges to an executive order, nor that the FLRA has the power to grant meaningful relief from the operation of an executive order. *AFGE* is thus distinguishable because the *AFGE* plaintiffs could receive from the FLRA "much of the . . . relief that they sought from the district court," 929 F.3d at 757, but here, it appears that the FLRA cannot grant any effective relief to the Unions at all.

Under the circumstances, it is unlikely that Congress intended the FSLMRS's statutory-review scheme to reach standalone claims challenging an executive order's legality. *See Axon Enter.*, 598 U.S. at 186 ("The ultimate question is how best to understand what Congress has done — whether the statutory review scheme, though exclusive where it applies, reaches the claim in question.").

## 2. Availability of *Ultra Vires* Review

The government argues that the FSLMRS precludes any *ultra vires* review because the decision to exempt agencies and subdivisions from collective-bargaining requirements is committed "to the discretion of the President." Mot. 14 (quoting *AFSA*, 2025 WL 1742853, at *2); *accord Dalton v. Specter*, 511 U.S. 462, 474 (1994). The government is likely incorrect.

As an initial matter, precedent suggests that even discretionary presidential actions are subject to *ultra vires* review. *See, e.g.*, *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (explaining that we can review *ultra vires* claims challenging national-monument designations "notwithstanding the broad discretion the Antiquities Act vests in the President"); *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980–81 (2021) (mem.) (Roberts, C.J., respecting the denial of certiorari) (indicating that courts can review *ultra vires* Antiquities Act claims even though "[t]he Act vests significant discretion in the President"). Thus, the government's invocation of the President's discretion is not dispositive.

In any event, the statute at issue here does not confer absolute discretion on the President such that courts cannot discern the limits of his authority. We have held that "[s]o long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). Section 7103(b)(1) fits that description. It provides in full:

> The President may issue an order excluding any agency or subdivision thereof from coverage under [the FSLMRS] if the President determines that — (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the FSLMRS] cannot be applied to that agency or subdivision in a manner

consistent with national security requirements
and considerations.

5 U.S.C. § 7103(b)(1). While § 7103(b)(1) allows the President
to "determine[] that" its requirements are met, it specifies the
findings that the President *must* make in order to exclude any
agency or subdivision from FSLMRS coverage. *Id.* To order
an exclusion, the President must "determine[]" that the
excluded agency or subdivision has a certain "primary
function" and that the FSLMRS's collective-bargaining
provisions "cannot be applied to that agency or subdivision"
consistent with "national security requirements and
considerations." *Id.* Those requirements cabin the President's
discretion and delineate the outer bounds of his authority,
thereby readily enabling *ultra vires* review.[5]

The government cites *AFGE v. Reagan* for the proposition
that a court cannot require the President to explain the basis for
§ 7103(b)(1) determinations. *See* 870 F.2d 723, 727 (D.C. Cir.

---

[5]     A prior panel that considered a motion to stay a preliminary
injunction in the *AFSA* case did not hold to the contrary. *See* 2025
WL 1742853, at *3. The *AFSA* panel "assume[d] without deciding
that a form of review [was] appropriate" when considering a
materially identical statutory provision governing the Foreign
Service. *Id.* (assessing 22 U.S.C. § 4103(b)). To the extent the *AFSA*
panel made statements suggesting that the President has absolute
discretion to exempt agencies or subdivisions from collective-
bargaining requirements, that was dictum that did not address the
criteria that the President must apply when making such exemptions.
*See id.* ("Here, the statute commits the relevant decision to the
President's discretion."). The *AFSA* panel's statements about the
President's discretion do not bind us; *AFSA* is a nonprecedential
order, and even if it were precedential, "[b]inding circuit law comes
only from the holdings of a prior panel, not from its dicta." *Gersman
v. Grp. Health Ass'n*, 975 F.2d 886, 897 (D.C. Cir. 1992).

1989). But in that case, we "deem[ed] the familiar presumption of regularity decisive." *Id.* *Reagan* does not help the government here because the district court specifically found that the presumption of regularity does not apply. The district court reasoned:

> (1) the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS; (2) the White House Fact Sheet [that accompanied the Executive Order] reflects retaliatory motive [against unions]; and (3) the Administration's guidance related to the Executive Order — specifically, the OPM Guidance — suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria.

