**[ORAL ARGUMENT NOT SCHEDULED]**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

FEDERAL EDUCATION
ASSOCIATION, et al.,

      Plaintiffs-Appellees,

        v.

DONALD J. TRUMP, et al.,

      Defendants-Appellants.

No. 25-5303

**UNDERLYING DECISION FROM WHICH APPEAL ARISES**

Attached are the August 14, 2025, order and opinion of the

district court granting plaintiffs a preliminary injunction.

MELISSA N. PATTERSON

 s/ *Joshua M. Koppel*
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
Attorneys
Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 7212
Washington, D.C. 20530
(202) 514-4820

September 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants. | Civil Action No. 25-1362 (PLF) |

## ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that the Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 22] is GRANTED; it is

FURTHER ORDERED that Section 2 of the Executive Order, Exclusions from Federal Labor-Management Relations Programs (Mar. 27, 2025) ("Executive Order"), is unlawful as applied to the Plaintiffs, each of whom exclusively represent Department of Defense Education Activity ("DoDEA") employees, and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that the Office of Personnel Management's Guidance on Executive Order Exclusions from Federal Labor-Management Programs (Mar. 27, 2025) ("OPM Guidance"), on the Executive Order is unlawful as applied to the Plaintiffs and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing Section 2 of Executive Order with respect to the Plaintiffs and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing the OPM guidance with respect to the Plaintiffs and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that, pursuant to Fed. R. Civ. P. 65(c), Plaintiffs shall post with the Court $100 as security for the issuance of this Preliminary Injunction; and it is

FURTHER ORDERED that the parties shall meet and confer and file a joint report on or before September 5, 2025, proposing a schedule for how this case should proceed.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8|14|25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
)
FEDERAL EDUCATION                          )
ASSOCIATION, et al.,                       )
)
        Plaintiffs,                     )
)
        v.                              )       Civil Action No. 25-1362 (PLF)
)
DONALD J. TRUMP, et al.,                   )
)
        Defendants.                     )
_____)

## OPINION

This matter is before the Court on a motion for a preliminary injunction brought by Federal Education Association ("FEA"), Federal Education Association Stateside Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA") (collectively, "Union Plaintiffs"). See Plaintiffs' Motion for a Preliminary Injunction ("Mot.") [Dkt. No. 22]. On March 27, 2025, the President issued an executive order that removed various agencies and agency subdivisions from coverage of the Federal Service Labor-Management Relations Statute and Foreign Service Labor-Management Relations Statute. Both statutes – which protect federal employees' rights to "organize, bargain collectively, and participate through labor organizations of their own choosing," 5 U.S.C. § 7101(a)(1); 22 U.S.C. § 4101(1) – provide nearly identically worded provisions that permit the President to exclude components of the federal government from coverage of the statutes. To invoke these exclusionary provisions, the President must determine that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the statutes' provisions

"cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1); see 22 U.S.C. § 4103(b) (same except refers to "any subdivision").  The effect of the Executive Order was substantial:  it removed collective bargaining rights from approximately two-thirds of the federal workforce.  The Court has issued preliminary injunctions in two related cases.  See Nat'l Treasury Emps. Union v. Trump ("NTEU"), Civil Action No. 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025); Am. Foreign Serv. Ass'n v. Trump ("AFSA"), Civil Action No. 25-1030 (PLF), 2025 WL 1387331 (D.D.C. May 14, 2025).

The Court held oral argument on the Union Plaintiffs' motion on August 4, 2025. Upon careful consideration of the parties' written submissions, their oral arguments, and the relevant authorities, the Court grants plaintiffs' motion for a preliminary injunction.[1]

## I.    BACKGROUND

### A.   *The Union Plaintiffs*

The Department of Defense Education Activity ("DoDEA"), a subdivision of the Department of Defense ("DoD"), "operates schools for the children of uniformed and civilian

---

[1]    The papers reviewed by the Court in connection with this matter include:  First Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") [Dkt. No. 21]; Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pls.' Mem.") [Dkt. No. 22-1]; Declaration of Richard Tarr ("Tarr Decl.") [Dkt. No. 22-2]; Declaration of Alan Danahy ("Danahy Decl.") [Dkt. No. 22-3]; Declaration of Alexis Gorbea ("Gorbea Decl.") [Dkt. No. 22-4]; Declaration of Ben Hunter ("Hunter Decl.") [Dkt. No. 22-5]; Declaration of William Freeman ("Freeman Decl.") [Dkt. No. 22-6]; Declaration of Robin Smith ("Smith Decl.") [Dkt. No. 22-7]; Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs.' Opp.") [Dkt. No. 27]; Declaration of Michael A. Cogar ("Cogar Decl.") [Dkt. No. 27-1]; Reply Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction (Pls.' Reply") [Dkt. No. 29]; Joint Status Report ("Post-Argument JSR") [Dkt. No. 32]; and Federal Education Association v. Trump, Civil Action No. 25-1362, Transcript of Record (Aug. 4, 2025) [Dkt. No. 33].

DoD personnel stationed in military bases in the United States and abroad." Tarr Decl. ¶ 6.

Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside

Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA") are three

federal labor organizations that represent educators in pre-kindergarten through 12th grade

schools that are operated by DoDEA. See Am. Compl. ¶ 1. FEA is a labor organization that was

first recognized as the collective bargaining representative of DoDEA educators in 1970 – before

the FSLMRS was enacted – pursuant to an executive order issued by President Richard Nixon.

Tarr Decl. ¶ 8; see Exec. Order No. 11491, 34 Fed. Reg. 17605 (Oct. 29, 1969). Today, FEA has

"approximately 5,400 members" – including "classroom teachers, instructional assistants,

information specialists (also known as librarians), counselors, nurses, and classified

employees" – that work at various DoDEA schools "located in military bases in the United

States and in the U.S. Territory of Guam, countries throughout Europe and Asia, and in

Guantanamo Bay, Cuba." Tarr Decl. ¶ 6. FEA-SR, established in 1996, represents "two units of

employees working in stateside DODEA schools" – one unit that consists of "professionally

certified, non-supervisory educators and other professionals," and another unit that consists of

"classified education support professionals." Danahy Decl. ¶ 5. ACEA, established in 1974,

represents "professional educators who work at four DODEA schools in Puerto Rico." Gorbea

Decl. ¶¶ 3, 7.[2]

---

[2] The work of DoDEA educators and support staff has made DoDEA a "pre-eminent public school district," providing a valuable service to DoD personnel and their families. See Pls.' Mem. at 7-9; see also DoDEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025), https://perma.cc/YC24-G3MV (noting that DoDEA students' scored "higher than corresponding national average scores"); Danahy Decl. ¶¶ 13-16.

### B.   Statutory Background

The Federal Service Labor-Management Relations Statute, set forth in Title VII of the Civil Service Reform Act, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978) (codified at 5 U.S.C. §§ 7101-35) ("FSLMRS"), provides certain protections of the "right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . ."  5 U.S.C. § 7101(a)(1).  In passing the statute, Congress found, based on "experience in both private and public employment," that the protections were necessary to "safeguard[] the public interest," "contribute[] to the effective conduct of public business," and "facilitate[] and encourage[] the amicable settlements of disputes between employees and their employers involving conditions of employment."  Id.  In sum, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest."  Id.

Among other things, the FSLMRS requires federal agencies to collectively bargain "with respect to the conditions of employment affecting such employees."  5 U.S.C. § 7103(a)(12).  The statute provides a role for "labor organizations" in this collective bargaining process, stating:

> A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit.  An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.

5 U.S.C. § 7114(a)(1).

While Congress extended these protections to "many" federal employees, it did not "include the entire federal workforce within this regime."  Am. Fed'n of Gov't Emps., AFL-

CIO v. Reagan, 870 F.2d 723, 724 (D.C. Cir. 1989). "The Act itself exempted several federal agencies from coverage," id., including the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency. See 5 U.S.C. § 7103(a)(3). In addition to these explicit exclusions, "Congress also addressed the matter of national security" in Section 7103(b). Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps. (Petitioner/Labor Org.), 59 F.L.R.A. 137, 143 (Sept. 12, 2003). Specifically, Congress granted the President the authority to either exclude or suspend certain "agenc[ies] or subdivision[s] thereof" from the statute's coverage. See 5 U.S.C. § 7103(b). Section 7103(b) provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –
>
> > (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
> >
> > (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.
>
> (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

5 U.S.C. § 7103(b). The exclusion provided in Section 7103(b)(1) has been invoked numerous times since the passage of the FSLMRS.[3] As the Union Plaintiffs points out, however,

---

[3] See Exec. Order No. 12171, 44 Fed. Reg. 66565 (1979); Exec. Order No. 12338, 47 Fed. Reg. 1369 (1982); Exec. Order No. 12410, 48 Fed. Reg. 13143 (1983); Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986); Exec. Order No. 12632, 53 Fed. Reg. 9852 (1988); Exec. Order No. 12666, 54 Fed. Reg. 1921 (1989); Exec. Order No. 12671, 54 Fed. Reg. 11157 (1989); Exec. Order No. 12681, 54 Fed. Reg. 28997 (1989); Exec. Order No. 12693, 54 Fed. Reg. 40629 (1989); Exec. Order No. 13039, 62 Fed. Reg. 12529 (1997); Exec. Order No. 13252, 67 Fed.

