## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

FEDERAL EDUCATION ASSOCIATION, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the District of Columbia

—————————————

**BRIEF FOR APPELLANTS**

—————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.  Parties and Amici

Defendants-appellants are Donald J. Trump, Peter B. Hegseth, United States Department of Defense, Scott Kupor, and Office of Personnel Management.  Plaintiffs-appellees are Federal Education Association, Federal Education Association Stateside Region, and Antilles Consolidated Education Association.  No other parties, intervenors, or amici curiae appeared before the district court or have entered appearances in this Court.

### B.  Rulings Under Review

Defendants seek review of the August 14, 2025, order and opinion of the district court (Friedman, J.) granting plaintiffs a preliminary injunction.  *See* JA703-704; JA705-749.  The district court's opinion has not yet been assigned a citation in the Federal Supplement but is available on Westlaw at 2025 WL 2355747.

## C. Related Cases

This case has not previously been before the Court. The following cases involve an overlapping set of defendants and raise similar issues to this case:

- *National Treasury Employees Union v. Trump*, No. 25-5157 (D.C. Cir.)

- *National Treasury Employees Union v. Trump*, No. 1:25-cv-0935 (D.D.C.)

- *American Foreign Service Ass'n v. Trump*, No. 25-5184 (D.C. Cir.)

- *American Foreign Service Ass'n v. Trump*, No. 1:25-cv-01030 (D.D.C.)

- *National Association of Agriculture Employees v. Trump*, No. 1:25-cv-02657 (D.D.C.)

- *American Federation of Labor and Congress of Industrial Organizations v. Trump*, No. 1:25-cv-02445 (D.D.C.)

- *National Weather Service Employees Association v. Trump*, No. 25-cv-2947 (D.D.C.)

- *American Federation of State County & Municipal Employees, AFL-CIO v. Trump*, No. 25-cv-3306 (D.D.C.)

- *American Federation of Government Employees v. Trump*, No. 25-4014 (9th Cir.)

- *American Federation of Government Employees v. Trump*, No. 25-cv-03070 (N.D. Cal.)

- *Department of Defense v. American Federation of Government Employees, AFL-CIO, District 10*, No. 25-cv-0119 (W.D. Tex.)

s/ Weili J. Shaw
_____
Weili J. Shaw

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................... vi

GLOSSARY ................................................................................. xiv

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION .............................................. 4

STATEMENT OF THE ISSUES ................................................... 4

PERTINENT STATUTES ............................................................. 4

STATEMENT OF THE CASE ....................................................... 5

    A.    Statutory And Regulatory Background ................................. 5

    B.    Factual Background .............................................................. 7

    C.    Prior Proceedings ................................................................ 9

SUMMARY OF ARGUMENT ..................................................... 17

STANDARD OF REVIEW ........................................................... 19

ARGUMENT ................................................................................ 20

I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS ............. 20

    A.    The FSLMRS Precludes District-Court Jurisdiction Over Plaintiffs' Claims ........................................................ 20

        1.    Congress intended to channel this dispute through the FLRA ............................................................. 20

        2.    The FLRA has authority to entertain plaintiffs' challenges to the executive order ................................... 28

iv

B.    Plaintiffs Cannot Assert An *Ultra Vires* Claim To Challenge The President's Exercise Of Discretion Granted By Statute ................................................................. 32

C.    Plaintiffs Are Not Likely To Succeed On The Merits Of Their *Ultra Vires* Claim ..................................................... 36

    1.    The executive order is facially consistent with statute ................................................................................. 37

    2.    Plaintiffs failed to rebut the presumption of regularity ........................................................................... 40

    3.    The President's determinations reasonably apply the criteria of § 7103(b)(1) ........................................... 49

II.    PLAINTIFFS DID NOT ESTABLISH THAT THEY WOULD LIKELY SUFFER IRREPARABLE HARM .......................................................... 59

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR ............................................................... 64

CONCLUSION ...................................................................................... 69

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                            **Page(s)**

*AFGE v. Loy*,
   367 F.3d 932 (D.C. Cir. 2004) ............................................................ 25

*AFGE v. Reagan*,
   870 F.2d 723 (D.C. Cir. 1989) ............................... 36, 37, 38, 39, 42, 46

*AFGE v. Secretary of the Air Force*,
   716 F.3d 633 (D.C. Cir. 2013) ............................................................ 21

*AFGE v. Trump*:
   148 F.4th 648 (9th Cir. 2025) ............................15-16, 16, 44, 60, 62, 65
   No. 25-cv-03070, 2025 WL 1755442
      (N.D. Cal. June 24, 2025) ............................................................ 15

*AFGE v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ........................ 22, 23, 25, 26, 27, 31, 64

*AFGE Local 446 v. Nicholson*,
   475 F.3d 341 (D.C. Cir. 2007) ............................................................ 31

*AFSA v. Trump*:
   No. 25-5184, 2025 WL 1742853
      (D.C. Cir. June 20, 2025)............................... 32, 34, 35, 39, 65, 67, 68
   783 F. Supp. 3d 248 (D.D.C. 2025) .............................................. 10, 13

*Axon Enter., Inc. v. Federal Trade Comm'n*,
   598 U.S. 175 (2023) .......................................................................... 22

*Boumediene v. Bush*,
   553 U.S. 723 (2008) .......................................................................... 28

*BP P.L.C. v. Mayor & City Council of Baltimore*,
   593 U.S. 230 (2021) .......................................................................... 41

*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022)............................................................. 37

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ............................................................ 33

*Clevinger v. Advocacy Holdings, Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025) .................................. 20, 60

*Cole v. Young*,
    351 U.S. 536 (1956) .................................................... 54, 55

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*,
    250 U.S. 163 (1919) ............................................................ 33

*Dalton v. Specter*,
    511 U.S. 462 (1994) .................................................... 32, 34

*Department of the Navy Naval Aviation Depot Naval*
    *Air Station Alameda & Int'l Ass'n of Machinists &*
    *Aerospace Workers Lodge 739*,
    36 F.L.R.A. 509 (1990) .................................................... 63

*Department of the Navy, Naval Telecomms. Ctr. &*
    *Navtelcom Unit Loc. No. 1*,
    6 F.L.R.A. 498, 500 (1981) .............................................. 30

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking &*
    *Salvage Co.*,
    414 F.3d 700 (7th Cir. 2005) .......................................... 62

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) ........................................................ 25, 26

*FEA v. Trump*,
    No. 25-5303, 2025 WL 2738626
      (D.C. Cir. Sep. 25, 2025) ..............................12-13, 13, 66

*Federal Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) .......................................... 37

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) .......................................................... 21

*Gilligan v. Morgan,*
413 U.S. 1 (1973) .............................................................. 54

*Global Health Council v. Trump,*
No. 25-5097, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025) ................. 37

*Haig v. Agee,*
453 U.S. 280 (1981) .......................................................... 35

*Henderson ex rel. NLRB v. Bluefield Hosp. Co.,*
902 F.3d 432 (4th Cir. 2018) ................................................ 62

*Hercules Inc. v. EPA,*
598 F.2d 91 (D.C. Cir. 1978) ................................................ 40

*Holder v. Humanitarian L. Project*
561 U.S. 1 (2010) ............................................................ 43

*Independent Union of Pension Emps. for Democracy & Just.*
*& Pension Benefit Guar. Corp.,*
68 F.L.R.A. 999 (2015) ...................................................... 27

*Nken v. Holder,*
556 U.S. 418 (2009) .......................................................... 64

*North Am. Butterfly Ass'n v. Wolf,*
977 F.3d 1244 (D.C. Cir. 2020) ......................................... 36, 49

*NTEU v. Trump*:
No. 25-5157, 2025 WL 1441563
(D.C. Cir. May 16, 2025)................................... 15, 59, 60, 65
780 F. Supp. 3d 237 (D.D.C. 2025) .............. 10, 14, 41, 42, 45, 46, 47

*Nuclear Regul. Comm'n v. Texas,*
605 U.S. 665 (2025) ....................................................36-37, 57

*Owlfeather-Gorbey v. Avery,*
119 F.4th 78 (D.C. Cir. 2024) ............................................... 40

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ......................................................... 66

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994) ................................................ 22, 28

*Trump v. Hawaii,*
585 U.S. 667 (2018) ................................................ 42, 48

*Trump v. International Refugee Assistance Project,*
582 U.S. 571 (2017) ................................................ 64

*U.S. Army Corps of Eng'rs Memphis Dist. & National
Fed'n of Fed. Emps. Loc. 259,*
53 F.L.R.A. 79 (1997) ............................................. 53

*U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966,*
57 F.L.R.A. 750 (2002) ............................................ 24, 29

*U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970,*
71 F.L.R.A. 829 (2020) ............................................ 60

*U.S. Dep't of Homeland Sec. U.S. Immigration &
Customs Enf't & AFGE Nat'l Immigration & Customs
Enf't Council 118,*
67 F.L.R.A. 501 (2014) ............................................ 46

*U.S. Dep't of the Air Force Davis-Monthan Air Force Base
& AFGE Loc. 2924,*
62 F.L.R.A. 332 (2008) ............................................ 27

*U.S. Dep't of the Air Force Air Force Materiel Command
Warner Robins Air Logistics Ctr. Robins Air Force
Base & AFGE Local 987,*
66 F.L.R.A. 589 (2012) ............................................ 30

*U.S. Dep't of the Treasury U.S. Mint & AFGE Mint
Council, C-157,*
35 F.L.R.A. 1095 (1990) .......................................... 60

*U.S. Dep't of the Treas., IRS & NTEU,*
62 F.L.R.A. 298 (2007) ........................................... 52

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) .............................................. 39

*United States v. Ruiz,*
  536 U.S. 622 (2002) ............................................................ 28

*Webster v. Doe,*
  486 U.S. 592 (1988) ............................................... 34, 39, 43

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................ 20, 64

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) ............................................................ 35

**Statutes:**

Administrative Procedure Act,
  5 U.S.C. § 706(2)(A) ............................................................ 10