*FEA*, 2025 WL 2355747, at *9. Because record evidence supports the district court's presumption-of-regularity findings, they are unlikely to be clearly erroneous. *See Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1055 (9th Cir. 2021) ("[W]e review the district court's determination that [the government] is entitled to the presumption of regularity for clear error as a mixed question of law and fact where the nature of our inquiry is essentially factual."). Moreover, *Reagan* addressed a limited executive order that excluded eight narrowly defined subdivisions within the Drug Enforcement Administration and the U.S. Marshals Service. *See* 870 F.2d at 726 (assessing Exec. Order 12,559, 51 Fed. Reg. 18761 (May 20, 1986)). Here, the Executive Order, which strips two-thirds of civil-service workers of their statutory collective-bargaining protections, is a poor fit for a presumption of "regularity."

### 3. *Ultra Vires* Review

Although an *ultra vires* claim is "essentially a Hail Mary pass," *NRC v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted), it provides a critical backstop when "there is no other means . . . to protect and enforce [a statutory] right," *Leedom v. Kyne*, 358 U.S. 184, 190 (1958). The modern doctrine arose from a recognition that "the absence of jurisdiction of the federal courts" over a claim that a government official clearly violated a statute "meant a sacrifice or obliteration of a right which Congress had created." *Id.* (quoting *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943)). *Ultra vires* claims thus constitute a crucial safety net, ensuring that courts can fall back on their "general jurisdiction" to safeguard rights that Congress "intended . . . to be enforced" when other types of legal claims do not fit the facts. *Id.* at 190–91 (citations omitted).

*Ultra vires* review can play a particularly important role in addressing situations where the President has grossly exceeded the bounds of his statutory authority, given that other types of claims — most notably, APA claims, *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) — cannot directly reach the President's actions. In the absence of presidential *ultra vires* review, any "statute permitting the President in his sole discretion to" take a given type of action could "transform[] into a [source of] power without any discernible limit." *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (Roberts, C.J., respecting the denial of certiorari). Such a scenario would "implicate[] separation of powers concerns that resonate with the constitutional claims" against the President that the

Supreme Court recognized as justiciable in *Franklin*. *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023).[6]

In conducting *ultra vires* review, a court must determine whether a government official has acted "plainly in excess of [his] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Global Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025) (cleaned up). Although meritorious *ultra vires* claims are rare, we have ruled in favor of plaintiffs alleging *ultra vires* government conduct when the challenged action is based on unexplained and obvious deviations from statutory text, *see Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 973–74, and when the government's interpretation of its statutory authority would "lead[] to an absurd result," *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1176 (D.C. Cir. 2003). Moreover, a showing that the government has attempted to enlarge its authority in bad faith can bolster an *ultra vires* claim. *Cf. Barwood, Inc. v. District of Columbia*, 202 F.3d 290, 294 (D.C. Cir. 2000).

Against that backdrop, the Executive Order's alleged infirmities go well beyond the "garden-variety error[] of law or fact" that cannot be reviewed as *ultra vires*. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up). Indeed, because this case focuses on a presidential determination, there may be "no other means . . .

---

[6] The district court granted the Unions' request to enjoin the DoD, OPM, and their officials, rather than the President himself. ECF No. 22 (Plaintiffs' Motion for a Preliminary Injunction). The Unions and district court took this approach because "courts do not have jurisdiction to enjoin [the President]." *Newdon v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). Rather, courts can enforce a presidential *ultra vires* holding by enjoining agencies and their officials from implementing the President's unlawful order.

to protect and enforce [a statutory] right." *Leedom*, 358 U.S. at 190 (citation omitted). And the district court found it likely that the Executive Order excludes two-thirds of the federal civil service from statutory protections for reasons unrelated to national security, thus grossly exceeding the President's statutory power under § 7103(b)(1). Based on the facts found by the district court, *ultra vires* review is appropriate to address the President's alleged "obliteration of a right which Congress has given [federal] employees," *id.* (cleaned up) — namely, their right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees," 5 U.S.C. § 7102.

The President likely exceeded his authority under § 7103(b)(1), which allows him to exclude agencies and subdivisions from FSLMRS coverage based only on specific, national-security-related determinations. The Executive Order provides no indication that the President made the requisite determinations. The Executive Order does not identify any agency's or subdivision's "primary function" in national security, much less explain why the "provisions of [the FSLMRS] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). In fact, the Executive Order's exclusions seem to contravene § 7103(b)(1)'s requirements because many of the listed agencies and subdivisions do not appear to have as "primary function[s] intelligence, counterintelligence, investigative, or national security work." *Id.*; *see also Cole v. Young*, 351 U.S. 536, 544 (1956) (defining "national security" as concerning "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare").