Section 7103(b)(1) has never been invoked to exclude an entire cabinet-level department from

the FSLMRS.  See Pls.' Mem. at 11.

### C.  Factual Background

### 1.  The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions

from Federal Labor-Management Relations Programs."  Exec. Order No. 14251, 90 Fed.

Reg. 14553 (Mar. 27, 2025) ("Executive Order").  Section 2 of the Executive Order amends a

previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded

various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b).  See Exec.

Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979).[4]  The March 27, 2025 Executive

Order states that "[t]he agencies and agency subdivisions set forth in section 2 of this order are

hereby determined to have as a primary function intelligence, counterintelligence, investigative,

or national security work," and that it has been "determined that Chapter 71 of title 5, United

States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent

---

Reg. 1601 (2002); Exec. Order No. 13381, § 5(b), 70 Fed. Reg. 37955 (2005); Exec. Order
No. 13467, § 3(d), 73 Fed. Reg. 38107 (2008); Exec. Order No. 13480, §§ 2-6, 73 Fed.
Reg. 73991, 73992 (2008); Exec. Order No. 13741, § 3, 81 Fed. Reg. 68291 (2016); Exec. Order
No. 13760, §2, 82 Fed. Reg. 5325 (2017); Exec. Order No. 13869, §3(b), 84 Fed. Reg. 18130
(2019); see also 5 U.S.C. § 7103, U.S. Government Publishing Office, available at
https://www.govinfo.gov/content/pkg/USCODE-2019-title5/html/USCODE-2019-title5-partIII-
subpartF-chap71-subchapI-sec7103.htm [https://perma.cc/4JFC-SQXY].

[4]     While the executive order issued by President Carter "exempted large swaths of
DoD from FSLMRS coverage," see Defs.' Opp. at 5, 17, the government in a related action
acknowledged that President Carter's executive order "did not come close to the scope" of the
Executive Order at issue in this case.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, Civil
Action No. 25-3070 (JJD), 2025 WL 1755442, at *5 (N.D. Cal. June 24, 2025) ("It bears
mention that [President Carter's executive order] excluded agency subdivisions plainly related to
national security, most of which were in the Departments of the Army, Navy, and Air Force,
with a number of subdivisions specified at a high level of granularity . . . .").

6

with national security requirements and considerations."  Executive Order § 1(a).  As relevant to the Union Plaintiffs, the Executive Order excludes from the FSLMRS the entirety of the DoD, which includes DoDEA.  See Pls.' Mem. at 11-12.[5]

A "Fact Sheet" was issued by the White House the same day that the Executive Order was issued.  See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ [https://perma.cc/Y7HR-4W3H] ("Fact Sheet").  The Fact Sheet is divided into three parts.  First, it lists eight "national security missions" – "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each of these missions.  See Fact Sheet.  Second, in a section titled "Ensuring that Agencies Operate Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national security responsibilities."  See id.  Finally, in a section titled "Safeguarding American Interests," the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people.  The President needs a responsive and accountable civil service to protect our national security.

---

[5]    Section 4 of the Executive Order delegates authority to the Secretaries of Defense and Veterans Affairs "to issue orders suspending the application of" the Executive Order, "thereby bringing such subdivisions under the coverage" of the FSLMRS.  See Executive Order § 4; see also Executive Order § 2(b) (excluding "[t]he Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'").

- Certain Federal unions have declared war on President Trump's agenda.

    o The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.

    o For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration – an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a memorandum titled "Guidance on Executive Order Exclusives from Federal Labor-Management Programs." See Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf [https://perma.cc/QH4A-MQ9F] ("OPM Guidance"). The OPM Guidance states that pursuant to the Executive Order, "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the Statute and "are no longer required to collectively bargain with federal unions." OPM Guidance at 3. The document also states that "Federal unions" "lose their status as the 'exclusively recognized' labor organizations for employees of the agencies and agency subdivisions covered by Exclusions" in the Executive Order. Id. (alterations omitted)

(referencing 5 U.S.C. § 7111(a)); see 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in the election.").

### 2.   The Instant Litigation

On May 5, 2025, the Union Plaintiffs filed this lawsuit.  See Complaint for Declaratory and Injunctive Relief [Dkt. No. 1].  An amended complaint was filed on June 21, 2025.  See Am. Compl.  The Union Plaintiffs bring seven counts:  (1) the Executive Order is ultra vires because it exceeds the President's authority under 5 U.S.C. § 7103(b)(1); (2) the Executive Order reflects retaliation against Union Plaintiffs in violation of its First Amendment rights; (3) the Executive Order violates the Fifth Amendment's Takings Clause and prohibition against "the government's retroactive abrogation of its contracts"; (4) the Executive Order violates the Equal Protection Clause of the Fifth Amendment; (5) the Executive Order violates the Union Plaintiffs' procedural due process rights; (6) actions taken by the DoD and defendant Pete Hegseth related to the Executive Order are arbitrary and capricious in violation of the Administrative Procedure Act ("APA"); and (7) actions taken by the DoD and defendant Hegseth related to the Executive Order are contrary to law in violation of the APA.  See Am. Compl. ¶¶ 100-35.[6]  The Union Plaintiffs seek, inter alia, an injunction enjoining all the defendants from "implementing" the Executive Order and OPM Guidance related to the

---

[6]     The Union Plaintiffs do not seek any preliminary relief in connection with their APA claims.

Executive Order with respect to the Union Plaintiff and their members.  See Am. Compl. at 49-50.

## II.  JURISDICTION

At the onset, the government essentially recycles the same jurisdictional argument that it has made in NTEU and AFSA.  More specifically, the government argues that this Court lacks jurisdiction because Congress created a "special statutory review scheme" in the FSLMRS – the Federal Labor Relations Authority ("FLRA") – and that such a scheme precludes this Court's review under Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994).  See Defs.' Opp. at 9-14.  As the Court explained at length in NTEU and again in AFSA, this jurisdictional argument is unavailing.  See NTEU, 2025 WL 1218044, at *4-6; AFSA, 2025 WL 1387331, at *4-7; see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump ("AFGE"), Civil Action No. 25-3070 (JJD), 2025 WL 1755442, at *8-9 (N.D. Cal. June 24, 2025) (rejecting the government's jurisdictional arguments for the same reasons).

As the Court explained in NTEU,

> The Court concludes that its jurisdiction is not precluded in this case. The government's argument is essentially that NTEU must pursue its claims using the administrative review scheme created by Congress in the FSLMRS – the Federal Labor Relations Authority ("FLRA") – rather than by bringing claims in a federal district court. See Opp. at 12-13.  The administrative review scheme, however, is not available to challenge the Executive Order's exclusions of the agencies and subdivisions subject to the Executive Order for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here.  See Pl.'s Reply at 17 (arguing that the "Executive Order has taken away the administrative channels that Defendants argue must be used).  The relevant precedents from the FLRA make this point clear.  See United States Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics Ctr. Robins Air Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps. Loc. 987 (Charging Party/union), 66 F.L.R.A. 589, 598 (Apr. 20,

2012) ("[T]he Authority has determined that an exemption from coverage constitutes a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute"); Department of the Navy, Naval Telecommunications Ctr., Ward Circle and NAVTELCOM Unit Local No. 1, American Federation of Government Employees, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process a representation petition.").

NTEU, 2025 WL 1218044, at *5. It is unnecessary to revisit this analysis, especially where, as here, the government fails to address much of the Court's earlier analysis in NTEU and AFSA. With that said, it is worth emphasizing several points.

First, in direct contradiction to the government's contention in the instant case, on April 30, 2025, DoDEA – in response to an order to show cause issued by the FLRA in an unfair labor practice action – stated that the FLRA lacked jurisdiction over the matter because DoDEA was no longer covered by the FSLMRS pursuant to the Executive Order. See Tarr Decl. ¶ 42. More specifically, DoDEA stated:

> Per the express terms of Executive Order 14251, dated March 27, 2025, issued pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), the Department of Defense, (which includes the above-named Field Activity of the Department of Defense, to wit: Department of Defense Education Activity), is hereby excluded from coverage of the Federal Service Labor-Management Relations Statute. As such, the Authority lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union. Given the Charging Party's submission lacks any reference to the Secretary of Defense suspending the application of the above-cited Executive Order to the subdivision(s) represented by the Charging Party and/or lacks any reference to an applicable court injunction, this matter must be dismissed based on lack of jurisdiction.

Ex. 14 to Tarr Decl. As a result, it appears that DoDEA agrees that actions brought by the Union Plaintiffs now are "expressly outside the FLRA's purview" because DoDEA is not covered by

11

the FSLMRS.  See Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson, 475 F.3d 341, 348 (D.C. Cir. 2007).