5 U.S.C. § 105 ............................................................ 58

5 U.S.C. §§ 7101-7135 ............................................................ 5

5 U.S.C. § 7101(a) ............................................................ 41

5 U.S.C. § 7102(2) ............................................................ 5

5 U.S.C. § 7103(a)(3) ............................................................ 6, 58

5 U.S.C. § 7103(b)(1) .................................... 1, 6, 10, 57, 58, 66

5 U.S.C. § 7103(b)(1)(A) ............................................................ 49, 50

5 U.S.C. § 7103(b)(1)(B) ............................................................ 41, 47, 53

5 U.S.C. § 7104(f)(2) ............................................................ 5

5 U.S.C. § 7105(a) ............................................................ 10, 26

5 U.S.C. § 7105(a)(2) ............................................................ 21

5 U.S.C. § 7106 ............................................................ 5

5 U.S.C. § 7112(b)(6) ............................................................ 26

5 U.S.C. § 7114 ................................................................. 5

5 U.S.C. § 7116 ................................................................. 5

5 U.S.C. § 7116(a) ........................................................... 23

5 U.S.C. § 7116(a)(8) ...................................................... 26

5 U.S.C. § 7118(a) ........................................................... 23

5 U.S.C. § 7118(a)(1) ......................................................... 5

5 U.S.C. § 7118(a)(1)-(2) ................................................... 5

5 U.S.C. § 7118(a)(7) ...................................................... 63

5 U.S.C. §§ 7121-7122 ...................................................... 6

5 U.S.C. § 7121(a) ........................................................... 23

5 U.S.C. § 7122(a) ........................................................... 23

5 U.S.C. § 7123(a) ............................................. 6, 21, 23, 24

15 U.S.C. § 634b ............................................................. 50

22 U.S.C. § 4103 ............................................................. 34

28 U.S.C. § 1292(a)(1) ....................................................... 4

28 U.S.C. § 1331 .......................................................... 4, 20

31 U.S.C. § 321(a)(7) ........................................................ 52

38 U.S.C. § 7422(b) .......................................................... 31

38 U.S.C. § 7422(d) .......................................................... 31

50 U.S.C. § 3021(c) .......................................................... 52

42 U.S.C. § 247d-4(a)(1) .................................................... 51

42 U.S.C. § 300hh-10(b) ..................................................... 51

42 U.S.C. § 7111(2) ................................................................. 50

47 U.S.C. § 151 ...................................................................... 51

50 U.S.C. § 3021(c)................................................................. 52

**Regulatory Materials:**

5 C.F.R. §§ 2423.3-2423.6 ......................................................... 5

Exec. Order No. 12,171,
    44 Fed. Reg. 66,565 (Nov. 20, 1979) ................................... 6, 7

Exec. Order No. 12,666,
    54 Fed. Reg. 1,921 (Jan. 17, 1989) ......................................... 7

Exec. Order No. 13,039,
    62 Fed. Reg. 12,529 (Mar. 14, 1997) ....................................... 7

Exec. Order No. 13,252,
    67 Fed. Reg. 1,601 (Jan. 11, 2002) ......................................... 7

Exec. Order No. 13,480,
    73 Fed. Reg. 73,991 (Dec. 4, 2008) ......................................... 7

Exec. Order No. 14,251,
    90 Fed. Reg. 14,553 (Apr. 3, 2025) ...................... 7, 8, 48, 56

**Other Authorities:**

Memorandum from Charles Ezell, Acting Dir., OPM,
    to Heads and Acting Heads of Departments and
    Agencies (Mar. 27, 2025),
    https://perma.cc/QH4A-MQ9F ............................... 8, 9, 47, 48

Orders:
    *AFSA v. Trump*, No. 25-5184 (D.C. Cir. July 30, 2025) ..................... 14
    *NTEU v. Trump*, No. 25-5157 (D.C. Cir. July 16, 2025) ................... 15
    *NTEU v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 25, 2025) .............. 14

The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H ................................................. 44, 45, 47

U.S. Dep't of Energy, *Energy Security*, https://perma.cc/2YCS-EUBP ............................................................. 51

U.S. Dep't of State, *About the U.S. Department of State*, https://perma.cc/8GPX-63RG.................................................................. 50

U.S. Dep't of the Treasury, *Role of the Treasury*, https://perma.cc/24Z9-QXE8.................................................................. 52

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFSA | American Foreign Service Association |
| CSRA | Civil Service Reform Act |
| DoD | Department of Defense |
| DoDEA | Department of Defense Education Activity |
| FEA | Federal Education Association |
| FEA-SR | Federal Education Association Stateside Region |
| FLRA | Federal Labor Relations Authority |
| FSLMRS | Federal Service Labor–Management Relations Statute |
| NTEU | National Treasury Employees Union |
| OPM | Office of Personnel Management |

# INTRODUCTION

When Congress enacted the Federal Service Labor–Management Relations Statute (FSLMRS) and granted members of the civil service the right to unionize and bargain collectively, it recognized that those activities could, in certain circumstances, be inconsistent with the needs of national security.  Accordingly, Congress vested the President with discretion to exclude certain agencies and agency subdivisions from FSLMRS coverage "if the President determines" that national security so requires.  5 U.S.C. § 7103(b)(1).  Like his predecessors, President Trump exercised that authority by issuing an executive order determining that certain agencies and subdivisions should be excluded from the scope of the FSLMRS.  One of the agencies covered by the order is the Department of Defense (DoD).

Plaintiffs, who represent employees in one subdivision of DoD, the Department of Defense Education Activity (DoDEA), filed suit claiming that the executive order is inconsistent with the terms of the FSLMRS and violates the First Amendment.  In this case, as in two others currently pending before this Court and a fourth pending before the Court of Appeals for the Ninth Circuit, the district court preliminarily

enjoined the government from enforcing the executive order.  In three of these cases, the court of appeals has stayed the preliminary injunction, finding, for at least three different reasons, that the government is likely to prevail on the merits.  Although the Court did not grant a stay in this case, it did so on the sole ground that the government's stay motion did not sufficiently articulate why an injunction specific to DoDEA—as opposed to DoD generally—would cause the government irreparable harm.  The Court did not consider either side's likelihood of success on the merits, nor did it consider whether plaintiffs established irreparable harm warranting injunctive relief.

This case is now before the Court on the merits of the district court's preliminary injunction, and plaintiffs must establish a likelihood of success on the merits to sustain the injunction.  This Court should, consistent with the reasoning of the stay decisions that reached the merits of the preliminary injunction, reverse the district court and vacate the injunction.  First, the district court was wrong to exercise jurisdiction over plaintiffs' claims, which should have been brought before the Federal Labor Relations Authority (FLRA), with judicial review available directly in a court of appeals.  Second, the district

court's merits analysis is wrong several times over. As a preliminary matter, plaintiffs cannot bring a non-statutory *ultra vires* claim to challenge the President's exercise of discretion conferred by statute. Furthermore, the district court failed to afford the considerable deference owed to the President in making a national-security determination under the FSLMRS. Instead, the district court improperly drew negative inferences at every turn, holding that plaintiffs had rebutted the presumption of regularity that this Court has recognized attaches to a President's exclusion order, based on a mistaken belief that the order conflicted with the statute's purpose. And the district court then proceeded to second-guess the President's national-security determination, improperly replacing the President's judgment with the court's own.

Finally, the district court incorrectly weighed the equitable factors, ignoring that plaintiffs' injuries are both speculative and reparable and discounting the national-security interests that Congress left to the President to safeguard and that the executive order addresses.

In light of the district court's unwarranted usurpation of a national-security prerogative statutorily entrusted to the President, this Court should vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. JA50. The district court granted plaintiffs' motion for a preliminary injunction on August 14, 2025. JA703-704. Defendants filed a timely notice of appeal on August 18, 2025. JA750. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court lacked Article III jurisdiction because plaintiffs' claims must be channeled to the FLRA, with judicial review directly in a court of appeals, in accordance with the FSLMRS.

2. Whether the district court erred in finding that plaintiffs are likely to succeed on their claims that the executive order is *ultra vires*.

3. Whether the district court erred in finding that equitable factors support a preliminary injunction.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

# STATEMENT OF THE CASE

## A.    Statutory And Regulatory Background

Congress enacted the Federal Service Labor–Management Relations Statute as part of the Civil Service Reform Act of 1978 (CSRA) to govern labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135. The FSLMRS grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters. *Id.* §§ 7102(2), 7106, 7114.

The FSLMRS also establishes a dedicated mechanism for resolving labor disputes. An employee or union may file a charge with the Federal Labor Relations Authority alleging that an agency has engaged in an unfair labor practice, which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision. *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3-2423.6. The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)-(2); *see also id.* § 7104(f)(2). The FSLMRS also requires all collective-bargaining agreements to include grievance procedures,

allowing an employee or union to file a grievance that culminates in an arbitration that can be appealed to the FLRA. *See id.* §§ 7121-7122. With certain exceptions, an FLRA final order is subject to judicial review in a court of appeals. *Id.* § 7123(a).

The FSLMRS exempts several federal agencies from coverage, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the Tennessee Valley Authority. 5 U.S.C. § 7103(a)(3). Additionally, it provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

*Id.* § 7103(b)(1).

Shortly after the FSLMRS's enactment, President Carter issued an executive order excluding more than 45 agencies or subdivisions from coverage, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Those

agencies included, *inter alia*, subdivisions of the Library of Congress, Department of the Treasury and Internal Revenue Service, Department of Defense, Department of Energy, and Agency for International Development. *Id.* §§ 1-2, 44 Fed. Reg. at 66,565-66,566. Every President since, except President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving investigative and national-security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 11, 2002); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 12,666, 54 Fed. Reg. 1,921 (Jan. 17, 1989).

## B. Factual Background

In March 2025, President Trump issued another such executive order, determining that certain agencies and subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS "cannot be applied to th[o]se agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, §§ 1-2, 90 Fed. Reg. 14,553, 14,553-14,555 (Apr. 3, 2025).

The designated agencies include, *inter alia*, the Department of Defense, Department of State, Federal Communications Commission, and Environmental Protection Agency, along with subdivisions of the Departments of the Treasury, Energy, Justice, and Health and Human Services. *Id.*

The same day, the Office of Personnel Management (OPM) issued guidance to federal agencies. Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F (OPM Guidance). OPM explained that "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the FSLMRS. OPM Guidance 3. OPM advised agencies to "consult with their General Counsels as to how to implement" the executive order. *Id.*

The OPM guidance also identified several ways in which exclusion from the FSLMRS could improve agency functions. OPM explained that collective-bargaining agreements "often create procedural impediments to separating poor performers beyond those required by statute or regulation," and that covered agencies and subdivisions would now have a freer hand to "separate employees for unacceptable

performance in appropriate cases." OPM Guidance 3-4. The guidance also emphasized that covered agencies would be able to "eliminate waste, bloat, and insularity" by conducting reductions in force where appropriate, ordering employees to return to in-person work, and ensuring that agency resources are used for agency, rather than union, business. OPM Guidance 5-6.

### C. Prior Proceedings

**1.** DoDEA is a DoD "Field Activity," an organizational entity established by the Secretary of Defense to carry out supply or service functions that are shared across multiple military branches. JA697. DoDEA is responsible for operating prekindergarten through 12th grade educational programs for children of DoD personnel stationed in the United States and abroad. JA697. Because DoDEA is part of DoD, it is subject to Executive Order 14,251.

Plaintiffs Federal Education Association (FEA), Federal Education Association Stateside Region (FEA-SR), and Antilles Consolidated Education Association are federal-sector labor unions who represent certain employees of DoDEA. JA50-52.

Plaintiffs filed this action against DoD, OPM, the President, the Secretary of Defense, and the acting director of OPM. Plaintiffs alleged that Executive Order 14,251 is inconsistent with 5 U.S.C. § 7103(b)(1) and therefore *ultra vires*; that the order was issued in retaliation for the unions' exercise of their First Amendment rights; and that the order violates the Due Process, Takings, and Equal Protection Clauses of the Fifth Amendment. *See* JA87-93. Plaintiffs also asserted claims under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See* JA93-95.