Such agencies include the Department of Veterans Affairs,[7] the Environmental Protection Agency,[8] the Federal Communications Commission,[9] the General Services Administration,[10] and the U.S. International Trade Commission.[11] Excluded subdivisions that also likely do not have the requisite "primary function[s]" include the Department of Treasury's Office of Tax Policy,[12] the

---

[7] *About the Department*, U.S. Dep't of Veterans Affs. (Apr. 9, 2025), https://perma.cc/78YM-VP7W ("Our Mission: To fulfill President Lincoln's promise to care for those who have served in our nation's military and for their families, caregivers, and survivors.").

[8] *Our Mission and What We Do*, EPA (July 23, 2025), https://perma.cc/9L8E-CMQX ("The mission of EPA is to protect human health and the environment.").

[9] *What We Do*, FCC, https://perma.cc/6CLC-JLM6 ("The Federal Communications Commission regulates interstate and international communications by radio, television, wire, satellite and cable in all 50 states, the District of Columbia and U.S. territories.").

[10] *Our Mission's Evolution*, GSA (Mar. 20, 2024), https://perma.cc/4ZNV-6C38 ("Today our mission has evolved to provide stewardship of the way the government uses and provides real estate, acquisition services, and technology.").

[11] *About the USITC*, USITC, https://perma.cc/MJ2H-UAF7 ("Mission[:] Investigate and make determinations in proceedings involving imports claimed to injure a domestic industry or violate U.S. intellectual property rights; provide independent analysis and information on tariffs, trade and competitiveness; and maintain the U.S. tariff schedule.").

[12] *Tax Policy*, Dep't of the Treasury, https://perma.cc/Z6NN-M65Q ("Tax Policy develops and implements tax policies and programs; reviews regulations and rulings to administer the Internal Revenue Code, negotiates tax treaties, provides economic and legal policy analysis for domestic and international tax policy decisions. It also provides estimates for the President's budget, fiscal policy decisions, and cash management decisions.").

Department of Justice's Civil Rights Division,[13] and the Department of the Interior's Bureau of Land Management.[14]

By excluding two-thirds of the federal civil service from statutory protections without making the required findings, the Executive Order transforms a circumscribed exception into the general rule. The Executive Order's breadth makes it "hard to imagine a type of [agency or subdivision] that would not qualify." *City of Los Angeles v. Patel*, 576 U.S. 409, 425 (2015). As the Supreme Court explained in interpreting a different civil-service statute with a national-security exception, "if Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." *Cole*, 351 U.S. at 547. *Cole*'s reasoning reflects the Court's general disinclination to allow narrow statutory exceptions to "swallow" broader statutory rules. *E.g.*, *EPA v. Calumet Shreveport Refining, LLC*, 145 S. Ct. 1735, 1751 (2025) ("This constraint follows from the function of the 'nationwide scope or effect' exception as just that — an exception. Congress, after all, is unlikely to intend for an exception to swallow the rule."); *Patel*, 576 U.S. at 424–25 ("To classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the

_____

[13]  *About the Division*, DOJ Civil Rights Div. (June 1, 2023), https://perma.cc/4J8A-H26T ("The Division enforces federal statutes prohibiting discrimination on the basis of race, color, sex, disability, religion, familial status, military status and national origin.").

[14]  *Our Mission*, DOI BLM, https://perma.cc/R3HN-M2SA ("The Bureau of Land Management's mission is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations.").

rule."); *Flynt v. Ohio*, 451 U.S. 619, 622 (1981) ("A contrary conclusion would permit the fourth exception to swallow the rule.").

Here, the Executive Order is likely *ultra vires* because it broadly and unlawfully applies the FSLMRS's exclusion provision without regard to statutory mandates, in a quest to use a narrow national-security exception to "swallow" a general rule that favors union representation. The President likely does not have unfettered authority to unilaterally transform the scope of the FSLMRS, while disregarding the statute's intended reach, purpose, and mandatory requirements. *See NTEU v. Trump*, 780 F. Supp. 3d 237, 254–55 (D.D.C. 2025) (adopted by cross-reference by *FEA*, 2025 WL 2355747, at \*9) (finding that "the President was indifferent to the purposes and requirements of the FSLMRS, or acted deliberately in contravention of them" (cleaned up)).