Second, the government maintains that the Union Plaintiffs' position in this case – i.e., that the Executive Order is invalid – is somehow relevant to the issue of this Court's jurisdiction.  See Defs.' Opp. at 9.  More specifically, the government argues that under the Union Plaintiffs' theory that the Executive Order is invalid, DoDEA would still be covered by the FSLMRS, and therefore, their claims should be pursued through the FSLMRS's "special statutory review scheme" – the FLRA.  See id.  The government's argument fundamentally misunderstands the inquiry required under Thunder Basin.  The Thunder Basin factors are used to determine whether Congress intended to create a statutory review scheme.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019) ("To determine whether Congress has [established an alternative statutory scheme for administrative and judicial review], we use the two-step framework set forth in Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994)); Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (observing that Congress may create "an alternative scheme of review" "explicitly" or "implicitly").  The Union Plaintiffs' theory of their case therefore does not provide any relevant information that the Court can use to discern Congress's intent to create a special statutory review scheme.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025 WL 1755442, at *9 ("The question of the Court's jurisdiction is not answered by the plaintiffs' or defendants' beliefs about the merits of the case.  It is answered by the plain language of the FSLMRS."); see also AFSA, 2025 WL 1387331, at *6 ("[A]ssum[ing] that [plaintiff] will prevail on the merits of [its] claim does not change the fact that there is no dispute between the parties that the agency subdivisions at issue in this case

12

currently are excluded from the Statute as a result of the Executive Order.") (internal quotation marks omitted).

In sum, because the Executive Order has removed DoDEA from coverage under the FSLMRS, there is no "special statutory review scheme" that is actually available to the Union Plaintiffs for reviewing their claims. Accordingly, the Court has jurisdiction over the Union Plaintiffs' claims. See NTEU, 2025 WL 1218044, at *6; AFSA, 2025 WL 1387331, at *6; Am. Fed'n of Gov. Emps. v. Trump, 2025 WL 1755442 at *8-9.

## III. PRELIMINARY INJUNCTION

### A. Legal Standard

A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief" (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))). Of these, the most important factor is whether a movant has established a likelihood of success on the merits. See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024)

Before the Supreme Court's decision in Winter, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another. Davis v.

13

Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F. Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction."  Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025).  Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

 For each of its claims, the Union Plaintiffs bear the burden of persuasion. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The Union Plaintiffs also "bear[] the burden of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."  Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

*B. Likelihood of Success on the Merits*

For similar reasons as those discussed at length in NTEU and AFSA, the Court determines that the Union Plaintiffs have shown a likelihood of success on the merits of their ultra vires claims.

1.  The Union Plaintiffs Are Entitled to Ultra Vires Review of the Executive Order

The government argues that ultra vires review of the Executive Order is unavailable. See Defs.' Opp. at 14-18. More specifically, the government contends that ultra vires review is "'confined to extreme' errors" in the application of "'specific prohibitions in a statute,'" a situation that is not present here. Id. at 15 (emphasis omitted) (quoting Fed. Express Corp. v. United States Dep't of Com., 39 F.4th 756, 764 (D.C. Cir. 2022) and Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681 (2025)). The Court certainly agrees with Justice Kavanaugh that an ultra vires claim is "essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." Nuclear Regul. Comm'n v. Texas, 605 U.S. at 681-82 (citation and quotation marks omitted); see Glob. Health Council v. Trump, No. 25-5097, 2025 WL 2326021, at *12 (D.C. Cir. Aug. 13, 2025). Indeed, as the Court explained in NTEU, an ultra vires claim "is a doctrine of last resort, intended to be of extremely limited scope." NTEU, 2025 WL 1218044, at *12 (D.D.C. Apr. 28, 2025) (quoting Schroer v. Billington, 525 F. Supp. 2d 58, 65 (D.D.C. 2007)). Despite the "extremely limited scope" of ultra vires review, the government acknowledges – as it must – that "[w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996); see id. at 1332 ("[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President claims

15

that he is acting pursuant [to statutory authority].”); Glob. Health Council v. Trump, 2025
WL 2326021, at *8 n.14 (“[U]ltra vires review remains available to test presidential action
alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege
action contrary to a clear and mandatory statutory prohibition.”); Refugee & Immigrant Ctr. for
Educ. & Legal Servs. v. Noem, Civil Action No. 25-0306 (RDM), 2025 WL 1825431, at *30
(D.D.C. July 2, 2025).

   The core of the government’s argument is that Section 7103(b)(1) does not
contain a “specific prohibition” but rather “delegates broad authority to the President to exclude
parts of the [civil service from 5 U.S.C. Chapter 71] . . . in the interest of national security.”  See
Defs.’ Opp. at 16 (alterations in original) (quoting Am. Foreign Serv. Ass’n v. Trump,
No. 25-5184, 2025 WL 1742853, at *1 (D.C. Cir. June 20, 2025)).  In the absence of such a
“specific prohibition,” according to the government, there can be no judicial review to determine
if the President acted “in excess of [his] delegated powers and contrary to [the] specific
prohibition in the statute.”  See Nuclear Regul. Comm’n v. Texas, 605 U.S. at 681; Defs.’ Opp.
at 15-18, 23.

   The Court does not agree with the government’s characterization of Section
7103(b)(1) as a “delegat[ion] of broad authority” to the President.  The government cites to
several cases where courts have found that a particular statute delegates such authority,
concluding that judicial review is either foreclosed or, at a minimum, significantly limited.  See
Defs.’ Opp. at 23.  Section 7103(b)(1), however, is far narrower than the broad grants of
statutory authority at issue in those cases.  For example, in Webster v. Doe, the Supreme Court
found that Section 102(c) of the National Security Act of 1947 was sufficiently broad as to
permit the termination of a CIA employee without judicial review of that decision.  See Webster

v. Doe, 486 U.S. 592, 594, 600 (1988).  Section 102(c), however, was indeed a broad grant of

authority, providing that:

> [T]he Director of Central Intelligence may, in his discretion,
> terminate the employment of any officer or employee of the Agency
> whenever he shall deem such termination necessary or advisable in
> the interests of the United States . . . .

Webster v. Doe, 486 U.S. at 594 (quoting 50 U.S.C. § 403(c)).  The Supreme Court found that

the statute "exudes deference" to the Director of the CIA and that it "appear[ed] to [ ] foreclose

the application of any meaningful judicial standard of review."  See id. at 600.

In Trump v. Hawaii, the Supreme Court analyzed 8 U.S.C. § 1182(f), which

provides:

> Whenever the President finds that the entry of any aliens or of any
> class of aliens into the United States would be detrimental to the
> interests of the United States, he may by proclamation, and for such
> period as he shall deem necessary, suspend the entry of all aliens or
> any class of aliens as immigrants or nonimmigrants, or impose on
> the entry of aliens any restrictions he may deem to be appropriate.

Trump v. Hawaii, 585 U.S. 667, 684 (2018) (quoting 8 U.S.C. § 1182(f)).  The Supreme Court

determined that Section 1182(f) also "exudes deference to the President in every clause."  See

Trump v. Hawaii, 585 U.S. at 684.  In Bouarfa v. Mayorkas, the Supreme Court determined that

a statutory provision providing that the Secretary of Homeland Security "may, at any time, for

what he deems to be good and sufficient cause, revoke the approval of any [visa] petition" was a

"broad grant of authority" that similarly "fairly exudes deference."  See Bouarfa v. Mayorkas,

604 U.S. 6, 13-14 (2024) (citations and quotation marks omitted).  In Dalton v. Specter, the

Supreme Court determined that judicial review was inappropriate where the statutory provision

at issue did not "prevent[] the President" from taking the particular action "for whatever reason

he s[aw] fit."  See Dalton v. Specter, 511 U.S. 462, 476 (1994) ("The 1990 Act does not at all

limit the President's discretion . . . ."); see also Chicago & S. Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 106 (1948) (addressing a statutory provision that granted the President "unconditional[]" authority").

Section 7103(b)(1) plainly does not confer the same "broad" grant of authority as was at issue in any of these cases. Indeed, Section 7103(b)(1) contains not one, but two fairly exacting limitations on the President's authority to invoke the statutory provision. Specifically, the President must find that (1) the agency or subdivision at issue has as "a primary function intelligence, counterintelligence, investigative, or national security work," 5 U.S.C. § 7103(b)(1)(A), and (2) that the provisions of the FSLMRS "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Such limitations on the President's power to exclude agencies and subdivisions from the FSLMRS create a "clear and specific statutory mandate" that is "susceptible to ultra vires review." See National Association of Postal Supervisors v. USPS, 26 F.4th 960, 971 (D.C. Cir. 2022) ("So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for ultra vires acts that clearly violate its terms."). The Court therefore rejects the government's argument that ultra vires review is precluded because Section 7103(b)(1) is a "broad" grant of authority that forecloses such review. See id.; Chamber of Com. of U.S. v. Reich, 74 F.3d at 1328; Dart v. U.S., 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority. Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior . . . .").