Plaintiffs moved for a preliminary injunction on July 2, 2025, JA6, which the district court granted on August 14, 2025. JA703-704. The district court's reasoning largely echoed that in the two prior decisions in which the same judge entered preliminary injunctions against the same executive order, *National Treasury Emps. Union v. Trump* (*NTEU*), 780 F. Supp. 3d 237 (D.D.C. 2025), and *American Foreign Serv. Ass'n v. Trump* (*AFSA*), 783 F. Supp. 3d 248 (D.D.C. 2025). *See* JA714, JA719.

Although the FSLMRS makes the FLRA "responsible for carrying out the purpose of" the statute and resolving disputes arising under the statute, 5 U.S.C. § 7105(a), the district court determined that this

statutory review scheme did not preclude district-court jurisdiction over plaintiffs' claims because the executive order excluded DoD from the statute's coverage, JA714-717.

With respect to likelihood of success on the merits, the district court first concluded that § 7103(b)(1) constituted a sufficiently "clear and specific statutory mandate" to subject the President's exercise of authority to *ultra vires* review. JA722 (quotation marks omitted).

The court next acknowledged that the executive order is entitled to a presumption of regularity, but it opined that plaintiffs had rebutted that presumption. JA724. The court offered three reasons: (1) "the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS"; (2) an accompanying White House Fact Sheet reflected retaliatory motive toward certain unions; and (3) the order was motivated by policy goals unrelated to the statutory criteria in the FSLMRS. JA724.

The district court then decided that, in determining plaintiffs' likelihood of success on the merits, the court would not review the order's exclusion of DoD from the coverage of the FSLMRS, or the application of that exclusion to DoDEA in particular, but rather the

11

executive order as a whole.  JA729-739.  The court opined that "the

President's invocation of Section 7103(b)(1) to exclude two-thirds of the

federal workforce—coupled with contemporaneous evidence reflecting

motivations for the Executive Order plainly outside those contemplated

by the statute—represents that the Executive Order" violated the

statutory requirements in the FSLMRS.  JA739.  The court accordingly

concluded that plaintiffs were likely to succeed on the merits of their

*ultra vires* claim.  JA739.[1]

The district court also held that plaintiffs faced irreparable harm

from the loss of bargaining power and union dues.  JA739-745.  And it

determined that an injunction would serve the public interest by

preserving the status quo and furthering the purposes of the FSLMRS.

JA745-748.  Based on this analysis, the court enjoined defendants from

implementing the executive order as to plaintiff unions and the

employees they represent.  JA704.

**2.**  The government appealed and moved for a stay of the

injunction.  The Court denied that motion.  *FEA v. Trump*, No. 25-5303,

---

[1] The district court did not address plaintiffs' constitutional and
APA claims, which are not at issue in this appeal.  JA739 n.8.

2025 WL 2738626 (D.C. Cir. Sep. 25, 2025) (per curiam). The sole

ground for the Court's order was that, "[a]ssuming without deciding

that the government is likely to succeed on the merits, it has not met its

burden to separately demonstrate that it will face irreparable injury."

*Id.* at *2. The Court reasoned that, because the preliminary injunction

applies only to DoDEA, "the government must show that requiring

*DoDEA* to adhere to the FSLMRS's collective bargaining requirements

during the pendency of the appeal will harm national security or

otherwise irreparably injure the government." *Id.* The Court noted

that the government's stay motion did not offer evidence specific to

DoDEA. *Id.*

**3.** District courts have preliminarily enjoined the executive order

at issue here in four other cases. In *AFSA*, 783 F. Supp. 3d at 254, the

same district judge who issued the injunction in this case enjoined the

government from implementing a separate section of the executive

order that excludes subdivisions of the Department of State and U.S.

Agency for International Development from the coverage of the labor-

relations provisions of the Foreign Service Act. This Court stayed that

injunction. *AFSA v. Trump* (*AFSA* Stay Order), No. 25-5184,

13

2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam). The Court

explained that AFSA faces a heavy burden in meeting the standard for

establishing an *ultra vires* claim and that it is unclear whether *ultra*

*vires* review is available against the President, particularly when the

statute in question commits the decision to the discretion of the

President. *Id.* at *2-3. And even if the case is justiciable, the Court

explained that its review of the executive order "must be exceedingly

deferential." *Id.* at *3. Under that deferential review, the Court

concluded "that the Executive Order likely withstands the [union's]

'attacks on its sufficiency.'" *Id.* (alteration omitted). The Court further

concluded that the balance of equities favors a stay because the

national-security interests at stake outweigh any non-monetary harm

the union may suffer. *Id.* AFSA filed a motion for reconsideration en

banc, which this Court denied. Order, *AFSA v. Trump*, No. 25-5184

(D.C. Cir. July 30, 2025) (en banc) (per curiam).

In *NTEU*, 780 F. Supp. 3d 237, 269 (D.D.C. 2025), the same

district judge enjoined the government from implementing the

executive order's exclusions from the FSLMRS. *See* Order, *NTEU v.*

*Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 25, 2025). This Court stayed

that injunction. *NTEU v. Trump* (*NTEU* Stay Order), No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) (per curiam). The Court reasoned that the government is likely to prevail on the merits of the appeal because NTEU "failed to establish irreparable harm." *Id.* at *1-2. Among other reasons, the Court found that NTEU's alleged financial injury is speculative because the union can collect dues directly from its members, and any loss that results from agencies declining to withhold dues from employees' paychecks can be remedied in a subsequent FLRA proceeding. *Id.* at *2. NTEU filed a motion for reconsideration en banc, which this Court denied. Order, *NTEU v. Trump*, No. 25-5157 (D.C. Cir. July 16, 2025) (en banc) (per curiam).

In *American Federation of Government Employees* (*AFGE*) *v. Trump*, No. 25-cv-03070, 2025 WL 1755442 (N.D. Cal. June 24, 2025), another district court enjoined the executive order at issue at the behest of a separate group of union plaintiffs. This time, the district court did not reach the unions' *ultra vires* claims and instead held that the unions had raised a serious question whether the executive order is consistent with the First Amendment. *Id.* at *2. The Ninth Circuit granted a stay pending appeal. *AFGE v. Trump* (*AFGE* Stay Order), 148 F.4th 648,

651 (9th Cir. 2025) (per curiam). The court explained that the government had shown that it is likely to succeed on the merits of the First Amendment retaliation claim because the executive order "[o]n its face … does not express any retaliatory animus" but instead "conveys the President's determination that the excluded agencies have primary functions implicating national security and cannot be subjected to the FSLMRS consistent with national security." *Id.* at 655. The court rejected the unions' reliance on a fact sheet issued by the White House, explaining that the fact sheet "conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions." *Id.* The Ninth Circuit also found that the equitable factors favor the government because the preliminary injunction impedes the government's ability to protect national security and any temporary harm to the plaintiff unions could be addressed at the conclusion of litigation. *Id.* at 655-656.

Finally, in *AFL-CIO v. Trump*, No. 1:25-cv-02445 (D.D.C. Oct. 1, 2025), the same district judge that issued the injunction in this case again enjoined the government from implementing the executive order's

exclusions from the FSLMRS as to certain bargaining units, across several agencies, that were represented by the plaintiffs in that case.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs are unlikely to succeed on the merits of their suit. First, Congress withdrew district-court jurisdiction over claims like plaintiffs' through the FSLMRS, which establishes a comprehensive scheme for reviewing and remedying allegations that federal agencies have violated the FSLMRS. Under the statute, plaintiffs are required to submit their claims to the FLRA; only after receiving a final FLRA order may a plaintiff seek judicial review, directly in the court of appeals.

Second, plaintiffs' *ultra vires* claim fails at the outset because the Supreme Court has made clear that *ultra vires* review of presidential action is not available when the statute in question commits the action to the discretion of the President. The FSLMRS provides a grant of broad, unreviewable discretion to the President and forecloses the application of any meaningful judicial standard of review.

Third, even if plaintiffs could assert an *ultra vires* claim, they cannot establish that the President acted contrary to the statute. The

President properly invoked his authority to exclude DoD from the provisions of the FSLMRS, and this Court has held that such a decision is entitled to a presumption of regularity. The district court erred in holding that plaintiffs had rebutted that presumption; none of the reasons cited by the district court justifies a finding that the President acted improperly. In any event, the President's exclusion determination cannot be found *ultra vires* because it is not obviously beyond the terms of the statute. As the district court acknowledged, DoD performs national-security work as a primary function, and the President reasonably determined that applying the provisions of the FSLMRS to DoD is inconsistent with national security.

**II.** Plaintiffs have not established that they would likely incur irreparable harm absent a preliminary injunction. The district court relied on two supposed harms, but neither supports the extraordinary remedy of a preliminary injunction. First, plaintiffs' assertion that the executive order will diminish their bargaining power is speculative. Furthermore, if plaintiffs ultimately prevail in this litigation, the FLRA could impose a retroactive remedy to address any interim changes to

working conditions that agencies may have made outside the bargaining process.

Second, plaintiffs' asserted monetary harm is not irreparable because the FLRA can order agencies to reimburse plaintiffs if they are found to have unlawfully failed to withhold dues from employees' paychecks. And the claimed financial harm is speculative, in any event, because plaintiffs can collect dues directly from their members.

**III.** The balance of the equities and the public interest weigh in defendants' favor. In the FSLMRS, Congress left it to the President to determine when the government's national-security functions are incompatible with the demands of collective bargaining. The district court's preliminary injunction intrudes on the President's discharge of his duties under that statute, subjecting the government to collective-bargaining requirements that the President has concluded are inconsistent with DoD's national-security function.

## STANDARD OF REVIEW

The Court reviews the district court's weighing of the preliminary-injunction factors for an abuse of discretion, its factual findings for clear

error, and its legal conclusions de novo. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233-1234 (D.C. Cir. 2025).

## ARGUMENT

To obtain a preliminary injunction, a movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors weighed against granting a preliminary injunction here.

## I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A. The FSLMRS Precludes District-Court Jurisdiction Over Plaintiffs' Claims

#### 1. Congress intended to channel this dispute through the FLRA

Although Congress has generally granted district courts original jurisdiction over civil actions arising under the Constitution and laws of the United States, 28 U.S.C. § 1331, Congress has at times withdrawn such jurisdiction by establishing an alternative statutory scheme for administrative and judicial review of a dispute. "[W]hen Congress creates procedures designed to permit agency expertise to be brought to

bear on particular problems," those procedures are generally intended "to be exclusive." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks omitted).

With the FSLMRS, as with the rest of the CSRA, "Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector," along with dedicated mechanisms for resolving federal labor disputes. *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (quotation marks omitted). In particular, the FSLMRS channels adjudication of such disputes to the FLRA, followed by direct review in the court of appeals. *See* 5 U.S.C. §§ 7105(a)(2), 7123(a). This Court has held that the review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this regime by instead bringing a suit in district court." *AFGE*, 716 F.3d at 637-638.