In addition, the district court made other findings that buttress its determination that the Executive Order's exclusions are unrelated to national security and therefore likely *ultra vires*. Although the FSLMRS permits the President to exclude workers from its protective ambit only for reasons related to national security, the district court found that there was "clear evidence" that the White House Fact Sheet reflected "retaliatory motive towards certain unions";[15] and that "substantial evidence in the record" showed that the Executive

---

[15] As the district court found, in the Fact Sheet accompanying the Executive Order, the White House proclaimed that "[c]ertain Federal unions have declared war on President Trump's agenda," including by "widely filing grievances to block Trump policies." *FEA*, 2025 WL 2355747, at \*4. The Fact Sheet specifically criticized Department of Veterans Affairs unions for "fil[ing] 70 national and local grievances over President Trump's policies since the inauguration." *Id.*

Order's breadth "was in furtherance of unrelated policy goals rather than based on the [FSLMRS's] statutory criteria."[16] *NTEU*, 780 F. Supp. 3d at 254 (cleaned up) (adopted by cross-reference by *FEA*, 2025 WL 2355747, at *9). Those factual findings lend further support to the district court's conclusion that the President acted beyond the narrow, national-security-related bounds of the exclusion provision, and did so to achieve improper goals — such as retaliating against unions for protected activity.[17]

Finally, it is notable that the Executive Order purports to expand the scope of § 7103(b)(1) by excluding from FSLMRS coverage "any other agency or subdivision [within a Cabinet department] that has information resources management duties as the agency or subdivision's primary duty." 90 Fed. Reg. at 14554. That provision of the Executive Order effectively adds

---

[16] The district court relied on a memorandum released by OPM (the "OPM Guidance") that explained how agency heads should implement the Executive Order. *FEA*, 2025 WL 2355747, at *4. That memorandum characterized the Executive Order as a means to achieve the President's broader policy "to eliminate waste, bloat, and insularity within agencies and operate them more efficiently." *NTEU*, 780 F. Supp. 3d at 257 (adopted by cross-reference by *FEA*, 2025 WL 2355747, at *9). The memorandum comments minimally on national security and instead focuses on the Administration's goal of removing "underperforming employees." *Id.*

[17] The government contends that we should focus not on the Executive Order as a whole, but on its inclusion of the DoD specifically. That approach is likely incorrect for at least two reasons. First, the FSLMRS provides that "[t]he President may issue an *order* excluding any agency or subdivision thereof," suggesting that the order itself is the proper unit of review. 5 U.S.C. § 7103(b) (emphasis added). And second, an agency-by-agency analysis would require a court, in the first instance, to determine whether specific agencies meet § 7103(b)(1)'s requirements, even though it appears that the President himself did not conduct such an analysis.

19

"information resources management" to the list of primary functions that can justify exempting an agency or subdivision from the requirements of the FSLMRS. The President's enlargement by fiat of the list of primary functions in § 7103(b)(1)(a) also is likely *ultra vires*. *Cf. Guedes v. ATF*, 920 F.3d 1, 43 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part) ("The Rule's fatal flaw comes from its 'adding to' the statutory language in a way that is — at least to me — plainly *ultra vires*." (citation omitted)).

## B. Balance of Equities and Public Interest

The balance of equities and the public interest, which merge here because the government is a party, *see Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022), favor the Unions. The district court found that the Unions suffered irreparable harm from the Executive Order because it caused the government to "discontinue[] negotiations over successive collective bargaining agreements," to "stop[] engaging in arbitral proceedings on various grievances," and to "disallow[] union representation during employee disciplinary meetings and investigatory interviews," among other things. *FEA*, 2025 WL 2355747, at *16.[18] That harm outweighs the government's

---

[18]    This case is thus distinguishable from *NTEU*, in which a panel of this court stayed a different injunction against implementation of the Executive Order. *See* 2025 WL 1441563, at *3. There, the panel described the plaintiff union's asserted harms as "speculative" because "the Government [had] directed [the relevant] agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes." *Id.* at *1 (emphasis in original); *accord AFGE*, 148 F.4th at 656 ("Whatever harm to collective bargaining rights that Plaintiffs will experience due to a stay is mitigated by the direction to agencies to refrain from terminating collective bargaining agreements until litigation has concluded.").

asserted national-security interests because the restoration of FSLMRS protections to DoDEA's educators and other employees is unlikely to impede the President's ability to keep the nation safe.