2.   Presumption of Regularity

As the Court explained in <u>NTEU</u> and then again in <u>AFSA</u>, to determine whether the Union Plaintiffs are likely to succeed on their <u>ultra</u> <u>vires</u> claim, the Court must consider whether the Union Plaintiffs have proffered sufficient evidence to rebut the presumption of regularity.  See <u>NTEU</u>, 2025 WL 1218044, at *9-12; <u>AFSA</u>, 2025 WL 1387331, at *9-10; <u>see also</u> <u>Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d 723, 727 (D.C. Cir. 1989) ("We deem the familiar presumption of regularity decisive here.").  The "presumption of regularity" "has been recognized since the early days of the Republic," <u>Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d at 727, and has been applied in a variety of contexts where a governmental official's action has been challenged.  See Aram A. Gavoor & Steven A. Platt, <u>In Search of the Presumption of Regularity</u>, 74 FLA. L. REV. 729, 749 (2022) (outlining different categories of examples where the presumption of regularity has been applied).  The "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  <u>United States v. Chemical Foundation, Inc.</u>, 272 U.S. 1, 14-15 (1926); <u>see</u> <u>Latif v. Obama</u>, 677 F.3d 1175, 1178-181 (D.C. Cir. 2011) (same); <u>Paracha v. Trump</u>, Civil Action No. 04-2022 (PLF), 2019 WL 5296839, at *2 (D.D.C. Oct. 18, 2019).  The presumption of regularity, however, is just that, a presumption.  The presumption can be rebutted with "clear evidence" that the official did not discharge his or her official duties properly, <u>see</u> <u>Owlfeather-Gorbey v. Avery</u>, 119 F.4th 78, 86 (D.C. Cir. 2024), a standard which is "higher than

preponderance of the evidence but lower than beyond a reasonable doubt." <u>Paracha v. Trump</u>, 2019 WL 5296839, at *2 (citing <u>Addington v. Texas</u>, 441 U.S. 418, 423-35 (1979)).

      The Union Plaintiffs have provided the same evidence – including the White House Fact Sheet and OPM Guidance – on which the Court relied in <u>NTEU</u> and <u>AFSA</u> to conclude that the presumption of regularity had been rebutted. <u>See</u> <u>NTEU</u>, 2025 WL 1218044, at *9-12; <u>AFSA</u>, 2025 WL 1387331, at *9-10. Accordingly, for the same reasons as explained in <u>NTEU</u> and <u>AFSA</u>, the Court concludes that the Union Plaintiffs have rebutted the presumption of regularity. More specifically, the Court reaches this conclusion for three reasons: (1) the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS; (2) the White House Fact Sheet reflects retaliatory motive; and (3) the Administration's guidance related to the Executive Order – specifically, the OPM Guidance – suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria. <u>See</u> <u>NTEU</u>, 2025 WL 1218044, at *9-12.

      The Court notes that the "presumption of regularity" has become a frequent subject of litigation since January 20, 2025, the advent of the second Trump Administration. <u>See</u>, <u>e.g.</u>, <u>President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.</u>, Civil Action No. 25-11472 (ADB), 2025 WL 1737493, at *17 (D. Mass. June 23, 2025) ("As a last gasp, Defendants argue that the Proclamation should get the 'presumption of regularity' of government activity."); <u>League of United Latin Am. Citizens v. Exec. Off. of the President</u>, Civil Action No. 25-0946 (CKK), 2025 WL 1187730, at *20-21 (D.D.C. Apr. 24, 2025); <u>Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.</u>, Civil Action No. 25-1237 (DLC), 2025 WL 1621714, at *26 & n35 (S.D.N.Y. June 9, 2025); <u>Univ. of California Student Ass'n v. Carter</u>, 766 F. Supp. 3d 114, 122 (D.D.C. 2025); <u>NTEU</u>, 2025 WL 1218044, at *9-12; <u>AFSA</u>,

2025 WL 1387331, at *9-10; Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025

WL 1755442, at *12; Project on Gov't Oversight, Inc. v. Trump, Civil No. 25-0527 (JEB), 2025

WL 1707690, at *6 (D.D.C. June 17, 2025); New York v. Trump, 133 F.4th 51, 73 (1st

Cir. 2025).  The presumption of regularity finds its roots in common law and "has been

recognized since the early days of the Republic."  See Am. Fed'n of Gov't Emps., AFL-CIO v.

Reagan, 870 F.2d at 727; see also League of United Latin Am. Citizens v. Exec. Off. of the

President, 2025 WL 1187730, at *20 (citing Chi., Burlington, & Quincy Ry. Co. v. Babcock, 204

U.S. 585 (1907) (Holmes, J.)).  Justice Story explained the basis for the presumption, stating:

> It is the opinion of the Court, that this objection cannot be
> maintained.  When the President exercises an authority confided to
> him by law, the presumption is[] that it is exercised in pursuance of
> law.  Every public officer is presumed to act in obedience to his duty,
> [until] the contrary is shown; and, a fortiori, this presumption ought
> to be favourably applied to the chief magistrate of the Union.  It is
> not necessary to aver, that the act which he may rightfully do, was
> so done.

Martin v. Mott, 25 U.S. 19, 32-33 (1827) (Story, J.).

Generations of presidential administrations and public officials have validated this

underlying premise of the presumption of regularity:  their actions writ large have raised little

question that they act "in obedience to [their] duty."  Over the last six months, however, courts

have seen instance after instance of departures from this tradition.  See, e.g., J.O.P. v. United

States Dep't. of Homeland Sec., Civil Action 25-1519, 2025 WL 1431263, at *10 (4th Cir. May

19, 2025) (Gregory, J., concurring) ("As is becoming far too common, we are confronted again

with the efforts of the Executive Branch to set aside the rule of law in pursuit of its goals.  It is

the duty of courts to stand as a bulwark against the political tides that seek to override

constitutional protections and fundamental principles of law, even in the name of noble ends like

public safety."); President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec., 2025

WL 1737493, at *17 (D. Mass. June 23, 2025) ("[T]he Court will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face."); In re Search of One Device and Two Individuals under Rule 41, Search Warrant No. 25-0082 (ZMF), 2025 WL 1587917, at *14 n.10 (D.D.C. May 29, 2025) ("Blind deference to the government?  That is no longer a thing.  Trust that had been earned over generations has been lost in weeks. Numerous career prosecutors have had to resign instead of taking actions that they believe violated their oath of office, or worse, were fired for upholding that oath."); Washington v. Trump, Civil Action No. 25-0127 (JCC), Verbatim Report of Proceedings (W.D. Wash. Jan. 24, 2025) [Dkt. No. 53] at 13:13-15 ("I've been on the bench for over four decades.  I can't remember another case where the question presented was as clear as this one is.  This is a blatantly unconstitutional order."); New Hampshire Indonesian Cmty. Support v. Trump, 765 F. Supp. 3d 102, 109 (D.N.H. 2025) ("[T]he Executive Order contradicts the text of the Fourteenth Amendment and the century-old untouched precedent that interprets it."); Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, 774 F. Supp. 3d 86, 89 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue here is clear from its face . . . ."); Pacito v. Trump, Civil Action No. 25-0255 (JNW), 2025 WL 1295660, at*2 (W.D. Wa. May 5, 2025) ("The Government's interpretation is, to put it mildly, 'interpretive jiggery-pokery' of the highest order.  It requires not just reading between the lines, but hallucinating new text that simply is not there.") (citation omitted); Associated Press v. Budowich, Civil Action No. 25-0532 (TNM), 2025 WL 1039572, at *10 (D.D.C. April 8, 2025) ("Indeed, the Government has been brazen about this."); Perkins Coie LLP v. U.S. Dep't. of Justice, Civil Action No. 25-716 (BAH), 2025 WL 1276857, at *1 (D.D.C. May 2, 2025) ("In a cringe-worthy twist on the theatrical phrase 'Let's kill all the lawyers,' EO 14230 takes the approach of 'Let's

kill the lawyers <u>I don't like</u>,' sending the clear message:  lawyers must stick to the party line, or else.") (emphasis in original); <u>Abrego Garcia v. Noem</u>, No. 25-1345, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025) ("[T]his is a path of perfect lawlessness, one that courts cannot condone.") (Wilkinson, J., concurring); <u>United States v. Adams</u>, 777 F. Supp. 3d 185, 192 (S.D.N.Y. 2025) (The implication "that public officials may receive special dispensation if they are compliant with the incumbent administration's policy priorities . . . . is fundamentally incompatible with the basic promise of equal justice under law."); <u>LeBlanc v. United States Priv. & C.L. Oversight Bd.</u>, Civil Action No. 25-542 (RBW), 2025 WL 1454010, at *35 (D.D.C. May 21, 2025) ("To hold otherwise would be to bless the President's obvious attempt to exercise power beyond that granted to him by the Constitution and shield the Executive Branch's counterterrorism actions from independent oversight, public scrutiny, and bipartisan congressional insight regarding those actions."); <u>D.B.U. v. Trump</u>, Civil Action No. 25-1163 (CNS), 2025 WL 1304288, at *4 (D. Colo. May 6, 2025) ("This sentence [in the government's brief] staggers.  It is wrong as a matter of law and attempts to read an entire provision out of the Constitution."); <u>Ziliang J. v. Noem</u>, Civil Action No. 25-1391 (PJS) (DLM), 2025 WL 1358665, at *2 (D. Minn. Apr. 17, 2025) ("[T]he Court cannot imagine how the public interest might be served by permitting federal officials to flaunt the very laws that they have sworn to enforce."); <u>Widakuswara v. Lake</u>, Civil Action No. 25-1015 (RCL), 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025) ("[The defendants] took immediate and drastic action to slash [United States Agency for Global Media], without considering its statutorily or constitutionally required functions as required by the plain language of the [executive order], and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world.  It is hard to fathom a more straightforward display of arbitrary and capricious actions than the Defendants'

actions here."); Jenner & Block LLP v. U.S. Dep't of Just., Civil Action No. 25-0916 (JDB),

2025 WL 1482021, at *10 (D.D.C. May 23, 2025) ("In short, the order raises constitutional

eyebrows many times over."); Abrego Garcia v. Noem, 348 F.R.D. 594, 601 (D. Md. 2025)

("Defendants have failed to respond in good faith, and their refusal to do so can only be viewed

as willful and intentional noncompliance."); Maine v. U.S. Dep't of Agric., 778 F. Supp. 3d 200,

231-32 (D. Me. 2025) ("[The law] imposes numerous steps an agency must take before refusing

or terminating funding for noncompliance . . . .  [T]he factual record does not indicate the

Federal Defendants took any of these actions before freezing Maine's federal funds . . . .");

League of United Latin Am. Citizens v. Exec. Off. of the President, Civil Action No. 25-0946

(CKK), 2025 WL 1187730, at *27 (D.D.C. Apr. 24, 2025) ("This argument fails to persuade

because it misconceives (and in one instance misrepresents) the Executive Order, Plaintiffs'

claims, the law, and the facts."); Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F.