The district court thus lacks jurisdiction to review plaintiffs' claims alleging that the government has acted contrary to the provisions of the FSLMRS, unless those claims are not "of the type

Congress intended to be reviewed within [the] statutory structure."
*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("Congress intended the [FSLMRS] scheme to be exclusive with respect to claims within its scope.").  In determining whether the claims presented here fit within the statutory review scheme, the Court must consider whether "a finding of preclusion could foreclose all meaningful judicial review," whether the claims are "wholly collateral" to the FSLMRS's review provisions, and whether the claims are "outside the [FLRA's] expertise." *Thunder Basin Coal Co.*, 510 U.S. at 212-213 (quotation marks omitted); *see also AFGE*, 929 F.3d at 755.  "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme … reaches the claim in question."  *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186 (2023).

Each of the three *Thunder Basin* factors weighs in favor of finding plaintiffs' claims precluded.  First, requiring plaintiffs to proceed through the statutory review scheme would not foreclose all meaningful judicial review.  Specifically, plaintiffs can litigate their claims through the statutory scheme by alleging that DoDEA has committed unfair

labor practices by "refus[ing] to consult or negotiate in good faith with a labor organization as required by" the FSLMRS or "otherwise fail[ing] or refus[ing] to comply with any provision" of the statute, 5 U.S.C. § 7116(a).  A union can file such a charge with the FLRA's General Counsel, *see id.* § 7118(a), or raise a grievance through the grievance and arbitration procedures that the FSLMRS requires in every collective-bargaining agreement, *id.* § 7121(a), and then appeal any adverse arbitrator's award to the FLRA, *id.* § 7122(a).  In either event, the union can then obtain judicial review of an adverse FLRA decision regarding an alleged unfair labor practice in the court of appeals.  *See id.* § 7123(a); *see also AFGE*, 929 F.3d at 757-758 (identifying ways a union could obtain judicial review of constitutional challenges to executive orders through the FSLMRS review scheme).

In addition, plaintiffs could challenge the executive order in cases already pending before the FLRA.  If DoDEA moves to dismiss such a case because the executive order excludes the agency from the provisions of the FSLMRS, or if the FLRA asks the parties to address its jurisdiction in light of the executive order, plaintiffs could raise their arguments that the FLRA continues to have jurisdiction over those

pending cases because the executive order is invalid.  The district court itself noted one case in which the FLRA issued an order to show cause giving plaintiff FEA-SR an opportunity to address the FLRA's jurisdiction given the executive order.  *See* JA715-716; JA354 (union's response); *see also U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750, 750 (2002) (noting the FLRA "requested and received submissions from the parties as to why [the] cases should not be dismissed for lack of jurisdiction in light of the Executive Order" excluding U.S. Attorneys' Offices from coverage of the FSLMRS).  If the FLRA concludes it cannot address a union's claims under the FSLMRS and dismisses such a case, that dismissal order would generally be subject to judicial review.  *See* 5 U.S.C. § 7123(a).

Second, plaintiffs' claims are not wholly collateral to the FSLMRS's statutory review scheme.  On the contrary, the amended complaint squarely raises a claim under the FSLMRS, alleging (among other things) that the executive order is "unmoored from Section 7103(b)(1)'s narrow conditions" and that the order's purposes are not "legitimate under Section 7103(b)."  JA87-88.  The plaintiffs' challenge in this case is thus "of the type" that this Court has explained

"is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated." *AFGE*, 929 F.3d at 760. And the remedies that plaintiffs seek include, *inter alia*, a declaration that the executive order is unlawful and an order prohibiting the government from implementing it. JA96. That is precisely the type of relief that this Court has previously explained a union could obtain through the statutory scheme. *See AFGE*, 929 F.3d at 760 ("[T]he unions ask the district court for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders during bargaining disputes.").

Indeed, in analogous contexts, this Court has held that the FLRA has "exclusive authority to render judgment on the question" of whether employees are entitled to engage in collective bargaining. *AFGE v. Loy*, 367 F.3d 932, 935-936 (D.C. Cir. 2004). Plaintiffs' challenge is thus not wholly collateral to the statutory scheme. *See Elgin v. Department of the Treasury*, 567 U.S. 1, 22 (2012) (holding that a constitutional claim was not wholly collateral to the CSRA scheme because the plaintiffs

challenged "precisely the type of personnel action regularly adjudicated by the [Merit Systems Protection Board] and the Federal Circuit within the CSRA scheme" and "request[ed] relief that the CSRA routinely affords").

Third, plaintiffs' claims are not beyond the expertise of the FLRA. Plaintiffs' statutory challenges "lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations.'" *AFGE*, 929 F.3d at 760. Their claims "require interpreting the FSLMRS—the very law that the FLRA is charged with administering and interpreting," *id.* at 760-761; *see* 5 U.S.C. § 7105(a), and Congress has directed the FLRA to adjudicate disputes over whether an agency has failed or refused to comply with the statute, *see* 5 U.S.C. § 7116(a)(8). *See Elgin*, 567 U.S. at 23 (ruling that a claim was not outside the Merit Systems Protection Board's expertise where the challenged statute was one that the Board "regularly construes"). The FLRA could also bring its expertise to bear on factual issues that may be presented in this case; after all, it regularly resolves disputes over whether certain employees are "engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security," 5 U.S.C. § 7112(b)(6)—a

standard with obvious overlap with the provision at issue in this case. *See, e.g.*, *U.S. Dep't of the Air Force Davis-Monthan Air Force Base & AFGE Loc. 2924*, 62 F.L.R.A. 332, 334-336 (2008) (considering whether employees were engaged in work that directly affects national security). The FLRA also adjudicates First Amendment-retaliation claims in the course of its ordinary work. *See Independent Union of Pension Emps. for Democracy & Just. & Pension Benefit Guar. Corp.*, 68 F.L.R.A. 999, 1014 (2015) (considering a claim that an agency had initiated arbitration in retaliation for a union's exercise of free-speech rights). The FLRA thus has expertise that goes to the core issues in this case.

Even if the FLRA declined to address all of plaintiffs' claims or lacked expertise on some issue raised by those claims, however, a court of appeals could consider the claims on appeal from the FLRA. *See AFGE*, 929 F.3d at 758. After all, "[i]t is not unusual for an appellate court reviewing the decision of an administrative agency to consider a constitutional challenge to a federal statute that the agency concluded it lacked authority to decide." *Elgin*, 567 U.S. at 18 n.8; *see also AFGE*, 929 F.3d at 758 ("[I]t is of no dispositive significance whether the agency has the authority to rule on constitutional claims so long as the

claims can eventually reach an Article III court fully competent to adjudicate them[.]" (quotation marks omitted)). There is thus no reason why plaintiffs' constitutional or statutory claims could not be "meaningfully addressed in the Court of Appeals." *Thunder Basin Coal Co.*, 510 U.S. at 215.

### 2. The FLRA has authority to entertain plaintiffs' challenges to the executive order

The district court concluded that it had jurisdiction because Executive Order 14,251 exempts the agencies at issue from the FSLMRS, making FLRA review unavailable. JA717. But this circular logic assumes the validity of the very order that plaintiffs contend is invalid; if plaintiffs are correct on the merits of their claim, then DoDEA was not properly excluded and the FLRA has jurisdiction to resolve disputes between plaintiffs and DoDEA. Just as "a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), including to consider the scope and validity of a jurisdiction-stripping provision, *see generally Boumediene v. Bush*, 553 U.S. 723 (2008), the FLRA also has authority to consider whether the executive order was a valid exercise of the President's authority under § 7103(b)(1) to exclude agencies from coverage of the

FSLMRS.  Considering the scope of the FLRA's jurisdiction will of course give the FLRA an opportunity to decide the question at the heart of plaintiffs' claims—whether the challenged executive order is lawful—and however the FLRA disposes of that question, the losing party may then obtain judicial review of that question in the court of appeals.

The district court noted that the FLRA has disclaimed authority to hear claims brought in connection with agencies excluded from the FSLMRS, JA714-715, but that does not mean that the FLRA lacks authority to consider the *validity* of a presidential exclusion and thus whether the relevant agencies are in fact excluded from the scope of the statute.  Indeed, in *U.S. Attorney's Office Southern District of Texas & AFGE Local 3966*, for example, the FLRA "requested and received submissions from the parties" as to whether it should dismiss a pending case in light of an exclusion order under § 7103(b)(1).  57 F.L.R.A. at 750.  Although none of the parties in that case disputed the validity of the executive order, if one of them had, the FLRA could have resolved that dispute in order to resolve the question of its jurisdiction.  And in *Department of the Navy, Naval Telecommunications Center & Navtelcom Unit Local No. 1*, the FLRA had to (and agreed to) construe

the scope of an exclusion order in order to determine its jurisdiction. 6

F.L.R.A. 498, 500 (1981). There is thus no reason to think that the

FLRA would refuse to consider the validity of an executive order where

doing so is necessary to determining its jurisdiction.[2]

In fact, the FLRA's order to show cause why a pending case

between plaintiff FEA-SR and DoDEA should not be dismissed for lack

of jurisdiction, *see supra* p. 24; *see also* JA346-347, demonstrates that

the FLRA could consider plaintiffs' contention that the executive order

is ineffective. The FLRA has not yet decided the issue because the

union asked that the case be placed in abeyance pending other

litigation, JA358, and the FLRA granted the request, JA361. But even

if the FLRA ultimately dismisses without opining on the validity of the

challenged exclusion order, such an FLRA order would nonetheless

---

[2] The district court's reliance on the superseded administrative-law-judge decision in *U.S. Department of the Air Force Air Force Materiel Command Warner Robins Air Logistics Center Robins Air Force Base & AFGE Local 987*, 66 F.L.R.A. 589 (2012), provides no support for the court's conclusion. The administrative law judge in that case correctly stated that "an exemption from [FSLMRS] coverage constitutes a jurisdictional bar to [the FLRA's] consideration" of cases raised under the statute, but he also recognized that the FLRA would have authority to determine "the effect" of an exclusion order. *Id.* at 598.

trigger plaintiffs' ability to seek judicial review of that question (assuming it has been preserved) in a court of appeals. *See AFGE*, 929 F.3d at 758-759 ("[W]e may review the unions' broad statutory and constitutional claims on appeal from an FLRA proceeding even if the FLRA cannot.").

Finally, the district court's reliance on *AFGE Local 446 v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007), is misplaced, as that decision only underscores that plaintiffs' claims should have been brought before the FLRA. *See* JA715-716. In that case, the Secretary of Veterans Affairs' delegee had determined, pursuant to statutory authority, that a certain matter concerning employee compensation was not subject to collective bargaining. 475 F.3d at 346; *see* 38 U.S.C. § 7422(b), (d). This Court held that the FLRA did not have authority to review the Secretary's decision because the statute expressly provided that the decision "may not be reviewed by any other agency," which this Court interpreted to include the FLRA. *AFGE*, 475 F.3d at 347 (quoting 38 U.S.C. § 7422(d)). The authority providing for the President's exclusion order at issue here, in contrast, does not "expressly" provide that such an order is "outside the FLRA's purview." *Id.* at 348.