In addition, the FSLMRS explicitly recognizes the public interest in protecting the collective-bargaining rights of federal employees. 5 U.S.C. § 7101. That supports allowing DoDEA workers to remain within the FSLMRS's ambit during the pendency of this case. And relatedly, the public interest does not support allowing the Executive Order to undermine statutory protections for DoDEA employees where the Executive Order is likely unlawful. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016) ("There is a substantial public interest in having [the government] abide by the federal laws . . . ." (cleaned up)). The balance of the equities and the public interest therefore support denying the government's motion to stay the preliminary injunction.

## III.

Our dissenting colleague asserts that the government will likely prevail on the merits of its appeal of the preliminary injunction for three reasons: (1) *Ultra vires* review is inappropriate where "the plaintiffs pressed, and the district court accepted, what is essentially an ordinary statutory-interpretation argument," Dissenting Op. 2; (2) the alleged *ultra vires* action is not "plain on the record" because the district court looked to "*non-party*" agencies and subdivisions that do not appear to satisfy the statutory national-security-related requirements, *id.* at 3 (citation omitted) (emphasis in original); and (3) "the district court's decision and reasoning failed to reflect" the deference due to the Executive in the

domain of "foreign policy and national security," *id.* at 4 (citation omitted). I respectfully disagree.

First, this case does not present "an ordinary statutory-interpretation argument." Dissenting Op. 2. The Unions claim that the President stripped over one million federal employees of their statutory collective-bargaining rights without making the required national-security determinations, and that he did so for reasons unrelated to the statutory criteria. *See supra* section II.A.3. That is not a mere question of "statutory interpretation" because no plausible reading of the statute would permit the Executive to exclude a plethora of agencies from FSLMRS coverage for reasons that have nothing to do with national security. The wholesale transformation of labor relations across the entire executive branch, allegedly for reasons unsupported by any statutory authority, is indeed an action "so extreme that one may view it as jurisdictional or nearly so." Dissenting Op. 3 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). And because the statute requires the President to make the exclusion determinations, and the Unions may not bring an APA claim against the President, *see Franklin*, 505 U.S. at 801, there may be "no other means" besides the Unions' *ultra vires* claim "to protect and enforce [a statutory] right," *Leedom*, 358 U.S. at 190.

Second, our dissenting colleague contends that the district court erred by not focusing on whether the DoD and DoDEA satisfy the "primary function" requirement and instead looking to "*non-party*" agencies and subdivisions that the Executive Order excludes from FSLMRS coverage. Dissenting Op. 3 (emphasis in original). She concludes that the district court missed the target when it "determine[d] that the non-party excluded agencies and subdivisions do not satisfy paragraph 7103(b)(1) and that the order is accordingly *ultra vires*." *Id.*

That analysis misunderstands the Unions' claim and the district court's reasoning.

The Unions claim that the entire Executive Order is *ultra vires* because the President failed to make any of the required determinations and instead used the exclusion provision as a pretext to retaliate against unions and to pursue policy goals unrelated to the statutory criteria. *See supra* section II.A.3. Because the Unions challenge the Executive Order as a whole, they had no reason to focus specifically on the DoD or DoDEA. The Unions and the district court pointed out that many "non-party" agencies and subdivisions excluded by the Executive Order do not appear to fit the statutory criteria, but only because that is evidence that the President never made the required determinations to exclude any agencies and subdivisions. *See id.* Thus, the Unions' *ultra vires* claim is "plain on the record" because they allege that there is no indication, in the Executive Order or otherwise, that the President actually determined that each excluded agency and subdivision has a "primary function" related to national security *and* that each excluded agency and subdivision could not be unionized consistent with "national security requirements and considerations," 5 U.S.C. § 7103(b)(1). The President's alleged exclusion of broad swaths of the executive branch from the reach of the FSLMRS without making the two mandatory national-security-related determinations was likely *ultra vires*.