Supp. 3d 36, 50 (D.D.C. 2025) ("[I]t appears that OMB sought to overcome a judicially imposed

obstacle without actually ceasing the challenged conduct."); Grundmann v. Trump, 770 F. Supp.

3d 166, 171 (D.D.C. 2025) ("The Government's arguments paint with a broad brush and threaten

to upend fundamental protections in our Constitution.  But ours is not an autocracy; it is a system

of checks and balances."); American Fed'n of Gov't. Emp. v. Trump, 139 F.4th 1020, 1033 (9th

Cir. 2025) ("But such a characterization is at best disingenuous, and at worst flatly contradictory

to the record."); Rona v. Trump, Civil Action No. 25-3114 (JMF), 2025 WL 2162543, at *7

(S.D.N.Y. July 30, 2025) ("And regardless, Plaintiffs' First Amendment rights cannot be

defeated by the Government's professions of good will."); CASA, Inc. v. Trump, No. 25-1153,

2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025) ("It is hard to overstate the confusion and

upheaval that will accompany any implementation of the Executive Order."); Am. Fed'n of

Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt., 777 F. Supp. 3d 253, 281 (S.D.N.Y. 2025) ("The defendants' Kafkaesque argument to the contrary would deprive the plaintiffs of any recourse under the law."); Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, Civil Action No. 25-3698 (SI), 2025 WL 1482511, at *2 (N.D. Cal. May 22, 2025) ("[D]efendants want the Court to either declare that nine Presidents and twenty-one Congresses did not properly understand the separation of powers, or ignore how the executive branch is implementing large-scale reductions in force and reorganizations.") (footnote omitted).

In just six months, the President of the United States may have forfeited the right to such a presumption of regularity.  As Magistrate Judge Faruqui put it:  "Trust that had been earned over generations has been lost in weeks."  See In re Search of One Device and Two Individuals under Rule 41, 2025 WL 1587917, at *14 n.10; see also United States v. Warnagiris, Civil Action No. 21-0382 (PLF), 2025 WL 341990, at *5-6 (D.D.C. Jan. 30, 2025) ("And just because the Proclamation was signed by the President does not transform up into down or down into up as if peering through the looking glass of Alice in Wonderland.").

3.    The Court Should Consider the Executive Order's Exclusions as a Whole

Having determined that the presumption of regularity has been rebutted, the Court must determine whether the Union Plaintiffs are likely to succeed on the merits of their claim that the Executive Order is ultra vires.  The principal dispute among the parties centers on whether the Union Plaintiffs can succeed on their claim if the government is able to show that the Executive Order's exclusion of one agency or subdivision – in this case, the DoD – comports with Section 7103(b)(1), notwithstanding the fact that the exclusion of other agencies and subdivisions may have exceeded the President's authority.  See Defs.' Opp. at 16-18; Pls.' Reply at 16-17; see also Order [Dkt. No. 31] at 1-2 (directing the parties to prepare argument on this

issue).[7]  The government contends that the Court should consider only whether the President

properly exempted the DoD pursuant to Section 7103(b)(1) since the statutory provision permits

the President to exclude "any agency" from the FSLMRS.  See Defs.' Opp. at 16-18.  The Union

Plaintiffs maintain that the Court should consider the "staggering overbreadth" of the Executive

Order, which "render[s] the executive order, as a whole, void."  See Pls.' Reply at 16.  Put

simply, the parties' arguments require the Court to address the following issue:  "should the

Court consider the Executive Order in its entirety or only as it relates to the plaintiffs'

members?"  See Order [Dkt. No. 31].

　　　　There are essentially three levels at which the Court could assess whether the

Executive Order is ultra vires.  First, the Court could consider the entirety of the Executive

Order's exclusions made pursuant to Section 7103(b)(1).  If the Court were to consider the

Executive Order in this way, the Union Plaintiffs are likely to succeed on their ultra vires claim

---

[7]        In addition to the arguments discussed in this section, the government briefly argues that the Court should not rely on the definition of "national security" that was articulated by the Supreme Court in Cole v. Young, 351 U.S. 536 (1956).  See Defs.' Opp. at 18-20; see also NTEU, 2025 WL 1218044, at *16 ("[A]s in Cole v. Young, it is 'clear from the statute' that the term 'national security' 'comprehend[s] only those activities . . . that are directly concerned with the protection of the Nation from internal subversion or foreign aggression . . . .'") (quoting Cole v. Young, 351 U.S. at 544).  The government principally argues that Cole v. Young did not "announce a generally applicable definition of 'national security'" and arose "in an entirely different statutory context."  See Defs.' Opp. at 19.  It is true that the Supreme Court in Cole v. Young was not interpreting Section 7103(b)(1).  Nevertheless, for the reasons explained in NTEU and AFSA, the Court finds many of the concerns motivating the Supreme Court in Cole v. Young present here – specifically, the concern that a broad interpretation of the term "national security" risks allowing a narrow exception to swallow the rule.  See Cole v. Young, 351 U.S. at 547 ("[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws.");  see also NTEU, 2025 WL 1218044, at *15-16.  Moreover, the government does not set forth a competing interpretation of how the Court should interpret the term "national security" in Section 7103(b)(1).  See NTEU, 2025 WL 1218044, at *15 (noting that the FLRA authority the government relied on for its definition of "national security" adopted the definition set forth in Cole v. Young).

for the same reasons as explained in <u>NTEU</u> – namely, the Union Plaintiffs are likely able to show that the "President has applied an overly broad interpretation" of Section 7103(b)(1), "thereby making the President's Executive Order <u>ultra vires</u>."  <u>See</u> <u>NTEU</u>, 2025 WL 1218044, at *12-16.  Second, the Court could consider only the exclusion of the DoD – as the government suggests – since the statute permits the President to exclude "<u>any agency</u> or subdivision" from the FSLMRS.  <u>See</u> 5 U.S.C. § 7103(b)(1) (emphasis added); <u>see</u> <u>also</u> Defs.' Opp. at 16-18.  If the Court were to consider <u>only</u> the exclusion of the DoD as a whole, the Union Plaintiffs may have difficulty prevailing on their claim since the DoD is the quintessential example of an agency that has "a primary function" of "national security work."  <u>See</u> 5 U.S.C. § 7103(b)(1)(A).

Finally, the Court could consider only the Executive Order's exclusion of DoDEA, since DoDEA is the only DoD subdivision at issue in this case.  If the Court were to take this path, the Union Plaintiffs would likely succeed on the merits of their <u>ultra vires</u> claim because concluding that DoDEA has a "primary function" of "national security work" would require "an overly broad interpretation of the term 'primary function.'"  <u>See</u> <u>NTEU</u>, 2025 WL 1218044, at *14.  The government's explanation of DoDEA's "national security" function illustrates this point.  The government asserts in its brief:

> DoDEA has a primary national security function given its role in educating servicemembers children, which is critical to DoD's recruitment and retention efforts.  <u>See</u> Cogar Decl. ¶ 6.  Because the United States relies on an all-volunteer military, the support and benefits it offers its members allow it to recruit and retain military personnel.  Given that service members are often stationed overseas, DoDEA's ability to provide high-quality education and care for their children is a critical benefit.  <u>Id</u>.  DoDEA is crucially connected to DoD ability to maintain "a robust, well-staffed, and focused military, which is vital to national security."  <u>Id</u>.

Defs.' Opp. at 19-20.  The Court acknowledges the importance of DoDEA to military recruitment efforts.  With that said, DoDEA's relationship to recruitment efforts is insufficient to

support the government's argument.  Pre-kindergarten to 12th grade educators and support staff may have a function that tangentially benefits "national security work," but such an incidental relationship is hardly sufficient to conclude that DoDEA has a "primary function" of "national security work."  See 5 U.S.C. § 7103(b)(1)(A).