Accordingly, the FLRA has jurisdiction to review challenges to that executive order, just as it has authority to review other disputes arising under the FSLMRS and not expressly removed from the FLRA's jurisdiction.

### B. Plaintiffs Cannot Assert An *Ultra Vires* Claim To Challenge The President's Exercise Of Discretion Granted By Statute

Even if the district court has jurisdiction, plaintiffs are unlikely to succeed on the merits because they fail to state a claim upon which relief can be granted. Plaintiffs seek non-statutory, or *ultra vires*, review of an order issued by the President. The Supreme Court has assumed without deciding that some *ultra vires* claims that the President has violated a statutory mandate are judicially reviewable. *Dalton v. Specter*, 511 U.S. 462, 474 (1994). But "such review is not available when," as here, "the statute in question commits the decision to the discretion of the President." *Id.*; *see also AFSA* Stay Order, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam) ("[I]t is unclear whether *ultra vires* review is available at all. Again, an *ultra vires* action is a suit in equity, and courts generally lack authority to enjoin the President[.]" (citations omitted)).

In *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*,

the Supreme Court considered a challenge to the President's exercise of

statutorily conferred authority, for the duration of World War I, "to

supervise or to take possession and assume control of any telegraph,

telephone, … or radio system" "whenever he shall deem it necessary for

the national security or defense."  250 U.S. 163, 181-182 (1919).  South

Dakota claimed that the President exceeded his authority by taking

control of the telegraph and telephone systems, contending that "there

was nothing in the conditions at the time the power was exercised

which justified the calling into play of the authority" and "assail[ing]

the motives which it is asserted induced the exercise of the power."  *Id.*

at 184.  The Court held that it lacked authority to consider such a claim

because where a challenge to the President's action "concerns not a

want of power, but a mere excess or abuse of discretion in exerting a

power given, it is clear that it involves considerations which are beyond

the reach of judicial power."  *Id.*; *see also Chicago & S. Air Lines, Inc. v.*

*Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948) (holding that certificates

permitting foreign carriers to engage in overseas transportation

"embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate").

The FSLMRS provides a similar grant of broad, unreviewable discretion to the President to exercise certain powers when he has determined it is necessary for the national security to exclude certain agencies or subdivisions from coverage of the FSLMRS. This Court concluded that materially identical language in 22 U.S.C. § 4103 "delegates broad authority to the President to exclude parts of the Foreign Service from Subchapter X in the interest of national security," which is "consistent with the President's role as commander-in-chief." *AFSA* Stay Order, 2025 WL 1742853, at *3. The same is true of § 7103(b): the relevant provision "fairly exudes deference" to the President "and appears … to foreclose the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988). "How the President chooses to exercise the discretion Congress has granted him" in the FSLMRS is thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476.

Judicial review of the President's discretionary determination in this area is particularly inappropriate because that determination—like

the one at issue in *Dakota Central Telephone*—arises in the national-security context. "National-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided otherwise,'" *Ziglar*, 582 U.S. at 143, and a non-statutory *ultra vires* claim like plaintiffs assert here necessarily lacks congressional authorization. Plaintiffs thus lack a cause of action to challenge the President's exercise of discretion vested in him by the FSLMRS.

The district court utterly ignored these principles. It concluded that § 7103(b) is not "a 'delegat[ion] of broad authority' to the President," JA720 (alteration in original), even though this Court concluded that materially identical language "delegates broad authority to the President," *AFSA* Stay Order, 2025 WL 1742853, at *3. And it decided that the "fairly exacting limitations on the President's authority

to invoke the statutory provision" permitted the district court to closely scrutinize the President's determinations, JA722, even though this Court has previously admonished a district court for "mandating a presidential demonstration of compliance with the section," *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989); *see also id.* at 726 (rejecting proposition "that the courts are the instrumentalities for ensuring that the authority is properly exercised"). The district court's conclusions regarding the availability of *ultra vires* review flatly contradict this Court's prior decisions regarding the Executive Order and cannot support the injunction here.

## C. Plaintiffs Are Not Likely To Succeed On The Merits Of Their *Ultra Vires* Claim

Even if plaintiffs could assert an *ultra vires* claim, they cannot establish that the President plainly acted in contravention of the statute. Plaintiffs face a high bar to establish a right to relief. *Ultra vires* review "is intended to be of extremely limited scope." *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) (quotation marks omitted). To prevail, plaintiffs would have to show that the President acted "'in excess of [his] delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*,

605 U.S. 665, 681 (2025). An *ultra vires* challenge "is essentially a Hail Mary pass," and "garden-variety errors of law or fact are not enough" to establish such a claim. *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764-765 (D.C. Cir. 2022) (alteration and quotation marks omitted). Rather, "*ultra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Id.* at 765; *see also Global Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *12 (D.C. Cir. Aug. 13, 2025) (observing that such violations occur "only when the error is so extreme that one may view it as jurisdictional or nearly so" (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022))). Plaintiffs are unable to meet this standard in light of the discretionary authority that the FSLMRS vests in the President.

### 1. The executive order is facially consistent with statute

This Court has held that a President's exclusion order under § 7103(b)(1) need not be explained and is entitled to a presumption of regularity. *AFGE*, 870 F.2d at 727-728. In *AFGE v. Reagan*, this Court considered a similar challenge to President Reagan's exercise of discretion to exclude certain subdivisions of the U.S. Marshals Service

from the scope of the FSLMRS. *Id.* at 725. The union plaintiff in that case contended that federal marshals are not engaged in the protection of national security, and although the district court rejected that argument, it held that the President did not lawfully exercise his power because he did not include in the executive order his determination of the conditions specified in the statute. *Id.* This Court reversed, rejecting the argument that "courts are the instrumentalities for ensuring that the [§ 7103(b)(1)] authority is properly exercised" and upholding the validity of the executive order. *Id.* at 726-728. The Court explained that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," and this section "does not expressly call upon the President to insert written findings into an exempting order, or indeed to utilize any particular format for such an order." *Id.* at 727. Rather, a bare determination by the President is sufficient to invoke that authority. In light of the presumption of regularity, the Court refused to entertain "an unwarranted assumption that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *Id.* at 728.

This Court in *AFGE* thus properly recognized the extent of the discretion statutorily vested in the President and, correspondingly, the limited role for judicial review. After all, "[s]hort of permitting cross-examination of the [President] concerning his views of the Nation's security" and whether granting employees in the relevant agencies coverage under the provisions of the FSLMRS is "inimical to those interests"—a procedure that would plainly be improper—there is "no basis on which a reviewing court could properly assess" a President's exclusion decision. *Webster*, 486 U.S. at 600.

The executive order under review here "cited accurately the statutory source of authority therefor, and purported to amend [President Carter's] earlier order that indubitably was a proper exercise of that authority." *AFGE*, 870 F.2d at 728. The President's determination thus "satisfies every requirement" of § 7103(b)(1), "and a finding which follows [the statute's] language, as this finding does, cannot well be challenged as insufficient." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 331 (1936); *see also AFSA* Stay Order, 2025 WL 1742853, at *3 (observing that in prior cases involving "a statutory delegation [that] invokes the President's discretion in

exercising core Article II responsibilities," courts reviewed only whether the President acknowledged the statutory delegation, and "did not inspect the President's rationale").

### 2. Plaintiffs failed to rebut the presumption of regularity

If any further role for judicial review remains, it must be limited to circumstances where a plaintiff can overcome the presumption of regularity by making a "strong showing of bad faith or improper behavior." *Hercules Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978); *see also Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024) (a party seeking to rebut the presumption of regularity must present "clear evidence" that public officers have not "properly discharged their official duties" (quotation marks omitted)). No such showing was made here. The district court offered three conclusory reasons for its holding that plaintiffs had overcome the presumption of regularity, but the court did not explain those reasons apart from citing its earlier decision in *NTEU*. *See* JA724. Those reasons fail here as they do in *NTEU*.

**a.** First, the district court reasoned that "the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS," JA724, presumably referring to

the court's conclusion in *NTEU* that the order's scope was inconsistent with Congress's finding that "labor organizations and collective bargaining in the civil service are in the public interest," 780 F. Supp. 3d at 254 (quoting 5 U.S.C. § 7101(a)).  But the FSLMRS's "[e]xceptions and exemptions are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect."  *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 239 (2021).  By permitting the President to exclude agencies from the FSLMRS's coverage where collective bargaining is inconsistent with "national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B), Congress recognized that this is an "area[] fraught with competing social demands where … trade-offs are required."  *BP*, 593 U.S. at 239.  The district court erred in construing the executive order as a *violation* of the statute rather than as *respecting* the competing priorities that it balances.  The executive order is entirely compatible with Congress's judgment that the President is best positioned to make determinations over time as to which agencies should be exempted from the FSLMRS based on national-security concerns.

The district court placed undue emphasis on the breadth of the executive order, disregarding the fact that the President could reasonably determine that in the nearly half-century since the FSLMRS was enacted, national-security considerations and the conduct of labor organizations have changed such that a larger share of the federal workforce can, and should, be excluded from the statute's coverage. Contrary to the district court's suggestion, *NTEU*, 780 F. Supp. 3d at 254-255, Congress nowhere stated that the President's determinations under § 7103(b)(1) can cover only a certain percentage of the federal workforce. In any event, allegations that the President has established an "overbroad" policy that does not "serve national security interests" do not permit courts to "substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Trump v. Hawaii*, 585 U.S. 667, 707-708 (2018). The district court's disagreement with the President's line-drawing and its assumption that the order's breadth indicated unlawful motives turned the presumption of regularity on its head and was "unwarranted." *AFGE*, 870 F.2d at 728.

At any rate, it is not surprising that over time, in response to different national-security requirements and considerations, and applying different "informed judgment[s]," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010), different Presidents will make different determinations under § 7103(b)(1). But Congress provided no standards by which to judge a President's invocation of § 7103(b)(1), leaving it to the President to make those determinations. *See Webster*, 486 U.S. at 600. The district court's suggestion that the President must have acted contrary to statute because he took a capacious view of national-security interests is entirely misplaced.

**b.** Second, the district court viewed statements in a White House fact sheet as indicating that the President had considered improper factors. JA724. But even if that fact sheet represented the motivations of the President in issuing the executive order, it does not reflect any motivations inconsistent with the statute. Rather, the fact sheet merely explains how unions' activities have impaired the functioning of agencies in a manner that could undermine national security—a circumstance that is plainly relevant to the President's determination under § 7103(b)(1). The fact sheet notes, for example, that the FSLMRS

can "enable[] hostile Federal unions to obstruct agency management" by preventing agencies from removing employees for poor performance or misconduct and impede agencies from taking other operational measures including, for example, "modify[ing] cybersecurity policies." The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H (*Fact Sheet*). Such considerations are entirely in accord with an executive order issued to protect President Trump's "ability to manage agencies with vital national security missions" and "to ensure that agencies vital to national security can execute their missions without delay and protect the American people." *Id.*; *see AFGE* Stay Order, 148 F.4th 648, 655 (9th Cir. 2025) (per curiam) ("The Fact Sheet … conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions," and thus demonstrates "an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities.").