Third, our dissenting colleague suggests that the district court was insufficiently deferential to the Executive because this case involves matters of "foreign policy and national security." Dissenting Op. 4 (citation omitted). Although some deference is undoubtedly appropriate in that sphere, courts remain duty-bound to review claims that the President has abused or exceeded his powers. *See Youngstown Sheet & Tube*

*Co. v. Sawyer*, 343 U.S. 579, 642 (1952) (Jackson, J., concurring) ("[N]o doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled" that he can invoke his foreign-affairs powers to "vastly enlarge his mastery over the internal affairs of the country."); *Cole*, 351 U.S. at 545 ("Nor is [our review] vitiated by the grant of authority to the President . . . to extend the Act to such other agencies as he 'may, from time to time, deem necessary in the best interests of national security.'"); *Zweibon v. Mitchell*, 516 F.2d 594, 604–05 (D.C. Cir. 1975) ("Although the attempt to claim Executive prerogatives or infringe liberty in the name of security and order may be motivated by the highest of ideals, the judiciary must remain vigilantly prepared to fulfill its own responsibility to channel Executive action within constitutional bounds." (cleaned up)). Here, we need not blindly accept the government's dubious contention that a subdivision staffed by grade-school educators plays a prominent role "in support of DoD's overall national security mission." Mot. 24 n.3 (citation omitted). Nor should we fail to probe the government's conclusory assertion that the instant injunction "inflicts irreparable harm on the President by impeding his national-security prerogatives." *Id.* at 25 (citation omitted). It is the government's burden to convince us that restoring union protections to federal employees focused on K–12 education will make the country less safe. Because the government fails to meet that burden, I disagree with our dissenting colleague's unquestioning acceptance of the government's implausible claim of irreparable harm. *See* Dissenting Op. 4–5.

Finally, although I cannot join our dissenting colleague in her analysis of the legal issues before us, I share her concern that an unprecedented number of emergency motions has forced this court to prematurely confront novel and

controversial issues. *See* Dissenting Op. 1. Not every preliminary injunction presents an "emergency," and this case is a prime example. The scope of the instant preliminary injunction is narrow, restoring FSLMRS coverage to only one DoD subdivision, with a mission that focuses on K–12 education, employing around 14,000 employees. Although the legal issues are undoubtedly weighty and potentially far-reaching, it is unclear why the government felt a pressing need to seek emergency relief at this juncture in this case, when it could have either sought expedited consideration of the preliminary-injunction appeal, or litigated the case to its conclusion in the district court before coming to us with a complete record after entry of final judgment.

\*   \*   \*

Because the government fails to carry its burden to justify a stay of the district court's preliminary injunction pending appeal, the court properly denies its request. The government will likely fail on the merits of its legal claims because the Executive Order's exclusion of two-thirds of the federal civil service from statutory protections, without making the required determinations and with allegedly improper motives, likely exceeded the President's statutory power. Moreover, as discussed in the court's order, the government fails to show irreparable harm because the injunction affects only DoDEA, an agency subdivision that focuses on the education of the children of servicemembers and therefore has only an indirect effect on national security. Finally, the equities and the public interest also favor the Unions.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting statement:

I am becoming increasingly alarmed by our court being asked to decide novel, and usually controversial, issues via emergency stay motions. We can produce a more carefully reasoned but still timely result using the expedited appeals process. A merits panel could hear arguments in this case and decide it within a four-week period. *See, e.g.*, *United States v. Trump*, 91 F.4th 1173 (D.C. Cir. 2024). Nevertheless I believe we should grant the stay as explained briefly below.

In the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. § 7101 *et seq.*, the Congress provided collective-bargaining rights for certain federal employees. By its terms, the FSLMRS excludes the employees of some agencies from its coverage. *Id.* § 7103(a)(3). And it empowers the President to exclude others if he finds that national security so requires. *Id.* § 7103(b)(1). Under paragraph 7103(b)(1), the President is authorized to "issue an order excluding any agency or subdivision thereof from coverage under this chapter" if he determines that it has "as a primary function intelligence, counterintelligence, investigative, or national security work" and that "the provisions of this chapter cannot be applied" to it "in a manner consistent with national security requirements and considerations."