As the above discussion illustrates, the Union Plaintiffs likely will succeed on the merits of their ultra vires claim if the Court analyzes their claim from the standpoint of the entirety of the Executive Order's exclusion or from the standpoint of the exclusion of only DoDEA.  The government's primary contention is that the Court should consider the Union Plaintiffs' ultra vires claim from the standpoint of the exclusion of only the DoD.  See Defs.' Opp. at 16-18.

There are at least two reasons to reject the government's argument and to conclude that the Court should look to the entirety of the Executive Order's exclusions.  First, the evidence rebutting the presumption of regularity suggests that the Executive Order should be viewed in its entirety.  As discussed at length in NTEU and AFSA, contemporaneous evidence surrounding the Executive Order demonstrates that the entire Executive Order likely was motivated by considerations outside of those identified in the statute:  the exclusions were intended as retaliation against labor organizations that have opposed President Trump or in furtherance of unrelated policy goals.  See NTEU, 2025 WL 1218044, at *9-11.  As the Union Plaintiffs argue, evidence of these improper motives "infect every one of [the Executive Order's] myriad exclusions," see Pls.' Reply at 16, which negate any presumption that an individualized determination was made as to each of the excluded agencies and subdivisions.  For the Court to analyze individual exclusions thus appears at odds with the evidence suggesting that the action as a whole was "irregular."  The fact that the presumption of regularity is rebutted therefore may be

28

"decisive here," and warrants considering the Executive Order as a whole.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727; see also Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President, Civil Action No. 25-0917 (RJL), 2025 WL 1502329, at *6-7 & n.4 (D.D.C. May 27, 2025) (explaining that the executive order at issue should be analyzed "as a whole" where "the President's justification for the Order" showed that the different provisions were "inextricably interwoven"), amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President, Civil Action No. 25-0917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025).

Second, there is a functional reason to conclude that the Court should consider the Executive Order's exclusions in their entirety.  The government has argued throughout its briefing in NTEU, AFSA, and in this case, that the determinations required of the President under each prong of Section 7103(b)(1) are "ill-suited to judicial second-guessing" by the Court. See Defs.' Opp. at 24.  As already discussed, however, see supra Section III.B.1, this is not a sufficient reason to conclude that the President's invocation of Section 7103(b)(1) is entirely unreviewable.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727-28 (acknowledging that review of the President's invocation of Section 7103(b)(1) is proper if the presumption of regularity is rebutted); see also Chamber of Com. of U.S. v. Reich, 74 F.3d at 1332 (observing that judicial review is required to ensure that the President is not able "to bypass scores of statutory limitations on governmental authority").  After all, had the President excluded the entire federal government from the FSLMRS – rather than just two-thirds of the federal government workforce – judicial review would be required to ensure that the FSLMRS, an act of Congress, has not been effectively repealed by the Executive.

With that said, the government's insistence that the Court must parse through individual exclusions of the overly broad Executive Order seems to invite the same "second-guessing" that the government contends is improper.  See Defs.' Opp. at 24.  As a result, while there must be judicial review of the President's invocation of Section 7103(b)(1), that review must be of a more limited nature rather than a granular inquiry into the workings of each agency and subdivision at issue.  Put another way, while "some form of review is appropriate" to ensure that Section 7103(b)(1) is invoked consistently with the limitations placed on the President by Congress, the Court should avoid performing a more "searching inquiry into the persuasiveness of the President's justifications" for individual exclusions.  See Trump v. Hawaii, 585 U.S. at 686.  Only by analyzing the Executive Order's exclusions in their entirety – rather than by determining whether individual exclusions are justified – can the Court ensure that it does not perform an overly intrusive inquiry that interferes with the President's authority.

A not-so-hypothetical hypothetical is useful to illustrate this point.  Assume that the President had issued an executive order effectively repealing the FSLMRS in its entirety by excluding from the statute every agency and every agency subdivision of the federal government – rather than two-thirds of the federal workforce.  Accompanying this hypothetical executive order is the same White House Fact Sheet evincing retaliatory animus.  In such circumstances, the President's executive order would almost certainly be ultra vires because it would be tantamount to repealing the statute through the invocation of a narrow exception to the statutory scheme.  See Cole v. Young, 351 U.S. at 547 ("[I]f Congress intended the term ['national security'] to have such a broad meaning[,] . . . the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws.").  But under the government's preferred method of analysis here, the

Court would be put in the position of determining, one-by-one, whether each excluded agency or subdivision met the Section 7103(b)(1) criteria, notwithstanding the fact that all the evidence – including the scope of the executive order and the evidence of retaliatory animus – strongly suggests that the President made no such determination himself. This situation would be untenable. While Congress granted to the President authority to make determinations related to national security, there were conditions placed on that authority. Where the evidence points to other motivations for issuing the sweeping executive order, the Court cannot be placed in the position of making these national security determination – agency by agency – in the first instance.

The problem illustrated in the hypothetical above applies equally to this case. The Executive Order excludes two-thirds of the federal workforce from the FSLMRS, including:

> a. The Department of State.
>
> b. The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'
>
> c. The Department of the Treasury, except the Bureau of Engraving and Printing.
>
> d. The Department of Veterans Affairs.
>
> e. The Department of Justice.
>
> f. Agencies or subdivisions of the Department of Health and Human Services:
>
>> i. Office of the Secretary.
>>
>> ii. Food and Drug Administration.
>>
>> iii. Centers for Disease Control and Prevention.
>>
>> iv. Administration for Strategic Preparedness and Response.

v. Office of the General Counsel.

vi. Office of Refugee Resettlement, Administration for Children and Families.

vii. National Institute of Allergy and Infectious Diseases, National Institutes of Health.

g. Agencies or subdivisions of the Department of Homeland Security:

i. Office of the Secretary.

ii. Office of the General Counsel.

iii. Office of Strategy, Policy, and Plans.

iv. Management Directorate.

v. Science and Technology Directorate.

vi. Office of Health Security.

vii. Office of Homeland Security Situational Awareness.

viii. U.S. Citizenship and Immigration Services.

ix. United States Immigration and Customs Enforcement.

x. United States Coast Guard.

xi. Cybersecurity and Infrastructure Security Agency.

xii. Federal Emergency Management Agency.

h. Agencies or subdivisions of the Department of the Interior:

i. Office of the Secretary.

ii. Bureau of Land Management.

iii. Bureau of Safety and Environmental Enforcement.

iv. Bureau of Ocean Energy Management.

i. The Department of Energy, except for the Federal Energy Regulatory Commission.

j. The following agencies or subdivisions of the Department of Agriculture:

> i. Food Safety and Inspection Service.

> ii. Animal and Plant Health Inspection Service.

k. The International Trade Administration, Department of Commerce.

l. The Environmental Protection Agency.

m. The United States Agency for International Development.

n. The Nuclear Regulatory Commission.

o. The National Science Foundation.

p. The United States International Trade Commission

q. The Federal Communications Commission.

r. The General Services Administration.

s. The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

> i. Office of the Chief Information Officer.

> ii. any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

Executive Order § 2.

This extensive list hardly includes only agencies and subdivisions that "plainly relat[e] to national security." See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025 WL 1755442, at *5. Indeed, as the Court explained in NTEU, to conclude that all of these

agencies and subdivisions have a "primary function" of "national security work," see 5 U.S.C. § 7103(b)(1), requires either "overly broad interpretation[s] of the term[s]," or writing "the term[s] out of the statute entirely." See NTEU, 2025 WL 1218044, at *14-16. Outside of the scope of the Executive Order, the contemporaneous evidence reflects motivations for the order that are plainly unrelated to the statutory criteria. The Executive Order and the record in this case negate any inference that an individualized national security determination was made with respect to each agency and subdivision. In such circumstances – like the hypothetical discussed above – it would be perplexing to have the Court consider individual agency and subdivision exclusions where it does not appear that the President considered the agencies and subdivisions individually.

Finally, the government argues that the text of the statute – which provides that "[t]he President may issue an order excluding any agency or subdivision" – suggests that the Court should only consider the President's exclusion of the DoD. See Defs.' Opp. at 16-18. More specifically, the government contends that because (1) the President excluded the entirety of the DoD, and because (2) the statute permits the exclusion of an entire "agency," the proper issue before the Court is whether the President's exclusion of the DoD – and only that exclusion – was ultra vires. See id. The text of Section 7103(b)(1), however, strongly suggests that it is the "order" that the President issues pursuant to Section 7103(b)(1) that is significant, not the individual exclusions made pursuant to that order. See 5 U.S.C. § 7103(b)(1) ("The President may issue an order excluding any agency or subdivision . . . .") (emphasis added). Put differently, while the President may have authority to exclude a series of "agenc[ies] or subdivision[s]" from the FSLMRS, the "order" the President issues pursuant to Section 7103(b)(1) may be ultra vires if the order – as here – reflects an utter disregard for the Section

34

7103(b)(1) limitations through its all-encompassing set of exclusions.  The government's

argument, despite some surface appeal, is insufficient to overcome the other reasons discussed

above as to why the Executive Order must be viewed in its entirety.