In its earlier decision in *NTEU*, the district court drew a false

distinction between whether "'the provisions' of the FSLMRS

themselves" cannot be applied in a manner consistent with national

security and whether "the unions' *use of* these provisions" would be

inconsistent with national security. 780 F. Supp. 3d at 256. Applying

the provisions of the FSLMRS to the excluded agencies would be

inconsistent with national-security requirements precisely *because*

unions can use those provisions in a manner that "jeopardizes [the

President's] ability to manage agencies with vital national security

missions," which necessarily includes, *inter alia*, ensuring performance

accountability. *Fact Sheet*. Union activity that makes it difficult for

agencies engaged in national-security work to terminate poor

performers not only obstructs President Trump's "policy directives and

'agenda'" (which includes improving the functioning of these agencies),

*NTEU*, 780 F. Supp. 3d at 256, but also impairs the agencies' ability to

safeguard national security, and it is thus a legitimate consideration

under § 7103(b)(1). As another example, the fact sheet describes how a

union obtained an FLRA decision holding that U.S. Immigration and

Customs Enforcement had to bargain before addressing cybersecurity

threats by blocking access to web-based email services on its network. *See U.S. Dep't of Homeland Sec. U.S. Immigration & Customs Enf't & AFGE Nat'l Immigration & Customs Enf't Council 118*, 67 F.L.R.A. 501 (2014).  Rather than suggesting a "retaliatory motive," *NTEU*, 780 F. Supp. 3d at 256, the fact sheet reasonably describes how the FSLMRS has been used to undermine national-security requirements.

Instead of acknowledging the relevance of union activity to the § 7103(b)(1) determination and presuming that the fact sheet indicated legitimate considerations regarding past union practices, the district court drew the most negative possible inference and attributed unconstitutional motives to the President:  The court suggested that the President issued the executive order "as retaliation against labor organizations that have opposed President Trump."  JA732.  In doing so, the district court disregarded both the deference owed to the President's national-security assessments and its duty not to assume "that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE*, 870 F.2d at 728.

Nor was the district court's conclusion supported by the fact that President Trump did not exclude agencies where unions have worked cooperatively with the government to improve agency functioning. *Contra NTEU*, 780 F. Supp. 3d at 256. Where unions are engaged in such "constructive partnerships," *Fact Sheet*, the President was entitled to conclude that the provisions of the FSLMRS can be applied "in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B), and that exclusion is thus unwarranted.

**c.** Third, the district court erred in declaring that the OPM guidance demonstrates that the executive order was motivated by unrelated policy goals. *See* JA724. The guidance notes the policy of this Administration "to eliminate waste, bloat, and insularity" within agencies, OPM Guidance 5, and as applied to agencies that have as a primary function intelligence, investigative, or national-security work, these policies are directly relevant to the policy goals of § 7103(b)(1). Congress may have thought inefficiencies are tolerable in certain circumstances as the price for allowing federal employees to organize, but Congress made clear that labor interests cannot be allowed to

undermine national security. In agencies like DoD, *see* Exec. Order No. 14,251, § 2(b), 90 Fed. Reg. at 14,553, removing "procedural impediments to separating poor performers" is a national-security imperative, OPM Guidance 3. So is the ability to optimize the efficiency of an agency through restructuring, even when that involves reductions in force.

The FSLMRS does not permit courts to second-guess the President's decisions about how agencies must be operated so that employees can best perform their national-security work. Rather, the statute expressly leaves that judgment to the President. Judicially second-guessing the President's national-security determinations would be "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Hawaii*, 585 U.S. at 686. Furthermore, "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'" *Id.* at 704. The district court erred in rejecting the presumption of regularity based on its disagreement with a determination that Congress appropriately left to the President.

### 3. The President's determinations reasonably apply the criteria of § 7103(b)(1)

Even if the presumption of regularity did not apply and the district court could look behind the President's determinations, the government would still prevail. The district court believed that the scope of the order meant that "the 'President has applied an overly broad interpretation' of Section 7103(b)(1), 'thereby making the President's Executive Order *ultra vires.*'" JA731, JA739. However, as noted, the President could reasonably determine that, given the current state of national security and labor relations, a larger share of the federal workforce can and should be excluded from the statute's coverage than was the case almost a half-century ago. The President's determinations are reasonable and not "'obviously beyond the terms of the statute.'" *North Am. Butterfly Ass'n*, 977 F.3d at 1263.

**a.** The President reasonably determined that the agencies covered by the order, including DoD, have intelligence, investigative, or national-security work as "a primary function," 5 U.S.C. § 7103(b)(1)(A). An agency can have multiple primary functions, as Congress recognized through its use of the article "a." And although Congress does not always enumerate an agency's primary functions, where it has, it

frequently lists several.  *See, e.g.*, 15 U.S.C. § 634b (listing 12 "primary

functions").  Thus, an agency would fit within the terms of

§ 7103(b)(1)(A) even if it does not only (or mostly) perform intelligence,

investigative, or national-security work, so long as such work is "a"

primary function of the agency.

As the district court acknowledged, "DoD is the quintessential

example of an agency that has 'a primary function' of 'national security

work.'"  JA731 (quoting 5 U.S.C. § 7103(b)(1)(A)).  Similarly, the

Department of State's declared mission is "[t]o protect and promote U.S.

*security*, prosperity, and democratic values and shape an international

environment in which all Americans can thrive."  U.S. Dep't of State,

*About the U.S. Department of State*, https://perma.cc/8GPX-63RG

(emphasis added).

The President's determination as to the other agencies covered by

the order likewise contravenes no express statutory prohibition.  To

take a few examples, the Department of Energy performs several

national-security functions, and Congress recognized as much when it

created the agency.  *See* 42 U.S.C. § 7111(2) (finding that an "energy

shortage and … increasing dependence on foreign energy supplies

present a serious threat to the national security of the United States"). The Department works to "increase nuclear nonproliferation and ensure the security of the U.S. nuclear weapons stockpile," "manages the Strategic Petroleum Reserve, invests in protection against cyber and physical attacks on U.S. energy infrastructure, … and provides training tools and procedures for emergency response and preparedness." U.S. Dep't of Energy, *Energy Security*, https://perma.cc/2YCS-EUBP.

The Centers for Disease Control and Prevention has "an essential role in defending against and combatting public health threats domestically and abroad," including "capabilities related to bioterrorism and other public health emergencies." 42 U.S.C. § 247d-4(a)(1). The Department of Health and Human Services' Administration for Strategic Preparedness and Response performs work in support of "public health emergency preparedness and response, biodefense, [and] medical countermeasures." *Id.* § 300hh-10(b). And the Federal Communications Commission was created to regulate communication "for the purpose of the national defense." 47 U.S.C. § 151.

The Department of the Treasury's mission likewise includes "strengthen[ing] national security by combating threats and protecting

the integrity of the financial system."  U.S. Dep't of the Treasury, *Role of the Treasury*, https://perma.cc/24Z9-QXE8.  The enumerated duties of the Secretary of the Treasury include "tak[ing] steps to discover"—*i.e.*, investigating—fraud, 31 U.S.C. § 321(a)(7), and the IRS performs "investigative" work in the form of audits.  The FLRA has also previously found that the IRS performs national-security work.  *See, e.g., U.S. Dep't of the Treas., IRS & NTEU*, 62 F.L.R.A. 298, 304 (2007) ("[A]ny disruption to the [IRS]'s ability to collect taxes, which allows for the funding of governmental operations, would greatly impact the Nation's economic strength, and, thus, the national security.").  And Congress has provided for the Secretaries of Treasury and Energy to be part of the National Security Council.  50 U.S.C. § 3021(c).

The district court, in enjoining the executive order based on its view that the order covered too large a percentage of the federal workforce, improperly disregarded these national-security functions and usurped the President's discretion to make those determinations under the statute.

**b.**  The President also permissibly determined that the provisions of the FSLMRS cannot be applied to the exempted agencies "consistent

with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). The dictates of national security may, at any time, require changes in working conditions or employee status to be accomplished without hesitation, prior notice, or an opportunity to bargain. The collective-bargaining agreements negotiated under the FSLMRS, in contrast, are by nature designed to reduce the control of the agency over its personnel and operations.

For example, under the FSLMRS, agencies must postpone operational changes that substantively affect working conditions until they have offered the relevant union an opportunity to bargain. The FLRA routinely pauses agency attempts to implement changes before this midterm bargaining process has concluded, a process that often imposes delays of months or years. *See, e.g.*, *U.S. Army Corps of Eng'rs Memphis Dist. & National Fed'n of Fed. Emps. Loc. 259*, 53 F.L.R.A. 79, 86-87 (1997). Employee performance is also critical in agencies with important national-security roles. Yet many collective-bargaining agreements make it difficult to remove employees who perform poorly.

Providing for the national security involves "complex, subtle, and professional decisions as to the composition, training, equipping, and

control" of the workforce performing investigations, intelligence, and national-security tasks. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The President reasonably concluded that collective-bargaining agreements that impede or prevent agencies from separating underperforming employees, dictate the place or conditions of work, or impair the Executive Branch's ability to react to rapid developments with due haste are inconsistent with national-security considerations.

**c.** The district court cited *Cole v. Young*, 351 U.S. 536 (1956), for the proposition that "national security" includes "only those activities … that are directly concerned with the protection of the Nation from internal subversion or foreign aggression." *Cole*, 351 U.S. at 544; *see* JA730 n.7. But nothing in Executive Order 14,251 is inconsistent with that definition. The Defense Department's supervision of the military, the Energy Department's role in stockpiling petroleum and nuclear weapons and protecting energy infrastructure from domestic or foreign attacks, and the Centers for Disease Control and Prevention's bioterrorism-response capabilities—to name just a few—all fit within *Cole*'s definition of national-security functions. *Cf. Cole*, 351 U.S. at 544-545 (noting that agencies "directly concerned with the national

defense" include those that "are concerned with military operations or weapons development, … international relations, internal security, and the stock-piling of strategic materials").  Indeed, in *Cole* itself the Supreme Court was willing to "assume" that the President had validly extended a statute permitting the summary dismissal of employees to the Department of Health, Education, and Welfare on the basis that doing so was in the best interests of national security.  *Id.* at 542.

In any event, *Cole*'s holding is clearly inapplicable here.  *Cole* held that an employee had been improperly subjected to summary-termination procedures that the statute permitted only in circumstances where "necessary or advisable in the interest of the national security" because the agency had acted pursuant to an executive order that allowed the discharge of "any employee of doubtful loyalty, *irrespective* of the character of his job and its relationship to the 'national security.'"  351 U.S. at 541, 552-553, 556-557 (emphasis added).  The Court found that the executive order in that case permitted summary termination in circumstances not authorized by statute because it allowed agencies to dispense with the national-security determination contemplated by statute.  Here, however, the

President expressly determined that, with regard to each of the agencies listed in the executive order, the provisions of the FSLMRS "cannot be applied … in a manner consistent with national security requirements and considerations."  Exec. Order No. 14,251, § 1, 90 Fed. Reg. at 14,553.  *Cole* provides no basis to second-guess that determination.