On March 27, 2025, the President issued an Executive Order excluding a number of agencies and subdivisions, including the Department of Defense (DoD), from coverage pursuant to paragraph 7103(b)(1). *Exclusions from Federal-Labor Management Relations Programs*, Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (2025). Three labor organizations representing employees of the Department of Defense Education Activity (DoDEA), a

subdivision of the DoD, then sued the President, two additional Executive officials and two agencies. They alleged, among other things, that the Executive Order was issued *ultra vires* and the district court granted the plaintiffs a preliminary injunction on that ground. *Fed. Educ. Ass'n v. Trump (FEA)*, No. 25-1362, 2025 WL 2355747, at *1 (D.D.C. Aug. 14, 2025). Because the government has shown that it is entitled to a stay pending appeal, I would grant it that relief.

To warrant a stay pending appeal, the movant must show that it "is likely to succeed on the merits," it "will be irreparably injured absent a stay," a stay will not "substantially injure" the other interested parties and a stay is in the "public interest." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The government has satisfied each factor; I focus on the first two.

The government is likely to prevail on its appeal of the preliminary injunction. The district court—on a record largely confined to evidence of the DoDEA's functions—determined that much of the President's Executive Order was *ultra vires*. *FEA*, 2025 WL 2355747, at *15 (concluding that the Executive Order's "exclusions pursuant to Section 7103(b)(1)—taken together as a whole—exceeded the President's authority"). In my view, that conclusion is remarkable. A plaintiff bringing an *ultra vires* claim carries a uniquely heavy burden. *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). To prevail, he must come equipped with more than "a typical statutory-authority argument." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025). Here, the plaintiffs pressed, and the district court accepted, what is essentially an ordinary statutory-interpretation argument—that the President's broad

interpretation of paragraph 7103(b)(1) threatened to turn a narrow exception to the FSLMRS into its rule. *See FEA*, 2025 WL 2355747, at *12–13. That argument may not be implausible but it falls well short of showing an error that is "so extreme that one may view it as jurisdictional or nearly so." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988).

There are two additional factors that make the government highly likely to prevail on the merits. First, an *ultra vires* action must be "plain on the record" itself. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified). That requirement presents an unusual wrinkle in this case: Rather than focusing on whether the DoD and DoDEA satisfy paragraph 7103(b)(1)'s "primary function" requirement, the district court looked to the *non-party* departments and subdivisions that are excluded from FSLMRS coverage. *FEA*, 2025 WL 2355747, at *11–13. But because the plaintiffs represent employees of the DoDEA alone, the record contains scant evidence regarding the functions of the other excluded agencies and subdivisions—which are neither plaintiffs nor represented by any union in the litigation. As a consequence, the district court was left to rely largely on its say-so to determine that the non-party excluded agencies and subdivisions do not satisfy paragraph 7103(b)(1) and that the order is accordingly *ultra vires*. *FEA*, 2025 WL 2355747, at *14 ("This extensive list hardly includes only agencies and subdivisions that plainly relate to national security." (citation modified)). In essence, the district court aimed at non-targets and its errant aim cannot support an *ultra vires* claim against the President.

Second, we have repeatedly cautioned that *ultra vires* claims are even harder to win when they involve matters of "foreign policy and national security." *Fed. Express Corp.*, 39 F.4th at 769; *accord Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022). And *ultra vires* claims against the President raise unique concerns in that context. For this reason, we have explained that "[t]he President's national-security findings are not agency actions subject to arbitrary-or-capricious review, and we decline to treat them as such." *Am. Foreign Serv. Ass'n v. Trump (AFSA)*, No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025). Here, the district court's decision and reasoning failed to reflect the "additional layer of deference" owed to the Executive in this domain. *Changji Esquel Textile Co.*, 40 F.4th at 723.

For these reasons, the government is likely to prevail on the merits.

The government has also shown that it will suffer irreparable harm absent a stay. The district court's preliminary injunction has hampered—and will hamper—the President's congressionally authorized "national-security prerogatives." Mot. 25 (quoting *Nat'l Treasury Emps. Union v. Trump (NTEU)*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025)). In view of the political branches' preeminence in this arena, we have been careful not to improperly hamstring their efforts for any extended period. *NTEU*, 2025 WL 1441563, at *2; *AFSA*, 2025 WL 1742853, at *3; *see* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 823 (2025) (characterizing irreparable harm as, in part, "the intersection of significance and incommensurability"). Because the district court's preliminary injunction threatens to do exactly that, the

government has shown that it will face irreparable harm
absent a stay.