In sum, the Court concludes that the proper inquiry is whether the Executive

Order's exclusions pursuant to Section 7103(b)(1) – taken together as a whole – exceeded the

President's authority.  For the same reasons explained in <u>NTEU</u>, the President's invocation of

Section 7103(b)(1) to exclude two-thirds of the federal workforce – coupled with

contemporaneous evidence reflecting motivations for the Executive Order plainly outside those

contemplated by the statute – represents that the Executive Order patently "disregards [the]

specific and unambiguous statutory directive[s]" in the FSLMRS.  <u>See</u> <u>Changji Esquel Textile</u>

<u>Co. v. Raimondo</u>, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting <u>Fed. Express Corp. v. United</u>

<u>States Dep't of Com.</u>, 39 F.4th at 762); <u>see also</u> <u>NTEU</u>, 2025 WL 1218044, at *7-16.

Accordingly, Union Plaintiffs are likely to succeed on the merits of this claim.[8]

### C.  Irreparable Harm

The next factor to consider is whether the Union Plaintiffs will suffer irreparable

injury without the requested preliminary injunction.  <u>See</u> <u>Archdiocese of Washington v. Wash.</u>

<u>Metro. Area Transit Auth.</u>, 897 F.3d at 321.  The D.C. Circuit "has set a high standard for

irreparable injury."  <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C.

Cir. 2006).  "Not only must the injury 'be both certain and great,' and 'actual and not

theoretical,' but 'the injury must be beyond remediation.'"  <u>Brennan Ctr. for Just. at NYU Sch.</u>

---

[8]    Because the Court concludes that the Union Plaintiffs are likely to succeed on
their <u>ultra</u> <u>vires</u> claims, the Court does not reach the Union Plaintiffs remaining claims on this
motion.

of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (internal citations omitted) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297).  Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.

   As in NTEU and AFSA, the Union Plaintiffs here articulate two general grounds that they assert independently and in tandem establish that they will be irreparably harmed absent a preliminary injunction.  First, the Union Plaintiffs argue that they face significant financial harm as a result of DoDEA's termination of "the statutorily and contractually required payroll deductions" of union dues.  See Pls.' Mem. at 17-20; see also Tarr Decl. ¶ 23; Danahy Decl. ¶ 26; Gorbea Decl. ¶ 13.  The specific evidence related to the financial harm suffered by each union is different.  As to FEA, it appears that the loss of dues creates the sort of injury that is irreparable.  For example, FEA states that the dues revenue makes "up the overwhelming majority of FEA's income, and [that] these funds are used to carry out all of FEA's core activities as a labor organization . . . ."  Tarr Decl. ¶ 24.  Furthermore, FEA argues that because of DoDEA's termination of dues deduction, "it will be nearly impossible to raise the funds needed to sustain the union and provide representational services for our members for the coming school year."  Tarr Decl. ¶ 25.  The injury created by this financial harm appears to be irreparable because it creates serious difficulties for the unions to accomplish their mission of representing their members and indeed may threaten the union's survival.  See Climate United

<u>Fund v. Citibank, N.A.</u>, Civil Action No. 25-0698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025).

The financial harm suffered by FEA-SR and ACEA is not clearly irreparable. As to FEA-SR, it appears that it has been able to remedy the harm caused by the termination of automatic deductions by "convert[ing] most members to AutoPay or to pay by check . . . ." <u>See</u> Danahy ¶ 30. While FEA-SR argues that it has "been unable to recoup all of the lost revenue" that resulted from DoDEA's initial termination of automatic dues payments, <u>see id.</u>, it is not clear whether such financial harm "threatens the very existence" of FEA-SR. <u>See</u> <u>Wis. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985). As to ACEA, the union's declaration provides little information as to the effect DoDEA's termination of automatic dues payments has had on its operations. <u>See</u> Gorbea ¶¶ 13-14 (stating only that "ACEA has already experienced a drop in its projected revenue").

Setting aside the issue of whether the loss of union dues sufficiently supports the Union Plaintiffs' contention that they will suffer irreparable harm absent a preliminary injunction, the Union Plaintiffs have sufficiently shown that DoDEA's disregard of important provisions in the respective collective bargaining agreements itself creates irreparable harm. More specifically, the Union Plaintiffs argue that Executive Order significantly diminishes their bargaining power and ability to represent their members as DoDEA has essentially "pause[d] labor relations-related activities . . . ." <u>See</u> Pls.' Mem. at 20-23; <u>see</u> <u>also</u> Hunter Decl. ¶ 9; Danahy Decl. ¶¶ 17-19; Ex. 3 to Gorbea Decl. [Dkt. No. 22-4 at ECF 257] (email from DoDEA's Chief of the Labor Management & Employee Relations Division explaining that as a result of the "EO, the associated White House Fact Sheet, and OPM guidance," DoDEA was "paus[ing] labor relations-related activities pending further instruction from the Department").

The Union Plaintiffs' declarations demonstrate that DoDEA has discontinued negotiations over successive collective bargaining agreements, see Hunter Decl. ¶¶ 9, 15; Danahy Decl. ¶¶ 17-19; ceased participation in grievance proceedings, see Tarr Dec. ¶ 39; Freeman Decl. ¶¶ 11-13; Smith Decl. ¶ 4; Hunter Decl. ¶¶ 13-15; Gorbea Decl. ¶ 17; stopped engaging in arbitral proceedings on various grievances, see Freeman Decl. ¶ 13; Smith Decl. ¶¶ 9, 14; disallowed union representation during employee disciplinary meetings and investigatory interviews, see Tarr Decl. ¶ 49; Danahy Decl. ¶ 44; and eliminated official time and use of agency office spaces to conduct representation activities.  See Tarr Decl. ¶ 45; Danahy Decl. ¶¶ 25, 36; Gorbea Decl. ¶ 21.  Indeed, the government admits that the "DoD has taken a wide variety of actions to implement the Executive Order to date," and that

> [i]f forced to comply with Plaintiffs' request preliminary injunction, the Department would have to undo those actions by: reestablishing the withholding of union dues; restarting the processing of grievances; reengaging on arbitrations that had been held in abeyance; reengaging on matters pending before the Federal Labor Relations Authority; reestablishing the provision of official time to unions under the Statute and in accordance with the provisions of applicable CBAs; reengaging in collective bargaining under the Statute and in accordance with the provisions of applicable CBAs; and otherwise reverting back to full compliance with the terms of applicable CBAs, including, but not limited to: overtime distribution requirements, provision of union office space, and adherence to disciplinary and performance management procedural requirements.

Cogar Decl. ¶ 10.

> These actions, taken together, essentially terminate the respective collective bargaining agreements and thus cause irreparable harm.  As the Court explained in NTEU,

> Courts have long recognized that "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions."  Franks Bros. Co. v. NLRB, 321 U.S. 702, 704 (1944).

> "The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." <u>N.L.R.B. v. Electro-Voice, Inc.</u>, 83 F.3d 1559, 1573 (7th Cir. 1996). Furthermore, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished." <u>Id.</u>; <u>see</u> <u>Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB</u>, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining."). Therefore, any relief a court may provide "must come quickly." <u>In re Am. Fed'n of Gov't Emps., AFL-CIO</u>, 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and quotation marks omitted).

<u>NTEU</u>, 2025 WL 1218044, at *17. The analysis is the same here. As the Union Plaintiffs note, a favorable ruling cannot, for example, "retroactively help the member who has gone into a disciplinary meeting without the counsel of their union." <u>See</u> Tarr Decl. ¶ 30. Furthermore, "[t]he loss of [ ] statutory protections" resulting from the Executive Order strikes at the "heart" of the Union Plaintiffs' primary "purpose and mission," thereby "pos[ing] an existential threat to the union[s]." <u>See id</u>. ¶ 33; Danahy Decl. ¶ 35 (explaining that "DODEA's current implementation measures . . . are an existential threat to the union"); <u>see also</u> <u>League of Women Voters v. Newby</u>, 838 F.3d at 9 ("[O]bstacles unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes both of standing and irreparable harm.").

The government essentially regurgitates arguments that the Court addressed and rejected in its earlier opinions in <u>NTEU</u> and <u>AFSA</u>. <u>See</u> Defs.' Opp. at 37-38; <u>see also</u> <u>NTEU</u>, 2025 WL 1218044, at *17-18; <u>AFSA</u>, 2025 WL 1387331, at *14-15. Outside of those arguments – which the Court rejects for the same reasons as in <u>NTEU</u> and <u>AFSA</u> – the government argues that the Plaintiff Unions' failure to file a motion for preliminary injunction until "months" after the "DoD began taking certain actions pursuant to the Executive Order" "seriously undercuts Plaintiffs' allegations of irreparable harm . . . ." <u>See id</u>. at 35-36. The

government is correct that "[a]n unexcused delay in seeking extraordinary injunctive relief . . . implies a lack of urgency and irreparable harm." Sierra Club v. Env't Prot. Agency, Civil Action No. 25-1112 (RC), 2025 WL 1895609, at *4 (D.D.C. July 9, 2025) (quoting Open Top Sightseeing USA v. Mr. Sightseeing, LLC, 48 F. Supp. 3d 87, 90 (D.D.C. 2014)).  But the D.C. Circuit has made clear that such a delay, standing alone, cannot provide a sufficient basis for denying a party's motion for a preliminary injunction.  See Gordon v. Holder, 632 F.3d 722, 724-25 (D.C. Cir. 2011) (holding that while a delay in filing cannot be the sole basis for denial of a preliminary injunction, delay can "support a conclusion that the plaintiff cannot satisfy the irreparable harm prong").  Moreover, at oral argument, the Union Plaintiffs explained that their delay in filing the motion for a preliminary injunction was in part a result of the school year not being in session.  See Federal Education Association v. Trump, Civil Action No. 25-1362, Transcript of Record (Aug. 4, 2025) [Dkt. No. 33] at 30:12-18.  The Union Plaintiffs stated that as its members prepare for the school year, the effects of DoDEA's actions are more acutely felt. See id.  The Court therefore concludes that the Union Plaintiffs' delay in filing its motion for preliminary injunction is not a sufficient basis to deny the Union Plaintiffs' motion.