Accordingly, the district court's second-guessing of the President's determinations was entirely improper.  Such an approach is inconsistent with the statute's grant of discretion to the President, the presumption of regularity recognized in *AFGE v. Reagan*, and the standard for establishing a right to relief on a non-statutory *ultra vires* claim.

**d.**  The district court's conclusory statement that the "entire Executive Order likely was motivated by … retaliation against labor organizations that have opposed President Trump or in furtherance of unrelated policy goals," JA732, likewise provides no basis for concluding that plaintiffs are likely to prevail on the merits.  Whatever the significance of motive to other claims like plaintiffs' First Amendment retaliation claim, such evidence has no obvious relevance to plaintiffs'

*ultra vires* claim, which requires proof that the President acted "'in excess of [his] delegated powers and contrary to a *specific prohibition*' in a statute.'" *Nuclear Regul. Comm'n*, 605 U.S. at 681. The statute here does not speak to motive at all, but merely the findings that the President must make. Even if it were permissible for a court to second-guess the President's findings regarding the excluded agencies' "primary function[s]" and whether FSLMRS's requirements are "consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1), the correctness of those determinations does not depend on the President's subjective motives for excluding the agencies. *Ultra vires* review concerns whether the government had legal authority to take an action, not why the government exercised that authority.

**e.** The district court also suggested that it could review whether the President's findings were valid as to DoDEA specifically, but the court correctly declined to adopt that approach. JA731-732. The statute plainly gives the President discretion to decide whether to exclude an entire "agency" or only a "subdivision thereof," and the required determinations pertain only to that "agency or subdivision."

57

*See* 5 U.S.C. § 7103(b)(1) ("The President may issue an order excluding any agency or subdivision thereof[.]").  Congress itself excluded entire agencies in the statute, *id.* § 7103(a)(3), and the President here likewise exercised his discretion to make determinations at the agency level— that is, as to DoD.[3]  Requiring the President to justify those determinations with respect to DoDEA in particular would impose a new requirement that is outside of and contrary to the statute.

In any event, plaintiffs' claims are unlikely to succeed on the merits even if it were proper to consider the executive order only as applied to DoDEA.  The President could properly conclude that national security is a "primary function" of DoDEA and that applying the FSLMRS's requirements would not be "consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).  As DoD explained, the Executive Order's effects on workplace flexibility enabled DoDEA to "better serve the educational needs for the dependents of our service members in support of DoD's overall national security mission." JA701.  Because the United States relies on an all-volunteer military,

---

[3] The statute defines "agency" to mean "an Executive Agency," 5 U.S.C. § 7103(a)(3), which Title 5 in turn defines to include "an Executive department," *id.* § 105.

DoDEA's ability to provide high-quality education and care for service members' children is a critical benefit crucial to DoD's ability to maintain "a robust, well-staffed, and focused military, which is vital to national security." JA697. Such considerations underscore the propriety of the President's determination that national-security considerations support excluding the entirety of DoD from the FSLMRS, and nothing in the statute or this record supports judicial invalidation of that choice.

## II. PLAINTIFFS DID NOT ESTABLISH THAT THEY WOULD LIKELY SUFFER IRREPARABLE HARM

As this Court found with respect to the union plaintiff in *NTEU*, plaintiffs here have "failed to establish irreparable harm," which is by itself "a sufficient basis for vacating [the] preliminary injunction." *NTEU* Stay Order, No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025) (per curiam). The district court identified two supposed harms to plaintiffs in this case, but neither supports the injunction.

**A.** First, the district court erred in finding that plaintiff FEA would suffer irreparable monetary harm absent an injunction because DoDEA has stopped withholding union dues from employees' paychecks. JA740. Such "financial injuries are rarely irreparable because they are

presumptively remediable through monetary damages." *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025). And as this Court explained in *NTEU*, plaintiffs "can seek to recover missing dues in subsequent [FLRA] proceedings if the Union ultimately prevails in this litigation." *NTEU* Stay Order, 2025 WL 1441563, at *2; *see U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970*, 71 F.L.R.A. 829, 830 (2020) (ordering agency to reimburse union for dues that union would have received absent unlawful failure to withhold); *U.S. Dep't of the Treasury U.S. Mint & AFGE Mint Council, C-157*, 35 F.L.R.A. 1095, 1100-1102 (1990) (same).

It is also entirely speculative that plaintiffs will suffer significant financial injury in the interim. Although DoDEA is no longer withholding dues from the paychecks of employees, plaintiffs can collect dues directly from their members. *See NTEU* Stay Order, 2025 WL 1441563, at *2. "[T]hat is, after all, how most other voluntary membership organizations collect dues." *Id.*; *see also AFGE* Stay Order, 148 F.4th at 656 ("[P]aused administration of dues collection can be addressed by voluntary dues payment in the interim and by monetary damages at the end of litigation[.]"). Indeed, the district court found

that plaintiff FEA-SR did not clearly face irreparable harm because it "has been able to remedy the harm caused by the termination of automatic deductions by 'convert[ing] most members to AutoPay or to pay by check.'" JA741 (alteration in original).[4]

The district court declined to extend this finding to plaintiff FEA, opining that the loss of automatic deductions "creates serious difficulties for [FEA] to accomplish [its] mission of representing [its] members and indeed may threaten the union's survival." JA740. But the court provided no reason to believe that the union could not recover most of its revenues in the same manner as FEA-SR. Indeed, FEA itself reported that, by June 2, 2025, nearly half of its members had already opted into an alternative payment method. *See* JA107.

**B.** Second, the district court believed that the loss of bargaining power from "DoDEA's disregard of important provisions" of collective-bargaining agreements amounted to irreparable harm. JA741. But even if the collective-bargaining agreements with plaintiffs were terminated, it is speculative to think that employees—whose

_____

[4] The district court likewise found that plaintiff Antilles Consolidated Education Association did not clearly face irreparable financial harm. *See* JA741.

61

membership is purely voluntary regardless of the Executive Order—will leave the unions while this litigation is ongoing, and just as speculative to think that the loss of some members would materially weaken plaintiffs' bargaining position.

Courts have held that a union's concern "that its members will lose confidence in the union" absent immediate relief "is too speculative to justify a preliminary injunction." *East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). A union "is free to explain the difficulties of litigation to its members if they ask why more is not being done sooner," and "if some members' confidence is shaken, the chance that vindication of the union at trial would not restore that confidence is too speculative to justify a preliminary injunction." *Id.*; *see also, e.g.*, *Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 440 (4th Cir. 2018) (rejecting the "theory that interim relief is necessary to prevent the Union from losing employee support").

Moreover, "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *AFGE* Stay Order, 148 F.4th at 656. If their status as exclusive bargaining representatives is reaffirmed,

plaintiffs have identified no reason that employees who may have left

the unions would not rejoin.  Plaintiffs thus cannot demonstrate that

any ostensible harm would be lasting or irreparable.

Nor would plaintiffs suffer irreparable harm from any agency's

refusal to negotiate over changes to employment conditions during the

pendency of litigation.  If plaintiffs prevail and the executive order is

invalidated, the FLRA could direct agencies not to implement the

executive order and impose a retroactive remedy—including with

regard to any reductions in force.  *See* 5 U.S.C. § 7118(a)(7) (authorizing

the FLRA to issue an order that gives a collective-bargaining agreement

"retroactive effect" and to take "such other action as will carry out the

purpose" of the Civil Service Reform Act); *Department of the Navy*

*Naval Aviation Depot Naval Air Station Alameda & International Ass'n*

*of Machinists & Aerospace Workers Lodge 739*, 36 F.L.R.A. 509, 511

(1990) ("Where an agency violates the [FSLMRS] by changing a

negotiable condition of employment without fulfilling its obligation to

bargain on that change, the Statute requires the imposition of a status

quo ante remedy, in the absence of special circumstances.").  Plaintiffs'

remedy for agency non-compliance with a collective-bargaining

agreement is through the grievance procedures set out in the collective-

bargaining agreements and the FLRA, not by seeking a preliminary

injunction in district court. *See AFGE*, 929 F.3d at 757-758 (explaining

that FLRA could grant effective relief by directing agencies not to

implement various provisions of executive orders).

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

Finally, the last two preliminary-injunction factors—which merge

because the government is the party opposing an injunction, *see Nken v.

Holder*, 556 U.S. 418, 435 (2009)—strongly favor defendants. The clear

congressional purpose of § 7103(b)(1) is to allow the President to

guarantee the effective operation of agencies relevant to national

security without the constraints of collective bargaining. "The interest

in preserving national security is an urgent objective of the highest

order." *Trump v. International Refugee Assistance Project*, 582 U.S.

571, 581 (2017) (per curiam) (quotation marks omitted). To interfere

with the President's assessment of the government's investigative,

intelligence, and national-security functions "would appreciably injure

[the Nation's] interests." *Id.* at 582; *see also Winter*, 555 U.S. at 31.

As this Court previously concluded, "[t]he district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress." *AFSA* Stay Order, 2025 WL 1742853, at *3. The injunction "ties the government's hands" in determining whether and how to implement the executive order, and "[t]hat transfer of control, from the Executive to the Judiciary," is particularly "problematic … in the national security context, an area in which the President generally enjoys unique responsibility." *NTEU* Stay Order, 2025 WL 1441563, at *2 (quotation marks omitted). In contrast, "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest." *Id.* at *3; *see also AFGE* Stay Order, 148 F.4th at 656 (quotation marks omitted).

A motions panel of this Court declined to rely on this injury as irreparable harm justifying the government's requested stay of the preliminary injunction, a posture in which the government had the burden to show sufficient harm to justify interim relief. The panel reasoned that the President "made a blanket statutory determination for the Department of Defense as a whole" but that the preliminary

injunction applied only to DoDEA. *FEA v. Trump*, No. 25-5303, 2025

WL 2738626, at *2 (D.C. Cir. Sep. 25, 2025) (per curiam). The panel

believed that "[i]f the President did not consider DoDEA independently,

the Order itself cannot show that an injunction specific to DoDEA

causes irreparable harm." *Id.*

The Court should decline to extend such reasoning in answering

the distinct question of whether plaintiffs satisfied their burden to show

that the third and fourth preliminary-injunction factors are satisfied.

*See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (noting the

plaintiff must make the required showing on all four factors).

Congress gave the President, not the courts, the power to decide

whether to exclude an entire "agency" or only a "subdivision," and

therefore the power to decide the level at which to make the required

statutory determinations. 5 U.S.C. § 7103(b)(1). Requiring the

government to prove harms specific to a "subdivision," when the

President determined that it was necessary to exercise authority as to

the "agency" as a whole, would effectively usurp the power Congress

gave the President to decide the appropriate level for action. And where

Congress empowered the President to make determinations with

respect to DoD as a whole, an injunction limited to one DoD subdivision still "interfer[es] with [those] national-security determinations" and the exercise of a Presidential power that Congress determined to be in the public interest. *AFSA* Stay Order, 2025 WL 1742853, at *3.