Finally, as in NTEU and AFSA, the government argues that because the "DoD has yet to take any action to terminate a [collective bargaining agreement,]" any "loss of members" or "loss of bargaining power is too speculative a basis for granting relief at this stage." See Defs.' Opp. at 37-38.  As the Court has previous explained, while the Union Plaintiffs "have [not] shown that any agency has formally cancelled a collective bargaining agreement," the actions taken by the DoD and DoDEA discussed above demonstrate that the agency has "in essence disregarded critical provisions of the collective bargaining agreements." See Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1444446, at *4

40

(D.D.C. May 20, 2025).  The fact of the matter is that the collective bargaining agreements have been effectively terminated.  The "DoD has taken a wide variety of other actions to implement the Executive Order to date," including disregarding key provisions in the collective bargaining agreements.  See Defs.' Opp. at 39 (citing Cogar Decl. ¶ 10).  Similarly, DoDEA has argued that the FLRA – the body responsible for adjudicating complaints under the collective bargaining agreements – lacks jurisdiction over cases involving the collective bargaining agreements.  See Tarr Decl. ¶ 42; Ex. 14 to Tarr Decl.   The Court simply cannot accept that where the DoD has admitted to failing to abide by the collective bargaining agreements and has contested the jurisdiction of the FLRA to enforce those agreements that somehow, the collective bargaining agreements are still in force.

The Court concludes that the Union Plaintiffs have sufficiently established that they will suffer irreparable harm absent a preliminary injunction.  See NTEU, 2025 WL 1218044, at *17-18; AFSA, 2025 WL 1387331, at *14-15; Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025 WL 1755442, at *13 ("The loss of collective bargaining rights is deemed to be irreparable because 'the value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost.'") (quoting Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1192 (9th Cir. 2011)).

### D.  Equities and Public Interest

The remaining preliminary injunction factors – the balance of the equities and assessment of the public interest – weigh in the Union Plaintiffs' favor.  These factors "merge

when, as here, the Government is the opposing party.'" Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

As the Court explained in NTEU, Congress's unequivocal identification of collective bargaining rights and federal unions as being "in the public interest," coupled with the public interest "in ensuring that the laws enacted by their representatives are not imperiled by executive fiat," compel the conclusion that the Union Plaintiffs satisfies the remaining preliminary injunction factors. NTEU, 2025 WL 1218044, at *20 (citation and quotation marks omitted). The government makes two arguments as to how it will be harmed by a preliminary injunction. First, the government cites to the "wide variety of . . . actions to implement the Executive Order," arguing that reversing course "would require significant resources . . . ." See Defs.' Opp. at 39-40. The Court acknowledges that complying with the statutory requirements of the FSLMRS is likely costly. But the mere cost of complying with statutory obligations cannot outweigh the harm to the Union Plaintiffs and their members in having their collective bargaining rights cast aside. After all, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice . . . .'" Cabrera v. U.S. Dep't of Lab., Civil Action No. 25-1909 (DLF), 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (quoting R.I.L.-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); see also Am. Gateways v. U.S. Dep't of Just., No. 25-1370 (AHA), 2025 WL 2029764, at *10 (D.D.C. July 21, 2025) ("'[T]here is generally no public interest in the perpetuation of unlawful agency action.'") (quoting League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)).

Second, as in NTEU and AFSA, the government's primary response is the assertion that a preliminary injunction "would inflict harm on the public and the President by interfering with the national-security determinations regarding DoD and entrusted to the

President by Congress." <u>See</u> Defs.' Opp. at 39.  But as Judge Childs observed, "[s]uch vague assertions of harm dependent on the merits of the dispute are insufficient to show irreparable injury."  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, No. 25-5157, 2025 WL 1441563, at *5 (D.C. Cir. May 16, 2025) (Childs, J., dissenting); <u>see</u> <u>also</u> <u>Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget</u>, No. 25-5266, Order (D.C. Cir. Aug. 9, 2025) (<u>per curiam</u>) (Statement of Henderson, J.) ("As has become a theme in the Government's recent emergency motions practice, it spends almost all of its brief arguing the merits.  The Government's opening brief devotes a mere two paragraphs to the issue of irreparable harm, one of which simply repackages its merits argument.") (citation and internal quotation marks omitted).  "At bottom, this case is about whether [the Executive Order] amounts to a structural overhaul that usurps Congress's policymaking prerogatives – and it is hard to imagine deciding that question in any meaningful way <u>after</u> those changes have happened."  <u>Trump v. Am. Fed'n of Gov't Emps.</u>, 145 S. Ct. 2635, 2642-43 (2025) (Jackson, J., dissenting).

As the government acknowledges, it has taken a "wide variety" of actions that drastically change the collective bargaining regime that has existed for over fifty years.  <u>See</u> Defs.' Opp. at 39-40.  Granting the preliminary injunction would merely require the government to function as it has for over half a century; the lack of a preliminary injunction, by contrast, would cause immense and irreparable harm to the Union Plaintiffs.  As such, the Court concludes that the balance of the equities favors the Union Plaintiffs.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1441563, at *5 (Childs, J., dissenting) ("[T]he district court's injunction maintains the state of affairs that has existed for nearly half a century: NTEU has bargained on behalf of federal workers since the 1970s."); <u>Am. Foreign Serv. Ass'n v. Trump</u>,

Civil Action No. 25-1030 (PLF), 2025 WL 1695059, at *2 (D.D.C. June 17, 2025); see also

NTEU, 2025 WL 1218044, at *20-21; AFSA, 2025 WL 1387331, at *15.


## IV. SECURITY

The government requests that the Court impose a bond pursuant to Rule 65(c) of

the Federal Rules of Civil Procedure.  See Defs.' Opp. at 40-41; Post-Argument JSR at 2.  More

specifically, the government has requested that bond be set at $1,152,000.  See Defs.' Opp. at 41;

Post-Argument JSR at 2.  This amount "represents the average salary of educators multiplied by

the eight positions that DoDEA would need to fill if educators are allowed to return to

performing union duties on official time."  Defs.' Opp. at 41.  Put differently, this is the cost of

complying with the provisions in the collective bargaining agreements – which the government

contends have yet to be terminated, see id. at 37 – pertaining to official time.  The amount the

government seeks in security is perplexing.  On the one hand, the government argues that the

Union Plaintiffs are not harmed because the collective bargaining agreements are still being

honored; but on the other hand, it requests security to allow for the recovery of costs that are paid

out in official time under the collective bargaining agreements.  The collective bargaining

agreements are either in effect – in which case the government must comply with them – or they

are not.  See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1441563, at *5 (Childs, J.,

dissenting) ("How can the Government argue that the district court injunction will cause

irreparable injury when the Government itself voluntarily imposed that same constraint?").

In any event, courts have "broad discretion" in determining "the appropriate

amount of an injunction bond, including the discretion to require no bond at all."  Simms v. D.C.,

872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal citation and quotation marks omitted).  As the

Court explained in NTEU, requiring a significant bond "would conflict with both the Court's

findings that each of the preliminary injunction factors weigh heavily in [Union Plaintiffs'] favor and the principles of the right to seek judicial review of unlawful government action." NTEU, 2025 WL 1218044, at *21. Furthermore, DoDEA has taken actions that have placed serious financial strain on the Union Plaintiffs, such as by terminating the automatic deduction of dues and reducing the value the Union Plaintiffs can provide their members. See Tarr Decl. ¶ 25 ("[B]ased on our experience thus far, it will be nearly impossible to raise the funds needed to sustain the union . . . ."); Danahy Decl. ¶ 31 "It has been particularly difficult to persuade members to [pay union dues] in light of the fact that DODEA has, in its implementation of EO 14257 . . .[,] impeded FEA-SR's ability to advocate for members."); see also NTEU, 2025 WL 1218044, at *19. "It makes little sense to exacerbate the financial strain by requiring the [Union Plaintiffs] to post bond." See Nat'l Endowment for Democracy v. United States, Civil Action No. 25-0648 (DLF), 2025 WL 2305477, at *7 (D.D.C. Aug. 11, 2025). While the total amount requested by the government is unwarranted, the Court, in its discretion, orders the Union Plaintiffs to post a bond in the amount of $100 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

## V.  CONCLUSION

For the foregoing reasons, the Union Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 22] is hereby GRANTED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8\14\25

45