Finally, the government also presented evidence of the practical harms to the government and to the public interest that arise from the preliminary injunction. For example, provisions in a collective-bargaining agreement with plaintiff FEA-SR "restrict[] [DoDEA's] ability to reassign employees to other duty locations—requiring DoDEA to limit reassignment to their current military installation." JA699. Similarly, DoDEA's collective-bargaining agreement with plaintiff Antilles Consolidated Education Association requires DoDEA to allow one hour of work at an alternate location a day, restricting DoDEA's ability to order an educator to work a full day at school. JA699. These provisions stymy the President's objective of allowing the agency to "react more nimbly to workplace challenges, such as schedule changes, details, reassignments, and disciplinary actions." JA701. The injunction also requires DoDEA to divert resources from administration priorities, including by allowing educators who serve as union officials

to return to performing union duties on official time instead of educating the children of service members.  JA701-702.  The injunction therefore harms DoDEA's ability to "serve the educational needs [of] the dependents of … service members in support of DoD's overall national security mission."  JA701.

Ultimately, Congress already weighed the competing interests—union representation versus national security—when it passed the FSLMRS.  *See AFSA* Stay Order, 2025 WL 1742853, at *3.  Congress concluded that, when the President so determines, the public interest requires the former interest to yield to the latter.  To the extent plaintiffs will suffer any irreparable harm directly traceable to the executive order, the balance of equities favors the government.  *See id.*

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO

*s/ Weili J. Shaw*
WEILI J. SHAW
*Attorneys, Appellate Staff*
*Civil Division, Room 7240*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1371*

OCTOBER 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,822 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

s/ Weili J. Shaw
WEILI J. Shaw

# ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 7103 ................................................................. A1

5 U.S.C. § 7105 ................................................................. A2

5 U.S.C. § 7116 ................................................................. A4

5 U.S.C. § 7118 ................................................................. A5

5 U.S.C. § 7121 ................................................................. A8

5 U.S.C. § 7122 ................................................................. A10

5 U.S.C. § 7123 ................................................................. A11

**5 U.S.C. § 7103**

**§ 7103. Definitions; application**

(a) For the purpose of this chapter--

\* \* \*

(3) "agency" means an Executive agency (including a nonappropriated fund instrumentality described in section 2105(c) of this title and the Veterans' Canteen Service, Department of Veterans Affairs), the Library of Congress, the Government Publishing Office, and the Smithsonian Institution but does not include--

(A) the Government Accountability Office;

(B) the Federal Bureau of Investigation;

(C) the Central Intelligence Agency;

(D) the National Security Agency;

(E) the Tennessee Valley Authority;

(F) the Federal Labor Relations Authority;

(G) the Federal Service Impasses Panel; or

(H) the United States Secret Service and the United States Secret Service Uniformed Division.

\* \* \*

(b) (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that--

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

\* \* \*

**5 U.S.C. § 7105**

## § 7105. Powers and duties of the Authority

(a) (1) The Authority shall provide leadership in establishing policies and guidance relating to matters under this chapter, and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter.

(2) The Authority shall, to the extent provided in this chapter and in accordance with regulations prescribed by the Authority--

(A) determine the appropriateness of units for labor organization representation under section 7112 of this title;

(B) supervise or conduct elections to determine whether a labor organization has been selected as an exclusive representative by a majority of the employees in an appropriate unit and otherwise administer the provisions of section 7111 of this title relating to the according of exclusive recognition to labor organizations;

(C) prescribe criteria and resolve issues relating to the granting of national consultation rights under section 7113 of this title;

(D) prescribe criteria and resolve issues relating to determining compelling need for agency rules or regulations under section 7117(b) of this title;

(E) resolves issues relating to the duty to bargain in good faith under section 7117(c) of this title;

(F) prescribe criteria relating to the granting of consultation rights with respect to conditions of employment under section 7117(d) of this title;

(G) conduct hearings and resolve complaints of unfair labor practices under section 7118 of this title;

(H) resolve exceptions to arbitrator's awards under section 7122 of this title; and

(I) take such other actions as are necessary and appropriate to effectively administer the provisions of this chapter.

\* \* \*

(g) In order to carry out its functions under this chapter, the Authority may--

(1) hold hearings;

(2) administer oaths, take the testimony or deposition of any person under oath, and issue subpenas as provided in section 7132 of this title; and

(3) may require an agency or a labor organization to cease and desist from violations of this chapter and require it to take any remedial action it considers appropriate to carry out the policies of this chapter.

* * *

**5 U.S.C. § 7116**

## § 7116. Unfair labor practices

(a) For the purpose of this chapter, it shall be an unfair labor practice for an agency--

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

(3) to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status;

(4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter;

(5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

(7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of this title) which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

(8) to otherwise fail or refuse to comply with any provision of this chapter.

* * *

**5 U.S.C. § 7118**

## § 7118. Prevention of unfair labor practices

(a) (1) If any agency or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the agency or labor organization a complaint. In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint.

(2) Any complaint under paragraph (1) of this subsection shall contain a notice--

(A) of the charge;

(B) that a hearing will be held before the Authority (or any member thereof or before an individual employed by the authority and designated for such purpose); and

(C) of the time and place fixed for the hearing.

(3) The labor organization or agency involved shall have the right to file an answer to the original and any amended complaint and to appear in person or otherwise and give testimony at the time and place fixed in the complaint for the hearing.

(4) (A) Except as provided in subparagraph (B) of this paragraph, no complaint shall be issued based on any alleged unfair labor practice which occurred more than 6 months before the filing of the charge with the Authority.

* * *

(5) The General Counsel may prescribe regulations providing for informal methods by which the alleged unfair labor practice may be resolved prior to the issuance of a complaint.

(6) The Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) shall conduct a hearing on the complaint not earlier than 5 days after the date on which the complaint is served. In the discretion of the

A5

individual or individuals conducting the hearing, any person involved may be allowed to intervene in the hearing and to present testimony. Any such hearing shall, to the extent practicable, be conducted in accordance with the provisions of subchapter II of chapter 5 of this title, except that the parties shall not be bound by rules of evidence, whether statutory, common law, or adopted by a court. A transcript shall be kept of the hearing. After such a hearing the Authority, in its discretion, may upon notice receive further evidence or hear argument.

(7) If the Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) determines after any hearing on a complaint under paragraph (5) of this subsection that the preponderance of the evidence received demonstrates that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the agency or labor organization an order--

(A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;

(B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;

(C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or

(D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.

If any such order requires reinstatement of an employee with backpay, backpay may be required of the agency (as provided in section 5596 of this title) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.

(8) If the individual or individuals conducting the hearing determine that the preponderance of the evidence received fails to demonstrate that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, the individual or

individuals shall state in writing their findings of fact and shall issue an order dismissing the complaint.

(b) In connection with any matter before the Authority in any proceeding under this section, the Authority may request, in accordance with the provisions of section 7105(i) of this title, from the Director of the Office of Personnel Management an advisory opinion concerning the proper interpretation of rules, regulations, or other policy directives issued by the Office of Personnel Management.

**5 U.S.C. § 7121**

**§ 7121. Grievance procedures**

(a) (1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d), (e), and (g) of this section, the procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage.

* * *

(b) (1) Any negotiated grievance procedure referred to in subsection (a) of this section shall--

    (A) be fair and simple,

    (B) provide for expeditious processing, and

    (C) include procedures that--

        (i) assure an exclusive representative the right, in its own behalf or on behalf of any employee in the unit represented by the exclusive representative, to present and process grievances;

        (ii) assure such an employee the right to present a grievance on the employee's own behalf, and assure the exclusive representative the right to be present during the grievance proceeding; and

        (iii) provide that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration which may be invoked by either the exclusive representative or the agency.

    (2) (A) The provisions of a negotiated grievance procedure providing for binding arbitration in accordance with paragraph (1)(C)(iii) shall, if or to the extent that an alleged prohibited personnel practice is involved, allow the arbitrator to order--

        (i) a stay of any personnel action in a manner similar to the manner described in section 1221(c) with respect to the Merit Systems Protection Board; and

(ii) the taking, by an agency, of any disciplinary action identified under section 1215(a)(3) that is otherwise within the authority of such agency to take.

(B) Any employee who is the subject of any disciplinary action ordered under subparagraph (A)(ii) may appeal such action to the same extent and in the same manner as if the agency had taken the disciplinary action absent arbitration.

* * *

**5 U.S.C. § 7122**

**§ 7122. Exceptions to arbitral awards**

(a) Either party to arbitration under this chapter may file with the Authority an exception to any arbitrator's award pursuant to the arbitration (other than an award relating to a matter described in section 7121(f) of this title). If upon review the Authority finds that the award is deficient--

(1) because it is contrary to any law, rule, or regulation; or

(2) on other grounds similar to those applied by Federal courts in private sector labor-management relations;

the Authority may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations.

(b) If no exception to an arbitrator's award is filed under subsection (a) of this section during the 30-day period beginning on the date the award is served on the party, the award shall be final and binding. An agency shall take the actions required by an arbitrator's final award. The award may include the payment of backpay (as provided in section 5596 of this title).

**5 U.S.C. § 7123**

**§ 7123. Judicial review; enforcement**

(a) Any person aggrieved by any final order of the Authority other than an order under--

   (1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or

   (2) section 7112 of this title (involving an appropriate unit determination),

may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.

(b) The Authority may petition any appropriate United States court of appeals for the enforcement of any order of the Authority and for appropriate temporary relief or restraining order.

(c) Upon the filing of a petition under subsection (a) of this section for judicial review or under subsection (b) of this section for enforcement, the Authority shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of the petition, the court shall cause notice thereof to be served to the parties involved, and thereupon shall have jurisdiction of the proceeding and of the question determined therein and may grant any temporary relief (including a temporary restraining order) it considers just and proper, and may make and enter a decree affirming and enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Authority. The filing of a petition under subsection (a) or (b) of this section shall not operate as a stay of the Authority's order unless the court specifically orders the stay. Review of the Authority's order shall be on the record in accordance with section 706 of this title. No objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances. The findings of the Authority with respect to questions of fact, if supported

by substantial evidence on the record considered as a whole, shall be conclusive. If any person applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce the evidence in the hearing before the Authority, or its designee, the court may order the additional evidence to be taken before the Authority, or its designee, and to be made a part of the record. The Authority may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed. The Authority shall file its modified or new findings, which, with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. The Authority shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with the court, the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the judgment and decree shall be subject to review by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

(d) The Authority may, upon issuance of a complaint as provided in section 7118 of this title charging that any person has engaged in or is engaging in an unfair labor practice, petition any United States district court within any district in which the unfair labor practice in question is alleged to have occurred or in which such person resides or transacts business for appropriate temporary relief (including a restraining order). Upon the filing of the petition, the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant any temporary relief (including a temporary restraining order) it considers just and proper. A court shall not grant any temporary relief under this section if it would interfere with the ability of the agency to carry out its essential functions or if the Authority fails to establish probable cause that an unfair labor practice is being committed.