**No. 25-5303**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

FEDERAL EDUCATION ASSOCIATION, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

## JOINT APPENDIX

————————————

JASON WALTA
PHILIP A. HOSTAK
  *National Education Association*
  *1201 16th Street, NW*
  *Washington, D.C. 20036*
  *(202) 822-7035*
  *jwalta@nea.org*
  *phostak@nea.org*

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
WEILI J. SHAW
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1371*

# INDEX

| Description | Dkt. No. | Page |
|---|---|---|
| District Court Docket Sheet | | JA1 |
| Complaint | 1 | JA10 |
| Amended Complaint | 21 | JA48 |
| Exhibits to Plaintiffs' Motion for Preliminary Injunction | | |
| Declaration of Richard Tarr | 22-2 | JA99 |
| Excerpts from Exhibit 1 | 22-2 | JA120 |
| Excerpts from Exhibit 2 | 22-2 | JA159 |
| Excerpts from Exhibit 3 | 22-2 | JA254 |
| Exhibits 11-22 | 22-2 | JA336 |
| Declaration of Alan Danahy | 22-3 | JA380 |
| Exhibit 3 | 22-3 | JA396 |
| Exhibits 5-7 | 22-3 | JA401 |
| Exhibits 9-19 | 22-3 | JA409 |
| Declaration of Alexis A. Gorbea | 22-4 | JA449 |
| Excerpts from Exhibit 1 | 22-4 | JA461 |
| Exhibit 2 | 22-4 | JA501 |
| Exhibit 4 | 22-4 | JA508 |
| Exhibits 9-10 | 22-4 | JA511 |
| Declaration of Benjamin Hunter | 22-5 | JA518 |
| Exhibits 7-8 | 22-5 | JA531 |
| Exhibits 16-18 | 22-5 | JA587 |
| Exhibit 22 | 22-5 | JA597 |
| Declaration of William H. Freeman | 22-6 | JA600 |
| Exhibits 7-10 | 22-6 | JA612 |

| | | |
|---|---|---|
| Declaration of Robin Smith | 22-7 | JA640 |
| Exhibits 2-6 | 22-7 | JA645 |
| Exhibit to Defendants' Opposition to Motion for Preliminary Injunction | | |
| Declaration of Michael A. Cogar | 27-1 | JA687 |
| Order Granting Preliminary Injunction | 34 | JA703 |
| Opinion Regarding Preliminary Injunction | 35 | JA705 |
| Notice of Appeal | 36 | JA750 |

Query    Reports    Utilities    Help    Log Out

APPEAL,TYPE-K

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:25-cv-01362-PLF

| | |
|---|---|
| FEDERAL EDUCATION ASSOCIATION et al v. TRUMP et al | Date Filed: 05/05/2025 |
| Assigned to: Judge Paul L. Friedman | Jury Demand: None |
| Related Cases: 1:25-cv-00935-PLF | Nature of Suit: 790 Labor: Other |
| 1:25-cv-01030-PLF | Jurisdiction: U.S. Government Defendant |
| 1:25-cv-02445-PLF | |
| 1:25-cv-02990-PLF | |
| 1:25-cv-02657-PLF | |
| 1:25-cv-03306-PLF | |
| 1:25-cv-02947-PLF | |

Case in other court:  USCA, 25-05303
Cause: 05:0706 Judicial Review of Agency Actions

**Plaintiff**

**FEDERAL EDUCATION
ASSOCIATION**

represented by **Caitlin Rooney**
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036
509-200-4333
Email: crooney@nea.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip Adam Hostak**
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036
202-549-4152
Email: phostak@nea.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Walta**
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036
202-822-7035
Fax: 202-822-7033
Email: jwalta@nea.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

JA1

**FEDERAL EDUCATION
ASSOCIATION STATESIDE REGION**

represented by **Caitlin Rooney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip Adam Hostak**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Walta**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ANTILLES CONSOLIDATED
EDUCATION ASSOCIATION**

represented by **Caitlin Rooney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip Adam Hostak**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Walta**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the
United States*

represented by **Jeremy Mauritzen**
DOJ-Civ
1100 L St NW
Washington, DC 20005
202-598-7315
Email: jeremy.mauritzen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lisa Zeidner Marcus**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
700 Grant St.
Suite 4000
Pittsburgh, PA 15219
(202) 514-3336
Fax: (202) 616-8470
Email: lisa.marcus@usdoj.gov
*LEAD ATTORNEY*

JA2

*ATTORNEY TO BE NOTICED*

**Lydia Jane Jines**
DOJ-Civ
1100 L St., NW
Washington, DC 20005
202-305-7590
Email: lydia.jines@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
U.S. DEPARTMENT OF JUSTICE
Office of the Assistant Attorney General,
Civil Division
950 Pennsylvania Ave NW
Rm. 3632
Washington, DC 20530
202-514-4052
Email: tyler.becker@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**                  represented by   **Jeremy Mauritzen**
*in his official capacity as the United States*                 (See above for address)
*Secretary of Defense*                                *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lisa Zeidner Marcus**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lydia Jane Jines**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Tyler J. Becker**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF**        represented by   **Jeremy Mauritzen**
**DEFENSE**                                           (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lisa Zeidner Marcus**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lydia Jane Jines**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

JA3

Tyler J. Becker
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES EZELL**                              represented by   **Jeremy Mauritzen**
*in his official capacity as Acting Director of*              (See above for address)
*the U.S. Office of Personnel Management*                    *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lisa Zeidner Marcus**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lydia Jane Jines**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Tyler J. Becker**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OFFICE OF**                    represented by   **Jeremy Mauritzen**
**PERSONNEL MANAGEMENT**                                      (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lisa Zeidner Marcus**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lydia Jane Jines**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Tyler J. Becker**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/05/2025 | 1 | COMPLAINT *Federal Education Association et al* against All Defendants ( Filing fee $ 405 receipt number ADCDC-11667503) filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, FEDERAL EDUCATION ASSOCIATION. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Civil Cover Sheet)(Walta, Jason) (Entered: 05/05/2025) |

JA4

| 05/05/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by FEDERAL EDUCATION ASSOCIATION (Walta, Jason) (Entered: 05/05/2025) |
| --- | --- | --- |
| 05/05/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by FEDERAL EDUCATION ASSOCIATION STATESIDE REGION (Walta, Jason) (Entered: 05/05/2025) |
| 05/05/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION (Walta, Jason) (Entered: 05/05/2025) |
| 05/05/2025 | 5 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25-cv-00935. (Walta, Jason) (Entered: 05/05/2025) |
| 05/06/2025 | | Case Assigned to Judge Paul L. Friedman. (znmw) (Entered: 05/06/2025) |
| 05/06/2025 | 6 | SUMMONS (6) Issued Electronically as to CHARLES EZELL, PETER HEGSETH, DONALD J. TRUMP, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 05/06/2025) |
| 05/06/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,. The following error(s) need correction: Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit summonses for two agency defendants using the event Request for Summons to Issue. (znmw) (Entered: 05/06/2025) |
| 05/06/2025 | 7 | REQUEST FOR SUMMONS TO ISSUE filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, FEDERAL EDUCATION ASSOCIATION.(Walta, Jason) (Entered: 05/06/2025) |
| 05/06/2025 | 8 | REQUEST FOR SUMMONS TO ISSUE filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, FEDERAL EDUCATION ASSOCIATION.(Walta, Jason) (Entered: 05/06/2025) |
| 05/06/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Philip A. Hostak, Filing fee $ 100, receipt number ADCDC-11671420. Fee Status: Fee Paid. by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Attachments: # 1 Affidavit, # 2 Certificate of Good Standing, # 3 Text of Proposed Order) (Walta, Jason) (Entered: 05/06/2025) |
| 05/07/2025 | | MINUTE ORDER granting 9 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on May 7, 2025. (lcjd) (Entered: 05/07/2025) |
| 05/07/2025 | 10 | NOTICE of Appearance by Philip Adam Hostak on behalf of All Plaintiffs (Hostak, Philip) (Entered: 05/07/2025) |
| 05/07/2025 | 11 | SUMMONS (2) Issued Electronically as to UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (Attachments: # 1 Notice and Consent)(zjm) (Entered: 05/07/2025) |
| 05/22/2025 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES OFFICE OF PERSONNEL MANAGEMENT served on 5/22/2025 (Walta, Jason) (Entered: 05/22/2025) |

JA5

| 05/22/2025 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF DEFENSE served on 5/19/2025 (Walta, Jason) (Entered: 05/22/2025) |
| 05/22/2025 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETER B. HEGSETH served on 5/19/2025 (Walta, Jason) (Entered: 05/22/2025) |
| 05/22/2025 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 05/19/2025. (Walta, Jason) (Entered: 05/22/2025) |
| 05/22/2025 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/19/2025. Answer due for ALL FEDERAL DEFENDANTS by 7/18/2025. (Walta, Jason) (Entered: 05/22/2025) |
| 05/22/2025 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHARLES EZELL served on 5/22/2025 (Walta, Jason) (Entered: 05/22/2025) |
| 05/27/2025 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 5/27/2025 (Walta, Jason) (Entered: 05/27/2025) |
| 05/27/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Caitlin Rooney, Filing fee $ 100, receipt number ADCDC-11716398. Fee Status: Fee Paid. by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Walta, Jason) (Entered: 05/27/2025) |
| 05/28/2025 | | MINUTE ORDER granting 19 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Paul L. Friedman on May 28, 2025. (lcjd) (Entered: 05/28/2025) |
| 05/28/2025 | 20 | NOTICE of Appearance by Caitlin Rooney on behalf of All Plaintiffs (Rooney, Caitlin) (Entered: 05/28/2025) |
| 06/21/2025 | 21 | AMENDED COMPLAINT against All Defendants filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, FEDERAL EDUCATION ASSOCIATION.(Walta, Jason) (Entered: 06/21/2025) |
| 07/02/2025 | 22 | MOTION for Preliminary Injunction by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Attachments: # 1 Memorandum in Support Memorandum in Support of Motion for Preliminary Injunction, # 2 Declaration Declaration of Richard Tarr, # 3 Declaration Declaration of Alan Danahy, # 4 Declaration Declaration of Alexis Gorbea, # 5 Declaration Declaration of Ben Hunter, # 6 Declaration Declaration of William Freeman, # 7 Declaration Declaration of Robin Smith, # 8 Text of Proposed Order Proposed Order)(Hostak, Philip) (Entered: 07/02/2025) |
| 07/03/2025 | 23 | ORDER scheduling oral argument on Plaintiffs' 22 Motion for a Preliminary Injunction for August 4, 2025 at 10:00 a.m. and directing parties to meet and confer and file a joint status report. See Order for details. Signed by Judge Paul L. Friedman on July 7, 2025. (lcjd) (Entered: 07/03/2025) |
| 07/03/2025 | | Set/Reset Hearings: Motion Hearing set for 8/4/2025 at 10:00 AM in Courtroom 29A- In Person before Judge Paul L. Friedman. (tj) (Entered: 07/03/2025) |

JA6

| 07/07/2025 | 24 | NOTICE of Appearance by Lydia Jane Jines on behalf of All Defendants (Jines, Lydia) (Entered: 07/07/2025) |
|---|---|---|
| 07/07/2025 | 25 | Joint STATUS REPORT by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Walta, Jason) (Entered: 07/07/2025) |
| 07/07/2025 | | MINUTE ORDER: Upon consideration of the parties' 25 Joint Status Report, the defendants shall file their opposition to plaintiffs' motion for a preliminary injunction [Dkt. No. 22] on or before July 22, 2025. The plaintiffs shall file their reply on or before July 29, 2025. Furthermore, the defendants' deadline to respond to the plaintiffs' amended complaint is STAYED pending the resolution of plaintiffs' motion for a preliminary injunction. Signed by Judge Paul L. Friedman on July 7, 2025. (lcjd) (Entered: 07/07/2025) |
| 07/22/2025 | 26 | NOTICE of Appearance by Jeremy Mauritzen on behalf of CHARLES EZELL, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT (Mauritzen, Jeremy) (Entered: 07/22/2025) |
| 07/22/2025 | 27 | Memorandum in opposition to re 22 MOTION for Preliminary Injunction filed by CHARLES EZELL, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (Attachments: # 1 Ex. 1: Cogar Decl., # 2 Ex. 1-A: FEA CBA, # 3 Ex. 1-B: FEA-SR Pro CBA, # 4 Ex. 1-C: FEA-SR Non-Pro CBA, # 5 Ex. 1-D: ACEA CBA, # 6 Text of Proposed Order)(Mauritzen, Jeremy) (Entered: 07/22/2025) |
| 07/25/2025 | 28 | NOTICE of Appearance by Tyler J. Becker on behalf of All Defendants (Becker, Tyler) (Entered: 07/25/2025) |
| 07/29/2025 | 29 | REPLY to opposition to motion re 22 Motion for Preliminary Injunction,, filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Hostak, Philip) (Entered: 07/29/2025) |
| 07/30/2025 | | MINUTE ORDER: The Court will connect the public-access telephone line for the motion hearing now scheduled for August 4 at 10:00 a.m. Any member of the public or media may access the public-access line by dialing (833) 990-9400, and using meeting ID 492497252. As a reminder, any use of the public-access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on July 30, 2025. (lcjd) (Entered: 07/30/2025) |
| 08/01/2025 | 30 | Joint STATUS REPORT by CHARLES EZELL, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (Mauritzen, Jeremy) (Entered: 08/01/2025) |
| 08/01/2025 | 31 | ORDER setting forth questions for oral argument on August 4, 2025. See Order for details. Signed by Judge Paul L. Friedman on August 1, 2025. (lcjd) (Entered: 08/01/2025) |
| 08/04/2025 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Motion Hearing held on 8/4/2025 re 22 MOTION for Preliminary Injunction filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, FEDERAL EDUCATION ASSOCIATION. Oral argument heard, and the court takes the motion under advisement. Parties to submit a |

JA7

| | | |
|---|---|---|
| | | proposed order for the court's consideration by noon on August 6, 2025. (Court Reporter: Chandra Kean) (tj) (Entered: 08/04/2025) |
| 08/06/2025 | 32 | Joint STATUS REPORT by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Attachments: # 1 Text of Proposed Order Revised Proposed Order)(Walta, Jason) (Entered: 08/06/2025) |
| 08/14/2025 | 33 | TRANSCRIPT OF PROCEEDINGS before Judge Paul L. Friedman held on August 4, 2025; Page Numbers: 1-55. Date of Issuance: August 14, 2025. Court Reporter/Transcriber Chandra Kean, RMR, Email: Chandra_Kean@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/4/2025. Redacted Transcript Deadline set for 9/14/2025. Release of Transcript Restriction set for 11/12/2025.(Kean, Chandra) (Entered: 08/14/2025) |
| 08/14/2025 | 34 | ORDER granting Plaintiffs' 22 Motion for a Preliminary Injunction. The parties are directed to file a joint status report on or before September 5, 2025. See Order for details. Signed by Judge Paul L. Friedman on August 14, 2025. (lcjd) (Entered: 08/14/2025) |
| 08/14/2025 | 35 | OPINION granting Plaintiffs' 22 Motion for a Preliminary Injunction. See Opinion for details. Signed by Judge Paul L. Friedman on August 14, 2025. (lcjd) (Entered: 08/14/2025) |
| 08/18/2025 | 36 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 34 Order on Motion for Preliminary Injunction by UNITED STATES DEPARTMENT OF DEFENSE, CHARLES EZELL, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, DONALD J. TRUMP, PETER B. HEGSETH. Fee Status: No Fee Paid. Parties have been notified. (Jines, Lydia) (Entered: 08/18/2025) |
| 08/19/2025 | 37 | Transmission of the Notice of Appeal, Order Appealed (Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 36 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 08/19/2025) |
| 08/20/2025 | | USCA Case Number 25-5303 for 36 Notice of Appeal to DC Circuit Court, filed by PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, CHARLES EZELL, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (zjm) (Entered: 08/27/2025) |
| 08/22/2025 | 38 | NOTICE of Appearance by Lisa Zeidner Marcus on behalf of All Defendants (Marcus, Lisa) (Entered: 08/22/2025) |
| 08/22/2025 | 39 | MOTION to Stay re 34 Order on Motion for Preliminary Injunction, 35 Memorandum & Opinion - *Motion to Stay Pending Appeal* by CHARLES EZELL, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (Attachments: # 1 Ex. 1 - |

JA8

| | | |
|---|---|---|
| | | Schiavino-Narvaez Decl., # 2 Text of Proposed Order)(Marcus, Lisa) (Entered: 08/22/2025) |
| 08/22/2025 | | DEPOSIT of Funds for Bond in the amount of $ 100.00, Receipt Number 210247, pursuant to 34 Order. (znmw) (Entered: 08/27/2025) |
| 09/05/2025 | 40 | Memorandum in opposition to re 39 MOTION to Stay re 34 Order on Motion for Preliminary Injunction, 35 Memorandum & Opinion - *Motion to Stay Pending Appeal* filed by ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION, FEDERAL EDUCATION ASSOCIATION STATESIDE REGION. (Hostak, Philip) (Entered: 09/05/2025) |
| 09/05/2025 | 41 | Joint STATUS REPORT by CHARLES EZELL, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (Mauritzen, Jeremy) (Entered: 09/05/2025) |
| 09/12/2025 | 42 | REPLY to opposition to motion re 39 Motion to Stay, filed by CHARLES EZELL, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT. (Marcus, Lisa) (Entered: 09/12/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/13/2025 11:17:46 | | |
| **PACER Login:** | weilishaw | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-01362-PLF |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

JA9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, 1201 16th St. NW Suite 117, Washington, DC 20036;<br><br>FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, PO BOX 41035, Fayetteville, NC 28309;<br><br>and<br><br>ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, PO BOX 34425, Fort Buchanan, Puerto Rico 00934;<br><br>     *Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, 1600 Pennsylvania Avenue NW, Washington, D.C. 20500;<br><br>PETER HEGSETH, in his official capacity as the United States Secretary of Defense, 1000 Defense Pentagon, Washington, DC 20301;<br><br>UNITED STATES DEPARTMENT OF DEFENSE, 1400 Defense Pentagon, Washington, DC 20301;<br><br>CHARLES EZELL, in his official capacity as Acting Director of the U.S. Office of Personnel Management, 1900 E Street NW, Washington, DC 20415;<br><br>and<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street NW, Washington, DC 20415;<br><br>    *Defendants*. | Civil Action No. 1:25-cv-1362<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

JA10

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.      In this action, Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA")—labor organizations representing educators who work in prekindergarten-through-12th-grade ("PreK-12") schools operated by the Department of Defense Education Activity ("DODEA")—challenge Defendant Donald Trump's executive order stripping Plaintiffs and their members of their statutory and contractual collective bargaining rights on purported national security grounds, Exec. Order No. 14251, Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025) ("Executive Order"), as well as injurious acts and omissions relating to the implementation of the Executive Order committed by the other Defendants.

2.      The Executive Order suffers from manifold constitutional infirmities: (a) it is wholly unmoored from the narrow authority that Congress granted to the president to exclude federal agencies and agency subdivision from collective bargaining for reasons of national security and is therefore *ultra vires* and in violation of the constitutional separation of powers; (b) it violates the First Amendment inasmuch as its real purposes are to retaliate against federal unions for engaging in protected speech and petitioning activities and to facilitate the *en masse* firing of federal employees; (c) it violates the Fifth Amendment's guarantee of equal protection of the laws inasmuch as it was avowedly motivated by a bare desire to harm politically unpopular groups; and (d) by nullifying collective bargaining agreements ("CBAs") between Plaintiffs and the government, it violates the Fifth Amendment's protection against deprivations

of property without due process of law and its protection against unlawful takings of property.

Even if the Executive Order were not generally invalid by reason of those constitutional

infirmities, Defendant Peter Hegseth's failure to exercise his delegated authority under the

Executive Order to suspend its application to DODEA is arbitrary and capricious and contrary to

law and therefore violates the Administrative Procedure Act. Plaintiffs seek a declaration that the

Executive Order is unlawful in these respects and preliminary and permanent injunctive relief

prohibiting any further implementation and enforcement of the Executive Order and setting aside

Defendant Hegseth's failure to suspend the Executive Order with respect to DODEA.

## II.    JURISDICTION AND VENUE

3.      This court has jurisdiction under 28 U.S.C. § 1331 as this action arises under

federal law, including the United States Constitution and the Administrative Procedure Act, 5

U.S.C. § 701, *et seq*.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because

Plaintiff  FEA is headquartered in the District of Columbia and thus resides in this District,

because this action seeks relief against federal agencies and officials acting in their official

capacities residing in the District of Columbia., and because a substantial part of the events or

omissions giving rise to the Plaintiffs' claims occurred in this District.

## III.   PARTIES

5.      Plaintiff FEA is a labor organization with more than 5,400 members who work as

educators and education support professionals in schools operated by DODEA, a subdivision of

DOD that operates public schools serving more than 64,000 PreK-12 dependents of military and

civilian personnel stationed in bases in the United States, in United States territories, and abroad.

6.       FEA's members include classroom teachers, instructional assistants, information specialists (also known as librarians), counselors, nurses, and classified employees who work in DODEA schools located in military bases in the United States and in the U.S. Territory of Guam, countries throughout Europe and Asia, and in Guantanamo Bay, Cuba, to ensure that children of DOD-employed families have the opportunity to receive the high-quality education that has long characterized DODEA schools.

7.       FEA is dedicated to the proposition that educators should ensure the integrity and effectiveness of educational programs within federal school systems. In FEA's view, this goal requires three things: (a) achieving the high standards, benefits and working conditions that are necessary to attract and retain highly competent professionals; (b) supporting educators' professional growth; and (c) empowering educators to make decisions regarding their professional lives. To these ends, FEA advocates on behalf of DODEA educators before Congress and the courts, and, prior to the Executive Order, had for decades been engaged in collective bargaining with DODEA concerning the working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA's overseas schools pursuant to Chapter 71.

8.       FEA brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

9.       Prior to the Executive Order, FEA-SR had for decades engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA schools in these schools.

10.     Plaintiff FEA-SR brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

11.     Plaintiff ACEA is a labor organization with 182 members working as educators in four DODEA schools located in Puerto Rico. For nearly half a century prior to the Executive Order, ACEA had engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA schools in Puerto Rico. Plaintiff ACEA brings this action on behalf of itself and its members, whose statutory and contractual rights have been extinguished by the Executive Order.

12.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

13.     Defendant Peter Hegesth is the United States Secretary of Defense. He is sued in his official capacity.

14.     Defendant DOD is an agency of the United States.

15.     Defendant Charles Ezell is Acting Director of OPM. He is sued in his official capacity.

16.     Defendant OPM is an agency of the United States.

### IV.    FACTUAL ALLEGATIONS

**A.    Chapter 71 Has Provided a Sound Basis for Federal Sector Labor Relations for Nearly Half a Century**

17.     In 1978, Congress enacted the Federal Service Labor-Management Relations Statute, codified as Chapter 71 of Title 5 of the United States Code ("Chapter 71"), to provide a comprehensive statutory framework to govern collective bargaining in the federal civil service

"designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b).

That statutory framework is based on Congress's recognition that "the right of employees to

organize, bargain collectively, and participate through labor organizations of their own choosing

in decisions which affect them …safeguards the public interest, … contributes to the effective

conduct of public business, and … facilitates and encourages the amicable settlements of

disputes between employees and their employers involving conditions of employment." *Id.* §

7101(a).

18.    Chapter 71 guarantees federal employees the basic rights "to form, join, or assist

any labor organization, or to refrain from any such activity," 5 U.S.C. § 7102, and to "engage in

collective bargaining with respect to conditions of employment through representatives chosen

by employees," *id.* § 7102(2). In these respects, Chapter 71 mirrors the rights that the National

Labor Relations Act ("NLRA"), 49 Stat. 449 (1935), 29 U.S.C. § 151 *et seq.*, guarantees to

private-sector employees. *See* NLRA Section 7, 29 U.S.C. § 157. Chapter 71, also like the

NLRA, establishes election procedures for determining if a majority of employees in an

appropriate unit choose union representation, 5 U.S.C. § 7111(b), and requires covered agencies

to "accord exclusive recognition to a labor organization if the organization has been selected as

the representative, in a secret ballot election, by a majority of the employees in an appropriate

unit who cast valid ballots in the election," *id.* § 7111(a); *accord* NLRA Section 9(a)-(c); 29

U.S.C. §§ 159(a)-(c).

19.    Chapter 71, like the NLRA, also requires agencies to negotiate in good faith with

such representatives to reach a collective bargaining agreement, 5 U.S.C. § 7114(b)(5); *accord*

NLRA Section 8(d), 29 U.S.C. § 158(d), while setting out proscribed agency and union unfair

labor practices, including a refusal by an agency or union to bargain in good faith, 5 U.S.C.

§ 7116(a) and (b); *accord* NLRA Section 8(a) and (b), 29 U.S.C. § 158(a) and (b). And Chapter

71 established an independent agency, the Federal Labor Relations Authority ("FLRA"), to

resolve unfair labor practice complaints, 5 U.S.C. § 7104 *accord* NLRA Sections 3,10; 29 U.S.C.

§§ 153, 160, as well as exceptions to arbitral awards issued under grievance procedures set out in

CBAs between agencies and federal unions. 5 U.S.C. § 7105(2)(a).

20.    At the same time, given the federal government's "special requirements and

needs," *id.* § 7101(b), Congress tailored Chapter 71's collective bargaining framework to be

more limited than the NLRA in certain significant respects.

21.    Chapter 71, for example, provides statutory management rights protections that

preserve "the authority of any management official of any agency" to, *inter alia*, "determine the

mission, budget, organization, number of employees, and internal security practices of the

agency"; "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove,

reduce in grade or pay, or take other disciplinary action against such employees"; and "assign

work, .. make determinations with respect to contracting out, and ... determine the personnel by

which agency operations shall be conducted." 5 U.S.C. § 7106(a). Under the NLRA, by contrast,

management-rights protections are left to the bargaining process. *See NLRB v. American Nat'l*

*Ins. Co.*, 343 U.S. 395 (1952).

22.    While the NLRA expressly protects the right of private-sector employees to

strike, 29 U.S.C. § 163, federal employees are forbidden to "participate[] in a strike or assert[]

the right to strike" or even to knowingly be a member of a union that "asserts the right to strike"

against the federal government, 5 U.S.C. §§ 7311(3) and (4). Chapter 71 further makes it an

unfair labor practice for  employee unions to call, participate in, or condone "a strike, work

stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such

picketing interferes with an agency's operations," 5 U.S.C. § 7116(b)(7)(A), and it denies the rights and protections established by Chapter 71 to any employee who participates in a strike against the federal government, 5 U.S.C. § 7103(b)(2)(B)(v) (excluding any agency employee who participates in a strike in violation of section 7311" from the definition of a Chapter 71 "employee").

23.    Chapter 71 also contains provisions excluding particular employers from coverage that have no analog in the NLRA. Chapter 71 expressly excludes certain agencies from its provisions, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the United States Secret Service. 5 U.S.C. § 7103(a)(3). And it grants the President a narrow authority to exclude an otherwise covered agency or agency subdivision from Chapter 71's coverage, which narrow authority President Trump has invoked to extinguish collective bargaining for the vast majority of federal employees. Section 7103(b) of Chapter 71 authorizes the exclusion of agencies and agency subdivisions from Chapter 71 based on a determination that two specific limiting conditions are satisfied: (a) the agency or agency subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) Chapter 71 "cannot be applied" to that agency or subdivision "in a manner consistent with national security requirements and considerations." *Id*. § 7103(b)(1). As detailed further below, prior presidential administrations have—true to the narrow limiting conditions prescribed by Congress and in stark contrast to President Trump's sweeping and indiscriminate exclusions—taken a targeted approach, judiciously excluding particular sub-agencies and agency subdivisions clearly having intelligence and/or national security as their primary functions.

**B.    Plaintiffs Have Had Stable and Mutually Beneficial Relationships with DODEA for Decades**

24.    For decades, FEA—under its current name and under its previous name, the Overseas Education Association—has represented education professionals working at DODEA's schools in Europe and Asia for the purposes of collective bargaining and grievance handling, Indeed, under its former name, FEA was first recognized as the collective bargaining representative of DODEA educators in 1970 and negotiated its first CBA with DODEA before Chapter 71 was enacted and federal-sector labor relations were governed by an executive order issued by President Nixon (Exec. Order 11491, Labor-Management Relations in the Federal Service, 34 FR 17,605 (Oct. 31, 1969)).  Since 1999, FEA-SR has represented education professionals at DODEA's stateside schools (which include schools located in the U.S. Territory of Guam) for the purposes of collective bargaining and grievance handling. Prior that, local FEA affiliates had represented education professionals at DODEA's stateside schools for the purposes of collective bargaining and grievance handling for more than a decade.

25.    FEA entered into a CBA with DODEA in 2023, which provides that it will continue in force until Aug 1, 2028. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in representational work, employee rights, standards and procedures for employee discipline and adverse employment actions, mid-term bargaining procedures for management proposals on negotiable matters, and district and school-level consultations aimed at promoting and facilitating constructive relationships.

26.    FEA-SR entered into a CBA with DODEA in 2019, with a term that ended in January 2024. By operation of Chapter 71, its provisions governing the terms and conditions of bargaining unit members' employment have continued in force pending the negotiation of a

successor CBA or, failing that, the outcome of Chapter 71's impasse-resolution process. *See U.S. Immigr. & Naturalization Serv.*, 55 FLRA 69, 72-73 (1999); *U.S. Dep't of the Treasury Bureau of Alcohol, Tobacco, and Firearms*, 18 FLRA 466, 468-69 (1985). That CBA covers such subjects as grievance and arbitration procedures, payroll deduction of union membership dues, official time for union officials engaged in representational work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for employee discipline and adverse employment actions, mid-term bargaining procedures for management proposals on negotiable matters, and union-management cooperation. Until the Executive Order issued, FEA-SR had been engaged in bargaining with DODEA over a successor agreement.

27. ACEA has represented DODEA educators in Puerto Rico for the purpose of collective bargaining since 1976. ACEA's most recent CBA with DODEA was executed in 2023 and provides that it will continue in force until July 24, 2028. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in collective bargaining work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, association-management cooperation, and mid-term bargaining procedures for management proposals on negotiable matters.

28. Over the time that FEA, FEA-SR, and ACEA have represented DODEA education professionals, DODEA has become a pre-eminent public school district. Indeed, since 2020, the 161 schools operated by DODEA have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress. *See*

DODEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025) (quoting DODEA Director Beth Schiavino-Narvaez's statement that "[c]redit for this success belongs to … teachers, administrators, and staff of DoDEA," as well as "to students and their families"), https://www.dodea.edu/news/press-releases/dod-schools-ranked-best-united-states-again-nations-report-card.

29.    Collective bargaining—which facilitates cooperative labor-management solutions to educational challenges and provides a channel for education professionals at the school level to provide input—has contributed to the success of DODEA schools. For example, FEA-SR and DODEA negotiated arrangements for the union's participation in committees such as the Continuous School Improvement Committee, which focuses on enhancing the delivery of instruction and educational practices, and the Case Study Committee, which ensures that students with special needs receive appropriate educational services. Union representatives have brought valuable expertise in education to bear on these committees' work. And that is aided by the fact that committee members selected by the union to serve in a representational capacity are afforded the rights and protections of Chapter 71, which allows them to provide candid, constructive, and at times critical feedback to support DODEA's mission without fear of reprisal.

30.    The recent implementation of DODEA's Universal/Full-Day Pre-K program provides an illustrative example. By way of background, when DODEA introduces a new educational program, curriculum, assessment, or resource, the only opportunity for educators to provide the agency with feedback is in the union's response to a statutory notice from DODEA, which typically includes proposals concerning the impact and implementation of the policy. In such responses, FEA and FEA-SR typically provide targeted feedback from school-level educators who will be directly involved in incorporating the new program into their teaching.

Upon receiving the statutory notice for the Pre-K program's rollout, FEA-SR raised numerous concerns regarding DODEA's readiness to deliver appropriate instruction and the inadequate allocation of resources. In response to this feedback, DODEA established a "Tiger Team"—a cross-functional group of DODEA leadership, administrators, and union-selected representatives. This team successfully addressed many of the readiness concerns, developing actionable solutions that ensured the program's effective implementation, and has, at least until the Executive Order, continued to collaborate with the union.

### C.    FEA and FEA-SR Have Opposed Trump Administration Policies and Challenged them in Court and in Chapter 71 Grievance Proceedings

31.    Beginning in the first Trump administration, FEA and FEA-SR have spoken out against Trump administration policies attacking federal employees and have challenged such policies in court and in grievance proceedings.

32.    In June of 2018, FEA, along with several other federal unions, brought suit in this District to enjoin three executive orders issued by President Trump during his first administration that detrimentally affected collective bargaining rights under Chapter 71. The lawsuit was consolidated with three other federal union lawsuits challenging the executive orders. That litigation resulted in the District Court's entering summary judgment for the plaintiffs, and on the government's appeal, the Court of Appeals reversed the judgment for lack of subject matter jurisdiction. *See Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), *rev'd and vacated*, 929 F.3d 748 (D.C. Cir. 2019). Shortly after taking office in 2021, President Biden rescinded those executive orders. *See* Exec. Order 14003, Protecting the Federal Workforce , 86 Fed. Reg. 7,231 (Jan. 22, 2021).

33.    FEA-SR has filed grievances challenging some of the second Trump administration's signature policies affecting federal employees. For example, on February 26,

2025, FEA-SR filed two bargaining-unit-wide grievances, one on behalf of classified education support professionals and the other on behalf of certified educators challenging the second Trump administration's infamous mass "Fork in the Road" e-mails originating from OPM and sent to all government employees purporting to offer a "deferred resignation program" under Chapter 71 and the parties' CBA. And on March 14, 2025, FEA-SR filed another grievance challenging the also-infamous mass "What Did You Do Last Week" e-mail sent by OPM to all federal employees, also under Chapter 71 and the parties' CBA.

34.    FEA and FEA-SR also have spoken out to oppose Trump administration policies and directives affecting federal employees, issuing statements in opposition not only to the "Fork in the Road" and "What did you do last week" directives, but also such Trump administration actions as: drastically cutting congressionally appropriated funding to federal agencies, forcing layoffs of probationary employees, preparing large-scale reductions in force ("RIFs"); attacks on Diversity, Equity, and Inclusion; and executive actions specifically targeting cultural awareness celebrations, gender identity, and certain curriculum materials and library books in public education settings.

**D.    President Trump Issues the Executive Order in Avowed Retaliation for the Protected Speech and Petitioning Activities of "Hostile Federal Unions"**

35.    On March 27, 2025, President Trump issued the Executive Order, thereby depriving the overwhelming majority of federal civil service workers of their rights under Chapter 71. *See* Erich Wagner, "Trump order aims to outlaw most government unions on 'national security' grounds," *Government Executive* (March 27, 2025), https://perma.cc/6KF7-7SJY ("All told, the agencies covered by Trump's order amounts to 67% of the federal workforce, and 75% of federal workers who are currently represented by unions.").

36.    The Executive Order is staggering in its breadth. It sweeps up four Cabinet departments in their entirety;[1] two further Cabinet departments, each with a single narrow exception;[2] dozens of agencies and subdivisions within five other Cabinet departments;[3] and seven independent agencies in their entirety.[4] It also is unprecedented. Prior to the Executive Order, no president in the nearly half-century history of Chapter 71 has ever excluded from collective bargaining an entire Cabinet department or an entire independent agency, let alone multiple ones, or so broadly excluded agency subdivisions. Rather, presidents from both major parties—Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush, Barack Obama, and President Trump during his first administration—issued targeted orders excluding particular sub-agencies and agency subdivisions that clearly have intelligence and/or national security functions.[5]

---

[1] The four entirely excluded Cabinet departments are: the DOD, the Department of Justice, the Department of State, and the Department of Veterans Affairs. Executive Order Section 2(b), 90 Fed. Reg. at 14,533.

[2] The two almost-entirely excluded Cabinet departments are: the Department of Energy, with the sole exception of the Federal Energy Regulatory Commission; and the Department of the Treasury, with the sole exception of the Bureau of Engraving and Printing. *Id.*

[3] Those five Cabinet departments are: the Department of Agriculture, the Department of Commerce, the Department of Health and Human Services, the Department of Homeland Security, and the Department of the Interior. *Id.* at 14,533-34.

[4] Those entirely excluded independent agencies are: the Environmental Protection Agency, the United States Agency for International Development, the Nuclear Regulatory Commission, the National Science Foundation, the United States International Trade Commission, the Federal Communications Commission, and the General Services Administration. *Id.* at 14,554.

[5] *See* Exec. Order No. 12171, 44 Fed. Reg. 6,565 (Nov. 19, 1979) (excluding agencies and subdivisions of the DOD such as the Army Intelligence and Security Command and Defense Intelligence Agency); Exec. Order No. 12338, 47 Fed. Reg. 1,369 (Jan. 11, 1982) (excluding intelligence and security centers and directorates of the DOD's Joint Chiefs of Staff; the DOD's Air Force Assistant Chief of Staff or Intelligence and Intelligence Service; and the Department of Energy's Office of the Assistant Secretary for Defense Programs as well as military nuclear safety offices); Exec. Order No. 12410, 48 Fed. Reg. 13,143 (March 28, 1983) (excluding the then-recently created Joint Special Operations Command of DOD); Exec. Order No. 12559, 51

*(continued…)*

37.    Nor does the Executive Order stop with these staggeringly broad and unprecedented exclusions. In Section 5, the Executive Order authorizes further exclusions by delegating to the Secretary of Transportation the authority "to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration," from Chapter 71's coverage and "suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia." 90 Fed. Reg. at 14,556. And in Section 7, the Executive Order

---

Fed. Reg. 18,761 (May 20, 1986) (excluding the Department of Justice's Offices of Enforcement and Intelligence of the Drug Enforcement Administration as well as several offices of the United States Marshals Services); Exec. Order No. 12666, 4 Fed. Reg. 1,921 (Jan. 12, 1989) (excluding the Federal Air Marshal Branch of the Department of Transportation, as well as units of Civil Aviation Security Inspectors with air marshal functions); Exec. Order No. 12671, 4 Fed. Reg. 11,157 (March 14, 1989) (excluding the Office of Enforcement of the U.S. Customs Service); Exec. Order No. 12681, 54 Fed. Reg. 28,997 (July 6, 1989) (excluding several subdivisions of the National Preparedness Directorate of the Federal Emergency Management Agency ("FEMA")); Exec. Order No. 12693, 54 Fed. Reg. 40,629 (Sept. 29, 1989) (excluding DOD's Defense Mapping Agency Reston Center); Exec. Order No. 13039, 62 Fed. Reg. 12,529 (March 11, 1997) (excluding the DOD's Naval Special Warfare Development Group); Exec. Order No. 13252, 67 Fed. Reg 1,601 (Jan. 7, 2002) (excluding Department of Justice subdivisions such as INTERPOL and the Office of Intelligence and Policy Review); Exec. Order No. 13381, 70 Fed. Reg. 37953 (June 27, 2005) (excluding OPM's Center for Federal Investigative Services); Exec. Order 13480, 67 Fed. Reg. 1,601 (Nov. 26, 2008) (excluding subdivisions of the then-newly created Department of Homeland Security such as the Domestic Nuclear Detection Office and the Office of Intelligence and Analysis; subdivisions of the Department of Energy such as the National Nuclear Security Administration and the Office of Intelligence and Counterintelligence; offices and subdivisions of the United States Coast Guard; offices and subdivisions within the then-newly created U.S. Immigration and Customs Enforcement such as the Offices of Intelligence and International Affairs; subdivisions of FEMA such as the Continuity of Operations Division and the Integrated Public Alert and Warning Systems Division; the Department of Justice's National Security Division and Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Federal Aviation Administration's Office of Security and Hazardous Materials; and subdivisions of the Treasury Department such as the Office of Terrorism and Financial Intelligence and the Financial Crimes Enforcement Network); Exec. Order No. 13760, 82 Fed. Reg. 5,325 (Jan. 12, , 2017) (excluding subdivisions of the DOD such as the U.S. Strategic Command, U.S. Cyber Command, and the Marine Special Operations Command); Exec. Order No. 13869, 84 Fed. Reg. 18,125, (April 24, 2019) (excluding the DOD's Defense Counterintelligence and Security Agency).

directs all agency heads to report within 30 days to the President which additional agency subdivisions they determine should be excluded from Chapter 71. *Id.*

38.    Section 6 of the Executive Order directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the FLRA involving exceptions or arbitral awards or unfair labor practices. *Id.*

39.    Also on March 27, 2025, but before the Executive Order was publicly released, Defendant Ezell, as Acting Director of OPM, issued a memorandum providing guidance to agency leadership regarding implementation of the Executive Order. *See* Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025) ("OPM Guidance"), https://perma.cc/V6WH-435Z. The OPM Guidance declares that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in the Executive Order, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Executive Order. *Id.* at 1, 3 (alterations in original). The OPM Guidance also directs agencies to "cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

40.    The Executive Order is wholly unmoored from the narrow authority that Congress has granted the President to exclude agencies or agency subdivisions from Chapter 71 where (a) the agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) the provisions of Chapter 71 "cannot be applied

in a manner consistent with national security requirements and considerations." 5 U.S.C.

§ 7103(b)(1) (emphasis added). Many, if not most, of the agencies and agency subdivisions

swept up in the Executive Order's dragnet—including Cabinet departments such as  the

Department of Veterans Affairs and the Department of the Treasury, and independent agencies

such as the Environmental Protection Agency, the Federal Communications Commission, and

the General Services Administration—do little to no national security work, much less do they

have "as a *primary* function intelligence, counterintelligence, investigative, or national security

work." *Id.* (emphasis added). Nor can it be reasonably said that the collective bargaining

provisions of Chapter 71 "cannot be applied in a manner consistent with national security

requirements and considerations" to the panoply executive departments, agencies, and agency

subdivisions swept up in the Executive Order's dragnet. *Id.*

41.    The staggering and unprecedented breadth of the Executive Order—which ends

collective bargaining for some two-thirds of federal civil service employees and three-quarters of

those represented by unions, many if not most of whom are not engaged in national security

work—belies its purported national security justification.

42.    Beyond that, the Trump administration's own statements in support of the

Executive Order reveal the administration's actual motivations for extinguishing collective

bargaining for the overwhelming majority of federal civil service workers—namely (a) to

retaliate against federal unions by reason of their First-Amendment-protected speech and

petitioning activities and chill any further such speech and petitioning by any federal unions; and

(b) to facilitate the firing of civil service employees *en masse*.

43.    The Trump administration bluntly admitted the first of these motivations in a

White House "Fact Sheet" purporting to justify the Executive Order. *See* The White House,

"Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G-MUSH. In that document, the White House railed against "hostile Federal unions" that, in the White House's view, have "declared war on President Trump's agenda" by, for example, "filing grievances to block Trump policies." *Id.* The White House further decried "[t]he largest Federal union"—a clear reference to the American Federation of Government Employees—because it "describes itself as 'fighting back' against Trump" and "is widely filing grievances to block Trump policies." *Id.*

44.    At the same time, the White House Fact Sheet pointedly declares that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This statement sends a clear message that that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies, while unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict will be punished. This message is made all the more clear by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular—which the Fact Sheet takes pains to trumpet: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.*

45.    In addition, scarcely two days after the Executive Order was issued, a White House spokesperson candidly acknowledged the motivation for the Exclusion Order in these terms: "The goal is to stop employees in certain security-related agencies from unionizing in

ways that disrupt the president's agenda." Rebecca Davis O'Brien, "Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts," *New York Time*s (Mar. 29, 2025), https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html.

46.    The Fact Sheet also reveals the administration's second motivation by complaining about an FLRA ruling that affirmed an independent arbitrator's decision on a union grievance that required the reinstatement of employees of the Department of Veterans Affairs who had been wrongfully dismissed during the agency's implementation of a policy from the first Trump administration. *Id.* (referring in substance to *Dep't of Veterans Affs. Veterans Benefits Admin.*, 71 F.L.R.A. 1113 (Nov. 16, 2020)).

47.    The administration's second motivation is further laid bare by the OPM Guidance, which is largely devoted to the subject of "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3-5. To that end, the OPM Guidance directs agencies, after "terminating their collective bargaining agreements" a "to prepare large-scale reductions in force (RIFs)," which are to be "conduct[ed] … without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.* at 5.

48.    Neither retaliating against federal unions for their speech and petitioning activities nor the desire to engage in mass firings of federal workers is a legitimate national security rationale under Section 7103(b).

49.    The Executive Order itself implicitly acknowledges that exclusion from Chapter 71 is unwarranted with respect to at least some subdivisions of excluded agencies, inasmuch as it delegates to two Cabinet secretaries the authority to restore collective bargaining to subdivisions of their agencies. Section 2(a) of the Executive Order—which lists DOD and the Department of Veterans Affairs among the many agencies excluded from Chapter 71—includes the proviso

"except for any subdivisions excluded pursuant to section 4" of the Executive Order. 90 Fed.

Reg. at 14,553. And Section 4, in turn, "delegate[s] authority under 5 U.S.C. § 7103(b)(1)" to the

Secretaries of Defense and Veterans Affairs to "suspend[] the application" of the Executive

Order's exclusion "to any subdivisions of the departments they supervise, thereby bringing such

subdivisions under the coverage of [Chapter 71]" upon their certification that the provisions of

Chapter 71 "can be applied to such subdivision in a manner consistent with national security

requirements and considerations." *Id.* at 14,555-56.

50.    The orders that Secretary of Veterans Affairs Doug Collins ("VA Secretary") and

Defendant Hegseth issued pursuant to Section 4 of the Executive Order further demonstrate the

retaliatory purpose of the Executive Order and the absence of any meaningful grounding in

national security requirements and considerations for its exclusions.

51.    By order dated April 11, 2025, the VA Secretary exercised the authority

delegated by Section 4 in a manner fully and admittedly consistent with the Trump

administration's retaliatory motives. *See* Dep't of Veterans Affairs, Order Suspending the

Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16, 427 (April

17. 2025). Rather than suspend the Executive Order with respect to particular "subdivisions of

the agency," as Section 7103(b) provides and the Executive Order directs, the VA Secretary

pointedly did so with respect to "employees represented by" eight specified unions. *Id.* And the

agency's press secretary has admitted the rank favoritism that the administration shows toward

unions the administration considers to be complaisant and its retaliation against unions that have

exercised their right to challenge Trump administration actions that inheres in that order, stating

as follows: "The unions in the exempted units have posed no or minimal hinderance to VA

operations …. They have filed no or few grievances against VA and they have not proved an

impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to broadly frustrate the administration's ability to manage the agency.'" Erich Wagner, "VA is selectively enforcing Trump's order stripping workers of union rights," *Government Executive* (April 19, 2025) (quoting VA Press Secretary Pete Kasperowicz), https://perma.cc/2FMX-6L33.

52.    On April 4, 2025, forty-five members of Congress wrote to Defendant Hegseth, urging that he "exercise [his] authority to exempt DoDEA employees from the President's Executive Order and maintain their existing collective bargaining protections." Letter from Hon. Jill Tokuda, Member of Congress, *et al.*, to Secretary of Defense Peter Hegesth at 1 (April 4, 2025), https://tokuda.house.gov/imo/media/doc/dod_dodea_letter.pdf. The letter stressed that DODEA "does not have a primary function related to 'intelligence, counterintelligence, investigative, or national security'" and further pointed out that "federal collective bargaining protections can be applied to DoDEA in a manner consistent with national security requirements and considerations" because "DoDEA schools are not located in the frontlines of any conflict" and "DoDEA educators and personnel do not have security clearances or handle sensitive military information." *Id.* at 1-2.

53.    Defendant Hegseth did not exercise his delegated authority to exempt DODEA from the Executive Order. Rather, in an order dated April 17, 2025, Defendant Hegseth stated that Chapter 71 "can be applied … in a manner consistent with national security requirements and considerations" to "federal wage system employees in the trades" who work in four DOD subdivisions. DOD, Executive Order 14251 Certification, 90 Fed. Reg. 17,052 (April 23, 2025). Those subdivisions are the following:

"(a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army," *id.*, which, among other things, maintains air-to-air and air-to-ground precision guided missiles stores, serves as an ammunition supply depot for all DOD armed services, and demilitarizes tactical missiles and conventional munitions;

"(b) Air Force Test Center, Air Force Materiel Command, Department of Air Force," *id.*, which conducts research and development, testing, and evaluation of manned and unmanned aircraft for the Air Force;

"(c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force," *id.*, which provides depot-maintenance and supply-chain-management services, as well as operations and installation support for Air Force weapons systems ranging from fighter jets to intercontinental ballistic missiles; and

"(d) Fleet Readiness Center Southeast," *id.*, which provides aircraft repair and technical services for the U.S. Navy.

54.    There is no conceivable justification under Section 7103(b) for Defendant Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—which are primarily if not exclusively involved in national security work of the most obvious kinds—while maintaining the Executive Order's exclusion of DODEA.

55.    Like many if not most of the other agencies and agency subdivisions swept up in the Executive Order's dragnet, DODEA does not have, as a primary function, intelligence, counterintelligence, investigative, or national security. Indeed, DODEA is not involved in intelligence, counterintelligence, investigative, or national security work at all. Rather, it is one of two federally operated public school systems, which provides high-quality PreK-12 education to children of uniformed and civilian DOD personnel. And DODEA's educators—like many if

not most of the other federal employees whose rights under Chapter 71 have been extinguished by the Executive Order's dragnet but unlike the employees whose bargaining rights have been restored by Defendant Hegseth—are not engaged in intelligence, counterintelligence, investigative, or national security work.

56.     Nor can it reasonably be said that the collective bargaining provisions of Chapter 71 cannot continue to apply to DODEA in a manner consistent with national security requirements and considerations. Not only is there no remotely plausible basis for maintaining that DODEA has intelligence, counterintelligence, or national security as "primary function" but it is risible to suppose that there are any legitimate national security concerns implicated by collective bargaining between DODEA and the educators and education support professionals teaching in DODEA's schools, much less that such collective bargaining "cannot be conducted consistent with national security requirements and considerations." The latter point is shown starkly by the fact that DODEA has been engaged in collective bargaining with unions representing its educator employees, including Plaintiffs, since the 1970s.

**F.     The Executive Order Has Caused and Will Continue to Cause Irreparable Harm to Plaintiffs**

57.      Plaintiffs FEA, FEA-SR, and ACEA—and their members—have suffered and absent injunctive relief from this Court will continue to suffer, severe and irreparable harm by reason of the Executive Order.

58.     On April 3, 2025, the Chief of DODEA's Labor Management Employee Relations Division, Alexa Rukstele—citing the Executive Order, the White House Fact Sheet, and the OPM Guidance—notified Plaintiffs that DODEA "will pause all labor relations-related activities." Notwithstanding DODEA's use of the seemingly anodyne verb "pause," DODEA has already effectively repudiated its obligations under existing CBAs that remain in force by their

terms or by operation of law by cancelling dues deductions and bringing bargaining, grievance

handling, and other routine labor-management interactions to a halt.

59.    On or about April 7, 2025, DODEA terminated the statutorily and contractually

required payroll deductions of FEA, FEA-SR, and ACEA dues from union members who have

voluntarily authorized those deductions, thereby cutting off "dues payments of union members,"

which are the "economic lifeblood of a labor organization and normally its primary source of

income." *Loc. Union No. 5741, United Mine Workers of Am. v. NLRB*, 865 F.2d 733, 738 (6th

Cir. 1989) (quotation marks omitted). *See also Alachua County Educ. Ass'n v. Carpenter*, No.

1:23CV111-MW/HTC, 2024 WL 4708983, at *2 (N.D. Fla. Nov. 6, 2024) (explaining that

unions suffered injury arising from state law's ban on payroll deduction "because it prohibits this

bargained-for method of dues deduction"). As a consequence, Plaintiffs are forced to expend

funds and resources to effectuate alternative payment arrangements that are costly and less

reliable than payroll deduction, and then seek electronic payment authorizations for thousands of

members spread across the globe, which in FEA's case involves seeking such authorizations

from members around the globe.

60.    DODEA has ceased participating in grievance proceedings that arose, and have

been pending, before the Executive Order issued. DODEA has claimed that by reason of the

Executive Order, DODEA has no obligation to abide by unexpired CBAs, including their

provisions for the resolution of grievances, and that arbitrators have no jurisdiction to decide

grievances that arose and were pending prior to the Executive Order. These actions not only

amount to a repudiation of DODEA's contractual obligations but also retroactively seek to

extinguish grievance claims that accrued before the Executive Order issued, including many that

have already been upheld in arbitration awards.

61. For example, FEA has been prosecuting numerous grievances on behalf of more than 800 educators that seek relief from DODEA's wrongful garnishment of purported overpayments from educators' pay—or other failures to pay educators their rightful salaries—by reason of DODEA's chronic failure to correctly calculate their overseas employees' pay. Those grievances were all pending, in various stages of the arbitration process, when the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order. In grievance proceedings involving nearly 500 affected employees, arbitrators have already issued decisions upholding the grievances and ordering DODEA to make the affected employees whole through the payment of back pay and interest, but DODEA has yet to effectuate the decisions. The awards in these cases are substantial, amounting to more than $100,000 in back pay for some affected employees. The remaining grievances have either not yet been submitted to arbitration or are the subject of ongoing arbitration proceedings.

62. In other pending grievance proceedings initiated by FEA, DODEA attorneys have refused to further participate in arbitral proceedings. In one such proceeding, DODEA's procurement officer purported to cancel a scheduled arbitration and dismiss the arbitrator's services with the clear suggestion that the arbitrator would not be paid for any further contracted work on the case.

63. FEA-SR has 36 pay grievances on behalf of 122 bargaining unit employees that are in various stages of the arbitration process and an additional 10 grievance cases that have not yet been scheduled for arbitration; 7 of those are on behalf of multiple employees and the remaining three are individual grievances. All of those grievances were filed before the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order.

64.     Absent relief from this Court, those FEA and FEA-SR members with pay and other grievances that arose CBAs—including the hundreds who have already been awarded back pay and interest—will retroactively lose their ability to recover the pay they are owed because limitations periods have long expired for any alternative remedies.

65.     ACEA has two pending grievances under its CBA with DODEA, one that was scheduled for arbitration on April 28, 2025. Both have been placed in abeyance because of the Executive Order.

66.     DODEA has effectively nullified the sick leave bank established pursuant to its current CBA with ACEA to provide temporary assistance to employees who are incapacitated or are required to attend to a family member's medical emergency or serious medical condition. Under this CBA provision, participating bargaining unit members donate leave time to the leave bank, and a committee consisting of two union-appointed employees and one DODEA representative administers the bank and decides whether to grant employee requests to draw on the leave bank. The sick leave bank currently has more than 13,000 donated hours, but after the Executive Order issued DODEA has refused to convene the committee and consider employee requests. Three participating employees have since requested grants from the leave bank, but the requests have not been processed.

67.     DODEA's repudiation of its CBAs pursuant to the Executive Order have caused—and, absent relief from this Court, will continue to cause—grave and irreparable harm to Plaintiffs and their members. Absent relief from this Court, Plaintiffs' members will lose their contractual and statutory rights and remedies under CBAs validly entered into prior to the Executive Order and that continue in force either by their terms or, as in the case of FEA-SR, by operation of Chapter 71, including remedies for grievances predating the Executive Order.

68.     Nor will Plaintiffs and their members have any recourse to the FLRA.  FLRA case law holds that once an agency has been excluded from Chapter 71 under Section 7103(b), "the Authority has no jurisdiction to decide" union unfair labor practice complaints. *U.S. Attorney's Off. S. Dist. of Texas Houston*, 57 F.L.R.A. 750, 750 (Apr. 25, 2002). On April 4, 2025, the FLRA issued an order in a years-old unfair labor practice proceeding initiated by FEA, that cites the *U.S. Attorney's Office* decision and directs FEA to show cause why, in light of the Executive Order, "the Authority should not dismiss this matter for lack of jurisdiction." The FLRA has issued identical orders to other federal unions with pending cases before the FLRA. On April 18 2025, FEA responded that it considers the Executive Order to be unlawful on the same statutory and constitutional grounds underlying this pleading, and that it would therefore be more appropriate for the FLRA to stay the matter pending the outcome of litigation challenging the Executive Order. DODEA, in turn, replied to the FEA's response on April 30, 2025, taking the position that by reason of the Executive Order, the FLRA "lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union."

69.     On April 29, 2025, Rukstele notified Plaintiffs FEA, FEA-SR, and ACEA that "**official time**"—a term referring to contractual arrangements that allow union officials to perform representational functions while on duty status—"**is no longer authorized for any purpose**" and directed that "all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school" and must "promptly vacate any office space used by the union/association."

70.     As of April 29, 2025, DODEA has refused to allow employees to have a union representative present during meetings that may result in discipline—so-called "*Weingarten*

rights," after the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975)—regardless of whether the meeting is held during the duty day or not.

71.    By reason of the Executive Order, Plaintiffs are losing revenue and are bereft of their core functions as unions: they have lost their status as collective bargaining representatives chosen by unit employees, they have therefore lost the ability to negotiate CBAs or even enforce their existing CBAs through contractually agreed-upon grievance procedures, and they have lost recourse to the FLRA for unfair labor practices and other labor-management disputes within the FLRA's jurisdiction. The loss of these core union functions causes irreparable injury to the Plaintiffs and to Plaintiffs' members, who have lost their statutory and contractual rights and protections—including, in hundreds of cases, the retroactive nullification of pending grievances arising from CBA violations long predating the Executive order.

## CLAIMS FOR RELIEF

### COUNT ONE
### *ULTRA VIRES* ACTION IN VIOLATION OF THE SEPARATION OF POWERS
#### (All Plaintiffs v. Defendants Trump, Ezell, and OPM)

72.    Plaintiffs incorporate paragraphs 1–71 above by reference as if fully set forth herein.

73.    Under the authority granted by Congress in 5 U.S.C. § 7103(b)(1), agencies or subdivisions thereof may only be excluded from Chapter 71 if two narrow conditions are met: (a) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

74.    From the enactment of Chapter 71 through the Trump administration's first term, the practice of every president who has invoked Section 7103(b) confirms the narrowness of the

President's exclusion authority: each applied Section 7103(b) judiciously, targeting only those portions of Cabinet departments and independent agencies that clearly have a primary function of performing intelligence, counterintelligence, investigative, or national security work,

75.    The Executive Order—which excludes 75% of federal employees heretofore represented by federal unions under Chapter 71 and 67% of federal civil service employees overall—is wholly unmoored from Section 7103(b)'s narrow conditions. No limiting principle consistent with Section 7103(b)'s conditions can justify the Executive Order's staggeringly broad sweep, which takes in agencies and subdivisions including the Bureau of Land Management, the Environmental Protection Agency, and, by reason of the Executive Order's exclusion of the entirety of DOD, DODEA's PreK-12 schools, especially when coupled with the Executive Order's blanket exemption for agency law enforcement units.  The President's attempt to press the narrow authority granted by Section 7103(b) into the service of extinguishing collective bargaining for the overwhelming majority of federal employees—vast swathes of whom, like DODEA educators, perform no national security work—amounts to an effective nullification of the comprehensive collective bargaining system established by Congress.

76.    Wholly apart from the Executive Order's staggering overbreadth, the White House's own admissions betray the pretextual nature of the order's purported national security justification. The White House has bluntly admitted that the Executive Order's purpose is both (a) to harm and punish "hostile Federal unions" for voicing opposition to Trump administration policies and challenging Trump administration policies by petitioning for redress of the injuries inflicted by those policies through the courts and through collectively bargaining grievance proceedings; and (b) to facilitate the mass firing of federal employees. Neither of these purposes is legitimate under Section 7103(b).

77.     Because the Executive Order uses the narrow authority granted by Section 7103(b) to upend Congress's comprehensive framework for collective bargaining among federal agencies, and because the Executive Order does so for venal and retaliatory reasons under the pretext of national security, the Executive Order is *ultra vires* and violates the Constitution's separation of executive from legislative powers.

### COUNT TWO:
### VIOLATION OF THE FIRST AMENDMENT
### (All Plaintiffs v. All Defendants)

78.     Plaintiffs incorporate paragraphs 1–77 above by reference as if fully set forth herein.

79.     The First Amendment to the United States Constitution protects against government actions "abridging the freedom of speech" and "the right of the people … to petition the Government for a redress of grievances."

80.     FEA and FEA-SR have exercised their First Amendment rights to voice opposition to Trump administration policies that harm the federal employees they represent and to petition for redress of those harms through recourse to the courts and grievance proceedings governed by Chapter 71.

81.     The Executive Order was avowedly issued in retaliation for the protected speech and petitioning activities by federal unions—including FEA and FEA-SR—who have opposed Trump administration policies, and it aims to chill the protected speech of all federal unions going forward. The White House's Fact Sheet baldly admitted this motivation. That document justified the Executive Order on the basis of its assertions that "Federal unions have declared war on President Trump's agenda," that one such union "describes itself as 'fighting back' against Trump," and that such unions have filed grievances seeking relief from Trump administration policies.

82.     The White House's Fact Sheet further makes clear that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies and punish unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict. The Fact Sheet declares, "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This message that unions supporting Trump policies will receive favor and those opposing Trump policies will receive punishment is reinforced by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular—which the Fact Sheet highlights: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.*

83.     The Executive Order's purpose and effect is to harm and punish federal unions by reason of their First-Amendment-protected speech and petitioning and to chill protected activity by all federal unions going forward.

84.     The OPM Guidance, and Secretary Hegseth's Executive Order 14251 Certification all carry out and share in the Executive Order's retaliatory purpose and effects.

**COUNT THREE:**
**VIOLATION OF THE FIFTH AMENDMENT'S PROTECTIONS AGAINST THE**
**GOVERNMENT'S ANNULMENT OF VESTED RIGHTS ARISING FROM THE**
**GOVERNMENT'S OWN CONTRACTS**
**(All Plaintiffs v. All Defendants)**

85.     Plaintiffs incorporate paragraphs 1–84 above by reference as if fully set forth herein.

86.     The Fifth Amendment of the United States Constitution protects against deprivations of property "without due process of law" and provides that "private property" shall not be "taken for public use, without just compensation."

87.     Collective bargaining agreements entered into pursuant to Chapter 71 are contracts that bind federal agencies and unions representing their employees. *See* 5 U.S.C. §§ 7114(c)(3); 7116. Such "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934). As such, contracts with the federal government are protected by the Takings Clause. *Id.*

88.     The Fifth Amendment's Due Process Clause also protects against the government's retroactive abrogation of its contracts. Where Congress has "the power to authorize" contracts, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch*, 292 U.S. at 579. *See also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

89.     The Executive Order and the OPM Guidance seek to nullify CBAs and extinguish vested rights under them such as pending grievances over actions predating the Executive Order—including FEA's unresolved pay grievances on behalf of approximately 800 educators and ACEA's sick leave bank—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their vested rights under CBAs and thus their constitutionally protected property interests in CBAs lawfully entered into with DODEA. And they do so with no legitimate public purpose or rational justification. The Executive Order

and OPM Guidance therefore constitute unlawful takings and violate the Fifth Amendment's guarantee of substantive due process.

**COUNT FOUR:**
**VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION OF THE LAWS**
**(All Plaintiffs v. All Defendants)**

90.    Plaintiffs incorporate paragraphs 1–89 above by reference as if fully set forth herein.

91.    The due process guarantee of the Fifth Amendment to the United States Constitution includes a guarantee of equal protection. *See United States v. Windsor*, 570 U.S. 744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

92.    "The Constitution's guarantee of equality 'must at the very least mean that a bare … desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534–35 (1973)).

93.    A "bare … desire to harm a politically unpopular group" is precisely what motivated the Executive Order's exclusion of 75% of union-represented employees across multiple Cabinet departments and independent agencies, while providing a blanket exception for agency police and firefighters, whose unions have supported President Trump. This conclusion is all the more inescapable given the White House's statements admitting that the purpose of the order is to harm and punish federal unions that have voiced opposition to Trump administration policies and petitioned the government for redress from those policies.

## COUNT FIVE:
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE
## OF PROCEDURAL DUE PROCESS
### (All Plaintiffs v. All Defendants)

94.    Plaintiffs incorporate paragraphs 1–93 above by reference as if fully set forth herein.

95.    The Fifth Amendment's protection against deprivations of property "without due process of law" requires, at a minimum, notice and an opportunity to be heard before the government may deprive a person of property.

96.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch*, 292 U.S. at 579.

97.    The Executive Order and the OPM Guidance seek to retroactively nullify CBAs and extinguish pending grievances over actions predating the Executive Order—such as FEA's approximately 800 unresolved pay grievances on behalf of DODEA educators—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their constitutionally protected property interests in CBAs lawfully entered into with DODEA, and they do so without having afforded Plaintiffs any notice or opportunity to be heard in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

## COUNT SIX
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:
## ARBITRARY AND CAPRICIOUS AGENCY ACTION
### (All Plaintiffs v. Defendants Hegseth and DOD)

98.    Plaintiffs incorporate paragraphs 1–97 above by reference as if fully set forth herein.

99.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706 (2)(A).

100.    An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

101.    Defendant Hegseth provided no explanation of his failure—in the face of a letter from members of Congress cogently explaining that the exclusion of DODEA from collective bargaining is not justified under Section 7103(b) no less—to suspend the Executive Order with respect to DODEA while suspending the Executive Order for a subset of employees working in four DOD subdivisions working on weapons systems and munitions. Defendant Hegseth entirely failed to consider an important aspect of the problem, relied on factors which Congress has not intended it to consider, while offering no explanation whatsoever for his action.

102.    Moreover, there is no conceivable legal justification under Section 7103(b) for Defendant Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—which are primarily if not exclusively involved in national security work involving DOD weapons systems and munitions—while maintaining the Executive Order's exclusion of DODEA. DODEA does not perform intelligence, counterintelligence, investigative, or national security at all, much less does it have any such work as a primary function. Rather, DODEA operates high-quality public schools serving the dependents of uniformed and civilian DOD personnel. It follows from this fact that collective bargaining manifestly *can* be conducted

in a manner consistent with national security requirements and considerations, as confirmed by

DODEA's decades-long history of mutually productive collective bargaining with Plaintiffs

under Chapter 71.

103.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of

the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to

DODEA or even explain that failure is arbitrary and capricious.

**COUNT SEVEN**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:**
**AGENCY ACTION CONTRARY TO LAW**
**(All Plaintiffs v. Defendants Hegseth and DOD)**

104.    Plaintiffs incorporate paragraphs 1–103 above by reference as if fully set forth

herein.

105.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency

action" that is "contrary to law." 5 U.S.C. § 706(2)(A).

106.    Section 7103(b) provides no lawful justification for the continued exclusion of

DODEA from Chapter 75. DODEA performs no intelligence, counterintelligence, investigative,

or national security at all; much less does it have any such work as a primary function. It follows

from this fact that collective bargaining manifestly *can* be conducted in a manner consistent with

national security requirements and considerations, as confirmed by DODEA's decades-long

history of stable and mutually productive collective bargaining under Chapter 71. Defendant

Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to

suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA is contrary to

law.

107.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of

the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to

36

DODEA also is contrary to law because the Executive Order is *ultra vires* the President's narrow statutory authority and violates the separation of powers, the First Amendment's protection of speech and petitioning, the Fifth Amendment's guarantee of equal protection of the laws, and the Fifth Amendment's guarantee of procedural and substantive due process as well as its protection against unlawful government takings of property.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

(a)    a declaratory judgment that:

    i.    the Executive Order, the OPM Guidance, and their nullification of Plaintiffs' CBAs and contractual grievances, are *ultra vires*, in violation of the separation of powers, in violation of the First Amendment's protection of speech and petitioning activities, in violation of the Fifth Amendment's guarantee of equal protection of the laws, and in violation of the Fifth Amendment's protection against unlawful takings and its guarantee of substantive due process; and

    ii.    Defendant Hegseth's failure to suspend application of the Executive Order with respect to DODEA or to explain that failure violates the Administrative Procedure Act;

(b)    preliminary and permanent injunctive relief that:

    i.    prohibits the Defendants and their agents and successors from implementing or otherwise giving effect to the Executive Order and the OPM Guidance with respect to Plaintiffs and their members; or in the absence of such relief

    ii.   sets aside Defendant Hegseth's April 23, 2025, Executive Order 14251

Certification and directs Defendant Hegseth to address the question of

whether suspending the Executive Order as to DODEA is warranted under

U.S.C. § 7103(b).

(c) an order granting Plaintiffs attorney's fees and costs; and

(d) an order granting such other relief as this Court may deem just and proper.

DATED: May 5, 2025            Respectfully submitted,


                    /s/Jason Walta
                    Jason Walta
                    Alice O'Brien*
                    Philip Hostak*
                    Caitlin Rooney*
                    National Education Association
                    1201 16th Street NW
                    Washington, DC 20036
                    (202) 822-7035
                    jwalta@nea.org
                    phostak@nea.org
                    crooney@nea.org

                    *Attorneys for Plaintiffs*

                    *Application for admission *pro hac vice*
                    forthcoming

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL EDUCATION ASSOCIATION,
    1201 16th St. NW Suite 117, Washington,
    DC 20036;

FEDERAL EDUCATION ASSOCIATION
    STATESIDE REGION, PO BOX 41035,
    Fayetteville, NC 28309;

and

ANTILLES CONSOLIDATED EDUCATION
    ASSOCIATION, PO BOX 34425, Fort
    Buchanan, Puerto Rico 00934;

        *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
    President of the United States, 1600
    Pennsylvania Avenue NW, Washington, D.C.
    20500;

PETER HEGSETH, in his official capacity as the
    United States Secretary of Defense, 1000
    Defense Pentagon, Washington, DC 20301;

UNITED STATES DEPARTMENT OF
    DEFENSE, 1400 Defense Pentagon,
    Washington, DC 20301;

CHARLES EZELL, in his official capacity as
    Acting Director of the U.S. Office of
    Personnel Management, 1900 E Street NW,
    Washington, DC 20415;

and

UNITED STATES OFFICE OF PERSONNEL
    MANAGEMENT, 1900 E Street NW,
    Washington, DC 20415;

        *Defendants*.

Civil Action No. 1:25-cv-1362

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

_____

## FIRST AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

_____

### I.    INTRODUCTION AND NATURE OF THE ACTION

1.    In this action, Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA")—labor organizations representing educators who work in prekindergarten-through-12th-grade ("PreK-12") schools operated by the Department of Defense Education Activity ("DODEA")—challenge Defendant Donald Trump's executive order stripping Plaintiffs and their members of their statutory and contractual collective bargaining rights on purported national security grounds, Exec. Order No. 14251, Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025) ("Executive Order"), as well as injurious acts and omissions relating to the implementation of the Executive Order committed by the other Defendants.

2.    The Executive Order suffers from manifold constitutional infirmities: (a) it is wholly unmoored from the narrow authority that Congress granted to the president to exclude federal agencies and agency subdivision from collective bargaining for reasons of national security and is therefore *ultra vires* and in violation of the constitutional separation of powers; (b) it violates the First Amendment inasmuch as the Trump administration's own words demonstrate that it was issued to retaliate against federal unions for engaging in protected speech and petitioning activities; (c) it violates the Fifth Amendment's guarantee of equal protection of the laws inasmuch as it was avowedly motivated by a bare desire to harm politically unpopular groups; and (d) by nullifying collective bargaining agreements ("CBAs") between Plaintiffs and

the government, it violates the Fifth Amendment's protection against deprivations of property without due process of law and its protection against unlawful takings of property. Even if the Executive Order were not generally invalid by reason of those constitutional infirmities, Defendant Peter Hegseth's failure to exercise his delegated authority under the Executive Order to suspend its application to DODEA is arbitrary and capricious and contrary to law and therefore violates the Administrative Procedure Act. Plaintiffs seek a declaration that the Executive Order is unlawful in these respects and preliminary and permanent injunctive relief prohibiting any further implementation and enforcement of the Executive Order and setting aside Defendant Hegseth's failure to suspend the Executive Order with respect to DODEA.

## II.    JURISDICTION AND VENUE

3.      This court has jurisdiction under 28 U.S.C. § 1331 as this action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Plaintiff  FEA is headquartered in the District of Columbia and thus resides in this District, because this action seeks relief against federal agencies and officials acting in their official capacities residing in the District of Columbia, and because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

## III.    PARTIES

5.      Plaintiff FEA is a labor organization with more than 5,400 members, all of whom work as educators and education support professionals (ESPs) in schools operated by DODEA, a subdivision of DOD that operates public schools serving more than 64,000 PreK-12 dependents

of military and civilian DOD personnel stationed in bases in the United States, in United States territories, and abroad.

6.      FEA's members include classroom teachers, instructional assistants, information specialists (also known as librarians), counselors, nurses, and classified employees who work in DODEA schools located in military bases in the United States and in the U.S. Territory of Guam, countries throughout Europe and Asia, and in Guantanamo Bay, Cuba, to ensure that children of DOD-employed families have the opportunity to receive the high-quality education that has long characterized DODEA schools.

7.      FEA is dedicated to the proposition that educators should ensure the integrity and effectiveness of educational programs within federal school systems. In FEA's view, this goal requires three things: (a) achieving the high standards, benefits, and working conditions that are necessary to attract and retain highly competent professionals; (b) supporting educators' professional growth; and (c) empowering educators to make decisions regarding their professional lives. To these ends, FEA advocates on behalf of DODEA educators before Congress and the courts, and, prior to the Executive Order, had for decades been engaged in collective bargaining with DODEA concerning the working conditions, benefits, and other terms and conditions of employment of education support professionals working in DODEA's overseas schools pursuant to Chapter 71.

8.      FEA brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

9.      FEA-SR is an affiliated leadership council of FEA that represents DODEA educators in the continental United States and the Territory of Guam. Prior to the Executive

Order, FEA-SR had for decades engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in those schools.

10.    Plaintiff FEA-SR brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

11.    Plaintiff ACEA is a labor organization with 182 members working as educators in four DODEA schools located in Puerto Rico. For nearly half a century prior to the Executive Order, ACEA had engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA schools in Puerto Rico. Plaintiff ACEA brings this action on behalf of itself and its members, whose statutory and contractual rights have been extinguished by the Executive Order.

12.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

13.    Defendant Peter Hegesth is the United States Secretary of Defense. He is sued in his official capacity.

14.    Defendant DOD is an agency of the United States.

15.    Defendant Charles Ezell is Acting Director of OPM. He is sued in his official capacity.

16.    Defendant OPM is an agency of the United States.

## IV.    FACTUAL ALLEGATIONS

**A.    For Nearly Half a Century, Chapter 71 Has Provided a Sound and Carefully Calibrated Basis for Federal Sector Labor Relations.**

17.    Congress enacted the Federal Service Labor-Management Relations Statute, codified as Chapter 71 of Title 5 of the United States Code ("Chapter 71"), as part of the broader reforms of the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). Prior to the CRSA's January 11, 1979 effective date, collective bargaining in the federal civil service had been authorized and governed by two executive orders. The first was issued in 1962 by President John F. Kennedy. *See* Executive Order 10,988, Employee-Management Cooperation in the Federal Service, 27 F. Reg. 551 (Jan.17, 1962). The second, which formed the general blueprint for Chapter 71, was issued in 1969 by President Richard M. Nixon. *See* Exec. Order 11,491, Labor-Management Relations in the Federal Service, 34 FR 17,605 (Oct. 31, 1969).

18.    Congress enacted Chapter 71 to provide a comprehensive statutory framework to govern collective bargaining in the federal civil service "designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). That statutory framework is based on Congress's recognition that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them … safeguards the public interest, … contributes to the effective conduct of public business, and … facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." *Id.* § 7101(a).

19.    Like the executive orders that preceded it, Chapter 71 was patterned in part on the main private-sector labor-relations statute, the National Labor Relations Act of 1935 ("NLRA"), 49 Stat. 449 (1935), 29 U.S.C. § 151 *et seq.* Notably, Chapter 71 mirrors the NLRA in

guaranteeing federal employees the basic rights "to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal" 5 U.S.C. § 7102, and to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees," *id.* § 7102(2). *Accord* NLRA Section 7, 29 U.S.C. § 157.

20.     Like the NLRA, Chapter 71 also establishes election procedures for determining if a majority of employees in an appropriate unit choose union representation, 5 U.S.C. § 7111(b), and requires covered agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election," *id.* § 7111(a); *accord* NLRA Section 9(a)-(c); 29 U.S.C. §§ 159(a)-(c). Chapter 71 also requires agencies to negotiate in good faith with such representatives to reach a collective bargaining agreement, 5 U.S.C. § 7114(b)(5), as does the NLRA with respect to covered private employers, NLRA Section 8(d), 29 U.S.C. § 158(d).

21.     Chapter 71 also mirrors the NLRA in its setting out of proscribed agency and union unfair labor practices that make it unlawful for an agency or union, *inter alia*, "to interfere with, restrain, or coerce any employee in the exercise" of their rights under Chapter 71, "to encourage or discourage membership in any labor organization by discrimination" as to terms and conditions of employment, and "to refuse to bargain in good faith" with the labor organization or agency, 5 U.S.C. §§ 7116(a) and (b); *accord* NLRA Section 8(a) and (b), 29 U.S.C. § 158(a) and (b). And Chapter 71 created an independent agency, the Federal Labor Relations Authority ("FLRA"), to resolve unfair labor practice complaints, *see* 5 U.S.C. § 7104,

just as the NLRA created the National Labor Relations Board, *see* NLRA Sections 3,10; 29 U.S.C. §§ 153, 160.

22.     At the same time, given the federal government's "special requirements and needs," 5 U.S.C. § 7101(b), Congress tailored Chapter 71's collective bargaining framework to be more limited than the NLRA in certain significant respects.

23.     Chapter 71, for example, provides statutory management rights protections that preserve "the authority of any management official of any agency" to, *inter alia*, "determine the mission, budget, organization, number of employees, and internal security practices of the agency"; "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees"; and "assign work, .. make determinations with respect to contracting out, and ... determine the personnel by which agency operations shall be conducted." *Id.* § 7106(a). Under the NLRA, by contrast, management-rights protections are left to the bargaining process. *See NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395 (1952). While Chapter 71 thus precludes *decisional* bargaining when an agency invokes its management rights under Section 7106(a), bargaining is permitted as to the effects of such decisions, such as bargaining over the procedures for implementing those decision and for "appropriate arrangements for employees adversely affected by" such management decisions. 5 U.S.C. § 7106(b)(2) and (3).

24.     In addition to creating non-negotiable management rights, Chapter 71 provides that the duty of unions and federal agencies to negotiate over terms and conditions of employment under does not extend to matters established by federal statute or by government-wide regulations. 5 U.S.C. §§ 7103(a)(14)(c) and 7117(a)(2). Thus, where, for instance, agency

employees' pay is determined by statutory wage scales, as is the case for DODEA's overseas educators, bargaining over the amount of employees' compensation is prohibited.

25.    While the NLRA expressly protects the right of private-sector employees to strike, 29 U.S.C. § 163, federal employees are forbidden to strike, to assert the right to strike, or even to knowingly be a member of a union that asserts the right to strike, against the federal government, 5 U.S.C. §§ 7311(3) and (4). Chapter 71 makes it an unfair labor practice for federal employee unions to call, participate in, or condone "a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations," *id.* § 7116(b)(7)(A), and it denies the rights and protections established by Chapter 71 to any employee who participates in a strike against the federal government, *id.* § 7103(b)(2)(B)(v) (excluding any agency employee who participates in a strike in violation of section 7311" from the definition of a Chapter 71 "employee").

26.    Chapter 71 also contains provisions excluding particular employers from coverage that have no analog in the NLRA. Chapter 71 expressly excludes certain agencies from its provisions, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the United States Secret Service. *Id.* § 7103(a)(3). And it grants the President a narrow authority to exclude an otherwise covered agency or agency subdivision from Chapter 71's coverage, which narrow authority President Trump has invoked to extinguish collective bargaining for the vast majority of federal employees. Section 7103(b) of Chapter 71 authorizes the exclusion of agencies and agency subdivisions from Chapter 71 based on a determination that two specific limiting conditions are satisfied: (a) the agency or agency subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) Chapter 71 "cannot be applied" to that agency or subdivision "in

a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1).

As detailed further below, prior presidential administrations have—true to the narrow limiting

conditions prescribed by Congress and in stark contrast to President Trump's sweeping and

indiscriminate exclusions—taken a targeted approach, judiciously excluding particular sub-

agencies and agency subdivisions clearly having intelligence and/or national security as their

primary functions.

**B.    Plaintiffs Have Had Stable and Mutually Beneficial Relationships with DODEA for Decades**

27.    For decades, FEA—under its current name and under its previous name, the

Overseas Education Association—has represented education professionals working at DODEA's

schools in Europe and Asia for the purposes of collective bargaining and grievance handling,

Indeed, under its former name, FEA was first recognized as the collective bargaining

representative of DODEA educators in 1970 and negotiated its first CBA with DODEA before

Chapter 71 was enacted and federal-sector labor relations were governed by President Nixon's

Executive Order 1,1491. Since 1999, FEA-SR has represented education professionals at

DODEA's stateside schools (which include schools located in the U.S. Territory of Guam) for

the purposes of collective bargaining and grievance handling. Prior that, local FEA affiliates had

represented education professionals at DODEA's stateside schools for the purposes of collective

bargaining and grievance handling for more than a decade.

28.    FEA entered into a CBA with DODEA in 2023 covering certified educators in

DODEA's overseas schools. That CBA provides that it will continue in force until August 1,

2028, and covers such subjects as grievance procedures, payroll deduction of union membership

dues, official time for union officials engaged in representational work, employee rights,

standards and procedures for employee discipline and adverse employment actions, mid-term

bargaining procedures for management proposals on negotiable matters, and district and school-level consultations aimed at promoting and facilitating constructive relationships. The 2023-2028 CBA is the successor to the parties' 1989 CBA, which had an initial term of 3 years, but also included a clause stating that the CBA "shall remain in full force and effect during the renegotiation of said Agreement and until such time as a new Agreement is effective." FEA and DODEA operated under that 1989 agreement until the 2023 CBA was executed.

29.    Since 1996, FEA-SR has represented two units of employees working in stateside DODEA schools. One unit consists of professionally certified, non-supervisory educators; the other unit consists of classified education support professionals ("ESPs"). Prior to 1996, local FEA affiliates had represented those employees in separate, school-level bargaining units for more than a decade. But in 1996, the FLRA issued an order approving the consolidation of those school-level units into two units: one for stateside certified educators and the other for stateside ESPs. Following that order, DODEA recognized FEA-SR as the successor representative for those two units..

30.    The most recent CBA between FEA-SR and DODEA covering certified educators ("the 2019 Certified Educator CBA") went into effect on January 11, 2019. Article 35 of that agreement provides for an initial term of five years, but also includes a renewal clause providing that, if either party requests to bargain over a new agreement at least 365 but not more than 395 days before the end of the initial term, the basic terms and conditions of the agreement remain in effect until bargaining has concluded and a new agreement is executed. As FEA-SR timely provided notice of its request to bargain over a new agreement, the 2019 Certified Educator CBA remained in effect when President Trump issued the Executive Order on March 27, 2025.

31.     The most recent CBA between FEA-SR and DODEA covering ESPs went into effect on March 25, 2010 ("the 2010 ESP CBA").  Article 29 of the 2010 ESP CBA provides for an initial term of four years but also includes a renewal clause providing that if either party gives notice of intent to bargain over a successor agreement at least 60 but not more than 90 days before the CBA's expiration date, "the Agreement shall remain in full force and effect" until the bargaining concludes and a new agreement is reached, and that "[i]f neither party files such written notice, the Agreement shall be automatically renewed" for one year "on each anniversary date."  As neither party provided notice in the initial window period before the CBA's expiration, the CBA was renewed from year to year without negotiations over a successor agreement until DODEA provided notice of its intent to open negotiations for a successor agreement on April 28, 2020, and the parties began bargaining over a successor agreement. Thus, the 2010 ESP CBA remained in effect when President Trump issued the Executive Order on March 27, 2025.

32.     Both the 2019 Certified Educator CBA and the 2010 ESP CBA govern, among other things, educators' pay, grievance-and-arbitration procedures (which include provisions that protect employees asserting grievances from employer reprisals), payroll deduction of union membership dues, official time and use of office facilities for union officials engaged in representational work, employee and association rights (including the right of bargaining unit employees to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, an emergency leave bank for educators facing medical emergencies, association-management cooperation, and procedures to bargain over the impact and implementation of management-initiated changes to conditions of employments such as new curriculum implementations and new educational initiatives.

33.     ACEA has represented DODEA educators in Puerto Rico for the purpose of collective bargaining since 1974. ACEA's most recent CBA with DODEA was executed in 2023 and provides that it will continue in force until July 24, 2028. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in collective bargaining work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, association-management cooperation, and mid-term bargaining procedures for management proposals on negotiable matters.

34.     Over the time that FEA, FEA-SR, and ACEA have represented DODEA education professionals, DODEA has become a pre-eminent public school district. More than two decades ago, an audit report by the General Accounting Office ("GAO") (since renamed the Government Accountability Office) recognized that "[t]he academic achievement of DOD students, as measured by their performance on standardized tests and their plans for enrolling in college, generally exceeds that of elementary and secondary students nationwide." GAO, "BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools" (2001), https://www.gao.gov/assets/gao-01-934.pdf. Since 2020, the 161 schools operated by DODEA have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress. *See* DODEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025) (quoting DODEA Director Beth Schiavino-Narvaez's statement that "[c]redit for this success belongs to … teachers, administrators, and staff of DoDEA," as well as "to students and their

families"), https://www.dodea.edu/news/press-releases/dod-schools-ranked-best-united-states-again-nations-report-card.

35.     Collective bargaining—which facilitates cooperative labor-management solutions to educational challenges and provides a channel for education professionals at the school level to provide input—has contributed to the success of DODEA schools. For example, FEA-SR and DODEA negotiated arrangements for the union's participation in committees such as the Continuous School Improvement Committee, which focuses on enhancing the delivery of instruction and educational practices, and the Case Study Committee, which ensures that students with special needs receive appropriate educational services. Union representatives have brought valuable expertise in education to bear on these committees' work. And that is aided by the fact that committee members selected by the union to serve in a representational capacity are afforded the rights and protections of Chapter 71, which allows them to provide candid, constructive, and at times critical feedback to support DODEA's mission without fear of reprisal.

36.     The recent implementation of DODEA's Universal/Full-Day Pre-K program also provides an illustrative example. By way of background, when DODEA introduces a new educational program, curriculum, assessment, or resource, the only opportunity for educators to provide the agency with feedback is in the union's response to a statutory notice from DODEA, which typically includes proposals concerning the impact and implementation of the policy. In such responses, FEA and FEA-SR typically provide targeted feedback from school-level educators who will be directly involved in incorporating the new program into their teaching. Upon receiving the statutory notice for the Pre-K program's rollout, FEA-SR raised numerous concerns regarding DODEA's readiness to deliver appropriate instruction and the inadequate allocation of resources. In response to this feedback, DODEA established a "Tiger Team"—a

cross-functional group of DODEA leadership, administrators, and union-selected representatives. This team successfully addressed many of the readiness concerns, developing actionable solutions that ensured the program's effective implementation, and has, at least until the Executive Order, continued to collaborate with the union.

### C.  FEA and FEA-SR Have Opposed Trump Administration Policies and Challenged them in Court and in Chapter 71 Grievance Proceedings

37.     Beginning in the first Trump administration, FEA and FEA-SR have spoken out against Trump administration policies attacking federal employees and have challenged such policies in court and in grievance proceedings.

38.     In June of 2018, FEA, along with several other federal unions, brought suit in this District against President Trump, the OPM, and the OPM Director at the time, seeking to enjoin three executive orders issued by President Trump during his first administration that detrimentally affected collective bargaining rights under Chapter 71. The lawsuit was consolidated with three other federal union lawsuits challenging the executive orders. The District Court entered summary judgment for the plaintiffs in that case, although the Court of Appeals reversed on jurisdictional grounds. *See Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), *rev'd and vacated*, 929 F.3d 748 (D.C. Cir. 2019). FEA, working with a coalition of federal unions, publicized the District Court's judgment prior to its reversal in a press release.  Shortly after taking office in 2021, President Biden rescinded those executive orders. *See* Exec. Order 14003, Protecting the Federal Workforce , 86 Fed. Reg. 7,231 (Jan. 22, 2021).

39.     Throughout President Trump's first administration and into his second administration, FEA worked with the same coalition of federal unions to speak out in opposition to Trump administration policies that harm federal workers through letters to members of

Congress, including a 2017 letter opposing the confirmation of President Trump's nominee for OPM Director, a 2019 letter to all U.S. Senators opposing the confirmation of President Trump's nominee for General Counsel of the FLRA, and a 2025 letter opposing President's illegal impoundments and unconstitutional executive orders and urging the Senate Appropriations Committee to take a variety of actions to protect the civil service and federal unions.

40.     FEA-SR has filed grievances challenging some of the second Trump administration's signature policies affecting federal employees. For example, on February 26, 2025, FEA-SR filed two bargaining-unit-wide grievances, one on behalf of classified education support professionals and the other on behalf of certified educators challenging the second Trump administration's infamous mass "Fork in the Road" e-mails originating from OPM and sent to all government employees purporting to offer a "deferred resignation program" under Chapter 71 and the parties' CBA. And on March 14, 2025, FEA-SR filed another grievance challenging the also-infamous mass "What Did You Do Last Week" e-mail sent by OPM to all federal employees, also under Chapter 71 and the parties' CBA.

41.     FEA and FEA-SR also have spoken out to oppose Trump administration policies and directives affecting federal employees, issuing statements in opposition not only to the "Fork in the Road" and "What did you do last week" directives, but also such Trump administration actions as: drastically cutting congressionally appropriated funding to federal agencies, forcing layoffs of probationary employees, preparing large-scale reductions in force ("RIFs"); attacks on Diversity, Equity, and Inclusion; and executive actions specifically targeting cultural awareness celebrations, gender identity, and certain curriculum materials and library books in public education settings.

**D.    President Trump Issues the Executive Order in Avowed Retaliation for the Protected Speech and Petitioning Activities of "Hostile Federal Unions"**

42.    On March 27, 2025, President Trump issued the Executive Order, thereby depriving the overwhelming majority of federal civil service workers of their rights under Chapter 71. *See* Erich Wagner, "Trump order aims to outlaw most government unions on 'national security' grounds," *Government Executive* (March 27, 2025), https://perma.cc/6KF7-7SJY ("All told, the agencies covered by Trump's order amounts to 67% of the federal workforce, and 75% of federal workers who are currently represented by unions.").

43.    The Executive Order is staggering in its breadth. It sweeps up four Cabinet departments in their entirety;[1] two further Cabinet departments, each with a single narrow exception;[2] dozens of agencies and subdivisions within five other Cabinet departments;[3] and seven independent agencies in their entirety.[4] It also is unprecedented. Prior to the Executive Order, no president in the nearly half-century history of Chapter 71 has ever excluded from collective bargaining an entire Cabinet department or an entire independent agency, let alone multiple ones, or so broadly excluded agency subdivisions. Rather, presidents from both major parties—Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush,

---

[1] The four entirely excluded Cabinet departments are: the DOD, the Department of Justice, the Department of State, and the Department of Veterans Affairs. Executive Order Section 2(b), 90 Fed. Reg. at 14,533.

[2] The two almost-entirely excluded Cabinet departments are: the Department of Energy, with the sole exception of the Federal Energy Regulatory Commission; and the Department of the Treasury, with the sole exception of the Bureau of Engraving and Printing. *Id.*

[3] Those five Cabinet departments are: the Department of Agriculture, the Department of Commerce, the Department of Health and Human Services, the Department of Homeland Security, and the Department of the Interior. *Id.* at 14,533-34.

[4] Those entirely excluded independent agencies are: the Environmental Protection Agency, the United States Agency for International Development, the Nuclear Regulatory Commission, the National Science Foundation, the United States International Trade Commission, the Federal Communications Commission, and the General Services Administration. *Id.* at 14,554.

Barack Obama, and President Trump during his first administration—issued targeted orders

excluding particular sub-agencies and agency subdivisions that are clearly engaged in sensitive

intelligence and/or national security work.[5]

---

[5] *See* Exec. Order No. 12,171, 44 Fed. Reg. 6,565 (Nov. 19, 1979) (excluding agencies and subdivisions of the DOD such as the Army Intelligence and Security Command and Defense Intelligence Agency); Exec. Order No. 12,338, 47 Fed. Reg. 1,369 (Jan. 11, 1982) (excluding intelligence and security centers and directorates of the DOD's Joint Chiefs of Staff; the DOD's Air Force Assistant Chief of Staff or Intelligence and Intelligence Service; and the Department of Energy's Office of the Assistant Secretary for Defense Programs as well as military nuclear safety offices); Exec. Order No. 12,410, 48 Fed. Reg. 13,143 (March 28, 1983) (excluding the then-recently created Joint Special Operations Command of DOD); Exec. Order No. 12,559, 51 Fed. Reg. 18,761 (May 20, 1986) (excluding the Department of Justice's Offices of Enforcement and Intelligence of the Drug Enforcement Administration as well as several offices of the United States Marshals Services); Exec. Order No. 12,666, 4 Fed. Reg. 1,921 (Jan. 12, 1989) (excluding the Federal Air Marshal Branch of the Department of Transportation, as well as units of Civil Aviation Security Inspectors with air marshal functions); Exec. Order No. 12,671, 4 Fed. Reg. 11,157 (March 14, 1989) (excluding the Office of Enforcement of the U.S. Customs Service); Exec. Order No. 12681, 54 Fed. Reg. 28,997 (July 6, 1989) (excluding several subdivisions of the National Preparedness Directorate of the Federal Emergency Management Agency ("FEMA")); Exec. Order No. 12,693, 54 Fed. Reg. 40,629 (Sept. 29, 1989) (excluding DOD's Defense Mapping Agency Reston Center); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (March 11, 1997) (excluding the DOD's Naval Special Warfare Development Group); Exec. Order No. 13,252, 67 Fed. Reg 1,601 (Jan. 7, 2002) (excluding Department of Justice subdivisions such as INTERPOL and the Office of Intelligence and Policy Review); Exec. Order No. 13,381, 70 Fed. Reg. 37,953 (June 27, 2005) (excluding OPM's Center for Federal Investigative Services); Exec. Order 13,480, 67 Fed. Reg. 1,601 (Nov. 26, 2008) (excluding subdivisions of the then-newly created Department of Homeland Security such as the Domestic Nuclear Detection Office and the Office of Intelligence and Analysis; subdivisions of the Department of Energy such as the National Nuclear Security Administration and the Office of Intelligence and Counterintelligence; offices and subdivisions of the U.S. Coast Guard; offices and subdivisions within the then-newly created U.S. Immigration and Customs Enforcement such as the Offices of Intelligence and International Affairs; subdivisions of FEMA such as the Continuity of Operations Division and the Integrated Public Alert and Warning Systems Division; the Department of Justice's National Security Division and Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Federal Aviation Administration's Office of Security and Hazardous Materials; and subdivisions of the Treasury Department such as the Office of Terrorism and Financial Intelligence and the Financial Crimes Enforcement Network); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 12, , 2017) (excluding subdivisions of the DOD such as the U.S. Strategic Command, U.S. Cyber Command, and the Marine Special Operations Command); Exec. Order No. 13,869, 84 Fed. Reg. 18,125, (April 24, 2019) (excluding the DOD's Defense Counterintelligence and Security Agency).

44.     Nor does the Executive Order stop with these staggeringly broad and unprecedented exclusions. In Section 5, the Executive Order authorizes further exclusions by delegating to the Secretary of Transportation the authority "to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration," from Chapter 71's coverage and "suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia." 90 Fed. Reg. at 14,556. And in Section 7, the Executive Order directs all agency heads to report to the President any additional agency subdivisions they determine should be excluded from Chapter 71. *Id.*

45.     Section 6 of the Executive Order directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the FLRA involving exceptions or arbitral awards or unfair labor practices. *Id.*

46.     Also on March 27, 2025, but before the Executive Order was publicly released, Defendant Ezell, as Acting Director of OPM, issued a memorandum providing guidance to agency leadership regarding implementation of the Executive Order. *See* Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025) ("OPM Guidance"), https://perma.cc/V6WH-435Z. The OPM Guidance declares that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in the Executive Order, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and

agency subdivisions covered by" the Executive Order. *Id.* at 1, 3 (alterations in original). The OPM Guidance also directs agencies to "cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

47.    The Executive Order is wholly unmoored from the narrow authority that Congress has granted the President to exclude agencies or agency subdivisions from Chapter 71 where (a) the agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) the provisions of Chapter 71 "cannot be applied in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). Many, if not most, of the agencies and agency subdivisions swept up in the Executive Order's dragnet—including Cabinet departments such as  the Department of Veterans Affairs and the Department of the Treasury, and independent agencies such as the Environmental Protection Agency, the Federal Communications Commission, and the General Services Administration—do little to no national security work, much less do they have "as a *primary* function intelligence, counterintelligence, investigative, or national security work." *Id.* (emphasis added). Nor can it be reasonably said that the collective bargaining provisions of Chapter 71 "cannot be applied in a manner consistent with national security requirements and considerations" to the panoply executive departments, agencies, and agency subdivisions swept up in the Executive Order's dragnet. *Id.*

48.    The staggering and unprecedented breadth of the Executive Order—which ends collective bargaining for some two-thirds of federal civil service employees and three-quarters of those represented by unions, many if not most of whom are not engaged in national security work—belies its purported national security justification.

49.    Beyond that, the Trump administration's own statements in support of the Executive Order reveal the administration's actual motivations for extinguishing collective bargaining for the overwhelming majority of federal civil service workers—namely (a) to retaliate against federal unions by reason of their First-Amendment-protected speech and petitioning activities and chill any further such speech and petitioning by any federal unions; and (b) to facilitate the firing of civil service employees *en masse*.

50.    The Trump administration bluntly admitted the first of these motivations in a White House "Fact Sheet" purporting to justify the Executive Order. *See* The White House, "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G-MUSH. In that document, the White House railed against "hostile Federal unions" that, in the White House's view, have "declared war on President Trump's agenda" by, for example, "filing grievances to block Trump policies." *Id.* The White House further decried "[t]he largest Federal union"—a clear reference to the American Federation of Government Employees—because it "describes itself as 'fighting back' against Trump" and "is widely filing grievances to block Trump policies." *Id.*

51.    At the same time, the White House Fact Sheet pointedly declares that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This statement sends a clear message that that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies, while unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the

injuries those polices inflict will be punished. This message is made all the more clear by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular—which the Fact Sheet takes pains to trumpet: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.* (emphasis in original).

52.    In addition, scarcely two days after the Executive Order was issued, a White House spokesperson candidly acknowledged the motivation for the Exclusion Order in these terms: "The goal is to stop employees in certain security-related agencies from unionizing in ways that disrupt the president's agenda." Rebecca Davis O'Brien, "Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts," *New York Time*s (Mar. 29, 2025), https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html.

53.    The Fact Sheet also reveals the administration's second motivation by complaining about an FLRA ruling that affirmed an independent arbitrator's decision on a union grievance that required the reinstatement of employees of the Department of Veterans Affairs who had been wrongfully dismissed by reason of the agency's implementation of a policy from the first Trump administration. *Id.* (referring in substance to *Dep't of Veterans Affs. Veterans Benefits Admin.*, 71 F.L.R.A. 1113 (Nov. 16, 2020)).

54.    The administration's second motivation is further laid bare by the OPM Guidance, which is largely devoted to the subject of "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3-5. To that end, the OPM Guidance directs agencies, after "terminating their collective bargaining agreements" a "to prepare large-scale reductions in force

(RIFs)," which are to be "conduct[ed] … without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.* at 5.

55.    Neither retaliating against federal unions for their speech and petitioning activities nor the desire to engage in mass firings of federal workers is a legitimate national security rationale under Section 7103(b).

56.    The Executive Order itself implicitly acknowledges that exclusion from Chapter 71 is unwarranted with respect to at least some subdivisions of excluded agencies, inasmuch as it delegates to two Cabinet secretaries the authority to restore collective bargaining to subdivisions of their agencies. Section 2(a) of the Executive Order—which lists DOD and the Department of Veterans Affairs among the many agencies excluded from Chapter 71—includes the proviso "except for any subdivisions excluded pursuant to section 4" of the Executive Order. 90 Fed. Reg. at 14,553. And Section 4, in turn, "delegate[s] authority under 5 U.S.C. § 7103(b)(1)" to the Secretaries of Defense and Veterans Affairs to "suspend[] the application" of the Executive Order's exclusion "to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of [Chapter 71]" upon their certification that the provisions of Chapter 71 "can be applied to such subdivision in a manner consistent with national security requirements and considerations." *Id.* at 14,555-56.

57.    The orders that Secretary of Veterans Affairs Doug Collins ("VA Secretary") and Defendant Hegseth issued pursuant to Section 4 of the Executive Order carry out and further demonstrate the retaliatory purpose of the Executive Order and the absence of any meaningful grounding in national security requirements and considerations for its exclusions.

58.    By order dated April 11, 2025, the VA Secretary exercised the authority delegated by Section 4 in a manner fully and admittedly consistent with the Trump

administration's retaliatory motives. *See* Dep't of Veterans Affairs, Order Suspending the

Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16,427 (April 17,

2025). Rather than suspend the Executive Order with respect to particular "subdivisions of the

agency," as Section 7103(b) provides and the Executive Order directs, the VA Secretary

pointedly did so with respect to "employees represented by" eight specified unions. *Id.* And the

agency's press secretary has admitted the rank favoritism that the administration shows toward

unions the administration considers to be complaisant and its retaliation against unions that have

exercised their right to challenge Trump administration actions that inheres in that order, stating

as follows: "The unions in the exempted units have posed no or minimal hinderance to VA

operations …. They have filed no or few grievances against VA and they have not proved an

impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE,

NNU and SEIU by contrast are using their authority under the Federal Service Labor-

Management Relations Statute to broadly frustrate the administration's ability to broadly frustrate

the administration's ability to manage the agency.'" Erich Wagner, "VA is selectively enforcing

Trump's order stripping workers of union rights," *Government Executive* (April 19, 2025)

(quoting VA Press Secretary Pete Kasperowicz), https://perma.cc/2FMX-6L33.

59.     On April 4, 2025, forty-five members of Congress wrote to Defendant Hegseth,

urging that he "exercise [his] authority to exempt DoDEA employees from the President's

Executive Order and maintain their existing collective bargaining protections." Letter from Hon.

Jill Tokuda, Member of Congress, *et al.*, to Secretary of Defense Peter Hegesth at 1 (April 4,

2025), https://tokuda.house.gov/imo/media/doc/dod_dodea_letter.pdf. The letter stressed that

DODEA "does not have a primary function related to 'intelligence, counterintelligence,

investigative, or national security'" and further pointed out that "federal collective bargaining

protections can be applied to DoDEA in a manner consistent with national security requirements

and considerations" because "DoDEA schools are not located in the frontlines of any conflict"

and "DoDEA educators and personnel do not have security clearances or handle sensitive

military information." *Id.* at 1-2.

60.    Defendant Hegseth did not exercise his delegated authority to exempt DODEA

from the Executive Order. Rather, in an order dated April 17, 2025, Defendant Hegseth stated

that Chapter 71 "can be applied … in a manner consistent with national security requirements

and considerations" to "federal wage system employees in the trades" who work in four DOD

subdivisions. DOD, Executive Order 14251 Certification, 90 Fed. Reg. 17,052 (April 23, 2025).

Those subdivisions are the following:

"(a) Letterkenny Munition Center, US Army Aviation and Missile Command, United

States Army," 90 Fed. Reg. at 17,052, which, among other things, maintains air-to-air

and air-to-ground precision guided missiles stores, serves as an ammunition supply depot

for all DOD armed services, and demilitarizes tactical missiles and conventional

munitions, *see* https://www.jmc.army.mil/Installations.aspx?id=Letterkenny;

"(b) Air Force Test Center, Air Force Materiel Command, Department of Air Force," 90

Fed. Reg. at 17,052, which conducts research and development, testing, and evaluation of

manned and unmanned aircraft for the Air Force, *see* https://www.afmc.af.mil/About-

Us/Fact-Sheets/Display/Article/1614225/air-force-test-center/;

"(c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air

Force," 90 Fed. Reg. at 17,052, which provides depot-maintenance and supply-chain-

management services, as well as operations and installation support for Air Force

weapons systems ranging from fighter jets to intercontinental ballistic missiles, *see*

https://www.afmc.af.mil/About-Us/Fact-Sheets/Display/Article/2828599/air-force-

sustainment-center/; and

"(d) Fleet Readiness Center Southeast," 90 Fed. Reg. at 17,052, which provides aircraft

repair and technical services for the U.S. Navy, *see* https://frcse.navair.navy.mil/.

61.    There is no conceivable justification under Section 7103(b) for Defendant

Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—

which are primarily if not exclusively involved in national security work of the most obvious

kinds—while maintaining the Executive Order's exclusion of DODEA.

62.    Like many if not most of the other agencies and agency subdivisions swept up in

the Executive Order's dragnet, DODEA is not involved in intelligence, counterintelligence,

investigative, or national security work. Rather, it is one of two federally operated public school

systems, which provides high-quality PreK-12 education to children of uniformed and civilian

DOD personnel. Likewise, DODEA's educators—like many if not most of the other federal

employees whose rights under Chapter 71 have been extinguished by the Executive Order's

dragnet but unlike the employees whose bargaining rights have been restored by Defendant

Hegseth—are not engaged in intelligence, counterintelligence, investigative, or national security

work.

63.    Nor can it reasonably be said that continuing to apply the collective bargaining

provisions of Chapter 71 to DODEA is somehow inimical to national security requirements and

considerations. Not only is there no remotely plausible basis for maintaining that DODEA has

any meaningful connection to intelligence, counterintelligence, or national security work, but it

is risible to suppose that there are any legitimate national security concerns implicated by

collective bargaining between DODEA and the educators and education support professionals

teaching in DODEA's schools at all, much less that such collective bargaining "cannot be conducted consistent with national security requirements and considerations." The latter point is shown starkly by the fact that DODEA has been engaged in collective bargaining with unions representing its educator employees, including Plaintiffs, since the early 1970s.

### F.    The Executive Order Has Caused and Will Continue to Cause Irreparable Harm to Plaintiffs

64.     Plaintiffs FEA, FEA-SR, and ACEA—and their members—have suffered and absent injunctive relief from this Court will continue to suffer, severe and irreparable harm by reason of the Executive Order.

65.     On April 3, 2025, the Chief of DODEA's Labor Management Employee Relations Division, Alexa Rukstele—citing the Executive Order, the White House Fact Sheet, and the OPM Guidance—notified Plaintiffs that DODEA "will pause all labor relations-related activities." Notwithstanding DODEA's use of the seemingly anodyne verb "pause," DODEA has already effectively repudiated its obligations under existing CBAs that remain in force by their terms by unilaterally cancelling dues deductions, bringing collective bargaining negotiations and participation in grievance arbitration proceedings to a halt, cancelling contractual official time arrangements, unilaterally altering terms and conditions of employment, and bringing other routine labor-management interactions to a halt.

> (1)    *Contrary to Chapter 71 and its CBAs, DODEA Has Unilaterally Ceased Honoring Employees' Voluntary Authorizations to Pay Their Membership Dues Via Payroll Deduction*

66.     On or about April 7, 2025, DODEA terminated the statutorily and contractually required payroll deductions of FEA, FEA-SR, and ACEA dues from union members who have voluntarily authorized those deductions, thereby cutting off "dues payments of union members," which are the "economic lifeblood of a labor organization and normally its primary source of

income." *Loc. Union No. 5741, United Mine Workers of Am. v. NLRB*, 865 F.2d 733, 738 (6th Cir. 1989) (quotation marks omitted). As a consequence, Plaintiffs have lost revenue and are forced to expend their dwindling funds and resources to effectuate alternative payment arrangements that are costly and less reliable than payroll deduction, and then seek electronic payment authorizations for thousands of members, which in FEA's case involves seeking such authorizations from members around the globe. *See Alachua County Educ. Ass'n v. Carpenter*, No. 1:23CV111-MW/HTC, 2024 WL 4708983, at *2 (N.D. Fla. Nov. 6, 2024) (explaining that unions suffered injury arising from state law's ban on payroll deduction "because it prohibits this bargained-for method of dues deduction").

67.     Prior to DODEA's unilateral termination of payroll deductions, those deductions accounted for 83% percent of membership dues collected by FEA. These dues make up the overwhelming majority of FEA's income, and these funds are used to carry out all of FEA's core activities as a labor organization, including paying staff, supporting collective bargaining and organizing, funding the grievance and arbitration system, and providing representation to members as well as other critical services such as assisting bargaining unit educators to navigate the DODEA human resources and payroll systems.

68.     As a result of DODEA's decision to unilaterally stop payroll deductions, FEA has begun costly and resource-intensive efforts to ensure that members around the world are signing up for alternative methods for paying dues. These alternative methods are more costly to the union and less reliable and effective than payroll deduction. Despite these efforts, as of June 2, 2025, only 48% of FEA members had opted in to an alternative method of payment.

69.     When DODEA unilaterally ceased payroll deduction, there were three remaining pay cycles for educators at the stateside schools. FEA and FEA-SR were subsequently unable to

collect dues using an alternative pay method, leaving approximately 600 FEA-SR members who still owed over $65,000 that FEA-SR had expected to be collected through payroll deduction.

70.    The termination of payroll deductions means that FEA and FEA-SR are suffering from an immediate loss of revenue while also expending more of FEA's dwindling resources on signing up members for alternative payment methods. These resources would have been used to represent and advocate for our members. Union members frequently need representation services on an on-demand basis – for example, if they need advice and counsel when called in to speak to an administrator for a disciplinary reason.

71.    With fewer resources to draw on, and with those remaining resources strained because it is necessary to FEA's continued existence that substantial resources be devoted to the effort to convert members to a new dues payment system, it is inevitable that such representation work will suffer. Even if FEA were to recover its dues revenue eventually, the immediate harm to FEA and its members from such curtailment of services cannot be repaired after the fact. A subsequent restoration of FEA funds cannot, for instance, retroactively help the member who has gone into a disciplinary meeting without the counsel of their union. And restoration of revenue at a later date cannot undo the injury to FEA and FEA-SR in the eyes of members and prospective members arising from its diminished ability to help its members.

72.    As a result of DODEA's decision to repudiate its contractual commitment and statutory duty to honor employees' voluntary assignment of FEA dues via payroll deduction, FEA and FEA-SR have already had to make difficult decisions about resources, including cutting down on travel to DODEA schools, located from West Point, New York to Fort Rucker, Alabama, and from South Korea and Japan to Germany, England and Belgium. These visits are a

critical part of organizing and providing services to members; they also ensure that members feel heard, represented, and connected to the union.

73.     The Administration's unilateral action to stop payroll deduction of voluntary membership dues has created a vicious cycle for FEA and its ability to carry out its core functions. FEA is expending more resources on signing up members while immediately having fewer resources to provide representational services to members, a principal reason why educators and ESPs sign up to pay dues to the union.

74.     This vicious cycle is exacerbated by the loss of collective bargaining rights, which eliminates Plaintiffs' core function. DODEA is not abiding by its obligations under its CBAs with the Plaintiffs, which makes it very difficult to convince members to pay dues. This will inevitably lead to fewer funds for the Plaintiffs and thus, even fewer services for members, making it increasingly difficult to convince them to continue to be members by signing up for alternative means of paying dues. The Executive Order and DODEA's implementation of it thus pose an existential threat to the Plaintiffs—one that goes to the core of their purpose and mission, which is to collectively bargain, represent their members, and enforce CBAs under Chapter 71.

75.     As a result of DODEA's cancelling of employees' dues payments by payroll deduction, ACEA has already experienced a drop in its projected revenue, as of the pay period ending on May 31, 2025, of $29,257.65 for the current school year. ACEA is now in the process of establishing a different arrangement for members to pay a fee to ACEA by electronic means, which adds to the union's expenses and is a drain on the union's resources while the union's usual source of operating funds has been cut off. As a result, ACEA has fewer resources to devote to its mission of advocating for the interests of its members, the main reason why educators join the union. Moreover, given that Executive Order 14251 and its implementation by

DODEA, has halted collective bargaining and associated labor relations interactions between ACEA and DODEA, it is uncertain how many of ACEA's current membership will choose to remain members of ACEA now that it is unable to engage in collective bargaining and can no longer even enforce its current CBA.

76.    Convincing DODEA educators to remain members by signing up for electronic payment systems is all the more challenging because DODEA educators have lost critical statutory protections, such as the right to engage in union activity "freely and without fear of penalty or reprisal." 5 U.S.C. § 7102. Those formerly protected rights include the right "to form, join, or assist any labor organization"; "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities"; and "to engage in collective bargaining." The loss of these statutory protections makes joining or remaining a member of Plaintiffs FEA, FEA-SR, and ACEA riskier than it was before the Executive Order issued.

> (2)    *Contrary to Chapter 71 and its CBAs, DODEA Has Ceased Participation in Collective Bargaining Negotiations and in Contractually Required Grievance Arbitration Proceedings*

77.    Before the Executive Order issued, FEA-SR and DODEA were engaged in bargaining over successor agreements to the 2019 Certified Educator CBA and the 2010 ESP CBA. The parties had finalized an agreement as ground rules for both contracts in 2023 and subsequently reached agreement on a majority of the contract articles in both CBAs and worked with mediators from the Federal Mediation Conciliation Service to attempt to conclude the bargaining process for both CBAs. After the Executive Order issued and Ms. Rutskele sent her April 3, 2025, email "paus[ing] all labor management activities," DODEA ceased any communication with FEA-SR concerning the contract negotiations.

78.     DODEA also has ceased participating in grievance arbitration proceedings under its CBAs with FEA and FEA-SR not only with respect to grievances filed after the Executive Order under CBAs that remain in force by their terms but also with respect to grievances that arose, and have been pending, before the Executive Order issued. DODEA has claimed that by reason of the Executive Order, DODEA has no obligation to abide by its CBAs, including their provisions for the resolution of grievances, and that arbitrators have no jurisdiction to issue decisions on grievances that arose and were pending prior to the Executive Order. These actions not only amount to a repudiation of DODEA's contractual obligations but also retroactively seek to extinguish grievance claims that accrued before the Executive Order issued, including many that have already been upheld in arbitration awards.

79.     For example, FEA has been prosecuting numerous grievances on behalf of more than 800 overseas educators that seek relief from DODEA's wrongful garnishment of purported overpayments from educators' pay, and/or other failures to pay educators their rightful salaries, by reason of DODEA's chronic failure to correctly calculate their overseas employees' pay. Some of these grievances date back as far as 2011. Those grievances were all pending, in various stages of the arbitration process, when the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order. In grievance proceedings involving nearly 500 affected employees, arbitrators have issued merits awards upholding the grievances, but the grievants have yet to be made whole—either because the processes of auditing pay records that follow such merits awards have not yet concluded, or because DODEA has not yet complied with the awards, thus requiring further arbitral proceedings. Of the 493 grievants who are still waiting to made whole in accordance with merits awards, more than 200 were underpaid by as much as $125,000. The rest had their pay garnished illegally without the due process

protections required by the applicable CBA and by the Debt Collection Act, 5 U.S.C. § 5514. The remaining grievances have either not yet been submitted to arbitration or are the subject of ongoing arbitration proceedings.

80.    DODEA attorneys have refused to further participate in arbitral proceedings on such grievances, have told arbitrators that they have no jurisdiction over grievances predating the Executive Order, and have also told arbitrators that FEA is no longer the representative of the employees. In at least three such proceedings, with upcoming arbitration hearings or briefing deadlines at the time the Executive Order issued, DODEA went so far as to communicate with arbitrators *ex parte* purporting to cancel the arbitral proceedings and the arbitrators' contracts, and making clear that DODEA would not pay for any further contracted services performed by the arbitrators.

81.    FEA-SR also has 36 pay grievances on behalf of 122 bargaining unit employees that are in various stages of the arbitration process and an additional 10 grievance cases that have not yet been scheduled for arbitration; 7 of those are on behalf of multiple employees and the remaining three are individual grievances. All of those grievances were filed before the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order.

82.    Given DODEA's refusal to honor its contractual obligations to engage in the grievance-resolution process under CBAs that remain in force to this day, DODEA has plainly repudiated its CBAs and cannot be expected to honor its contractual obligations by complying with any arbitration awards issued in grievances arising prior to the Executive Order, including the awards already issued in pending cases involving 493 grievants who have yet to be made whole, or with any arbitral awards that may yet be issued resolving grievances arising under its

CBAs prior to or after the issuance of the Executive Order. DODEA's repudiation of its contractual obligations is particularly devastating to those grievants whose grievances arose from DODEA actions outside the limitations periods applicable in any other forum in which relief could be sought, such as the U.S. Court of Claims (for compensation claims under the Tucker Act) or the Merit Systems Protection Board (for adverse action claims under Civil Service Reform Act). Those grievants constitute the majority of the more than 800 whose grievances were pending when the Executive Order issued. The hundreds of FEA and FEA-SR members with pay and other grievances that arose and were brought under CBAs in force and effect when the Executive Orde issued—including the hundreds who have had their grievances upheld by arbitrators but have not been made whole—will therefore be irreparably harmed absent relief from this Court.

> (3)    *Contrary to Chapter 71 and its CBAs, DODEA Has Unilaterally Instituted a Reorganization Altering Employees' Terms and Conditions of Employment without Bargaining Over the Impact and Implementation of its Actions*

83.    DODEA also has unilaterally instituted a reorganization that alters employees' terms and conditions of employment in contravention of its duty to bargain with FEA, FEA-SR, and ACEA over the impact and implementation of such changes under both the collective-bargaining agreements and the CBAs in force between DODEA and each of the Plaintiffs and under Chapter 71.

84.    On May 22, 2025, employees at DODEA schools received an e-mail from DODEA Director Beth Schiavino-Narvaez announcing that in connection with a Department of Defense "optimization of its civilian workforce," DODEA was implementing a "Future-Ready DoDEA (FRD) initiative." While the e-mail uses euphemisms like "workforce shaping efforts" and "a strategic plan to streamline and improve student services," its clear import is that this

reorganization will eliminate positions for the 2025-2026 school year. Indeed, the email ends with the following warning: "As part of FRD, DoDEA will offer the Voluntary Early Retirement Authority (VERA) and a Voluntary Separation Incentive Payment (VSIP) to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees."

85.     On the evening of May 22, 2025, Ms. Rukstele sent an e-mail to all Educational Technologists, Speech Assessors, Special Education Assessors, and Automation Clerks working for DODEA. The e-mail tells recipients that their positions are "impacted by" the FDR initiative and that DODEA is "working to identify placement and job opportunities for affected employees," but that "[t]his does not guarantee that you will not be involuntarily separated from your position." The e-mail goes on to state that the recipients' positions are "eligible for" VERA and VSIP, provided that the recipient meets the eligibility requirements for those programs.

86.     On May 27, 2025, Amy Bower, Chief of DODEA's Human Resources Division, sent a memorandum to the affected employees DODEA-wide explaining the VERA and VSIP options and eligibility criteria and setting a June 2, 2025, deadline for applications for early retirement and voluntary separation.

87.     On June 10, 2025, DODEA sent notices of management-directed reassignments to some of the educators affected by the reorganization. Some of those reassignment notices require relocation to worksites that are far distant from the employees' current duty stations that would require Permanent Change of Station Orders. The notices are dated June 9, 2025, and they set a June 11, 2025, deadline for affected employees either accept or decline the reassignments.

88.     DODEA's announcement that eligible employes affected by the reorganization can request early retirement and its reassignment notices require affected employees to make

significant life and career decisions on an extremely short deadline, which exerts pressure on those employees to choose early retirement or reassignment under onerous conditions, rather than face potential termination.

89.     The reorganization was announced and is being implemented in violation of DODEA's obligation to bargain with FEA, FEA-SR, and ACEA over the impact and implementation of the reorganization. Each of the CBAs in force between DODEA and the Plaintiffs requires DODEA to bargain over the impact and implementation of changes to terms and conditions of employment arising from management decision. Each of the Plaintiffs timely sent bargaining requests to DODEA and in each case DODEA responded with an identically worded email saying that the request would be "held in abeyance" pending the outcome of litigation over the Executive Order.

(4)    *Contrary to its CBAs with Plaintiffs, DODEA Has Cancelled all Official Time Arrangements*

90.     Each of the CBAs in force between DODEA and the Plaintiffs has provisions requiring that DODEA allow certain union officials to use official time to conduct representation activities as well as provisions providing for the Plaintiffs' use of office space for such activities.

91.     On April 29, 2025, Ms. Rukstele notified Plaintiffs FEA, FEA-SR, and ACEA that "**official time**"—a term referring to contractual arrangements that allow union officials to perform representational functions while on duty status—"**is no longer authorized for any purpose**" and directed that "all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school" and must "promptly vacate any office space used by the union/association."

92.     The loss of official time has impaired Plaintiffs' ability to carry out their representation of DODEA educators and increased their costs due to the need to move and store

their union records. Without official time, union business and representational functions will have to be performed outside of duty hours, which will create significant delays in the provision of services to members who may, for example, be facing a disciplinary interview or who need advice when faced with management directives that contravene the CBA. For FEA, the loss of official time is particularly harmful as it is a global organization representing members in time zones across the world. Consequently, official time has been integral to FEA's ability to conduct its business and representational functions in a timely manner.

       (5)   *Contrary to its CBAs and Chapter 71, DODEA Has Refused to Honor Employees' Rights to Have a Union Representative During Investigatory Interviews*

93.    Each of the CBAs in force between DODEA and the Plaintiffs has provisions that give employees the right to have a union representative present at any interview that could lead to discipline or discharge of the employee.  And Chapter 71 mandates that an exclusive representative shall be given the opportunity to be represented at any examination of an employee in the unit by a representative of the agency in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary action and requests representation.  *See* 5 U.S.C. § 7114(a)(2)(B). (These rights are often referred to as "*Weingarten* rights," after the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975).)

94.    Following the Executive Order's issuance, DODEA has refused to allow employees to have a union representative present during any such meetings, regardless of whether they are held during the duty day or not.

       (6)   *Contrary to its CBA with ACEA, DODEA's Implementation of the Executive Order Has Stymied the Operation of the CBA's Sick Leave Bank*

95.    The CBA currently in force between DODEA and ACEA established an emergency sick leave bank to provide temporary assistance to employees who are incapacitated

or are required to attend to a family member's medical emergency or serious medical condition. To participate in the leave bank, bargaining unit members donate leave time and can request leave time from the bank in emergencies. The bank is administered by a committee consisting of two union-appointed employees and one DODEA representative, which meets to decide whether to grant participating employees' requests to draw on the leave bank when they or their family members are facing medical emergencies. The sick leave bank currently has more than 13,000 donated hours.

96.     Shortly before Ms. Rutskele sent the April 3, 2025, e-mail announcing that DODEA "will pause all labor-relations activities," ACEA Vice-President Janet Lopez wrote to DODEA's Caribbean Community Superintendent, Andrew Rynberg, as the official responsible for appointing the agency representative to the committee that manages employee requests for hours from the leave bank, requesting a meeting of the committee because ACEA had received requests for leave hours from three bargaining unit employees who were experiencing medical emergencies. In the wake of Ms. Rutskele's e-mail "paus[ing] all labor-relations activities," that request went unfulfilled, leaving the three employees, who were in the midst of medical emergencies, without any way to obtain leave hours from the bank to which they had contributed.

       *(7)*    *DODEA's Various Repudiations of its CBAs with the Plaintiffs Are Causing and Unless Enjoined Will Continue to Cause Plaintiffs and Their Members Irreparable Harm*

97.     DODEA's repudiation of its CBAs by reason of the Executive Order have caused—and, absent relief from this Court, will continue to cause—grave and irreparable harm to Plaintiffs and their members. Absent relief from this Court, Plaintiffs' members will lose their contractual and statutory rights and remedies under CBAs that were in force at the time the

Executive Order issued and that continue in force by their terms or, including remedies for grievances predating the Executive Order.

98.     Nor will Plaintiffs and their members have any recourse to the FLRA.  FLRA case law holds that once an agency has been excluded from Chapter 71 under Section 7103(b), "the Authority has no jurisdiction to decide" union unfair labor practice complaints. *U.S. Attorney's Off. S. Dist. of Texas Houston*, 57 F.L.R.A. 750, 750 (Apr. 25, 2002). On April 4, 2025, the FLRA issued an order in a years-old unfair labor practice proceeding initiated by FEA, that cites the *U.S. Attorney's Office* decision and directs FEA to show cause why, in light of the Executive Order, "the Authority should not dismiss this matter for lack of jurisdiction." The FLRA has issued identical orders to other federal unions with pending cases before the FLRA. On April 18, 2025, FEA responded that it considers the Executive Order to be unlawful on the same statutory and constitutional grounds underlying this pleading, and that it would therefore be more appropriate for the FLRA to stay the matter pending the outcome of litigation challenging the Executive Order. DODEA, in turn, replied to the FEA's response on April 30, 2025, taking the position that by reason of the Executive Order, the FLRA "lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union." On June 10, 2025, the FLRA placed that proceeding in abeyance. The FLRA also has responded to unfair labor practice charges filed after the Executive Order stating that action would be deferred by reason of the Executive Order.

99.     By reason of the Executive Order, the OPM Guidance, and DODEA's implementation of both, Plaintiffs are losing revenue and are bereft of their core functions as unions. They have lost their status as collective bargaining representatives chosen by unit employees, and with it the ability to negotiate CBAs or even enforce their existing CBAs through contractually agreed-upon grievance procedures. And they have lost recourse to the FLRA for

unfair labor practices and other labor-management disputes within the FLRA's jurisdiction. The loss of these core union functions causes irreparable injury to the Plaintiffs and to Plaintiffs' members, who have lost their statutory and contractual rights and protections—including, in hundreds of cases, their pending grievances arising from CBA violations long predating the Executive Order, which are in the process of being retroactively nullified.

## CLAIMS FOR RELIEF

### COUNT ONE
### *ULTRA VIRES* ACTION IN VIOLATION OF THE SEPARATION OF POWERS
### (All Plaintiffs v. Defendants Trump, Ezell, and OPM)

100.    Plaintiffs incorporate paragraphs 1–99 above by reference as if fully set forth herein.

101.    Under the authority granted by Congress in 5 U.S.C. § 7103(b)(1), agencies or subdivisions thereof may only be excluded from Chapter 71 if two narrow conditions are met: (a) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

102.    From the enactment of Chapter 71 through the Trump administration's first term, the practice of every president who has invoked Section 7103(b) confirms the narrowness of the President's exclusion authority: each applied Section 7103(b) judiciously, targeting only those portions of Cabinet departments and independent agencies that clearly have a primary function of performing intelligence, counterintelligence, investigative, or national security work,

103.    The Executive Order—which excludes 75% of federal employees heretofore represented by federal unions under Chapter 71 and 67% of federal civil service employees overall—is wholly unmoored from Section 7103(b)'s narrow conditions. No limiting principle

consistent with Section 7103(b)'s conditions can justify the Executive Order's staggeringly broad sweep, which takes in agencies and subdivisions including the Bureau of Land Management, the Environmental Protection Agency, and, by reason of the Executive Order's exclusion of the entirety of DOD, DODEA's PreK-12 schools, especially when coupled with the Executive Order's blanket exemption for agency law enforcement units. The President's attempt to press the narrow authority granted by Section 7103(b) into the service of extinguishing collective bargaining for the overwhelming majority of federal employees—vast swathes of whom, like DODEA educators, perform no national security work—amounts to an effective nullification of the comprehensive collective bargaining system established by Congress.

104. Wholly apart from the Executive Order's staggering overbreadth, the White House's own admissions betray the pretextual nature of the order's purported national security justification. The White House has bluntly admitted that the Executive Order's purpose is both (a) to harm and punish "hostile Federal unions" for voicing opposition to Trump administration policies and challenging Trump administration policies by petitioning for redress of the injuries inflicted by those policies through the courts and through collectively bargaining grievance proceedings; and (b) to facilitate the mass firing of federal employees. Neither of these purposes is legitimate under Section 7103(b).

105. Because the Executive Order uses the narrow authority granted by Section 7103(b) to upend Congress's comprehensive framework for collective bargaining among federal agencies, and because the Executive Order does so for venal and retaliatory reasons under the pretext of national security, the Executive Order is *ultra vires* and violates the Constitution's separation of executive from legislative powers.

**COUNT TWO:**
**VIOLATION OF THE FIRST AMENDMENT**
**(All Plaintiffs v. All Defendants)**

106.    Plaintiffs incorporate paragraphs 1–105 above by reference as if fully set forth herein.

107.    The First Amendment to the United States Constitution protects against government actions "abridging the freedom of speech" and "the right of the people … to petition the Government for a redress of grievances."

108.    FEA and FEA-SR have exercised their First Amendment rights to voice opposition to Trump administration policies that harm the federal employees they represent and to petition for redress of those harms through recourse to the courts and grievance proceedings governed by Chapter 71.

109.    The Executive Order was avowedly issued in retaliation for the protected speech and petitioning activities by federal unions—including FEA and FEA-SR—who have opposed Trump administration policies, and it aims to chill the protected speech of all federal unions going forward. The White House's Fact Sheet baldly admitted this motivation. That document justified the Executive Order on the basis of its assertions that "Federal unions have declared war on President Trump's agenda," that one such union "describes itself as 'fighting back' against Trump," and that such unions have filed grievances seeking relief from Trump administration policies.

110.    The White House's Fact Sheet further makes clear that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies and punish unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict. The Fact Sheet

declares, "President Trump supports constructive partnerships with unions who work with him"
but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This
message that unions supporting Trump policies will receive favor and those opposing Trump
policies will receive punishment is reinforced by the Executive Order's blanket exception
preserving collective bargaining rights for federal agency police, firefighters, and security
guards—whose unions have supported Republicans in general and President Trump in
particular—which the Fact Sheet highlights: "***Law Enforcement Unaffected.*** Police and
firefighters will continue to collectively bargain." *Id.*

111.    The Executive Order's purpose and effect is to harm and punish federal unions by
reason of their First-Amendment-protected speech and petitioning and to chill protected activity
by all federal unions going forward.

112.    The OPM Guidance, and Secretary Hegseth's Executive Order 14251
Certification all carry out and share in the Executive Order's retaliatory purpose and effects.

## COUNT THREE:
## VIOLATION OF THE FIFTH AMENDMENT'S PROTECTIONS AGAINST THE
## GOVERNMENT'S ANNULMENT OF VESTED RIGHTS ARISING FROM THE
## GOVERNMENT'S OWN CONTRACTS
### (All Plaintiffs v. All Defendants)

113.    Plaintiffs incorporate paragraphs 1–112 above by reference as if fully set forth
herein.

114.    The Fifth Amendment of the United States Constitution protects against
deprivations of property "without due process of law" and provides that "private property" shall
not be "taken for public use, without just compensation."

115.    Collective bargaining agreements entered into pursuant to Chapter 71 are
contracts that bind federal agencies and unions representing their employees. *See* 5 U.S.C.
§§ 7114(c)(3); 7116. Such "[v]alid contracts are property, whether the obligor be a private

individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934). As such, contracts with the federal government are protected by the Takings Clause. *Id.*

116.    The Fifth Amendment's Due Process Clause also protects against the government's retroactive abrogation of its contracts. Where Congress has "the power to authorize" contracts, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch*, 292 U.S. at 579. *See also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

117.    The Executive Order and the OPM Guidance seek to nullify CBAs and extinguish vested rights under them such as pending grievances over actions predating the Executive Order—including FEA's unresolved pay grievances on behalf of approximately 800 educators and ACEA's sick leave bank—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their vested rights under CBAs and thus their constitutionally protected property interests in CBAs lawfully entered into with DODEA. And they do so with no legitimate public purpose or rational justification. The Executive Order and OPM Guidance therefore constitute unlawful takings and violate the Fifth Amendment's guarantee of substantive due process.

## COUNT FOUR:
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION OF THE LAWS
### (All Plaintiffs v. All Defendants)

118.    Plaintiffs incorporate paragraphs 1–117 above by reference as if fully set forth herein.

119.    The due process guarantee of the Fifth Amendment to the United States

Constitution includes a guarantee of equal protection. *See United States v. Windsor*, 570 U.S.

744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

120.    "The Constitution's guarantee of equality 'must at the very least mean that a bare

… desire to harm a politically unpopular group cannot' justify disparate treatment of that group."

*Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534–35

(1973)).

121.    A "bare … desire to harm a politically unpopular group" is precisely what

motivated the Executive Order's exclusion of 75% of union-represented employees across

multiple Cabinet departments and independent agencies, while providing a blanket exception for

agency police and firefighters, whose unions have supported President Trump. This conclusion is

all the more inescapable given the White House's statements admitting that the purpose of the

order is to harm and punish federal unions that have voiced opposition to Trump administration

policies and petitioned the government for redress from those policies.

### COUNT FIVE:
### VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE
### OF PROCEDURAL DUE PROCESS
### (All Plaintiffs v. All Defendants)

122.    Plaintiffs incorporate paragraphs 1–121 above by reference as if fully set forth

herein.

123.    The Fifth Amendment's protection against deprivations of property "without due

process of law" requires, at a minimum, notice and an opportunity to be heard before the

government may deprive a person of property.

124.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch*, 292 U.S. at 579.

125.    The Executive Order and the OPM Guidance seek to retroactively nullify CBAs and extinguish pending grievances over actions predating the Executive Order—such as FEA's approximately 800 unresolved pay grievances on behalf of DODEA educators—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their constitutionally protected property interests in CBAs lawfully entered into with DODEA, and they do so without having afforded Plaintiffs any notice or opportunity to be heard in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

**COUNT SIX**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:**
**ARBITRARY AND CAPRICIOUS AGENCY ACTION**
**(All Plaintiffs v. Defendants Hegseth and DOD)**

126.    Plaintiffs incorporate paragraphs 1–125 above by reference as if fully set forth herein.

127.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

128.    An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

129.    Defendant Hegseth provided no explanation of his failure—in the face of a letter from members of Congress cogently explaining that the exclusion of DODEA from collective bargaining is not justified under Section 7103(b)—to suspend the Executive Order with respect to DODEA while suspending the Executive Order for a subset of employees working in four DOD subdivisions working on weapons systems and munitions. Defendant Hegseth entirely failed to consider an important aspect of the problem, relied on factors which Congress has not intended it to consider, while offering no explanation whatsoever for his action.

130.    Moreover, there is no conceivable legal justification under Section 7103(b) for Defendant Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—which are primarily if not exclusively involved in national security work involving DOD weapons systems and munitions—while maintaining the Executive Order's exclusion of DODEA. DODEA does not perform intelligence, counterintelligence, investigative, or national security. Rather, DODEA operates high-quality public schools serving the dependents of uniformed and civilian DOD personnel. It follows from this fact that collective bargaining manifestly *can* be conducted in a manner consistent with national security requirements and considerations, as confirmed by DODEA's long history of mutually productive collective bargaining with Plaintiffs under Chapter 71.

131.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA or even explain that failure is arbitrary and capricious.

**COUNT SEVEN**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:**
**AGENCY ACTION CONTRARY TO LAW**
**(All Plaintiffs v. Defendants Hegseth and DOD)**

132.    Plaintiffs incorporate paragraphs 1–131 above by reference as if fully set forth herein.

133.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency action" that is "contrary to law." 5 U.S.C. § 706(2)(A).

134.    Section 7103(b) provides no lawful justification for the continued exclusion of DODEA from Chapter 75. DODEA performs no intelligence, counterintelligence, investigative, or national security. Rather, it provides high-quality PreK-12 education opportunities to children of civilian and uniformed employees of DOD. It follows from this fact that collective bargaining manifestly *can* be conducted in a manner consistent with national security requirements and considerations, as confirmed by DODEA's  long history of stable and mutually productive collective bargaining under Chapter 71. Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA is contrary to law.

135.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA also is contrary to law because the Executive Order is *ultra vires* the President's narrow statutory authority and violates the separation of powers, the First Amendment's protection of speech and petitioning, the Fifth Amendment's guarantee of equal protection of the laws, and the Fifth Amendment's guarantee of procedural and substantive due process as well as its protection against unlawful government takings of property.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for the following relief:

(a)    a declaratory judgment that:

    i.    the Executive Order, the OPM Guidance, and their nullification of Plaintiffs' statutory and contractual rights, are *ultra vires*, in violation of the separation of powers, in violation of the First Amendment's protection of speech and petitioning activities, in violation of the Fifth Amendment's guarantee of equal protection of the laws, and in violation of the Fifth Amendment's protection against unlawful takings and its guarantee of substantive due process; and

    ii.    Defendant Hegseth's failure to suspend application of the Executive Order with respect to DODEA or to explain that failure violates the Administrative Procedure Act;

(b)    preliminary and permanent injunctive relief that:

    i.    prohibits the Defendants and their agents and successors from implementing or otherwise giving effect to the Executive Order and the OPM Guidance with respect to Plaintiffs and their members; or in the absence of such relief

    ii.    sets aside Defendant Hegseth's April 23, 2025, Executive Order 14251 Certification insofar as it failed to suspend the Executive Order as to DODEA and directs Defendant Hegseth to address the question of whether suspending the Executive Order as to DODEA is warranted under U.S.C. § 7103(b).

(c) an order granting Plaintiffs attorney's fees and costs; and

(d) an order granting such other relief as this Court may deem just and proper.

DATED: June 21, 2025                    Respectfully submitted,


/s/Jason Walta_____
Jason Walta
Alice O'Brien*
Philip Hostak**
Caitlin Rooney**
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
jwalta@nea.org
phostak@nea.org
crooney@nea.org

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice*
forthcoming

**Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2025, a true copy of the foregoing First Amended Complaint for Declaratory and Injunctive Relief was filed electronically filed with the Clerk of Court using the CM/ECF system, and, because no counsel has yet appeared on behalf of the Defendants, was sent by certified U.S. Mail to each of the Defendants and to the United States Attorney General and the United States Attorney for the District of Columbia at the following addresses:

Donald J. Trump
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Peter Hegseth
1000 Defense Pentagon
Washington, DC 20301

United States Department of Defense
1400 Defense Pentagon
Washington, DC 20301

Charles Ezell
1900 E Street NW
Washington, DC 20415

United States Office of Personnel
   Management
1900 E Street NW
Washington, DC 20415

Jeanine Ferris Pirro
Interim United States Attorney for the
   District of Columbia
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530

Pamela Bondi
United States Attorney General
950 Pennsylvania Ave., NW
Washington, D.C. 20530

/s/Jason Walta
Jason Walta

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL EDUCATION ASSOCIATION,
*et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

Civil Action No. 1:25-cv-1362

## DECLARATION OF RICHARD TARR

I, Richard Carroll Tarr II, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of Springfield, Virginia. I am over the age of 18 and have personal knowledge of all facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I hold a Bachelor of Arts in International Relations from Ursinus College and a Juris Doctorate from American University, Washington College of Law.

3.      Since 2020, I have served as the Executive Director and General Counsel of the Federal Education Association ("FEA"). In that role, I am responsible for overseeing the operations of the organization and for advising the FEA Board of Directors on a range of matters, including legal strategies and litigation involving the organization, collective bargaining strategies, external auditing of the of the organization's finances, compliance with IRS requirements, and compliance with the requirements of the Civil Service Reform Act ("CSRA"),

1

including the filing of disclosure reports with the United States Department of Labor. As part of

my role as Executive Director, I supervise and manage FEA's Washington, DC based staff, who

handle membership and finances, develop FEA's social media and communications, and perform

other duties. I also supervise seven attorneys who are employed by FEA in various locations. In

addition, I oversee and engage in collective bargaining negotiations, handle grievances arising

under CBAs ("CBAs"), and represent FEA in proceedings before the Federal Labor Relations

Authority.

      4.     Prior to becoming the Executive Director and General Counsel of FEA, I served

as FEA's Deputy General Counsel from approximately May 2016 to January 2020 and as its

associate general counsel from September 1999 to approximately May 2016.

      5.     In performing my duties over the course of my nearly 25 years of work for FEA, I

have become deeply familiar with FEA's mission, history, operations, and finances.

      6.     FEA is a labor organization with approximately 5,400 members who work as

educators and education support professionals ("ESPs") in prekindergarten through 12th grade

schools operated by the Department of Defense Education Activity ("DODEA"), a subdivision

of the United States Department of Defense ("DOD") that operates schools for the children of

uniformed and civilian DOD personnel stationed in military bases in the United States and

abroad. FEA's members include classroom teachers, instructional assistants, information

specialists (also known as librarians), counselors, nurses, and classified employees who work in

DODEA schools located in military bases in the United States and in the U.S. Territory of Guam,

countries throughout Europe and Asia, and in Guantanamo Bay, Cuba. FEA membership is open

to any educator employed at any overseas DODEA school in FEA's bargaining unit as well as to

educators and ESPs within the continental United States and in U.S. Territories, except for those

in Puerto Rico, who are represented by the Antilles Consolidated Education Association.

7.     Among the services FEA provides to its members (as well as to represented employees who are not members) are: negotiating and enforcing CBAs with DODEA as well as protecting employee rights and speaking out for the interests of educators and their students before Congress, the federal courts, and federal agencies, and in communications to the public. FEA also helps educators and ESPs resolve human resources or pay issues by facilitating contact with appropriate DODEA officials or contacting such officials on their behalf.

8.     While FEA represents and advocates on behalf of DODEA educators in a number of different forums, FEA's core function for more than 50 years has been advocacy for DODEA educators by means of collective bargaining. Through collective bargaining, FEA helps to ensure that DODEA educators and ESPs have a voice regarding workplace issues, due-process safeguards to ensure fair treatment, and a safe and supportive work environment. From 1970-1979, FEA (then called the Overseas Education Association) engaged in collective bargaining with DODEA (then called the Department of Defense Dependent Schools) under the 1969 Executive Order issued by President Richard Nixon that governed labor relations within the federal service prior to the effective date of the CSRA. *See* Exec. Order 11491, Labor-Management Relations in the Federal Service, 34 FR 17,605 (Oct. 31, 1969). From the effective date of the CSRA in January 1979 until President Trump issued Executive Order 14251 on March 27, 2025, FEA continued its representation DODEA educators under the comprehensive collective bargaining framework of the Federal Service Labor Management Relations Statute, which was enacted as part of the CSRA and is codified as Chapter 71 of Title 5 of the U.S. Code ("Chapter 71").

9.     In my role as Executive Director and General Counsel, I monitor and oversee the three CBAs administered by FEA.

3

10.    The first CBA covers educators who work overseas in DODEA's Europe East, Central and West Districts and all DODEA units in Asia. I served as the chief negotiator for FEA during the negotiations that resulted in the 2023 CBA for FEA's overseas bargaining unit, which by its terms is in force through August 1, 2028. Attached hereto as Exhibit 1 is a true and correct copy of the 2023 CBA for the overseas unit.

11.    The other two CBAs are those negotiated by and administered by the Federal Education Association for the Stateside Region ("FEA-SR"), an affiliated leadership council of FEA that represents educators in the continental United States and the Territory of Guam. One covers certified educators and the other covers classified educators, or ESPs.

a.    The most recent CBA for the certified unit was executed in 2019. A true and correct copy of the 2019 CBA between FEA-SR and DODEA covering the certified educator unit is attached as Exhibit 2. The duration provision of that agreement, Article 35 Section 1, provides for an initial term of five years, along with a renewal clause, Article 35 Section 2, that is triggered by a request for bargaining over a new agreement during a window period of 365-395 days before the end of the initial term. *See* Exhibit 2 at 186. Upon such a timely bargaining request, the basic terms and conditions of the agreement remain in effect until bargaining is concluded and new provisions are executed in accordance with [Chapter 71]," with the sole exception of those pertaining to the pay-raise schedule, which is only extended for one year. *Id.* FEA-SR requested bargaining within the window period of the renewal clause, and thus the 2019 CBA for certified educators remained in full force in effect at the Time President Trump issued Executive Order 14251.

b.    The most recent CBA for the classified unit was executed in 2010. A true and correct copy of the 2010 CBA between FEA-SR and DODEA covering the classified

4

educator unit is attached as Exhibit 3. That agreement's duration provision, at Article 29, Section 1, provides for an initial term of four years, but also includes, at Article 29, Section 2, a renewal clause providing that if either party gives notice of intent to bargain over a successor agreement at least 60 but not more than 90 days before the CBA's expiration date, "the Agreement shall remain in full force and effect until that bargaining is concluded and new provisions are executed and executed in accordance with [Chapter 71]" and that if no party requested bargaining, the CBA will be extended from year to year on each anniversary date. *Id.* That CBA, too, remained in force pursuant to its renewal clause at the time President Trump issued Executive Order 14251.

12.    When I began working at FEA, a CBA for the overseas unit had been in place since 1989. A true and correct copy of the 1989 CBA for the overseas unit is attached as Exhibit 4. Article 53 of that 1989 CBA set an initial term of three years but also included a clause stating that "Agreement shall remain in full force and effect during the renegotiation of said Agreement and until such time as a new Agreement is effective." Exhibit 4 at 99. DODEA and FEA agreed that the 1989 CBA remained in effect under Article 53 through 2023, and the parties operated under this agreement – often resolving disputes informally and taking grievances to arbitration when they could not be resolved between the parties – and engaged in negotiations that resulted in the execution of the successor agreement in 2023.

13.    Since 2017, FEA has taken public positions opposing the actions of the Trump Administration through litigation, public statements, and in advocacy with members of Congress. I have advised the Board of Directors on these public positions opposing the actions of the Trump Administration.

14.    During the first Trump administration, while I was serving as the FEA Deputy General Counsel, FEA and 12 other federal employee unions brought suit against President

Trump, the Office of Personnel Management, and the OPM Director at the time, seeking to enjoin three executive orders issued by President Trump that detrimentally affected the collective bargaining rights of federal employees under Chapter 71. A true and correct copy of the complaint that FEA and other unions filed in 2018 is attached as Exhibit 5. The District Court entered summary judgment in favor of the plaintiffs, but that decision was subsequently reversed by the Court of Appeals for lack of jurisdiction. In 2021, President Biden rescinded the executive orders that were the subject of the litigation.

15.    In addition to working with outside counsel on the litigation, I also worked with our team at FEA to publicize the litigation and ensure that we communicated about the litigation to our members and the public. Specifically, I worked with our general counsel at the time to review and sign off on a press release issued by the Federal Workers Alliance ("FWA"), the coalition of unions behind the 2018 lawsuit, which lifted up the coalition's victory in the District Court and expressly listed FEA as one of the unions pushing back against the Trump Administration's overreach and illegal executive actions. A true and correct copy of the press release that was issued about the 2018 lawsuit against the Trump Administration is attached as Exhibit 6.

16.    FEA was a charter member of the FWA, a coalition of labor unions representing federal employees that was formed to advocate on their behalf with a unified voice. I regularly attended FWA meetings and represented FEA's views in FWA meetings to help ensure that FWA's positions were consistent with FEA's and its members' views. Through its work with FWA, FEA has spoken out to oppose Trump administration policies that harm federal workers by writing to members of Congress during President Trump's first term in office and his current term. I also reviewed final drafts of these letters and worked with FEA's former General Counsel and the NEA Office of Government Relations to approve FEA's signature on the letters.

17.    On July 26, 2017, FEA and the other members of the FWA sent a letter to Chairman Ron Johnson and Ranking Member Claire McCaskill of the Senate Homeland Security and Government Affairs Committee opposing the confirmation of President Trump's nominee George Nesterczuk to be the Director of the Office of Personnel Management. A true and correct copy of the letter, dated July 26, 2017, is attached as Exhibit 7.

18.    On July 16, 2018, FEA and the other members of the FWA sent a letter to Ranking Member Robert Scott of the House Education and Workforce Committee opposing President Trump's Executive Order purporting to move Administrative Law Judges across the federal government from the competitive service to the excepted service. A true and correct copy of the letter, dated July 16, 2018, is attached as Exhibit 8.

19.    On August 6, 2019, FEA and the other members of the FWA sent a letter to all United States Senators urging them to oppose the confirmation of President Trump's nominee Catherine Bird to serve as the General Counsel of the Federal Labor Relations Authority. A true and correct copy of the letter, dated August 6, 2019, is attached as Exhibit 9.

20.    On February 25, 2025, FEA and the other members of the FWA sent a letter to Chair Susan Collins and Vice-Chair Patty Murray of the Senate Appropriations Committee opposing President's illegal impoundments and unconstitutional executive orders and urging the Appropriations Committee to take a variety of actions to protect the civil service and federal unions. A true and correct copy of the letter, dated February 25, 2025, is attached as Exhibit 10.

21.    President Trump issued Executive Order 14251 on March 27, 2025, thereby stripping FEA and its members of their rights under Chapter 71. FEA began to feel the negative impact of the Executive Order 14251 immediately, and since then, DODEA has refused to honor its statutory and contractual obligations, including refusing to abide by numerous terms of its CBAs with FEA.

7

22.     On April 3, 2025, I received an email from Alexa Rukstele, the Chief of DODEA's Labor Management Employee Relations Division. The email notified union leadership that DODEA was "paus[ing] all labor-management activities." A true and correct copy of the email I received from Ms. Rukstele on April 3, 2025 is attached hereto as Exhibit 11.

23.     Shortly thereafter, DODEA unilaterally terminated FEA membership dues payroll deductions for FEA members. FEA members had voluntarily authorized these payroll deductions, and the payroll deductions are both required by statute and also by a negotiated term of the 2023 CBA for the overseas unit. Article 40, Section 1 of that agreement provides that, "[DODEA] shall provide dues withholding for payment of Association dues for unit members in accordance with 5 U.S.C. 7115." Exhibit 1 at 88. DODEA is thus refusing to honor Article 41 of that CBA.

24.     Prior to DODEA's unilateral termination of payroll deductions, these deductions accounted for 83% percent of membership dues collected by FEA. These dues make up the overwhelming majority of FEA's income, and these funds are used to carry out all of FEA's core activities as a labor organization, including paying staff, supporting collective bargaining and organizing, funding the grievance and arbitration system, and providing representation to members as well as other critical services such as assisting bargaining unit educators to navigate the DODEA human resources and payroll systems.

25.     FEA's funding model, like that of most labor unions, is membership driven. FEA has very few sources of income other than dues revenue, which are quite modest. Limiting funds to dues paid by members ensures that the union remains a democratic institution that represents the interests of its members. But based on our experience thus far, it will be nearly impossible to raise the funds needed to sustain the union and provide representational services for our members for the coming school year.

26.     As a result of DODEA's decision to unilaterally stop payroll deductions, FEA has begun costly and resource-intensive efforts to ensure that members around the world are signing up for alternative methods for paying dues. These alternative methods are more costly to the union and less reliable and effective than payroll deduction.

27.     As of June 2, 2025, only 48% of FEA members had opted in to an alternative method of payment.

28.     When DODEA unilaterally ceased payroll deduction, there were three remaining pay cycles for educators at the stateside schools. Based on information provided by FEA's Chief Financial Officer, approximately 1,627 FEA-SR members had been enrolled in dues deduction when the three remaining dues cycles were cancelled as of March 12, but FEA and FEA-SR were subsequently unable to collect dues using an alternative pay method, leaving approximately 600 FEA-SR members who still owed over $65,000 that FEA-SR had expected to be collected through payroll deduction.

29.     The termination of payroll deductions means that FEA and FEA-SR are suffering from an immediate loss of revenue while also expending more of FEA's dwindling resources on signing up members for alternative payment methods. These resources would have been used to represent and advocate for our members. Union members frequently need representation services on an on-demand basis – for example, if they need advice and counsel when called in to speak to an administrator for a disciplinary reason.

30.     With fewer resources to draw on, and with those remaining resources strained because it is necessary to FEA's continued existence that substantial resources be devoted to the effort to convert members to a new dues payment system, it is inevitable that such representation work will suffer. Even if FEA were to recover its dues revenue eventually, the immediate harm to FEA and its members from such curtailment of services cannot be repaired after the fact. A

9

subsequent restoration of FEA funds cannot retroactively help the member who has gone into a disciplinary meeting without the counsel of their union. And restoration of revenue at a later date cannot undo the injury to FEA in the eyes of members and prospective members arising from its diminished ability to help its members.

31.    As a result of DODEA's decision to repudiate its contractual commitment and statutory duty to honor employees' voluntary assignment of FEA dues via payroll deduction, FEA and FEA-SR have already had to make difficult decisions about resources, including cutting down on travel to DODEA schools, located from West Point, New York to Fort Rucker, Alabama, and from South Korea and Japan to Germany, England and Belgium. These visits are a critical part of organizing and providing services to members; they also ensure that members feel heard, represented, and connected to the union.

32.    The Administration's unilateral action to stop payroll deduction of voluntary membership dues has created a vicious cycle for FEA and its ability to carry out its core functions. FEA is expending more resources on signing up members while immediately having fewer resources to provide representational services to members, a principal reason why educators and ESPs sign up to pay dues to the union. This vicious cycle is exacerbated by the loss of collective bargaining rights, which eliminates FEA's core function. DODEA is not abiding by its obligations under the Overseas Negotiated Agreement or the two FEA-SR Master Labor Agreements, which makes it very difficult to convince members to pay dues. This will inevitably lead to fewer funds for the union and thus, even fewer services for members, making it increasingly difficult to convince them to continue to be members by signing up for alternative means of paying dues.

33.    Convincing DODEA educators to remain members by paying dues through electronic payment systems is all the more challenging because DODEA educators have lost

10

critical statutory rights and protections such as the right to engage in union activity "freely and without fear of penalty or reprisal," 5 U.S.C. § 7102, including the right "to form, join, or assist any labor organization." The loss of these statutory protections makes joining or remaining a member of FEA riskier than it was before Executive Order 14251 issued. The Executive Order and DODEA's implementation of it thus pose an existential threat to the union – one that gets to the heart of FEA's purpose and mission, which is to collectively bargain, represent its members, and enforce CBAs under Chapter 71.

34.     The EO has also made it impossible for FEA to move forward with or resolve its many outstanding Overseas and Stateside grievances because DODEA is not abiding by the negotiated grievance procedure required by the CBAs. The grievance procedures in the Overseas Negotiated Agreement have remained largely the same since the previous contract took effect in 1989, and the parties are well acquainted with resolving disputes under the terms of that CBA. While there were some specific changes to the arbitration process in the 2023 Negotiated Agreement, the process generally was relatively similar to that under the 1989 Negotiated Agreement. Article 12 of the Overseas Negotiated Agreement states, "The negotiated grievance procedure is established to provide unit employees with an opportunity to raise matters of concern or dissatisfaction for informal and, where appropriate, formal consideration and resolution." Exh. B, Art. 12 §1. Article 12, Section 6 also provides that if the grievance is not resolved informally between the parties, either party "may proceed to arbitration." *Id.* Art. 12 §6.

35.     Under the terms of the Overseas Negotiated Agreement, FEA has been prosecuting numerous grievances on behalf of hundreds of educators who seek relief from DODEA's wrongful garnishment of purported overpayments from educators' pay as well as DODEA's other failures to pay educators their rightful salaries. During my years with FEA, DODEA has been plagued by a chronic failure to correctly calculate their overseas and stateside

11

employees' pay, and helping to address these issues has been a key representational service that FEA has offered to members. As a result of DODEA's consistent payroll errors, FEA has, since the 1989 Overseas CBA came into force, filed grievances on behalf of hundreds of Overseas educators to resolve these pay issues, which all arose before the Executive Order issued. Many of these pay grievances were pending, in various stages of the arbitration process, when President Trump issued Executive Order 14251.

36.    By the time that President Trump issued EO 14251, FEA had already obtained significant relief for its members. In grievance proceedings involving hundreds of affected employees, arbitrators issued decisions upholding the grievances and ordering DODEA to make the affected employees whole through the payment of back pay and interest. But DODEA has yet to make any payments to many of the grievants to make them whole. FEA alleges that DODEA owes some educators more than $100,000 in back pay.

37.    When President Trump issued EO 14251 and DODEA subsequently announced that it was unilaterally pausing all labor-management activities, FEA was preparing to submit many of the remaining grievances to arbitration under the required escalation steps of the Overseas Negotiated Agreement or was in the middle of ongoing arbitration proceedings.

38.    In other pending grievance proceedings initiated by FEA, DODEA attorneys have refused to further participate in arbitral proceedings and taken the position that the arbitrator has no jurisdiction and that FEA and FEA-SR are no longer recognized as exclusive representatives.

39.    In a case I am handling—arising from a grievance on behalf of the entire overseas bargaining unit challenging DODEA's failure to implement a mandatory, government-wide regulation from the Department of State increasing living quarter allowances—FEA and DODEA had, prior to Executive Order 14251, had agreed to move forward with a hearing in the Fall of 2025 but had not yet selected a hearing date. In response to a May 1, 2025, e-mail from

12

the arbitrator requesting a statue report, I informed the arbitrator of the case's status on May 6, 2025. DODEA's counsel replied the same day, stating that DODEA "considers this arbitration cancelled pursuant to Executive Order 14251," that the Federal Education Association is no longer recognized as the exclusive representative, and jurisdiction before the arbitrator no longer exists." Arbitrator Vaughn replied that "[t]his matter will be resolved at levels far above any of our pay grades" and wished the parties the best. A true and correct copy of the e-mail correspondence summarized and quoted above is attached as Exhibit 12.

40.    Other FEA and FEA-SR attorneys working on grievances that were pending when Executive Order 14251 issued have received communications from DODEA counsel with the same language as that quoted above. Indeed, in at least three arbitration proceedings, DODEA has gone so far as to communicate with arbitrators *ex parte* purporting to cancel hearings and informing arbitrators that their services are no longer needed and that DODEA would pay for no further work on the grievances. FEA learned of DODEA's efforts to unilaterally cancel pending arbitration proceedings and arbitrators' contracts only when the arbitrators handling the grievances revealed DODEA's communications to FEA counsel or after FEA counsel made inquiries with DODEA's counsel.

41.    After Executive Order 14251 issued, the FLRA has indicated that it intends to dismiss an unfair labor practice proceeding that has been pending before the agency for more than 3 years. In 2021, FEA learned that the Southeast District of DODEA which is under the MLA administered by FEA-SR had unilaterally changed the scheduled workday without negotiating the change. On June 22, 2021, FEA-SR filed an unfair labor practice charge over this unilateral change with the Federal Labor Relations Authority (FLRA) Regional Office in Atlanta, which has been pending for more than three years. I was the representative for FEA-SR in that matter. On May 16, 2024, an FLRA Administrative Law Judge (ALJ) issued a decision

13

denying FEA's charge. On June 17, 2024, I filed a timely appeal of the ALJ's decision denying the charge on behalf of FEA-SR. On April 4, 2025, the FLRA issued an order directing FEA to show cause as to why the matter should not be dismissed for lack of subject matter jurisdiction in light of EO 14251. At true and correct copy of the FLRA's Order to Show Cause, dated April 4, 2025, is attached as Exhibit 13.

42.     In response to the FLRA's Order to Show Cause, DODEA filed a response arguing that the FLRA lacked jurisdiction because it was no longer covered by the Federal Service Labor-Management Relations Statute pursuant to EO 14251. A true and correct copy of DODEA's response to the FLRA's Order to Show Cause, dated April 30, 2025, is attached as Exhibit 14.

43.     FEA filed a response to the Order to Show Cause asking that the FLRA stay, rather than dismiss, the ULP proceedings given that the validity of the order is being challenged by multiple unions. A true and correct copy of FEA's response to the Order to Show Cause, is attached as Exhibit 15.

44.     On June 10, 2025, the FLRA entered an order placing the unfair labor practice case in abeyance by reason of Executive Order 14251. A true and correct copy of that order is attached as Exhibit 16.

45.     On April 29, 2025, I received another email from Alexa Rukstele notifying me and other federal union leaders that DODEA would no longer permit the use of union official time. "Official time" refers to terms in FEA's stateside and overseas CBAs that permit union officials to perform representation functions while on duty status. The email also required FEA to vacate any office space that was used by FEA pursuant to the CBA. A true and correct copy of the April 29, 2025, email from Ms. Rukstele is attached as Exhibit 17.

46.     Official time is governed by the three CBAs currently in force. Article 5, Section 1 of the CBA for the overseas unit provides that specified FEA representatives "shall be granted official time" and sets out "the amount of official time they shall be granted to perform representational duties." Exhibit 1 at 18. Similarly, Article 6, Sections 9-11 of the CBA for stateside certified educators provides for "release time" for the FEA-SR Director and for local FEA Presidents, as well as "official time" for FEA representatives to conduct official representational duties and other union activities under Chapter 71. Exhibit 2 at 17-26. Article 6, sections 10-12 of the CBA for stateside classified employees also provides for release time for the FEA Area Director and Local Presidents and for official time for FEA representatives to conduct official representational duties and other union activities under Chapter 71. Exhibit 3 at 24-35. Following the issuance of Executive Order 14251, DODEA has – consistent with Ms. Rukstele's April 29, 2025, email – ignored these provisions and refused to abide by them.

47.     The use of school facilities is also governed by the CBAs. Article 16, Section 5 of the CBA for the overseas unit provides as follows with regard to the use of school facilities by FEA:

> Upon request of the Association, the use of school facilities, equipment, and/or services not specifically mentioned in this Agreement shall be subject to consultations at the school level.
>
> The use of such facilities, equipment and/or services shall normally be provided when the Agency determines the following conditions are met:
>
> A. The use of facilities, equipment, and/or services will promote effective Labor Management dealings;
>
> B. No additional identifiable costs to the Agency will be incurred;
>
> C. The use of such facilities, equipment and/or services will not degrade or interfere with the educational process or interfere with the administration of the school office;

15

> D. The use of such facilities, equipment and/or services will not violate policies and/or regulations of the host Military Department/Installation, and other applicable regulations of higher authority.
>
> Once approved, the use of such facilities, equipment, and/or services shall be subject to the general control procedures established by the Agency. Violations of such general procedures may cause cancellation/suspension in the use of such facilities, equipment, and/or services.

Exhibit 1 at 53. Article 13 of the CBA for the stateside certified educators unit provides, among other things, that DODEA will "provide space in a school building for Association meetings after duty hours"; "make reasonable effort to ensure that Association employees and officials are allowed access to military installations in order to conduct labor-management or Association business"; and "shall consider allowing the Association's use of other school-level facilities, equipment, and/or services . . . ." Exhibit 2 at 30-31. Article 6, Sections 13-14 of the CBA for stateside classified employees requires that each local president receive "office space with a desk and locking filing cabinet" as well as "space in a school/Local School System building for [FEA] meetings." Exhibit 3 at 36-37. D, As is the case with the official time provisions, following the issuance of Executive Order 14251, DODEA has ignored these facilities and access provisions and refused to abide by them.

48.     The loss of official time has negatively impacted FEA's ability to move forward with its representational services in a timely manner and harmed FEA's officers. Under the Overseas CBA, DODEA agreed to grant FEA's two Area Representatives half of their duty time to perform representational functions and the other half of their time on leave without pay, to grant six District Representatives half of their duty time as official time, and to grant 100% of the FEA President's duty time as official time. Because FEA is a global organization representing members in time zones across the world, official time is critical to being able to conduct FEA business and representational functions in a timely manner. Without this official time, union

16

business and representational functions will have to be performed outside of duty hours, which will create a significant delay for members who may be facing a disciplinary interview or who need advice when faced with management directives that contravene the CBA.

49.    DODEA has also failed to honor the rights of FEA and members of the stateside certified educators unit to have a union representative present during any investigatory meetings held by management that may result in discipline of unit employees, which are not only guaranteed by Chapter 71, but are also enshrined in the stateside CBA for that unit. Article 6, Section 2 of the CBA for stateside certified educators provides as follows:

> a. The Association shall be given the opportunity to be present at any examination of a unit employee by a representative of the Agency concerning an investigation if:
>
>> (1) The employee reasonably believes that the examination may result in disciplinary action against the employee; and
>>
>> (2) The employee requests representation.

Exhibit 2 at 12.

50.    In one instance, a stateside educator learned that management would hold a pre-action investigation meeting with the educator, who invoked the right to union representation under Article 6 of the CBA for the stateside certified educator unit. DODEA made clear that union representation was not permitted, so the educator requested that the meeting happen outside of the school day in order to have union representation. This request also was denied, and the educator was forced to attend the meeting without the union representation that is required by the plain terms of the CBA.

51.    Most recently, DODEA has taken advantage of Executive Order 14251 by announcing that it will unilaterally reorganize DODEA, which will impact staffing and the positions of FEA members, without negotiating with FEA. On May 22, 2025, employees at DODEA schools received an e-mail from DODEA Director Beth Schiavino-Narvaez announcing

17

that in connection with a Department of Defense "optimization of its civilian workforce," DODEA was implementing a "Future-Ready DoDEA (FRD) initiative." A true and correct copy of this e-mail is attached as Exhibit 18. I was sent this email by a member of FEA who wishes to remain anonymous out of fear of retaliation by DODEA management. The e-mail uses euphemisms like "workforce shaping efforts" and "a strategic plan to streamline and improve student services," but it is clear that this reorganization will eliminate positions for the 2025/2026 school year and that downsizing of workforce will almost certainly require a Reduction in Force ("RIF"). Indeed, the email ends with the following warning: "As part of FRD, DoDEA will offer the Voluntary Early Retirement Authority (VERA) and a Voluntary Separation Incentive Payment (VSIP) to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees."

52.    On the evening of May 22, 2025, Ms. Rukstele sent an e-mail to an e-mail list designated as "FRD@dodea.gov". I understand that this group consists of all Educational Technologists, Speech Assessors, Special Education Assessors, and Automation Clerks working for DODEA. I received a copy of this e-mail from a DODEA employee who is known to me but who wishes to remain anonymous for fear of reprisals by DODEA. A true and correct copy of Ms. Rukstele's May 22, 2025, e-mail, less any indication of the recipient's identity, is attached as Exhibit 19. The e-mail tells recipients that their positions are "impacted by" the FDR initiative and that DODEA is "working to identify placement and job opportunities for affected employees," but that "[t]his does not guarantee that you will not be involuntarily separated from your position." The e-mail goes on to state that the recipients' positions are "eligible for" VERA and VSIP, provided that the recipient meets the eligibility requirements for those programs.

53.    On May 27, 2025, Amy Bower, Chief of DODEA's Human Resources Division, sent a memorandum to the affected employees DODEA-wide explaining the VERA and VSIP

18

options and eligibility criteria and setting a June 2, 2025, deadline for applications for early retirement and voluntary separation. I received a copy of this memorandum from a DODEA employee who is known to me but who wishes to remain anonymous for fear of reprisals by DODEA. A true and correct copy of Ms. Bower's memorandum is attached as Exhibit 20.

54. On June 10, 2025, I learned that DODEA had sent notices of management-directed reassignments to some of the educators affected by the reorganization. Some of those reassignment notices require relocation to worksites that are far distant from the employees' current duty stations that would require Permanent Change of Station Orders. I reviewed copies of reassignment notices that DODEA sent to FEA members who wish to remain anonymous and do not wish that copies of those notices be made public, for fear of retaliation by DODEA. The notices are dated June 9, 2025, and they set a June 11, 2025, deadline for affected employees either accept or decline the reassignments.

55. DODEA's announcement that eligible employes affected by the reorganization can request early retirement and its reassignment notices require affected employees to make significant life and career decisions on an extremely short deadline, which exerts pressure on those employees to choose early retirement or reassignment under onerous conditions, rather than face potential termination.

56. The reorganization was announced and is being implemented in violation of the CBA for the overseas unit.

57. Article 7, sections 1 and 2 of the CBA for the overseas unit provides that if FEA makes a demand for bargaining over mid-term changes to terms and conditions of employment, DODEA must bargain over the impact and implementation of DODEA's action. I sent a bargaining demand to DODEA on May 28, 2025. A true and correct copy of my email setting forth FEA's bargaining request is attached as Exhibit 21. Ms. Rukstele responded within minutes

19

acknowledging receipt but stating that the request would be "will be held in abeyance pending the outcome of litigation over EO 14251." A true and correct copy of Ms. Rukstele's response is attached as Exhibit 22.

58.     Furthermore, Article 11, Sections 3-4 of the CBA for the overseas unit lays out specific procedures for RIFs, including a 60-day notification requirement to FEA and to individually impacted bargaining unit members as well as a host of other protections. Exhibit 1 at 32. Because a RIF is almost certainly unavoidable given the sheer number of positions being eliminated for the 2025-2026 school year, and because the 2025-2026 school year for overseas educators begins in August, 2025, it will not be possible for DODEA to comply with the notification and bargaining requirements of the CBA for the overseas unit, even if, contrary to its actions and stated positions since Executive Order 14251 issued, it were inclined to do so.

59.     Additionally, Chapter 71 creates a duty to bargain in good faith and makes it an unfair labor practice to refuse to consult or negotiate in good faith. 5 U.S.C. §§ 7114,7117 and 7116(a)(5). The FLRA has long interpreted these provisions to require agencies to bargain over impact and implementation resulting from changes to the terms and conditions of employment that occur during the course of the contract period.[1] DODEA's failure to provide notice and engage in bargaining over the impact and implementation of the reorganization by reason of Executive Order 14251 thus not only violates the terms of the CBA but it also strips FEA and its members of this vital statutory right. Since DODEA announced the FRD, FEA members have been reaching out to me to express their fears, concern, and the impact that DODEA's actions

---

[1] *See, e.g.*, *Ogden Air Logistics Ctr.*, 41 F.L.R.A. 690, 698 (1991) ("It is well settled that prior to implementation of a change in the conditions of employment of unit employees, an agency must provide a union with reasonable notice of the change and an opportunity to bargain, as appropriate, over the substance and/or impact and implementation of the change.").

will have on both employees and students. A special education assessor reached out to me to share the following: "It's not right. [The FRD] hurts children and will ultimately impact the referral process leading to significant delays in services and broken timelines and promises not to mention the outrageous cost."

60.    FEA's inability to bargain over the impact and implementation of DODEA's impending reorganization and elimination of positions harms FEA, as it another instance of FEA's inability to carry out its core function of collective bargaining by reason of Executive Order 14251, the OPM guidance, and DODEA's implementation of both. It also harms FEA members whose positions are being eliminated, as FEA could mitigate some of the harms to those members and other affected employees through the bargaining process. It also harms other members and employees, such as special education teachers, as the elimination of assessor positions will increase their workloads as they absorb the duties that assessors currently perform, another effect that could be ameliorated through bargaining.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 12, 2025

Richard Tarr

21

# Exhibit 1

# Collective Bargaining Agreement (CBA) Between Department of Defense Education Activity (DoDEA) And Federal Education Association (FEA)

Effective August 1, 2023

# Table of Contents

ARTICLE 1 – PREAMBLE ...................................................................................................... 9

    Section 1 .......................................................................................................................... 9

    Section 2 .......................................................................................................................... 9

ARTICLE 2 – CONDITIONS OF THE AGREEMENT ......................................................... 9

    Section 1. Relationship to Laws and Government-Wide Regulations ............................. 9

    Section 2. Association .................................................................................................... 10

    Section 3. Employee Rights ........................................................................................... 11

    Section 4. Management Rights ....................................................................................... 12

    Section 5 ........................................................................................................................ 13

ARTICLE 3 – GENERAL ADMINISTRATION PROCEDURES ...................................... 13

    Section 1 ........................................................................................................................ 13

    Section 2 ........................................................................................................................ 13

    Section 3 ........................................................................................................................ 13

    Section 4 ........................................................................................................................ 14

    Section 5 ........................................................................................................................ 14

    Section 6 ........................................................................................................................ 14

    Section 7 ........................................................................................................................ 14

ARTICLE 4 – FEA/DoDEA COOPERATION ................................................................... 14

    Section 1 ........................................................................................................................ 14

    Section 2 ........................................................................................................................ 15

    Section 3. District/School Level Consultations ............................................................. 15

    Section 4 ........................................................................................................................ 16

    Section 5 ........................................................................................................................ 16

    Section 6. Levels of Communication ............................................................................. 16

ARTICLE 5 – OFFICIAL TIME ......................................................................................... 17

    Section 1. General ......................................................................................................... 17

    Section 2. Faculty Representative Spokespersons ......................................................... 17

    Section 3. National Officer, Area-level, and District Level .......................................... 18

    Section 4. Procedures for the Use of Official Time ...................................................... 18

    Section 5. Training. ....................................................................................................... 18

ARTICLE 6 – INITIATING/PROCESSING ULP'S ........................................................... 20

1

Section 1 .......................................................................................................................... 20

Section 2 .......................................................................................................................... 20

Section 3 .......................................................................................................................... 20

ARTICLE 7 – NEGOTIATIONS OVER PROPOSED CHANGES IN ................................... 21

CONDITIONS OF EMPLOYMENT OR POLICIES ............................................................. 21

Section 1. General ........................................................................................................... 21

Section 2. National/Regional Level/District ..................................................................... 21

Section 3. Local Level ...................................................................................................... 22

ARTICLE 8 – DIVERSITY, EQUITY, and INCLUSION (DEI) ............................................. 22

Section 1. DEI Policy ....................................................................................................... 22

Section 2. DEI Cooperation ............................................................................................. 23

Section 3. Human and Civil Rights Coordinators (HCRCs) .............................................. 23

ARTICLE 9 – TRANSFER PROGRAM ............................................................................... 24

ARTICLE 10 – STAFFING ................................................................................................... 24

Section 1. General Staffing Procedures. .......................................................................... 24

Section 2. Involuntary Reassignment(s) ........................................................................... 25

Section 3. Excessing Process. .......................................................................................... 26

ARTICLE 11 – REDUCTION IN FORCE ............................................................................. 30

Section 1. Definitions ....................................................................................................... 30

Section 2. Exclusions ....................................................................................................... 31

Section 3. Notification to Association ............................................................................... 31

Section 4. Notification to Bargaining Unit Members ........................................................ 31

Section 5. - Competitive Area .......................................................................................... 32

Section 6. Competitive Levels .......................................................................................... 32

Section 7. Retention Registers/Retention Priority ........................................................... 32

Section 8. Placement Considerations ............................................................................... 33

Section 9. Salary Retention Provisions ............................................................................ 33

Section 10. Severance Pay ............................................................................................... 33

Section 11. Assistance to Employees ............................................................................... 33

Section 12. Reemployment Priority List ........................................................................... 33

Section 13 .......................................................................................................................... 34

Section 14 .......................................................................................................................... 34

ARTICLE 12 – GRIEVANCE PROCEDURE ....................................................................... 34

Section 1. Generally ........................................................................................................ 34

2

Section 2. Applicability ................................................................................................... 35

Section 3. Types of Grievances ...................................................................................... 35

Section 4. Individual and Group Grievances .................................................................. 36

Section 5. Association and Agency Grievance Process ................................................... 37

Section 6. Arbitration ..................................................................................................... 38

Section 7. General Provisions ......................................................................................... 40

Section 8. Attorney Fees ................................................................................................. 42

ARTICLE 13 – DISCIPLINE AND ADVERSE ACTION ............................................ 44

Section 1 ......................................................................................................................... 44

Section 2 ......................................................................................................................... 44

Section 3 ......................................................................................................................... 44

Section 4 ......................................................................................................................... 45

Section 5 ......................................................................................................................... 45

ARTICLE 14 – PERFORMANCE APPRAISAL SYSTEM ......................................... 46

Section 1 ......................................................................................................................... 46

Section 2 ......................................................................................................................... 46

Section 3 ......................................................................................................................... 46

Section 4 ......................................................................................................................... 47

Section 5 ......................................................................................................................... 47

Section 6 ......................................................................................................................... 48

Section 7 ......................................................................................................................... 48

ARTICLE 15 – USE OF SCHOOL FACILITIES ........................................................ 48

Section 1 ......................................................................................................................... 48

Section 2 ......................................................................................................................... 49

Section 3 ......................................................................................................................... 49

Section 4 ......................................................................................................................... 49

Section 5 ......................................................................................................................... 50

Section 6 ......................................................................................................................... 50

Section 7 ......................................................................................................................... 50

Section 8 ......................................................................................................................... 50

Section 9 ......................................................................................................................... 51

ARTICLE 16 – USE OF OFFICIAL FACILITIES ...................................................... 51

Section 1 ......................................................................................................................... 51

Section 2 ......................................................................................................................... 51

3

JA124

Section 3.................................................................................................................................... 51

Section 4.................................................................................................................................... 51

Section 5.................................................................................................................................... 52

Section 6.................................................................................................................................... 52

ARTICLE 17 – COMMUNITY ENVIRONMENT ................................................................. 52

Section 1.................................................................................................................................... 52

Section 2.................................................................................................................................... 52

ARTICLE 18 – EQUAL EMPLOYMENT OPPORTUNITY ................................................ 52

ARTICLE 19 – STUDENT DISCIPLINE .............................................................................. 53

Section 1.................................................................................................................................... 53

Section 2.................................................................................................................................... 53

Section 3.................................................................................................................................... 53

Section 4.................................................................................................................................... 53

Section 5.................................................................................................................................... 54

ARTICLE 20 – POSITION DESCRIPTIONS ........................................................................ 54

Section 1.................................................................................................................................... 54

Section 2.................................................................................................................................... 54

ARTICLE 21 – LEAVE ........................................................................................................... 54

Section 1. Definitions ............................................................................................................... 55

Section 2. General Rules and Procedures ................................................................................. 57

Section 3. School Closures ....................................................................................................... 58

Section 4. Sabbatical Leave ...................................................................................................... 59

Section 5. Administrative Leave ............................................................................................... 59

Section 6. LWOP ...................................................................................................................... 60

Section 7. Witness in a Judicial Proceeding ............................................................................ 60

Section 8. VLTP Procedures ..................................................................................................... 61

Section 9. Family Medical Leave Act (FMLA) ....................................................................... 63

Section 10. Reducing Pay for Absences Without Pay ............................................................. 66

Section 11. Indebted for Leave ................................................................................................. 66

ARTICLE 22 – SALARY SETTING PRACTICES ............................................................... 66

ARTICLE 23 – PAY RETENTION ........................................................................................ 67

Section 1.................................................................................................................................... 67

Section 2.................................................................................................................................... 67

Section 3.................................................................................................................................... 67

4

ARTICLE 24 – EXTRA DUTY ASSIGNMENTS ............................................................................. 68
  Section 1 ............................................................................................................................... 68
  Section 2 ............................................................................................................................... 68
  Section 3 ............................................................................................................................... 68
  Section 4 ............................................................................................................................... 69
  Section 5 ............................................................................................................................... 69
  Section 6 ............................................................................................................................... 69
ARTICLE 25 – TEMPORARY PROMOTION ............................................................................... 75
  Section 1 ............................................................................................................................... 75
  Section 2 ............................................................................................................................... 75
  Section 3 ............................................................................................................................... 75
ARTICLE 26 – CHILD CARE CENTERS ...................................................................................... 75
  Section 1 ............................................................................................................................... 75
  Section 2 ............................................................................................................................... 75
ARTICLE 27 – EDUCATION/TRAINING OPPORTUNITIES ..................................................... 76
  Section 1 ............................................................................................................................... 76
  Section 2. Administrative Reemployment Rights .................................................................. 76
  Section 3. Summer Attendance at an Accredited College or University ............................... 77
ARTICLE 28 – PROFESSIONAL LEARNING .............................................................................. 78
  Section 1 ............................................................................................................................... 78
  Section 2 ............................................................................................................................... 78
  Section 3 ............................................................................................................................... 78
  Section 4 ............................................................................................................................... 79
  Section 5 ............................................................................................................................... 79
  Section 6 ............................................................................................................................... 79
ARTICLE 29 – NEW EDUCATIONAL PROGRAMS .................................................................... 79
ARTICLE 30 – CERTIFICATION AND RENEWAL OF CERTIFICATION ............................... 79
  Section 1 ............................................................................................................................... 79
  Section 2 ............................................................................................................................... 80
  Section 3 ............................................................................................................................... 81
  Section 4 ............................................................................................................................... 81
  Section 5 ............................................................................................................................... 81
  Section 6 ............................................................................................................................... 81
ARTICLE 31 – TOUR OF DUTY ................................................................................................... 81

5

ARTICLE 32 – DRESS AND APPEARANCE ........................................................................ 82

ARTICLE 33 – PASSPORTS/VISAS/IDENTIFICATION CARDS .................................... 82

Section 1 .................................................................................................................. 82

Section 2 .................................................................................................................. 82

Section 3 .................................................................................................................. 82

ARTICLE 34 – MILITARY GRADE EQUIVALENCY ...................................................... 83

Section 1 .................................................................................................................. 83

Section 2 .................................................................................................................. 83

ARTICLE 35 – EMPLOYEE ASSISTANCE PROGRAM .................................................. 83

ARTICLE 36 – DISABILITY RETIREMENT ...................................................................... 84

Section 1 .................................................................................................................. 84

Section 2 .................................................................................................................. 84

Section 3 .................................................................................................................. 84

Section 4 .................................................................................................................. 84

ARTICLE 37 – WORKERS COMPENSATION ................................................................... 85

ARTICLE 38 – HEALTH CARE ............................................................................................ 85

Section 1 .................................................................................................................. 85

Section 2. Immunizations ....................................................................................... 85

Section 3. Exemptions ............................................................................................ 85

Section 4. Health Issues .......................................................................................... 86

Section 5. Pandemics and Health Emergencies ..................................................... 86

Section 6. Testing .................................................................................................... 86

ARTICLE 39 – DAMAGE OR LOSS OF PROPERTY ....................................................... 87

Section 1 .................................................................................................................. 87

Section 2 .................................................................................................................. 87

Section 3 .................................................................................................................. 87

ARTICLE 40 – DUES WITHHOLDING ............................................................................... 87

Section 1 .................................................................................................................. 87

Section 2 .................................................................................................................. 87

Section 3 .................................................................................................................. 87

Section 4 .................................................................................................................. 88

Section 5 .................................................................................................................. 88

Section 6 .................................................................................................................. 88

Section 7 .................................................................................................................. 88

6

Section 8....................................................................................................................................88

ARTICLE 41 – UNIT EMPLOYEE WORKDAY ................................................................89

Section 1. Workday ...................................................................................................89

Section 2. Preparation ..............................................................................................89

Section 3. Lunchtime. ...............................................................................................90

Section 4. Grade-Level Chairs. ................................................................................90

Section 5 - Classroom Coverage ..............................................................................90

ARTICLE 42 – HOUSING AND OVERSEAS ALLOWANCES ........................................90

Section 1.....................................................................................................................90

Section 2.....................................................................................................................91

Section 3.....................................................................................................................91

Section 4.....................................................................................................................92

Section 5.....................................................................................................................93

Section 6.....................................................................................................................93

ARTICLE 43 – TRAVEL .......................................................................................................94

Section 1.....................................................................................................................94

Section 2.....................................................................................................................94

Section 3.....................................................................................................................94

Section 4.....................................................................................................................94

Section 5.....................................................................................................................94

Section 6.....................................................................................................................95

Section 7.....................................................................................................................95

ARTICLE 44 – RETIREMENT ..............................................................................................95

Section 1.....................................................................................................................95

Section 2.....................................................................................................................95

ARTICLE 45 – STUDENT GRADES .....................................................................................95

Section 1.....................................................................................................................95

Section 2.....................................................................................................................95

Section 3.....................................................................................................................96

Section 4.....................................................................................................................96

Section 5.....................................................................................................................96

Section 6.....................................................................................................................96

ARTICLE 46 – CURRICULAR MATERIALS .......................................................................96

Section 1.....................................................................................................................96

7

ARTICLE 47– School Year .......................................................................................................... 96

   Section 1. School Year ............................................................................................................ 96

   Section 2. Orientation Time at the Start of the School Year................................................... 97

   Section 3. Early Return Late Release ..................................................................................... 97

ARTICLE 48 – TRIAL PERIOD................................................................................................. 97

ARTICLE 49 – DURATION AND SUCCESSOR AGREEMENT............................................. 97

   Section 1. Effective Date and Successor Agreement.............................................................. 98

   Section 2. .................................................................................................................................. 98

   Section 3. Ground Rules for the Negotiation of the Successor Agreement ............................ 98

   Section 4. .................................................................................................................................. 98

MEMORANDUM ...................................................................................................................... 101

APPENDIX A .............................................................................................................................. 102

APPENDIX B .............................................................................................................................. 103

APPENDIX C .............................................................................................................................. 110

8

prohibited by law, and supported by particularized need, data –
   1. which is normally maintained by DoDEA in the regular course of business,
   2. which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining; and
   3. which does not constitute guidance, advice, counsel, or training provided for DoDEA officials or supervisors, relating to collective bargaining.

F. DoDEA shall ensure that appropriate personnel actions related to the death of a unit employee are processed promptly.

G. Whenever in this Agreement the wording can be read to assign a duty or task to a specific position it shall be interpreted to mean that the duty can be assigned to that position or a designee.

**Section 2. Association**

A. FEA is recognized as the exclusive representative of employees in the unit and is entitled to act for and negotiate agreements covering all employees in the unit. FEA shall represent the interests of all employees in the unit without discrimination and without regard to labor organization membership. FEA shall be given the opportunity to be represented at:
   1. any formal discussion between one or more representatives of DoDEA and one or more employees in the unit, or their representatives, concerning any grievance or any personnel policy or practices or other general conditions of employment.
   2. any examination of an employee in the unit by a representative of DoDEA in connection with an investigation, if:
      a. the employee reasonably believes that the examination may result in disciplinary action against the employee; and
      b. the employee requests representation.

B. DoDEA shall annually inform unit employees of their rights as indicated in Section 2.A(2).

C. DoDEA shall provide the FRS a brief period at the end of each faculty meeting to make announcements, subject to the following restrictions:
   1. no internal FEA business shall be conducted;
   2. meeting does not interfere with the instructional day; and
   3. members of the faculty are free to leave at the end of the faculty meeting.

D. Employees who are released from duty without pay to represent the Association shall retain entitlement to all allowances and benefits to the extent provided by law or government-wide regulations.

E. Upon request, the Agency may provide Association Representatives who are unit employees of DoDEA with appropriate permissive Government Travel Orders for the purpose of conducting representational duties.

10

**Section 3. Employee Rights**

A. Each employee shall have the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal, and such employee shall be protected in the exercise of such right. This also includes the right to act for a labor organization and, in that capacity, present the views of the Association to the Agency.

Neither the Agency nor the Association shall interfere with, restrain, coerce, or discriminate against employees in the bargaining unit for exercising their rights under the Federal Service Labor-Management Relations Statute. The Agency shall not encourage or discourage membership in the Association.

The Agency also agrees that no Association representative shall be subject to reprisal in the form of lowering of performance ratings or imposition of disciplinary action for engaging in protected Association activities. Furthermore, the Agency shall not solicit employees to run for Association office or otherwise interfere with election of Association representatives.

B. Each unit employee has the right to request official time to seek assistance from their Association Representative when requested and approved in advance.

C. Personnel Files
   1. The Agency shall establish, maintain, and retain unit employees' personnel records only in accordance with law, regulations, and this Agreement. To the extent permitted under the Privacy Act, unit employees and/or their designated representatives shall have access to records contained in their personnel file(s) and further, shall be entitled to make a copy of any or all material contained therein.
   2. Material relating to a unit employee's conduct, service, character, or personality that is to be placed in the employee's personnel file(s) shall be first shown to the employee. The unit employee shall acknowledge that the employee has seen such material by affixing the employee's signature to the document to be filed with the understanding that the signature merely signifies that the employee has been shown the material and does not indicate agreement with its contents. Further, the employee shall have the right to request removal or amendment of objectionable material and to attach a written response to the material to be placed in said file.
   3. Records of admonishment, letters of caution, warning, reprimand, and similar non- adverse action documents shall not be used against the unit employee unless a disciplinary, administrative, or judicial proceeding has been instituted within one (1) year from the time of the initial action provided it is of a similar nature.
   4. In the event that a unit employee's pay is not received on the established pay day, upon the unit employee's request, the Agency will request from the servicing finance office  that a replacement salary be issued as soon as possible.

11

JA131

Unit employees are encouraged to maintain official documents they receive related to pay and leave and to carry such documents with them when they are transferred or reassigned. When the finance records of a unit employee are lost, destroyed, or delayed in conjunction with a reassignment or transfer, the Agency agrees to accept the unit employee's most recent "Earnings and Leave" statement or Standard Form 50, Notification of Personnel Action, as evidence of the proper basis for payment until the actual pay records have been reconstructed or received.

E. If a unit employee is to be served with a warrant or subpoena or is to be interviewed in connection with an investigation while at school in the performance of assigned duties, and the Agency has advance notice, the Agency shall make every reasonable effort to ensure that such activity is done in private without the knowledge of other employees or students.

F. The Agency shall make reasonable efforts to ensure that unit employees have privacy on the school site for making necessary telephone calls to parents of students, personnel offices, military offices, and other Agency officials.

G. A unit employee is free to set the effective date of their resignation/retirement consistent with law and regulation.

H. The biweekly base pay for unit employees will be the appropriate school year salary divided by the number of pay periods, normally 21 or 26, in the school year. The biweekly base pay will be reduced by the daily rate, 1/190th of the school year salary, for each day of absence in a non-pay status occurring on a workday within a pay period.

**Section 4. Management Rights**

A. Nothing in this Agreement shall affect the authority of any management official of the Agency -
   1. to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and
   2. in accordance with applicable laws –
      a. to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade, or pay, or take other disciplinary action against such employees;
      b. to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
      c. with respect to filling positions, to make selections for appointments from –
         i. among properly ranked and certified candidates for promotion; or
         ii. any other appropriate source; and
      d. to take whatever actions may be necessary to carry out the agency mission during emergencies.

B. Nothing in this section shall preclude the Agency and the Association from negotiating –

12

JA132

ARTICLE 5 – OFFICIAL TIME

**Section 1. General**

This Article sets forth the Association representatives who shall be granted official time and the amount of official time they shall be granted to perform representational duties. The number of Association representatives and the official time used by each, as defined by this Agreement, shall be reasonable, necessary and in the public interest.

**Section 2. Faculty Representative Spokespersons**

The Faculty Representative Spokesperson (FRS) at each school shall be entitled to a reasonable amount of official time to perform their official representational duties for the school in accordance with the following:

Elementary and secondary schools with less than ten (10) unit employees may be entitled to an amount of official time that the Principal and the FRS agree is reasonable, necessary and in the public interest.

Elementary and secondary schools with eleven to twenty-five (11-25) unit employees are authorized five (5) days per school year.

Elementary schools with twenty-six plus (26+) unit employees are authorized nine (9) days per school year.

In order to minimize disruption to the education program, the use of official time specified above, if not regularly scheduled, shall be requested in advance, normally three (3) workdays. Such requests shall be in writing and shall be granted absent compelling circumstances.

Secondary schools with twenty-six plus (26+) unit employees are authorized one (1) instruction-free period per day.

When the FRS at an elementary or secondary school in the Association's bargaining unit is not a classroom educator, they will receive the equivalent time to an FRS at a school with a comparable number of unit employees.

Subject to mutual agreement and in lieu of official time provided herein, the Parties at the local level may enter into alternative arrangements equal to the above entitlements.

17

**Section 3. National Officer, Area-level, and District Level**

A.  The National Officer, Area-level and District-level representatives shall be granted official time for the purpose of conducting labor management business as set forth below:

> FEA President: Full-Time official time
>
> Two (2) Area Representatives: Half-Time official time/Half-Time LWOP
>
> Six (6) District Representatives: Half-Time official time/Half-Time Duty

A.  The official time in section 3A for the Six (6) FEA District-level Representatives will be used as follows: three (3) Local Presidents in the Pacific Area and three (3) District Representatives in Europe. The Association will provide an annual notice to management identifying all of the individuals holding the positions in Section 3A.

**Section 4. Procedures for the Use of Official Time**

When an Association representative leaves their work site for the purpose of meeting with a unit employee(s) at another work site, the representative shall notify their supervisor prior to leaving and shall notify the supervisor in the unit employee's work site prior to meeting with said employee to work out the necessary arrangements.

The Association representative shall promptly report to the appropriate Agency representative the amount of official time used.

**Section 5. Training.**

The Association shall be entitled to one (1) full workday during the first school year of this Agreement to participate in joint training with the Agency with Association representatives listed in sections 2 and 3, concerning labor-management relations and this Agreement.

18

**[SAMPLE]**
**Request for Official Time**

To (Supervisor): _____

I hereby request _____hour(s) of official time for representational duties or training pursuant to Article 5, Section _____.

Representational duties to be performed are (Check Applicable):

☐ (DAI OHO Code = BA)    Term Negotiations

☐ (DAI OHO Code = BB)    Mid-Term Negotiations

☐ (DAI OHO Code = BK)    Dispute Resolution proceedings before FLRA during time employee would normally be in a duty status

☐ (DAI OHO Code = BD)    For all activities not covered in BA, BB or BK, such as: Employee initiated grievance, appearing as a witness in any grievance proceeding, Preparing for term or mid-term bargaining, formal meetings, or other union representational activities.

Date(s) requested:

_____
Date of request                              Unit Employee and Association Title


_____                     _____
Approved _____    Disapproved_____


                                           _____
                                           Supervisor

19

JA135

ARTICLE 7 – NEGOTIATIONS OVER PROPOSED CHANGES IN

CONDITIONS OF EMPLOYMENT OR POLICIES

**Section 1. General**

A. It is understood that this Agreement or other agreements reached at the National level are controlling and no agreements reached at the Region or local level shall amend or otherwise conflict with this Agreement.

B. The Association shall be entitled to representation in accordance with 5 U.S.C. 7131(a).

C. If either Party disagrees as to whether a subject matter or particular proposal is negotiable or is covered by this Agreement or another agreement at the National level, or that a proposal conflicts with the terms of this Agreement or other agreements at the National level, or if impasse is reached, the matter shall be resolved as provided by law or this Agreement.

D. Proposed Management changes which fall within the scope of bargaining shall not be implemented until agreement is reached with the Association unless the Agency is allowed to do so by applicable law, FLRA case decisions, or rules and regulations of appropriate authorities. Required implementation shall not waive the right of the Association to negotiate over the impact and implementation of such required changes.

**Section 2. National/Regional Level/District.**

A. Matters appropriate for negotiations at the National level concern conditions of employment affecting unit employees which fall within the scope of bargaining.

B. Matters appropriate for negotiations at the Region/District level concern conditions of employment which fall within the scope of bargaining, and which are unique to a Region or District.

C. The Agency shall notify the Association, in writing, of proposed changes in conditions of employment including a cover sheet briefly listing and explaining the changes being made ("Notice"). If the Association wishes to negotiate over the proposed changes, it shall notify the Agency and submit proposals, in writing, within twenty-five (25) days following receipt of the Notice. If advanced notification of the change cannot occur, the Parties agree to expedite the process. Only those proposals directly related to the proposed changes, and not otherwise beyond

21

the scope of the proposed changes, shall be subject to negotiations. Upon receipt of the Association proposals, negotiations shall be promptly scheduled and held.

D. Not more than once every six (6) months the Association may provide such proposals, which deal with matters not covered by the negotiations which led to this Agreement, to the Agency. If the Agency wishes to submit counterproposals, it shall submit written proposals to the Association within twenty-five (25) days following receipt of the Association proposals. Upon receipt of the Agency's proposals, negotiations shall be promptly scheduled and held.

E. National level bargaining will be held promptly at a mutually agreeable location in the Washington, D.C. metropolitan area unless otherwise agreed by the Parties. To the greatest extent possible, Region or District level bargaining will be promptly scheduled and accomplished in such a manner so as to minimize the need for travel. Bargaining may be accomplished by person-to-person meetings, telephone, electronic mail, video teleconferencing or other appropriate means.

**Section 3. Local Level.**

A. The Parties agree that at the school level, matters appropriate for discussion (personnel policy or practices or other general conditions of employment) are best resolved on an informal basis.

B. Such matters arising at the school level that fall within the scope of bargaining may be negotiated at the National, Region, or District level, provided a reasonable amount of time has been allowed at the local level to informally resolve such matters. The Parties agree that the Agency and the Facility Representative Spokesperson, upon request, shall meet to consult on such matters at reasonable times as may be necessary. In the event the matter is not resolved at the school level, the Association may submit written proposals to the Agency at the Region level within a reasonable time.

ARTICLE 8 – DIVERSITY, EQUITY, and INCLUSION (DEI)

**Section 1. DEI Policy**

The Agency and the Association affirm their commitment to promoting the principles of diversity, equity, and inclusion (DEI) in the bargaining unit. The Parties agree to cooperate to cultivate a diverse and inclusive workforce with equal accessibility to opportunities, resources, and support. The Parties agree to cooperate to promote diversity, equity, inclusion, and accessibility, defined as follows:

22

their worldwide location preferences, they will be considered for any vacant positions worldwide. (Except Cuba- *See* General Excessing Process, Article 10, Section 3.A.4)

F. In accordance with Section 3.A.7 above, the Agency may offer VERA and/or VSIP to employees in order to place excess employees remaining after the worldwide process is complete.

G. Request for Reconsideration

    1. Employees may request reconsideration if:

        a. they are placed in a vacancy and teaching category for which they have never taught or did not request in accordance with Section 3.A.8 above; or

        b. they are assigned a position outside their District and a subsequent vacancy for which they are qualified becomes available within their District.

    2. Employees assigned vacancies related to an Agency-approved VERA or VSIP are not eligible for reconsideration.

    3. Request for reconsideration must be submitted to the designated human resources office within seven (7) calendar days of being assigned a vacancy.

    4. Reconsideration request will be considered for twenty-one (21) calendar days from date request was submitted by the employee.

    5. Reconsideration determinations are at the sole discretion of the Agency.

H. NTEs.
After the reconsideration period for permanent employees, NTE employees impacted by excessing will be considered for placement for remaining vacancies within their commuting area prior to the vacancies being filled by new local/CONUS applicants. Placement will be considered by SCD until the end of the school year.

ARTICLE 11 – REDUCTION IN FORCE

## Section 1. Definitions

A Reduction in Force (RIF) is the systematic way of making organizational changes that provides retention preference on the basis of tenure, veteran preference, length of service and performance. Definitions of terms in this Article are as provided for in 5 C.F.R. 351.203. A RIF occurs whenever a competing employee is released from their competitive level by furlough for more than thirty (30) days, separation, demotion, or reassignment requiring displacement because of:

30

a. Lack of work;

b. Shortage of funds;

c. Insufficient personnel ceilings;

d. Reorganization;

e. The exercise of reemployment or restoration rights;

f. The reclassification of an employee's position due to the erosion of duties when such action will take effect after the formal announcement of a RIF in the competitive area and the RIF will take effect within one-hundred and eighty (180) days; or

g. Transfer of function.

## Section 2. Exclusions

Actions excluded from RIF procedures are as provided for in 5 C.F.R. 351.202(c).

## Section 3. Notification to Association

When it is determined that there is a need for a RIF, the Agency shall notify the Association as soon as possible, but no later than sixty (60) calendar days prior to the scheduled effective date of the RIF. Such notice shall include the following information:

1. Reasons for the RIF;

2. Number and types of positions to be affected;

3. Names of employees to be affected by RIF when available.

It is understood that the above information may change during the sixty (60) calendar day period.

## Section 4. Notification to Bargaining Unit Members

Once it has been determined that a RIF is required, bargaining unit employees who will be affected by RIF actions will be given specific notice at least sixty (60) calendar days prior to the effective date of the RIF. Such notice shall contain the following information required per 5 C.F.R. 351.802:

1. action to be taken;

2. reasons for the action;

3. personal information used to determine the action;

4. effective date of action;

5. entitlements and benefits;

6. place where affected employees and their representatives may inspect retention registers and related records pertaining to the action; and

7. employee appeal rights.

It is understood that the above information may change during the sixty (60) calendar day period.

31

**Section 5. - Competitive Area**

Competitive Area for any RIF shall be defined as all employees in the District.

**Section 6. Competitive Levels**

Competitive levels shall be established in accordance with 5 C.F.R. 351.403 consisting of all the positions in a competitive area that are in the same pay plan, at the same grade equivalency or occupational level; are in the same classification series, position category and certification and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an incumbent of one position can be reassigned to another position without undue interruption. Separate competitive levels will be issued by type of service (competitive or excepted), by appointment authority, by pay schedule, and by work schedule.

**Section 7. Retention Registers/Retention Priority**

When determination is made to conduct a reduction in force, competing employees will be listed on a retention register in accordance with 5 C.F.R. 351.501 and 502 as follows:

1. Tenure Group. Tenure group I is first, followed by tenure group II, and then tenure group III;
2. Within Tenure group, by Veteran's Preference subgroups. Subgroup AD is first, followed by subgroup A, and then subgroup B;and
3. Within each subgroup, by years of service which includes performance credit. The employee with the earliest service date is entered first.

The retention register will be prepared from current retention records of employees. To provide adequate time to determine employee retention standing, only that information that is available at least ninety (90) calendar days prior to the scheduled issuance of RIF notices may be used, except to correct errors in the record that are discovered prior to the effective date of the RIF.

A. Tenure of employment. Competing employees shall be classified on a retention register as Group I (includes each permanent employee whose appointment carries no restrictions or conditions such as conditional, indefinite, specific time limit, or trial period), Group II (includes each employee serving a trial period or whose tenure is equivalent to a career-conditional appointment in the competitive service), and Group III (includes each employee whose tenure is indefinite or has a time limitation).

B. Veteran preference. Within each tenure group described in Section 7.a. above, competing employees shall be classified on the retention register based upon veteran preference in accordance with the priority order of retention factors established by the Secretary above as Subgroup AD (preference eligible who have a service-connected disability of thirty (30) percent or more); Subgroup A (preference eligible employees not included in subgroup AD), or Subgroup B (non- preference eligible employees).

32

C. Length of service. Each competing employee's length of service shall be established in accordance with 5 C.F.R. 351.503.

D. Competing employees shall be released from competitive levels in the inverse order of retention standing, beginning with the employee with the lowest retention standing on the retention register. A competing employee may not be released from a competitive level while retaining in that level an employee with lower retention standing except as provided for in 5 C.F.R. 351.601.

## Section 8. Placement Considerations

In order to minimize the impact of a RIF, consideration will be given to:

a. Filling existing vacancies by the placement of qualified employees who are adversely affected by the RIF.

b. Terminating temporary appointments of individuals in unaffected competitive levels to create placement opportunities for qualified permanent employees (Group I or Group II employees) who are scheduled for separation under RIF procedures.

## Section 9. Salary Retention Provisions

Pay retention, in accordance with Article 23 of this Agreement, shall be provided to bargaining unit employees who are demoted to a lower graded/paid position within DoDEA. A bargaining unit employee who is demoted and on retained grade and/or pay shall receive priority consideration for re-promotion to positions up to and including the grade/pay level from which demoted.

## Section 10. Severance Pay

Severance pay shall be paid in accordance with subpart G of 5 C.F.R. Part 550.

## Section 11. Assistance to Employees

The Agency may provide job placement or other services to unit employees adversely affected by a RIF, in accordance with applicable law and government-wide regulations.

## Section 12. Reemployment Priority List

The Agency shall establish and maintain a reemployment priority list (RPL) for bargaining unit employees separated due to RIF. Eligibility shall be determined by seniority of SCD. It is the Agency's policy that if there are not qualified part-time employees on the RPL for a

33

particular part-time position, full-time employees who have indicated availability for part-time work shall be placed if qualified and interested. Eligible employees will be registered on the RPLs for a maximum of two (2) years. If an employee declines a valid job offer, their name will be removed from the RPL. If a full-time permanent employee accepts permanent part-time employment, it will be considered a valid job offer; and the employee's name will be removed from the RPL. Acceptance of a temporary appointment will not alter a permanent employee's right to be offered permanent employment. (i.e., the employee's name will remain on the RPL).

**Section 13.**

Unit employees who are reassigned outside the commuting area by the Agency's actions under this Article shall be provided travel and transportation allowances in accordance with applicable regulations.

**Section 14.**

The determination as to whether or not to fill a vacancy shall be solely within the discretion of the Agency. The Agency reserves the right to determine the qualifications for vacant positions.


ARTICLE 12 – GRIEVANCE PROCEDURE


**Section 1. Generally**

The negotiated grievance procedure is established to provide unit employees with an opportunity to raise matters of concern or dissatisfaction for informal and, where appropriate, formal consideration and resolution.

This Article also provides the two Parties to this Agreement with an opportunity to raise matters of concern or dissatisfaction for formal consideration by the other Party in accordance with Section 2 below. It is the intent of the Parties to resolve grievances informally at the earliest possible time, and at the lowest possible level.

The filing of a grievance shall not be construed as reflecting unfavorably on an employee's good standing, performance, loyalty, or desirability to the organization, nor shall it be regarded as an unfavorable reflection upon the Agency or particular Agency officials.

34

**Section 2. Applicability**

A. This procedure applies to unit employees and shall be the exclusive procedure for resolving grievances that fall within its coverage.

B. A grievance means any complaint:

    1. by a unit employee concerning any matter relating to the employment of the employee;

    2. by the Association concerning any matter relating to the employment of any unit employee(s): or

    3. by a unit employee, the Association, or the Agency concerning:

        a. the effect or interpretation or a claim of breach of the Collective Bargaining Agreement; or

        b. any claimed violation, misinterpretation of any law, rule, or regulation affecting conditions of employment.

C. This procedure shall not apply to any grievance concerning:

    1. any claimed violation of Subchapter III of Chapter 73, Title 5 U.S.C. (relating to prohibited political activities);
    2. retirement, life insurance, or health insurance;
    3. a suspension or removal under Section 7532 of Title 5 U.S.C.;
    4. any examination, certification, or appointment;
    5. the classification of any position which does not result in the reduction in grade or pay of an employee;
    6. an advance notice as provided in Articles 13 and 14;
    7. termination of trial period employees;
    8. termination or expiration of temporary appointments;
    9. non-selection for promotion or transfer from lists of properly ranked eligible; and
    10. oral admonishments.

**Section 3. Types of Grievances**

A. Individual Grievance – It is understood that the Association may present a grievance on behalf of an individual unit employee. However, a unit employee may present a grievance on their own behalf under this procedure, provided that the Association is given the opportunity to be present during the grievance proceeding. The Agency shall send the Association District-level Representative where the employee is assigned a copy of the grievance within one (1) week of filing. Any resolution reached with the unit employee shall be consistent with the terms of this Agreement and a copy of the resolution shall be provided to the Association at the same time as it is provided to the employee. If the employee is represented by the Association, a copy of the resolution will be provided to the designated Association Representative for the employee.

35

An employee's claim may be addressed through only one type of grievance. Once the concern is resolved (e.g., remedy granted, matter dismissed by an arbitrator, matter no longer timely or greeable), it cannot be refiled (even under a different category of grievance). An Individual Grievance may be withdrawn unilaterally by the grievant or Association Representative in order to consolidate it with a Group Grievance if done before the issuance of a written grievance response/decision by DoDEA. After DoDEA has issued a written response/decision, the Parties at the Region level may mutually agree to consolidate it with a Group Grievance.

B. Group Grievance - One grievance filed on behalf of a group of employees, where the alleged violation involves more than one employee on the same issue. When the group is not represented by the Association, all unit employees electing to join in the grievance must be identified and must sign the grievance at the time it is put in writing. When the group is represented by the Association, the Association will have a representative sample of the group to sign the grievance at the time it is put into writing. There will be only one (1) Association representative for the group, if they choose to be represented by the Association. If the group chooses not to be represented by the Association, the Association will be given an opportunity to be present during the grievance proceeding and the Agency shall send the appropriate District-level Association Representative a copy of the grievance within one (1) week of filing and copy of any grievance decision at the same time it is provided to the group members. The final grievance decision will apply to all members of the group and each member of the group shall receive one (1) copy of the final decision. If the group is represented by the Association, the designated Association Representative will receive a copy of the grievance decision for the group.

C. Association Grievance – The Association may file a grievance in accordance with Section 2.B of this Article.

D. Agency Grievance – The Agency may file a grievance in accordance with Section 2.B of this Article.

### Section 4. Individual and Group Grievances

**Step 1. – Informal**
The Parties agree that informal resolution of unit employees' grievances is desirable. To this end, unit employee(s) and/or their Association representative(s) should present any grievance informally to the supervisor prior to reducing a grievance to writing. Such informal presentation should take place within seven (7) calendar days of the act or incident giving rise to the grievance. The supervisor /or designee should arrange for a meeting within five (5) calendar days of the informal presentation of the grievance to fully discuss the matter and to attempt informal resolution.

**Step 2. – Formal**
A. Notwithstanding the provisions of Step 1 above, the unit employee or the Association

36

representative must present the grievance, in writing, to the appropriate supervisor within fifteen (15) calendar days of the act or incident giving rise to the grievance. The grievance shall be in the format described at the end of this Article.

B.1. The Principal or designee shall issue a written decision within seven (7) calendar days from the date the written grievance was received by the Principal. Such decision shall be transmitted to the grievance and the Association representative.

B.2. The grievant or their Association representative shall have ten (10) calendar days after the receipt of the Principal's or designee's written decision to advance the grievance to the next level. If the grievant has not received a written decision from the Principal or designee within the seven (7) calendar days heretofore referred to, then the grievant or the Association representative may advance the grievance to Step Three of this procedure within ten (10) calendar days after the seven (7) calendar day period has elapsed.

## Step 3. – Review

A. When the grievance has not been resolved at Step 2, the grievant or their Association representative may submit their grievance to the Principal or designee within ten (10) calendar days from the date they received the Principal's or designee's written decision. In addition to the information submitted under Step 2, the grievant must include a statement as to why the Principal's or designee's decision is unacceptable. Within two (2) working days following receipt of the Step 3 grievance, the Principal or designee shall forward the grievance and a copy of their Step 2 decision to the DoDEA Region Executive or designee, with a copy of the forwarding letter to the grievant or Association Representative.

B. Upon receipt of the grievance for consideration at the Region office, the Region review will be completed, and a final decision rendered within twenty (20) days from its receipt. Such decision shall be in writing and set forth the reasons for the decision. The written decision shall be immediately transmitted to the grievant or the Association representative. A complete copy of the case file shall be immediately transmitted to the appropriate FEA Area Director or Designee. In the Pacific Region, the case file will be transmitted to the FEA Pacific Uniserv Director and the FEA Pacific Area Director or Designee. Actual costs of copying and transmittal to the FEA Pacific Area Director shall be paid by the Association.

## Section 5. Association and Agency Grievance Process

A. Association or Agency grievances may be filed only at the National level by the respective officials at the National level.

B. Association or Agency grievances arising over the interpretation and application of this Agreement that are not related to a specific incident or occurrence may be filed at any time.

37

C. An Association grievance under Article 12, Section 2B (2) or (3) that relates to a specific incident or occurrence, must be filed within forty-five (45) calendar days after the incident or occurrence giving rise to the grievance.

An Agency grievance arising under Article 12, Section 2B (3), that relates to a specific incident or occurrence must be filed within forty-five (45) calendar days after the incident or occurrence giving rise to the grievance.

D. Upon receipt of an Association or Agency grievance, the Association or Agency, as appropriate, shall review, investigate, and furnish a written final decision within thirty (30) calendar days.

E. Grievances filed under this Section must contain sufficiently detailed information for the responding Party to have a reasonable opportunity to resolve the dispute. Grievants are encouraged to use the Grievance Form, modified as appropriate.

F. Should the Association's or Agency's final decision not be satisfactory, arbitration may be invoked by the appropriate Party.

**Section 6. Arbitration**

A. Should either the Agency or the Association be dissatisfied with the final decision of the other Party in a grievance covered by this Agreement, the Party (Association or Agency) that brought the grievance may proceed to arbitration.

B. Arbitration may be invoked either electronically through the Federal Mediation and Conciliation Service's (FMCS) Online Arbitration System or by the submission of the appropriate FMCS form by the grieving Party to the other Party. The invocation must be made within thirty (30) calendar days after the date the final decision was either due from the responding Party, or was received by the grieving Party, whichever is earlier. Each Party will notify the other the name and contact information of the official the FMCS form should be sent to. Not later than five (5) days after the earlier of receipt or due date, the FMCS form shall be forwarded to the FMCS for referral of an arbitration panel.

C. Normally, within five (5) calendar days after receipt of an FMCS referral, the Party who invoked arbitration ("moving Party") shall contact the other Party to schedule a mutually agreeable time for arbitrator selection. Unless mutually agreed otherwise, the FMCS will be requested to provide a list of seven (7) arbitrators who will be attorneys with practices within the Washington, DC metropolitan area with Federal sector arbitration experience and members of the FMCS or American Arbitration Association panels and the National Academy of Arbitrators.

38

The Parties will select an arbitrator by alternately striking names from the referral with the name of the last arbitrator becoming the selection. The moving Party shall strike the first name. Absent mutual agreement, arbitrator selection must be completed within twenty (20) calendar days after the Parties' receipt of the panel from the FMCS.

The FMCS shall be empowered to make a direct designation of an arbitrator to hear the case in the event:

      1. Either Party refuses to participate in the selection of an arbitrator; or

      2. Upon inaction or undue delay by either Party.

D. With the consent of both Parties, more than one arbitration case may be consolidated for review by the same arbitrator. Any hearing for cases that arise under this Agreement (or was invoked under the prior CBA, but is still pending scheduling) that are not scheduled within twelve (12) months from the date of invocation (or, for the prior-CBA cases, not scheduled within 12 months from the effective date of this Agreement) will be considered withdrawn. The hearing may be held beyond the twelve (12) month window provided the hearing was scheduled within twelve (12) months of invocation., the twelve (12) month timeframe was extended by mutual agreement, or the moving Party can demonstrate they exercised due diligence in attempting to schedule within the 12 months.

E. If the Parties fail to agree on a joint submission of the issue for arbitration, each shall submit a separate submission and the arbitrator shall determine the issue(s) to be heard. A conference call with the arbitrator will be held in order to raise threshold issues and set briefing schedules when hearings are bifurcated, submit stipulations of facts, etc. If either Party declares a grievance non-arbitrable or non-grievable, the merits portion of the grievance will be placed in abeyance and the arbitrator will issue a decision on the threshold issue of grievability and/or arbitrability. However, the Parties may mutually agree to request that the arbitrator conduct a joint hearing on grievability/arbitrability and the merits rather than bifurcate the hearing.

F. The arbitration hearing for an Individual or Group grievance will normally be at the school site, unless the Agency decides otherwise. The arbitration hearing for an Association and Agency grievance will normally be rotated between NEA Headquarters and DoDEA Headquarters or a mutually agreed upon third party location, with witnesses not from DoDEA Headquarters participating by video or teleconference, if practical and acceptable to the Arbitrator.
The Party invoking arbitration will have the burden of proof and will present its case first, except in disciplinary actions in which case the Agency will present its case first, unless the burden of proof is established by law or government-wide regulation. If the parties are not able to reach mutual agreement on the burden of proof in mixed cases (i.e., cases that include both discipline

39

and non-discipline matters), the matter will be decided by the arbitrator selected to hear the case after considering arguments form the Parties.

G. All unit employees who are witnesses in the hearing shall be in a duty status.

H. The arbitrator shall be requested to render their decision as quickly as possible, but in any event not later than thirty (30) calendar days after the conclusion of the hearing or submission of post-hearing briefs, whichever occurs later, unless the Parties mutually agree to extend the time limit.

I. The arbitrator's authority will be limited only to the issue involved, subject to section 6. E of this Article. The arbitrator's award will be binding on both Parties unless an exception to the award is filed in accordance with the Federal Service Labor-Management Relations Statute.

J. Upon mutual consent of the Parties, any dispute over the application of an arbitrator's award shall be remanded to the arbitrator for settlement.

K. The Association and the Agency may mutually agree regarding any particular arbitration case to use a "mini-arbitration" procedure or make any other modification in the arbitration process which would reduce the cost of arbitration.

L. The cost for arbitration shall be borne equally by the Association and the Agency. Arbitration costs will include the fee, travel and per diem for the arbitrator, and the costs of the transcript of the hearing where mutual agreement was reached on sharing said costs or where the arbitrator requests a transcript. It is further agreed that if one Party obtains a transcript at its own cost, the other Party shall not be entitled to receive or obtain said transcript or a copy thereof unless it is provided to the arbitrator.

M. Upon mutual consent of the Parties, the grievance case file and current Agreement may be sent to the arbitrator.

N. Copies of all documents, including a certificate of service, filed with the arbitrator at any stage of the arbitration proceeding will be simultaneously served on the other Party.

**Section 7. General Provisions**

A. Time Limits

    1. To be considered timely under the procedure, Individual or Group grievances resulting from a one- time act or decision must be presented within fifteen (15) calendar days after the grievant knew or should have known about the act or specific incident giving rise to

40

the individual or group grievance. Similarly, to be considered timely, those Association or Agency grievances resulting from a one-time act or specific incident must be presented within forty-five (45) calendar days after the Association or Agency (as appropriate) knew or should have known about the act or specific incident giving rise to Association or Agency grievances. Those grievances resulting from continuing conditions may be presented at any time.

2. All time limits in this procedure may be extended in writing by mutual consent of the Parties.

3. Failure of the responding Party to observe the time limits shall entitle the moving Party to advance the grievance to the next step if the moving Party chooses to move the grievance. The failure of the moving Party to present a grievance or move a grievance to the next step after receiving a response within the prescribed time limits of this Article, including arbitration, shall be considered as a waiver of the grievance and issue(s) grieved. In such cases, grievances shall be closed absent written mutual Agreement between the Parties at the National level to continue processing the grievance.

B. Nothing in this Agreement shall prevent the Parties from mutually resolving grievances which have been dismissed due to untimely filing or which are not covered under the scope of the grievance procedure.

C. A grievance shall be cancelled upon the death of the unit employee, or upon their separation for reasons not connected with the grievance, provided there is no question of pay involved or other relief that could be granted to the unit employee or the employee's estate.

D. Under 5 U.S.C. 7116 and 5 U.S.C. 7121, unit employees may raise certain matters under this negotiated grievance procedure or under a statutory procedure, but not both. For purposes of this Article, the unit employee or their representative shall be deemed to have exercised their option as to procedure when a timely grievance under this procedure is filed or a charge, appeal, or complaint under the applicable statutory procedure is initiated, whichever event occurs first.

E. A unit employee may challenge a rating of Fully Successful or commendable (or equivalent ratings) under this grievance procedure, except that such challenge shall not be subject to the arbitration provisions set forth in section 6 of this Article.

F. Nothing in this Agreement shall prevent the Parties from discussing and attempting resolution of issues once a grievance has been filed under the grievance procedure.

41

**Section 8. Attorney Fees**

Disputes over attorney fees will be resolved by the arbitrator who heard the underlying grievance unless the Parties mutually agree otherwise.

The Association will present a petition for fees to the Agency no later than thirty (30) calendar days after the grievance arbitration decision becomes final and binding, i.e., no further challenge, clarification, etc. is available. If no agreement is reached voluntarily between the Parties within thirty (30) days of the Agency receiving the petition, the Association will forward the petition to the arbitrator for resolution no later than ninety (90) days after the decision became final and binding.

42

**GRIEVANCE FORMAT**

Date:

Addressed to: Principal's Name and Official Mailing Address

Subject: Employee Grievance Initiated Under the FEA/DoDEA Negotiated Agreement.

Paragraph 1: This grievance is being submitted under Step 2 of the grievance procedure.

Paragraph 2: Employee's name, duty assignment, work, and home telephone numbers.

Paragraph 3: A narrative description of the grievance including (if known) date, time, and place of event being grieved.

Paragraph 4: A statement of the relief sought (what must DoDEA do to resolve your complaint).

Paragraph 5: The name, address, and telephone number of the employee's Association representative, if used.

(Note: An employee, under the terms of the Agreement, can only be represented by the Association. An employee who does not elect to be represented by the Association must represent himself/herself. If an employee has chosen not to be represented by the Association, a statement to this effect shall be included in Paragraph 6 of the grievance letter.)

Paragraph 6: A copy of any documents that support the grievance allegations.

_____

Employee or Association Representative Signature

43

**Section 9.**

If schools enter a remote learning environment, unit employees may request to work from home as an alternate work location. If approved, unit employees may request to sign out technology and Management will make reasonable efforts to allow technology to be signed out to perform work related activities.

ARTICLE 16 – USE OF OFFICIAL FACILITIES

**Section 1.**

The Agency shall provide the Association in each school with a mailbox, where available, and/or a distribution box identified for the exclusive use of the Association. Mail received at the school specifically addressed to the Association shall be deposited in the appropriate box. The Agency will lend assistance to the FRS in acquiring an Association mailbox at the installation military post office, if available.

**Section 2.**

The Association, as the certified representative of unit members, shall have access to school internal distribution boxes for the distribution of Association (Union) literature to unit employees.

Literature relating to the internal business of the Association (including the solicitation of membership, elections of Association officials, and collection of dues) shall only be distributed during the time the employee is in a non-duty status.

**Section 3.**

The Agency shall ensure that the FRS is provided reserved parking near their working area in the same manner as the school supervisor when not prohibited by the Installation Commander.

If there is a lack of parking for all employees at the school, the Agency shall make a reasonable effort to work with the installation to locate additional parking near the school for employees.

**Section 4.**

The Agency shall provide the Association an area not to exceed 6' x 8' in a location in the school building convenient to a majority of the unit employees for posting Association material. Such area shall be for the exclusive use of the Association.

51

**Section 5.**

Upon request of the Association, the use of school facilities, equipment, and/or services not specifically mentioned in this Agreement shall be subject to consultations at the school level. The use of such facilities, equipment and/or services shall normally be provided when the Agency determines the following conditions are met:

A. The use of facilities, equipment, and/or services will promote effective Labor-Management dealings;
B. No additional identifiable costs to the Agency will be incurred;
C. The use of such facilities, equipment and/or services will not degrade or interfere with the educational process or interfere with the administration of the school office;
D. The use of such facilities, equipment and/or services will not violate policies and/or regulations of the host Military Department/Installation, and other applicable regulations of higher authority.

Once approved, the use of such facilities, equipment, and/or services shall be subject to the general control procedures established by the Agency. Violations of such general procedures may cause cancellation/suspension in the use of such facilities, equipment, and/or services.

**Section 6.**

Unit employees that are Association representatives will be authorized to utilize the Agency's official email system at all levels of the Association in order for the Association to provide representation to bargaining unit educators.

## ARTICLE 17 – COMMUNITY ENVIRONMENT

**Section 1.**

Each DoDEA school is encouraged to include a link on their school website to their host Military Command website.

**Section 2.**

The Agency encourages management at DoDEA schools and/or complexes to invite the Installation Commander and/or School Liaisons to meet the faculty as early in the school year as possible.

## ARTICLE 18 – EQUAL EMPLOYMENT OPPORTUNITY

52

In addition, if a unit employee who is asymptomatic but was exposed to illness at the worksite and is directed not to work or to stay in their quarters through a directive from the Agency, the unit employee may request Weather and Safety Leave (W&SL) until such time as the Agency permits or directs the unit employee to report back to work.

## ARTICLE 39 – DAMAGE OR LOSS OF PROPERTY

**Section 1.**

Unit employees shall make every reasonable effort to maintain security within the classroom to reduce theft.

**Section 2.**

A unit employee shall report in writing any loss, damage, or destruction of school property to the Agency upon becoming aware of such loss, damage, or destruction.

**Section 3.**

Unit employees will "sign in/sign out" for property and equipment and shall exercise reasonable care in safeguarding all property assigned.

## ARTICLE 40 – DUES WITHHOLDING

**Section 1.**

The Agency shall provide dues withholding for payment of Association dues for unit members in accordance with 5 U.S.C. 7115.

**Section 2.**

Allotments shall be effective on the second complete bi-weekly pay period in October of each school year. The amount of such allotments shall be the designated dues identified on each Standard Form 1187 initiated by a unit employee divided by 10 full pay periods unless mutually agreed otherwise between the Parties.

**Section 3.**

Unit members who enter the dues withholding agreement at a time when less than 10 full pay

87

periods remain in the school year shall have their dues prorated over the remaining full pay periods within the dues-withholding period.

An employee formally temporarily assigned to a position not included in the bargaining unit as supported by an SF-50 will not have dues withheld during that time and will have an automatic resumption of the dues withholding upon return to the bargaining unit.

**Section 4.**

Authorization for dues withholding with a SF 1187 will continue in full force and effect if a not to exceed (NTE) employee is given another excepted appointment in the bargaining unit prior to the expiration of the NTE appointment.

**Section 5.**

The appropriate finance office will notify the Association in writing of any requests which are not honored. A remittance will be prepared by the appropriate finance office at the close of each pay period for which deductions are made. These will be forwarded on the same pay schedule as for unit employees after the close of each pay period. The remittances will be sent to the appropriate Association account. Each remittance will be accompanied by a listing of names and amounts withheld. The list will also include the names of employees whose allotments have been temporarily or permanently stopped and the reasons therefore.

**Section 6.**

An employee may voluntarily revoke an allotment for the payment of dues by completing a SF 1188, Cancellation of Payroll Deductions for Labor Organization Dues.

**Section 7.**

A.    SF 1187 forms which are in effect on the date of this Agreement shall continue in force under this Article. Therefore, for those unit employees who have already authorized dues withholding under current negotiated Dues Withholding Agreements, SF 1187 forms need not be re-executed.

B.    Dues allotment will be terminated at the end of the pay period during which an employee member is separated, or permanently assigned to a position not included in the bargaining unit.

**Section 8.**

DoDEA shall make the Association whole for any dues lost through the dues-withholding process due to government error, as provided for by law. However, the Agency retains the right

88

to collect the full correct dues from employees, as provided by law. The Agency may also collect from the Association any overpayment of dues, as provided by law, in which case the Agency will provide the Association with a list by bargaining unit employee of the amount needed to be recovered prior to recovery actions.

## ARTICLE 41 – UNIT EMPLOYEE WORKDAY

**Section 1. Workday**

A. The school workday for unit employees, shall commence not more than twenty (20) minutes before and terminate not more than thirty (30) minutes after the instructional day.

B. In addition to the workday, in order to provide the highest quality educational programs practicable, unit employees will be required to be onsite outside those hours at times designated by the Agency to participate in, for example, Open House, parent-teacher conferences, public performances by students of plays, concerts, athletic events, other extra-curricular activities, etc. Administrators should normally provide as much advanced notice as possible of the events scheduled.

C. Unit employees are responsible for participation in parent-student conferences and will remain at the worksite to complete such conferences which commence prior to the end of the workday. This requirement pertains to conferences mutually scheduled between a unit member(s) and parent(s)/guardian(s).

**Section 2. Preparation**

A. Unit employees are expected to perform additional preparation and professional tasks necessary to the completion of their assigned work. This work may be performed either at the school site or elsewhere.

B. The Agency shall make reasonable efforts to provide a reasonable amount of preparation time for each unit employee during the employee's workday. For elementary school unit employees, a reasonable amount of time is approximately 225 minutes each week during the school year. For secondary school unit employees, a reasonable amount of time approximately two (2) periods in a cycle of seven (7) instructional periods, or the equivalent thereof, which will be built into the master schedule. Reductions in preparation time and other related issues due to shortened workdays/workweeks will be handled in accordance with past practice.

C. DoDEA shall make reasonable efforts to provide each unit employee with adequate preparation time during each workday of exams to prepare, administer, and grade required semester examinations.

89

If the Agency extends the school year to more than 190 days, including early return/late departure, the compensation at an employee's daily rate each additional day beyond 190 days shall be included in unit employee's base compensation for retirement purposes as required by applicable law, rule, and regulation.

**Section 2. Orientation Time at the Start of the School Year**

At the start of the school year, the Agency will provide unit educators with two (2) workdays during orientation time of uninterrupted time free of faculty meetings, trainings or like events to allow unit educators to prepare classrooms for the return of the students.

At the end of each school year, the Agency and the FRS at the school will consult on the orientation time schedule for the start of the next school year. Unit employees at each school will receive notice of the orientation time schedule for the next school year at least three (3) workdays before the last workday of the school year. Unit employees who are reassigned to a different school will be notified by the Agency of the orientation time schedule at their new school at least two (2) days before the last workday of the school year via the Agency's official email system.

**Section 3. Early Return Late Release**

If the Agency directs early return/late departure for unit educators, the pro-rated daily rate (i.e., half, or full day) based on the number of hours of work assigned will be received by unit educators for each workday worked in addition to their school year base pay.

In order to allow for unit employees to have sufficient time to adjust summer and/or RAT travel plans, the Agency will inform any unit employee who is directed to perform early return/late release for training or professional development with at least one hundred twenty (120) days prior notice before the end of the school year.

ARTICLE 48 – TRIAL PERIOD

Non-preference eligible employees are required to serve a two-calendar year trial period in accordance with applicable laws and regulations. Preference eligible employees as defined in 5 U.S.C. 2108 are required to serve a one calendar year trial period in accordance with applicable laws and regulations.

ARTICLE 49 – DURATION AND SUCCESSOR AGREEMENT

97

JA157

**Section 1. Effective Date and Successor Agreement**

This Agreement shall become effective on August 1, 2023. This Agreement shall remain in effect for an initial term of five (5) years following the effective date.

Either Party may give notice to the other not earlier than one hundred and five (105) days before or later than sixty (60) days prior to the anniversary date of this agreement. If neither Party serves notice of its intent to renegotiate this Agreement, the Agreement will be automatically renewed for one (1) year periods. The present Agreement will remain in effect during the renegotiation of the successor Agreement and until a new Agreement is effective.

**Section 2.**

When a negotiability appeal which arises out of the negotiations of this Agreement has been decided by the appropriate authority, upon request of the Association, the parties shall negotiate on negotiable issues raised in the negotiability appeals procedures within forty-five (45) days of the final decision. Agreements reached or settlements imposed shall become part of this Agreement.

**Section 3. Ground Rules for the Negotiation of the Successor Agreement**

The Parties will use the ground rules included in this Agreement as Appendix B for the negotiation of a successor to this Negotiated Agreement when notice is given in accordance with Section 1 of this Article.

**Section 4.**

All the bargaining, mediation, and renegotiation sessions shall take place in person unless there is a government shutdown or emergency DoDEA furlough, or a pandemic declared by the CDC, US Government, or equivalent government authorities in locations in which bargaining will take place. If a pandemic allows DoDEA to continue operations, the parties will arrange for virtual negotiations similar to the arrangements they made during the COVID-19 pandemic

98

JA158

# Exhibit 2

# MASTER LABOR AGREEMENT
# FOR
# PROFESSIONAL EMPLOYEES

## BETWEEN

# FEDERAL EDUCATION
# ASSOCIATION
# STATESIDE REGION
# (FEA-SR)

## AND

# DEPARTMENT OF DEFENSE
# DOMESTIC DEPENDENT
# ELEMENTARY
# AND SECONDARY SCHOOLS
# (DDESS)

**Effective:  January 11, 2019**

# FEA-SR / DDESS MASTER LABOR AGREEMENT

## INDEX

| ARTICLE | SUBJECT | PAGE |
|---|---|---|
| 1 | PREAMBLE | 1 |
| 2 | MISSION STATEMENT | 4 |
| 3 | RECOGNITION | 5 |
| 4 | CONDITIONS OF THE AGREEMENT | 7 |
| 5 | AGENCY RIGHTS | 10 |
| 6 | ASSOCIATION RIGHTS | 12 |
| 7 | BARGAINING RIGHTS AND REQUIREMENTS | 31 |
| 8 | EMPLOYEE RIGHTS | 40 |
| 9 | GENERAL ADMINISTRATION MATTERS | 51 |
| 10 | ASSOCIATION AND DDESS COOPERATION | 57 |
| 11 | HEALTH AND SAFETY | 60 |
| 12 | STUDENT DISCIPLINE | 68 |
| 13 | IDEA/IDEIA COMPLIANCE WITH SPECIAL EDUCATION REQUIREMENTS | 71 |
| 14 | PROFESSIONAL MATTERS | 75 |
| 15 | PERFORMANCE APPRAISAL SYSTEM | 78 |
| 16 | DUES ALLOTMENTS | 85 |
| 17 | ORIENTATION AND CERTIFICATION | 91 |
| 18 | HOURS OF WORK AND SCHEDULING | 94 |
| 19 | PROFESSIONAL DEVELOPMENT | 100 |

| 20 | PAY AND BENEFITS | 103 |
|----|------------------|-----|
| 21 | LEAVE | 112 |
| 22 | REASSIGNMENTS, VACANCIES, AND TRANSFERS | 125 |
| 23 | REDUCTION IN FORCE | 134 |
| 24 | BASE CLOSURES | 142 |
| 25 | DISCIPLINARY/ADVERSE ACTIONS | 143 |
| 26 | GRIEVANCE PROCEDURE | 151 |
| 27 | ARBITRATION | 159 |
| 28 | DEVELOPMENT OF NEW/SPECIAL PROGRAMS | 166 |
| 29 | RESERVED | 167 |
| 30 | EQUAL EMPLOYMENT OPPORTUNITY | 168 |
| 31 | WORKERS COMPENSATION | 170 |
| 32 | CHILD ABUSE REPORTING AND EMPLOYEE RIGHTS | 172 |
| 33 | TRAVEL | 177 |
| 34 | FURLOUGH | 179 |
| 35 | DURATION OF AGREEMENT | 182 |
| -- | AGENCY HEAD REVIEW | 184 |
| APPENDIX A | FLRA CERTIFICATION | |
| APPENDIX B | DDESS OFFICIAL TIME REQUEST/REPORT | |
| APPENDIX C | FEA-SR REQUEST FOR INFORMATION FORM | |
| APPENDIX D | SALARY WORKSHEET | |
| APPENDIX E | EXPERIENCE CREDIT MATRIX | |
| APPENDIX F | SALARY SCHEDULES | |

APPENDIX G          DDESS EXTRACURRICULAR DUTY ASSIGNMENT AGREEMENT

APPENDIX H          DDESS EXTRACURRICULAR DUTY ASSIGNMENT
                    COMPENSATION SCHEDULE

APPENDIX I          EMERGENCY LEAVE BANK PARTICIPATION FORM

APPENDIX J          EMERGENCY LEAVE BANK REQUEST FORM

APPENDIX K          DDESS EDUCATIONAL LEAVE PROGRAM FACT SHEETS
                    AND APPLICATION AGREEMENT FORM

APPENDIX L          FMCS FORM NO. R-43

APPENDIX M          DEFINITIONS

APPENDIX N          OCTOBER 22, 2015 MOU RE: EXTINGUISHING PRIOR MOU'S

APPENDIX O          DDESS POLICY LETTER 04-009

APPENDIX P          RESERVED

APPENDIX Q          GRIEVANCE FORM

APPENDIX R          STATEMENT OF UNDERSTANDING

APPENDIX S          ELB FORMS
                    (Incorrectly labeled as APPENDIX V)

APPENDIX T          AUTHORIZATION FOR RELEASE OF EMPLOYMENT
                    INFORMATION AND REFERENCE

APPENDIX U          RESERVED

APPENDIX V          APPLICATION FOR ACADEMIC SALARY LANE CHANGE

APPENDIX W          EMERGENCY DATA FORM

ARTICLE 6

**ASSOCIATION RIGHTS**

*Section 1.*  **Exclusive Representative.**  The Association is recognized as the exclusive representative of the employees in the unit described in Article 3 and is entitled to act for and negotiate collective bargaining agreements covering all employees in the unit.  The Association shall represent the interests of all employees in the unit pursuant to 5 U.S.C. § 7114(a)(1).  The Association retains all bargaining rights provided under Chapter 71 of Title 5.

*Section 2.*  **Weingarten Rights.**

a.  The Association shall be given the opportunity to be present at any examination of a unit employee by a representative of the Agency concerning an investigation if:

(1)  The employee reasonably believes that the examination may result in disciplinary action against the employee; and

(2)  The employee requests representation.

b.  The Agency shall inform unit employees of their Weingarten rights by posting a written notice on bulletin boards at each school and by distributing said notice in either written or electronic form, to each individual unit employee during September of each school year.  All new employees

will receive like notice at the time of hiring.

*Section 3.* **Formal Discussion Rights**.  As specifically provided in 5 USC 7114 (a)(2)(A),  the Association shall be given the opportunity to be represented at any formal discussion (which may include, for example, committees, meetings, training, and/or groups) between one or more representative(s) of the Agency and one or more bargaining unit members or their representative(s) concerning any grievance, any personnel policy or practices, or other general conditions of employment.

Whenever possible, prior to the Agency initiating any formal discussion involving resolution of grievances or discussions of personnel policies, practices, or other general conditions of employment, the Association shall be given thirty-six (36) hours advance written notification. The Parties understand that the Association shall inform the Agency, before any meeting herein described, of the identity of the Association representative(s) who will attend the meeting.

*Section 4.* **Announcement of Association Officers.**  The Agency shall recognize the Association as the exclusive representative of its professional bargaining unit employees and, during the new employee orientation and initial school district and school building faculty meetings of each new school year, shall announce the names of the elected and

designated officials of the Association.

*Section 5.*  **Announcements at Faculty Meetings and Orientations.**

a.  The Association will be afforded the opportunity to make a presentation of not more than ten (10) minutes during the initial school district, and school building meeting, of each new school year, regardless of when the school district meeting is held.

b.  The Association will be afforded not more than ten (10) minutes to address the faculty during scheduled District and/or school faculty/staff meetings or employee formal orientation. The building FRS will notify the School Principal in advance of the meeting if there are announcements to be made. Local Association Presidents not on release time may request to use hours from the bank of hours to attend school faculty meetings (other than the school where the President is assigned) that discuss personnel policies, practices, and/or terms and conditions of employment that impact bargaining unit members.

*Section 6.*  **Notification of Agency Responsibilities.**

a.  Each local DDESS school district will, within twenty (20) work-days of the beginning of each school year, provide the local Association President, each Faculty Representative Spokesperson or Building Representative, and the FEA Director for DDESS  with a copy of the school

14

district phone directory and the name and phone number of the managerial point of contact for the following issues and topics: Equal Employment Opportunity (EEO); employee pay; labor employee relations; employee benefits; leave; workers compensation; retirement; training; hiring; position classification; official travel; purchasing; supplies / equipment / technology; school building security; safety; building maintenance; and property accountability.

b. **Upon request**, the Agency will provide to the FEA Director for DDESS, a copy of the DDESS phone directory.

*Section 7.* **Association Access to DoD, Department of Defense Education Activity (DoDEA), and DDESS Issuances.**

a. DoD and DoDEA Directives, Instructions, Regulations, and Policy Letters are available on the DoD and DoDEA websites. The Agency agrees to provide a copy of any DoD or DoDEA issuance not available on these websites.

b. The Agency also agrees to maintain at each local school district a set of current School Policies, as well as policies issued by the Superintendent, school principals, or any other management official, which apply to bargaining unit members. The above will be available for review to all bargaining unit members.

15

*Section 8.*  **Representation on Committees.**

a. The Association shall be entitled to select a representative for each DDESS Level and /or School District/School Building Committee that is composed of Agency representative(s) and bargaining unit member(s) and that discusses personnel policies, practices, and/or terms and conditions of employment to the extent that it does not interfere with management rights under 5 USC 7106.  If the Association's designated representative is an individual that the Agency has chosen to be a working member of the committee, that Association representative will be paid in the same manner as other working members. If the Association representative is a working member of the committee, travel expenses, including per diem, will be paid in accordance with the Joint Travel Regulations (JTR).

b. The Association shall also be entitled to nominate committee members who are to come from the bargaining unit.  If selected, the bargaining unit member will be compensated at his/her earned hourly rate while working on committee activities or receive compensation in the form of an EDA stipend if the work is performed outside the normal workday. Travel expenses, including per diem, will be paid in accordance with the JTR.

*Section 9.*  **Release of Association Area Director.**

a.  The Association is entitled to the release from duty of one bargaining unit member to act as FEA Director for DDESS.  The bargaining unit member to act as FEA Director for DDESS will be determined by the Association.  The following protocol will govern the FEA Director for DDESS employment:

(1)  While on release, the FEA Director for DDESS will receive his/her regular rate of pay for full-time (ten month) employment with DDESS.  The FEA Director for DDESS will receive his/her pay spread over the pay year.

(2)  While on release, the FEA Director for DDESS will receive all benefits of full-time employment with DDESS.  These benefits include, but are not limited to, retirement credit, health benefits, savings plans, sick leave, and personal leave.

(3)  When official travel is required, as determined and approved by the DDESS Director, for the FEA Director to meet with Agency officials, the FEA Director will receive government travel orders.  Travel expenses will be paid in accordance with the JTR.  However, if the FEA Director for DDESS resides outside the CONUS, all travel expenses will be shared equally by the Association and the Agency.  Additionally, the DDESS

Director will annually provide a letter of introduction for the FEA Director for DDESS to use for travel to DDESS school districts described in Appendix A.  The letter will request that on-base field grade quarters be provided, if available.

(4)  A bargaining unit member released from duty to serve as FEA Director for DDESS under this section will be granted return rights to his/her former or similar position.

b.  In the event that Agency officials initiate a meeting (VTC/telephone/in person) during a recess period with the FEA Director for DDESS, the FEA Director for DDESS will be paid at his/her earned hourly rate.  In the event that Agency officials initiate bargaining by providing notice of proposed changes during a recess period, the FEA Director for DDESS will be paid at his/her earned hourly rate for a mutually agreed upon time spent  in planning, preparation, and participation in the bargaining process.

*Section 10.*  **Release Time for Local Presidents.**

a.  The Association is entitled to the release from duty of one local Association President at each of the below noted districts as listed:

18

| | |
|---|---|
| Fort Benning | |
| Fort Bragg | 1/2 of each workday |
| Fort Campbell | to include lunch and 1/2 regular preparation time |
| Camp Lejeune | |
| Fort Knox | |
| Guam | |
| | |
| Fort Stewart | 1 day per week |
| Fort Jackson | to include lunch or |
| Quantico | 1/2 day twice a week to include lunch and 1/2 regular |
| Fort Rucker | preparation time |
| | |
| Laurel Bay | ½ day per week |
| Maxwell | to include lunch and ½ regular preparation time |
| West Point | |
| Dahlgren | |

b.  The local Association President will continue to be responsible for his/her professional responsibilities, reduced proportionately  by the amount of release time.

c.  In cases of special circumstances, i.e., natural disaster, standardized testing, end-of-course exams, parent conferences, field trips, field days, the local Association President may be required to forego the official time period for a given day.

d.  The schedule of release will be determined by the Agency with Association input at the local level.

e.  The local Association President will be paid by DDESS at his/her regular rate of pay for full-time (ten month) employment and will receive all

19

the benefits given for full-time employment with DDESS.

f.  When official travel is required to meet with Agency officials, the bargaining unit member released from duty will receive government travel orders.  Travel expenses will be paid in accordance with the JTR.

g.  In the event that Agency officials initiate a meeting during a recess period covering bargaining under 5 U.S.C. 7114, the bargaining unit member will be paid at his/her earned hourly rate.

h.  The Agency recognizes the right of the Association to select or appoint its representatives for purposes of carrying out representational responsibilities.

i.  When a local Association President gives notice of an absence for more than five (5) consecutive workdays for reasons described in Section 2.a. of Article 21 of the MLA (Sick Leave), the local Association President may designate another bargaining unit member to assume the responsibilities of the local Association President starting on the first day of such leave, to include appropriate release time as specified above.

j.  When a local Association President gives three (3) days advance notice of an absence for more than five (5) consecutive workdays for reasons describe in Article 21, Section 4.a.(3) (Jury Duty), Section 4.a.(5) (Conference Attendance), or Section 7 (Military Leave), the local

Association President may designate another bargaining unit member to assume the responsibilities of local Association President starting on the third (3rd) day of such leave, to include appropriate release time as specified above.

k.  In applying these provisions, the Agency retains the right specified in Section 10.d. above.

l.  During release time, as specified in Section 10.a. above, Local Association Presidents may visit District schools and facilities and/or speak with unit members during the unit member's non-paid, duty-free lunch period, without the permission of District/School administrators.

m.  A local Association President may meet with a unit member during the workday at a time other than the unit member's non-paid duty-free lunch period, when approved by a District/School administrator.

n.  The local Association President will sign in and out at each location and will not interrupt or prevent any bargaining unit member from carrying out his/her work assignments or responsibilities, and will not conduct internal union business.

*Section 11.*  **Official Time.**

a.  Official Time shall be defined as time granted to an Association representative to conduct official representational duties or other activities

21

as provided in 5 U.S.C. 7131. Official time may not be used to conduct internal Association business.

b. Bargaining units at DDESS school districts shall receive a bank of hours per school year to be used by Association officials and representatives for representational duties as follows:

| | |
|---|---|
| Fort Benning Dependents Schools | 220 hours |
| Fort Bragg Dependents Schools | 220 hours |
| Fort Campbell Dependents Schools | 220 hours |
| Fort Knox | 220 hours |
| Camp Lejeune Dependents Schools | 220 hours |
| Guam DDESS District | 220 hours |
| Laurel Bay | 150 hours |
| West Point Schools | 150 hours |
| Maxwell Elementary Dependents School | 150 hours |
| Fort Stewart Dependents Schools | 110 hours |
| Fort Jackson Dependents Schools | 110 hours |
| Quantico Dependents Schools | 110 hours |
| Fort Rucker Dependents Schools | 110 hours |
| Dahlgren School | 110 hours |

22

All requests for use of hours from the bank of hours will be made by the local Association President. These above-mentioned hours do not include official time provided by statute or regulation, or for Agency-initiated requests to meet with Association official(s).  If mutually agreed upon, additional official time may be granted.

c.  Use of official time from the bank of hours shall normally be requested in writing two (2) workdays in advance utilizing the form at Appendix B.  Any such time approved will be recorded on the same form.

d.  Association designated bargaining unit members may use up to thirty-two (32) hours of official time per school year from each respective bank of hours at all districts, except the DDESS Guam District, to attend Association Area Council meetings. The Association designated bargaining unit member attending the Area Council meeting will be required to use hours from the bank of hours in Section 11.b. even though the member may be on scheduled release time in accordance with Section 10 of Article 6.  Up to forty-eight (48) hours of official time per school year from the bank of hours may be used by Association-designated bargaining unit members at the DDESS Guam District to attend Association Area Council meetings. Bargaining unit member attendees will be provided temporary duty travel (TDY) orders, i.e., permissive TDY orders. This travel order will include

23

appropriate statements that the travel is at no expense to the Government, that no per diem or other travel reimbursement is authorized, that the travel is at the employee's request, and that no accounting citation is required. Bargaining unit members must request official time for attendance at Association Area Council meeting using the form at Appendix B.

e. In addition to the official time authorized in Section 11.d. above for attendance at Association Area Council meetings, the FEA Director for DDESS may identify five (5) additional bargaining unit members within DDESS who may attend each Area Council meeting up to a maximum of eighty (80) hours per Area Council meeting. No later than fifteen (15) days prior to the date on which the release time for attendance will occur, the FEA Director for DDESS must give written notice to the DDESS/DoDDS-Cuba Director of all bargaining unit members (to include the employee's school and school district) who have been identified to attend the Area Council meeting.  Should any of the identified employees be unable to attend as planned, a substitute may be permitted to go in his/her place if notice of the need for attendance is provided to the DDESS/DoDDS-Cuba Director at least five (5) workdays in advance and the employee's absence from the worksite is approved by the supervisor.

f.  Local Association Presidents who are on official time as

described in Section 10 of this Article will perform duties as the elected local Association President in the office space provided by the Agency. Exceptions to this requirement would be attendance at meetings, scheduled meetings with the Agency officials, or other representational responsibilities or activities that necessitate the local Association President to be in another location within the School District.

g.  When official time (not including release time described in Sec. 10) is requested and granted, the Superintendent, or designee, and Local Association President may mutually agree at the local level that such release time will be used at an alternate location within the School District.

h.  Except for approved absences from the School District to attend Area Council meetings, training, or other events necessitating the Local President's absence from the District, official time will occur within the School District, to include traveling between schools within the district.  Any period of official time performed away from School District property (excluding travel between schools within the District) requires the notification/ approval of the Superintendent of the School District.

*Section 12.*  **Office Space and Equipment.**

a.  Each local Association President will be provided locking (if feasible) office/space with a desk, table, locking file cabinet, chairs, an

Agency-standard computer with software, printer, and a private telephone line with long distance capability, if feasible.  In providing an Agency-standard computer with software and printer the Agency agrees to include the local Association office on the schedule for periodic upgrades of office equipment (excluding furnishings) which is normally a three (3) to four (4) year cycle.  Changes/upgrade of equipment will be scheduled with the local Association President.  The Agency will, as far as possible, identify individuals who have access to the office space allocated for the Association's use.

b.  The Agency agrees to pay the cost of installation for the telephone line; but all recurring operating costs, i.e., monthly long distance service, and copy paper, etc., will be the responsibility of the Association.

c.  All furniture and equipment is for Association business and may not be removed from school premises without written authorization from the Agency.

*Section 13.*  **Use of Facilities and Equipment.**

a.  Upon written request, the Agency agrees to provide space in a school building for Association meetings after duty hours.  Use of the space will be contingent upon availability and will not interfere with any school activities or community functions.  The Association will be responsible for

26

the security and physical condition of the space/facility used.

b.  The Association may use bargaining unit members' mailboxes within each school for distribution of Association notices, bulletins, and other informational materials to bargaining unit members.  All such materials must be clearly identified as Association materials.

c.  The Agency shall also provide the local Association with a mailbox and/or distribution box identified for the exclusive use of the Association in each school and the school district office.  The Association shall also have access to the school system's distribution mail service.  Any mail addressed to the Association and received at a school will be placed in the Association's mailbox.

d.  The Association representative/designee shall be provided direct access to a copy machine/**scanner** (as designated by the Agency) in each school for use in official matters.  The Association shall provide the paper used for such copying.

e.  The Association will be allowed use of up to one-half the space on existing bulletin boards located in teacher or faculty lounges or will be provided with a bulletin board in each school's faculty lounge or other appropriate location.  Such bulletin board space shall be for the exclusive use of the Association.

27

f.  Upon advance written notice, the Agency shall make reasonable effort to ensure that Association employees and officials are allowed access to military installations in order to conduct labor-management or Association business.

g.  Upon written request by the Association, the Agency shall consider allowing the Association's use of other school-level facilities, equipment, and/or services not otherwise specifically mentioned in this Agreement.

*Section 14.*  **School Board Meetings.**

a.  The Local Association President or designee will be permitted to attend all local district school board meetings, including regularly scheduled meetings and working group meetings.  Executive session meetings may be closed under 10 U.S.C. 2164 (d)(6).  The Local Association President/designee may submit items for placement on the agenda.  The Local Association President/designee may participate in school board discussions of agenda items in accordance with local school board procedures.  A copy of the agenda and the previous month's minutes will be provided to the Local Association President/designee upon distribution to the school board.  Official time will be provided if the meeting is held during the school day.

b.  A copy of all minutes of open meetings of the board will be posted in each school upon approval and distribution.

c.  These rights will apply to any future established school board(s).

*Section 15*.  **FEA At-Large Officers.**  In the event an FEA At-Large Officer is elected from the DDESS professional bargaining unit, the bank of hours of official time identified for the district where that bargaining unit employee works (Section 11b of this Article) will be increased by 160 hours of official time for the school year(s) during which the employee holds the position of FEA At-Large Officer.  The FEA At-Large Officer will be accorded up to a maximum of twenty (20) workdays (160 hours) of official time as needed to attend FEA Board meetings, workshops, training, and the like.  Requests for official time for this purpose will be submitted, at least five (5) workdays in advance, to the Superintendent of the FEA At-Large Officer's District on the form at Appendix B.  Such requests for official time are subject to approval by the Superintendent.

*Section 16*.  **FEA-SR Human and Civil Rights Coordinator.**  The bank of hours of official time identified for the district where that bargaining unit employee works (Section 11b of this Article) will be increased by 48 hours of official time for the school year(s) during which the employee holds the position.  The HCR Coordinator may use up to a maximum of (32 hours) of

29

official time to attend FEASR Area Council meetings, and 16 hours for workshops, training, and the like.  Requests for official time for this purpose will be submitted, at least five (5) workdays in advance, to the Superintendent of the HCR Coordinator's District on the form at Appendix B.  Such requests for official time are subject to approval by the Superintendent.

ARTICLE 7

**BARGAINING RIGHTS AND REQUIREMENTS**

*Section 1.* **Impact and Implementation Bargaining.**

a. In the event that the Agency exercises its rights under 5 U.S.C. 7106(a), the following rules shall apply:

(1) For proposed changes which affect more than one District, the FEA Director for DDESS will be notified in writing of the proposed change(s), via electronic mail, certified mail, or hand-delivered with signed acknowledgment of receipt. If sent electronically, the FEA Director for DDESS will send an acknowledgement of receipt of the proposed change. If no acknowledgement of receipt is sent, the Agency will speak with the FEA Director for DDESS to determine if receipt has occurred or if another electronic transmission needs to be sent. For local School District or school building proposed change(s), the Local Association President will be notified in writing of the proposed action(s), via first class mail, or hand-delivered with signed acknowledgment of receipt; or electronically, and a copy will be provided by the Agency to the FEA Director for DDESS. If sent electronically, the Local President will send an acknowledgement of receipt upon receipt. If no acknowledgement of receipt is sent, the Agency will speak with the Local President to determine if receipt has occurred or if

31

another electronic transmission needs to be sent.  All such written notification(s) will include a description of the proposed change(s) along with the Agency rationale for the change(s).  The date of receipt for the certified mail will be the date of signing for the certified mail. The date of receipt for hand delivery will be the date of signed acknowledgement of receipt. The date of receipt for electronic transmission will be the date of acknowledgement by the FEA Director for DDESS or Local President, as appropriate.

(2)  If requested, the Association and the Agency will discuss the details of the Agency's proposed change(s).

(3)  For proposed change(s) which affect more than one District **as** defined in Appendix M, the FEA Director for DDESS will have thirty (30) calendar days to submit written proposal(s) to the Agency's proposed change(s) to the office of the DDESS Director.  For local School District or school building change(s), the Local Association President will have twenty-one (21) calendar days to respond to the local Superintendent with any written proposal(s) to the proposed change(s).

(4)  Bargaining sessions will commence during the normal business day and at a place convenient to the Agency and the Association.

32

Local School District bargaining will normally take place at the local School District as defined in Appendix M.  Association representatives, at the DDESS or School District level, involved in bargaining (including reasonable preparation time) with the Agency, will be in a duty status and on official time for pay purposes, regardless of the time of the day or part of the calendar year.  Bargaining on local School District and school building change(s) will commence not later than ten (10) calendar days after receipt of the Association's proposal(s).  Bargaining on proposed change(s), which affect more than one district, will commence not later than forty-five (45) calendar days after receipt of the Association's proposal(s).

      (5)  If, after proper notification (as described in 1.a.(1) and (3) above) of proposed change(s), the Association fails to respond with written proposal(s) during the time frames listed above, the Agency may implement its proposed change(s).

      (6)  Impact and implementation bargaining, at all levels, may be accomplished through use of virtual communication, electronic communication, and/or person-to-person meetings.  The Parties agree that bargaining unit members will be compensated for time spent in such bargaining in accordance with Section 1.a.(4) of Article 7.

(7)  If travel is required for the FEA Director for DDESS engage in such bargaining, the Agency will issue a government travel order and pay travel expenses in accordance with the Joint Travel Regulations.

b.  The Agency recognizes the Association's right to information under 5 U.S.C. 7114(b)(4).  The Parties agree that all such requests for information by the Association will be in writing (per the format in Appendix C) and will articulate why the Association needs the requested information, including the uses to which the Association will put the information and the connection between those uses and the Association's representational responsibilities.  The Agency will make reasonable attempts to process requests meeting the above stated criteria within ten (10) workdays.  If the information cannot be provided within ten (10) workdays the Agency will notify the Association in writing/email as to the status of their request. The Agency further agrees to provide to the Association, without charge and to the extent not prohibited by law, all such data and information normally maintained by the Agency in the regular course of business, which are reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of bargaining, and which do not constitute guidance, advice, counsel, or training provided for management officials or supervisors, relating to collective bargaining.  If

34

the Agency needs clarification of a request for information or needs to communicate countervailing anti-disclosure interests on employee privacy concerns, it will do so in writing.

c.  The Agency recognizes that the Association must be notified of all changes to personnel policies, practices, and/or terms and conditions of employment that impact bargaining unit members, prior to implementation, in accordance with Chapter 71 of Title 5.  The obligation set forth above in the immediately preceding sentence includes, but is not limited to, the solicitation of volunteers and implementation of committee recommenda-tions that constitute changes to personnel policies, practices, and/or terms and conditions of employment that impact bargaining unit members. While groups/committees/sub-committees make recommendations, it is understood that any decision regarding the approval and/or implementation of such recommendation rests solely with the Agency.  As adopted recommendations move forward the Administrator and the elected FEA-SR Representatives should jointly discuss a plan for implementing the recommendations in accordance with Section 4 of Article 10.  The time, training, and resources needed should be identified in a timeline/calendar outlined to establish reasonable expectations.  The plan that is developed should be documented in writing.

35

d.  The Parties agree that normally a change in conditions of employment does not include assignment of non-preparatory duties.  The Parties recognize that changes to the manner and amount of non-preparatory duties assigned may constitute a change in conditions of employment which would create an obligation for notice and subsequent impact and implementation bargaining.

e.  Any impact and implementation bargaining already begun over any changes in conditions of employment on the date of the execution of this Agreement will be allowed to continue.

*Section 2*.  **Resolution/Discussion of Change Issues.** When an Association representative(s) becomes aware that a change in the assignment of work and/or duties to professional bargaining unit members has occurred or is planned to occur which the Association believes rises to a level which should have created a bargaining obligation and the Agency has not provided notice of the change(s), the FEA-SR Area Director (or designee) will notify the Agency of the Association's desire to meet and discuss the change.  In an attempt to resolve the matter, appropriate DDESS official(s) and Association representative(s) will, within two (2) workdays of such notification, discuss the change(s); and DDESS agrees to consider the Association's input in an attempt to resolve the matter.  If, at

36

the conclusion of the meeting between DDESS official(s) and the Association representative(s), the matter is not resolved to the Parties' satisfaction, either party may pursue their respective contractual and/or statutory remedies.

*Section 3.* **Mid-Term Bargaining.**  The Parties agree that during the thirtieth (30th) month of this Agreement that either side may propose bargaining over any DDESS-wide matter not reasonably covered by or contained in this Agreement.  When mid-term bargaining is proposed, the following procedures will be followed:

a. Initial bargaining requests will be sent via certified mail, return receipt requested, or hand-delivered with signed acknowledgment of receipt, to the DDESS Director; or, in the case of Agency-requested bargaining, to the Association Area Director.

b.  The initial bargaining requests will include proposals and a written explanation of the result desired by the proposals.

c.  All requests by the Association for information will follow the procedures set forth in Section 1.b. of this Article.

d.  Within thirty (30) days of confirmation of receipt of the request to bargain, the Parties will meet to discuss ground rules and a subsequent schedule for the submission of counter-proposals and bargaining.

*Section 4.* **Bargaining Levels.**

   a.  DDESS Level Bargaining

    (1)  Issues that affect more than one DDESS school district as defined in Appendix M, will be bargained by the DDESS Director and FEA-SR Director for DDESS.  Similar changes that occur first at one District and then a second District will be bargained by the DDESS Director and the FEA-SR Director for DDESS.

    (2)  The Association and the Agency will determine the make-up of their own DDESS level bargaining teams.

    (3)  The Association bargaining team will be in a paid duty status on official time during all bargaining, regardless of the time of day or part of the calendar year.  Pay for all bargaining team members during bargaining will be at each individual bargaining team member's earned hourly rate.

   b.  Local School District Level Bargaining.

    (1)  Issues unique to a local school district, or individual school, will be bargained by the local Association President and District Superintendent or designee.

    (2)  The Association and the Agency will determine the make-up  of their own local bargaining teams.  Each local Association bargaining team will be made up of no less than two members.  If the local Agency

38

bargaining team exceeds two members, then the local Association bargaining team will be entitled to the same number as the local Agency team.

(3)  The Association bargaining team will be in a paid duty status on official time during all bargaining, regardless of the time of day or part of the calendar year.  Pay for all bargaining team members during bargaining will be at each individual bargaining team member's earned hourly rate.

(4)  If applicable, all agreements reached will become binding on the District.

ARTICLE 16

**DUES ALLOTMENTS**

*Section 1*.  **Authority.**  The employer shall deduct Association dues from the pay of all eligible employees who voluntarily authorize such deductions in accordance with the provisions set forth herein.

*Section 2*.  **Payroll Deduction**.  Bargaining unit employees may have their Association dues deducted through payroll deduction provided:

a.  The employee is a member in good standing of the Association;

b.  The employee has completed an SF-1187, "Request for Payroll Deductions for Labor Organization Dues."  This form may be submitted and dues withheld at any time in accordance with Section 4. of this Article;

c.  The completed form should be submitted to the Local Association President or designee;

d.  The employee receives pay on the regularly scheduled paydays; and such pay is sufficient, after all deductions required by lawful authority, to cover the full amount of the dues allotment; and

e.  During any pay period in which there are insufficient funds in an employee's paycheck to cover dues-withholding, no withholding will be deducted from that pay period.  A list of employees having insufficient funds for dues-withholding purposes will be furnished to the FEA-SR Area

85

Director.  The Agency will not be responsible for collecting dues not withheld due to insufficient funds.

*Section 3.*  **Association Responsibilities.**  The Association agrees to:

a.  Notify the Defense Finance and Accounting Service (DFAS) in writing of the amount of Association dues by September 15 and any changes in the dues amount thereafter;

b.  Notify the DFAS in writing of the name and address of the payee to whom the remittance check should be made;

c.  Provide the standard allotment forms, SF-1187, to unit members as requested;

d.  Forward any completed SF-1187 forms to the servicing Financial Technician (CSR) at the DDESS Area Service Center.  The Agency's obligation to deduct dues does not commence until receipt of the employee's completed SF-1187.  Yearly SF-1187s are not required;

e.  Promptly forward any written revocation (SF-1188) of an allotment received by the Association to the servicing Financial Technician (CSR) at the DDESS Area Service Center.

f.  Notify the DDESS Payroll servicing Financial Technician (CSR) at the DDESS Area Service Center promptly and in writing if an employee ceases to be a member in good standing;

86

g.  Assist the Agency in resolving any claims and disputes arising by reason of the Association's actions relating to the amount of dues-withholding; and

h.  Reimburse the affected employee(s) when an excess amount of dues deduction is taken from an employee's pay.

*Section 4.*  **Agency Responsibilities.**  The Agency agrees to:

a.  Promptly process voluntary dues allotments in the amount certified by the Association;

b.  Withhold dues in equal amounts over fifteen (15) full pay periods beginning with the first paycheck after October 15. For all new requests for payroll deduction, if the SF-1187, "Request for Payroll Deductions for Labor Organization Dues," is submitted by September 15, dues will be deducted in fifteen (15) full pay periods beginning with the first paycheck after October 15. If the SF-1187 is submitted after September 15, the dues deduction will begin the first full pay period after submission of the SF-1187 but not earlier than October 15. If less than fifteen (15) full pay periods remain in the pay year after submission of the SF-1187, the Agency will collect the normal dues amount (1/15th of the total dues allotment amount) from each remaining full pay period. The Association will assume responsibility for collection from the employees of any dues amount not

87

withheld as a result of there being less than 15 full pay periods in the pay year remaining after submission of the SF-1187;

c.  Transmit funds (remittance checks, electronic fund transfer, etc.) to the FEA Stateside Region for dues withheld for its account.  The transmittal shall be made no later than ten (10) workdays following the day that the related salaries were paid to the unit members.  Such remittances will be made to the Association officer designated in writing by the FEA-SR Area Director of the Association.  Remittances shall show the names of participating unit members, the DDESS local school District assigned, the amounts withheld, and the pay period from which deductions were made;

d.  Maintain SF-1188s (Cancellation of Payroll Deductions for Labor Organization Dues) and furnish the forms to unit members upon request; and

e.  Expeditiously correct government error in the dues-withholding process.  Errors in remittance checks will be corrected and adjusted in a subsequent check.

*Section 5.*  **Revocation of Dues-Withholding.**  Employees may revoke their dues-withholding by submitting an SF-1188 to the Association or the servicing Financial Technician (CSR) at the DDESS Area Service Center. After the initial one (1) year period of dues withholding, the Agency will

88

honor any dues revocation submitted between August 15 and September 15 of each school year. Dues revocation requests received by the Association (timely or untimely) will be promptly forwarded to the servicing Financial Technician (CSR) at the DDESS Area Service Center. Untimely-submitted dues revocation requests received by the Agency will be promptly returned to the employee.

*Section 6.*  **Termination of Dues-Withholding Allotment.**

a.  An allotment for an employee will be terminated at the end of the pay period during which an employee is separated from the Agency's rolls through transfer, retirement, resignation, death, or for cause.  Allotments for all employees will be automatically terminated in the event exclusive recognition is no longer accorded to the Association.

b.  In the event the Agency either improperly revokes or terminates dues-withholding, the Agency will immediately restart the dues-withholding if any pay periods remain. If insufficient pay periods remain to cover the full amount of the dues withholding, the Agency agrees to pay only the amount of dues affected by the error.

*Section 7.*  **Indemnification.**  The Association shall indemnify and hold the Agency harmless against any liability for actions taken by the Agency in

89

reliance upon signed authorization cards or forms furnished by the

Association for the purpose of payroll deduction of dues.

ARTICLE 17

**ORIENTATION AND CERTIFICATION**

*Section 1.*  **Orientation.**  During in-processing, the Agency will provide each new bargaining unit member a copy of his/her position description, salary schedule, notice of benefits, and access to the Master Labor Agreement in accordance with Section 4 of Article 4.

*Section 2.*  **Certification and Recertification.**

a.  The Agency shall determine the requirements for certification and recertification for all unit employees. Requisite professional certification and recertification of professional bargaining unit members will be in compliance with DODEA Regulation 5000.9, "DODEA Educator Licensure Program." Notice of changes to certification and/or recertification requirements will be provided to the Association, and the Agency agrees to bargain these changes in accordance with Chapter 71 of title 5, United States Code.

b.  All employees are required to be certified at the time of hiring and recertified as appropriate.  The Agency may, however, elect to hire or place employees who are not fully certified, e.g., to avoid the impact of a Reduction-In-Force, because a fully certified candidate for a position is not available, or for other unusual circumstances. This decision is non-

91

greivable.  If additional certification/licensure is required, the employee will be issued a "Notice of Deficiency" specifying the particular course work or semester hours required to correct the deficiency. The employee will have one (1) year from the issuance of "Notice of Deficiency" to correct noted deficiency.  If requirements are not met after the one (1) year period, action may be initiated to remove the educator from employment.

c.  The Agency shall require proof from all unit employees that they are in possession of a current, valid certificate.  The Agency may initiate appropriate corrective action, including removal, when unit employees fail to meet certification requirements.

d.  The Agency will give the employee twelve (12) months' advance written notification of certification and/or recertification requirements.  Such notification shall also advise employees that if recertification requirements are not accomplished in the stated time frame, they may be subject to removal.

*Section 3.* **Non-Teaching Professional Certification and Licensure**.

a.  The Agency shall determine the requirements for certification and recertification, licensure and re-licensure for nurses, psychologists, speech language pathologists, guidance counselors, psychometrists, occupational, physical and speech/language therapists and other student support

positions.  Notice of changes to certification and recertification, licensure and re-licensure requirements will be provided to the Association, and the Agency agrees to bargain these changes in accordance with Chapter 71 of title 5, United States Code.

b.  All employees are required to be certified/licensed at the time of hiring and recertified/re-licensed as appropriate.  The Agency may, however, elect to hire or place employees who are not fully certified, e.g., to avoid the impact of a Reduction-In-Force, because a fully certified candidate for a position is not available, or for other unusual circumstances.  This decision is non-grievable.

c.  The Agency shall require proof from all unit employees that they are in possession of a current, valid certificate/license.  The Agency may initiate appropriate corrective action, including removal, when unit employees fail to meet certification/licensure requirements.

d.  The Agency will give the employee twelve (12) months' advance written notification of certification and recertification, or licensure and re-licensure requirements.  Such notification shall also advise employees that if recertification/re-licensure requirements are not accomplished in the stated time frame, they may be subject to removal.

ARTICLE 18

**HOURS OF WORK AND SCHEDULING**

*Section 1.*  **Workday.**

a.  The workday for full-time bargaining unit members shall consist of eight (8) hours. Unit members must be physically present at the worksite for seven and one-half (7 ½) hours which includes a 30-minute non-paid duty-free lunch period. Unit employees are expected to perform additional preparation and professional tasks necessary for the completion of their assigned work, either at or away from the work site. At the Agency's discretion, management may require employees to work up to an additional 24 hours at the work site during each school quarter without additional compensation. The Agency will normally provide three (3) workdays notice when employees are required to be at the worksite more than seven-and-one-half (7 ½) hours. Bargaining unit members may leave the worksite without obtaining permission during their non-paid, duty-free lunch time.

b.  If an Agency management official requires a bargaining unit member to lose his/her duty free lunch period (excluding student field trips and off-site professional development/conferences), the employee will be compensated at his or her earned hourly rate. On non-instructional days, the non-paid duty free lunch may be extended to accommodate the lack of

94

on-site (school) cafeteria services. It is understood that the workday may increase by the amount of time the lunch period is extended.

c.  The workday for part-time bargaining unit members shall be established as needed to meet the needs of the Agency. Typically, a part-time employee scheduled to work more than four (4) hours per day will receive a 30-minute non-paid, duty-free lunch period.

d.  In addition to the workday, bargaining unit members may be required to attend three (3) evening meeting/events per school year without additional compensation. Administrators should normally provide as much advanced notice as possible of the evening events scheduled.

e.  Bargaining unit members are responsible for participation in parent/student conferences and will remain at the worksite to complete such conferences which commence prior to the end of the workday. This requirement pertains to conferences mutually scheduled between a unit member(s) and parent(s)/guardian(s).

*Section 2.* **Instructional Planning.**

a.  In order to comply with requisite accreditation standards, the Agency has determined that each full-time bargaining unit employee with instructional duties shall have a minimum of 225 minutes per work week (5 days) for instructional planning in amounts not less than 20 minutes.

Instructional planning time provided is an assignment of work subject to assignment of other duties as determined by the Agency.

b.  The Agency has determined that part-time bargaining unit members shall receive a pro-rated portion (factor of 5.625 for each hour scheduled to work per week) of planning and preparation time; however, planning and preparation time provided is an assignment of work subject to the assignment of other duties as determined by the Agency.

c.  The loss of instructional planning period as a result of a change in the instructional day such as assemblies, field days, special events, ceremonies, field trips, early release for students, or emergencies (adverse weather, bomb threats, fire drills, installation-imposed threat conditions, and the like) will not be compensated. In addition, compensation will not be provided for Agency-directed loss of one (1) instructional planning period for any employee per instructional quarter.

d.  In the case of management-directed loss of instructional planning periods beyond the conditions described above, the bargaining unit member will receive compensatory time.

e.  The Agency may, in its sole discretion, elect to assign time during the workday for collaborative/team planning for such purposes as, for

96

example: co-planning units of instruction; sharing of best practices;

articulation of curriculum and assessment; and collaborative incorporation

of Continuous School Improvement (CSI) interventions into lesson plans.

*Section 3.*  **Work Year.**

a.  Management has determined that the work year will normally

consist of 190 work days unless the Agency invokes its statutory right to

alter the work year (e.g., layoff (furlough) employees as described in

Section 1.b. (1) of Article 5 and Article 34). The Agency will determine the

number of instructional and non-instructional workdays within the work year.

Examples of uses of non-instructional days include, but are not limited to,

classroom/work area preparation and deconstruction, orientation, staff

development, grading and report cards, record keeping, parent/teacher

conferences or other purposes as determined by the Agency.

b.  The Agency is free to assign additional workdays. Employees

assigned to work for more than four (4) hours will receive a 30-minute, non-

paid, duty-free lunch period. Employees will be paid for actual hours

worked, but not less than four (4) hours per workday. When additional

workdays are assigned, the bargaining unit employee will be compensated

at his/her earned hourly rate of pay.

c.  The Agency is also free to assign additional work hours. When

additional work hours are assigned, the bargaining unit employee will be

compensated by the Agency at the employee's earned hourly rate.

d.  In order for additional hours/days outside of the regular workday or

year to be compensable, the management official will normally make the

assignment in writing.

e.  The Agency agrees to make reasonable efforts to provide

bargaining unit employees sufficient time to set up and close down their

respective classrooms at the beginning and the end of the school year.

However, the Agency reserves the right to assign duties on any particular

day of the work year.

f.  If the Agency closes schools on days that are assigned as work

days as a part of the work year, due to inclement weather or other

emergency, the Agency may extend the work year for an equal number of

days without additional compensation to employees.

*Section 4.*  **School Calendars.**

a.  The Agency agrees to consider local Association input prior to

adopting a school calendar and bargain impact and implementation in

accordance with Chapter 71 of Title 5.

b.  All unit employees will receive a copy of the respective school district-approved calendar.

c.  Five (5) days may be designated as potential make-up days on the school calendar in the event of missed instructional days.

ARTICLE 19

## PROFESSIONAL DEVELOPMENT

*Section 1.*  **In-Service Programs and Staff Development.**  The Agency agrees to meet and consult with the local Association President when planning in-service programs and staff development courses and bargain impact and implementation in accordance with Chapter 71 of Title 5.

*Section 2.*  **Training**.  In cases where it is considered appropriate to hold workshops/in-service sessions/training on a school-wide or District-wide basis, the Agency will inform the local Association President regarding such training.  The Parties agree that the terms "school-wide" and "District-wide" include training involving all employees occupying a given type of position, i.e., all third grade teachers, all special education teachers, all nurses, etc.

*Section 3.*  **Conference Attendance.**

a.  The Agency shall consider all requests for attendance at educational classes, professional conferences, seminars, workshops, conventions, and professional in-service training sessions for individual development which benefit the Agency.  The Agency may pay all or part of the bargaining unit employee's expenses at the discretion of the Agency in accordance with the Joint Travel Regulations (JTR).

JA207

a.  Leave under the Family and Medical Leave Act (FMLA) will be in accordance with applicable OPM and Agency regulations.

b.  Bargaining unit members should consult with their supervisor when requesting leave pursuant to FMLA.

*Section 7.*  **Military Leave.**  Military leave, with pay, shall be granted to bargaining unit members who serve in the National Guard or Reserve components of the U.S. Armed Forces in accordance with governing statutes.

*Section 8.*  **Voluntary Leave Transfer Program.**  The Agency will provide employees the opportunity to participate in the Voluntary Leave Transfer Program under 5 C.F.R. 630, Subpart I, and applicable Agency regulations (DDESS Instruction 1410.2).  Sick leave, in addition to personal leave, may be donated under this program.  Employees may receive and donate leave under the VLTP only from/to those employees who earn leave in the same manner.

*Section 9.*  **Emergency Leave Bank.**

a.  An Emergency Leave Bank (ELB) will be established at each DDESS school district for use by all bargaining unit employees for medical emergencies, catastrophic illness, or injury experienced by the member.  All bargaining unit employees may join the bank by contributing at least one (1)

sick or personal leave day and completing the form contained at Appendix I.  The ELB may carry over all unused hours to the following school year.

b.  Participation in the ELB by bargaining unit employees will require donation of one (1) day of sick or personal leave during the first thirty (30) days of employment or when opened for the purpose of replenishing the ELB.   Bargaining unit employees electing to join/participate in the ELB should complete the form at Appendix I and submit the completed form to their respect time keeper (School Secretary) who will in turn forward the form to the servicing Financial Technician (CSR) at the DDESS Area Service Center.

c.  An employee requesting days from the ELB must use the form contained in Appendix J. and have exhausted all leave which can be used for the nature of the emergency such that the employee is in a non-pay status.

d.  The ELB Committee will consist of one Agency official appointed by the Superintendent and two employees selected by the Local Association President.  The ELB Committee will make decisions on all requests for leave to be available for use from the ELB.  Supervisor approval is required prior to using any leave made available for use from the ELB.  The requestor will furnish a completed employee request form

and a written physician's statement, as contained in Appendix J, demonstrating the need for additional leave to cover a medical emergency.

e.  A majority vote by the ELB Committee members approving the leave is required to grant leave from the ELB.  Decisions by the ELB Committee are not subject to the grievance process.

f.  Any bargaining unit employee participating in the ELB will be limited to a withdrawal from the bank of up to a total of forty (40) work-days in succession.  When an illness extends beyond forty (40) work-days, the bargaining unit member may re-apply to the ELB Committee for further consideration of additional leave.

g.  The ELB Committee will monitor the amount of leave remaining in the bank and shall afford the opportunity to all bargaining unit employees to voluntarily contribute to replenish the bank during an open season.   At the need to replenish the ELB, employees must contribute another day of leave to in order to continue eligibility.

h. Departing employees may donate up to forty-eight (48) hours of unused leave to the ELB.  The bargaining unit member must submit a written request to their servicing Financial Technician at the DDESS Area Service Center. (Appendix S).

i.  All donations of leave to the ELB are final when donated and

cannot be restored to the employee.

j.  Unused leave donated prior to the effective date of this Agreement will be transferred to the ELBs established pursuant to section 9.a. above.

k.  The ELB Committee may elect to open one (1) window of two-weeks duration during each school year when employees who have previously not elected to participate in the ELB may choose to do so by donating one (1) day of sick or personal leave to the bank.  This two-week window is purely for the purpose of allowing employees who previously did not elect to participate in the ELB an opportunity to do so.  Employees who previously elected to participate in the bank by donating one (1) day of sick or personal leave will not be required to donate another day of leave to continue eligibility to participate in the ELB, unless there is a need to replenish the ELB.

*Section 10.*  **Educational Leave.**

a.  Bargaining unit members may apply annually (subject to any additional criteria stated below) for any or all of the following Agency educational leave programs:

(1) Yearlong Educational Leave at Half Pay;

(2) Leave Without Pay (LWOP) for Educational Purposes; and

ARTICLE 22

**REASSIGNMENTS AND VACANCIES**

*Section 1.*  **Posting Notices.**

a.  When the Agency intends to fill a new or vacant professional position on an installation (or Guam) through reassignment or use of a referral list, a vacancy notice for that installation will be sent via email to bargaining unit employees on the installation (or Guam and to the Local Association President). Vacancy notices for professional bargaining unit positions will contain:

　　1.  Position title;

　　2.  Grade Level(s), Subject or other identifying information;

　　3.  Closing date;

　　4.  Duty location (specific school(s)); and

　　5.  Permanent or Not to Exceed;

b.  Vacancy notices are not required to be posted at the installation if management has determined to fill a position by methods outside the referral list or reassignment (e.g., Reduction-in-Force (RIF), Management Directed Reassignment, assignments made due to other hiring authorities or placement processes such as Reasonable Accommodations, Settlement Agreements, Compassionate Reassignments, etc.)

125

c.  Application Process

1)  Employees who desire to be considered for bargaining unit positions on their installation or other installations may elect to utilize the Employment Application System (EAS) or successor system.

a.  Employees are able to update or activate their EAS applications at any point during the year to apply for vacancies.

b.  Employees who update their EAS applications before the closing date of a vacancy will be considered for the position.

c.  Employees who apply for vacancies will be notified whether they were selected for the position once a candidate is selected.

2)  Employees who desire to be considered for posted bargaining unit positions on their installation may also submit a written request to their current and to the prospective supervisors in addition to the approved systems.

d.  When vacant positions within the bargaining unit are to filled through RIF procedures, the FEA Director for DDESS will be provided notice of the vacant positions being used for that purpose.

*Section 2.* **Details and Temporary Promotions.**

a.  When a bargaining unit member is detailed to a higher graded position for more than thirty (30) days, that employee will then be

temporarily promoted to the higher graded position beginning on the 31st day.

(1)  If temporary promotion of the bargaining unit member would adversely affect the pay of that bargaining unit member, the Agency, with the concurrence of the bargaining unit member, may continue the detail rather than effect the promotion. Such detail beyond thirty (30) days will not adversely affect the employee's pay.

(2)  If the employee does not meet the minimum qualifications for the higher graded position, the detail may be continued rather than effecting the temporary promotion.

(3)  Temporary promotions will be documented in the bargaining unit member's Official Personnel File.

*Section 3.* **Reassignment.**

Employees, who desire a reassignment in a school, grade, and/or subject/course and who are certified and otherwise qualified for such a reassignment, shall submit a written intent form to their immediate supervisor. The Agency will give employees (requesting reassignment) consideration should the assignment become available however, the Agency retains full discretion to determine how a vacancy will be filled or who should be assigned to a position, based upon the needs of the Agency.

127

Also, the Agency may, at its discretion, direct a reassignment of an employee. The reassignment may be from one school location to another or from one grade/course to another in the same district.

    a.  When the Agency reassigns any unit member to a new room location, the employee will be given at least 24-hour advance notice except in the case of an emergency.

    b.  Prior to the Agency involuntarily reassigning any unit member to a new location, the Agency will first consider seeking volunteers for the reassignment.

    c.  In the event a bargaining unit member is selected for an involuntary reassignment, the unit member will be given an opportunity to provide reasons why he/she should not be reassigned.

    d.  The Agency will consider any written request by a unit member to return to the school location, grade, or course from which he/she was reassigned.

    e.  Management has determined that employees who are reassigned to a different school or classroom location shall receive:

        1)  Packing materials and assistance with packing, moving, and unpacking;

        2)  Access to the school building if needed;

3)  Normally one and one-half (1-1/2) workdays of release time from assigned duties to accomplish the move. Additional release time may be granted at the discretion of the supervisor, if requested. If Management determines that the employee does not require the full one and one-half (1-1/2) workdays to accomplish the move, the employee will return to this/her normal duties or, if the move was accomplished during a recess period or outside the duty day, the employee's workday will conclude; and

4)  In the event the employee is directed to complete the move outside the duty day, the employee will be paid at his/her earned hourly rate.

5)  The Agency will specify, in writing, the period of time the employee will be released from work to accomplish the reassignment. Upon completion of the reassignment or move, the employee shall notify their supervisor.

f.  Management has determined that employees who are reassigned to a different grade (elementary grades) or new subject area shall receive:

1)  Packing materials and assistance with packing, moving, and unpacking;

2) Access to the school building if needed;

3)  Normally one and one-half (1-1/2) workdays of release time

129

from assigned duties to accomplish the change. Additional release time may be granted at the discretion of the supervisor, if requested. If Management determines that the employee does not require the full one and one-half (1-1/2) workdays to accomplish the move, the employee will return to this/her normal duties or, if the move was accomplished during a recess period or outside the duty day, the employee's workday will conclude; and

4) The opportunity to observe other classes in the area of reassignment as designated by the supervisor;

5) In the event the employee is directed to complete the move outside the duty day, the employee will be paid at his/her earned hourly rate; and

6) The Agency will specify, in writing, the period of time the employee will be released from work to accomplish the reassignment. Upon completion of the reassignment or move, the employee shall notify their supervisor.

g. Management has determined that employees who are simultaneously reassigned to a different school or classroom and to a different grade (elementary grades) or new subject area shall receive:

1) Packing materials and assistance with packing, moving and

unpacking;

2)  Access to the school building, if needed;

3)  Normally, three (3) workdays of release time from assigned duties to accomplish the move and change. If the employee does not require the full three (3) workdays to accomplish move/change, the employee is expected to return to normal duties or, if accomplishing the change during a recess period, the employee's workday will conclude. Additional release time may be granted at the discretion of the supervisor, if requested. If Management determines that the employee does not require the full 3 workdays to accomplish the move, the employee will return to his/her normal duties or, if the move was accomplished during a recess period or outside the duty day, the employee's workday will conclude;

4)  The opportunity to observe other classes in the area.

5)  In the event the employee is directed to complete the move outside the duty day, the employee will be paid at his/her earned hourly rate; and

6)  The Agency will specify, in writing, the period of time the employee will be released from work to accomplish the reassignment. Upon completion of the reassignment or move, the employee shall notify their supervisor.

h.  A new subject area is defined as a teaching assignment with a new curriculum.

i.  Management has determined that normally no more than a total of three (3) workdays will be allowed per employee for any combination of contemporaneous reassignments to a different school or classroom and to different grades (elementary grades), and new subject areas under this section. Additional release time may be granted at the discretion of the supervisor, if requested.

*Section 4.* **School Moves.**

a.  In the event the Agency elects to relocate all the employees and contents of an entire school, each bargaining unit employee making such move shall normally receive:

1)  Packing materials and assistance with packing, moving, and unpacking;

2)  Access to the school building if needed;

3)  One and one-half (1-1/2) workdays of release time form assigned duties for packing his/her classroom.

4)  Two (2) workdays of release time from assigned duties to unpack and/or setup his/her classroom. Additional release time may be granted at the discretion of the supervisor, if requested.

5)  If Management determines that the employee does not require the full one and one- half (1-1/2) workdays to accomplish the packing or the full two (2) workdays to unpack/set up his/her classroom, the employee will return to this/her normal duties or, if the move was accomplished during a recess period or outside the duty day, the employee's workday will conclude.

*Section 5.* **Selection for Summer School and Extended School Year (ESY).**

a.  The agency will provide bargaining unit employees an announcement of Summer School positions by email prior to the end of the school year.

b.  The Agency will make a reasonable effort to assign current bargaining unit employees who have indicated a desire to teach ESY prior to seeking other candidates.

c.  The Agency maintains the right to select from among any appropriate source. Selection will be made based upon the knowledge, skills, and abilities of the candidates in relation to the duties of the position.

ARTICLE 23

**REDUCTION IN FORCE**

*Section 1.*  **Definition**.  A Reduction in Force (RIF) is the systematic way of making organizational changes that provides retention preference on the basis of tenure, veteran preference, length of service and performance. Definitions of terms in this article are as provided for in 5 C.F.R. 351.203.  A RIF occurs whenever a competing employee is released from his/her competitive level by furlough for more than thirty (30) days, separation, demotion, or reassignment requiring displacement is required because of:

    a.  Lack of work;

    b.  Shortage of funds;

    c.  Insufficient personnel ceilings;

    d.  Reorganization;

    e.  The exercise of reemployment or restoration rights;

    f.  The reclassification of an employee's position due to the erosion of duties when such action will take effect after the formal announcement of a RIF in the competitive area and the RIF will take effect withinone-hundred and eighty (180) days; or

    g.  Transfer of function.

134

*Section 2.* **Exclusions.**  Actions excluded from RIF procedures are as provided for in 5 C.F.R. 351.202(c).

*Section 3.*  **Notification to Association.**  When it is determined that there is a need for a RIF, the Agency agrees to notify the Association of pending RIF actions as early as possible, but not less than ninety (90) calendar days prior to the scheduled effective date of the RIF.  Such notice shall normally include the following information:

    a.  Reasons for the RIF;

    b.  Number and types of employees to be affected.

It is understood that the above information may change during the ninety (90) calendar day period.

*Section 4.*  **Notification to Bargaining Unit Members.**  Once it has been determined that a RIF is required, bargaining unit employees who will be affected by RIF actions will be given specific notce at least sixty (60) calendar days prior to the effective date of the RIF.  Such notice shall contain the following information and all other information required per 5 C.F.R. 351.802:

    a.  Action to be taken;

    b.  Reasons for the action;

    c.  Personal information used to determine the action

135

d.  Effective date for the action;

e.  Entitlements and benefits;

 f.  Place where affected employees and their representatives may

inspect retention registers and related records pertaining to the action; and

g.  Employee appeal rights

It is understood that the above information may change during the sixty (60)

calendar day period.

*Section 5*.  **Competitive Area**.  The competitive area for any RIF is defined

as all employees of a Local School System (schools or District

Superintendent's Office) located on a military installation.  When there are

schools on more than one military installation under the administration of

one Superintendent, the schools on each military installation form a

separate competitive area unless they are in the same commuting area, in

which case they form one competitive area.

*Section 6*.  **Competitive Levels.**  Competitive levels shall be established in

accordance with 5 C.F.R. 351.403 consisting of all positions in the

competitive area which are in the same pay plan, at the same grade, grade

equivalency or occupational level; are in the same classification series,

position category and certification; and which are similar enough in duties,

qualification requirements, pay schedules and working conditions so that an

incumbent of one position can be reassigned to another position without undue interruption.  Separate competitive levels will be issued by type of service (competitive or excepted), by appointment authority, by pay schedule, and by work schedule.

*Section 7.*  **Retention Register / Retention Priority.**  When an employee is to be released from a competitive level due to RIF, a retention register will be established for that competitive level in accordance with 5 C.F.R. 351.404.  The retention register will be prepared from current retention records of employees.  To provide adequate time to determine employee retention standing, only that information that is available at least ninety (90) calendar days prior to the scheduled issuance of RIF notces may be used, except to correct errors in the record that are discovered prior to the effective date of the RIF.  Competing employees shall be classified on a retention register in tenure groups on the basis of their tenure of employment, veteran preference, length of service, and performance in descending order as provided for in 5 CFR 351.502.

a.  Tenure of employment.  Competing employees shall be classified on a retention register as Group I (includes each permanent employee whose appointment carries no restrictions or conditions such as conditional, indefinite, specific time limit, or trial period), Group II (includes each

employee serving a trial period or whose tenure is equivalent to a career-conditional appointment in the competitive service), and Group III (includes each employee whose tenure is indefinite or has a time limitation).

b.  Veteran preference.  Within each tenure group described in Section 7.a. above, competing employees shall be classified on the retention register based upon veteran preference as defined in 5 C.F.R. 351.501(c) as Subgroup AD (preference eligibles who have a service-connected disability of 30 percent or more); Subgroup A (preference eligible employees not included in subgroup AD), or Subgroup B (non-preference eligible employees).

c.  Length of service.  Each competing employee's length of service shall be established in accordance with 5 C.F.R. 351.503.

d.  Competing employees shall be released from competitive levels in the inverse order of retention standing, beginning with the employee with the lowest retention standing on the retention register. A competing employee may not be released from a competitive level while retaining in that level an employee with lower retention standing except as provided for in 5 C.F.R. 351.601.

*Section 8.*  **Placement Considerations.**  In order to minimize the impact of a RIF, consideration will be given to:

a.  Filing existing vacancies by the placement of qualified employees who are adversely affected by the RIF.

b.  Terminating temporary appointments of individuals in unaffected competitive levels to create placement opportunities for qualified permanent employees (Group I or Group II employees) who are scheduled for separation under RIF procedures.

*Section 9*.  **Placement Assistance.**  All available and appropriate job placement services will be provided to employees adversely affected by RIF in accordance with appropriate law and regulations.  Such assistance shall include use of:

a.  Bargaining unit employees who are offered and accept bargaining unit positions outside their competitive area in lieu of involuntary separation due to RIF will have their transportation expenses paid to the maximum extent permitted under the provisions of the Joint Travel Regulations provided the employee has not previously declined a valid offer.

b.  DoD Priority Placement Program (PPP).  Employees adversely affected by a RIF shall be registered in the DoD PPP in accordance with the DoD PPP Operations Manual. Employees placed outside their commuting area through the PPP and who have been notified of involuntary separation will have their transportation expenses paid to the maximum extent

permitted under the provisions of the Joint Travel Regulations provided the employee has not previously declined a valid offer.

c.  DDESS Re-employment Priority Lists (RPL).  DDESS will establish RPLs for employees who have been separated due to RIF in accordance with procedures at subpart B of 5 C.F.R. Part 330, Reemployment Priority List.  It is DDESS policy that, if there are not qualified part-time employees on the RPL for a particular part-time position, full-time employees who have indicated availability for part-time work shall be placed if qualified and interested. Eligible employees will be registered on the RPLs for a maximum of two (2) years.  If an employee declines a valid job offer, his/her name will be removed from the RPL.  If a full-time employee accepts part-time employment, it will be considered a valid job offer and the employee's name will be removed from the RPL.  Acceptance of a temporary appointment will not alter a permanent employee's right to be offered permanent employment.

*Section 10.* **Salary Retention Provisions**.  Grade and pay retention shall be afforded to employees who are demoted to a lower graded/paid position within DDESS in accordance with 5 C.F.R. Part 536 and appropriate procedures.  Pay retention will be granted based upon the employee's hourly rate of pay without regard to work schedule.  An employee who is

demoted and on retained grade and/or pay shall receive priority consideration for re-promotion to positions up to and including the grade/pay level from which demoted.

*Section 11.*  **Severance Pay**.  Severance pay shall be paid in accordance with subpart G of 5 C.F.R. Part 550

*Section 12*.  **Assistance to Employees**. Job placement services may be provided to employees adversely affected by the RIF, according to appropriate law and regulation.

*Section 13*.  **Review of Records**.  Employees or the employee's representative, have the right to review any records used by the Agency in any RIF action that was taken or will be taken regarding the employee, including the complete retention register with the employee's name, so that the employee may consider how the competitive level was constructed and how the relative standing of the competing employees was determined. This also includes the right to review the complete retention register (as appropriately redacted for privacy concerns) for other positions that could affect the composition of the employee's competitive level.

141

ARTICLE 25

**DISCIPLINARY ACTIONS**

*Section 1.*  **Policy.**

a.  Discipline is the right and the responsibility of the Agency and will only be taken for such just and sufficient cause as will promote the efficiency of the service, and the penalty will fit the offense.

b.  Constructive discipline, to be effective, must be timely.  The results to be achieved through this means diminish in proportion to the time allowed to elapse between the offense and the corrective action. Nevertheless, the Parties agree that sufficient time should be allowed to complete appropriate investigations and fact-finding and that undue haste is as undesirable as undue delay.  Supervisors, unit employees, Association representatives, and others involved in an investigation will not disclose any information gained through such investigations except in the performance of their official duties.

c.  Disciplinary actions will not be arbitrary or capricious.

d.  The Agency recognizes the concept of progressive discipline, and generally actions imposed should be the minimum that can reasonably be expected to correct and improve employee behavior and maintain discipline and morale among other employees.

143

e.  A bargaining unit member who is to be questioned by a DoDEA or DDESS management employee in connection with an investigation may request representation by the Association at any time that he/she reasonably believes that disciplinary action may result against him/her.  If requested, the bargaining unit member will be entitled to be represented by an FEA attorney, at no cost to the Agency, and a local Association representative.  If the bargaining unit member requests Association representation by an FEA attorney or local Association representative, or both, no questioning will take place until the Association has been given at least 24 hours to confer privately with the bargaining unit member. However, if the matter to be investigated involves a lost child, bomb/terrorist threat, or some other matter involving imminent danger to students, faculty and/or staff, the Agency shall not be required to delay the questioning. In no event will the bargaining unit member be permitted to delay questioning beyond 24 hours.

*Section 2.*  **Informal Disciplinary Actions.**  Informal disciplinary actions are oral admonitions and letters of caution.  When such an action is taken by a supervisor, the employee will be advised of the specific infraction or breach of conduct, when it occurred, and will be permitted to explain his/her conduct or act of commission or omission.  Such actions will not be placed

144

in the employee's Official Personnel File (OPF).

*Section 3.*  **Formal Disciplinary Actions.**  Formal disciplinary actions consist of written reprimands, suspensions, demotions, and removals. Before formal disciplinary action is initiated, an investigation or inquiry will be made by the immediate supervisor or other official designated by the Agency to ensure himself/herself of the facts of the case.

a.  A Letter of Reprimand must state the reason(s) for its issuance, the employee's right to file a grievance under the negotiated grievance procedure, and the length of time the reprimand will remain in the OPF.  A Letter of Reprimand may remain in the OPF for a period of two (2) years.  If at the end of the first year, there have been no further disciplinary infractions, the employee may request to have the Letter of Reprimand removed from the OPF.  There is no advance notice required before issuing a Letter of Reprimand.

b. The Agency may choose to not discipline an employee or may select a lower range of remedies and/or a lower appropriate remedy than provided in the Schedule of Offenses and Recommended Remedies.

c.  Whenever a formal disciplinary action is initiated against a unit employee that involves a suspension of fourteen (14) days or less, the following procedural requirements shall apply:

(1)    The unit employee must be given no less than fourteen (14) days written notice of the proposed action.

(2)    The notice shall:

(a)    State, in detail, the reason(s) for the proposed action;

(b)    Provide the employee with a copy of the material relied upon for the proposed action. Applicable Military Criminal Investigation Report of Investigation will be provided in accordance with Section 8 of this article.

(c)    Inform the unit employee of the right to reply orally or in writing, or both, within ten (10) workdays after receipt of the notice of proposed action, and the name and title of the official designated to hear an oral reply and/or receive a written reply;

(d)    State that a final decision of the proposed action will not be made until after receipt of the unit employee's reply or after the ten (10) workdays notice period, described in (c) above, whichever comes first; and

(e)    Inform the unit employee what duty status he/she will be in pending a decision on the proposed action.

(3)    Notice of Final Decision.  The unit employee shall receive notice of a final decision at the earliest possible date following the ten (10) workday reply period.  The notice of final decision shall be signed and

dated and shall inform the unit employee of:

      (a)    The reason(s) for the decision;

      (b)    The effective date of the action; and

      (c)    His/her rights under the negotiated grievance procedure.

    d.  Whenever a unit employee is reduced in pay, removed, or suspended for more than fourteen (14) days, the following procedures shall apply:

    (1)    Issuance of Advance Notice.  The unit employee will be given thirty (30) days advance notice of the proposed adverse action. The advance notice shall:

      (a)    State, in detail, the reason(s) for the action;

      (b)    Provide the employee with a copy of the material relied upon for the proposed action; Applicable Military Criminal Investigation Report of Investigation will be provided in accordance with Section 8 of this article.

      (c)    Inform the unit employee of his/her right to reply orally or in writing, or both, within twenty (20) days from receipt of the notice of proposed action, and the name and title of the official designated to hear an oral reply and/or receive a written reply;

      (d)    State that a final decision of the proposed action will not

147

be made until after receipt of the unit employee's reply or after the twenty (20) day period, whichever comes first; and

      (e)    Inform the unit employee of the duty status he/she will remain in pending a decision on the proposed action.

    (2)    An employee may be placed on excused leave or reassigned during the advance notice period at the sole option of the Agency.  Such a decision is not grievable.

    (3)    Notice of Final Decision.  The unit employee shall receive notice of final decision at the earliest possible date following the notice period. The notice of final decision shall be signed and dated and shall inform the employee of the following:

      (a)    Which of the reasons in the proposed notice have been found sustained;

      (b)    The effective date of the action; and

      (c)    His/her rights under the appropriate grievance and/or appeal procedures.

    e.  Employees to whom a notice of proposed disciplinary action has been issued are also entitled to:

    (1)    A reasonable amount of official time to review the notice and supporting material, to prepare an answer and to secure affidavits,

medical documentation, and other documentary evidence, if the employee is otherwise in a duty status; and

   (2) Be represented by an attorney and/or other representative.

*Section 4.* **Rights of Probationers.** The procedural rights described in Section 3.d. above do not apply to the discharge or separation of an employee during a probationary period.

*Section 5.* **Duty Status.** In the event a notice period is not completed prior to the beginning of the recess period, the affected unit employee may be carried in a duty status until the end of the notice period in order to complete the process. Otherwise, time limits do not run during any recess period.

*Section 6.* **Relationship to DDESS Instruction**. The provisions of this Agreement will be controlling when in conflict with DDESS Administrative Instruction 1435.1.

*Section 7.* **Crime Provision/Indefinite Suspension.** The Agency may, pursuant to the provisions of section 7513(b) of title 5, United States Code, reduce the 30-day notice period in Section 3.d. of this article when suspension or removal is initiated under that provision if the Agency has reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment may be imposed. In those

circumstances, the Agency may require the employee to furnish any reply to the proposed action, to include affidavits and other documentary evidence in support of the reply, within seven (7) days and may effect a decision once a reply is received or the reply period has expired.  In addition, if the Agency has reasonable cause to believe the employee has committed a crime for which the employee could be imprisoned, the employee may be placed on indefinite suspension in accordance with 5 C.F.R. 752.402**.**

*Section 8:*  **Agency Release of Military Criminal Investigation Reports.** When the material relied upon by the Agency to propose a disciplinary action as described in Sections 3. c. (2)(b) and 3. d. (1)(b) includes a Military Criminal Investigation Report of Investigation (ROI) conducted by OSI, CID, NCIS, etc., the employee and his/her representative may be required to sign a "non-disclosure" agreement prior to any release of the ROI since the ROI is not the property of the Agency.

150

ARTICLE 26

## GRIEVANCE PROCEDURE

*Section 1.*  **Purpose.**  The purpose of this Article is to provide a procedure for consideration of grievances filed by the Association, the Agency, and bargain unit employees.  The filing of a grievance shall not be construed as reflecting unfavorably on an employee's good standing, his/her performance, or his/her loyalty or desirability to the organization, nor shall it be regarded as an unfavorable reflection upon the Agency or its officials.

*Section 2.*  **Coverage.**

a.  These procedures apply to the Association, the Agency, and unit employees and shall be the exclusive procedure for resolving grievances that fall within its coverage.

b.  A grievance means any complaint:

(1)  by a unit employee concerning any matter relating to the employment of that employee;

(2)  by the Association concerning any matter relating to the employment of any unit employee(s); or

(3)  by a unit employee, the Association, or the Agency concerning:

(a)   the effect or interpretation or a claim of breach of this Agreement; or

151

JA237

(b)  any claimed violation, misinterpretation of any law, rule, or regulation affecting working conditions of employment.

c.  This procedure shall not apply to any grievance concerning:

(1)  any claimed violation of Subchapter III of Chapter 73, Title 5 U.S.C. (relating to prohibited political activities);

(2)  retirement, life insurance, or health insurance;

(3)  a suspension or removal under Section 7532 of Title 5 U.S.C.;

(4)  any examination, certification, or appointment;

(5)  the classification of any position which does not result in the reduction in grade or pay of an employee;

(6)  an advance notice of disciplinary or adverse action;

(7)  separation of probationary period employees;

(8)  termination or expiration of temporary appointments;

(9)  oral or written admonishments which are not placed in the employee's Official Personnel File; and

(10)  any other matter or issue excluded by any provision of this Agreement.

*Section 3.*  **Representation.**  A unit employee may present a grievance on his/her behalf under this procedure provided that the Association is given the opportunity to be present during the grievance proceeding and given a

152

copy of the written grievance.  The Local President will be provided with a copy of the written grievance within one (1) week of filing.  Any resolution reached with the unit employee shall be consistent with the terms of this Agreement.

*Section 4.*  **Local Grievance Procedures.**

Step 1 - Informal

The Parties agree that informal resolution of employee grievances is desirable.  To this end, the unit employee and/or their Association representative should present any grievance informally to his/her immediate supervisor within ten (10) days after the grievant knew, or should have known, of the act or incident leading to the grievance.  A meeting should be arranged within five (5) days of the informal presentation of the grievance to fully discuss the matter and to attempt informal resolution.

Step 2 – Formal

    a.  Notwithstanding the provisions of Step 1 above, the unit employee or his/her Association representative must present the grievance, in writing (using the form at Appendix Q), to the appropriate supervisor within thirty (30) days after the grievant knew, or should have known, of the act or incident leading to the grievance.

    (1)  A written decision shall be issued within ten (10) days from the

153

date the written grievance was received by the supervisor.  Such decision shall be transmitted to the grievant and the grievant's representative, if any.

(2)  The grievant or his/her Association representative shall have ten (10) days after the receipt of the supervisor's decision to advance the grievance to the next level.  If the grievant has not received a written decision from the supervisor within the ten (10) day period, the grievant may advance the grievance to Step 3 of this procedure within ten (10) days after the ten (10) day period has elapsed.

Step 3 - Review

When the grievance has not been resolved at Step 2, the grievant or his/her Association representative may submit his/her grievance to the Superintendent within the time specified in Step 2.  Along with the information submitted under Step 2, the grievant must include a statement as to why the supervisor's decision is unacceptable.  A final decision will be issued within thirty (30) days from its receipt.  Such decision shall be in writing and shall set forth the reasons for the decision.  A copy of the decision shall be transmitted to the grievant and the grievant's representative, if any.

Step 4 - Review by DDESS Director

154

When the grievance has not been resolved in Step 3, the grievant or his/her Association Representative may submit his/her grievance to the Director within the time specified in Step 2.  Along with the information submitted under Step 2 and 3, the grievant must include a statement as to why the supervisor's decision is unacceptable.  A final decision will be issued within thirty (30) days from its receipt and such decision shall be in writing and shall set forth the reasons for the decision. A copy of the decision shall be transmitted to the grievant and the grievant's representative, if any.

*Section 5.* **Agency/Association Grievances.**  The following procedure will be followed when processing grievances arising between the Association and the Agency:

a.  Association or Agency grievances may be filed only at the DDESS level by the respective officials at the regional level  utilizing the form at Appendix Q.

b.  Association or Agency grievances must be filed within thirty (30) days after the Association or Agency knew, or should have known, of the incident or occurrence giving rise to the grievance.

c.  Upon receipt of an Association or Agency grievance, the Association or Agency, as appropriate, shall review, investigate, and furnish a final decision within thirty (30)  days.  Should the Association's or Agency's decision not be satisfactory, arbitration may be invoked by the

appropriate party.

*Section 6.*  **Alternative Dispute Resolution.**

a.  Any grievance not resolved by the last step of the grievance procedure may be mediated with the assistance from the Federal Mediation and Conciliation Service, or other mutually agreed upon mediation service, if requested by either party.

b.  The party requesting mediation must notify the other party of its desire to engage in mediation and submit any necessary forms within thirty (30) days following the last step of the grievance procedure.  The Parties must mutually agree to mediation of any grievance and if mediation is agreed to, will share equally in any fees of the mediator.

c.  If the grievance is unresolved by mediation, the Association or the Agency may pursue the grievance to arbitration.  The date of the last day of mediation will be considered the conclusion of the last stage in the grievance procedure.  The grievance may then proceed to arbitration in accordance with Article 27.

d.  When DoDEA or DDESS officials request mediation and when attendance at such mediation will require travel by the FEA-SR Area Director outside of the commuting area (normal School District to which assigned) to participate in the mediation session, the Agency will issue a government travel order and pay travel expenses in accordance with the

Joint Travel Regulation.

*Section 7.*  **General Provisions.**

    a.  Time Limits.

    (1)  The time periods set forth herein shall be tolled during all recess periods in excess of four (4) workdays.  For Association Grievances, the winter recess shall be considered the twenty-one (21) calendar day period beginning on 18 December of each year through the 21st calendar day.  For Association Grievances, the summer recess period shall be considered the period beginning on 10 June and extending through 10 August of the same year.

    (2)  All time limits in this procedure may be extended or curtailed in writing by the mutual consent of the Parties.

    (3)  Both Parties agree to comply with the time limits estab-lished in the grievance procedure.  Failure to comply with established time limits will serve as a basis for either party to advance the grievance to the next step or to reject a grievance.

    b.  Cancellation. Local non-monetary grievance(s) shall be cancelled upon the death of the unit employee or upon his/her separation for reasons not connected with the grievance.

    c.  Exercise of Rights.  Under 5 U.S.C. 7116 and 5 U.S.C. 7121, unit employees may raise certain matters under this negotiated grievance

procedure or under an applicable statutory procedure, but not both.  For purposes of this Article, the unit employee or his/her representative shall be deemed to have exercised his/her option as to procedure when a timely written grievance under this procedure is filed; or a charge, appeal, or complaint under an applicable statutory procedure is initiated, whichever event occurs first.

d.  Protection from Reprisal.  In exercising their right to seek resolution of grievances, unit employees and witnesses shall be free from any and all restraint, interference, coercion, discrimination, or reprisal.  The filing of a grievance shall not be construed as reflecting unfavorably on a unit employee's good standing, his/her performance, his/her loyalty or desirability to the organization, nor shall it be regarded as an unfavorable reflection upon the Agency or particular Agency officials.

## ARTICLE 27

## **ARBITRATION**

*Section 1.*  **Invoking Arbitration.**

a.  Should either the Agency or the Association be dissatisfied with the final decision in a grievance covered by Article 26 of this Agreement, the party who filed the grievance may proceed to arbitration.  However, arbitration of the grievance may be invoked only by the Association or the Agency and does not require the approval of the bargaining unit member(s) involved.

b.  A written request for arbitration, FMCS Form No. R-43 (Appendix L), must be served on the opposing party within thirty (30) days following the conclusion of the last stage in the grievance procedure.  If the written request for arbitration is not served on the opposing party within thirty (30) days following the conclusion of the last step of the grievance procedure, the grievance shall be cancelled.

c.  The time periods set forth herein shall be tolled during all recess periods in excess of four (4) days.  The winter recess period shall be considered the twenty-one (21) calendar day period beginning on 18 December of each year through the 21st calendar day.  The summer recess

159

shall be considered the period beginning on 10 June and extending through 10 August of the same year.

d.  The party who files the grievance is deemed to be the "moving party" and bears the responsibility for moving the grievance forward in a timely fashion.  Both Parties owe a duty of good faith in moving the grievance forward.

*Section 2.*  **Selecting an Arbitrator.**

a.  Within ten (10) days from the date of the request for arbitration, the parties will jointly ask the Federal Mediation and Conciliation Service (FMCS) to provide a list of seven (7) impartial attorneys, "panel," qualified to act as arbitrators.  All costs associated with requesting a panel will be borne equally by the Parties, but the Agency reserves the right to reimburse the Association on a quarterly basis.

b.  Within thirty (30)  days from the date of the response from the FMCS conveying the names of the prospective arbitrators, the Parties shall meet, either in person or telephonically, to select an arbitrator.

c.  If the Parties cannot mutually agree upon one (1) member of the panel, then the Agency and the Association will each strike one (1) arbitrator from the panel and will repeat this procedure until one (1) name is remaining on the panel.  The remaining person shall be the duly selected

arbitrator.

d.  The Association shall have first strike the first time an arbitrator is selected under this Agreement, with the Parties alternating first strike in each selection thereafter.

e.  The FMCS shall be empowered to make a direct designation of an attorney arbitrator to hear the case in the event:

(1) Either party refuses to participate in the selection of any arbitrator; or

(2) Of inaction or undue delay by either party.

*Section 3.* **Arbitrating Grievances.**   Unless the Parties agree otherwise, all cases in which the Agency bears the burden of proof will proceed to hearing first.  Other cases will proceed to hearing in the order determined by the moving Party. Where the Agency bears the burden of proof, the Agency can petition the arbitrator to dismiss the case with prejudice at any time after two (2) years following the invocation date if the arbitrator finds that the Union has not made reasonable efforts to participate in scheduling/conducting the hearing.

*Section 4.*  **Issue.**  If the Parties fail to agree on a joint submission of the issue for arbitration, each shall submit a separate submission; and the arbitrator shall determine the issue or issues to be heard.  Issues not raised

during the grievance process, including timeliness, shall not be raised nor considered by the arbitrator during the arbitration process.

*Section 5.*  **Arbitration Expense.**

a.  The arbitrator's fee and his/her expenses of the arbitration shall be borne equally by the Agency and the Association.

b.  The arbitration hearing will be held on the Agency's premises during the normal duty day as determined by the arbitrator.  In the unforeseen event that the Parties must agree to hold hearings in facilities that are not under the administrative control of the Agency, any cost of such facilities will be borne equally by the Agency and the Association.

c.  If desired, either party may choose to tape-record or have a transcript made of the hearing.  Should the other party wish to have a copy of the transcript, it must share equally in the cost.

d.  The grieving employee will be in a pay status for the duration of the hearing if otherwise in a duty status.  The Association representative will be granted official time as described in Article 6 for the duration of the hearing if otherwise in a duty status.

*Section 6.*  **Witnesses.**

a.  Each party may recommend witnesses by providing the full name, address, and a statement setting forth the expected testimony.  The parties

162

will exchange witness lists at least one (1) day before the hearing.

     b.  The arbitrator shall determine the witnesses to provide testimony.

     c.  Approved witnesses will be in a pay status to the extent necessary to permit their testimony only if otherwise in a duty status.  The term "otherwise in a duty status" does not include when the hearing occurs on a normal duty day and the proceedings go beyond the employee's normal duty hours nor does it include days when the employee would not otherwise be in a normal duty status because of school closure, break periods, etc.

     d.  The arbitrator has the authority to extend the proceedings past the duty day.  However, no reimbursement (monetary and/or compensatory time) will be paid as a result.

     e.  Telephone testimony will be admissible unless objected to by the opposing party, in which case the Arbitrator will decide whether such testimony will be admissible.  Except for rebuttal witnesses, all witnesses identified for telephonic testimony will be so identified in the list of witnesses provided to the opposing party specified in Section 6.a. above.

*Section 7.*  **Decision.** The arbitrator will be requested to render a written decision as quickly as possible but, in any event, not later than thirty (30) days after the closing of the record.  The record will close following the last

day of the hearing unless extended by the arbitrator.  Post-hearing written briefs, if requested by the arbitrator, are due within thirty (30) days after closing of the record.

*Section 8.*  **Exceptions.**  The arbitrator's award shall be binding on the Parties.  However, either party may file exceptions to an award with the Federal Labor Relations Authority (FLRA) under 5 U.S.C. 7122.

*Section 9.*  **Arbitrator's Authority**.  The arbitrator shall have no power to add to, subtract from, disregard, alter, or modify any of the express terms of the Agreement or any Memorandum of Understanding (MOU) between the Parties.  Additionally, he/she will have no authority to make any decision, recommendation, or award that would require an act inconsistent with or prohibited by law, rule, or regulation, or that would violate the terms of this Agreement.  If either party disagrees as to the meaning or application of the decision, that party may return the decision to the arbitrator with a request for clarification.  Arbitrators are bound by the holdings and interpretations of the Merit Systems Protection Board, the FLRA, and the Agency's regulations as provided by law.

*Section 10.*  **Attorney's Fees**.

164

a.  The General Counsel's Office, Department of Defense Education Activity, will provide a written notice to the Association thirty (30) calendar days after an entitlement to payment of attorney's fees to FEA-SR has been established and the attorney's fees have not yet been paid.  The notice to FEA-SR will contain the following information.

(1)  What steps have been taken to obtain payment;

(2)  Status of payment request;

(3)  Steps to be taken to obtain payment; and

(4)  Projected payment date.

b.  If attorney's fees have not been paid within sixty (60) calendar days after the original date of entitlement to payment, the General Counsel will send a follow-up letter to the Association that updates the information contained in the previous letter.

c.  This provision is not limited to the payment of attorney's fees resulting from grievances filed under Article 26 of the MLA.

ARTICLE 35

## DURATION OF AGREEMENT

*Section 1.*  **Effective Date and Duration.**

This Agreement shall become effective on the date it is approved by the

Agency Head (as provided for in 5 U.S.C. 7114(c)), or (if not approved or

disapproved within thirty (30) calendar days from the date of execution) on

the thirty-first (31st) day following the date of execution, or as otherwise

provided for by law, and shall remain in effect for an initial term of five (5)

years following the effective date. This Agreement will be considered

executed on the date of signatures by the parties' designated signatories.

*Section 2.* **Renewal.**

a.  Either party may provide written notice of at least 365, but not

more than 395 days before the expiration of this Agreement of its desire to

engage in bargaining a new agreement. If either party requests to bargain

and negotiations are not completed prior to the expiration of the agreement,

subject to the exception set forth below, the Agency agrees to provide a

one-year extension of the general schedule pay raise. In the event such

notice is submitted, the basic terms and conditions of the Agreement shall

remain in effect until that bargaining is concluded and new provisions are

executed and approved in accordance with 5 U.S.C. § 7114 (c).

b.  If neither party files such written notice, the mandatory subjects of bargaining contained in the expired Agreement shall be automatically renewed in one (1) year increments. The non-mandatory subjects of bargaining contained in the expired Agreement will continue until such time as the party assigned the privilege withdraws its permission to continue to abide by the non-mandatory subject(s) after notice(s) to the other party.

c.  The parties may jointly agree to amend provisions of the agreement through duly executed Memorandums of Agreement.

*Section 3.* **Negotiability Appeal Determinations.**

If a negotiability appeal that arises out of the negotiation of this Agreement has been decided by the appropriate authority, and the issue has been found to be negotiable, upon written request of one or both of the Parties, the issues raised in the negotiability appeals procedure shall be re-negotiated within sixty (60) days of the final decision, if bargaining is not completed within sixty (60) days, either party may request FMCS assistance. Agreements reached or third party decisions rendered shall become an addendum to this Agreement.

# Exhibit 3

# MASTER LABOR AGREEMENT

_____ BETWEEN_____

## FEDERAL EDUCATION ASSOCIATION STATESIDE REGION (FEA-SR) (EDUCATION SUPPORT PROFESSIONALS)

_____ AND _____

## DEPARTMENT OF DEFENSE DOMESTIC DEPENDENT ELEMENTARY AND SECONDARY SCHOOLS (DDESS)

25 March 2010

**MASTER LABOR AGREEMENT**

**BETWEEN**

**FEDERAL EDUCATION ASSOCIATION – STATESIDE REGION (FEA-SR)**

**(EDUCATION SUPPORT PROFESSIONALS)**

**AND**

**DOMESTIC DEPENDENT AND SECONDARY SCHOOLS (DDESS)**

**INDEX**

| ARTICLE | SUBJECT | PAGE |
|---|---|---|
| 1 | PREAMBLE | 1 |
| 2 | MISSION STATEMENT | 4 |
| 3 | RECOGNITION | 5 |
| 4 | CONDITIONS OF THE AGREEMENT | 7 |
| 5 | AGENCY RIGHTS | 11 |
| 6 | ASSOCIATION RIGHTS | 14 |
| 7 | BARGAINING RIGHTS AND REQUIREMENTS | 38 |
| 8 | EMPLOYEE RIGHTS | 46 |
| 9 | GENERAL ADMINISTRATION PROCEDURES | 58 |
| 10 | ASSOCIATION AND DDESS COOPERATION | 64 |
| 11 | HEALTH AND SAFETY | 67 |
| 12 | STUDENT DISCIPLINE | 74 |
| 13 | PLACEMENT OF CHILDREN WITH DISABILITIES | 76 |
| 14 | WORKERS COMPENSATION | 77 |
| 15 | PERFORMANCE APPRAISAL SYSTEM | 79 |
| 16 | DUES ALLOTMENTS | 81 |
| 17 | CERTIFICATION AND LICENSURE | 87 |

| 18 | HOURS OF WORK AND SCHEDULING | 92 |
| 19 | TRAINING AND STAFF DEVELOPMENT | 99 |
| 20 | PAY AND BENEFITS | 103 |
| 21 | LEAVE | 122 |
| 22 | INTERNAL PROMOTION, REASSIGNMENTS, CHANGE TO LOWER GRADE, DETAILS, TEMPORARY PROMOTIONS, AND SCHOOL MOVES | 141 |
| 23 | REDUCTION IN FORCE | 149 |
| 24 | BASE CLOSURES | 158 |
| 25 | DISCIPLINARY ACTIONS | 159 |
| 26 | GRIEVANCE PROCEDURE | 167 |
| 27 | ARBITRATION | 177 |
| 28 | DEVELOPMENT OF NEW/SPECIAL PROGRAMS | 184 |
| 29 | DURATION | 185 |
| APPENDIX A | CASE NO. AT-RP-02-0019 DECISION AND ORDER | |
| APPENDIX B | DDESS/FEA-SR CLASSIFIED UNIT OFFICIAL TIME REQUEST/REPORT | |
| APPENDIX C | FEA-SR CLASSIFIED UNIT REQUEST FOR INFORMATION UNDER SECTION 7114(b) (4) OF THE FEDERAL SERVICE LABOR MANAGEMENT RELATIONS STATUTE | |
| APPENDIX D | SALARY SCHEDULES | |
| APPENDIX E | DDESS/FEA-SR CLASSIFIED UNIT EXTRACURRICULAR DUTY ASSIGNMENT AGREEMENT | |
| APPENDIX F | DDESS EXTRACURRICULAR DUTY ASSIGNMENT COMPENSATION SCHEDULE | |
| APPENDIX G | DDESS/FEA-SR CLASSIFIED BARGAINING UNIT EMERGENCY LEAVE BLANK ENROLLMENT FORM | |

APPENDIX H          DDESS/FEA-SR CLASSIFIED UNIT EMERGENCY LEAVE BANK

                    REQUEST FORM

APPENDIX I          DDESS/FEA-SR CLASSIFIED UNIT NEGOTIATED GRIEVANCE FORM

APPENDIX J          REQUEST FOR ARBITRATION PANEL FORM

APPENDIX K          DEFINITIONS

APPENDIX L          STATEMENT OF UNDERSTANDING

APPENDIX M          SALARY WORKSHEET

APPENDIX N          DDESS POLICY LETTER 04-009, EMERGENCY CLOSURE, DISMISSAL,

                    OR LATE ARRIVAL PROCEDURES, 9 Aug 2004

ARTICLE 6

**ASSOCIATION RIGHTS**

*Section 1.*  **Exclusive Representative.**  The Association is recognized as the exclusive representative of the employees in the unit described in Article 3 and is entitled to act for and negotiate collective bargaining agreements covering all employees in the unit.  The Association shall represent the interests of all employees in the unit pursuant to 5 U.S.C. § 7114(a)(1).  The Association retains all bargaining rights provided under Chapter 71 of Title 5, U.S. Code.

*Section 2.*  **Weingarten Rights.**

a.  The Association shall be given the opportunity to be present at any examination of a bargaining unit member by a representative of the Agency concerning an investigation if:

(1) The employee reasonably believes that the examination may result in disciplinary action against the employee; and

(2) The employee requests representation.

b.  The Agency shall inform bargaining unit employees of their Weingarten rights by posting a written notice on bulletin boards at each school and by distributing said notice, in either written or electronic form, to

14

each individual unit employee during September of each school year.  All new employees will receive like notice at the time of hiring.

c.  If the bargaining unit member requests Association representation, by an FEA attorney, or a local Association representative, or both, no questioning will take place until the Association has been given at least twenty-four (24) hours to confer privately with the bargaining unit member.  In no event will the bargaining unit member be permitted to delay questioning beyond twenty-four (24) hours.  The Agency shall not be required to delay the questioning if the matter to be investigated involves a lost child, bomb/terrorist threat, or some other matter involving imminent danger to students, faculty, and/or staff.

d.  The Parties understand that the Association shall inform the Agency of the identity of the local Association representative who will attend the Weingarten meeting.

*Section 3.*  **Formal Discussion Rights.**

a.  Local School System/School Building/Worksite Level.

(1)  The Association shall be given the opportunity to be represented at any formal discussion whether held at the school system, school, worksite level, and/or any subpart thereof (which may include, for

15

example, committees, meetings, groups, and training) between one or more representatives of the Agency and one or more unit employees or their representatives concerning any grievance, any personnel policy or practices, or other general conditions of employment.  Whenever possible, prior to the Agency initiating any formal discussion involving resolutions of grievances or discussions of personnel policies, practices, or other terms and/or other general conditions of employment, the Association shall be given forty-eight (48) hour advance written or electronic (email) notification.

(2)  The Parties understand that the Association shall inform the Agency, before any meeting herein described, of the identity of the Association representative who will attend the meeting.  The Association representative shall be authorized official time, as provided for in Section 10 of this Article, during the time the employee would otherwise be in a duty status.  The Association representative will be in a paid duty status regardless of the time of day or year.

b.  District/DDESS/DoDEA Level.

(1)  The Association shall be given the opportunity to be represented at any formal discussion (which may include, for example, committees, meetings, groups, and/or training) between one or more

16

representatives of the Agency and one or more unit employees or their representatives concerning any grievance, any personnel policy or practices, or conditions of employment whether at the District, DDESS, or DoDEA level.

(2)  The Parties understand that normally the Association representative will be the FEA-SR Area Director for meetings at the DoDEA, DDESS, or District level.  The Parties also understand that the Association shall inform the Agency, before any meeting herein described, of the identity of the Association representative who will attend the meeting.

(3)   Prior to the Agency initiating any formal discussion involving resolutions of grievances or discussions of personnel policies, practices, or other general conditions of employment, the Association shall normally be given 10 calendar days advance written or electronic (email) notification.

(4)  The Association representative attending the formal discussion will be in a paid duty status for hours assigned and worked after the normal duty day or days assigned and worked regardless of the time of

day or year.  If travel is required, travel expenses, including per diem, will

be paid in accordance with the JTR.

*Section 4.*  **Information Requests Under Subsection (b)(4) of Section**

**7114, Title 5, United States Code.**  The Agency recognizes the

Association's right to information under 5 U.S.C. 7114(b)(4).  The Parties

agree that all such requests for information by the Association will be in

writing (per the format in Appendix C) and will articulate why the

Association needs the requested information, including the uses to which

the Association will put the information and the connection between those

uses and the Association's representational responsibilities.  All such

requests meeting the above-stated criteria will be processed by the Agency

within ten (10) workdays.  The Agency further agrees to provide to the

Association, without charge and to the extent not prohibited by law, all

such data and information normally maintained by the Agency in the

regular course of business, which are reasonably available and necessary

for full and proper discussion, understanding, and negotiation of subjects

within the scope of bargaining, and which do not constitute guidance,

advice, counsel, or training provided for Agency officials or supervisors,

relating to collective bargaining.  If the Agency needs clarification of a

18

request for information or needs to communicate countervailing anti-disclosure interests on employee privacy concerns, it will do so in writing.

*Section 5.*  **Announcement of Association Officers.**  The Agency shall recognize the Association as the exclusive representative of its classified bargaining unit employees.  During the initial staff meeting (Local School System/school level/work site) of each school year, the Agency shall announce the names of the elected and designated officials of the Association.  During new staff/employee in-processing or orientation, whether by group or individuals, the Agency shall provide the new employee written notice of the names of the elected and designated officials of the Association.

*Section 6.*  **Announcements at Faculty Meetings and Orientations.**

a.  The Association will be afforded the opportunity to make a presentation of not more than ten (10) minutes during the initial staff/faculty meeting at the Local School System/school building/worksite level, regardless of when the meeting is held, if bargaining unit employees are in attendance at the meeting.

b.  The Association will be afforded the opportunity to make announcements at any regularly scheduled District/Local School System/

19

worksite/school faculty/staff meetings if bargaining unit members are in attendance at the meetings.

c.  The Association will also be afforded the opportunity to make a presentation of at least ten (10) minutes prior to the end of scheduled formal new employee orientations.  This provision is not intended to obligate the Agency to conduct formal new employee orientations.

*Section 7.*  **Notification of Agency Responsibilities.**

a.  Each Local School System will, within twenty (20) workdays of the beginning of each school year, provide the local Association President, each Building Representative Spokesperson, and the Association Area Director with a copy of the school district phone directory and the name and phone number of the managerial point of contact for the following issues and topics: Equal Employment Opportunity (EEO); employee pay; labor employee relations; employee benefits; leave; workers compensation; retirement; training; hiring; position classification; official travel; purchasing; supplies and equipment; technology; school building security; safety; building maintenance; and property accountability.

b.  Within twenty (20) workdays of the beginning of each school year, the Agency will provide to the Association Area Director and the General Counsel a copy of the DDESS phone listings.

*Section 8.*  **Association Access to DoD, Department of Defense Education Activity (DoDEA), and DDESS Issuances.**

a.  The Agency shall provide to the Association General Counsel the website addresses which contain current DoD Directives and Instructions, as well as current DoDEA Directives and Instructions.

b.  The Agency agrees to provide to the Association General Counsel a copy (hard copy, electronic copy by e-mail, or website address) for all current DoDEA and DDESS Directives, Instructions, and Policy Letters that apply to bargaining unit members.  All bargaining unit members (at each Local School System) will have access to the directives, instructions, and policy letters.  Updated changes will be provided as issued.

c.  The Agency also agrees to maintain at each Local School System a set of current School Policies, as well as policies issued by the Superintendent, Community Superintendent, school principals, or any other Agency official, which apply to bargaining unit members.  The above will be available for review to all bargaining unit members.

21

*Section 9.*  **Representation on Committees.**

    a.  DDESS Level Committees.

      (1)  The Association shall be entitled to select one Association representative to be a member of each DDESS Level group or committee that is composed of Agency representative(s) and bargaining unit member(s) and that discusses personnel policies, practices, and terms and/or conditions of employment.  The Association representative will be in a paid duty status while working on committee activities.  If such committee work occurs outside of the regular duty day/year, such work must be approved by the Agency.  The Association representative will be compensated at his/her earned hourly rate for hours assigned and worked after the normal duty day or days assigned and worked outside of the normal work year.  The Association representative may elect, with Agency concurrence, to receive compensatory time in lieu of his/her earned hourly rate.  If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

      (2)  The Association shall also be entitled to nominate committee member(s) who are to come from the bargaining unit.  The bargaining unit member(s) will be in a paid duty status while working on

committee activities.  If such committee work occurs outside of the regular duty day/year, such work must be approved by the Agency.  The Association representative will be compensated at his/her earned hourly rate for hours assigned and worked after the normal duty day or days assigned and worked outside of the normal work year.  The bargaining unit member may elect, with Agency concurrence, to receive compensatory time in lieu of his/her earned hourly rate.  If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

b.  Local School System/School Building/Worksite Level Committees:

(1)  The Association shall be entitled to select one local Association representative to be a member of each Local School System/school building/worksite level group or committee that is composed of Agency representative(s) and bargaining unit member(s) and that discusses personnel policies, practices, and/or terms and conditions of employment.  The Association representative will be in a paid duty status while working on committee activities, when such activities are required and approved by the Agency, regardless of the time of day or time of year that the committee works.  The Association representative will be compensated at his/her earned hourly rate for hours assigned and worked

23

JA268

after the normal duty day or days assigned and worked outside of the normal work year.  The Association representative may elect, with Agency concurrence, to receive compensatory time in lieu of his/her earned hourly rate.  If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

(2)  The Association shall also be entitled to nominate committee member(s) who are to come from the bargaining unit.  Such bargaining unit member(s) will be in a paid duty status while working on committee activities, when the activities are approved by the Agency, regardless of the time of day or time of the year that the committee works.  Bargaining unit members will be compensated at their earned hourly rate for hours assigned and worked after the normal duty day or days assigned and worked outside of the normal work year.  The bargaining unit member may elect, with Agency concurrence, to receive compensatory time in lieu of his/her earned hourly rate.  If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

*Section 10.*  **Release of and Travel by Association Area Director.**

a.  If the Area Director is elected from this bargaining unit, the Association will be entitled to the release from duty of one bargaining unit

24

member to act as Area Director.  The bargaining unit member to act as

Area Director will be determined by the Association.

    b.  The following protocol will govern the Area Director's employment.

       (1)  While on release, the Area Director will receive

his/her regular rate of pay for his/her normal employment work schedule

with DDESS and will receive all benefits including, but not limited to,

retirement credit, health benefits, savings plans, and leave.

       (2)  In the event that Agency officials initiate a meeting

during a recess period with the Area Director who is a seasonal employee,

the Area Director will be paid at his or her earned hourly rate for hours

assigned and worked.

       (3)  When official travel is required for the Area Director

to meet with Agency officials, the Area Director will receive government

travel orders.  Travel expenses will be paid in accordance with the JTR.

       (4)  Additionally, the DDESS Director will annually provide a

letter of introduction for the Area Director to use for travel to Local School

Systems described in Article 3.  The letter will request that on-base field

grade quarters be provided, if available.

25

(5)  A bargaining unit member released from duty to serve as Area Director under this section will be granted return rights to his/her former or similar position.

*Section 11.*  **Release Time for Local Presidents.**

a.  The Association is entitled to the release from duty of one local Association President as follows:

(1)  One (1) workday per week at the following Local School Systems:

> Fort Campbell
> Camp Lejeune
> Fort Stewart
> Fort Knox

(2) One-half (1/2) workday per week at the following Local School Systems:

> West Point

b.  The local Association President will continue to perform duties normally assigned to his/her position; but those duties will be reduced in the same proportion as the release/official time described in section 10.a.

c.  Any local President entitled to pre-approved release time as described above may request and, with the concurrence of the

26

Superintendent (or designee), choose to not schedule regular release time but instead request official time on an as-needed basis.

d.  In cases of special circumstances, i.e., natural disaster, adverse weather, closure of schools, in-service training, standardized testing, end-of-course exams, parent conferences, field trips, field days, the local Association President may be required, or may elect with the Superintendent's (or designee's) concurrence, to reschedule the official time period for a given day.

e.  The schedule of release time will be determined by the Agency and the Association at the local level.  If the Agency elects to provide substitute coverage while the Local Association President is on official time release, it will consider utilizing the same employee in the position.

f.  The local Association President will continue to receive his/her normal salary and benefits while otherwise in a duty status and on pre-approved release/official time.

g.  When official travel is required to meet with Agency officials away from the normal duty station, the Local Association President will receive government travel orders.  Travel expenses will be paid in accordance with the JTR.

27

JA272

h.  In the event that Agency officials initiate or schedule a meeting during a recess period, a local President, not otherwise in a duty status because of the recess period, will be paid at his/her earned hourly rate for hours assigned and worked outside of the normal work year.  The local President may elect, with Agency concurrence, to receive compensatory time in lieu of his/her earned hourly rate.

i.  The Agency recognizes the right of the Association to select or appoint its representatives for purposes of carrying out representational responsibilities.  Accordingly, if the Local Association President is out on approved sick leave for any reason listed in Section 3.d of Article 21 and unable to perform necessary representational functions, he/she may designate an alternate representative to fulfill representational functions.

j.  Except for approved absences from the Local School System to attend Area Council meetings, training, or other events that necessitate the local President's absence from the Local School System, official time granted under this section will occur within Agency premises.  The local Association President will obtain approval from the Agency prior to performing duties while on official time away from Agency premises.

28

*Section 12.*  **Official Time.**

a.  Official Time shall be defined as time granted to an Association representative to conduct official representational duties or other activities as provided in 5 U.S.C. 7131.  Official time may not be used to conduct internal Association business (e.g., activities related to solicitation of members, collection of dues, and election of officers).

b.  Bargaining units at Local School Systems shall receive a bank of hours per school year to be used by Association officials and representatives for representational duties as follows:

| | |
|---|---|
| Fort Campbell Dependents Schools | 200 hours |
| Fort Knox Community Schools | 200 hours |
| Camp Lejeune Dependents Schools | 200 hours |
| West Point School | 200 hours |
| Fort Stewart Dependents Schools | 200 hours |

These above-mentioned hours do not include official time provided by statute or regulation or for Agency-initiated requests to meet with Association official(s).  If mutually agreed upon, additional official time may be granted.

29

JA274

c.  Use of official time from the bank of hours shall normally be requested in writing two (2) workdays in advance utilizing the form at Appendix B except for scheduled regular release time.  Any such time approved will be recorded on the same form.

d.  Up to thirty-two (32) hours of official time per school year from each respective bank of hours may be used by Association-designated bargaining unit members at each Local School System to attend Association Area Council meetings.  The hours authorized for attendance at Association Area Council meetings are in addition to the release time provided under Section 11 of Article 6.  When requested, bargaining unit member attendees will be provided temporary duty travel (TDY) orders, i.e., permissive TDY orders.  This travel order will include appropriate statements that the travel is at no expense to the Government, that no per diem or other travel reimbursement is authorized, that the travel is at the employee's request, and/or that no accounting citation is required.

e.  In addition to the official time authorized in Section 12.d. above for attendance at Area Council meetings, the Association Area Director may identify three (3) additional employees and the FEA-SR HCR within the bargaining unit who may attend each Area Council meeting up to a

30

maximum of sixty-four (64) hours per Area Council meeting.  No later than thirty (30) days prior to the date on which the release time for attendance will occur, the Area Director must give written notice to the DDESS Labor Relations Specialist(s) of which employees (to include the employee's school and school district) have been identified to attend the Area Council meeting.  Should any of the identified employees be unable to attend as planned, a substitute may be permitted to go in his/her place if notice of the need for attendance is provided to the DDESS Labor Relations Specialist(s) at least five (5) workdays in advance and the employee's absence from the worksite is approved by the supervisor.

f. Except for approved absences from the Local School System to attend Area Council meetings, training, or other events that necessitate the bargaining unit member's absence from the Local School System, official time granted under this section will occur within Agency premises, to include traveling between schools within the district.  The bargaining unit member on official time will obtain approval from the Agency prior to performing duties while on official time away from Agency premises.

31

*Section 13.*  **Office Space and Equipment.**

a.  Each local Association will be provided office space with a desk and locking file cabinet dedicated for use by the Association President. The office space shall also contain a table, chairs, an Agency-standard computer with software, printer, Fax machine, and a telephone line with long distance capability, if feasible.  In providing an Agency-standard computer with software, printer, and FAX machine, the Agency agrees to include the local Association office on the schedule for periodic upgrades of software and computer equipment which is normally a three (3) to four (4) year cycle.  Changes/upgrade of equipment will be scheduled with the local Association President.  The Agency will, as far as possible, identify individuals who have access to the office space allocated for the Association's use.

b.  The Agency agrees to pay the cost of installation for the telephone line, basic monthly service, and monthly long-distance access fees; but all other recurring operating costs, i.e., monthly long distance calls, FAX and copy paper, etc., will be the responsibility of the Association.

c.  All furniture and equipment is for Association business and may not be removed from school premises without written authorization from the Agency.

d.  The Agency will provide cleaning and maintenance of the office space allocated for the Association's use.

*Section 14.*  **Use of Facilities and Equipment.**

a.  Upon written request and approval by the local Superintendent (or designee), the Agency agrees to provide space in a school/Local School System building for Association meetings.  Normally, such meetings occur after duty hours.  Use of the space will be contingent upon availability and will not interfere with any school activities or community functions.  The Association will be responsible for the security and physical condition of the space/facility used.

b.  The Association may use bargaining unit members' mailboxes within each school or worksite for distribution of Association notices, bulletins, and other informational materials to bargaining unit members.  All such materials must be clearly identified as Association materials.

c.  The Agency shall also provide the local Association with a mailbox and/or distribution box identified for the exclusive use of the Association in

each school, worksite, and/or Local School System office.  The Association

shall also have access to the school system's distribution service.  Any

mail addressed to the Association and received at a school will be placed

in the Association's mailbox.

d.  The Association representative/designee shall be provided direct

access to a copy machine (as designated by the Agency) in each

school/worksite for use in official matters.  The Association shall provide

the paper used for such copying.

e.  The Association will be entitled use of up to one-half the space on

existing bulletin boards located in each teacher, staff, or worksite

lounges/break area, or will be provided with a bulletin board in each

school's/worksite's lounge, break area, or other appropriate location.  Such

bulletin board space shall be for the exclusive use of the Association.

f.  Upon advance written notice, the Agency shall make reasonable

effort to ensure that Association employees and officials are allowed

access to military installations in order to conduct labor-Agency or

Association business.  The parties understand that access to the

installation will be subject to security restrictions imposed by the local

installation.

34

g.  Upon written request by the Association, the Agency shall consider allowing the Association's use of other school/Local School System facilities, equipment, and/or services not otherwise specifically mentioned in this Agreement.

*Section 15.*  **School Board Meetings.**

a.  The Local Association President or designee will be permitted to attend all regularly scheduled school board meetings for the site they represent.  Official time, as provided for in Sections 10 and 11 of this Article, will be provided if the meeting is held during the school day. Executive session meetings may be closed under 10 U.S.C. 2164 (d)(6).

b.  The Local Association President/designee may submit items for placement on the agenda and may participate in school board discussions of agenda items in accordance with local school board procedures.

c.  A copy of the agenda and the previous month's minutes will be provided to the Local Association President/designee upon distribution to the school board.  Official time will be provided if the meeting is held during the school day.

35

d.  If travel outside the commuting area is required for attendance at a school board meeting, the Local Association President or designee, will receive reimbursement for travel expenses in accordance with the JTR.

e.  If subsequent legislation changes the present statutory requirement for a School Board to be established at each military installation where a DDESS Local School System exists, the Parties will, upon written request by either party, meet and complete bargaining as provided in Chapter 71 of Title 5, United States Code.

*Section 16.*  **FEA At-Large Officers.**  In the event an FEA At-Large Officer is elected from the DDESS classified bargaining unit, the bank of hours of official time identified for the Local School System where that bargaining unit employee works (Section 12b. of this Article) will be increased by 160 hours of official time for the school year(s) during which the employee(s) holds the position of FEA At-Large Officer.  The FEA At-Large Officer will be accorded up to a maximum of twenty (20) workdays (160 hours) of official time as needed to attend FEA Board meetings, workshops, training, and the like.  Requests for official time for this purpose will be submitted, at least five (5) workdays in advance, to the Superintendent of the FEA

36

At-Large Officer's District on the form at Appendix B.  Such requests for

official time are subject to approval by the Superintendent.

ARTICLE 7

**BARGAINING RIGHTS AND REQUIREMENTS**

*Section 1.*  **Bargaining.**

a.  Levels for Bargaining:

(1)  Issues affecting DoDEA, DDESS, District, or multiple local school systems will be bargained at the DDESS Director/Association Area Director level.

(2)  Issues unique to a Local School System, individual school, or worksite, or portion thereof, will be bargained at the local Association President/local Superintendent level.

b.  Requirements for All Bargaining:

(1)  The Association and the Agency will determine the make-up of their own bargaining teams.

(2)  Association representatives engaged in bargaining will be in a duty status and on official time for pay purposes while bargaining, including reasonable amounts of approved preparation time, regardless of the time of the day or part of the calendar year.  Pay for all bargaining unit team members during bargaining will be at each individual bargaining team member's earned hourly rate.

(3)  While bargaining may be accomplished through person-to-person meetings or by telephone, facsimile, electronic mail, and/or video teleconferencing, etc., to the greatest extent possible bargaining will be accomplished in such a manner so as to preclude the need for travel.

(4)  When bargaining is completed through person-to-person meetings, bargaining sessions will be held at a location selected and paid for by the Agency.  Typically the sessions will be held during normal duty hours.

(5)  If travel is required for the Association Area Director, local President(s) and/or bargaining team members to engage in DoDEA, DDESS, District, or multiple Local School System bargaining (substantive, impact and implementation, or mid-term), the Agency will issue a government travel order and pay travel expenses in accordance with the Joint Travel Regulations.

(6)  The DDESS Director may also, at his/her discretion, agree to issue government travel orders and pay travel expenses in accordance with the JTR for the Area Director to participate in local bargaining when unique circumstances so warrant.

39

(7)  As provided for in 5 U.S.C. 7114(b)(5), if agreement is reached between the Parties and either party so requests, the agreement will be executed in writing documenting the agreed-upon terms.

*Section 2.*  **Impact and Implementation Bargaining.**

a.  The Agency recognizes that the Association must be notified of changes to personnel policies, practices, and/or terms and conditions of employment that impact bargaining unit members, prior to implementation, in accordance with Chapter 71 of Title 5, U.S. Code.  The obligation set forth above in the immediately preceding sentence includes, but is not limited to, the solicitation of volunteers and implementation of committee recommendations that constitute changes to personnel policies, practices, and/or terms and conditions of employment that impact bargaining unit members.

b.  In the event that the Agency exercises its rights under 5 U.S.C. 7106 (a), the following rules shall apply:

**(1)  DoDEA, DDESS, District, and/or multiple Local School System Level Bargaining.**

(a)  For proposed changes, the Association Area Director will

40

be notified in writing of the proposed change(s), electronically (email) and certified mail, or hand-delivered with signed acknowledgement of receipt. The date of receipt for the certified mail, or the actual acknowledgment date in the case of personal delivery, will be the starting date for counting all future time requirements under this Article.

(b)  All such notification(s) described in paragraph  2.b.(1)(a) above will include a description of the proposed change(s) along with the Agency rationale for the change(s).

(c)  If requested, the Association and the Agency will discuss the details of the Agency's proposed change(s).

(d)  The Association Area Director will have thirty (30) calendar days to submit any written proposal(s) to the Agency's proposed change(s) to the office of the DDESS Director.

(e)  If, after proper notification of proposed change(s), the Association fails to respond with written proposal(s) during the time frames listed above, the Agency may implement its planned change(s).

(f)  Bargaining will commence not later than forty-five (45) calendar days after receipt of the Association's proposal(s).

41

(g)  The Association's bargaining team may be comprised of no more than two (2) bargaining unit members, the Association Area Director, or designee, and an FEA-SR attorney. If the Agency's bargaining team exceeds four (4) team members, then the Association bargaining team will be entitled to the same number of members as the Agency team.

(h)  In instances where implementation is necessary prior to expiration of the thirty (30) calendar day notification period or completion of bargaining, the Parties may agree, in writing, to allow for implementation of the change with application of agreed upon provisions retroactive to the date of implementation.

## (2)  Local School System Level Bargaining.

(a)  For proposed changes affecting a Local School System (or entity thereof), the Local Association President will be notified via certified mail or hand-delivered with signed acknowledgement of receipt.  The date of receipt for the certified mail or the actual acknowledgment date in the case of personal delivery, will be the starting date for counting all future time requirements under this Article.

(b)  All such notification(s) described in paragraph 2(a) above will include a description of the proposed change(s) along with the Agency rationale for the change(s).

(c)  If requested, the Local Association President (or designee) and Agency representative(s) will discuss the details of the Agency's proposed change(s)

(d)  The Local Association President will have twenty (20) calendar days to submit, to the local Superintendent (or designee), any written proposal(s) to the Agency's planned change(s).

(e)  If, after proper notification of proposed change(s), the Association fails to respond with written proposal(s) during  the time frames listed above, the Agency may implement its proposed change(s).

(f)   Bargaining will commence not later than ten (10) calendar days after receipt of the Association's proposal(s).

(g)  The Association bargaining team will consist of no more than one (1) bargaining unit member and the local President, or designee. If the Agency's bargaining team exceeds two (2), the Association will be entitled to an equal number of team members.  The Association Area

43

Director and/or FEA-SR Attorney may attend any bargaining session as observers at Association expense.

(h)   In instances where implementation is necessary  prior to expiration of the twenty (20) calendar day notification period or completion of bargaining, the Parties may agree, in writing, to allow for implementation of the change with application of agreed upon provisions retroactive to the date of implementation.

*Section 3.* ***Mid-Term Bargaining.***  The Parties agree that, during the eighteenth (18th) month of this Agreement, either side may provide notice of desire to engage in mid-term bargaining over any matter not reasonably covered by or contained in this Agreement.

a.  Within sixty (60) calendar days of that notice, the Parties may submit proposals over any DDESS-wide matter not reasonably covered by or contained in this Agreement.  After expiration of the sixty (60) day window to submit proposals, the Parties may agree to bargain on additional proposals.

b.  Initial bargaining proposals will be sent electronically, certified mail, overnight delivery service, or hand-delivered with signed acknowledgment of receipt to the DDESS Director or Association Area

44

Director.  The date of receipt for the electronic mail message, certified mail, or overnight delivery, or the actual acknowledgment date in the case of personal delivery, will be the starting date for counting all future time requirements under this Article.

c. The bargaining proposals will include a written explanation of the result desired by the proposals.

d.  Within thirty (30) days of receipt of the proposals, the Parties will meet to discuss ground rules (if requested by either side) and a schedule for bargaining.

e.  The Association bargaining team will consist of four (4) bargaining unit members, the Association Area Director, and an Association attorney.

45

ARTICLE 16

**DUES ALLOTMENTS**

*Section 1.* **Authority.**  The employer shall deduct Association dues from the pay of all eligible employees who voluntarily authorize such deductions in accordance with the provisions set forth herein.

*Section 2.* **Payroll Deduction.**  Bargaining unit employees may have their Association dues deducted through payroll deduction provided:

a.  The employee is a member in good standing of the Association;

b.  The employee has completed an SF-1187, "Request for Payroll Deductions for Labor Organization Dues." This form may be submitted and dues withheld at any time in accordance with Section 4 of this Article;

c.  The employee receives pay on the regularly scheduled paydays; and such pay is sufficient, after all deductions required by lawful authority, to cover the full amount of the dues allotment; and

d.  During any pay period in which there are insufficient funds in an employee's paycheck to cover dues-withholding, no withholding will be deducted from that pay period.  A list of employees having insufficient funds for dues-withholding purposes will be furnished to the Association

81

Area Director. The Agency will not be responsible for collecting dues not withheld due to insufficient funds.

*Section 3.*  **Association Responsibilities.**  The Association agrees to:

a.  Notify the Defense Finance and Accounting Service (DFAS) or the servicing payroll office in writing of the amount of Association dues by September 15 and any changes in the dues amount thereafter;

b.  Notify the DFAS or servicing payroll office in writing of the name and address of the payee to whom the remittance check should be made;

c.  Provide the standard allotment forms, SF-1187, to unit members as requested;

d.  Forward any completed SF-1187 forms to the Local School System payroll technician.  The Agency's obligation to deduct dues does not commence until receipt of the employee's completed SF-1187.  Yearly SF-1187's are not required;

e.  Notify the Designated DDESS Area Service Center Labor Relations Specialist promptly and in writing if an employee ceases to be a member in good standing;

82

f.  Assist the Agency in resolving any claims and disputes arising by reason of the Association's actions relating to the amount of dues-withholding; and

g.  Reimburse the affected employee(s) when an excess amount of dues deduction is taken from an employee's pay.

*Section 4.*  **Agency Responsibilities.**  The Agency agrees to:

a.  Promptly process voluntary dues allotments in the amount certified by the Association;

b.  Withhold dues in equal amounts over fifteen (15) full pay periods beginning with the first paycheck after October 15.  For all new requests for payroll deduction, if the SF-1187, "Request for Payroll Deductions for Labor Organization Dues", is submitted by September 15, dues will be deducted in fifteen (15) full pay periods beginning with the first paycheck after October 15.  If the SF-1187 is submitted after September 15, the dues deduction will begin the first full pay period after submission of the SF-1187, but not earlier than October 15.  If less than fifteen (15) full pay periods remain in the pay year after submission of the SF-1187, the Agency will collect the normal dues amount (1/15th of the total dues allotment amount) from each remaining full pay period.  The Association

will assume responsibility for collection from the employees of any dues

amount not withheld as a result of there being less than 15 full pay periods

in the pay year remaining after submission of the SF-1187;

   c.  Transmit funds (remittance checks, electronic fund transfer, etc.)

to the FEA Stateside Region for dues withheld for its account.  The

transmittal shall be made no later than ten (10) workdays following the day

that the related salaries were paid to the unit members.  Such remittances

will be made to the Association officer designated in writing by the FEA-SR

Area Director of the Association.  Remittances shall show the names of

participating unit members, the DDESS Local School System assigned, the

amounts withheld, and the pay period from which deductions were made;

   d.  Maintain SF-1188s (Cancellation of Payroll Deductions for Labor

Organization Dues) and furnish the forms to unit members upon request;

and,

   e.  Expeditiously correct government error in the dues-withholding

process.  Errors in remittance checks will be corrected and adjusted in a

subsequent check.

*Section 5.*  **Revocation of Dues-Withholding.**   Employees may revoke

their dues-withholding by submitting an SF-1188 to the Local School

84

System payroll technician, or servicing payroll office. After the initial one (1) year period of dues withholding, the Agency will honor any dues revocation submitted between August 15 and September 15 of each school year. Untimely-submitted dues revocation requests received by the Agency will be promptly returned to the employee.

*Section 6.* **Termination of Dues-Withholding Allotment.**

a. An allotment for an employee will be terminated at the end of the pay period during which an employee is separated from the Agency's rolls through transfer, retirement, resignation, death, or for cause. Allotments for all employees will be automatically terminated in the event exclusive recognition is no longer accorded to the Association.

b. In the event the Agency either improperly revokes or terminates dues-withholding, the Agency will immediately restart the dues-withholding if any pay periods remain. If insufficient pay periods remain to cover the full amount of the dues withholding, the Agency agrees to pay only the amount of dues affected by the error.

*Section 7.* **Indemnification.** The Association shall indemnify and hold the Agency harmless against any liability for actions taken by the Agency in

85

reliance upon signed authorization cards or forms furnished by the

Association for the purpose of payroll deduction of dues.

JA296

*Section 10.*  **Family and Medical Leave.**

a.  Leave under the Family and Medical Leave Act (FMLA) will be in accordance with 5 C.F.R. 630.1201 and applicable OPM guidance.

b.  Bargaining unit members should consult with their supervisor when requesting leave pursuant to FMLA.

*Section 11.*  **Voluntary Leave Transfer Program.**  The Agency will provide employees the opportunity to participate in the Voluntary Leave Transfer Program under 5 C.F.R. 630.903 and applicable Agency regulations (DDESS Instruction 1410.2).  Bargaining unit employees may donate annual leave, and seasonal employees (earning personal leave in lieu of annual leave) may donate personal or sick leave under this program.

*Section 12.*  **Emergency Leave Bank.**

a.  An Emergency Leave Bank (ELB) will be established at each DDESS district for use by all bargaining unit employees for medical emergencies, catastrophic illness, or injury experienced by the member. All bargaining unit employees may join the bank by contributing at least eight (8) hours of annual, personal, or sick leave and completing the form contained in Appendix G.  The ELB may carry over all unused hours to the following school year.

b.  Participation in the ELB by bargaining unit employees will require donation of one (1) day (eight hours) of sick, personal, or annual leave during the first thirty (30) days of employment or upon open season as determined by the ELB Committee.  At the need to replenish the ELB, employees may volunteer to contribute another day of leave to continue eligibility.

c.  An employee requesting days from the ELB must use the form contained in Appendix H and must have exhausted all leave that can be used for the nature of the emergency such that the employee is in a non-pay status.

d.  The ELB Committee will consist of one Agency official appointed by the Superintendent and two employees selected by the Local Association President.  The ELB Committee will make decisions on all requests for leave hours to be made available for unit employee use from the ELB.  However, unit employees thereafter must still request leave approval from their supervisor. The requestor will furnish a completed employee request form and a written physician's statement, as contained in Appendix H, demonstrating the need for additional leave to cover a medical emergency.

e.  A majority vote, by the ELB Committee approving the leave, is required to grant leave from the ELB.  Decisions by the ELB Committee are not subject to the grievance process.

f.  Any bargaining unit employee participating in the ELB will be limited to a withdrawal from the bank of up to a total of forty (40) workdays in succession.  When an illness extends beyond forty (40) workdays, the bargaining unit member may re-apply to the ELB Committee for further consideration of additional leave.

g.  The ELB Committee will monitor the amount of leave remaining in the bank and shall afford the opportunity to all bargaining unit employees to voluntarily contribute to replenish the bank during an open season.

h.  Departing employees may donate up to forty-eight (48) hours of unused personal/annual or sick leave to the ELB.

i.  All donations of leave to the ELB are final when donated and cannot be restored to the employee.

j.  Unused leave donated prior to the effective date of this Agreement will be transferred to ELBs established pursuant to Section 9.a. above.

k.  The ELB Committee may elect to open one (1) window of two

139

weeks duration during each school year when employees who have previously not elected to participate in the ELB may choose to do so by donating one (1) day (eight hours) of personal, annual, or sick leave to the bank.  This two-week window is purely for the purpose of allowing employees who previously did not elect to participate in the ELB an opportunity to do so.  Employees who previously elected to participate in the bank by donating one (1) day (eight hours) of personal, annual, or sick leave will not be required to donate another day of leave to continue eligibility to participate in the ELB, unless there is a need to replenish the ELB.

ARTICLE 23

**REDUCTION IN FORCE**

*Section 1*.  **Definition.**  A Reduction-in-Force (RIF) is the systematic way of making organizational changes that provides retention preference on the basis of tenure, veteran preference, length of service, and performance. Definitions of terms in this article are as provided for in 5 C.F.R. 351.203. A RIF occurs whenever a competing employee is released from his/her competitive level by furlough (for more than thirty (30) days), separation, demotion, or reassignment requiring displacement when the release is required because of:

a.  Lack of work;

b.  Shortage of funds;

c.  Insufficient personnel ceilings;

d.  Reorganization;

e.  The exercise of reemployment or restoration rights;

f.  The reclassification of an employee's position due to erosion of duties when such action will take effect after the formal announcement of a RIF in the competitive area and the RIF will take effect within one hundred eighty (180) days; or

149

g.  Transfer of function.

*Section 2*.  **Exclusions.**  Actions excluded from RIF procedures are as provided for in 5 C.F.R. 351.202(c).

*Section 3.*  **Notification to Association.**  When it is determined that there is a need for a RIF, the Agency agrees to notify the Association Area Director in writing of pending RIF actions as early as possible, but not less than ninety (90) days, prior to the scheduled effective date of the RIF. Such notice shall normally include the reasons for the RIF and the numbers and type of employees to be affected.  It is understood that the above information may change during the ninety (90) day period.

*Section 4.*  **Notification to Bargaining Unit Members.**  Once it has been determined that a RIF is required, bargaining unit employees who will be affected by RIF actions will be given specific notice at least sixty (60) days prior to the effective date of the RIF.  Such notice shall, at a minimum, contain the following information and ALL other information required per 5 C.F.R. 351.802.

a.  Action to be taken;

b.  Reasons for the action;

c.  Personal information used to determine the action;

150

d.  Effective date of the action;

e.  Entitlements and benefits;

f.  Place where affected employees and their representatives may inspect retention registers and related records pertaining to the action; and

g.  Employee appeal rights.

It is understood that the above information may change during the sixty (60) day period.

*Section 5*.  **Competitive Area.**  The competitive area for any RIF is defined as all employees of a Local School System (schools, District Superintendent's Office, Community Superintendent's Office) located on a military installation.  When there are schools on more than one military installation under the administration of one Superintendent, the schools on each military installation form a separate competitive area unless they are in the same commuting area in which case they form one competitive area.

*Section 6*.  **Competitive Levels.**  Competitive levels shall be established in accordance with 5 C.F.R. 351.403 consisting of all positions in the competitive area which are in the same pay plan, at the same grade (grade equivalency or occupational level), same classification series (position category and certification), and which are similar enough in duties,

151

qualification requirements, pay schedules, and working conditions so that an incumbent of one position can be reassigned to another position without undue interruption.  Separate competitive levels will be issued by type of service (competitive or excepted), by appointment authority, by pay schedule, and by work schedule.

*Section 7.*  **Retention Register/Retention Priority.**  When an employee is to be released from a competitive level due to RIF, a retention register will be established in accordance with 5 C.F.R. 351.404.  The retention register will be prepared from current retention records of employees.  To provide adequate time to determine employee retention standing, only that information that is available at least ninety (90) days prior to the scheduled issuance of RIF notices may be used except to correct errors in the record that are discovered prior to the effective date of the RIF.  Competing employees shall be classified on a retention register in tenure groups on the basis of their tenure of employment, veteran preference, length of service, and performance in descending order as provided for in 5 CFR 351.502.

a.  Tenure of employment.  Competing employees shall be classified on a retention register as Group I (includes each permanent employee

whose appointment carries no restrictions or conditions such as conditional, indefinite, specific time limit, or trial period), Group II (includes each employee serving a trial period or whose tenure is equivalent to a career-conditional appointment in the competitive service), and Group III (includes each employee whose tenure is indefinite or has a time limitation).

b. Veteran preference. Within each tenure group described in Section 7.a. above, competing employees shall be classified on the retention register based upon veteran preference as defined in 5 C.F.R. 351.501(c) as Subgroup AD (preference eligibles who have a service-connected disability of 30 percent or more); Subgroup A (preference eligible employees not included in subgroup AD), or Subgroup B (non preference eligible employees).

c. Length of service. Each competing employee's length of service shall be established in accordance with 5 C.F.R. 351.503.

d. Performance. Credit for performance shall be granted in accordance with 5 C.F.R. 351.504.

(1) To provide adequate time to determine employee retention standing, only those performance ratings completed (issued to

employee with all appropriate reviews and signatures) at least ninety (90) days prior to the scheduled issuance of RIF notices may be used.

(2)  An employee's entitlement to additional service credit for performance shall be based on the employee's three most recent annual performance ratings of record received during the four (4) year period immediately prior to the established cut-off date established in paragraph d.(1) above.

(3)  An employee who has not received a rating of record during the 4-year period shall receive credit for performance based on the modal rating for the summary level pattern that applies to the employee's official position of record at the time of the reduction-in-force.

e.  Competing employees shall be released from competitive levels in the inverse order of retention standing, beginning with the employee with the lowest retention standing on the retention register.  A competing employee may not be released from a competitive level while retaining in that level an employee with lower retention standing except as provided for in 5 C.F.R. 351.601.

154

*Section 8.*  **Placement Considerations.**  In order to minimize the impact of a RIF, consideration may be given to:

a.  Filling existing vacancies by the placement of qualified employees who are adversely affected by the RIF.

b.  Terminating temporary appointments of individuals in unaffected competitive levels to create placement opportunities for qualified permanent employees (Group I or Group II employees) who are scheduled for separation under RIF procedures.

*Section 9.*  **Placement Assistance.**  All available and appropriate job placement services will be provided to employees adversely affected by RIF in accordance with appropriate law and regulation.  Such assistance shall include use of:

a.  DDESS Re-employment Priority List (RPL).  The Agency will establish RPLs for employees who have been separated due to RIF in accordance with procedures at subpart B of 5 C.F.R. Part 330, Reemployment Priority List.  It is the Agency's policy that, if there are not qualified part-time employees on the RPL for a particular part-time position, full-time employees who have indicated availability for part-time work shall be placed if qualified and interested.

155

JA307

(1)  Eligible employees will be registered on the RPLs for a maximum of two (2) years.  If an employee declines a valid job offer, his/her name will be removed from the RPL.  If a full-time permanent employee accepts permanent part-time employment, it will be considered a valid job offer; and the employee's name will be removed from the RPL.  Acceptance of a temporary appointment will not alter a permanent employee's right to be offered permanent employment. (i.e., the employee's name will remain on the RPL).

b.  DoD  Priority Placement Program (PPP).  Employees adversely affected by a RIF shall be registered in the DoD PPP in accordance with the DoD PPP Operations Manual.

*Section 10.*  **Salary Retention Provisions.**  Grade and pay retention shall be afforded to employees who are demoted to a lower graded/paid position within DDESS in accordance with 5 C.F.R. Part 536 and appropriate procedures.  Pay retention will be granted based upon the employee's hourly rate of pay without regard to work schedule.  When an overall loss of pay will result due to a full-time employee accepting a full-time shortened work schedule, the Agency will consider providing the affected employee additional work hours in order to allow the employee to retain their annual

156

salary.  An employee who is demoted and on retained grade and/or pay shall receive priority consideration for re-promotion to positions up to and including the grade/pay level from which demoted.

*Section 11*.  **Severance Pay.**  Severance pay shall be paid in accordance with subpart G of 5 C.F.R. Part 550.

*Section 12*.  **Assistance to Employees.**  Job placement services may be provided to employees adversely affected by the RIF, according to appropriate law and regulation.

*Section 13*.  **Review of Records.**  Employees, or the employee's representative, have the right to review any records used by the Agency in any RIF action that was taken or will be taken regarding the employee, including the complete retention register with the employee's name, so that the employee may consider how the competitive level was constructed and how the relative standing of the competing employees was determined. This also includes the right to review the complete retention register (as appropriately redacted for privacy concerns) for other positions that could affect the composition of the employee's competitive level.

ARTICLE 25

**DISCIPLINARY ACTIONS**

*Section 1.*  **Policy.**

a.  Discipline is the right and the responsibility of the Agency and will only be taken for such just and sufficient cause as will promote the efficiency of the service, and the penalty will fit the offense.

b.  Constructive discipline, to be effective, must be timely.  The results to be achieved through this means diminish in proportion to the time allowed to elapse between the offense and the corrective action. Nevertheless, the Parties agree that sufficient time should be allowed to complete appropriate investigations and fact-finding and that undue haste is as undesirable as undue delay.  Supervisors, unit employees, Association representatives, and others involved in an investigation will not disclose any information gained through such investigations except in the performance of their official duties.

c.  Disciplinary actions will not be arbitrary or capricious.

d.  A bargaining unit member who is to be questioned by a DoDEA or DDESS management employee in connection with an investigation may

159

request representation by the Association at any time that he/she

reasonably believes that disciplinary action may result against him/her.  If

requested, the bargaining unit member will be entitled to be represented by

an FEA attorney, at no cost to the Agency, and a local Association

representative.  If the bargaining unit member requests Association

representation, by an FEA attorney or a local Association representative,

or both, no questioning will normally take place until the Association has

been given at least twenty-four (24) hours to confer privately with the

bargaining unit member.  In no event will the bargaining unit member be

permitted to delay questioning beyond twenty-four (24) hours.  The Agency

shall not be required to delay the questioning, if the matter to be

investigated involves a lost child, bomb/terrorist threat, or some other

matter involving imminent danger to students, faculty and/or staff.

*Section 2.*  **Informal Disciplinary Actions.**  Informal disciplinary actions

are oral admonitions and letters of caution.  When such an action is taken

by a supervisor, the employee will be advised of the specific infraction or

breach of conduct, when it occurred, and will be permitted to explain, orally

or in writing, his/her conduct or act of commission or omission.  Such

actions will not be placed in the employee's Official Personnel File (OPF).

160

JA311

*Section 3.*  **Formal Disciplinary Actions.**  Formal disciplinary actions consist of written reprimands, suspensions, demotions, and removals. Before formal disciplinary action is initiated, an investigation or inquiry will be made by the immediate supervisor or other official designated by the Agency to ensure himself/herself of the facts of the case.

a.  A Letter of Reprimand must state the reason(s) for its issuance, the employee's right to file a grievance under the negotiated grievance procedure, and the length of time the reprimand will remain in the OPF.  A Letter of Reprimand may remain in the OPF for a period of two (2) years.  If at the end of the first year, there have been no further disciplinary infractions, the employee may request to have the Letter of Reprimand removed from the OPF.  There is no advance notice required before issuing a Letter of Reprimand.

b. The Agency may choose to not discipline an employee or may select a lower range of remedies and/or a lower appropriate remedy than provided in the Schedule of Offenses and Recommended Remedies.

c.  Whenever a formal disciplinary action is initiated against a unit employee that involves a suspension of fourteen (14) days or less, the following procedural requirements shall apply:

(1)  The unit employee must be given no less than fourteen (14) days' written notice of the proposed action.

(2)    The notice shall:

(a) State, in detail, the reason(s) for the proposed action;

(b) Provide the employee with a copy of the material relied upon for the proposed action;

(c) Inform the unit employee of the right to reply orally or in writing, or both, within ten (10) workdays after receipt of the notice of proposed action, and the name and title of the official designated to hear an oral reply and/or receive a written reply;

(d) State that a final decision of the proposed action will not be made until after receipt of the unit employee's reply or after the ten (10) workday notice period, described in (c) above, whichever comes first;

(e) Inform the unit employee what duty status he/she will be in pending a decision on the proposed action; and

(f)  Be in written form, dated by the Agency, and signed by the proposing Agency official.

162

(3)  Notice of Final Decision.  The unit employee shall receive notice of a final decision at the earliest possible date following the ten (10) workday reply period.  The notice of final decision shall be signed and dated and shall inform the unit employee of:

(a) The reason(s) for the decision;

(b) The effective date of the action; and

(c) His/her rights under the negotiated grievance procedure.

d.  Whenever a unit employee is furloughed for thirty (30) days or less, reduced in grade/pay, removed, or suspended for more than fourteen (14) days, the following procedures shall apply:

(1)    Issuance of Advance Notice.  The unit employee will be given thirty (30) days advance notice of the proposed adverse action. The advance notice shall:

(a) State, in detail, the reason(s) for the action;

(b) Provide the employee with a copy of the material relied upon for the proposed action;

(c) Inform the unit employee of his/her right to reply orally or in writing, or both, within twenty (20) days from

163

receipt of the notice of proposed action, and the name

and title of the official designated to hear an oral reply

and/or receive a written reply;

(d) State that a final decision of the proposed action will

not be made until after receipt of the unit employee's

reply or after the twenty (20) day period, whichever

comes first;

(e) Inform the unit employee of the duty status

he/she will remain in pending a decision on the

proposed action; and

(f) Be in written form, dated by the Agency, and signed

by the proposing Agency official.

(2) An employee may be placed on excused leave

or reassigned during the advance notice period at the sole option of the

Agency. Such a decision is not grievable. Normally, if an employee who is

in an absent without leave (AWOL) or leave without pay (LWOP) status

voluntarily returns to duty during the notice period, the Agency agrees to

return the employee to a pay status, i.e., returned to work or placed on

excused leave. However, if the employee does not return to duty during

164

the notice period, the Agency reserves the right to continue the employee-initiated non-pay status (AWOL or LWOP) for the duration of the notice period.

   (3) Notice of Final Decision.  The unit employee shall receive notice of final decision at the earliest possible date following the reply period.  The notice of final decision shall be signed and dated and shall inform the employee of the following:

    (a) Which of the reasons in the proposed notice have been found sustained;

    (b) The effective date of the action; and

    (c) His/her rights under the appropriate grievance and/or appeal procedures.

 e.  Employees to whom a notice of proposed disciplinary action has been issued are also entitled to:

   (1) A reasonable amount of official time to review the notice and supporting material, to prepare an answer and to secure affidavits, medical documentation, and other

documentary evidence, if the employee is otherwise in a

duty status; and

(2)    Be represented by an attorney and/or other

representative.

*Section 4.*  **Rights of Probationers.**  The procedural rights described in

Section 3.d. above do not apply to the discharge or separation of an

employee during a probationary/trial period.

*Section 5.*  **Duty Status.**  In the event a notice period affecting a bargaining

unit employee on a seasonal work schedule is not completed prior to the

beginning of the recess period, the affected unit employee may be carried

in a duty status until the end of the notice period in order to complete the

process.  Otherwise, the time limits do not run during any recess period.

*Section 6.*  **Relationship to DDESS Instruction.**  The provisions of this

Agreement will be controlling when in conflict with DDESS Administrative

Instruction 1435.1.

166

ARTICLE 26

**GRIEVANCE PROCEDURE**

*Section 1.*  **Purpose.**  The purpose of this Article is to provide a procedure for consideration of grievances by bargaining unit employees.  The filing of a grievance shall not be construed as reflecting unfavorably on an employee's good standing, his/her performance, or his/her loyalty or desirability to the organization, nor shall it be regarded as an unfavorable reflection upon the Agency or its officials.

*Section 2.*  **Coverage.**

    a.  This procedure applies to unit employees and shall be the exclusive procedure for resolving grievances that fall within its coverage.

    b.  A grievance means any complaint:

        (1)  by a unit employee concerning any matter relating to the employment of that employee;

        (2)  by the Association concerning any matter relating to the employment of any unit employee(s); or

        (3)  by a unit employee, the Association, or the Agency concerning:

167

(a) the effect or interpretation or a claim of breach of this Agreement; or

(b) any claimed violation, misinterpretation of any law, rule, or regulation affecting working conditions of employment.

c. This procedure shall not apply to any grievance concerning:

(1) any claimed violation of Subchapter III of Chapter 73, Title 5 U.S.C. (relating to prohibited political activities);

(2) retirement, life insurance, or health insurance;

(3) a suspension or removal under Section 7532 of Title 5 U.S.C.;

(4) any examination, certification, or appointment;

(5) the classification of any position which does not result in the reduction in grade or pay of an employee;

(6) an advance notice of disciplinary or adverse action;

(7) separation of probationary/trial period employees;

(8) termination or expiration of temporary appointments;

(9) oral or written admonishments which are not placed in the employee's Official Personnel File; and

(10). any other matter or issue excluded by any provision of this Agreement.

168

*Section 3.*  **Representation.**  A unit employee may present a grievance on his/her behalf under this procedure provided that the Association is given the opportunity to be present during the grievance proceeding.  Any resolution reached with the unit employee shall be consistent with the terms of this Agreement.

*Section 4.*  **Local Grievance Procedures.**  Individual employees are encouraged to use the local grievance procedure to address a grievance personal to that individual.

### *Step 1 - Informal*

The Parties agree that informal resolution of employee grievances is desirable.  To this end, the unit employee and/or their Association representative should present any grievance informally (orally or in writing) to his/her  immediate supervisor within ten (10) days after the grievant knew, or should have known, of the act or incident leading to the grievance.  The supervisor should arrange for a meeting within five (5) days of the informal presentation of the grievance to fully discuss the matter and to attempt informal resolution.  Should the employee choose to present the grievance informally, he/she, or his/her representative, should explain the factual basis for the grievance and the relief he/she is seeking.

169

The local administration should work with the employee to find a resolution to the grievance.

### Step 2 - Formal

a.  Notwithstanding the provisions of Step 1 above, the unit employee or his/her Association representative must present the grievance, utilizing the form at Appendix I or in a written format that includes the facts and circumstances surrounding the grievance, to the appropriate supervisor within thirty (30) days after the grievant(s) knew, or should have known, of the act or incident leading to the grievance or after the Association, if acting on the grievant's behalf, knew or should have known of the act or incidence leading to the grievance.  The formal grievance should articulate, if known, the names of all employees affected, the specific basis for the grievance, and the relief sought.

> (1)  The supervisor shall issue a written decision within seven (7) days from the date the written grievance was received by the supervisor.  Such decision shall be transmitted to the grievant and the grievant's representative, if any.

> (2)  The grievant or his/her Association representative shall have ten (10) days after the receipt of the supervisor's decision to

170

advance the grievance to the next level.  If the grievant has not received a written decision from the supervisor within the seven (7) day period, the grievant may advance the grievance to Step 3 of this procedure within ten (10) days after the seven (7) day period has elapsed.

### Step 3 - Review

When the grievance has not been resolved at Step 2, the grievant or his/her Association representative may submit his/her grievance within the time specified in Step 2.  Along with the information submitted under Step 2, the grievant must include a statement as to why the supervisor's decision is unacceptable.  No new issues may be raised that were not raised at the Step 2 formal stage of the grievance process.  The Superintendent will review the grievance and will issue a final decision within thirty (30) days from its receipt.  Such decision shall be in writing and shall set forth the reasons for the decision.  A copy of the decision shall be transmitted to the grievant and the grievant's representative, if any.

*Section 5.* **Agency/Association Grievances.**  The following procedure will be followed when processing grievances arising between the Association and the Agency.

171

a.  Association or Agency grievances may be filed only at the DDESS level by the respective officials at the regional level.

b.  Association or Agency grievances must be filed within thirty (30) days after the Association or Agency knew, or should have known, of the incident or occurrence giving rise to the grievance.  Grievances should be filed utilizing the form at Appendix I or in a written format that clearly identifies the basis of the grievance, the specific district locations affected, the names of all known employees affected, and the relief sought.

c.  Upon receipt of an Association or Agency grievance, the Association or Agency, as appropriate, shall review, investigate, and furnish a final decision within thirty (30) days.  Should the Association's or Agency's decision not be satisfactory, the grieving party must, within thirty (30) days, notify the other party that the decision is not satisfactory and that they wish to proceed to arbitration.

*Section 6.*  **Alternative Dispute Resolution.**

a.  Upon notification that a grievance is being elevated to arbitration, either party may request that the grievance be mediated with the assistance from the Federal Mediation and Conciliation Service, or other mutually agreed upon mediation service.

b.  The party requesting mediation must notify the other party of its desire to engage in mediation and submit any necessary forms within twenty (20) days following the receipt of notification that the grievance is being elevated to arbitration.  The Parties will share equally in any fees and expenses of the mediator.

c.  If the grievance is unresolved by mediation, the Association or the Agency may pursue the grievance to arbitration.  The date of the last day of mediation will be considered the conclusion of the last stage in the grievance procedure.  The grievance may then proceed to arbitration in accordance with Article 27.

d.  Mediation for local grievances, when requested by either party, will be conducted at the local school district.  Mediation for Association/DDESS grievances, when requested by either party, will be conducted at the Agency's Headquarters in Atlanta, Georgia, or at a site mutually agreeable to both parties.  When DoDEA or DDESS officials request mediation and when attendance at such mediation will require travel by the FEA-SR Area Director outside of the commuting area (normal School District to which assigned) to participate in the mediation session, the Agency will issue a government travel order and pay travel expenses in

173

accordance with the Joint Travel Regulation.

*Section 7.*  **General Provisions.**

    a.  Time Limits.

        (1)  For grievances affecting one or more bargaining unit employees on a seasonal work schedule, the time periods set forth herein shall be tolled during all recess periods in excess of four (4) workdays.  For local grievances, recess periods are defined by the local school district calendar.  For Agency/Association Grievances, the winter recess shall be considered the twenty-one (21) calendar day period beginning on 18 December of each year through the 21st calendar day (January 7th).  For Agency/Association grievances, the summer recess shall be considered the period beginning on 10 June and extending through 10 August of the same year.

        (2)  For grievances affecting employees on other than a seasonal work schedule, time limits are not tolled.

        (3)  For grievances affecting both seasonal and twelve-month employees, time limits are tolled as described in Section 7.a,

174

(1) above.

(4)  All time limits in this procedure may be extended or curtailed in writing by the mutual consent of the Parties.

(5)  Both Parties agree to comply with the time limits established in the grievance procedure.  Failure to comply with established time limits will serve as a basis for either party to advance the grievance to the next step or to reject a grievance.

b.  Cancellation.  A local district grievance affecting only one (1) employee shall be canceled upon the death of the unit employee or upon his/her separation for reasons not connected with the grievance.  In a local district or Association grievance filed on behalf of multiple employees, that portion of the grievance specific to an individual employee who has died or separated for reasons not connected with the grievance will be cancelled.

c.  Exercise of Rights.  Under 5 U.S.C. 7116 and 5 U.S.C. 7121, unit employees may raise certain matters under this negotiated grievance procedure or under an applicable statutory procedure, but not both.  For purposes of this Article, the unit employee or his/her representative shall be deemed to have exercised his/her option as to procedure when a timely

175

written grievance under this procedure is filed; or a charge, appeal, or complaint under an applicable statutory procedure is initiated, whichever event occurs first.

d.  Protection from Reprisal.  In exercising their right to seek resolution of grievances, unit employees and witnesses shall be free from any and all restraint, interference, coercion, discrimination, or reprisal.  The filing of a grievance shall not be construed as reflecting unfavorably on a unit employee's good standing, his/her performance, his/her loyalty or desirability to the organization, nor shall it be regarded as an unfavorable reflection upon the Agency or particular Agency officials.

ARTICLE 27

**ARBITRATION**

*Section 1.* **Invoking Arbitration.**

a.  Should either the Agency or the Association be dissatisfied with the final decision in a grievance covered by Article 26 of this Agreement, the party who filed the grievance may proceed to arbitration.  However, arbitration of the grievance may be invoked only by the Association or the Agency and does not require the approval of the bargaining unit member(s) involved.

b.  A written request for arbitration, FMCS Form No. R-43 (Appendix K), must be served on the opposing party within thirty (30) days following the conclusion of the last stage in the grievance procedure.

c  Arbitration hearings affecting one or more bargaining unit employees on a seasonal work schedule will not normally be scheduled to occur during recess periods.  The winter recess period shall be considered the twenty-one (21) calendar day period beginning on 18 December of each year through the 21st calendar day (January 7th).  The summer recess

shall be considered the period beginning on 10 June and extending through 10 August of the same year.

*Section 2.*  **Selecting an Arbitrator.**

a.  Within ten (10) days from the date of the request for arbitration (if mediation not requested), the parties will jointly ask the Federal Mediation and Conciliation Service (FMCS) to provide a list of seven (7) impartial persons, "panel," qualified to act as arbitrators.  All costs associated with requesting a panel will be borne equally by the Parties, but the Agency reserves the right to reimburse the Association on a quarterly basis.  Either party may request a maximum of one (1) new panel if not satisfied with the previous one sent by the FMCS.  The party requesting the panel will pay the full fee for the second panel.

b.  Within thirty (30) days from the date of the response from the FMCS conveying the names of the prospective arbitrators, the Parties shall meet, either in person or telephonically, to select an arbitrator.

c.  If the Parties cannot mutually agree upon one (1) member of the panel, then the Agency and the Association will each strike one (1) arbitrator from the panel and will repeat this procedure until one (1) name

178

is remaining on the panel.  The remaining person shall be the duly selected arbitrator.

d.  The Association shall have first strike the first time an arbitrator is selected under this Agreement, with the Parties alternating first strike in each selection thereafter.

e.  The FMCS shall be empowered to make a direct designation of an arbitrator to hear the case in the event:

(1) Either party refuses to participate in the selection of any arbitrator; or

(2) Of inaction or undue delay by either party.

f.  Following the selection/appointment of the arbitrator, the parties will contact the arbitrator and schedule a hearing date.

*Section 3.*  **Issue.**  If the Parties fail to agree on a joint submission of the issue for arbitration, each shall submit a separate submission; and the arbitrator shall determine the issue or issues to be heard.  Issues not raised during the grievance process, including timeliness, shall not be raised nor considered by the arbitrator during the arbitration process.

179

*Section 4.*  **Arbitration Expense.**

a.  The arbitrator's fee and his/her expenses of the arbitration shall be borne equally by the Agency and the Association.

b.  The arbitration hearing will be held on the Agency's premises or facilities provided and paid for by the Agency.  The arbitrator shall determine the hours at which the hearing will be conducted.

c.  If desired, either party may choose to tape-record or have a transcript made of the hearing.  Should the other party wish to have a copy of the transcript, it must share equally in the cost.

d.  The grieving employee will be in a pay status for the duration of the hearing if otherwise in a duty status.  The Association representative will be granted official time as described in Article 6 for the duration of the hearing, if otherwise in a duty status.

*Section 5.*  **Witnesses.**

a.  Each party may recommend witnesses by providing the full name, address, and a statement setting forth the expected testimony.  The parties will exchange witness lists at least one (1) day before the hearing.  If travel at Government expense is required for Association witnesses, the Agency

will pay such expenses for approved witnesses to attend the arbitration hearing in accordance with the JTR.

b.  The arbitrator shall determine the witnesses to provide testimony.

c.  Approved employee witnesses will be in a pay status to the extent necessary to permit their testimony if otherwise in a duty status.

d.  The arbitrator has the authority to extend the proceedings past the normal duty day.  However, no reimbursement (monetary and/or compensatory time) will be paid as a result.

e.  Telephonic testimony will be admissible unless objected to by the opposing party, in which case the arbitrator will decide whether such testimony will be admissible.  Except for rebuttal witnesses, all witnesses identified for telephonic testimony will be so identified in the list of witnesses provided to the opposing party specified in Section 6.a. above.

*Section 6.*  **Decision.** The arbitrator will be requested to render a written decision as quickly as possible. The record will close at the conclusion of the last day of the hearing unless extended by the arbitrator.  Post-hearing written briefs, if requested by the arbitrator, are due within thirty (30) days after closing of the record unless one or both parties order copies of a transcript of the hearing.  In that event, post-hearing written briefs, if

181

requested by the arbitrator, are due within thirty (30) days after receipt of the transcript.

*Section 7.*  **Exceptions.**  The arbitrator's award shall be binding on the Parties.  However, either party may file exceptions to an award with the Federal Labor Relations Authority (FLRA) under 5 U.S.C. 7122.

*Section 8.*  **Arbitrator's Authority.**  The arbitrator shall have no power to add to, subtract from, disregard, alter, or modify any of the express terms of the Agreement or any Memorandum of Understanding (MOU) between the Parties.  Additionally, he/she will have no authority to make any decision, recommendation, or award that would require an act inconsistent with or prohibited by law, rule, or regulation, or that would violate the terms of this Agreement.  If either party disagrees as to the meaning or application of the decision, that party may return the decision to the arbitrator with a request for clarification.  Arbitrators are bound by the holdings and interpretations of the Merit Systems Protection Board, the FLRA, and the Agency's regulations as provided by law.

*Section 9:*  **Attorney's Fees.**

a.  The General Counsel's Office, Department of Defense Education Activity, will provide a written notice to the Association thirty (30) calendar

days after an entitlement to payment of attorney's fees to FEA-SR has

been established and the attorney's fees have not yet been paid.  The

notice to FEA-SR will contain the following information:

      (1)    What steps have been taken to obtain payment

      (2)    Status of payment request:

      (3)    Steps to be taken to obtain payment; and

      (4)    Projected payment date.

b.  If attorney's fees have not been paid within sixty (60) calendar

days after the original date of entitlement to payment, the General Counsel

will send a follow-up letter to the Association that updates the information

contained in the previous letter.

c.  This provision is not limited to the payment of attorney's fees

resulting from grievances filed under Article 26 of the MLA.

183

ARTICLE 29

**DURATION**

*Section 1*.  **Effective Date and Duration.**  This Agreement shall become effective and be implemented, following Agency head review as provided for in 5 U.S.C. 7114 (c), on 25 July 2010 and shall remain in full force and effect for four (4) years.  This Agreement will be considered executed on the date of initial signature by the Parties.

*Section 2*.  **Renewal.**  Either party may provide written notice at least sixty (60), but not more than ninety (90), days before the expiration of this Agreement of its desire to engage in bargaining a new agreement.  In the event such notice is submitted, the Agreement shall remain in full force and effect until that bargaining is concluded and new provisions are executed and approved in accordance  with 5 U.S.C. 7114(c).  If neither party files such written notice, the Agreement shall be automatically renewed on each anniversary date for one (1) full year.

*Section 3*.  **Impact of Invalid Clause.**  In the event any portion of this Agreement is declared invalid upon Agency head review or by a judicial or administrative tribunal, the remainder of this Agreement will be in full force and effect.

# Exhibit 11

**Tarr, Richard [NEA]**

| | |
|---|---|
| **From:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ<Alexa.Rukstele@DODEA.EDU> |
| **Sent:** | Thursday, April 3, 2025 2:35 PM |
| **To:** | King, Frank Mr. CIV OSD/DoDEA-HQ; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe; Woods, Elgin Mr. CIV OSD/DoDEA-Americas; Steele, Andre Mr. CIV OSD/DoDEA-Pacific |
| **Cc:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ |
| **Subject:** | [EXTERNAL] - UPDATE: Executive Order "Exclusions from Federal Labor-Management Programs" |
| **Importance:** | High |

Union Presidents & Leaders:

As you know, President Trump signed an Executive Order (EO) on March 27, 2025, entitled "Exclusions from Federal Labor-Management Programs," providing that the Federal Service Labor-Management Relations Statute (FSLMRS) no longer applies to the Department of Defense (DoD). DoDEA is currently awaiting implementation guidance from DoD and the DoD Civilian Personnel Advisory Service (DCPAS) regarding the EO. Given the directives outlined in the EO, the associated White House Fact Sheet, and OPM guidance, DoDEA has determined that it will pause labor relations-related activities pending further instruction from the Department. This is applicable across the Agency to include both HQ and the field. Additional information will be provided as it becomes available.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office: (571) 372-1864
Cell: (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION: This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Additionally, please indicate to the sender that you have received this message in error and delete the original message.

# Exhibit 12

**Tarr, Richard [NEA]**

| | |
|---|---|
| **From:** | M. David Vaughn <vaughnarbr@gmail.com> |
| **Sent:** | Tuesday, May 6, 2025 1:17 PM |
| **To:** | Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu> |
| **Cc:** | Tarr, Richard [FEA] <RTarr@nea.org>; Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> |
| **Subject:** | Re: Arbitration Between Department of Defense Education Activity and Federal Education Association, AG 24-01/DoDEA Management's Refusal to Implement Authorized Special Quarters Allowance (SQA) for DoDEA Overseas Educators in the Association's Bargainin... |

Counsel:

I acknowledge the Agency's response and position.

The Association may state its position as it sees fit.

This matter will be resolved at levels far above any of our pay grades.

I wish the parties the best.

Keep me informed as appropriate.

David Vaughn
Arbitrator


M. David Vaughn
Arbitrator and Mediator
13732 Lakeside Drive
Clarksville, MD 21029-1345
(301) 854-3200; (301) 854-3218 fax
Vaughnarbr@gmail.com

**LEGAL DISCLAIMER**: The information contained in this transmission, including any attachments, are intended for the exclusive use of the addressees and may contain confidential or privileged information. If you are not the intended recipient, please notify Mr. Vaughn through his office at 301 854-3200, by facsimile at 301 854-3218 or by email at Vaughnarbr@Gmail.com and please destroy all copies of this message and any attachments.

I work exclusively as a neutral, offering arbitration, mediation, and other dispute resolution services. I do not practice law. Nothing in this email is intended to offer legal advice, and no attorney-client relationship is formed through any exchange of correspondence related to this email.


On Tue, May 6, 2025 at 12:31 PM Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu> wrote:

> Dear Arbitrator Vaughn and FEA Counsel,


> The Agency considers this arbitration cancelled pursuant to Executive Order 14251.

In accordance with the exclusions outlined in the Executive Order, the Federal Education Association is no longer recognized as the exclusive representative, and jurisdiction before the arbitrator no longer exists.

Respectfully,

Carla

Carla J. Eldred

Associate General Counsel

Labor and Litigation

Department of Defense Educational Activity

Office of the General Counsel

(720) 546-2994

carla.eldred@dodea.edu

CAUTION:  This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege.  Do not disseminate without the approval of the DoDEA Office of the General Counsel.

Controlled by:  DoDEA OGC

CUI Category:  Privilege

Distribution/Dissemination Control:  AWP, AC, FEDCON

POC:  Carla J. Eldred (carla.eldred@dodea.edu)

**From:** M. David Vaughn <vaughnarbr@gmail.com>
**Sent:** Tuesday, May 6, 2025 9:58 AM
**To:** Tarr, Richard [FEA] <RTarr@nea.org>
**Cc:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; carla.eldred@dodea.edsu

**Subject:** Re: Arbitration Between Department of Defense Education Activity and Federal Education Association, AG 24-01/DoDEA Management's Refusal to Implement Authorized Special Quarters Allowance (SQA) for DoDEA Overseas Educators in the Association's Bargainin...

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Counsel:

Thanks to Mr. Tarr for the Association's status report.

David Vaughn

Arbitrator

On Tue, May 6, 2025 at 9:29 AM Tarr, Richard [FEA] <RTarr@nea.org> wrote:

Arbitrator Vaughn,

The parties have not yet met to select a date for this hearing in the fall of 2025.  The Association intends to reach out to the Agency to schedule this case in the near future.  Thank you.

Richard Tarr

Executive Director/General Counsel

Federal Education Association, NEA

1201 16th St., N.W., Suite 117

Washington, D.C. 20036

Phone: (202) 822-7859

Fax: (202) 822-7867

Email: RTarr@nea.org

www.feaonline.org

**Confidentiality Notice**: This electronic message transmission contains information that is confidential and/or privileged. This e-mail, as well as any attachments, is intended for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail and/or any attachment is prohibited. If you have received this electronic transmission in error, please delete the e-mail and any attachments and notify me by telephone at (202) 822-7859 or by e-mail (RTarr@nea.org) immediately.

**From:** M. David Vaughn <vaughnarbr@gmail.com>
**Sent:** Thursday, May 1, 2025 4:04 PM
**To:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Tarr, Richard [FEA] <RTarr@nea.org>
**Cc:** Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; carla.eldred@dodea.edsu
**Subject:** Re: Arbitration Between Department of Defense Education Activity and Federal Education Association, AG 24-01/DoDEA Management's Refusal to Implement Authorized Special Quarters Allowance (SQA) for DoDEA Overseas Educators in the Association's Bargainin...

May 1, 2025

To:
Ms. Anitha Vemury
Anitha.Vemury@dodea.edu

Richard C. Tarr
Federal Education Association
Rtarr@nea.org

Cc: Carla J. Eldred, Esq.
Associate General Counsel
DOD Education Activity
carla.eldred@dodea.edsu

**Re: Arbitration Between Department of Defense Education Activity and Federal Education Association, AG 24-01/DoDEA Management's Refusal to Implement Authorized Special Quarters Allowance (SQA) for DoDEA Overseas Educators in the Association's Bargaining Unit Eligible to Receive Living Quarters Allowances (LQA), FMCS No. 240513-6095**

Representatives:

As a matter of housekeeping, please advise as to the status of the above matter.

Please copy your opposite Party on any response.

Thanks.

M. David Vaughn
Arbitrator

24-066

M. David Vaughn

Arbitrator and Mediator

13732 Lakeside Drive

Clarksville, MD 21029-1345

(301) 854-3200; (301) 854-3218 fax

Vaughnarbr@gmail.com


**LEGAL DISCLAIMER**: The information contained in this transmission, including any attachments, are intended for the exclusive use of the addressees and may contain confidential or privileged information. If you are not the intended recipient, please notify Mr. Vaughn through his office at 301 854-3200, by facsimile at 301 854-3218 or by email at Vaughnarbr@Gmail.com and please destroy all copies of this message and any attachments.


I work exclusively as a neutral, offering arbitration, mediation, and other dispute resolution services. I do not practice law. Nothing in this email is intended to offer legal advice, and no attorney-client relationship is formed through any exchange of correspondence related to this email.

--

M. David Vaughn

Arbitrator and Mediator

13732 Lakeside Drive

Clarksville, MD 21029-1345

(301) 854-3200; (301) 854-3218 fax

Vaughnarbr@gmail.com


**LEGAL DISCLAIMER**: The information contained in this transmission, including any attachments, are intended for the exclusive use of the addressees and may contain confidential or privileged information. If you are not the intended recipient, please notify Mr. Vaughn through his office at 301 854-3200, by facsimile at 301 854-3218 or by email at Vaughnarbr@Gmail.com and please destroy all copies of this message and any attachments.

I work exclusively as a neutral, offering arbitration, mediation, and other dispute resolution services. I do not practice law. Nothing in this email is intended to offer legal advice, and no attorney-client relationship is formed through any exchange of correspondence related to this email.

# Exhibit 13

**FEDERAL LABOR RELATIONS AUTHORITY
WASHINGTON, D.C.**

—————

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**(Agency)**

**and**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
COUNCIL 238**
**(Union)**

**0-AR-6001**

———

**ORDER TO SHOW CAUSE**

**April 4, 2025**

—————

On March 27, 2025, President Donald J. Trump amended Executive Order 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to exclude certain agencies and agency subdivisions from the coverage of the Federal Service Labor-Management Relations Statute (the Statute).[1]  Accordingly, the Authority directs the Agency to show cause why the Authority should not dismiss this matter for lack of jurisdiction.[2]  As described further below, the Union may reply to the Agency's response to this order.

The Agency must file its response to this order with the Authority by **April 18, 2025**.  The Agency's response must also include a statement of service that complies with the Authority's Regulations showing that the Agency served its response on all counsel of record or other designated representatives.[3]

The Agency should direct its response to Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority, 1400 K Street NW, Suite 300, Washington, D.C. 20424-0001.  The proper methods for filing documents with the Authority are set forth at § 2429.24(e) of the Authority's Regulations.[4]  As outlined in the

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).
[2] *See generally U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex.*, 57 FLRA 750 (2002) (where President amended Executive Order 12,171 to exclude additional entity from Statute's coverage, Authority ordered affected parties to brief whether Authority lacked jurisdiction over their cases).
[3] 5 C.F.R. § 2429.27(a), (c).
[4] *Id.* § 2429.24(e).

Authority's Regulations, the Agency's response to the Authority must be filed by personal delivery, commercial delivery, first-class mail, or certified mail.[5]

The Agency's failure to comply with this order by **April 18, 2025**, may result in dismissal of the Agency's filing in this case.

If the Union chooses to file a reply to the Agency's response, then the reply must be filed with the Authority within ***fourteen days*** after service of the Agency's response. The Union's reply must also be filed in accordance with the Authority's Regulations, including the requirement to file a statement of service showing that the Union served its reply on all counsel of record or other designated representatives.[6]

Requests for extensions of time must be in writing and received by the Authority not later than five days before the established time limit for filing.[7]  The request must state the position of the other party and must be served on the other party.[8]

Because the Authority's jurisdiction over this matter is in question, ***the deadlines for any remaining filings in this case – except for responses or replies to this order – are temporarily suspended***.  Except for responses or replies to this order, you are not required to submit any further filings in this case until the Authority notifies you otherwise.

Procedural questions regarding this case should be directed to the Office of Case Intake and Publication at (771) 444-5805.

For the Authority:

Erica Balkum, Chief
Office of Case Intake and Publication

---

[5] *Id.*; *see also id.* § 2429.24(a) ("To file documents by personal delivery, *you must schedule an appointment at least one business day in advance* by calling [(771) 444-5805]." (emphasis added)).
[6] *Id.* §§ 2429.24(e); 2429.27(a), (c).
[7] *Id.* § 2429.23(a).
[8] *Id.*

2

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

———

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**(Agency)**

**and**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES**
**COUNCIL 238**
**(Union)**

**0-AR-6001**

———

**STATEMENT OF SERVICE**

———

I hereby certify that copies of the Order of the Federal Labor Relations Authority in the subject proceeding have this day been served to the following:

EMAIL
Robert D. Coomber
Agency Representative
Environmental Protection Agency
1200 Pennsylvania Ave. NW, WJC North; Rm. 6317A
Washington, DC 20460
coomber.robert@epa.gov

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
Bethany Dreyfus
President
AFGE, Council 238
6350 Racine Street
Oakland, CA 94609
President.local1236.afge@gmail.com

Dated:
_____                        _____ (for)
April 4, 2025
WASHINGTON, D.C.                                    Belinda Stevenson
                                                   Legal Assistant

JA348

# Exhibit 14

**BEFORE THE**
**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **FEDERAL EDUCATION** | ) | |
| **ASSOCIATION - STATESIDE REGION,** | ) | |
| | ) | |
| **Charging Party/Union,** | ) | |
| | ) | |
| **and** | ) | **Case No. AT-CA-21-0324** |
| | ) | |
| **DEPARTMENT OF DEFENSE EDUCATION** | ) | **Date: April 30, 2025** |
| **ACTIVITY,** | ) | |
| | ) | |
| **Respondent/Agency** | ) | |

## <u>RESPONDENT'S REPLY</u>

COMES NOW the Department of Defense Education Activity ("DoDEA" or Respondent"), by and through its designated representative, and pursuant to 5 Code of Federal Regulations (CFR) § 2423.31(d), hereby replies to the Authority's Order to Show Cause dated April 4, 2025, and the Charging Party's Response to such Order dated April 18, 2025.

Per the express terms of Executive Order 14251, dated March 27, 2025, issued pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), the Department of Defense, (which includes the above-named Field Activity of the Department of Defense, to wit: Department of Defense Education Activity), is hereby excluded from coverage of the Federal Service Labor-Management Relations Statute. As such, the Authority lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union. Given the Charging Party's submission lacks any reference to the Secretary of Defense suspending the application of the above-cited Executive Order to the subdivision(s) represented by the Charging Party and/or lacks any reference to an applicable court injunction, this matter must be dismissed based on lack of jurisdiction.

1

Respectfully Submitted,

*Carla J. Eldred*

_____
Carla J. Eldred
Associate General Counsel (Litigation)
Department of Defense Education Activity
Office of the General Counsel
(720) 546-2994
carla.eldred@dodea.edu

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2025, the Respondent's Reply to the Charging Party's Response in Case No. AT-CA-21-0324 was served upon the FLRA via electronic service and upon the following parties as specified below.

**<u>By Email and Electronic Filing</u>**
Richard Tarr
Executive Director/General Counsel
Federal Education Association, NEA
1201 16th St., N.W., Suite 117
Washington, D.C. 20036
Phone: (202) 822-7859
Fax: (202) 822-7867
Email: RTarr@nea.org


Brent Hudspeth
Counsel for the General Counsel
FLRA, Atlanta Regional Office
229 Peachtree Street, NE
International Tower, Ste. 900
Atlanta, GA 30303
bhudspeth@flra.gov

3

# Exhibit 15

BEFORE THE
**FEDERAL LABOR RELATIONS AUTHORITY**
WASHINGTON, D.C.
_____

**FEDERAL EDUCATION ASSOCIATION
STATESIDE REGION
(Union)**

**and**

**DEPARTMENT OF DEFENSE
DEPARTMENT OF DEFENSE EDUCATION ACTIVITY
DOMESTIC DEPENDENT ELEMENTARY AND SECONDARY SCHOOLS
SOUTHEASTERN DISTRICT
(Agency)**

**AT-CA-21-0324**
_____

**UNION'S RESPONSE TO ORDER TO SHOW CAUSE
AND REQUEST FOR STAY**

In response to the Federal Labor Relations Authority's ("FLRA" or "Authority") Order to Show Cause issued on April 4, 2025, the Federal Education Association Stateside Region ("the Union") requests that this matter be stayed and held in abeyance pending the resolution of litigation currently proceeding in at least four separate federal district courts challenging the validity and applicability of Executive Order 14251, *Exclusions from the Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14533 ("the Executive Order"), with the parties providing periodic status reports of that litigation and the impact on this matter.

In support of this request, the Union states as follows:

1

1. This matter commenced with an unfair labor practice charge filed by the Union on June 22, 2021, alleging that the Agency violated § 7116(a)(l) and (5) of the Statute by unilaterally changing the starting and quitting times for bargaining-unit employees. After the Acting Regional Director of the FLRA's Atlanta Region issued a Complaint, the matter was heard before an administrative law judge ("ALJ") on February 15 and 16, 2023. The ALJ issued a Decision on May 16, 2024, recommending that the Authority dismiss the Complaint because the alleged unilateral change was "covered" by the parties' existing collective-bargaining agreement. The Union filed exceptions to the ALJ's Decision with the Authority on June 17, 2024. The Authority has yet to rule on the Union's exceptions.

2. On March 27, 2025, President Trump issued the Executive Order, which purports to exclude numerous agencies from the Statute's coverage pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), and thereby strip the vast majority of federal workers of their right to organize and bargain collectively through a labor organization of their choosing. The list of agencies removed from the Statute's coverage in Section 2 of the Executive Order includes the "Department of Defense, except for any subdivisions excluded pursuant to section 4" of the Executive Order. Section 4, in turn, grants the Secretary of Defense "delegated authority under 5 U.S.C. § 7103(b)(1) to issue orders suspending the application" of the Executive Order's exclusion "to any subdivisions of the departments [he] supervise[s], thereby bringing such subdivisions under the coverage of the…Statute." This delegated authority can only be exercised if the Secretary of Defense certifies that the

provisions of the Statute "can be applied to such subdivision in a manner consistent with national security requirements and considerations" and submits that certification for publication in the *Federal Register* within 15 days of the date of the Executive Order. As of April 18, no certification appears to have been executed with respect to the Agency.

3. Litigation over the validity of the Executive Order began immediately. At least two federal district court lawsuits have been filed by agencies—including the Department of Defense—seeking declaratory relief that they are entitled to terminate their CBAs pursuant to the Executive Order and begin implementing guidance from the Office of Personnel Management for management of an unrepresented workforce. *See U.S. Dep't of Def. v. AFGE Dist. 10*, No. 25-cv-119 (W.D. Tex. filed Mar. 27, 2025); *U.S. Dep't of Treas. v. NTEU, Ch. 73*, No. 25-cv-00049 (E.D. Ky. filed Mar. 28, 2025). Shortly thereafter, various unions commenced actions in federal district court challenging the validity of the Executive Order and seeking declaratory and injunctive relief. *See NTEU v. Trump*, No. 25-cv-00935 (D.D.C. filed Mar. 31, 2025); *AFGE v. Trump*, 25-cv-03070 (N.D. Cal. filed Apr. 3, 2025); *AFSA v. Trump*, 25-cv-01030 (D.D.C. filed Apr. 7, 2025).

4. In agreement with the suits brought by other unions, it is FEA's position that both the President's Executive Order and the Secretary of Defense's failure to exercise his delegated authority to exempt the Agency from the Executive Order are void on multiple grounds. In particular, FEA maintains that these actions are:

(a) ultra vires;

   (b) arbitrary and capricious and contrary to law under the Administrative Procedure Act, 5 U.S.C. § 706;

   (c) violative of the First Amendment; and

   (d) violative of the Fifth Amendment.

  5. The validity of the Executive Order involves constitutional and statutory issues that are well beyond the ordinary purview of the Authority and that will ultimately be resolved by Article III courts, which the Union submits are the proper fora for determining whether the Executive Order should be invalidated. Nothing in the statutory framework suggests that Congress intended for the validity of the President's exercise of authority under section 7103(b)(1) to be adjudicated through unfair labor practice proceedings.  See *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989) (exercising jurisdiction over union challenge to an exclusion order under Section 7103(b) and decided the merits). Nor it is apparent how such review would even be possible once a union is excluded from Chapter 71's remedial scheme.  In this regard, it is notable that the Government itself first initiated federal court litigation to resolve uncertainties surrounding the scope of the President's authority under 5 U.S.C. Section 7103(b)(1). The Authority should therefore stay the instant matter to allow those issues to be determined conclusively. A premature dismissal of this and other matters *en masse* will squander the resources of the Authority, the agencies, unions, and the courts. A stay, by contrast, will promote governmental efficiency and finality.

WHEREFORE, the Union respectfully requests that the Authority stay this matter and hold it in abeyance until such time judicial appeals are exhausted in the cases litigating the validity of the Executive Order.


Respectfully Submitted,


Richard Tarr
Executive Director/General Counsel
Federal Education Association, NEA
1201 16th St., N.W., Suite 117
Washington, D.C. 20036
Phone: (202) 822-7859
Fax: (202) 822-7867

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing document and attachments were served on April 18th, 2025 upon the FLRA via electronic service and upon the Agency representative listed below on April 18th, 2025 via email:


EMAIL
Carla J. Eldred
Associate General Counsel (Litigation)
Department of Defense Education Activity
Office of the General Counsel
carla.eldred@dodea.edu


FIRST CLASS MAIL
Brent Hudspeth
Counsel for the General Counsel
FLRA, Atlanta Regional Office
229 Peachtree Street, NE
International Tower, Ste. 900
Atlanta, GA 30303
bhudspeth@flra.gov


Richard Tarr
Executive Director/General Counsel
Federal Education Association/NEA
1201 16th St., N.W., Suite 117
Washington, D.C. 20036
Email: RTarr@nea.org

# Exhibit 16

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

———

**DEPARTMENT OF DEFENSE**
**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**DOMESTIC DEPENDENT ELEMENTARY AND SECONDARY SCHOOLS**
**SOUTHEASTERN DISTRICT**
**(Respondent)**

**and**

**NATIONAL EDUCATION ASSOCIATION**
**FEDERAL EDUCATION ASSOCIATION, STATESIDE REGION**
**(Charging Party)**

**AT-CA-21-0324**

———

**ORDER**

**June 10, 2025**

———

In the above-captioned case, the Authority previously issued an order directing the Charging Party to show cause why the Authority should not dismiss this matter for lack of jurisdiction pursuant to Executive Order 14,251,[1] and provided the Respondent the opportunity to file a reply.

The deadlines for the Charging Party's response and the Respondent's reply have now elapsed, and the Authority has placed the above-captioned case in abeyance. As a result, *the deadlines for any remaining filings in this case remain suspended.* You are not required to submit any further filings in this case until the Authority notifies you otherwise.

For the Authority:

*Erica J. Balkum*
Erica Balkum, Chief
Office of Case Intake and Publication

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

———

**U. S. DEPARTMENT OF DEFENSE**
**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**DOMESTIC DEPENDENT ELEMENTARY AND SECONDARY SCHOOLS**
**SOUTHEASTERN DISTRICT**
**(Respondent)**

**and**

**NATIONAL EDUCATION ASSOCIATION FEDERAL EDUCATION**
**ASSOCIATION, STATESIDE REGION**
**(Charging Party)**

**AT-CA-21-0324**

———

**STATEMENT OF SERVICE**

———

I hereby certify that copies of Order of the Federal Labor Relations Authority in the subject proceeding have this day been served by the following methods:

EMAIL
Richard Tarr
1201 16th St NW, Suite 117
Washington, DC 20036
rtarr@nea.org

Carla J. Eldred
Associate General Counsel (Litigation)
Department of Defense Education Activity
Office of the General Counsel
carla.eldred@dodea.edu

<u>FIRST CLASS MAIL</u>
Brent Hudspeth
Counsel for the General Counsel
FLRA, Atlanta Regional Office
229 Peachtree Street, NE
International Tower, Ste. 900
Atlanta, GA 30303
bhudspeth@flra.gov

Dated: June 10, 2025
WASHINGTON, D.C.

Erica Balkum, Chief
Office of Case Intake and Publication

2

# Exhibit 17

**Tarr, Richard [NEA]**

| | |
|---|---|
| **From:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ<Alexa.Rukstele@DODEA.EDU> |
| **Sent:** | Tuesday, April 29, 2025 9:58 AM |
| **To:** | Woods, Elgin Mr. CIV OSD/DoDEA-Americas; King, Frank Mr. CIV OSD/DoDEA-HQ; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe; Steele, Andre Mr. CIV OSD/DoDEA-Pacific |
| **Cc:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ |
| **Subject:** | [EXTERNAL] - Implementation of EO 14251 |
| | |
| **Importance:** | High |

Union Presidents & Leaders:

Consistent with EO 14251 and subsequent OPM and DoD guidance, **official time is no longer authorized for any purpose**. Accordingly, all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school. Representatives who were previously scheduled one (1) instruction-free period per day are no longer authorized to conduct representational work during that time and must coordinate with the school principal to be assigned agency work during that period. If they are not already doing so, beginning May 5, 2025, all union/association representatives on full- or half-time must engage in agency work for 100% of the duty day, as assigned by the District Superintendent, in coordination with school administrators. Also, DoDEA must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by unions/associations for representational activities and repurpose those resources for agency business only. In this regard, representatives will be required to promptly vacate any office space used by the union/association.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office: (571) 372-1864
Cell: (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION: This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Additionally, please indicate to the sender that you have received this message in error and delete the original message.

# Exhibit 18

 Outlook

---

**Future-Ready DoDEA Initiative**

**From** Director, DoDEA <DoDEA.Director@dodea.edu>
**Date** Thu 5/22/2025 4:00 PM
**To** DoDEA – All <dodea-all@dodea.edu>

The Department of Defense (DoD) is undergoing an optimization of its civilian workforce through its Workforce Acceleration and Recapitalization Initiative. Within the broader DoD framework, the Department of Defense Education Activity (DoDEA) will play a significant role in advancing this goal through our Future-Ready DoDEA (FRD) initiative. The FRD aligns with DoDEA's new Blueprint for Continuous Improvement, our five-year strategic plan to streamline and improve student services, foster innovation, and elevate the overall educational experience. DoDEA's workforce shaping efforts are a key part of this mission-aligned transformation, as they are designed to ensure that our staff and resources are strategically aligned with DoD priorities and our educational mission.

DoDEA is realigning and redefining existing roles, as well as adding key positions to better support the organization's evolving needs. This forward-focused effort will enable us to build a more agile and responsive structure that enables continuous improvement. While organizational changes are planned for implementation during SY 2025-2026, all DoDEA classrooms will be staffed and ready to receive students on Day 1. Maintaining continuity in our schools and providing flexibility to allow for continuous improvement is paramount.

The heart of DoDEA's mission-aligned transformation is an enhancement of the support systems that allow our schools to thrive; we must ensure that all students receive the attention, resources, and educational opportunities they deserve. By strengthening the services within our schools, improving leadership frameworks, and investing in the professional development of our staff, FRD will help DoDEA meet the needs of our communities, now and in the future.

As part of FRD, DoDEA will offer the Voluntary Early Retirement Authority (VERA) and a Voluntary Separation Incentive Payment (VSIP) to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees. All impacted employees will receive further information via email; school level employees will receive the message today and above school level employees will receive it tomorrow. Questions regarding this initiative may be sent to FRD@dodea.edu.

The professionalism that DoDEA employees demonstrate every day is unparalleled. DoDEA's strength lies in its people. This is embodied in one of my core values – we are better together. I am confident that FRD will facilitate our mission-aligned transformation, and allow DoDEA to educate, engage, and empower military-connected students to succeed in a dynamic world. Thank you for your dedication to DoDEA and the families we serve.


Beth Schiavino-Narvaez, Ed.D.
Director

# Exhibit 19

Outlook

---

**For Employees in Positions Impacted by the Future-Ready DoDEA Initiative**

---

**From** FRD <FRD@dodea.edu>

**Date** Thu 5/22/2025 9:28 PM

**To** FRD <FRD@dodea.edu>

DoDEA Employee:

Per the earlier message from the Director Narvaez, your position has been identified as impacted by the Future-Ready DoDEA (FRD) initiative in conjunction with our mission-aligned transformation.  DoDEA is actively utilizing available workforce shaping tools and working to identify placement and job opportunities for affected employees.  This does not guarantee that you will not be involuntarily separated from your position.

However, your position is eligible for Voluntary Separation Incentive Program (VSIP) in conjunction with either immediate retirement or early retirement under the Voluntary Early Retirement Authority (VERA).

VERA and VSIP are authorized by the Office of Personnel Management (OPM) and the Department of Defense (DoD) to provide eligible employees with options during reorganization, restructuring, and/or realignment.

VERA allows eligible employees to retire early without the usual age and service requirements, helping to create opportunities while supporting employees in making transitions that work for their individual situations  An employee is eligible to apply for VERA and receive an immediate annuity provided ALL the following conditions are met:
- Minimum age and service requirements
  - At least 50 years of age with at least 20 years creditable Federal service; OR
  - Any age with at least 25 years creditable Federal service.
- Continuously employed by DoD for more than 30 days.
- Serving under a non-time-limited appointment.
- Separates from a position subject to CSRS or FERS coverage.
- Separates by the close of the early-out period.
  - For school-level employees, no later than 24 July 2025
  - For above school-level/Headquarters employees, no later than 30 September 2025.

VSIP offers a financial incentive for employees who choose to voluntarily separate from Federal service.  VSIP computations are either $25,000 or an amount equal to the amount of severance pay the employee would be entitled to receive under 5 U.S.C. § 5595(c) – *whichever is less*.  Information regarding severance pay is available here: https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/severance-pay-estimation-worksheet/.

More retirement resources are available on the Government Retirement and Benefits (GRB) Platform; visit https://platform.chra.army.mil/.  The Army Benefits Center – Civilian is also available to assist and can be reached via email at usarmy.riley.chra-hqs.mbx.abcc-dodea-inquiries@army.mil or telephone at 1-877-276-9268, option 2 (M-Th 0800-1600 CT).

Specific information about individual VERA/VISP options will be sent to you on Tuesday, 27 May 2025, and the window to apply will run through Monday, 2 June 2025.  Questions may be submitted to FRD@dodea.edu.

JA369

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office:  (571) 372-1864
Cell:  (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.

# Exhibit 20



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**

**HEADQUARTERS**

**4800 MARK CENTER DRIVE**

**ALEXANDRIA, VA  22350-1400**

May 27, 2025

MEMORANDUM FOR DODEA EMPLOYEES IN 0485 EDUCATIONAL TECHNOLOGIST, 0414 ASSESSOR (SPEECH/LANGUAGE PATHOLOGIST), AND 0415 ASSESSOR (SPECIAL EDUCATION) POSITIONS

SUBJECT:  Announcement of Voluntary Early Retirement Authority (VERA) and Voluntary Separation Incentive Pay (VSIP)

The DoDEA Director has authorized a Voluntary Early Retirement Authority (VERA) and Voluntary Separation Incentive Pay (VSIP) window for DoDEA employees currently in a 0485 Educational Technologist, 0414 Assessor (Speech/Language Pathologist), or a 0415 Assessor (Special Education) position.  The window is open from 27 May – 2 June 2025.

Approval of VERA and VSIP is limited to employees who 1) occupy a position that, if vacated, would avoid or minimize the need to involuntarily separate DoDEA employees in these positions; and 2) are eligible for immediate retirement or VERA, either with or without VSIP.  Employees who are approved must separate from DoDEA no earlier than their last day of instruction and no later than 24 July 2025.

Employees requesting approval of VERA and VSIP, if applicable (hereinafter VERA/VSIP) under this announcement must respond with a request to be approved for a specific offer of VERA/VSIP, no later than **1700 EDT on 2 June 2025**.  Upon receipt of your request for VERA/VSIP approval, your eligibility will be verified.  If you meet the requirements described in paragraph 2 above, you will receive a specific offer of VERA/VSIP.  Your request for VERA/VSIP approval is not binding; however, **once you have received written notice of a specific offer of VERA and/or VSIP, your decision to accept the offer is irrevocable**.  This will be further explained in your written specific offer of VERA/VSIP.

The use of VERA is a one-time opportunity for employees to retire early.  To be eligible for a VERA, an employee must meet the following conditions:
1. Minimum age and service requirements
    a. At least 50 years of age with at least 20 years creditable Federal service; or
    b. Any age with at least 25 years creditable Federal service.
2. Continuously employed by DoD for more than 30 days.
3. Serving under a non-time-limited appointment.
4. Separating from a position subject to CSRS or FERS coverage.

Civil Service Retirement System (CSRS) employees who are granted VERA will have an age reduction of 2% for each year they are under age 55.  There is no age reduction for employees covered by the Federal Employees Retirement System (FERS).

JA372

For additional information regarding VERA, employees should access the information in the Office of Personnel Management: https://www.opm.gov/policy-data-oversight/workforce-restructuring/voluntary-early-retirement-authority/.

Employees should contact the Army Benefits Center – Civilian POC, Ms. Ashlee Outlaw, at ashlee.outlaw@dodea.edu to request an annuity estimate for planning purposes in making their decision to apply for immediate retirement or VERA.

Only employees who are eligible to separate by immediate or early retirement are eligible for VSIP. Additionally, to be eligible for VSIP, an employee must be a U.S. citizen serving on a permanent appointment and have at least 12 months of continuous DoD employment. For Fiscal Year 2025, the DoD has set the amount of VSIP payments at $25,000, or the amount of severance pay an employee would be entitled to receive under 5 U.S.C. § 5595(c) – *whichever is less*. At the employee's election, VSIP may be paid a lump sum or in installments, but all payments are taxable regardless of which way is selected. It is not required for an employee to be eligible for severance pay to receive VSIP.

**An employee who receives a VSIP and later accepts Federal employment, including under a personal services contract, within 5 years of the date of separation must repay the entire amount of the VSIP before the individual's first day of reemployment. Additionally, employees are precluded from accepting any position with the DoD for 12 months after receiving a VSIP and are ineligible for registration in the DoD Priority Placement Program (PPP).**

To request VERA/VSIP, please complete the ET Asessor VERA-VSIP application form and send to VSIP-SL@dodea.edu. You should notify your supervisor that you are applying for VERA/VSIP. This request is NOT a commitment to accept VERA/VSIP. **Employees who are approved for VERA/VSIP will receive a written specific offer. Written acceptance of an individual specific offer of VERA/VSIP constitutes an irrevocable decision.**

Should you have any questions or concerns, please send them to VSIP-SL@dodea.edu.


Amy Bower
Chief, Human Resources Division

# Exhibit 21

**Tarr, Richard [NEA]**

| | |
|---|---|
| **From:** | Tarr, Richard [FEA] <RTarr@nea.org> |
| **Sent:** | Wednesday, May 28, 2025 5:13 PM |
| **To:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU> |
| **Subject:** | FEA's Information Requests and Bargaining Proposals for DoDEA's Future-Ready initiative |

Alexa,

The Association has been informed by unit educators that a number of Educational Technologists (ETs), SPED Assessors and Speech Assessors have been impacted by the "Future-Ready" DoDEA initiative.  The Association officially requests bargaining over the "Future-Ready" DoDEA initiative by management.  The following are the Association's initial requests for information and initial written proposals.  Pursuant to the terms of Article 7 of the Negotiated Agreement and the Agency's obligations under 5 USC 7114(b)(4), the Association requests the following information:

At the outset, the Association requests management provide the Association with exactly which positions in its bargaining unit will be affected by this change.  In other words, is this change limited to ETs, SPED and Speech Assessors, or will additional positions be affected?

In addition, the Association requests the names and duty stations of all affected bargaining unit educators from this change by management.  The requested information includes a list of how many educators are affected at each school in the Association's bargaining unit.

The Association also requests information regarding the apparent authority for DoDEA to offer VERA/VSIP to the affected educators.  Based on information provided to the Association, management is claiming that it can offer $25,000 VSIPs to bargaining unit educators.  However, the Association submits that DoD has previously stated authority to offer $40,000 for VSIP. The Association requests additional information regarding why the $40,000 amount is not being offered, how the $25,000 figure was arrived at, and whether the information provided to educators about the VSIP totals was correct or not.

The Association also requests additional information regarding whether management is considering providing VERA/VSIP to all DoDEA educators in the FEA bargaining unit in an attempt to create additional vacancies to place affected ETs, SPED and Speech Assessors?

The Association also requests additional information regarding vacancies remaining in DoDEA at this time.  Specifically, the Association requests information whether DoDEA has begun filling vacancies with local hires or CONUS hires.  Furthermore, the Association requests additional information as to whether management intends to give ETs, SPED and Speech Assessors priority in placement over CONUS hires and local hires.

The Association also request additional information from management concerning whether any ISS educators will be affected by these changes and whether any ISS educators will be placed in vacancies in the Association's bargaining unit.  Furthermore, the Association requests additional information regarding management's intent concerning whether the affected ETs, SPED and Speech Assessors be given priority in placement over ISSs?

The Association requests additional information from management concerning whether management intends to release probationary, term/NTE educators from their positions to place affected ETs, SPED and Speech Assessors?  If management releases probationary or term/NTE educators from their positions, will they be considered for other vacancies as they arise?

Once the Association receives the above-requested information and has adequate time to review this information, the Association will submit additional proposals based on the requested information at that time.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors, that management provide these ETs, SPED and Speech Assessors educators the opportunity to provide feedback as to whether they wish to be placed in the same District, Area or Worldwide.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors, that management provide these educators with the opportunity to enter any additional certifications they may hold that are not currently listed on their DoDEA Educator Certificate into the DoDEA Certification prior to attempted placement to improve their chances of finding a vacancy they can fill.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors, that management will consider provisional or emergency certification to support placement of employees with limited certification areas, provided the employee agrees to meet the requisite educational requirements within two (2) years.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors and reduce the likelihood of being unable to accept a proposed reassignment that management provide affected ETs, SPED and Speech Assessors the opportunity to submit any health concerns, needs or Reasonable Accommodations required by the educators before any attempted placements are made.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors that these educators be provided with priority over CONUS recruitment and above school level educator placement in vacancies in the Association's bargaining unit.

The Association proposes that management request the authority to offer VERA/VSIP to all DoDEA educators in the Association's bargaining unit to encourage the creation of vacancies that could be filled by the affected ETs, SPED and Speech Assessors. In the event that VERA/VSIP is offered to all bargaining unit educators, the Association also proposes that any bargaining unit educator who receives and accepts a VERA/VSIP be provided with an extension of LQA or TQSA eligibility for the maximum amount of time provided under applicable regulations to allow educators to have lodging until departure and that management provide assistance in getting a pack out date before the educator's LQA or TQSA expires to prevent educators from being out of pocket through no fault of their own.

In addition, the Association proposes that if management determines to release probationary, term appointees or NTE educators to place affected ETs, SPED and Speech Assessors, that any vacancies left over after placement of ETs, SPED and Speech Assessors and any potential VERA/VSIP vacancies created be offered to displaced probationary, term appointees or NTE educators in the Association's bargaining unit before any CONUS recruitment.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors that management provide affected ETs, SPED and Speech Assessors with RAT waivers and summer LQA waivers for any affected educator accepting a VERA/VSIP.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors that management provide affected ETs, SPED and Speech Assessors who accept a VERA/VSIP offer with an extension of LQA or TQSA eligibility for the maximum amount of time provided under applicable regulations to allow educators to have lodging until departure.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors that management provide affected ETs, SPED and Speech Assessors who accept a

VERA/VSIP offer that due to the VERY limited amount of time left before the end of the school year that management provide assistance in getting a pack out date before the educator's LQA or TQSA expires to prevent educators from being out of pocket through no fault of their own.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors that management provide affected ETs, SPED and Speech Assessors that if any of these affected educators are sponsoring spouses and have dependent spouses, that management work with these affected educators to transfer their benefits to their dependent spouses in accordance with applicable regulations and the 7 year rule to prevent these spouses from being "stranded" or losing their job.

The Association proposes that in order to minimize the impact of reassignments on affected ETs, SPED and Speech Assessors that management provide bargaining unit educators to volunteer to be excessed out of their position to place affected ETs, SPED and Speech Assessors.  In the event that there are volunteers who can be excessed to place affected ETs, SPED and Speech Assessors, the Association proposes that these volunteers be permitted to offer feedback on desired location and special needs before management considers the volunteers for placement.  The Association also proposes that these volunteers be provided with official PCS travel orders to a new duty station as being in the government's interest (allowing displaced educators to be placed).

The above are the Association's initial written requests for information and initial written proposals concerning managements' changes under the "Future-Ready" DoDEA initiative to the ET, Speech and SPED Assessor positions in the Association's bargaining unit.  The Association reserves the right to submit additional proposals, whether verbally or in writing, throughout the bargaining process.  Thank you.

Rich


Richard Tarr
Executive Director/General Counsel
Federal Education Association, NEA
1201 16th St., N.W., Suite 117
Washington, D.C. 20036
Phone: (202) 822-7859
Email: RTarr@nea.org

**Confidentiality Notice**: This electronic message transmission contains information that is confidential and/or privileged. This e-mail, as well as any attachments, is intended for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail and/or any attachment is prohibited. If you have received this electronic transmission in error, please delete the e-mail and any attachments and notify me by telephone at (202) 822-7859 or by e-mail (RTarr@nea.org) immediately.

# Exhibit 22

**Tarr, Richard [NEA]**

| | |
|---|---|
| **From:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU> |
| **Sent:** | Wednesday, May 28, 2025 5:15 PM |
| **To:** | Tarr, Richard [FEA] <RTarr@nea.org> |
| **Subject:** | RE: FEA's Information Requests and Bargaining Proposals for DoDEA's Future-Ready initiative |

Rich:

DoDEA acknowledges receipt of FEA's below requests; they will be held in abeyance pending the outcome of litigation over EO 14251.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office:  (571) 372-1864
Cell:  (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Federal Education Association, *et al.,*

    *Plaintiffs,*

      v.

Donald J. Trump, *et al.,*

    *Defendants.*

Civil Action No. 1:25-cv-1362

## DECLARATION OF ALAN DANAHY

I, Alan Danahy, hereby declare that

1.     I am over the age of 18 years old and am a resident of South Carolina. I have personal knowledge of the following facts and if called to testify could and would competently do so.

2.     I am offering this Declaration in my individual capacity and not on behalf of the institution that employs me.

3.     I am currently employed as a music teacher by the Department of Defense Education Activity (DODEA) at C.C. Pinckney Elementary School, Fort Jackson, in Columbia, South Carolina.

4.     I am a member of the Federal Education Association (FEA) and serve as the Director for the Federal Education Association-Stateside Region (FEA-SR). I have been a member of FEA for approximately 15 years, and have been the FEA-SR Director since August 2023. Before becoming the FEA-SR Director, I served for seven years—from 2016 to 2023—as

1

the President of the Fort Jackson Association of Educators, one of the local associations within FEA-SR.

5.    Since 1996, FEA-SR has represented two units of employees working in stateside DODEA schools. One unit consists of professionally certified, non-supervisory educators and other professionals; the other unit consists of classified education support professionals (ESPs). Prior to 1996, local FEA affiliates had represented those employees in separate, military installation-level bargaining units for more than a decade. But in 1996, the FLRA issued an order approving the consolidation of those military installation-level units into two units: one for stateside certified educators and the other for stateside ESPs. A true and correct copy of that order is attached as Exhibit 1.  Following that order, DODEA recognized FEA-SR as the successor representative for those two units.

6.    The certified unit signed its first collective-bargaining agreement (CBA) in 1999, and the ESP unit signed its first CBA in 2010. Approximately 91% of FEA-SR's membership consists of certified educators, and the remaining 9% consists of ESPs.

7.    As the FEA-SR Director, I am the primary point of contact for the presidents of FEA-SR's 21 local affiliates and communicate with them on a daily basis. In addition, I work closely with the two General Counsels for FEA-SR, Benjamin Hunter and Angelia Stubbs. Throughout my tenure as the FEA-SR Director, I have provided guidance to presidents and members, drafted FEA-SR communications, engaged in bargaining and consultation with my management counterparts at DODEA, drafted and negotiated grievance settlements, bargained and signed memoranda of understanding (MOUs) between the bargaining units and DODEA. I also helped draft grievances, bargaining requests, information requests, and unfair labor practice

(ULP) charges before the Federal Labor Relations Authority. I have also served as the Chief Negotiator for the certified educators bargaining team.

8.    The most recent CBA covering certified educators went into effect on January 11, 2019 (the 2019 Certified Educator CBA). A true and correct copy of that agreement is attached as Exhibit 2. The 2019 Certified Educator CBA's duration provision, Article 35, provides for an initial term of five years and also includes a renewal clause providing that, if either party requests to bargain over a new agreement at least 365 but not more than 395 days before the end of the initial term, the basic terms and conditions of the agreement remain in effect until bargaining has concluded and a new agreement is executed. *See* Exh. 2 at 182. FEA-SR submitted to DODEA a timely request to renegotiate the 2019 CBA on January 4, 2023. A true and correct copy of that notice is attached as Exhibit 3.

9.    The most recent CBA between FEA-SR and DODEA covering ESPs went into effect on March 25, 2010 (the 2010 ESP CBA). A true and correct copy of that agreement is attached as Exhibit 4. The 2010 ESP CBA's duration provision, Article 29, provides for an initial term of four years but also includes a renewal clause providing that if either party gives notice of intent to bargain over a successor agreement at least 60 but not more than 90 days before the CBA's expiration date, "the Agreement shall remain in full force and effect" until the bargaining concludes and a new agreement is reached, and that "[i]f neither party files such written notice, the Agreement shall be automatically renewed" for one year "on each anniversary date." Exh. 4 at 185. As neither party provided notice in the initial window period before the CBA's expiration, the CBA was renewed from year to year without negotiations over a successor agreement until DODEA provided FEA-SR notice of its intent to renegotiate the Classified CBA on April 28, 2020.  A true and correct copy of that notice is attached as Exhibit 5.

10.     In addition to the extension of both the 2019 Certified Educator CBA and 2010 ESP CBA by operation of their respective duration clauses, the provisions of those agreements governing mandatory subjects of bargaining also continued in force by operation of law pending the negotiation of successor CBAs or, failing that, the outcome of Chapter 71's impasse-resolution processes. *See, e.g., Dep't of the Air Force 35th Combat Support Grp.*, 4 F.L.R.A. 22, 23 (Aug. 12, 1980) ("[T]he existing personnel policies and practices and matters affecting working conditions—including negotiated grievance and arbitration procedures—must continue as established upon the expiration of a negotiated agreement, absent an express agreement by the parties to the contrary or unless modified in a manner consistent with the Statute.").

11.     Both the 2019 Certified Educator CBA and 2010 ESP CBA provide for, among other things, grievance-and-arbitration procedures (which include provisions that protect employees asserting grievances from employer reprisals), payroll deduction of union membership dues, official time and use of office facilities for union officials engaged in representational work, employee and association rights (including the right of bargaining unit employees to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, an emergency leave bank for educators facing medical emergencies, and procedures to bargain over the impact and implementation of management-initiated changes to conditions of employments such as new curriculum implementations and new educational initiatives. All of the foregoing provisions deal with subjects that the FLRA considers to be mandatory bargaining subjects.

a)     Before President Trump issued EO 14251, FEA-SR had been engaged in bargaining with DODEA over successor agreements to both the 2010 ESP CBA and the 2019 certified educator CBA. Benjamin Hunter, FEA-SR General Counsel, and I negotiated the

4

JA383

ground rules for Certified bargaining. I signed the Ground Rules MOU on December 13, 2023.
Mr. Hunter and I exchanged initial bargaining proposals with DODEA in mid-February 2024,
and our first bargaining sessions started on February 26, 2024. Mr. Hunter had been leading the
negotiations with DODEA for the ESP CBA since the parties finalized an agreement for ground
rules for bargaining on August 29, 2023. The negotiating teams for FEA-SR and DODEA had
completed the initial agreed upon bargaining schedule and had ultimately reached agreement on
a majority of the contract articles in both CBAs. FEA-SR and DODEA had also worked with
mediators from the Federal Mediation Conciliation Service (FMCS) to attempt to conclude the
bargaining process for both CBAs. DODEA refused to continue negotiations after the EO was
issued, however. *See infra* at ¶¶ 19–20.

12.     The 2019 Certified Educator CBA is central to FEA-SR's support for certified
educators and to FEA-SR's organizational mission. That agreement guarantees hours of weekly
planning time, sets a cap on the length of the duty day, and mandates a 30-minute unpaid lunch.
*See* Exh. 2 at 94–96. It also provides for bargained-for salaries, which is rare for federal
employees. *See* Exh. 2 at 103–111. Without the protections of the 2019 Certified Educator CBA,
DODEA would be free to freeze or cut certified educators' salaries and mandate that certified
educators work longer hours with no additional compensation and with less planning time or the
same amount of planning time in writing but with greater DODEA control over how the planning
time is used.

13.     In addition to benefiting educators, collective bargaining benefits DODEA's
schools. Over the time that FEA-SR has represented DODEA education professionals, DODEA
has become a pre-eminent public school district. Indeed, "[t]he academic achievement of DOD
students, as measured by their performance on standardized tests and their plans for enrolling in

college, generally exceeds that of elementary and secondary students nationwide." Government Accountability Office, "BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools" (2001) at https://www.gao.gov/assets/gao-01-934.pdf. Since 2020, the 161 schools operated by DODEA have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress. *See* DODEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025) (quoting DODEA Director Beth Schiavino-Narvaez's statement that "[c]redit for this success belongs to … teachers, administrators, and staff of DoDEA," as well as "to students and their families"), https://www.dodea.edu/news/press-releases/dod-schools-ranked-best-united-states-again-nations-report-card.

14.    Collective bargaining can and has contributed to this success. For example, FEA-SR and DODEA negotiated arrangements for the union's participation in committees such as the Continuous School Improvement Committee, which focuses on enhancing the delivery of instruction and educational practices, and the Case Study Committee, which ensures that students with special needs receive appropriate educational services. Union representatives have brought valuable expertise in education to bear on these committees' work. Because committee members are selected by the union to serve in a representational capacity and are therefore afforded the rights and protections of the Federal Service Labor-Management Relations Statute (FSLMRS), they are able to provide candid, constructive, and at times critical feedback to support DODEA's mission without fear of reprisal.

15.    The union also has played a constructive role when DODEA introduces a new educational program, curriculum, assessment, or resource. Under the FSLMRS and under Article 7 of the CBAs, DODEA is required (a) to provide notice when it decides to exercise its statutory

management rights in ways that affect the terms and conditions of unit members' employment; and (b) if FEA-SR requests bargaining, is further required to bargain over the impact and implementation of its management decisions. *See* Exh. 2 at 31–36, Exh. 4 at 40–44. In these situations, FEA-SR typically provides targeted feedback from school-level educators who will be directly involved in incorporating the new program into their teaching. In fact, the union's response to DODEA's notice of such a change, as required by both the FSLMRS and the CBAs, is the only opportunity for educators to provide the agency with feedback on management proposals.

16.     For example, FEA-SR provided feedback that aided in DODEA's recent implementation of its Universal/Full-Day Pre-K program. Upon receiving the statutory notice for the Pre-K program's rollout, FEA-SR raised numerous concerns regarding DODEA's readiness to deliver appropriate instruction and the inadequate allocation of resources. In response to this feedback, DODEA established a "Tiger Team"—a cross-functional group of DODEA leadership, administrators, and union-selected representatives. This team addressed many of the readiness concerns, developing actionable solutions to advocate for the program's effective implementation, and had, until the Executive Order, continued to collaborate with the union. After the EO, however, the team's final scheduled meeting was canceled. The team has not met since.

17.     Since the issuance of EO 14251, DODEA has refused to engage in any further negotiations for a new collective bargaining agreement and has abrogated its obligations under the existing CBAs. It has justified these actions by pointing to EO 14251 and to guidance from the Office of Personnel Management ("OPM") implementing EO 14251.

18.     Despite the benefits collective bargaining has provided to DODEA schools and the educators who work in them, DODEA has ceased bargaining over FEA-SR's successor agreement by reason of EO 14251.

19.     In a March 31, 2025, Teams video call, Frank King, Chief Negotiator for DODEA's bargaining team, told me that DODEA would not engage in further bargaining because of the EO.

20.     Because of the EO and DODEA's refusal to engage in further bargaining, FMCS is no longer offering mediation services to help the parties bargain. FMCS last provided mediation services for the parties on December 16-19, 2024. On June 16, 2025, an FMCS mediator, David Rose, reached back out to FEA-SR to offer additional mediation services. The next day, on June 17, 2025, Mr. Hunter responded on behalf of FEA-SR, notifying FMCS about the EO and stating that FEA-SR is "eager to resume bargaining as soon as DoDEA is either willing or directed to re-engage." A true and correct copy of those emails is attached as Exhibit 6. A few hours later, Mr. Rose emailed both Mr. King and myself informing us that because FMCS learned negotiations "are no longer on-going because of Executive Order 14251…FMCS will close the case." He stated that "the case can be re-opened if and when a court orders the parties to bargain and the parties request mediation." A true and correct copy of that email is attached as Exhibit 7.

21.     DODEA has also repudiated its obligation to abide by the terms of the CBAs, which remain in force.

22.     On April 3, 2025, I received an email from Alexa A. Rukstele, the Chief of the Labor Management and Employee Relations Division in DODEA stating that, due to the EO and

the OPM guidance, DODEA "determined that it will pause labor relations-related activities." A true and correct copy of the email I received is attached as Exhibit 8.

23.    Also on April 3, 2025, after Ms. Rukstele emailed FEA-SR about pausing labor-related activities due to the EO, DODEA began canceling meetings with FEA-SR. Specifically, at 2:47 p.m. that day, I received an email sent by Dr. Judith Minor, Director of Student Excellence for DODEA Americas, cancelling an important "year-in-review debrief" meeting for the "Tiger Team," which had been scheduled for May 12, 2025. This was the final scheduled meeting for the team, comprised of DODEA leadership, administrators, and union-selected representatives, including myself. A true and correct copy of a screenshot of this cancelation is attached as Exhibit 9. Since then, other scheduled meetings between FEA-SR and DODEA have been canceled due to the EO.

24.    Also on April 3, 2025, Ryan Smith, Superintendent of the DODEA Americas Mid-Atlantic District, emailed union presidents in his district, stating that in accordance with the EO, school-, community- and district-level union meetings were suspended. A true and correct copy of that email is attached as Exhibit 10.

25.    Since then, DODEA has, in direct violation of the CBAs, stopped honoring employees' authorizations for payroll deduction of their union dues, denied FEA-SR representatives official time for union activity, refused to respond to grievances, and denied members their rights to have a union representative attend any meeting with supervisors that could lead to discipline. Each of these actions taken on its own has severely weakened the union and will further weaken the union unless EO 14251 and the OPM guidance are enjoined. Moreover, taken together, these harmful actions compound the harm to FEA-SR's finances and to its ability to effectively represent the interests of its members, creating a vicious circle in

which the union's ability to represent its members is hobbled at the same time its revenues are

decreasing, and it has to expend substantial resources to convince members to continue paying

dues through an alternative payment system.

26.    Although Article 16 of both CBAs requires DODEA to honor unit employees'

authorizations for payment of their FEA-SR dues through payroll deduction, on April 7, 2025,

we became aware that DODEA unilaterally stopped deducting and remitting employee dues

payments to FEA-SR. April Brown, A DODEA payroll technician, emailed at least one local

president stating that the Defense Finance and Accounting Service (DFAS) had cancelled dues

deductions in compliance with EO 14251. That local president provided that email to me. A true

and correct copy of that email is attached as Exhibit 11. The next day, April 8, 2025, this was

confirmed when FEA-SR employees, including myself, received an email copy of our Leave and

Earnings Statement (LES) and saw that our union dues were no longer being deducted.

27.    Approximately 91.8% of FEA-SR members were enrolled in payroll deduction at

the time of this decision.

28.    DODEA's unilateral decision to end payroll deduction contravenes Article 16 of

both CBAs.

29.    As of April 8, 2025, there were three remaining dues payments for the school

year.

30.    FEA-SR's local presidents and I have engaged in extensive outreach to members

encouraging them to enroll in automatic payments to pay their union dues and retain their

membership. Although we were able to convert most members to AutoPay or to pay by check,

we have been unable to recoup all of the lost revenue. In total, this decision cost FEA-SR

$65,239.

31.    It has been particularly difficult to persuade members to convert to AutoPay in light of the fact that DODEA has, in its implementation of EO 14257 and of the OPM's guidance, impeded FEA-SR's ability to advocate for members, as detailed further below. Without the ability to engage in collective bargaining, prosecute grievances, represent members in meetings with their supervisors with potential disciplinary consequences, or work on members' behalf during the workday, it is difficult for FEA-SR to convince members that union membership continues to be worth paying for.

32.    Such reluctance on the part of members is made all the worse because EO 14251 has stripped educators of critical statutory rights and protections such as the right to engage in union activity "freely and without fear of penalty or reprisal." 5 U.S.C. § 7102. Those formerly protected rights include the right "to form, join, or assist any labor organization"; "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities"; and "to engage in collective bargaining." The loss of these statutory protections, and the unfair labor practice provisions by which they are enforced, makes joining or remaining a member the union a riskier act than it was before Executive Order 14251 issued. DODEA has exacerbated this fear by issuing a Letter of Caution to a union president who engaged in lawful union activity—namely, contacting members to sign them up to pay their dues through AutoPay—outside their duty day and away from government property. *See infra* at ¶ 38. This has caused fear and anxiety among other presidents that they could also face disciplinary action for engaging in lawful union activities outside their duty day and away from government property.

11

33.     It is also logistically challenging to convert members to AutoPay. Membership

processing occurs at three levels—the local association level, the regional level (FEA-SR), and

the national level (National Education Association). One employee, Margaret Sleeper, who

normally works for FEA part time, essentially worked day and night to do this conversion. The

termination of dues deductions and immediate need to convert members to AutoPay or have

them pay by check was like flipping a switch. This process was difficult and time consuming, not

only for Margaret Sleeper but also presidents, local membership processors, me, and our regional

membership processor.

34.     The conversion process has been time- and resource-intensive, as local presidents

and I have spent hours outside our workday to communicate with members about the new model

of representation we plan to offer as well as providing instructions and reminders on how to

convert to auto pay.

35.     DODEA's implementation of EO 14251 and the OPM guidance threatens the

future of our organization. By drastically reducing FEA-SR's revenues, while abrogating FEA-

SR's CBAs in ways that weaken the union in the eyes of the membership (as detailed further

below), DODEA's implementation of EO 14251 has reduced, and will continue to reduce, union

membership, which will in turn further weaken the union financially, which will further impact

representation, resulting in a vicious circle that threatens our ability to keep our organizational

structure intact. Unless collective bargaining is restored quickly, DODEA's current

implementation measures—to say nothing of those to come—are an existential threat to the

union.

36.     Pursuant to EO 14251, DODEA has also ceased allowing new or additional

official time request—or spot official time requests—for FEA-SR union representatives.

37.     In an email on April 7, 2025, Mr. Smith, Superintendent of the DODEA Americas Mid-Atlantic District, stated to a union president that "new and/or additional official time will not be authorized in accordance with the EO." A true and correct copy of this email is attached as Exhibit 12. Later, on April 29, 2025, I received an email from Ms. Rukstele stating that "official time is no longer authorized for any purpose." A true and correct copy of this email is attached as Exhibit 13. This meant that union representatives like myself and local presidents were now officially prohibited from engaging in union activities during work hours.

38.     On May 13, 2015, a community superintendent issued a Letter of Caution (LOC) to a one of FEA-SR's local presidents for allegedly sending a union email to their members during the duty day. A true and correct copy of that LOC is attached as Exhibit 14. The president produced a screenshot of the email to prove to that the email was actually sent *outside* duty hours. A true and correct copy of that screenshot is attached as Exhibit 15. In response, the community superintendent said that "the timestamp point is moot"—even though that was the entire basis for the LOC—and then shifted to a new claim—that "union engagement" is not permitted even if it occurs off duty. A true and correct copy of this email is attached as Exhibit 16. Richard Tarr, FEA's Executive Director and General Counsel, sent an email to James Richardson, DODEA's General Counsel, about this incident, citing First Amendment concerns, but never received a response. A true and correct copy of this email is attached as Exhibit 17. As far as I know, the LOC is still on file and has not been retracted by DODEA.

39.     In addition, Ms. Rukstele's April 29 email effectively evicted union representatives from their DODEA-provided offices, stating, "representatives will be required to promptly vacate any office space used by the union/association." This directive was issued to be "[c]onsistent with EO 14251 and subsequent OPM and DoD guidance." *See* Exh. 13.

40.     The cancellation of official time and revocation of office space contravenes Article 6 of both CBAs. *See* Exh. 2 at 17–26; Exh. 4 at 24–33. Those provisions grant nearly every local president release time and nearly every local association office space. In addition, they grant [each?] local a bank of official time that other union representatives can use to conduct representational duties.

41.     The loss of official time makes it harder for me and other union representatives to engage in representational work, since we cannot communicate with or represent members during the workday, and it is more difficult and time-consuming to meet with employees after the duty day and away from the workplace.

42.     The loss of office space also constitutes a major loss of resources for the union. To vacate those offices, some presidents had to spend hours of their personal time, outside working hours, to haul furniture, equipment, and other items away from their school and to an off-site location. Locals incurred transportation costs and in some cases storage costs. The loss of this space has hit large locals particularly hard. One local, for example, had to hire movers, pay to rent a truck, and pay for a storage unit.

43.     Pursuant to EO 14251, DODEA has ceased processing FEA-SR's grievances. On April 28, 2025, DODEA began sending FEA-SR automatic responses to FEA-SR filing any new grievances, beginning with AG-24-25 No. 25 (Certified) filed on April 24, 2025. This email stated that DODEA has paused any action on grievances because of EO 14251. A true and correct copy of the first such email I received is attached as Exhibit 18.

44.     Pursuant to EO 14251, DODEA has ceased allowing union representation to FEA-SR-represented employees in disciplinary meetings and investigations. On or around April 30, 2025, I received a DODEA guidance document instructing administrators to not allow union

representation in meetings that could result in discipline, regardless of whether the meeting occurred during or outside of the duty day. A true and correct copy of the guidance is attached as Exhibit 19.

45.    Since then, DODEA has denied several member requests for representation in meetings that could result in discipline. These denials have occurred in many locals across the Stateside Region, ranging from the Southeast District to the Mid-Atlantic District to Guam. In at least one instance, the FEA-SR member asked to hold the meeting after school so their union representative could attend (in the absence of the right to official time), and DODEA told them that they were not allowed that representation even outside of the duty day.

46.    DODEA's denial of these contractual representation rights violates Article 6 Section 2 of both CBAs. It also is contrary to the FSLMRS. *See* 5 U.S.C. § 7114(a)(2)(B) (providing that a union representative "shall be given the opportunity to be represented at . . . any examination of an employee in the unit by a representative of the agency in connection with an investigation if …the employee reasonably believes that the examination may result in disciplinary action against the employee; and … the employee requests representation").

47.    FEA-SR's inability—by reason of the Executive Order 14251, the OPM Guidance, and DODEA's implementation of both—to collect dues via payroll deduction as guaranteed by the CBA, to continue bargaining for successor CBAs for both units, to exercise its contractual rights to official time for representational activities and to represent members in meetings with management that could result in discipline, have weakened FEA-SR and harmed its members and will, unless an injunction issues, continue to further harm FEA-SR and its members in ways that cannot be repaired after the fact.

15

I declare under penalty of perjury that the above is true and correct.

Executed this 1st day of July, 2025.

# Exhibit 3

 Outlook

---

## Request to Bargain Successor Agreement for FEA-SR Certified Bargaining Unit

**From** Hunter, Benjamin [FEA] <BHunter@nea.org>

**Date** Wed 1/4/2023 3:19 PM

**To** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Cc** Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; Minor, Judith A. Dr. SES OSD/DoDEA-Americas <Judith.Minor@DODEA.EDU>; Stubbs, Angelia [FEA] <astubbs@nea.org>; feasrdirector <feasrdirector@gmail.com>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>

---

🖉 1 attachment (138 KB)
Request to Bargain Successor Agreement for the FEA-SR Certified Bargaining Unit.pdf;

Dear Alexa,

Attached please find FEA-SR's written notice of its desire to engage in bargaining over a new Master Labor Agreement for the FEA-SR Certified Bargaining Unit. I am mailing hard copies today. I am hoping we can discuss a way forward at the parties' scheduled CADRO conference (January 12).

Hope you had a nice break and are refreshed for the New Year!

Sincerely,
Ben

Ben Hunter
FEA-Stateside Region General Counsel
Phone: (202) 834-3427

Email: bhunter@nea.org

**Confidentiality Notice**: This electronic message transmission contains information that is confidential and/or privileged. This e-mail, as well as any attachments, is intended for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail and/or any attachment is prohibited. If you have received this electronic transmission in error, please delete the e-mail and any attachments and notify me by telephone at (202) 834-3427 or by e-mail (bhunter@nea.org) immediately.



Benjamin N. Hunter
FEA Stateside Region General Counsel

Tel: 202-834-3427
bhunter@nea.org

January 4, 2023

Ms. Alexa Rukstele
Chief Labor Management & Employee Relations
Department of Defense Education Activity
4800 Mark Center Drive (04C05-07)
Alexandria, VA 22350

**RE: Request to Bargain Successor Master Labor Agreement (MLA) for the Federal Education Association Stateside-Region (FEA-SR) Certified Bargaining Unit**

Dear Ms. Rukstele:

This is notice of FEA-SR's desire to engage in bargaining over a new MLA for the FEA-SR Certified Bargaining Unit. FEA-SR will offer its proposals for ground rules for bargaining in the near future. I propose that we discuss a time to meet to bargain after management receives FEA-SR's initial ground rules proposals.

As I am sure you are aware, the parties are currently engaged in settlement discussions to resolve a Complaint issued by the FLRA Atlanta Regional Director over unilateral changes made to the 2021/22 workday schedule (FLRA case number AT-CA-21-0324). During those discussions, FEA-SR indicated that the Association intended to reopen the MLA for negotiations. Further, that FEA-SR would agree to waive virtually all relief sought in the ULP Charge in exchange for a commitment in the ensuing negotiations to prioritize the teacher workday. Specifically, FEA-SR's proposal is that the parties would bargain a new workday provision to completion before commencing bargaining on the rest of the contract and that the

agreed upon duty day would take effect immediately (and eventually be incorporated into the successor MLA).

I do not have to tell you that the additional "24 hours" has been an especially sore subject that has greatly damaged the bargaining relationship. After nearly four (4) years since the Agency imposed the provision, FEA-SR is still the only bargaining unit in DoDEA required to work the additional time. DoDEA proposed a similar provision in its contract negotiations with the Overseas Federation of Teachers. However, management recently abandoned the proposal in the final agreement. DoDEA also recently tentatively agreed to a provision with FEA's overseas bargaining unit that will not extend the teacher workday in the parties' successor CBA. We were hopeful these developments signal that DoDEA is moving away from its push to make the "24 hours" a system-wide policy. FEA-SR believes a mutually acceptable path forward can be achieved though bargaining. Since the CBA is up for renegotiations anyway, there is no better time than now.

I am hopeful we will be able to resolve FLRA case number AT-CA-21-0324 prior to the February 15, 2023 hearing date. In any case, please consider this notice of FEA-SR's request to bargain a successor MLA for the FEA-SR Certified Bargaining Unit.

Sincerely,

Ben Hunter / FEA- Stateside Region General Counsel

Cc:

Dr. Judith Minor
Director of Student Excellence
DoDEA Americas
700 Westpark Drive
Peachtree City, GA 30269


Mr. Elgin Woods
Supervisory HR Specialist (LMER)
DoDEA Americas
700 Westpark Drive
Peachtree City, GA 30269

3

# Exhibit 5

Outlook

## Contract Re-Opener (MLA Non-Pro)

**From** James, Ronald Mr. CIV OSD/DoDEA <Ronald.James@dodea.edu>

**Date** Tue 4/28/2020 11:48 AM

**To** feaddess <feaddess@gmail.com>

**Cc** Brady, Thomas M. Mr. SES OSD/DoDEA <Thomas.Brady@dodea.edu>; Brady, Robert M. SES OSD/DoDEA <Robert.Brady@dodea.edu>; Minor, Judith A. Dr. SES OSD/DoDEA <Judith.Minor@DODEA.EDU>; Hunter, Benjamin [NEA] <BHunter@nea.org>; King, Frank Mr. CIV OSD/DoDEA <Frank.King@dodea.edu>; Woods, Elgin, Mr., CIV, OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>

📎 1 attachment (222 KB)
Re-Open FEASR NonPro 04-28-2020.pdf;

Good Morning Jane,

As we discussed on the phone this morning, please find attached DoDEA's notice to open negotiations for the successor to the 2010 MLA between the DoDEA and the FEASR Non-Professional Unit. As I also mentioned, DoDEA's ground rules proposal will follow under separate cover.

Thank you,

Ron
Ronald S. James, Chief
Labor Management and Employee Relations
Department of Defense Education Activity
4800 Mark Center Drive
Alexandria, VA 22311

Phone: (571) 372-0769
Email: Ronald.James@dodea.edu

This communication may contain information protected by the Privacy Act of 1974 and is For Official use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this E-mail in error, and delete the original message you received.



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY
HEADQUARTERS**
**4800 MARK CENTER DRIVE**
**ALEXANDRIA, VA  22350-1400**

Delivered by email                                                                April 28, 2020

Ms. Jane Loggins
FEA Director for DDESS
Federal Education Association
194 Manscoe Place
Clarksville, TN 37043-1578

Dear Ms. Loggins,

     This letter is official notice of the decision by the Department of Defense Education
Activity (DoDEA) to engage in bargaining for a successor agreement to the 2010 Master Labor
Agreement between the Federal Education Activity-Stateside Region (non-professional unit) and
the Department of Defense, Domestic Dependent Elementary and Secondary Schools (MLA).
This notice is issued in accordance with MLA Article 29 and pursuant to the parties' mutual
obligations under 5 USC 7101 et seq.

     If you have any questions, please contact Mr. Elgin Woods, Labor Management and
Employee Relations Chief for DoDEA Americas, by telephone at (470) 460-2028 or via email at
Elgin.Woods @dodea.edu.

                        Sincerely,

                        Ronald S. James
                        Chief
                        Labor Management and Employee Relations

Cc:    Thomas M. Brady, DoDEA Director
       Robert Brady, DoDEA Associate Director for Finance and Business Operations
       Dr. Judith Minor, DoDEA Director for Student Excellence-Americas
       Frank King, DoDEA Chief Negotiator
       Elgin Woods, DoDEA LMER Chief for DoDEA Americas
       Benjamin Hunter, FEA-SR General Counsel

JA403

# Exhibit 6

**Rooney, Caitlin [HQ-GC]**

| | |
|---|---|
| **From:** | Hunter, Benjamin [FEA] |
| **Sent:** | Wednesday, June 18, 2025 11:47 AM |
| **To:** | Rooney, Caitlin [HQ-GC]; Hostak, Phil [NEA]; Tarr, Richard [FEA] |
| **Subject:** | Fw: Reaching out regarding negotiation between DODEA and FEA |

**From:** Hunter, Benjamin [FEA] <BHunter@nea.org>
**Sent:** Tuesday, June 17, 2025 10:45 AM
**To:** Rose David <drose@fmcs.gov>
**Cc:** Danahy, Alan [FEA] <ADanahy@nea.org>
**Subject:** Re: [EXTERNAL] - Reaching out regarding negotiation between DODEA and FEA

Dear David,

Very good to hear from you. I'm looping in Alan Danahy. FEA-SR is ready to resume negotiations and mediation as soon as possible. However, following the issuance of Executive Order 14251 ("Exclusions from Federal Labor-Management Programs"), DoDEA informed FEA-SR that it was pausing all labor relations activities and has since ceased communication with us.

FEA-SR is currently challenging EO 14251 in the U.S. District Court for the District of Columbia and is eager to resume bargaining as soon as DoDEA is either willing or directed to re-engage.

Sincerely,

Ben Hunter

FEA-SR General Counsel

(202) 834-3427

**From:** Rose David <drose@fmcs.gov>
**Sent:** Monday, June 16, 2025 5:24 PM
**To:** Hunter, Benjamin [FEA] <BHunter@nea.org>
**Subject:** [EXTERNAL] - Reaching out regarding negotiation between DODEA and FEA

Ben,

I am reaching out to you because FMCS has been partially re-constituted by court order.  The Agency is once again offering mediation services if federal sector parties are at impasse in their collective bargaining agreement negotiations.  As I recall, just before FMCS was shut down temporarily the DOD schools and FEA were trying to negotiate a new collective bargaining agreement, and you were getting close to an impasse situation.  I wanted to reach out to both sides to see where negotiations stood, and whether mediation would be helpful at this point.  When you have a moment, please feel free to reach out to me at the points of contact below to discuss the status of the negotiations.

Regards,

David Rose
FMCS Commissioner
Nashville Area
drose@fmcs.gov
(615) 389-8001

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

# Exhibit 7

**Rooney, Caitlin [HQ-GC]**

| | |
|---|---|
| **From:** | Hunter, Benjamin [FEA] |
| **Sent:** | Wednesday, June 18, 2025 11:49 AM |
| **To:** | Rooney, Caitlin [HQ-GC]; Hostak, Phil [NEA]; Tarr, Richard [FEA] |
| **Subject:** | Fw: Status of FMCS Case 202411320023 (DODEA and FEA) |

---

**From:** Rose David <drose@fmcs.gov>
**Sent:** Tuesday, June 17, 2025 12:49 PM
**To:** Frank.King@dodea.edu; Danahy, Alan [FEA] <ADanahy@nea.org>
**Subject:** [EXTERNAL] - Status of FMCS Case 202411320023 (DODEA and FEA)

Frank and Alan,

I wanted to send this email out to both of you to update everyone at the same time.  FMCS is now aware that negotiations for the successor collective bargaining agreement in the above referenced case are no longer on-going because of Executive Order 14251.  At this point in time FMCS will close the case.  The case can be re-opened if and when a court orders the parties to bargain and the parties request mediation pursuant to that bargaining.  Should the court order bargaining and the parties would like mediation please reach out to FMCS at that time.

Regards,

David Rose
FMCS Commissioner
Nashville Area
drose@fmcs.gov
(615) 389-8001

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

# Exhibit 9



[EXTERNAL] - Canceled: UPK Tiger Team Meeting - Meeting

Search

File    Meeting    Help    Acrobat

Remove from Calendar    Respond    Share to Teams    Calendar    Saved    To Manager    Team Email    Done    Reply & Delete    Create New    Move    Rules    Mark Unread    Categorize    Find    Related    Select    Read Aloud    Immersive Reader    Zoom    Viva Insights    Phish Alert Report

Respond    Teams    Calendar    Quick Steps    Move    Tags    Editing    Immersive    Zoom    Add-in    Phish Alert

## [EXTERNAL] - Canceled: UPK Tiger Team Meeting

MJ    Minor, Judith A. Dr. SES OSD/DoDEA-Americas <Judith.Minor@DODEA.EDU>

Required  Lamonski, Angie Dr. CIV OSD/DoDEA-Americas; Bull, Gregory Mr. CIV OSD/DoDEA-Americas; Smith, Ryan Mr. CIV OSD/DoDEA-Americas; Pickel, Lori P. Ms. CIV OSD/DoDEA-HQ; Woods, Elgin Mr. CIV OSD/DoDEA-Americas;    Thu 4/3/2025 2:47 PM
Williamitis, Darla Ms. CIV, OSD/DoDEA-Americas; Torregano, Aristian Dr. CIV, OSD/DoDEA-Americas; Kapiko, Leigh Ms. CIV OSD/DoDEA-Americas; Danahy, Alan [FEA]; statesideprocessor@gmail.com; +13 others

Monday, May 12, 2025 11:00 AM-12:00 PM    Microsoft Teams Meeting

11 AM

[EXTERNAL] - Canceled: UPK Tiger Team Meeting
Microsoft Teams Meeting
Minor, Judith A. Dr. SES OSD/DoDEA-Americas

12 PM

## Microsoft Teams  Need help?

### Join the meeting now

Meeting ID: 262 844 158 712

Passcode: hk6TE93i

**Dial in by phone**

Remove from Calendar

# Exhibit 10

| | |
|---|---|
| **From:** | Danahy, Alan [FEA] |
| **To:** | Danahy, Alan [FEA] |
| **Subject:** | Fwd: Executive Order - Exclusions from Federal Labor-Management Programs |
| **Date:** | Tuesday, July 1, 2025 4:27:03 PM |
| **Attachments:** | image001.png |

Respectfully,
Alan

**Dr. Alan Danahy**
FEA Director for DDESS
☎ (803) 414-6355
✉ ADanahy@nea.org

---

**From:** Smith, Ryan Mr. CIV OSD/DoDEA-Americas <Ryan.Smith@DODEA.EDU>
**Sent:** Thursday, April 3, 2025 7:08:02 PM
**To:** Hankins, Beth Ms. CIV OSD/DoDEA-Americas <Beth.Hankins@DODEA.EDU>; Smith, Annitra Ms. CIV OSD/DoDEA-Americas <Annitra.Smith@DODEA.EDU>; Sullivan, Leonard Mr. CIV OSD/DoDEA-Americas <Leonard.Sullivan@dodea.edu>; Boutall, Teresa Ms. CIV OSD/DoDEA-Americas <teresa.boutall@dodea.edu>; Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>; Lopez, Tracy Dr. CIV OSD/DoDEA-Americas <Tracy.Lopez@DODEA.EDU>; White, Curtis Mr. CIV OSD/DoDEA-Americas <Curtis.White@DODEA.EDU>
**Subject:** Executive Order - Exclusions from Federal Labor-Management Programs

Dear Union Presidents,

In accordance with Executive Order (EO), "Exclusions from Federal Labor-Management Programs," monthly community and district union meetings are suspended pending further guidance.

Additionally, principals have been notified that building level meetings with FRS' are suspended pending further guidance.

Thank you.

V/R,

Ryan Smith



Ryan Smith
Superintendent
Mid-Atlantic District
Department of Defense Education Activity
ryan.smith@dodea.edu
(910) 861-7359

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

# Exhibit 11

| From: | Danahy, Alan [FEA] |
|---|---|
| To: | Danahy, Alan [FEA] |
| Subject: | FW: UNION DUES CANCELLATION |
| Date: | Monday, June 30, 2025 6:27:52 PM |

Respectfully,
Alan

**Dr. Alan Danahy**
FEA Director for DDESS
☎ (803) 414-6355
✉ ADanahy@nea.org

---

**From:** Brown, April Ms. CIV OSD/DoDEA-Americas <April.Brown@DODEA.EDU>
**Sent:** Monday, April 7, 2025 9:39 AM
**To:** Martin, Deon Dr. CIV OSD/DoDEA-Americas <Deon.Martin@DODEA.EDU>; Boutall, Teresa Ms. CIV OSD/DoDEA-Americas <teresa.boutall@dodea.edu>; White, Curtis Mr. CIV OSD/DoDEA-Americas <Curtis.White@DODEA.EDU>; Don Gardner <dglocal1770@gmail.com>
**Subject:** UNION DUES CANCELLATION
**Importance:** High

Please share with all union members.  Help Desk tickets are no longer necessary.  ALL dues have been cancelled by DFAS.  Thank you.


*In coordination with the DCPAS and Policy and Regulation, DFAS complied with the Executive Order 14251 "Exclusions from Federal Labor-Management Programs".*

*DFAS/DCPS terminated current deductions. Employees should contact their union directly to make alternative payment arrangements.*


April Brown
Financial Analyst
DoDEA
700 Westpark Drive
Peachtree City, GA 30269
470-460-2035

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

# Exhibit 12

| From: | Danahy, Alan [FEA] |
|---|---|
| To: | Danahy, Alan [FEA] |
| Subject: | FW: Executive Order - Exclusions from Federal Labor-Management Programs |
| Date: | Monday, June 30, 2025 6:30:28 PM |
| Attachments: | image001.png |
| | image001.png |

Respectfully,
Alan

**Dr. Alan Danahy**
FEA Director for DDESS
☎ (803) 414-6355
✉ ADanahy@nea.org

---

**From:** Smith, Ryan Mr. CIV OSD/DoDEA-Americas <Ryan.Smith@DODEA.EDU>
**Sent:** Monday, April 7, 2025 6:30:23 AM
**To:** Smith, Annitra Ms. CIV OSD/DoDEA-Americas <Annitra.Smith@DODEA.EDU>; Hankins, Beth Ms. CIV OSD/DoDEA-Americas <Beth.Hankins@DODEA.EDU>; Sullivan, Leonard Mr. CIV OSD/DoDEA-Americas <Leonard.Sullivan@dodea.edu>; Boutall, Teresa Ms. CIV OSD/DoDEA-Americas <teresa.boutall@dodea.edu>; Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>; Lopez, Tracy Dr. CIV OSD/DoDEA-Americas <Tracy.Lopez@DODEA.EDU>; White, Curtis Mr. CIV OSD/DoDEA-Americas <Curtis.White@DODEA.EDU>
**Subject:** RE: Executive Order - Exclusions from Federal Labor-Management Programs

Hi Ms. Smith,

I was referring to the regularly occurring meetings between administrators and FRS'.

Insofar as the Weingarten meetings, they may continue (for now), provided it is not disruptive to the school day/students. To the maximum extent possible, investigative interviews should be conducted at a time when the union rep is available – and that doesn't negatively impact time with students. New and/or additional official time will not be authorized in accordance with the EO.

V/R,

JA418



Ryan Smith
Superintendent
Mid-Atlantic District
Department of Defense Education Activity
ryan.smith@dodea.edu
(910) 861-7359

**From:** Smith, Annitra Ms. CIV OSD/DoDEA-Americas <Annitra.Smith@DODEA.EDU>
**Sent:** Thursday, April 3, 2025 8:31 PM
**To:** Smith, Ryan Mr. CIV OSD/DoDEA-Americas <Ryan.Smith@DODEA.EDU>; Hankins, Beth Ms. CIV OSD/DoDEA-Americas <Beth.Hankins@DODEA.EDU>; Sullivan, Leonard Mr. CIV OSD/DoDEA-Americas <Leonard.Sullivan@dodea.edu>; Boutall, Teresa Ms. CIV OSD/DoDEA-Americas <teresa.boutall@dodea.edu>; Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>; Lopez, Tracy Dr. CIV OSD/DoDEA-Americas <Tracy.Lopez@DODEA.EDU>; White, Curtis Mr. CIV OSD/DoDEA-Americas <Curtis.White@DODEA.EDU>
**Subject:** Re: Executive Order - Exclusions from Federal Labor-Management Programs

For clarification, you mean monthly meetings between principals and building reps, correct? Or does this also include Weingarten-related meetings?

Thank you, Annitra

Get Outlook for iOS

**From:** Smith, Ryan Mr. CIV OSD/DoDEA-Americas <Ryan.Smith@DODEA.EDU>
**Sent:** Thursday, April 3, 2025 7:08:02 PM
**To:** Hankins, Beth Ms. CIV OSD/DoDEA-Americas <Beth.Hankins@DODEA.EDU>; Smith, Annitra Ms. CIV OSD/DoDEA-Americas <Annitra.Smith@DODEA.EDU>; Sullivan, Leonard Mr. CIV OSD/DoDEA-Americas <Leonard.Sullivan@dodea.edu>; Boutall, Teresa Ms. CIV OSD/DoDEA-Americas <teresa.boutall@dodea.edu>; Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>; Lopez, Tracy Dr. CIV OSD/DoDEA-Americas <Tracy.Lopez@DODEA.EDU>; White, Curtis Mr. CIV OSD/DoDEA-Americas <Curtis.White@DODEA.EDU>
**Subject:** Executive Order - Exclusions from Federal Labor-Management Programs

Dear Union Presidents,

In accordance with Executive Order (EO), "Exclusions from Federal Labor-Management Programs," monthly community and district union meetings are suspended pending further guidance.

Additionally, principals have been notified that building level meetings with FRS' are suspended pending further guidance.

Thank you.

V/R,

Ryan Smith

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

# Exhibit 13

 **Outlook**

---

## [EXTERNAL] - Implementation of EO 14251

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Tue 4/29/2025 9:57 AM

**To** Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; King, Frank Mr. CIV OSD/DoDEA-HQ <Frank.King@dodea.edu>; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe <muslimah.shabazz@dodea.edu>; Steele, Andre Mr. CIV OSD/DoDEA-Pacific <Andre.Steele@dodea.edu>

**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

📎 1 attachment (79 KB)
[EXTERNAL] - Implementation of EO 14251;

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

 Outlook

---

**[EXTERNAL] – Implementation of EO 14251**

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Tue 4/29/2025 9:57 AM

**To** Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; King, Frank Mr. CIV OSD/DoDEA-HQ <Frank.King@dodea.edu>; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe <muslimah.shabazz@dodea.edu>; Steele, Andre Mr. CIV OSD/DoDEA-Pacific <Andre.Steele@dodea.edu>

**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

Union Presidents & Leaders:

Consistent with EO 14251 and subsequent OPM and DoD guidance, **official time is no longer authorized for any purpose**.  Accordingly, all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school. Representatives who were previously scheduled one (1) instruction-free period per day are no longer authorized to conduct representational work during that time and must coordinate with the school principal to be assigned agency work during that period.  If they are not already doing so, beginning May 5, 2025, all union/association representatives on full- or half-time must engage in agency work for 100% of the duty day, as assigned by the District Superintendent, in coordination with school administrators.  Also, DoDEA must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by unions/associations for representational activities and repurpose those resources for agency business only.  In this regard, representatives will be required to promptly vacate any office space used by the union/association.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office:  (571) 372-1864
Cell:  (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.

# Exhibit 14



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**AMERICAS**
MID-ATLANTIC DISTRICT, QUANTICO FIELD OFFICE
3308 JOHN QUICK ROAD
QUANTICO, VA 22134
571.660.9512

May 13, 2025

MEMORANDUM FOR JENNIFER KAYSAK, INFORMATION SPECIALIST, QUANTICO
MIDDLE/HIGH SCHOOL, DODEA AMERICAS, MID-ATLANTIC
DISTRICT, QUANTICO, VIRGINIA

Subject: Letter of Caution

1. This letter of caution is issued based on your failure to follow instructions.  Information in support of this letter follows.

**CHARGE: FAILURE TO FOLLOW INSTRUCTIONS**

**Specification:** On April 30, 2025, Mr. Ryan Smith, Superintendent, Mid-Atlantic District, sent an email to union representatives stating the following:

"Dear All,

On March 27, 2025, President Trump signed <u>Executive Order 14251 "Exclusions from Federal Labor-Management Programs</u>."  In compliance with this EO the following will be addressed:

DoDEA must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by unions/associations for representational activities and repurpose those resources for agency business only. Employees previously authorized to use official time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time.

**Effective 5 May 2025**, union/association representatives on full- or half-time official time must engage in agency work for 100% of the duty day. Please work with the Community Superintendent and your first line supervisor for assigned agency duties. Example: Representatives who were previously scheduled one (1) instruction-free period per day are no longer authorized to conduct representational work during that time and must coordinate with the school principal to be assigned agency work during that period."

Although you were copied on the email, on May 8, 2025, at 2:36 p.m., during a time when you should have been engaged in assigned duties for the Agency, you sent the following message to employees previously represented by FEA-SR:

"Good Afternoon,

I am sure most of you have seen the lawsuit NEA filed on FEA-SR behalf. If not, here is the <u>link</u>. There are 107 items listed. It appears that number 69–loss of official time and office space has caught someone's attention at QMHS. Yes, I have cleared out the QEA items from the space allocated at the CSO and am back at QMHS on what was my release time on Thursdays. I can only conduct official union business before 7:00 am and after 3:00 pm. I will

only communicate using this email. The President position for QEA is not a paid position, but something I feel is important enough to continue to dedicate personal time to as I have done throughout my term. I still bring concerns to Dr. Bannerman's attention, therefore I encourage you to still bring those concerns to me. If you don't feel comfortable bringing concerns to your administration, please send them to me. I am not sure I will get a timely answer, but I will have record that concerns were raised during this time.

I have also heard there are concerns about the calendar. As I stated in the email update on April 7th, the union was not given proper opportunity to have input into the 2025/2026 calendar. Concerns have been raised to Dr Bannerman's attention about the two days for Parent Teacher Conferences and the later graduation date. I encourage members to talk to their administrators as well if they have concerns.

**Tomorrow is the deadline for members to either elect Autopay or by check to finish paying their union dues for SY 24/25**. Members who have not done this will be dropped from the membership roster and all communication from FEA-SR/FEA/NEA. FEA-SR has sent out several communications of what the union can still help dues paying members with and O have sent emails to those members who have not made a decision. If you have further questions, please contact me.

Elections have been placed on hold due to the Executive Order and lack of volunteers for the election committee and nominations. If anyone is interested in running for the following offices, please contact me. Vice President; Secretary; FRS QMHS (second position); FRS CES (second positions). Currently we only have one member on the election committee.

Thank you for supporting the Union!
Jennifer"

You failed to follow instructions when you sent the email during the time you should have been engaged in assigned duties.

2. The purpose of this letter of caution is to inform you that your conduct was inappropriate. You were provided with clear instructions that effective May 5, 2025, union/association representatives on full-time or half-time official time must engage in agency work for 100% of the duty day and that you were no longer authorized to conduct representational work during that time. Further infractions of this nature will not be tolerated and may subject you to more severe disciplinary action, up to and including your removal from Federal service.

3. The DoD Civilian Employee Assistance Program (CEAP), Magellan, is available to assist you in the event there are personal problems affecting your conduct.  Magellan can be reached at (866) 580-9046 twenty-four hours a day/seven days a week.  Magellan's call center will ask you for your location to connect you with local counselors and services as needed.  This information is provided for referral purposes only and is not intended to obligate the Agency regarding reasonable accommodation issues.

4. This action is neither grievable nor appealable to the merit systems protection board.  This letter is not an official disciplinary action and will not be filed in your official personnel folder; however, it may be considered in determining an appropriate remedy should a disciplinary offense occur.  I will retain a copy of this letter for a period not to exceed one year.

5. You are requested to acknowledge receipt of this letter by signing below. Your signature does not indicate agreement.

BANNERMAN.VI
CKIE.CHIFFON.1
274844899

Digitally signed by
BANNERMAN.VICKIE.CHIFF
ON.1274844899
Date: 2025.05.12 15:21:13
-04'00'

Dr. Vickie Bannerman
Community Superintendent

Receipt Acknowledgement:

_____        _____

Employee Signature                      Date

# Exhibit 15



**From:** QEA President Jennifer... >
**To:** QEA President Jennifer Kaysak >
May 8, 2025 at 4:36 PM

## QEA May Update

Good Afternoon,

I am sure most of you have seen the lawsuit NEA filed on FEA-SR behalf. If not, here is the link. There are 107 items listed. It appears that number 69—loss of official time and office space has caught someone's attention at QMHS. Yes, I have cleared out the QEA items from the space allocated at the CSO and am back at QMHS on what was my release time on Thursdays. I can only conduct official union business before 7:00 am and after 3:00 pm. I will only communicate using this email.The President position for QEA is not a paid position, but something I feel is important enough to continue to dedicate personal time to as I have done

# Exhibit 16

| | |
|---|---|
| **From:** | Danahy, Alan [FEA] |
| **To:** | Danahy, Alan [FEA] |
| **Subject:** | Fwd: LOC - Signature Needed |
| **Date:** | Tuesday, July 1, 2025 4:52:00 PM |
| **Attachments:** | image001.png |

Respectfully,
Alan

**Dr. Alan Danahy**
FEA Director for DDESS
☎ (803) 414-6355
✉ ADanahy@nea.org

---

**From:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas
<Vickie.Bannerman@DODEA.EDU>
**Sent:** Friday, May 16, 2025 8:26 AM
**To:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** Re: LOC - Signature Needed

Ms. Kaysak,

Technically, employees are no longer represented by a union.

The problem is that some employees are taking exception with the unions continuing to reach out and request dues as you did. This creates issues. Although it may be off duty, it can still impact employees. I'm not sure about the time the email was sent; however, you needed to be informed that I received a complaint about your outreach to staff and reminded that there is no union engagement at this time hence the LOC.

I do not have the original email to share but the timestamp point is moot.

I hope this helps clarify things.

JA432

Get Outlook for iOS

---

**From:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Sent:** Thursday, May 15, 2025 6:56:32 AM
**To:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas
<Vickie.Bannerman@DODEA.EDU>
**Cc:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** RE: LOC - Signature Needed

Dr. Bannerman,

The only reason I sent the email with my signature was because you set a
deadline for me to submit, and I follow directions.

I still need to see the email that was received by the Agency as it is fraudulent
that I requested on 5/13/25 and 5/14/25.

Jennifer

Jennifer Kaysak, MSLS
Information Specialist

Quantico Middle High School
3307 Purvis Road, Quantico, VA 22134
703-630-7055
Jennifer.kaysak@dodea.edu or Jennifer.l.kaysak@student.dodea.edu

---

**From:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas

<Vickie.Bannerman@DODEA.EDU>
**Sent:** Wednesday, May 14, 2025 3:30 PM
**To:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** Re: LOC - Signature Needed

Hi Ms. Kaysak,

My apologies for the delayed response. I am just getting a moment to catch up on emails.

I see that you have sent a second email with a statement. I have not yet read it, but I will. I wanted to address this initial request, but it looks like we may have moved past it depending on what you have shared in your statement.

I will review and provide a response to your most recent email.

**Yours In Partnership,**

*Dr. B*



Dr. Vickie C. Bannerman

Community Superintendent (NY/VA)

Department of Defense Education Activity

vickie.bannerman@dodea.edu

Main Office: 571-660-9512

This e-mail, including any attachments, may constitute a Federal record that is intended only for the addressed individuals. This message may also contain information that is sensitive, confidential or otherwise protected from disclosure under the Privacy Act of 1974, as amended, and other applicable laws. If you are not a named addressee you must not disseminate, distribute or copy this e-mail. If you have received this e-mail in error, please notify the sender immediately and delete this e-mail from your system.

---

**From:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Sent:** Tuesday, May 13, 2025 4:55 PM
**To:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas <Vickie.Bannerman@DODEA.EDU>
**Subject:** Re: LOC - Signature Needed


Dr. Bannerman,


I request to see the email in its entirety, that the Agency used to make this charge prior to me signing this document. I know and have documentation to prove I did not send the email during duty hours.


Jennifer Kaysak

Information Specialist


Get Outlook for iOS

---

**From:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas <Vickie.Bannerman@DODEA.EDU>
**Sent:** Tuesday, May 13, 2025 3:42 PM
**To:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** LOC - Signature Needed

Ms. Kaysak,

I need you to please sign and return the LOC you received today, to me, tomorrow by or before noon. Your signature simply indicates "receipt acknowledgement" as stated at the bottom of the letter and nothing more.

Please let me know what questions you have, and I look forward to hearing from you soon.

**Yours In Partnership,**

*Dr. B*

<image001.png>

Dr. Vickie C. Bannerman

Community Superintendent (NY/VA)

Department of Defense Education Activity

vickie.bannerman@dodea.edu

Main Office: 571-660-9512

This e-mail, including any attachments, may constitute a Federal record that is intended only for the addressed individuals. This message may also contain information that is sensitive, confidential or otherwise protected from disclosure under the Privacy Act of 1974, as amended, and other applicable laws. If you are not a named addressee you must not disseminate, distribute or copy this e-mail. If you have received this e-mail in error, please notify the sender immediately and delete this e-mail from your system.

# **Exhibit 17**

| | |
|---|---|
| **From:** | Tarr, Richard [FEA] |
| **To:** | Richardson, Jr. James C. Mr. CIV OSD/DoDEA-HQ |
| **Cc:** | Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ; Schiavino-Narvaez, Beth Dr. SES OSD/DoDEA-HQ; Judith.minor@dodea.edu |
| **Subject:** | FW: [EXTERNAL] - Fwd: LOC - Signature Needed |
| **Date:** | Friday, May 16, 2025 4:24:10 PM |
| **Attachments:** | image001.png |

Dear Mr. Richardson,

I was recently forwarded the concerning email below from the Community Superintendent of the DoDEA Americas Mid-Atlantic District for New York and Virginia. Notwithstanding Executive Order 14,251, *Exclusions from the Federal Labor-Management Relations Program*—which is currently the subject of litigation in six separate lawsuits, including one filed by FEA, FEA-SR, and ACEA, and which has already resulted in two preliminary injunctions—FEA, FEA-SR, and their local affiliates remain 501(c)(5) organizations engaged in lawful organizing activities. Federal employees participating in these activities are protected from retaliation under the First Amendment.

It is undisputed that the First Amendment protects the right of government employees to organize and solicit union membership, regardless of whether they are part of a bargaining unit or eligible to join one, so long as these organizing efforts occur outside the duty day. *Thomas v. Collins*, 323 U.S. 516, 532 (1945) ("The right . . . to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly."); *Smith v. Arkansas State Highway Emp., Loc. 1315*, 441 U.S. 463, 465 (1979) ("[A] public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so."); *Ass'n of Civilian Technicians, Montana Air Chapter v. FLRA*, 756 F.2d 172, 176 (D.C. Cir. 1985) ("The First Amendment guarantees the rights of public employees to speak freely and to associate with others, and protects the right of associations to engage in advocacy on behalf of their members." ) (cleaned up); *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013) ("The First Amendment protects the right of a public employee to join and participate in a labor union," and "the employer may not retaliate against an employee for engaging in union activity."); *Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999) ("There is no doubt that retaliation against public employees solely for their union activities violates the First Amendment.); *Wells v. O'Malley*, 31 F. App'x 886, 889 (6th Cir. 2002) ("It has long been established that public employees have the right to be free from retaliation for their exercise of their First Amendment rights to speech and association through participation in union activity."); *Int'l Ass'n of Firefighters, Loc. No. 3808 v. City of Kansas City*, 220 F.3d 969, 972 (8th Cir. 2000) ("The First Amendment freedom of association . . .provides . . . union members with a constitutionally protected right to organize a labor union, even though they are public employees."); *Phillips v. City of Victoria*, 243 F. App'x 867, 871 (5th Cir. 2007) ("[I]t [is] clearly established that a government employer violates the First Amendment when he retaliates against an employee for engaging in union activities.").

Given this established precedent, I hope this matter is simply the result of a manager attempting to cover an earlier allegation that an employee sent an email during work hours—an assertion that is demonstrably false. However, due to the seriousness of the infraction and its potential chilling effect on protected activity, I must request immediate clarification from DoDEA regarding its position on this issue.  Thank you.

Richard Tarr
Executive Director/General Counsel
Federal Education Association, NEA
1201 16th St., N.W., Suite 117
Washington, D.C. 20036
Phone: (202) 822-7859
Email: RTarr@nea.org

**Confidentiality Notice**: This electronic message transmission contains information that is
confidential and/or privileged. This e-mail, as well as any attachments, is intended for the use
of the individual or entity named above. If you are not the intended recipient, be aware that
any disclosure, copying, distribution or use of the contents of this e-mail and/or any
attachment is prohibited. If you have received this electronic transmission in error, please
delete the e-mail and any attachments and notify me by telephone at (202) 822-7859 or by e-
mail (RTarr@nea.org) immediately.

Begin forwarded message:

> **From:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas
> <Vickie.Bannerman@DODEA.EDU>
>
> **Sent:** Friday, May 16, 2025 8:26 AM
> **To:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
> **Subject:** Re: LOC - Signature Needed
>
> Ms. Kaysak,
>
> Technically, employees are no longer represented by a union.
>
> The problem is that some employees are taking exception with the unions
> continuing to reach out and request dues as you did. This creates issues.
> Although it may be off duty, it can still impact employees. I'm not sure about the
> time the email was sent; however, you needed to be informed that I received a
> complaint about your outreach to staff and reminded that there is no union
> engagement at this time hence the LOC.
>
> I do not have the original email to share but the timestamp point is moot.
>
> I hope this helps clarify things.
>
> Get Outlook for iOS
>
> **From:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
> **Sent:** Thursday, May 15, 2025 6:56:32 AM
> **To:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas

JA439

<Vickie.Bannerman@DODEA.EDU>
**Cc:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** RE: LOC - Signature Needed

Dr. Bannerman,

The only reason I sent the email with my signature was because you set a deadline for me to submit, and I follow directions.

I still need to see the email that was received by the Agency as it is fraudulent that I requested on 5/13/25 and 5/14/25.

Jennifer

Jennifer Kaysak, MSLS
Information Specialist
Quantico Middle High School
3307 Purvis Road, Quantico, VA 22134
703-630-7055
Jennifer.kaysak@dodea.edu or Jennifer.l.kaysak@student.dodea.edu

---

**From:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas <Vickie.Bannerman@DODEA.EDU>
**Sent:** Wednesday, May 14, 2025 3:30 PM
**To:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** Re: LOC - Signature Needed

Hi Ms. Kaysak,

My apologies for the delayed response. I am just getting a moment to catch up on emails.

I see that you have sent a second email with a statement. I have not yet read it, but I will. I wanted to address this initial request, but it looks like we may have moved past it depending on what you have shared in your statement.

I will review and provide a response to your most recent email.

**Yours In Partnership,**
*Dr. B*



Dr. Vickie C. Bannerman
Community Superintendent (NY/VA)
Department of Defense Education Activity
vickie.bannerman@dodea.edu
Main Office: 571-660-9512

This e-mail, including any attachments, may constitute a Federal record that is intended only for the addressed individuals. This message may also contain information that is sensitive, confidential or otherwise protected from disclosure under the Privacy Act of 1974, as amended, and other applicable laws. If you are not a named addressee you must not disseminate, distribute or copy this e-mail. If you have received this e-mail in error, please notify the sender immediately and delete this e-mail from your system.

---

**From:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Sent:** Tuesday, May 13, 2025 4:55 PM
**To:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas <Vickie.Bannerman@DODEA.EDU>
**Subject:** Re: LOC - Signature Needed

Dr. Bannerman,

I request to see the email in its entirety, that the Agency used to make this charge prior to me signing this document. I know and have documentation to prove I did not send the email during duty hours.

Jennifer Kaysak
Information Specialist

Get Outlook for iOS

---

**From:** Bannerman, Vickie Dr. CIV OSD/DoDEA-Americas <Vickie.Bannerman@DODEA.EDU>
**Sent:** Tuesday, May 13, 2025 3:42 PM
**To:** Kaysak, Jennifer Ms. CIV OSD/DoDEA-Americas <Jennifer.Kaysak@DODEA.EDU>
**Subject:** LOC - Signature Needed

Ms. Kaysak,

I need you to please sign and return the LOC you received today, to me, tomorrow by or before noon. Your signature simply indicates "receipt acknowledgement" as stated at the bottom of the letter and nothing more.

Please let me know what questions you have, and I look forward to hearing from you soon.

    **Yours In Partnership,**
    *Dr. B*

<image001.png>

Dr. Vickie C. Bannerman
Community Superintendent (NY/VA)
Department of Defense Education Activity
vickie.bannerman@dodea.edu
Main Office: 571-660-9512

This e-mail, including any attachments, may constitute a Federal record that is intended only for the addressed individuals. This message may also contain information that is sensitive, confidential or otherwise protected from disclosure under the Privacy Act of 1974, as amended, and other applicable laws. If you are not a named addressee you must not disseminate, distribute or copy this e-mail. If you have received this e-mail in error, please notify the sender immediately and delete this e-mail from your system.

# Exhibit 18

| From: | Simoni, Scott Mr. CIV OSD/DoDEA-Americas |
|---|---|
| To: | Stubbs, Angelia [FEA]; Minor, Judith A. Dr. SES OSD/DoDEA-Americas |
| Cc: | Woods, Elgin Mr. CIV OSD/DoDEA-Americas; Danahy, Alan [FEA]; Hunter, Benjamin [FEA] |
| Subject: | RE: Association Grievance 2024/2025, no. 25 (Certified) |
| Date: | Monday, April 28, 2025 8:00:36 AM |
| Attachments: | image001.png |

Acknowledge receipt of this grievance.   There is currently a pause on all responses related to grievances.

Thank You

V/r
Scott



**Scott Simoni**
**Executive Asst to the Director for Student Excellence,**
**DoDEA Americas**
Department of Defense Education Activity
**Phone** 470-460-2171
**Web** https://www.dodea.edu/americas **Email** scott.simoni@dodea.edu
700 Westpark Drive, Peachtree City, GA  30269

**From:** Stubbs, Angelia [FEA] <astubbs@nea.org>
**Sent:** Thursday, April 24, 2025 6:18 PM
**To:** Minor, Judith A. Dr. SES OSD/DoDEA-Americas <Judith.Minor@DODEA.EDU>
**Cc:** Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; Danahy, Alan [FEA] <ADanahy@nea.org>; Simoni, Scott Mr. CIV OSD/DoDEA-Americas <Scott.Simoni@dodea.edu>; Hunter, Benjamin [FEA] <BHunter@nea.org>; Stubbs, Angelia [FEA] <astubbs@nea.org>
**Subject:** Association Grievance 2024/2025, no. 25 (Certified)

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Good afternoon Dr. Minor:

Attached please find AG 24-25, no. 25 (Certified) attached. If you require any further information, please do not hesitate to contact me.

Angelia Wade Stubbs

FEA-SR General Counsel/UniServ Director

Phone: 202-468-1460

Confidentiality Notice: This electronic message transmission contains information that is confidential and/or privileged. This e-mail, as well as any attachments, is intended for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this e-mail and/or any attachment is prohibited. If you have received this electronic transmission in error, please delete the e-mail and any attachments and notify me by telephone at (202) 468-1460 or by e-mail at astubbs@nea.org immediately.

# Exhibit 19

# DoDEA Frequently Asked Questions re: Executive Order 14251 "Exclusions from Federal Labor-Management Relations Programs"

*On 8 and 22 April 2025, the Office of Personnel Management (OPM) published FAQs re: EO 14251. Applying guidance from the DoD Civilian Personnel Advisory Service (DCPAS), the Labor Management Employee Relations Division (LMER) is providing the following DoDEA-specific FAQ to address operations and expectations through the end of SY 2024-2025.*

**Q1:    How should DoDEA handle official time and office space provided to union/association representatives?**

A1:    DoDEA must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by unions/associations for representational activities and repurpose those resources for agency business only. Employees previously authorized to use official time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time. Supervisors and timekeepers should not approve any timecards that include official time codes.

Effective 5 May 2025, union/association representatives on full- or half-time official time must engage in agency work for 100% of the duty day, as assigned by the District Superintendent, in coordination with school administrators. Representatives who were previously scheduled one (1) instruction-free period per day are no longer authorized to conduct representational work during that time and must coordinate with the school principal to be assigned agency work during that period.

**Q2:    Should DoDEA continue to allow union representation in Weingarten meetings and formal discussions with employees excluded under Executive Order 14251?**

A2:    No.

**Q3:    What if a request for official time has already been granted for a future date?**

A3:    The requestor must be informed that the request/approval is cancelled as official time is no longer authorized IAW EO 14251. (See Q/A 18.)

**Q4:    Should DoDEA speak directly with union/association representatives or attorneys about performance or disciplinary actions?**

A4:    Engagement with union/association representatives about individual employee actions may occur *only after* receiving written confirmation from the impacted employee that he/she is being represented by a named representative of the union/association (i.e., "John Smith" not FEA or FEA-SR generally) in a specific matter.

**Q5:    Should the CBA be cited in any DoDEA-issued documents?**

A5:    No. This includes, but is not limited to, proposals, decisions, terminations, letters of caution or reprimand, directives, and assignments to an alternate worksite.

**Q6:**   **The union/association has filed a grievance or elevated a grievance to the next step. What should I do?**

A6:   DoDEA should respond as follows:

*Receipt of this grievance is acknowledged; however, be advised that the Agency will hold the grievance in abeyance pending the outcome of litigation related to EO 14521. An update on the status of this grievance will be provided within thirty (30) days.*

No further action should be taken by DoDEA. This includes conducting a grievance meeting, drafting a response, and/or addressing the issue raised. Please forward a copy of the grievance and associated correspondence to LMER.

**Q7:**   **Can administrators voluntarily elect to invite union/association representatives to meetings or discussions regarding school operations, scheduling, or planning?**

A7:   No. EO 14251 precludes DoDEA from recognizing a union/association as the exclusive representative; this includes all participation and communication regardless of the subject and/or past practice.

**Q8:**   **Should DoDEA respond to Requests for Information (RFIs) from the union/association?**

A8:   No. Requests for information pursuant to 5 U.S.C. § 7114(b)(4) must be held in abeyance pending the outcome of litigation.

*

*Please contact LMER if you have any questions about this FAQ.*

JA448

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL EDUCATION ASSOCIATION,
*et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

Civil Action No. 1:25-cv-1362

## DECLARATION OF ALEXIS A. GORBEA

I, Alexis A. Gorbea, declare that the following is true and correct:

1.    I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    My position of record with the Department of Defense Education Activity ("DODEA") is Teacher Learning Impaired Mild/Moderate (Middle) at Antilles Middle School. I have worked as an educator for DODEA for 34 years.

3.    I am a member of the Antilles Consolidated Education Association ("ACEA"), a labor organization representing professional educators who work at four DODEA schools in Puerto Rico. Three schools (Antilles Elementary School, Antilles Middle School, and Antilles High School) are located in Fort Buchanan, a U.S. Army installation, and the fourth (Ramey Unit School) is adjacent to U.S. Coast Guard Air Station Borinquen. I have been an ACEA member since 1992.

1

4.     I currently serve as the president of ACEA. I was elected to this office in 2016. I previously served as ACEA president from 2004-2006 and have held a number of other elected positions in ACEA, such as Health and Human services Chairperson, Local Fort Buchanan President, and ACEA Negotiated Grievance Chairperson. I was the chief negotiator for ACEA during negotiations for the last four collective bargaining agreements ("CBAs") with DODEA.

5.     As of March 22, 2025, ACEA had 182 members, and 263 educators were within the recognized bargaining unit represented by ACEA.

6.     ACEA's mission is to advocate for the interests of professional educators working at DODEA's pre-kindergarten through-12th-grade schools in Puerto Rico.

7.     Collective bargaining with DODEA over the terms and conditions of professional educators' employment has been at the core of ACEA's mission for more than 50 years. ACEA has represented DODEA educators in Puerto Rico for the purpose of collective bargaining since 1974, when bargaining was governed by an executive order issued by President Nixon. After the Federal Service Labor-Management Relations Statute ("FSLMRS") became effective in 1979, ACEA and DODEA (under both that name and its former name, the Department of Defense Dependents Schools) engaged in bargaining, executed CBAs, resolved grievances, and otherwise carried out CBA obligations pursuant to the FSLMRS until the issuance and implementation of President Trump's March 27, 2025, executive order entitled "Exclusions from Federal Labor-Management Programs ("Executive Order 14251").

8.     ACEA's most recent CBA with DODEA was executed in 2023 and provides that it will continue in force until July 24, 2028. That CBA provides for, among other things, grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in representational work, employee and association rights (including employees' rights

2

to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, a sick leave bank for educators facing medical emergencies, association-management cooperation, and mid-term bargaining procedures for management proposals affecting bargaining unknit employees' terms and conditions of employment. A true and correct copy of that CBA is attached as Exhibit 1.

9.     On or about March 28, 2025, I learned that President Trump had issued Executive Order 14251, which excludes a large number of government agencies, including the Department of Defense, from coverage under the FSLMRS. Around the same time, I also learned that the Office of Personnel Management ("OPM") had issued a guidance memorandum to agencies regarding the implementation of Executive Order 14251, a true and correct copy of which, downloaded from the OPM's website at https://www.opm.gov/policy-data-oversight/latest-and-other-highlighted-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf, is attached as Exhibit 2.

10.     The OPM's guidance memorandum tells agencies, among other things, that under Executive Order 14251, excluded agencies and subdivisions "are no longer required to collectively bargain with Federal unions," that such "unions lose their status" as recognized bargaining agents, that "agencies should cease participating in grievance procedures after terminating their CBAs," that any CBA provision authorizing official time arrangements "allow[ing] agency employees to perform union representational work terminates when agency CBAs are terminated," and that after "an agency terminates its CBAs," any "contractual commitments" to honor employees' authorizations for payroll deduction of their union dues "no longer apply, and the covered agency should terminate allotments."

3

11.    At approximately 2 p.m. on April 3, 2025, I received an e-mail from Alexa Rukstele, the Chief of DODEA's Labor Management and Employee Relations Division, stating, "Given the directives outlined in the EO, the associated White House Fact Sheet, and OPM guidance, DODEA has determined that it will pause all labor-relations activities." A true and correct copy of that e-mail is attached as Exhibit 3.

12.    Following that April 3, 2025, e-mail, DODEA has taken numerous actions contravening the FSLMRS and abrogating its obligations under the CBA. As a result, ACEA's representation of its members and other members of the bargaining unit has been severely disrupted.

13.    While both the FSLMRS and Article 24 of the CBA requires DODEA to honor employees' choice to pay their ACEA dues by means of voluntarily authorized deductions DODEA has, since Executive Order 14251 was issued, ceased deducting and transmitting to ACEA the membership dues of ACEA members who have authorized those deductions. The last dues transmittal from DODEA was for the pay period ending on March 22, 2025, and the next one—expected to be withheld for the pay period ending on April 5, 2025—never arrived. DODEA did not provide any notification to ACEA that it was cancelling dues deductions, much less that it had repudiated its obligations under the CBA.

14.    As a result of DODEA's cancelling of employees' dues payments by payroll deduction, ACEA has already experienced a drop in its projected revenue, as of the pay period ending on May 31, 2025, of $29,257.65 for the current school year. ACEA is now in the process of establishing a different arrangement for members to pay a fee to ACEA by electronic means, which adds to the union's expenses and is a drain on the union's resources while the union's usual source of operating funds has been cut off. As a result, ACEA has fewer resources to

4

devote to its mission of advocating for the interests of its members, the main reason why educators join the union. Moreover, given that Executive Order 14251 and its implementation by DODEA, has halted collective bargaining and associated labor relations interactions between ACEA and DODEA, it is uncertain how many of ACEA's current membership will choose to remain members of ACEA now that it is unable to engage in collective bargaining and can no longer even enforce its current CBA.

15.     This uncertainty is all the worse because DODEA educators have lost critical statutory rights and protections such as the right to engage in union activity "freely and without fear of penalty or reprisal." 5 U.S.C. § 7102. Those formerly protected rights include the right "to form, join, or assist any labor organization"; "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities"; and "to engage in collective bargaining." ACEA members and all educators in the four DODEA schools for whom ACEA was recognized as the bargaining representative prior to Executive Order 14251 have lost these statutory protections, which makes joining or remaining a member of ACEA a riskier act than it was before Executive Order 14251 issued.

16.     Because Executive Order 14251 has excluded DODEA from the FSLMRS's coverage, ACEA and its members, as well as other educators in the bargaining unit who were represented by ACEA under the FSLMRS prior to Executive Order 14251, have lost recourse to the Federal Labor Relations Authority ("FLRA") to seek remedies for unfair labor practices. Indeed, on April 9, 2025, ACEA received a letter from the FLRA stating that an unfair labor practice ("ULP") charge filed by ACEA in January of 2025 was being "deferred" because of

5

14251, a true and correct copy of which is attached as Exhibit 4. Consequently, ACEA and its members have no forum in which to seek relief for unfair labor practices by DODEA, such as DODEA's abrogation of its obligations under the CBA or any acts of "interfere[nce] with, restrain[t], or coerc[ion]" of employees in the exercise of the rights under the FSLMRS or "discourag[ing] membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment." 5 U.S.C. § 7116(1) and (2).

17.    DODEA's implementation of Executive Order 14251 also has disrupted pending grievance proceedings under the CBA. At the time Executive Order 14251 was issued, ACEA had two pending grievance proceedings arising under the CBA—one involving safety inspections and the other involving a performance evaluation—that had not yet been heard. Both have been placed on hold indefinitely by reason of Executive Order 14251.

18.    By reason of Executive Order 14251 and the OPM guidance, DODEA also has effectively shut down the CBA's sick leave bank, leaving employees who have contributed hours to the leave bank without any access to those hours in times of need.

19.    Article 27, Section 13.a of the CBA establishes a sick leave bank "to provide temporary assistance to employees when they are incapacitated due to medical emergencies, catastrophic illness, maternity purposes, or injury experienced by the employee or when they are required to attend to a medical emergency or serious health condition of an immediate family member." Section 13.b provides that participating bargaining unit members must donate one hour of leave in the first 30 days of employment and then annually thereafter and that they request hours from the bank due to qualifying health events. Section 13.d of Article 27 provides that the bank will be administered by a committee consisting of one agency representative appointed by the community superintendent and two unit employees appointed by the ACEA

6

president. This committee, among other responsibilities, decides whether to grant employee requests to draw on the leave bank. The sick leave bank currently has more than 13,000 donated hours.

20.     Shortly before Ms. Rutskele sent the April 3, 2025, e-mail announcing that DODEA "will pause all labor-relations activities," ACEA Vice-President Janet Lopez wrote to DODEA's Caribbean Community Superintendent, Andrew Rynberg, as the official responsible for appointing the agency representative to the committee that manages employee requests for hours from the leave bank. That e-mail, copied to me, requested a meeting of the committee because ACEA had received requests for leave hours from three bargaining unit employees who were experiencing medical emergencies. In the wake of Ms. Rutskele's April 3, 2025 e-mail "paus[ing] all labor-relations activities," that request went unfulfilled, leaving the three employees, who were in the midst of medical emergencies, without any way to obtain leave hours from the bank to which they had contributed.

21.     DODEA has also unilaterally cancelled all official time—which the CBA defines as "time granted to an Association representative to conduct official representational duties or other activities as provided in [the FSLMRS]" without loss of pay or benefits—despite the fact that Article 6, Sections 10 and 11 of the CBA provides that the ACEA president is entitled to 100% release time and establishes a 220-hour leave bank for other union representatives to draw on in order to perform designated representational and labor-relations activities. On April 29, 2025, I received an e-mail from Ms. Rutskskele stating that "[c]onsistent with EO 14251 and subsequent OPM and DoD guidance, **official time is no longer authorized for any purpose**" and that union "representatives will be required to promptly vacate any office space used by the union/association." A true and correct copy of that e-mail is attached as Exhibit 5.

7

22.     Since receiving that e-mail, I have had to vacate the office space that I and other current and prior ACEA officers have used for representational work. ACEA now has to find temporary storage for 50 years' worth of union records. ACEA held a meeting on May 17, 2025, to authorize paying for such storage.

23.     DODEA also has unilaterally altered employees' terms and conditions of employment in contravention of DODEA's duty to bargain with ACEA over the impact and implementation of such changes under both the CBA and the FSLMRS.

24.     On May 22, 2025, employees at DODEA's schools in Puerto Rico, including myself, received an e-mail from DODEA Director Beth Schiavino-Narvaez announcing that in connection with a Department of Defense "optimization of its civilian workforce," DODEA was implementing a "Future-Ready DoDEA (FRD) initiative." A true and correct copy of this e-mail is attached as Exhibit 6. While the e-mail avoids specificity in favor of phrases like "workforce shaping efforts" and "a strategic plan to streamline and improve student services," it is readily apparent from the letter that DODEA will be eliminating positions for the 2025/2026 school year and that downsizing of workforce will almost certainly require a Reduction in Force ("RIF"). That is made plain by the e-mail's statement that "[a]s part of FRD, DoDEA will offer the Voluntary Early Retirement Authority (VERA) and a Voluntary Separation Incentive Payment (VSIP) to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees."

25.     On the evening of May 22, 2025, Alexa Rukstele, the Chief of DODEA's Labor Management and Employee Relations Division, sent an e-mail to an e-mail list designated as "FRD@dodea.gov"; on information and belief, this group consists of all Educational Technologists, Speech Assessors, and Special Education Assessors working for DODEA. I

8

received a copy of this e-mail from a DODEA employee who is known to me but who wishes to remain anonymous for fear of reprisals by DODEA. A true and correct copy of Ms. Rukstele's May 22, 2025, e-mail, less any indication of the recipient's identity, is attached as Exhibit 7. The e-mail tells recipients that their positions are "impacted by" the FDR initiative and that DODEA is "working to identify placement and job opportunities for affected employees," but that "[t]his does not guarantee that you will not be involuntarily separated from your position." The e-mail goes on to state that the recipients' positions are "eligible for" VERA and VSIP, provided that the recipient meets the eligibility requirements for those programs.

26.     On May 27, 2025, Amy Bower, Chief of DODEA's Human Resources Division, sent a memorandum to the affected employees DODEA-wide explaining the VERA and VSIP options and eligibility criteria and setting a June 2, 2025, deadline for applications for those early-retirement options. I received a copy of this memorandum from a DODEA employee who is known to me but who wishes to remain anonymous for fear of reprisals by DODEA. A true and correct copy of Ms. Bower's memorandum is attached as Exhibit 8.

27.     DODEA's communications regarding this reorganization sparked significant concerns from the affected employees and from ACEA given DODEA's failure to follow the procedures it agreed to in the CBA before implementing changes to the terms and conditions of employment, its opaque execution of this initial phase of the reorganization, its failure to provide information about further phases of implementation that would help employees make informed decisions about the major life and career decision of choosing early retirement, and its offering of limited options to affected employes on a very tight deadline—all of which exert pressure on those employees to choose early retirement regardless of their readiness to do so, rather than to face possible termination. In addition, the communications failed to account for,

9

and make accommodations for, those affected employees who lack multiple teacher certifications that would qualify them for alternative placements—such as providing temporary waivers of qualifications while such employees complete coursework necessary for such certifications, as provided in DODEA's own administrative instructions and regulations.

28.    The reorganization was announced and is being implemented in violation of the CBA in two respects.

a.    First, Article 7, Section 5 of the CBA, which sets out mid-term bargaining obligations, requires that when DODEA exercises its management rights to make changes to the terms and conditions of bargaining unit employees' employment, which the reorganization announcement clearly does, DODEA must provide notice to ACEA. DODEA provided no such notice.

b.    Second, Article 7, Section 5 of the CBA further provides that if ACEA makes a demand for bargaining over mid-term changes to terms and conditions of employment, DODEA must bargain over the impact and implementation of DODEA's action. Notwithstanding DODEA's failure to provide the required notice, I sent a letter requesting impact and implementation bargaining to DODEA on May 31, 2025, a true and correct copy of which is attached as Exhibit 9. In that letter, I set out the grave concerns that the reorganization announcement raised for ACEA and affected employees, which include ACEA members, including DODEA's failure to follow contractual procedures and its forcing major life and career choices on affected employees without supplying them adequate information and offering accommodations to affected employees who currently lack the credentials necessary for alternative placements. DODEA responded on the same day, acknowledging receipt of the bargaining request and

10

stating that it "will be held in abeyance pending the outcome of litigation over EO 14251." A true and correct copy of DODEA's June1, 2025, response is attached as Exhibit 10.

29. Furthermore, Article 29, Section 4 of the CBA requires that DODEA provide notice to ACEA of any reduction in force ("RIF") at least 90 days prior to the effective date of the RIF stating the reasons for the action and the number and types of positions affected. Because a RIF is almost certainly unavoidable given the sheer number of positions being eliminated for the 2025-2026 school year, and because the 2025-2026 school year for DODEA employees in Puerto Rico begins on August 4, 2025, it will not be possible for DODEA to comply with the notification requirements under Article 29, section 4, even if it were inclined to do so.

30. ACEA's inability to bargain over the impact and implementation of DODEA's impending reorganization and elimination of positions harms ACEA, as it is a further and quite serious instance of ACEA's inability to carry out its core function of collective bargaining by reason of Executive Order 14251, the OPM guidance, and DODEA's implementation of both. It also harms ACEA members whose positions are being eliminated, as ACEA could mitigate some of the harms to those members and other affected employees through the bargaining process. It also harms other members and employees, such as special education teachers, as the elimination of assessor positions will increase their workloads as they absorb the duties that assessors currently perform, another effect that could be ameliorated through bargaining.

31. ACEA's inability—by reason of the Executive Order 14251, the OPM Guidance, and DODEA's implementation of both—to collect dues via payroll deduction as guaranteed by the CBA, to exercise its contractual rights to official time for representational activities, to

11

administer the CBA's sick leave bank for the benefit of unit employees in need, to exercise its contractual right to bargain over the impact and implementation of DODEA's elimination of positions, to enforce the CBA through the grievance process, and to seek relief from the FLRA for unfair labor practices (including all of the foregoing CBA violations) has immeasurably weakened ACEA and harmed its members.

I declare under penalty of perjury that the foregoing is true and correct.

Signed June 4, 2025, in Dorado, Puerto Rico

Alexis A. Gorbea

12

JA460

# Exhibit 1

# Collective Bargaining Agreement (CBA)

**Between:**

**Department of Defense Education Activity (DoDEA), Department of Defense Domestic Dependent Elementary and Secondary Schools (DDESS)-Puerto Rico**

**and**

**Antilles Consolidated Education Association (ACEA)**

**October 20, 2023 - July 24, 2028**

# Table of Contents

ARTICLE 1 – PREAMBLE AND PURPOSE ........................................................................5

ARTICLE 2 – EXCLUSIVE RECOGNITION ....................................................................6

ARTICLE 3 – CONDITION OF THE AGREEMENT .........................................................7

ARTICLE 4 – PERSONNEL RECORDS ...........................................................................8

ARTICLE 5 – AGENCY RIGHTS ....................................................................................10

ARTICLE 6 – ASSOCIATION RIGHTS ..........................................................................12

ARTICLE 7 – BARGAINING RIGHTS AND REQUIREMENTS ...................................19

ARTICLE 8 – EMPLOYEE RIGHTS ..............................................................................22

ARTICLE 9 – EQUAL EMPLOYMENT OPPORTUNITY ............................................26

ARTICLE 10 – ASSOCIATION-MANAGEMENT COOPERATION ............................27

ARTICLE 11 – INJURY/ILLNESS/MEDICAL EXAMS ...............................................29

ARTICLE 12 – HEALTH AND SAFETY ........................................................................30

ARTICLE 13 – WORKERS COMPENSATION .............................................................34

ARTICLE 14 – STUDENT DISCIPLINE ........................................................................36

ARTICLE 15 – STUDENTS WITH DISABILITIES ......................................................38

ARTICLE 16 – PROFESSIONAL MATTERS ................................................................42

ARTICLE 17 – PERFORMANCE APPRAISAL SYSTEM ............................................45

ARTICLE 18 – CHILD ABUSE REPORTING AND EMPLOYEE RIGHTS ................50

ARTICLE 19 – HOURS OF WORK AND SCHEDULING ............................................52

ARTICLE 20 – PROFESSIONAL DEVELOPMENT .....................................................55

ARTICLE 21 – EMPLOYEE PRIVILEGES AND BENEFITS ......................................57

ARTICLE 22 – DISCIPLINARY AND ADVERSE ACTIONS ......................................58

ARTICLE 23 – TRAVEL .................................................................................................62

ARTICLE 24 – DUES ALLOTMENTS ...........................................................................63

ARTICLE 25 – CERTIFICATION/LICENSURE ...........................................................66

ARTICLE 26 – PAY AND BENEFITS ............................................................................67

ARTICLE 27 – LEAVE ....................................................................................................71

ARTICLE 28 – VACANCIES, REASSIGNMENTS, DETAILS, AND SUMMER SCHOOL .....................80

ARTICLE 29 – REDUCTION IN FORCE .......................................................................84

**Page 2 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA463

**ARTICLE 30 – GRIEVANCE PROCEDURE** ..................................................................................88

**ARTICLE 31 – ARBITRATION** .............................................................................................93

**ARTICLE 32 – SUBSTITUTES** ..............................................................................................96

**ARTICLE 33 – GENERAL ADMINISTRATION MATTERS** .............................................98

**ARTICLE 34 – EXTRACURRICULAR DUTY ASSIGNMENTS** ....................................100

**ARTICLE 35 – USE OF FACILITIES AND EQUIPMENT** ..............................................102

**ARTICLE 36 – DURATION OF AGREEMENT** ...............................................................105

**Page 3 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA464

# ARTICLE 6 – ASSOCIATION RIGHTS

**Section 1. Exclusive Representative.**
The Association is recognized as the exclusive representative of the employees in the unit described in Article 2 and is entitled to act for and negotiate collective bargaining agreements covering all employees in the unit. The Association recognizes the responsibility to represent fairly and equitably the interests of all employees within the unit with respect to grievances, personnel policies, practices, or other matters affecting their general conditions of employment, without discrimination and without regard to Association membership. The Association retains all bargaining rights provided under Chapter 71 of title 5, United States Code.

**Section 2. Weingarten Rights.**
a.  The Association shall be given the opportunity to be present at any examination of a bargaining unit employee by a representative of the Agency concerning an investigation if:

   1.  The employee reasonably believes that the examination may result in disciplinary action against the employee;

   2.  The employee requests representation.

b.  The Agency shall inform unit employees of their Weingarten rights annually by posting (in September) a notice on bulletin boards at each school, the notice shall remain posted all year.

c.  An employee who is to be questioned by a DoDEA management employee in connection with an investigation may request representation by the Association at any time that the employee reasonably believes that disciplinary action may result against the employee. If the employee requests Association representation, no questioning will take place until the Association has been given at least twenty-four (24) hours to confer privately with the employee. In no event will the employee be permitted to delay questioning beyond twenty-four (24) hours. However, if the matter to be investigated involves a lost child, bomb/terrorist threat, or some other matter involving imminent danger to students, faculty, and/or staff, the Agency shall not be required to delay the questioning for the full 24 hours.

d.  The Parties understand that the Association shall promptly inform the Agency of the identity of the local Association representative who will attend the Weingarten meeting.

**Section 3. Formal Discussion Rights.**
a.  Community/School Building/Worksite Level.

   1.  The Association shall be given the opportunity to be represented at any formal discussion whether held at the Community, school, or worksite level (which may include, for example, committees, meetings, and groups) between one or more representatives of the Agency and one or more unit employees or their representatives concerning any grievance, any personnel policy or practices, or other general conditions of employment. Whenever possible, prior to the Agency

**Page 12 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA465

initiating any formal discussion involving resolutions of grievances or discussions of personnel policies, practices, or other general conditions of employment, the Association shall be given twenty-four (24) hours advance written notification. Oral notification will be provided in the event that a twenty-four (24) hour advance written notification is not possible.

2. The Parties understand that the Association shall inform the Agency, before any meeting herein described, of the identity of the Association representative who will attend the meeting. The Association representative shall be authorized official time as provided for in Section 10 of this Article, during the time the employee would otherwise be in a duty status.

b. DDESS/DoDEA Level.

1. The Association shall be given the opportunity to be represented at any formal discussion (which may include, for example, committees, meetings, and groups) between one or more representatives of the Agency and one or more unit employees or their representatives concerning any grievance, any personnel policy or practices, or other general conditions of employment whether at the DDESS or DoDEA level.

2. The Parties understand that normally the Association representative will be the ACEA President for meetings at the DDESS or DoDEA level. The Parties also understand that the Association shall inform the Agency, before any meeting herein described, of the identity of the Association representative who will attend the meeting.

3. Prior to the Agency initiating any formal discussion involving resolutions of grievances or discussions of personnel policies, practices, or other general conditions of employment, the Association shall normally be given 5 workdays advance written notification.

4. If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

**Section 4. Association Officers and Representatives.**
a. At the building level, the Faculty Representative (FR) will normally be the Association representative. However, the Association President, or designee, may designate another bargaining unit member from the same commuting area for representational functions.

b. Association officers and representatives visiting DDESS Puerto Rico schools to which they are not assigned will follow the security and visitor rules and procedures established by the Agency.

c. The performance of statutorily protected representational activities by any ACEA bargaining unit employee, including approved absence for such activities, shall not have a negative effect on that employee's performance evaluation.

**Section 5. Information Requests Under Subsection (b)(4) of Section 7114, Title 5, United States Code.**
The Agency recognizes the Association's right to information under 5 U.S.C. §7114(b)(4).

**Page 13 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA466

The Agency shall furnish to the Association, upon written request, and, to the extent not prohibited by law and supported by particularized need, data:

1. which is normally maintained by the Agency in the regular course of business;

2. which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining;

3. which does not constitute guidance, advice, counsel, or training provided for Agency officials or supervisors, relating to collective bargaining; and

4. If the Agency needs clarification of a request for information or needs to communicate countervailing anti-disclosure interests on employee privacy concerns, it will do so in writing.

All such requests meeting the above-stated criteria will normally be processed by the Agency within ten (10) workdays.

**Section 6. Announcements at Faculty Meetings and Orientations.**
a. The Association will be afforded the opportunity to make a presentation of not more than ten (10) minutes at the beginning of each new school year at the employees' initial school meeting, regardless if the initial meeting is hosted by the school building or the Community Superintendent.

b. The Association will be afforded the opportunity to make announcements at any regularly scheduled school Community and school faculty/staff meeting.

c. The Association will also be afforded the opportunity to make a presentation of at least ten (10) minutes prior to the end of scheduled formal new employee orientations. This provision is not intended to obligate the Agency to conduct formal new employee orientations.

**Section 7. Notification of Agency Responsibilit**es.
a. The Agency will, within twenty (20) workdays of the beginning of each school year, provide the Association President, with an electronic copy of the school Community phone directory and the name and phone number of the managerial point of contact for the following issues and topics: Equal Employment Opportunity (EEO); employee pay; labor and employee relations; leave; official travel; school building security; safety; building maintenance; and property accountability.

b. Within twenty (20) workdays of the beginning of each school year, the Agency will provide to the Association President a copy of the DoDEA Human Resources phone directory.

**Section 8. Association Access to DoD, Department of Defense Education Activity (DoDEA), and DDESS Issuances**.
The Agency agrees to provide the Association President access to all current School Policies, as well as policies issued by the Community Superintendent, school principals, or any other management official, which apply to bargaining unit employees. The above will be available to all bargaining unit employees for review.

**Page 14 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA467

**Section 9. Representation on Committees.**
a.  DDESS Level Committees

1.  The Association shall be entitled to select one Association representative to be a member of each DDESS level committee that is composed of Agency representative(s) and bargaining unit employee(s) and that discusses personnel policies, practices, and/or terms and conditions of employment. If travel is required, travel expenses, including per diem, will be paid in accordance with the Joint Travel Regulations (JTR).

2.  The Association shall also be entitled to recommend committee member(s) who are to come from the bargaining unit. The bargaining unit member(s) will be in a paid duty status while working on committee activities. If such committee work occurs outside of the regular duty day/year, such work must be approved by the Agency. If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

b.  Community and/or School Building Level Committees

1.  The Association shall be entitled to select one local Association representative to be a member of each Community/school building/worksite level group or committee that is composed of Agency representative(s) and bargaining unit employee(s) and that discusses personnel policies, practices, and/or terms and conditions of employment, including the Continuous School Improvement team. The Association representative will be in a paid duty status while working on committee activities, when such activities are required and approved by the Agency, regardless of the time of day or time of year that the committee works. The Association representative will be paid at the employee's earned hourly rate for hours assigned and worked after the normal duty day or days assigned and worked outside of the normal work year. The Association representative may elect, with management concurrence, to receive compensatory time in lieu of the employee's earned hourly rate. If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

2.  The Association shall also be entitled to recommend committee member(s) who are to come from the bargaining unit. Such bargaining unit employee(s) will be in a paid duty status while working on committee activities, when the activities are required and approved by the Agency, regardless of the time of day or time of the year that the committee works. Bargaining unit employees will be compensated at their earned hourly rate for hours assigned and worked after the normal duty day or days assigned and worked outside of the normal work year. The bargaining unit employee may elect, with management concurrence, to receive compensatory time in lieu of the employee's earned hourly rate. If travel is required, travel expenses, including per diem, will be paid in accordance with the JTR.

**Section 10. Official Time for Association President.**
a.  The Association President is entitled to 100% official time to perform representational. These duties shall include primary responsibility for:

1.  serving as a member of the Association team for collective bargaining;

**Page 15 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA468

2.  processing of grievances at the Community Superintendent's level;

3.  representing the Association at meetings with the Community Superintendent/Assistant Community Superintendent;

4.  representing the Association at School Board meetings; and

5.  representing the Association on the Community School Improvement Team.

b.  The Association President will be paid by the Employer at their regular rate of pay for full-time (10 month) employment and will receive all the benefits for full-time employment. The assignment as the full-time representative in no way cancels, waives or diminishes any protection, entitlements or benefits conferred by employment with the Agency.

c.  When official travel is required to meet with Agency officials, the bargaining unit employee will receive government travel orders. Travel expenses will be paid in accordance with the JTR.

d.  When the Association President gives three (3) days advance notice of an absence for more than five (5) consecutive workdays for reasons described in Section 2.a. of Article 27 (Sick Leave), the Association President may designate another bargaining unit member to assume the responsibilities of the President starting on the first day of such leave, to include appropriate official time as specified above.

e.  When the Association President gives three (3) days advance notice of an absence for more than (5) consecutive workdays for reasons described in Article 27, Section 4.a.(3) (Jury Duty), Section 4.a.(5) (Conference Attendance), or Section 7 (military Leave), the Association President may designate another bargaining unit member to assume the responsibilities of President starting on the third (3rd) day of such leave, to include appropriate official time as specified above.

f.  The normal work site of the Association President while on official time shall be the official duty location of the Association President, unless otherwise mutually agreed.

1.  The President will perform duties as the elected President in the office space provided by the Agency, unless otherwise mutually agreed. Exceptions to this requirement would be attendance at meetings, scheduled meetings with management officials, or other requirements that necessitates the President to be in another location in the school Community.

2.  Except for approved absences to attend meetings, training sessions, or other events necessitating the President's absence from the Community, official time will occur within the School Community, to include traveling between schools in the Community.

3.  The Community Superintendent or designee shall meet with the Association President at the beginning of each school year to discuss the President's daily schedule, use of official time and use of alternative work location. At this same meeting, the Community Superintendent or designee, shall notify the Association President as to the name of the school administrator responsible for the President's time and attendance and leave. If during the work year either party

**Page 16 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA469

believes the current schedule and/or use of official time is in need of adjustment, the Parties will meet to resolve the matter.

4. The Association President shall sign in on a form and at a designation selected by the Agency. The Association President shall not be required to sign out at the end of the duty day; however, the Association President shall notify the responsible administrator when such duties require travel off their installation. The Agency reserves the right to institute a sign out procedure in accordance with reasons (1) and (3) as provided for in Section 6a of Article 19.

g. If representational activity involves conferring with another unit employee on duty time, the Association President shall contact the appropriate supervisor one workday in advance to obtain the supervisor's approval. Such requests shall normally be approved unless work requirements necessitate the services of the employee in question. In the event that a request to confer with an employee must be denied, the employee shall be made available at the earliest possible time consistent with work requirements.

h. Should the position of Association President be vacated during the duty year, the Association Executive Board shall, as soon as possible, notify the Agency of the successor.

## Section 11. Official Time.

a. Official Time shall be defined as time granted to an Association representative to conduct official representational duties or other activities as provided in 5 U.S.C. 7131. Official time may not be used to conduct internal Association business.

b. The DDESS Puerto Rico professional bargaining unit shall receive a bank of 220 hours per school year to be used by Association officials and representatives for representational duties. The above-mentioned hours do not include official time provided by statute or regulation, or for Agency-initiated requests to meet with Association official(s). If mutually agreed upon, additional official time may be granted.

c. Excluding the Association President, use of official time shall normally be requested in writing two (2) workdays in advance utilizing the form at Appendix C. Any such time approved will be recorded on the same form.

d. Accounting for Official Time.
Employees and Association representatives are responsible for ensuring the appropriate time codes and amount of official time used is accurately recorded on their timesheet, using the following codes:

BA- Term negotiations
BB- Mid-term negotiations
BD- General labor management relations
BK- Dispute Resolution proceedings before the FLRA

**Section 12. School Board Meetings.**

a.  The Association President will be permitted to attend all DDESS Puerto Rico Community regularly scheduled school board meetings. Executive session meetings may be closed under 10 U.S.C. 2164 (d)(6). The Association President may submit items for placement on the agenda. A copy of the agenda and the previous month's minutes will be provided to the Association President upon distribution to the school board.

b.  A copy of all minutes of open meetings of the board will be posted in each school upon approval and distribution.

c.  If travel outside the commuting area is required for attendance at a school board meeting, the Association President, or designee, will receive reimbursement for travel expenses in accordance with the JTR.

**Page 18 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA471

## ARTICLE 7 – BARGAINING RIGHTS AND REQUIREMENTS

**Section 1. Definitions.**

a. Collective Bargaining: Collective Bargaining means the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees (the Association) in an appropriate unit in the agency to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession.

b. Conditions of employment means personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters:

   1. relating to political activities prohibited under subchapter III of chapter 73 of this title;

   2. relating to the classification of any position; or

   3. to the extent such matters are specifically provided for by Federal statute.

**Section 2. Rights and Obligation**

Notwithstanding any provision of this Article or Article 5, management will negotiate over matters covered by 7106(b)(1) as long as Executive Order 14003 remains in effect or other Executive Order requires it to do so.

**Section 3. Bargaining Levels.**

a. DoDEA or DDESS level issues that affect the DDESS-PR professional bargaining unit will be bargained at the DODEA or DDESS Director/Association President level.

b. Issues unique to DDESS-PR will be bargained at the Association President/DDESS-PR Superintendent level.

**Section 4. Requirements for All Bargaining**.

a. Association representatives who are involved in bargaining with the Agency must submit a request for official time as provided for in Article 6 (unless already on official time).

b. Association representatives involved in bargaining with the Agency, will be in a duty status and on official time for pay purposes if otherwise in a duty status.

c. To the greatest extent possible, bargaining will be accomplished in such a manner so as to preclude the need for travel, normally through video teleconferencing. Bargaining may be accomplished by person-to-person meetings**,** telephone, or electronic mail.

**Page 19 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA472

d.  When bargaining is accomplished through person-to-person meetings, bargaining sessions will be held at a location selected by the Agency. Typically, the sessions will be held during normal duty hours.

e.  If travel is required for the Association bargaining team to engage in impact and implementation or mid-term bargaining, the Agency will issue a government travel order and pay travel expenses in accordance with the Joint Travel Regulations for up to the same number of negotiators that are participating on behalf of the Agency.

f.  The parties agree that for impact and implementation or mid-term bargaining, the Agency will provide official time for up to the same number of negotiators that are participating on behalf of the Agency.

**Section 5. Impact and Implementation Bargaining**.
The Parties recognize that frequent changes to existing conditions of employment not covered in this Agreement may be disruptive to morale and productivity; however, the Parties also recognize that changes must be made, and new guidance issued in order to improve personnel management, employee morale and services, and meet mission requirements. In the event that the Agency exercises its rights under 5 U.S.C 7106 (a), the following rules shall apply:

a.  The Association President will be notified in writing of the planned change(s), utilizing email with return receipt.  The email acknowledgment date will be the starting date for counting all future time requirements under this Article.

b.  If requested, the Association and the Agency will discuss the details of the Agency's planned change(s).

c.  The Association will have ten (10) workdays to respond to the Agency concerning its desire to negotiate. Within twenty (20) workdays after the Association's receipt of the Agency's written notice, the Association will provide any written proposal(s) to the planned change(s).

d.  Bargaining sessions will normally commence at a reasonable time after receipt of the Association's proposal(s) during the normal business day.

e.  If, after proper notification of planned change(s), the Association fails to respond with written negotiable proposal(s) during the time frames listed above, the Agency may implement its planned change(s).

f.  The Parties further agree that planned changes in conditions of employment subject to collective bargaining under Chapter 71 of title 5, United States Code, shall normally not be implemented until and unless good faith negotiations have been concluded. However, the parties may mutually agree to allow planned changes to be implemented while bargaining proceeds, and then implement any agreed upon terms retroactively. Additionally, the Agency reserves the right to implement a change pending the outcome of negotiations if such implementation is required by law or required for the necessary functioning of the Agency as defined by the FLRA.

**Page 20 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA473

g. The Parties further agree that the terms and conditions of employment in existence during the School Year preceding the agreement will be the basis on which to determine in the future if a change has occurred or is being proposed by the Agency. However, the Parties agree that normally a change in conditions of employment does not include the equitable and reasonable assignment of duties and responsibilities typically and customarily associated with the DDESS-Puerto Rico position to which assigned or to the assignment of other duties in emergency situations. Such duties may, for example, include: supervision of students (bus duty; pre-and post-instruction periods; cafeteria, playground, field day, and other out-of-class activities); tutoring and/or remedial assistance which does not require independent planning; committee meetings and associated work performed within the regular duty day; and other similar assignments. Assignments (other than those of an emergency nature) made in an inequitable and/or unreasonable manner may be grieved in accordance with Article 30. The Parties further recognize that changes to the manner in which duties are assigned may constitute a change in conditions of employment which would create an obligation for notice and subsequent I & I bargaining. Even if the manner in which duties are assigned does not constitute a change requiring formal notice and impact and implementation bargaining, the Agency is committed to a dialogue with and consideration of Association input.

h. If the parties cannot voluntarily reach an agreement during impact and implementation bargaining, they may seek the assistance of the Federal Mediation and Conciliation Service. If the Federal mediator is unsuccessful in assisting the parties in reaching an agreement, either party may request that the Federal Service Impasses Panel resolve the impasse.

**Section 6. Mid-Term Bargaining.**
The Parties agree that either side may demand bargaining over any matter not expressly covered by or contained in this Agreement once a year after the agreement has been effective for at least (12) twelve months. When such mid-term bargaining is demanded, the following procedures will be followed:

a. Initial bargaining requests will be sent via utilizing email with return receipt, to the DDESS PR Community Superintendent, or in the case of Agency-requested bargaining, to the Association President.

b. The initial bargaining demand will include proposals and a written explanation of the result desired by the proposals.

**Page 21 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA474

## ARTICLE 22 – DISCIPLINARY AND ADVERSE ACTIONS

**Section 1. Policy.**

a.  Discipline is the right and the responsibility of the Agency and will only be taken for such just and sufficient cause as will promote the efficiency of the service, and the penalty will fit the offense. Employees are ensured the protections of due process.

b.  Constructive discipline, to be effective, must be timely. The results to be achieved through this means diminish in proportion to the time allowed to elapse between the offense and the corrective action. Nevertheless, the Parties agree that sufficient time should be allowed to complete appropriate investigations and fact-finding and that undue haste is as undesirable as undue delay. Supervisors, unit employees, Association representatives, and others involved in an investigation will not disclose any information gained through such investigations except in the performance of their official duties.

c.  Disciplinary actions will not be arbitrary or capricious.

d.  The Agency recognizes the concept of progressive discipline, and generally actions imposed should be the minimum that can reasonably be expected to correct and improve behavior and maintain discipline and morale among other employees. Nevertheless, the Parties acknowledge that some offenses are so serious as to warrant lengthy suspension or removal for a first offense.

e.  An employee who is to be questioned by a DoDEA management employee in connection with an investigation may request representation by the Association at any time that they reasonably believe that disciplinary action may result against the employee. If the employee requests Association representation, no questioning will take place until the Association has been given at least 24 hours to confer privately with the employee. In no event will the employee be permitted to delay questioning beyond 24 hours. However, if the matter to be investigated involves a lost child, bomb/terrorist threat, or some other matter involving imminent danger to students, faculty, and/or staff, the Agency shall not be required to delay the questioning for the full 24 hours.

**Section 2. Informal Disciplinary Actions.**

Informal disciplinary actions are oral admonitions and letters of caution. Letters of Caution shall normally be kept by the supervisor for no more than one year from the date of issuance. When such an action is taken by a supervisor, the employee will be advised of the specific infraction or breach of conduct, when it occurred, and will be permitted to explain their conduct or act of commission or omission. Such actions will not be placed in the employee's Official Personnel File (OPF).

**Section 3. Formal Disciplinary Actions.**

Formal disciplinary actions consist of written reprimands, suspensions, demotions, and removals. Before formal disciplinary action is initiated, an investigation or inquiry will be made by the immediate supervisor or other official designated by the Agency, if necessary, to ensure they have the facts of the case.

a.  A Letter of Reprimand is the lowest level of formal disciplinary action. A Letter of Reprimand must state the reason(s) for its issuance, the employee's right to file a grievance under the negotiated grievance procedure, and the length of time the reprimand will remain in the OPF. A Letter of

**Page 58 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA475

Reprimand may remain in the OPF for a period two (2) years. If at the end of the first year, there have been no further disciplinary infractions, the employee may request to have the Letter of Reprimand removed from the OPF. There is no advance notice required before issuing a Letter of Reprimand.

b.   The Agency may choose not to discipline an employee or may select a lower range of remedies and/or a lower appropriate remedy than provided in the Table of Penalties.

c.   Whenever a formal disciplinary action is initiated against a unit employee that involves a suspension of fourteen (14) days or less the following procedural requirements shall apply:

   1.   The unit employee must be given no less than fourteen (14) days written notice of proposed action.

   2.   The notice shall:

      a.   State, in detail, the reason(s) for the proposed action;

      b.   Provide the employee with a copy of the material relied upon for the proposed action;

      c.   Inform the unit employee of the right to reply orally or in writing or both, within ten (10) workdays after receipt of the notice of proposed action, and the name and title of the official designated to hear an oral reply and/or receive a written reply;

      d.   State that a final decision of the proposed action will not be made until after the ten (10) workday notice period, described in (c) above, whichever comes first; and

      e.   Inform the unit employee what duty status they will be in pending a decision on the proposed action.

   3.   **Notice of Final Decision.** The unit employee shall receive notice of a final decision at the earliest possible date following the ten (10) day reply period. The notice shall be signed and dated and shall inform the unit employee of:

      a.   The reason(s) for the decision;

      b.   The effective date of the action; and

      c.   The employee rights under the negotiated grievance procedure.

d.   Whenever a unit employee is furloughed for thirty (30) days or less, reduced in pay, removed, or suspended for more than fourteen (14) days, the following procedures shall apply:

   1.   Issuance of Advance Notice. The unit employee will be given thirty (30) days advance notice of the proposed adverse action. The advance notice shall:

**Page 59 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA476

a.  State, in detail, the reason(s) for the action;

b.  Provide the employee with a copy of the material relied upon for the proposed action;

c.  Inform the employee of their right to reply orally or in writing, or both, within twenty (20) days from receipt of the notice of proposed action, and the name and title of the official designated to hear an oral reply and/or receive a written reply;

d.  State that a final decision of the proposed action will not be made until after receipt of the unit employee's reply or after the twenty (20) day period, whichever comes first; and

e.  Inform the unit employee of the duty status the employee will remain in pending a decision on the proposed action.

2.  An employee may be placed on excused leave or reassigned during the advance notice period at the sole option of the Agency. Such a decision is not grievable.

3.  Notice of Final Decision. The unit employee shall receive notice of final decision at the earliest possible date following the notice period. The notice of final decision shall be signed and dated and shall inform the employee of the following:

    a.  Which of the reasons in the proposed notice have been found sustained;

    b.  The effective date of the action; and

    c.  The employee rights under the appropriate grievance and/or appeal procedures.

    d.  Employees to whom a notice of proposed disciplinary action has been issued are also entitled to:

        1.  A reasonable amount of official time to review the notice and supporting material, to prepare an answer and to secure affidavits, medical documentation, and other documentary evidence, if the employee is otherwise in a duty status; and

        2.  Be represented by an attorney and/or other representative.

**Section 4. Crime Provision/Indefinite Suspension**.
The Agency may, pursuant to the provisions of section 7513(b) of title 5, United States Code, reduce the 30-day notice period in Section 3.d. of this article when suspension or removal is initiated under that provision if the Agency has reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment may be imposed. In those circumstances, the Agency may require the employee to furnish any reply to the proposed action, to include affidavits and other documentary evidence in support of the reply, within seven (7) days and may effect a decision once a reply is received or the reply period has expired. In addition, if the Agency has reasonable cause to believe the employee has committed a crime for which the employee could be imprisoned, the employee may be placed on indefinite suspension in accordance with 5 C.F.R. 752.402.

**Page 60 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA477

**Section 5. Rights of Probationers, Temporaries (NTE) and Substitutes.**
The procedural rights described in Section 3.d. above do not apply to the discharge or separation of an employee during a probationary period, on a temporary appointment, or a substitute employee. However, if discharge is considered necessary, a written notification will be given to the employee before affecting the discharge.

**Section 6. Duty Status.**
An employee may be retained in a duty status, placed on excused leave, reassigned, or continued in an employee initiated non-pay status during the notice period at the sole option of the Agency. Such a decision is not subject to the grievance process.

**Section 7. Notice Period.**
In the event a notice period affecting an employee on a seasonal work schedule is not completed prior to the beginning of a recess period, the affected unit employee may be carried in a duty status until the end of the notice period in order to complete the process. Otherwise, time limits do not run during any recess period in excess of four (4) days on disciplinary actions affecting employees on a seasonal work schedule.

**Section 8. Anti-Deficiency Act.**
The procedural rights described in Section 3.d. do not apply in the event that bargaining unit employees are affected by an emergency furlough due to an absence of an appropriation from Congress under 31 U.S.C. § 1341.

**Page 61 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA478

# ARTICLE 24 – DUES ALLOTMENTS

**Section 1. Authority.**
The Employer shall deduct Association dues from the pay of all eligible employees who voluntarily authorize such deductions in accordance with the provisions set forth herein.

**Section 2. Payroll Deductions.**
Bargaining unit employees may have their Association dues deducted through payroll deduction provided:

    a.  The employee is a member in good standing of the Association;

    b.  The employee has completed a Standard Form 1187, "Request for Payroll Deductions for Labor Organization Dues." supplied by the Association;

    c.  The employee receives pay on the regularly scheduled paydays; and such pay is sufficient, after all deductions required by lawful authority, to cover the full amount of the dues allotment; and

    d.  During any pay period in which there are insufficient funds in an employee's paycheck to cover dues withholding, no withholding will be deducted for that pay period. A list of employees having insufficient funds for dues withholding purposes will be furnished to the Association President. The Agency will not be responsible for collecting dues not withheld due to insufficient funds.

**Section 3. Association Responsibilities.**
The Association agrees to:

    a.  Notify the Defense Finance and Accounting Service (DFAS), or the servicing payroll office in writing of the amount of Association dues by September 15 and any changes in the dues amount thereafter;

    b.  Notify the DFAS or servicing payroll office in writing of the name and address of the payee to whom the remittance check should be made;

    c.  Acquire and distribute Standard Form 1187 to unit members, as requested;

    d.  Submit completed Standard Forms 1187 and 1188, both authorizing deductions and revoking deductions, to the servicing payroll office;

    e.  Certify to the Agency, at the earliest practical date, the amount of dues and the names and addresses of officials of the Association authorized to certify Section "A" of the Standard Form 1187 on behalf of the Association. The Association shall also be responsible for providing the Agency prompt written notification of changes in the name or address, or both, of the officials of the Association who have such authority;

    f.  Certify the amount of dues to be withheld on the Standard Form 1187;

g. Notify the servicing personnel office promptly and in writing if an employee ceases to be a member in good standing; and

h. Assist the Agency in resolving any claims and disputes arising by reason of the Association's actions relating to dues withholding.

**Section 4. Agency Responsibilities.**
The Agency agrees to:

a. Promptly process voluntary dues allotments in the amount certified by the Association;

b. Withhold dues in equal amounts over twenty-six (26) full pay periods;

c. Transmit funds (remittance checks, electronic fund transfer, etc.) to the Treasurer of the Association dues withheld for its account. The transmittal shall be made no later than ten (10) workdays following the day that the related salaries were paid to the unit members. Such remittances will be made to the Association Officer designated in writing by the Association President. Remittances shall show the names of participating unit members, the amounts withheld, and the pay period from which deductions were made;

d. Maintain SF-1188s, Cancellation of Payroll Deductions for Labor Organization Dues, and furnish the forms to unit members upon request; and

e. Expeditiously correct government error in the dues-withholding process. Errors in remittance checks will be corrected and adjusted in a subsequent check.

**Section 5. Dues Withholdings.**
a. Standard Form 1187, authorizing withholding of dues, may be submitted at any time to the appropriate official of the Agency, and withholding of dues shall begin with the first pay period after its receipt by the Defense Finance and Accounting Service (DFAS).

b. The amount of Association dues to be deducted each biweekly pay period shall remain as originally authorized on the Standard Form 1187 until a change in the amount of such dues is certified by the authorized Association official, and such certification is transmitted to the Agency by the Association. Such change in the amount of dues to be withheld will be effective at the beginning of the third pay period following receipt of the notice in the payroll office, unless the Association specifies a later date. Only one (1) such change may be made in any period of twelve (12) consecutive months.

**Section 6. Revocation of Dues-Withholding.**
Employees may revoke their dues withholding by submitting an SF-1188 to the servicing personnel office, DFAS, or servicing payroll office. Per 5 U.S.C. 7115, a voluntary revocation of due withholdings may not be effected for a period of one (1) year after authorization by the employee. Dues revocation requests received by the Association (timely or untimely) will be promptly forwarded to the servicing personnel office.

**Page 64 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA480

**Section 7. Termination of Dues-Withholding Allotmen**t.

a.  An allotment for an employee will be terminated at the end of the pay period following receipt of the dues revocation notice, or during which an employee is separated from the Agency's rolls through transfer, retirement, resignation, death, expiration of appointment, or for cause.

b.  Allotments for all employees will be automatically terminated in the event exclusive recognition is no longer accorded to the Association.

c.  When a unit employee is reassigned to a non-unit position, the Agency will cease dues withholding for the employee.

**Section 8. Dues Withholding Errors.**

a.  In the event the Agency either improperly revokes or terminates dues withholding, the Agency will immediately restart the dues withholding.

b.  When an erroneous deduction (Dues-Withholding Revocation) is taken from an employee's pay, the Agency will reimburse the affected employee(s) but will recoup the amount of the erroneous deduction from a subsequent remittance check, following written notification to the Association.

**Page 65 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA481

**Section 8. Funeral Leave.**
Employees will be entitled to not more than a three (3) day absence without charge to leave or loss of pay, to make arrangements for, or attend the funeral or memorial service for, an immediate relative who died as a result of wounds, disease, or injury incurred while serving as a member of the Armed Forces in a combat zone as provided for in 5 C.F.R. 630.804.

**Section 9. Military Leave.**
Military leave will be granted in accordance with Section 6323 of title 5, United States Code and implementing regulations.

**Section 10. Court Leave.**
Leave for jury or witness service will be in accordance with 5 U.S.C. § 6322, and applicable OPM and Agency regulations.

**Section 11. Family and Medical Leave.**
a.  Leave under the Family and Medical Leave Act (FMLA) will be in accordance with applicable OPM and Agency regulations.

b.  Employees should consult with their supervisor and/or servicing labor/employee relations specialist when requesting leave pursuant to FMLA.

**Section 12. Voluntary Leave Transfer Program.**
The Agency will provide employees the opportunity to participate in the Voluntary Leave Transfer Program under 5 C.F.R. 630, Subpart I and applicable Agency regulations. Sick leave, in addition to personal leave, may be donated under this program.

**Section 13. ACEA Leave Bank.**
a.  A Leave Bank (LB) will be established to provide temporary assistance to employees when they are incapacitated due to medical emergencies, catastrophic illness, maternity purposes, or injury experienced by the employee or when they are required to attend to a medical emergency or serious health condition of an immediate family member (as those terms are defined by OPM in FMLA regulations). All employees who accrue leave may join the bank by contributing at least one (1) sick or personal leave day and completing the form contained at Appendix K. The LB may carry over all unused hours to the following school year.

b.  Participation in the LB by employees will require donation of one (1) day of sick or personal leave (or pro-rated portion thereof for part-time employees) during the first thirty (30) days of employment and then annually during the Open Season (September of each year). Unit employees may initiate or cancel contributions only during an annual open season. Contributions and cancellations made during the September open season shall become effective on the following first day of October. For the first twelve months of new membership in the LB, no employee will be authorized a grant of leave from the bank for pre-existing conditions.

**Page 76 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA482

c. An employee requesting days from the LB must use the form contained in Appendix L and have exhausted all leave which can be used for the nature of the emergency such that the employee would otherwise, absent approval from the LB, be in a non-pay status. The requester will furnish a completed employee request form and a written physician's statement, as contained in Appendix M, demonstrating the need for additional leave to cover a medical emergency, catastrophic illness, maternity/paternity/adoption, purpose, or injury, along with evidence that leave has been approved by the supervisor. Grants of leave from the bank will not be authorized for illness or disability from intentional self-inflicted injury or act of war. Further, a member of the bank will lose the right to request leave from the bank by:

1. falsification of information on the LB Leave Request Application;

2. termination of employment with DDESS-PR; or

3. written, signed notice from the employee during the established open season to discontinue the employee's annual contribution of leave days as of the date the contribution becomes due.

d. The LB Committee will consist of one Agency official appointed by the Community Superintendent and two employees appointed by the Association President. The LB Committee will make decisions on all requests for leave hours from the LB to be made available for unit employee use. However, unit employees must still obtain leave approval from their supervisor. The LB will also determine when open seasons should be held to allow employees who have not previously contributed to the bank an opportunity to do so and will monitor the amount of leave remaining in the bank to ensure the bank is not depleted. No grant(s) may exceed 30% of the total available balance in the sick leave bank account.

e. A majority vote by the LB Committee members approving the leave is required to grant leave hours from the LB. Neither the Agency nor Association is obligated to provide this temporary assistance to LB members to cover all the requested leave hours. Decisions by the LB Committee are final and not subject to the grievance process.

f. Any employee participating in the LB will be limited to a withdrawal from the bank of up to a total of twenty (20) workdays in succession for their own incapacitation, and for a total of ten (10) workdays in succession to attend to the illness or incapacity of an immediate family member. When an employee's own illness or incapacitation extends beyond twenty (20) workdays, the employee may re-apply to the LB Committee for further consideration of additional leave. Such reapplication shall include evidence that the employee timely applied for an advance of sick leave under section 2(i) and for leave from the voluntary leave transfer program under section 12, and that the applications for these additional leave sources have been denied or are still pending. An employee submitting an application for additional leave may be required to supply additional certification from a second medical provider. Any employee participating in the LB will be limited to a withdrawal from the bank up to a total of forty (40 hours) for medical follow -up/treatment of a catastrophic illness. No member may be granted more than (40) workdays from the Leave Bank over the course of any two consecutive school years.

g. All donations of leave to the LB are final when donated and cannot be restored to the employee.

**Page 77 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA483

h.  The leave balance in the LB established prior to the effective date of this agreement will be transferred to the bank and be available for use of employees as determined by the LB Committee. Employees enrolled in the prior LB must re-enroll in the LB established under this Article as described in Section 13a above in order to continue eligibility to receive leave from the LB.

i.  The Agency shall provide an annual report of the status of the Emergency Leave Bank to the LB Committee.

j.  A grant of leave from the leave bank for maternity purposes is limited to the following circumstances:

1.  When the employee is incapacitated from work because of severe morning sickness, prescribed bed-rest, or while recovering from childbirth;

2.  When the employee is required to care for a baby who has a serious health condition; and

3.  When the employee is required to care for an immediate family member who has severe morning sickness, has been prescribed bed-rest, or who is recovering from childbirth.

k.  Leave from the LB may not be used for disabilities which qualify the employee for Workers' Compensation.

l.  If the LB is terminated for any reason, the balance remaining shall be returned to the current members on an equal basis.

m.  Grants of leave from the LB will not be carried over from one school year to another. All grants end as of the last duty day of the school year.

n.  If a member does not use all of the leave days granted by the LB, the unused portion will be returned to the LB.

**Section 14. Educational Leave.**
a.  If offered by the Agency, employees may apply (subject to any additional criteria stated below) for any or all of the following Agency educational leave programs:

1.  Yearlong Educational Leave at Half Pay;

2.  Leave Without Pay (LWOP) for Educational Purposes; and

3.  Administrative Reemployment Rights (ARR) Program.

b.  To be eligible for the Yearlong Educational Leave Program, an employee must be serving on a permanent appointment as a professional educator with three (3) years of consecutive service with the Agency. Those employees applying for the LWOP or ARR programs must be serving on

**Page 78 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA484

## ARTICLE 29 – REDUCTION IN FORCE

**Section 1. Definition.**
A Reduction-in-Force (RIF) is the systematic way of making organizational changes that provides retention preference on the basis of tenure, veteran preference, length of service and performance.

Definitions of terms in this article are as provided for in 5 C.F.R. 351.203. A RIF occurs whenever a competing employee is released from the employee's competitive level by furlough for more than thirty (30) days or by separation, demotion, or reassignment requiring displacement because of:

a. Lack of work;
b. Shortage of funds;
c. Insufficient personnel ceilings;
d. Reorganization;
e. The exercise of reemployment or restoration rights;
f. The reclassification of an employee's position due to erosion of duties when such action will take effect after the formal announcement of a RIF in the competitive area and the RIF will take effect within one-hundred and eighty (180) days; or
g. Transfer of function.

**Section 2. VSIP/VERA.**
The Agency agrees to seek authorization from the Department of Defense Activity (DoDEA) to offer employees Voluntary Early Retirement Authority (VERA) and/or Voluntary Separation Incentive Pay (VSIP) prior to initiating a RIF if there is existing statutory authority for these programs and there are allocations in the budget.

**Section 3. Exclusions.**
Actions excluded from RIF procedures are as provided for in 5 C.F.R.351.202(c).

**Section 4. Notification to Association.**
When it is determined that there is a need for RIF, the Agency agrees to notify the Association in writing of pending RIF actions as early as possible, but not less than ninety (90) calendar days prior to the effective date of actions to be effected under RIF procedures. Such notice to the Association shall normally include the following:

a. Reasons for the RIF; and

b. Numbers and types of positions to be affected.

It is understood that the above information may change during the ninety (90) calendar day period.

**Section 5. Notification to Bargaining Unit Employees.**
Once it has been determined that a RIF is required, each affected employee will be given specific advanced notice not less than sixty (60) calendar days prior to the effective date of the RIF. Such notice shall contain the following information, according to a 5 CFR 351.802:

**Page 84 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA485

a. Action to be taken;
b. Reasons for the action;
c. Personal information used to determine the action;
d. Effective date of the action;
e. Entitlements and benefits;
f. Place where affected employees and their representatives may inspect retention registers and related records pertaining to the action; and
g. Employee appeal rights.

The Association will be provided information on all employees affected by the RIF and the specific action to be taken with respect to each employee.

## Section 6. Competitive Area.
The competitive areas for any RIF within the Puerto Rico School System are defined as two separate areas: the Fort Buchanan Schools and Ramey School.

## Section 7. Competitive Levels.
Competitive levels shall be established in accordance with 5 C.F.R. 351.403.

## Section 8. Retention Register/Retention Priority.
When an employee is to be released from a competitive level due to RIF, a retention register will be established for that competitive level in accordance with 5 C.F.R. 351.404. The retention register will be prepared from current retention records of employees. To provide adequate time to determine employee retention standing, only that information that is available at least ninety (90) days prior to the scheduled issuance of RIF notices may be used, except to correct errors in the record that are discovered prior to the effective date of the RIF. Competing employees shall be classified on a retention register in tenure groups on the basis of their tenure of employment, veteran preference, length of service, and performance in descending order as provided for in 5 CFR 351.502.

a. Tenure of employment. Competing employees shall be classified on a retention register as Group I (includes each permanent employee whose appointment carries no restrictions or conditions such as conditional, indefinite, specific time limit, or trial period), Group II (includes each employee serving a trial period or whose tenure is equivalent to a career conditional appointment in the competitive service), and Group III (includes each employee whose tenure is indefinite or has a time limitation).

b. Veteran preference. Within each tenure group described in Section 6.a. above, competing employees shall be classified on the retention register based upon veteran preference as defined in 5 C.F.R. 351.501(c) as Subgroup AD (preference eligibles who have a service-connected disability of 30 percent or more); Subgroup A (preference eligible employees not included in subgroup AD), or Subgroup B (non-preference eligible employees).

c. Length of service. Each competing employee's length of service shall be established in accordance with 5 C.F.R. 351.503.

d. Performance. Credit for performance shall be granted in accordance with 5 C.F.R. 351.504. To provide adequate time to determine employee retention standing, a cut-off date will be established

**Page 85 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA486

and only cycles with finalized performance ratings (i.e., issued to employee with all appropriate reviews and signatures) completed at least ninety (90) days prior to the scheduled issuance of RIF notices may be used.

e.  Competing employees shall be released from competitive levels in the inverse order of retention standing, beginning with the employee with the lowest retention standing on the retention register. A competing employee may not be released from a competitive level while retaining in that level an employee with lower retention standing except as provided for in 5 C.F.R. 351.601.

**Section 9. Placement Considerations.**
In order to minimize the impact of a RIF, consideration will be given to:

a.  Filling existing vacancies by the placement of qualified employees who are adversely affected by the RIF to include identifying vacancies at other DDESS Districts that will be made available for placement of unit employees.

b.  Terminating temporary appointments of individuals in unaffected competitive levels to create placement opportunities for competing Group I or Group II employees who are scheduled for separation.

c.  The Agency may, at its discretion, waive qualifications to place an employee who has been released from the employees' competitive level into a vacant position. If placement is to another professional bargaining unit position, the employee must meet certification/licensure requirements of the new position within the time frame established by the Agency.

**Section 10. Reemployment Priority Lists (RPL).**
a.  DDESS will establish RPLs for bargaining unit employees who have been separated due to RIF in accordance with 5 C.F.R. 330 Subpart B, Reemployment Priority List. It is the Agency's policy that, if there are not qualified part-time employees on the RPL for a particular part-time position, full-time employees who have indicated availability for part-time positions will be placed if qualified and interested.

b.  Eligible bargaining unit employees will be registered on the RPLs for a maximum of two (2) years. If an employee declines a valid job offer, the employee's name will be removed from the RPL. If a full-time employee accepts part-time employment, it will be considered a valid job offer and the employee's name will be removed from the RPL. Except for employees separated by RIF from temporary employment, acceptance of a temporary appointment will not alter the employee's right to be offered permanent employment.

**Section 11. Severance Pay.**
Severance pay shall be paid in accordance with appropriate law and regulation.

**Section 12. Assistance to Employees.**
Job placement services will be provided to employees adversely affected by the RIF, according to appropriate law and regulation. Assistance will include use of the Reemployment Priority List.

**Page 86 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA487

**Section 13. Review of Records.**

Each employee or the employee's representative has the right to review any records used by the Agency in any RIF action that was taken or will be taken regarding the employee, including the complete retention register with the employee's name, so that the employee may consider how the competitive level was constructed and how the relative standing of the competing employees was determined.

This also includes the right to review the complete retention register (as appropriately redacted for privacy concerns) for other positions that could affect the composition of the employee's competitive level.

**Section 14. Salary Retention Provisions.**

Grade and pay retention shall be afforded to employees who are demoted to a lower graded/paid position within DDESS in accordance with 5 C.F.R. Part 536 and appropriate procedures. Pay retention will be granted based upon the employee's hourly rate of pay without regard to work schedule. An employee who is demoted and on retained grade and/or pay shall receive priority consideration for re-promotion to positions up to and including the grade/pay level from which demoted.

**Section 15. Continuation of Benefits.**

Bargaining unit employees separated by RIF will be afforded continued coverage under the Federal Employees Health Benefits Program (FEHB) in accordance with Chapter 89 Title 5, United States Code. DOD has determined that if an employee's status changes, such as RIF and their dependents would no longer be eligible for enrollment in a DDESS School, enrollment may continue for the remainder of the school year.

**Page 87 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA488

## ARTICLE 30 – GRIEVANCE PROCEDURE

**Section 1. Purpose.**
The purpose of this Article is to provide a procedure for consideration and resolution of grievances by bargaining unit employees. The filing of a grievance shall not be construed as reflecting unfavorably on an employee's good standing, performance, or loyalty or desirability to the organization, nor shall it be regarded as an unfavorable reflection upon the Agency or its officials.

**Section 2. Coverage.**

a.  This procedure applies to unit employees and the Parties and shall be the exclusive procedure for resolving grievances that fall within its coverage.

b.  A grievance means any complaint:

 1.  by a unit employee concerning any matter relating to the employment of that employee;

 2.  by the Association concerning any matter relating to the employment of any unit employee(s);

 3.  by a unit employee, the Association, or the Agency concerning:

   a.  the effect or interpretation or a claim of breach of this Agreement; or

   b.  any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.

c.  This procedure shall not apply to any grievance concerning:

 1.  any claimed violation of Subchapter Ill of Chapter 73, Title 5 U.S.C. (relating to prohibited political activities);

 2.  retirement, life insurance, or health insurance;

 3.  a suspension or removal under Section 7532 of Title 5, U.S. Code;

 4.  any examination, certification, or appointment;

 5.  the classification of any position which does not result in the reduction in grade or pay of an employee;

 6.  a proposed notice of disciplinary or adverse action;

 7.  separation during ones trial period;

 8.  termination or expiration of temporary appointments;

 9.  any other matter or issue excluded by any provision of this Agreement.

**Page 88 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

10. non-selection for promotion from a group of properly ranked and certified candidates made in accordance with applicable laws;

11. oral admonishments which are not placed in the employee's Official Personnel File.

d. Matters covered under equal employment opportunity (EEO) statutes may be raised under the negotiated grievance procedure set forth in this Article, or under DoDEA EEO complaint procedures, but not both.

**Section 3. Representation.**

A unit employee may present a grievance on their own behalf under this procedure provided that the Association is given the opportunity to be present during the grievance proceeding. Any Association official may present a grievance under this procedure in accordance with Section 2.a. and 2.b. (2). Any resolution reached with the unit employee shall be consistent with the terms of this Agreement.

**Section 4. Grievance Procedures.**

Step 1 - Informal (Optional)

The Parties agree that informal resolution of employee grievances is preferable whenever possible. To this end, the unit employee and/or their Association representative should present any grievance informally to the employee's immediate supervisor within fifteen (15) workdays after the occurrence of a particular act or incident, or fifteen (15) workdays after the date the employee could have been reasonably expected to be aware of the particular act or incident leading to the grievance. A matter concerning a continuing violation may be raised at any time. The supervisor should arrange for a meeting within five (5) workdays of the informal presentation of the grievance to fully discuss the matter and to attempt informal resolution. The employee, or the representative, should explain the basis for the grievance and the relief the employee is seeking. The supervisor, school principal (or designee) should answer the employee's concern within five (5) unit workdays after the meeting. If the issue is not resolved to the employee's satisfaction at the informal stage, or by a date a response was due but not received from the supervisor, the grievant may proceed to Step 2.

Step 2 - Formal

The unit employee(s) or the employee's Association representative must present the grievance to the appropriate supervisor within ten (10) workdays after the denial of the grievance at the informal stage, or date such action was due. Employees are encouraged to use the form at Appendix O.

The formal grievance must list the names (if known) of all employees affected, the specific basis for the grievance, and the relief sought.

a. The supervisor shall issue a written decision within ten (10) workdays from the date the written grievance was received by the supervisor. Such decision shall be transmitted to the grievant and the grievants representative, if any.

**Page 89 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA490

b. The grievant or the Association representative shall have ten (10) workdays after the receipt of the supervisor's decision to advance the grievance to the next level. If the grievant has not received a written decision from the supervisor within the ten (10) workday period, the grievant may advance the grievance to Step 3 of this procedure within ten (10) workdays after the ten (10) workday period has elapsed.

If the Informal Stage as described above in Step 1 is not utilized, the unit employee(s) or their Association representative may present the grievance in writing to the appropriate supervisor within fifteen (15) workdays after occurrence of a particular act or incident, or fifteen (15) workdays after the date the employee could have been reasonably expected to be aware of the particular act or incident leading to the grievance. A matter concerning a continuing violation made be raised at any time. Employees are encouraged to use the form at Appendix O.

Step 3 - Review

a. When the grievance has not been resolved at Step 2, the grievant or the Association representative may submit the grievance to the Superintendent (or designee) within fifteen (15) workdays after the denial or non-response specified in Step 2. Employees are encouraged to use the form at Appendix O. Along with the information submitted under Step 2, the grievance must include a statement as to why the supervisor's decision is unacceptable.

b. No new issues may be raised that were not raised at the formal stage of the grievance process nor may the grievance be expanded to include employees who were not identified (named) at the previous step of the grievance process, except for group grievances.

c. The Superintendent (or designee) will review the grievance and will issue a final decision within fifteen (15) workdays from its receipt. Such decision shall be in writing and shall set forth the reasons for the decision. A copy of the decision shall be transmitted to the grievant and the grievants representative, if any.

**Section 5. Agency/Association Grievances.**
The following procedure will be followed when processing grievances arising between the Association and the Agency:

a. Association or Agency grievances may be filed only at the Superintendent/ACEA level by the respective officials.

b. Association or Agency grievances must be filed within twenty (20) workdays after the occurrence of a particular act or incident, or twenty (20) workdays after the date the Agency or Association could have been reasonably expected to be aware of the particular act or incident leading to the grievance. A matter concerning a continuing violation may be raised at any time.

c. Upon receipt of an Association or Agency grievance, the Association or Agency, as appropriate, shall review, investigate, and furnish a final decision within fifteen (15) workdays.

**Page 90 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA491

**Section 6. Alternative Dispute Resolution.**

a. If the final grievance decision is not acceptable, the parties may mutually agree to request that the grievance be mediated with assistance from the Federal Mediation and Conciliation Service, or other mutually agreed upon mediation service.

b. The party requesting mediation must notify the other party of its desire to engage in mediation and submit any necessary forms within five (5) workdays following receipt of the final grievance decision. The Parties will share equally in any fees and expenses of the mediator.

c. No new issues may be raised in the mediation process that were not raised at the previous stage of the grievance process nor may the grievance be expanded to include employees who were not identified (named) at the previous step of the grievance process.

d. If the grievance is unresolved by mediation or neither party requests mediation, the Association or the Agency may pursue the grievance to arbitration. If mediation is not requested within (5) workdays of receipt of the final decision, the date of receipt of the final decision shall be considered the last step of the grievance process. If mediation is invoked, the date of the last day of mediation will be considered the conclusion of the last stage in the grievance procedure. The grievance may then proceed to arbitration in accordance with Article 31.

e. Mediation for grievances will normally be conducted at the DDESS Puerto Rico District Office.

**Section 7. General Provisions.**
a. **Time Limits.**

1. All time limits in this procedure may be extended or curtailed in writing by the mutual consent of the Parties.

2. Both Parties agree to comply with the time limits established in the grievance procedure. Failure to comply with established time limits will serve as a basis for either party to advance the grievance to the next step or to reject a grievance.

b. **Cancellation.** A non-monetary grievance affecting only one (1) employee shall be cancelled upon the death of the unit employee or upon the employee's separation from the bargaining unit for reasons not connected with the Grievance if the employee's death or separation occurs prior to the conclusion of the arbitration hearing on the matter. In a non-monetary Association grievance filed on behalf of multiple employees, that portion of the Grievance specific to an individual employee who has died or separated for reasons not connected with the grievance will be cancelled if the employee's death or separation occurs prior to the conclusion of the arbitration hearing on the matter.

c. **Exercise of Rights.** Under 5 U.S.C. 7116 and 5 U.S.C. 7121, unit employees may raise certain matters under this negotiated grievance procedure or under an applicable statutory procedure, but not both. For purposes of this Article, the unit employee or the representative shall be deemed to have exercised the employee's option as to procedure when a timely written grievance under this procedure is filed; or a charge, appeal, or complaint under an applicable statutory procedure is initiated, whichever event occurs first.

**Page 91 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA492

d.  **Protection from Reprisal.** In exercising their right to seek resolution of grievances, unit employees and witnesses shall be free from restraint, interference, coercion, discrimination, or reprisal.

**Page 92 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA493

# ARTICLE 31 – ARBITRATION

**Section 1. Invoking Arbitration.**

a.  Should either the Agency or the Association be dissatisfied with the final decision in a grievance covered by Article 30 of this Agreement, the party who filed the grievance may proceed to arbitration. However, arbitration of the grievance may be invoked only by the Association or the Agency and does not require the approval of the bargaining unit employee(s) involved.

b.  No new issues may be raised in the arbitration process that were not raised at the previous stage of the grievance/mediation process nor, absent agreement of the parties, may the grievance be expanded to include employees who were not identified by name at the previous step of the grievance/mediation process except for class grievances.

c.  A written notice invoking arbitration must be served on the opposing party within twenty (20) workdays following the conclusion of the last stage in the grievance procedure.

d.  Arbitration hearings affecting one or more bargaining unit employees on a seasonal work schedule will not be scheduled to occur during recess periods unless mutually agreed.

**Section 2. Selecting an Arbitrator.**

a.  Within twenty (20) workdays from the date of the request for arbitration (if mediation not requested), the invoking party will ask the Federal Mediation and Conciliation Service (FMCS) to provide a list of seven (7) impartial persons, "panel," qualified to act as arbitrators who are members of the National Academy of Arbitrators and who are located in the FMCS Region 7 (or whatever successor region includes Washington, D.C.). The Party requesting the panel shall pay the FMCS electronic filing fee.

b.  Within twenty (20) workdays from the date of the response from the FMCS conveying the names of the prospective arbitrators, the Parties shall meet, either in person or telephonically, to select an arbitrator.

c.  If the Parties cannot mutually agree upon one (1) member of the panel, then the Agency and the Association will each strike one (1) arbitrator from the panel and will repeat this procedure until one (1) name is remaining on the panel. The remaining person shall be the duly selected arbitrator.

d.  The Association shall have first strike the first time an arbitrator is selected under this Agreement, with the Parties alternating first strike in each selection thereafter.

e.  The FMCS shall be empowered to make a direct designation of an arbitrator to hear the case in the event:

1.  The non-grieving party refuses to participate in the selection of any arbitrator; or

2.  Of inaction or undue delay by either party.

**Page 93 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA494

f.  If the grieving party refuses to select an arbitrator within thirty (30) workdays from the date of the response from the FMCS conveying the names of the prospective arbitrators, the request for arbitration submitted by the grieving party will be considered withdrawn with prejudice.

g.  Thereafter, the Parties shall contact the arbitrator and establish a date for a hearing.

**Section 3. Issue.**
If the Parties fail to agree on a joint submission of the issue for arbitration, each may submit a separate submission at the beginning of the hearing only; and the arbitrator shall determine the issue or issues to be heard. The arbitrator may not consider an issue in arbitration that was not raised at the previous stage of the grievance process, absent agreement of the parties.

**Section 4. Arbitration Expense.**
a.  The arbitrator's fee and their expenses of the arbitration shall be borne equally by the Agency and the Association.

b.  The arbitration hearing will be held on the Agency's premises during the normal duty day as determined by the arbitrator. If the Parties agree to hold hearings in facilities that are not under the administrative control of the Agency, any cost of such facilities will be borne equally by the Agency and the Association.

c.  Court reporters shall be used for all arbitration hearings to provide a transcript of the hearing, unless the parties mutually agreed not to use the court reporter.  The court reporter expenses shall be borne equally by the Agency and the Association.

d.  The grieving employee will be in a pay status for the duration of the hearing, if otherwise in a duty status. The Association representative will be granted official time as described in Article 6 for the duration of the hearing, if otherwise in a duty status.

**Section 5. Witnesses.**
a.  The arbitrator shall determine the witnesses to provide testimony.

b.  Approved employee witnesses will be in a pay status to the extent necessary to permit their testimony.

c.  The arbitrator has the authority to extend the proceedings past the duty day.

d.  Telephonic testimony will be admissible unless objected to by the opposing party, in which case the arbitrator will decide whether such testimony will be admissible.

**Section 6. Decision.**
The arbitrator will be requested to render a written decision as quickly as possible but, in any event, not later than sixty (60) days after the closing of the record, and receipt of the transcript and closing briefs. The record will close the last day of the hearing unless extended by the arbitrator. Post-hearing written briefs, if requested by the arbitrator, are due within an agreed upon number of days after closing of the record unless one or both parties order copies of a transcript of the hearing.  In that event post-hearing

**Page 94 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA495

written briefs, if requested by the arbitrator, are due within an agreed upon number of days after receipt of the transcript.

**Section 7. Arbitrator's Authority.**
The arbitrator shall have no power to add to, subtract from, disregard, alter, or modify any of the express terms of the Agreement or any Memorandum of Understanding (MOU) between the Parties. Additionally, the arbitrator will have no authority to make any decision, recommendation, or award that would require an act inconsistent with or prohibited by law, rule, or regulation, or that would violate the terms of this Agreement. If either party disagrees as to the meaning or application of the decision, that party may return the decision to the arbitrator with a request for clarification. Arbitrators are bound by the holdings and interpretations of the Merit Systems Protection Board, the Federal Labor Relations Authority; they are also bound by all other Federal statutes and regulations as applicable.

**Page 95 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA496

## ARTICLE 35 – USE OF FACILITIES AND EQUIPMENT

**Section 1. Meeting Space.**
Upon written/email request, the Agency agrees to provide space in a school building or at the District Office building for Association meetings after duty hours. Use of the space will be contingent upon availability and will not interfere with any school activities or community functions. The Association will be responsible for the security and physical condition of the space/facility used.

**Section 2. Association Office Space/Equipment/Storage.**
a.  The Association will be provided office space with a desk, table, a locking file cabinet, chairs, an Agency-standard computer with software, printer, Fax machine, and a private telephone line with long distance capability, if feasible. In providing an Agency-standard computer with software, printer, and facsimile machine, the Agency agrees to include the Association office on the schedule for periodic upgrades of computer equipment which is normally a three (3) to four (4) year cycle. Changes/upgrade of equipment will be scheduled with the Association President.

b.  The Agency agrees to pay the cost of installation for the telephone line and basic monthly service; but all recurring operating costs, i.e., monthly long-distance service, fax and copy paper, etc., will be the responsibility of the Association.

c.  The Association may utilize the Agency's courier system, and the Agency agrees to provide ACEA with access to its Local Area Network (LAN) for purposes of performing representational duties only.

d.  All furniture and equipment is for Association business and may not be removed from school premises without written authorization from the Agency.

e.  The Agency agrees to provide to the Association a closet (or similar area) for storage purposes.

**Section 3. Teacher Workspace.**
Whenever practicable, a workroom with telephone will be designated in each school complex to be used by the unit employees for work-related purposes. If consistent with the Principal's building security policy, such space may be made available to unit employees for use outside the school day.

**Section 4. Telephone Access.**
a.  Unit employees shall be authorized to make local or non-toll telephone calls for necessary personal business from government telephones. Such calls shall be kept to a minimum and should not interrupt classroom instruction or other assigned duties.

b.  The Agency shall make reasonable efforts to ensure that bargaining unit employees responsible for confidential information, other than classroom teachers, will be provided a telephone in their office or work areas. The Agency shall also make reasonable efforts to ensure that unit employees have privacy on the school site for making necessary phone calls to parents of students, personnel offices, school administration offices, military offices, and other Agency officials.

**Page 102 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA497

c.  Absent an emergency, unit employees should not receive personal telephone calls at the work site. School staff will, however, place telephone messages of incoming calls in the employee's mailbox.

## Section 5. Association Mailboxes.

a.  The Association President, and designee, and all Faculty Representatives may use bargaining unit employee's mailboxes within each school for distribution of Association notices, bulletins, and other informational materials to bargaining unit employees. All such materials must be clearly identified as Association materials.

b.  The Agency shall also provide the Association with a mailbox located at its main office. The Parties recognize that the Association has an official address, but for convenience the Association shall also have access to the school system's distribution mail service. Any mail addressed to the Association and received at a school will be forwarded to the Association President.

## Section 6. Computer Access.

The Agency agrees to make reasonable efforts to ensure that unit employees have access to a functioning computer with email/internet/requisite software capability in the employee's office/classroom/work area.

## Section 7. Employee Parking.

a.  The Agency agrees to make reasonable efforts to ensure that unit employees have accessible parking at the work site.

b.  Upon receipt of a request from a handicapped unit employee, the Employer will give special consideration to the assignment of reserved parking space close to the employee's work area. Such consideration is dependent upon the nature and degree of a medically certified handicap.

c.  The Agency agrees to designate a parking space for the Association President/Faculty Representative (FR) or designee, convenient to each school site.

## Section 8. Employee Access to Work and Storage Areas.

a.  Access will be provided to facilities and equipment that are required in the performance of a bargaining unit employee's duties during normal school hours.

b.  The Agency will normally provide unit employees access to classroom and toilet facilities for work-related purposes after normal duty hours and during all recess periods, where health, safety, and security concerns can be met.

## Section 9. Association Use of Agency Copy Machines and Bulletin Boards.

a.  The Association President (or designee) and all Faculty Representatives shall be provided direct access to a copy machine (as designated by the Agency) in each school for use in official matters. The Association shall provide the paper used for such copying.

b.  The Association will be allowed use of a bulletin board in each school's faculty lounge. Such bulletin board space shall be for the exclusive use of the Association.

**Page 103 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA498

**Section 10. Unit Employee Storage Space.**
a.  Each unit employee will be provided one locking storage area, i.e., cabinet, file cabinet, desk, closet, etc., for each bargaining unit employee to store their personal belongings during the duty day. Except for emergencies that necessitate such action or situations that may endanger the health or safety of students or bargaining unit employees, the Agency shall not open a locked storage area designated for use by an individual bargaining unit employee for storage of their personal belongings unless the bargaining unit employee, if available, has been given the opportunity to be present, has given written consent, or the locked storage area is also used to store Agency supplies and materials.

b.  The Agency will make reasonable efforts to provide adequate storage for employment-related supplies, materials, and equipment.

**Section 11. Relocation of Equipment and Furniture.**
a.  The Agency will make reasonable efforts to ensure that unit employees who must have unique materials or large equipment to adequately perform their duties (e.g., science, music, art) shall be assisted in the movement of these items and not be required to move them alone.

b.  Relocation of equipment, furniture, storage cabinets, and bookshelves located in the unit employee's work area, shall occur, if possible, when the employee is present.

**Section 12. Staff Lounge.**
The Agency will provide a minimum of one faculty lounge per school for use by employees. Where feasible, the lounge shall be furnished with a couch, chair, a table and chairs, a microwave, a refrigerator, a soda machine, and a telephone. The lounge will be maintained by the Agency.

**Page 104 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA499

## ARTICLE 36 – DURATION OF AGREEMENT

**Section 1. Effective Date and Duration.**
This Agreement shall become effective on the date it is approved by the Agency Head (as provided for in 5 U.S.C. 7114(c)), or (if not approved or disapproved within 30 calendar days from the date of execution) on the 31st day following the date of execution and shall remain in full force and effect through 24 July 2028. This Agreement will be considered executed on the date of signatures of the Parties.

**Section 2. Renewal.**
a.  Either party may provide written notice of at least 60 but not more than 180 days before the expiration of this Agreement of its desire to engage in bargaining for a new agreement. In the event such notice is submitted, the terms and conditions of the Agreement, including any annual salary increases, shall remain in effect until that bargaining is concluded and new provisions are executed and approved in accordance with 5 U.S.C. 7114(c). If such notice is given, the parties shall promptly meet for the purpose of bargaining ground rules. The first meeting shall be held no later than 30 days following such notice, and the parties shall exchange their first set of ground rules proposals no later than seven (7) days before such meeting.

b.  If neither party files such written notice, the Agreement shall be automatically renewed for one full year. Any annual pay increases provided for in Article 26 and 32 shall be applicable for any year in which this Agreement is automatically renewed.

**Page 105 of 105**
ACEA and DoDEA CBA, October 20, 2023 – July 24, 2028.

JA500

# Exhibit 2



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | March 27, 2025 |
| **RE**: | Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* |

On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).[1] The President's Executive Order directs that the FSLMRS will no longer apply to the following agencies and agency subdivisions (collectively, the "covered agencies and subdivisions"):

- The Department of Defense;

- The Department of State;

- The Department of the Treasury, except the Bureau of Engraving and Printing;

- The Department of Veterans Affairs (VA);

- The Department of Justice, except certain components of the U.S. Marshals Service;

- Subdivisions of the Department of Homeland Security:
    - Departmental Headquarters components;
    - U.S. Citizenship and Immigration Services;
    - Immigration and Customs Enforcement;
    - U.S. Coast Guard;
    - The Cybersecurity and Infrastructure Security Agency; and
    - The Federal Emergency Management Agency;

---

[1] These provisions are codified in chapter 71 of title 5, United States Code, and subchapter X of chapter 52 of title 22, United States Code.

- Subdivisions of the Department of Health and Human Services:
  - Office of the Secretary;
  - Office of the General Counsel;
  - Food and Drug Administration;
  - Centers for Disease Control and Prevention;
  - The Administration for Strategic Preparedness and Response;
  - The National Institute for Allergy and Infectious Diseases, National Institutes of Health; and
  - Office of Refugee Resettlement, Administration for Children and Families.

- The Department of Energy, except the Federal Energy Regulatory Commission;

- Subdivisions of the Department of the Interior:
  - Office of the Secretary;
  - Bureau of Land Management;
  - Bureau of Safety and Environmental Enforcement;
  - Bureau of Ocean Energy Management;

- Subdivisions of the Department of Agriculture:
  - The Food Safety and Inspection Service;
  - The Animal and Plant Health Inspection Service;

- The International Trade Administration within the Department of Commerce;

- The Environmental Protection Agency;

- The U.S. Agency for International Development;

- The Nuclear Regulatory Commission;

- The National Science Foundation;

- The International Trade Commission;

- The Federal Communications Commission;

- The General Services Administration; and

- The Office of the Chief Information Officer (CIO) in each Executive department, as well as the CIO offices for the U.S. Office of Personnel Management (OPM) and the Social Security Administration, and any other agency or subdivision that has information

resources management duties as the agency or subdivision's primary duty.[2]

By operation of 5 U.S.C. § 7103(b) and *Exclusions*, covered agencies and subdivisions are no longer subject to the collective-bargaining requirements of chapter 71 of part III, subpart F of title 5 (5 U.S.C. §§ 7101-7135). Consequently, those agencies and subdivisions are no longer required to collectively bargain with Federal unions. Also, because the statutory authority underlying the original recognition of the relevant unions no longer applies, unions lose their status as the "exclusive[ly] recogni[zed]" labor organizations for employees of the agencies and agency subdivisions covered by *Exclusions*.[3]

Agencies should consult with their General Counsels as to how to implement the President's directive in *Exclusions*. Agencies should also begin to consider and implement the changes described below and any others that agencies deem necessary, consistent with the President's national security determination. OPM highlights some common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities.

## I.    Performance Accountability

Merit system principles codified at 5 U.S.C. § 2301(6) direct agencies to separate employees who cannot or will not improve their performance to meet required standards. This often does not occur. When asked what happens to poor performers in their work unit, a plurality of Federal employees respond that they "remain in the work unit and continue to underperform."[4] Only a quarter of agency supervisors report that they are confident they could remove a seriously underperforming employee.[5]

Strengthening performance accountability in the Federal workforce is a high priority of President Trump and his Administration. The President believes that he must be able to effectively supervise Federal employees to take care that the law is faithfully executed and to protect America's national security. Shortly after taking office the President issued multiple directives to facilitate the separation of underperforming employees.[6]

Agency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation. Covered agencies and subdivisions should seek to bring

---

[2] The Executive Order excludes the immediate employing offices of police and firefighters. It also provides a process for the Secretaries of Defense and Veterans Affairs to retain collective bargaining in subdivisions of their agencies if they certify that doing so does not impair national security.

[3] *Cf.* 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . ."), *id.* § 7114(a)(1) (authorizing the exclusively recognized labor organization to "negotiate collective bargaining agreements covering[] all employees in the unit.")

[4] https://www.opm.gov/fevs/reports/opm-fevs-dashboard/.

[5] U.S. Merit Systems Protection Board, *Remedying Unacceptable Employee Performance in the Federal Civil Service* (June 18, 2019), at p. 15.

[6] *See* Executive Order 14171 of Jan. 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*); Memorandum of January 20, 2025 (*Restoring Accountability for Career Senior Executives*); Executive Order 4211 of Feb. 12, 2025 (*One Voice for America's Foreign Relations*).

their policies into alignment with the specific Administration priorities below.

### A. Limit PIPs to 30 Days.

The Civil Service Reform Act (CSRA) requires agencies to provide underperforming employees with an opportunity to demonstrate acceptable performance before dismissing them under chapter 43 of title 5, United States Code.[7] These opportunity periods are commonly known as Performance Improvement Periods (PIPs). Executive Order 13839 of May 25, 2018. (*Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles*) generally standardized PIPs at 30 days. Executive Order 14003 of January 22, 2021 (*Protecting the Federal Workforce*) rescinded Executive Order 13839 and directed agencies to reverse policies effectuated under it. Under this directive, agencies increased PIPs from 30 days to 60 to 120 days. However, Executive Order 14171 of January 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*) revoked Executive Order 14003 and directed agencies to reverse disciplinary and unacceptable-performance policies effectuated pursuant to it.

Prior OPM guidance has explained that Executive Order 14171 now requires agencies to return to the policies of Executive Order 13839.[8] Agencies are accordingly required to, consistent with applicable law, return PIPs to 30 days. Where a CBA requires PIPs of more than 30 days, agencies must generally wait until such CBAs expire or otherwise terminate before shortening PIPs.[9] After covered agencies and subdivisions terminate CBAs that require PIPs of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days.

### B. Use Chapters 43 and 75 for Performance-Based Removals.

Covered agencies and subdivisions are required to revert their discipline and unacceptable performance policies to those set in the first Trump Administration under Executive Order 13839. This includes the directive to use the procedures of chapter 75 of title 5, United States Code, in addition to chapter 43 (discussed above), to separate employees for unacceptable performance in appropriate cases.[10]

Chapter 75 actions do not require a PIP but bear a higher burden of proof than chapter 43 actions. Many agency CBAs functionally prohibit using chapter 75 procedures by requiring PIPs for all performance-based separations. Covered agencies and subdivisions that have terminated their CBAs should thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases. Agencies may continue to use chapter 43 procedures in appropriate cases.

### C. VA Should Resume Use of Section 714.

---

[7] 5 U.S.C. 4202(c)(6).
[8] OPM, *Guidance on Revocation of Executive Order 14003* (Feb. 7, 2025).
[9] 5 U.S.C. 7116(a)(7).
[10] See section 2(h) of Executive Order 13839.

In 38 U.S.C. § 714, Congress gave VA special authority to remove some employees for poor performance without a PIP and with a lower burden of proof than chapter 43 actions. The Biden Administration discontinued use of section 714 authority after an arbitrator held that VA could not renegotiate its CBA to eliminate contractual PIPs. VA should, upon termination of its CBA, consider whether to resume use of section 714 authority in appropriate cases. Where facts and circumstances warrant, VA should cease providing covered employees with PIPs before separating them for poor performance under section 714.

### D. Discontinue Grievance Participation.

In keeping with the provisions of the FSLMRS, CBAs provide for binding arbitration of union grievances, including disputes over whether personnel actions were justified.[11] To implement *Exclusions*, agencies should cease participating in grievance procedures after terminating their CBAs. To the extent that covered agencies and subdivisions are litigating grievances before an arbitrator when they terminate their CBAs, they should discontinue participation in such proceedings upon termination. Agencies can and should compensate arbitrators for work performed prior to the termination of the CBA, but not for any work performed thereafter. Agencies should not participate in further grievance arbitration proceedings following termination of their CBAs.

## II.    Effective and Efficient Government

It is the policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently. Covered agencies and subdivisions should therefore take the following actions after terminating their CBAs.

### A. Disregard Contractual RIF Articles.

The President has directed agencies to prepare large-scale reductions in force (RIFs).[12] OPM previously provided guidance about agency collective bargaining obligations when undertaking RIFs.[13] Covered agencies and subdivisions that terminate their CBAs are advised that this guidance will no longer apply. After terminating their CBAs, covered agencies and subdivisions should conduct RIFs consistent with applicable statutory and regulatory requirements, but without regard to provisions in terminated CBAs that go beyond those requirements.

### B. Return to In-Person Work.

The President considers returning agency employees to in-person work necessary for effective and efficient agency operations. The President issued a memorandum generally requiring

---

[11] 5 U.S.C. § 7121.

[12] OPM, *Guidance on Agency RIF and Reorganization Plans Requested by  Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (February 26, 2025).

[13] OPM, *Guidance on Collective Bargaining in Connection with Reductions in Force* (March 12, 2025).

in-person work on the first day of his Administration.[14] OPM guidance has explained that substantive telework levels and the substantive determination of which positions are eligible for telework or remote work are non-negotiable management rights.[15] However, agency CBAs sometimes impose procedural restrictions on agency return to work policies that do not violate non-negotiable management rights. Upon termination of these CBAs, covered agencies and subdivisions should swiftly implement the President's directives in *Return to In-Person Work*.

### C.  Use Agency Resources for Agency Business.

The FSLMRS permits unions to negotiate to allow agency employees to perform union representational work instead of agency business during their official duty hours.[16] Contractual authorization for "taxpayer-funded union time" terminates when agency CBAs are terminated. Additionally, employees no longer have representational activities to conduct once their agency or subdivision has been excluded from the FSLMRS coverage. *Exclusions* requires agencies to promptly return such employees to performing solely agency business. Upon termination of any CBAs that require taxpayer-funded union time, agencies should reassign employees on union time to duties that solely include agency business.

Many agency CBAs similarly provide Federal unions with free use of agency resources (such as office space) or commit the agency to cover certain union expenses (such as the cost of travel and per diems). Following termination of CBAs that require such subsidies, covered agencies and subdivisions should promptly discontinue them and use agency resources only for agency business.

### D.  End Allotments Through Agency Payroll Systems.

The FSLMRS requires agencies to deduct union dues from employees' pay upon request.[17] Agency resources are expended to set up those payroll deductions and process payments, and many agency CBAs contractually commit agencies to making such allotments according to specified procedures. When a covered agency terminates its CBAs, those contractual commitments no longer apply, and the covered agency should terminate allotments except where required by statute. Agency employees may make other arrangements for dues payments if they wish to do so. However, agency resources ordinarily should not be expended to facilitate payment of union dues.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

---

[14] Memorandum of January 20, 2025 (*Return to In-Person Work*).
[15] OPM, *Guidance on Collective Bargaining Obligations in Connection with Return to In-Person Work* (February 3, 2025).
[16] 5 U.S.C. 7131(d), 22 U.S.C. 4118(d)(4).
[17] 5 U.S.C. 7115, 22 U.S.C. 4118(a).

# Exhibit 4



UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**
**CHICAGO REGIONAL OFFICE**
224 S. Michigan Avenue, Suite 445 • Chicago, Illinois 60604-2505
(872) 627-0020; FAX: (312) 281-6500

April 9, 2025

**VIA EMAIL**

Anitha Vemury
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel
DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA 22350-1400
anitha.vemury@dodea.edu

Richard Hirn, Attorney
Richard J. Hirn Attorney at Law
5335 Wisconsin Ave NW
Washington, D.C. 20015
richard@hirnlaw.com

Re:    CH-CA-25-0105: Depart of Defense
        Eduaction Activity, Alexandria, Virginia and
        Antilles Consolidated Eduation Association

Dear Parties:

This Office docketed the above-captioned unfair labor practice (ULP) charge on January 21, 2025. The Agent assigned to investigate this charge is Brittany Copper, who can be reached via phone at 872-627-0001 or via email at bcopper@flra.gov.

On March 27, 2025, President Trump issued an Executive Order titled *Exclusions from Federal Labor-Management Relations Programs*, which amended Executive Order 12171, dated November 19, 1979 (as amended), and excluded a number of Federal agencies from collective bargaining pursuant to Section 7103(b)(1) of the Federal Service Labor-Management Relations Statute (Statute).

Because the Executive Order impacts the processing of this ULP charge, processing of this charge will be deferred so as to afford the Office of the General Counsel time to reevaluate the case in view of the Executive Order and in view of cases pending before the Authority.

Sincerely,

/Timothy Sullivan/

Timothy Sullivan
Acting Regional Director

# Exhibit 9

**ANTILLES CONSOLIDATED EDUCATION ASSOCIATION**

P. O. BOX 34425, FT. BUCHANAN, PUERTO RICO 00934

May 31, 2025

Ms. Alexa Rukstele
Labor Management & Employee Relations Chief
Department of Defense Education Activity
4800 Mark Center Drive
Suite 04H-01
Alexandria, VA. 22350

**Re: Request to Bargain the Impact of the Implementation of the Future-Ready DoDEA (FRD) Initiative on Impacted Mid-Atlantic Puerto Rico Community Employees**

Dear Ms. Rukstele:

On May 22,2025 at 12:00 pm EST, Puerto Rico Community employees received an informational email from Dr. Beth Schiavino-Narvaez announcing DoDEA's new plan to realign roles of employees, reduce positions and add new key positions for organizational needs.  The email indicated that due to this effort geared to optimize DoDEA's workforce, eligible employees impacted by this transformational change will be offered Voluntary Early Retirement Authority (VERA) and Voluntary Separation Incentive Payment (VSIP).

Almost three hours later the same day, you sent the impacted Community's Educational Technologists and Assessors (i.e. SPED, SLP) another email stating that their position was impacted by the FDR initiative.  Your email indicated DoDEA was working to identify placement and job opportunities for affected employees, but this potential outcome was not guaranteed.  On Tuesday, May 28, 2025, around 5 p.m., Ms. Amy R. Bower, DoDEA HR Chief, emailed impacted employees about their eligibility for VERA/VSIP, including instructions and timelines. Due to confusion among some employees, Ms. Bower sent a clarification early on Wednesday, 5-28-25 regarding eligibility and available options. The initial phase is singularly focused on offering VERA and VSIP as the primary measures to achieve the intended personnel drawdown figures, without providing alternative options at this stage.

ACEA, as the exclusive representative of teachers and professional employees in the Puerto Rico Community, is concerned about the lack of transparency and adherence to established protocols. Notification to the union was eluded during the implementation of the Future-Ready DoDEA (FRD) initiative, which directly impacts the rights and job security of many employees. By bypassing the union and the bargained procedures, DoDEA has failed to provide clarity regarding the phases of this personnel drawdown.  Impacted employees have been misled to believe their options are limited to the four or five choices in phase one, without information on their rights and potential alternatives (like RIF procedures), which may come in later phases if phase one does not achieve the expected drawdown percentages.

The implementation of the Future-Ready DoDEA (FRD) initiative has sparked significant concern among both employees and their representatives due to its opaque execution. The absence of detailed communication regarding subsequent phases, coupled with the limited initial options, has left many feeling unsupported and uncertain about their future. The rushed nature of the process undermines the principles of fairness and transparency, further exacerbating the anxiety of those affected.

*Strength in Unity!*
Cell (787) 402-3440

1

JA512

DoDEA's quick solution to the mandated reorganization has placed significant pressure on affected employees, forcing them to choose between multiple unfriendly options under tight deadlines. Employees are overwhelmed by fears of losing everything if they don't make the expected selection, leading many to accept "voluntary early retirement" regardless of their readiness. Those who cannot select from the expected selection because they don't meet criteria may still face separation, as a possible but hidden second-round of placement alternatives remain unknown to impacted employees.

The current approach does not account for employees lacking multiple teacher certifications or providing temporary waivers for qualifications while they complete coursework, as outlined in DoDEA Administrative Instruction 1404.02, Section 3.7 b. (9) and DoDEA Regulation 5000.9, Section 4.2.3. Additionally, it overlooks procedural guarantees in Article 29 of our **ACTIVE** Collective Bargaining Agreement. Therefore, ACEA requests impact and implementation bargaining for DoDEA's Future-Ready Initiative due to its significant effect on all affected unit employees in Puerto Rico.

Respectfully,

Alexis A. Gorbea
President
Antilles Consolidated Education Association

*Strength in Unity!*
Cell (787) 402-3440

2

JA513

# Exhibit 10

 Gmail

**Antilles Consolidated Education Association <gorbea.acea@gmail.com>**

---

## RE: FRD Initiative_ ACEA's Request for Bargaining its Impact
1 message

---

**Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ** <Alexa.Rukstele@dodea.edu>        Sun, Jun 1, 2025 at 5:27 PM
To: Antilles Consolidated Education Association <gorbea.acea@gmail.com>

Ms. Gorbea:


Yes, of course.  My apologies.


DoDEA acknowledges receipt of ACEA's proposals; they will be held in abeyance pending the outcome of litigation over EO 14251.


Alexa Rukstele

Chief, Labor Management & Employee Relations Division

Department of Defense Education Activity

Office:  (571) 372-1864

Cell:  (703) 459-7490

alexa.rukstele@dodea.edu


CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.

---

**From:** Antilles Consolidated Education Association <gorbea.acea@gmail.com>
**Sent:** Sunday, June 1, 2025 5:23 PM
**To:** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>
**Cc:** Gorbea, Alexis Ms. CIV OSD/DoDEA-Americas <Alexis.Gorbea@DODEA.EDU>; President ACEA <acea1973@hotmail.com>
**Subject:** Re: FRD Initiative_ ACEA's Request for Bargaining its Impact


**\*\*\*This message originated from outside of DoDEA.\*\*\***

Ms.Rukstele,

Thank you for your prompt response, especially on Sunday.


You meant ACEA?


Alexis



On Sun, Jun 1, 2025 at 5:14 PM Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@dodea.edu> wrote:

Ms. Gorbea:


DoDEA acknowledges receipt of FEA's below requests; they will be held in abeyance pending the outcome of litigation over EO 14251.


Alexa Rukstele

Chief, Labor Management & Employee Relations Division

Department of Defense Education Activity

Office:  (571) 372-1864

Cell:  (703) 459-7490

alexa.rukstele@dodea.edu


CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.

---

**From:** Antilles Consolidated Education Association <gorbea.acea@gmail.com>
**Sent:** Saturday, May 31, 2025 11:26 PM
**To:** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>
**Cc:** Gorbea, Alexis Ms. CIV OSD/DoDEA-Americas <Alexis.Gorbea@DODEA.EDU>; President ACEA <acea1973@hotmail.com>
**Subject:** FRD Initiative_ ACEA's Request for Bargaining its Impact


**\*\*\*This message originated from outside of DoDEA.\*\*\***

Hello, Ms. Rukstle.

JA516

Attached would find a letter regarding the Future Ready DoDEA Initiative and our
request to bargain as soon as possible the impact such initiative has on members of our
unit.


Respectfully,


Alexis A. Gorbea
ACEA President
P.O. Box 34425
FT. Buchanan, P.R.00934
(787) 402-3440 cell.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Federal Education Association *et al.*,

Plaintiffs,

v.

Civil Action No. 1:25-cv-1362

Donald J. Trump *et al.*,

Defendants.

## DECLARATION OF BENJAMIN HUNTER

I, Benjamin Hunter, hereby declare that

1.       I am over the age of 18 years old and am a resident of New York. I have personal knowledge of the following facts and if called to testify could and would competently do so.

2.       I am employed by the Federal Education Association (FEA), where I work as one of two General Counsels and UniServ Directors for the Federal Education Association Stateside Region (FEA-SR). FEA-SR is an affiliate of FEA that represents educators in the continental United States and the Territory of Guam. I have served in my current role since 2016. Before then, I served as a General Counsel and UniServ Director in the FEA European Region for three years.

3.       Since 1996, FEA-SR has represented two units of employees working in stateside DODEA schools. One unit consists of professionally certified, non-supervisory educators; the other unit consists of classified education support professionals (ESPs). Prior to that, local FEA affiliates had represented those educators in separate, military installation-level bargaining units for more than a decade. But in 1996, the FLRA issued an order approving the consolidation of those military installation-level units into two units: one for stateside certified

1

educators and the other for stateside ESPs. A true and correct copy of that order is attached as Exhibit 1. Following that order, DODEA recognized FEA-SR as the successor representative for those two units.

4.     Throughout my employment as General Counsel and UniServ Director of FEA-SR, I have engaged in collective bargaining negotiations on behalf of both of FEA-SR's bargaining units, represented bargaining unit members in grievance proceedings under collective bargaining agreements (CBAs) and in unfair labor practice proceedings before the Federal Labor Relations Authority (FLRA), and provided advice and counsel to the presidents of FEA-SR's 21 local affiliates as well as to members of the two bargaining units.

5.     The most recent collective-bargaining agreement covering certified educators went into effect on January 11, 2019 (the 2019 Certified Educator CBA). A true and correct copy of that agreement is attached as Exhibit 2. The 2019 Certified Educator CBA remained in effect when President Trump issued EO 14251 on March 27, 2025. Article 35 of that agreement provides for an initial term of five years, but also includes a renewal clause providing that, if either party requests to bargain over a new agreement at least 365 but not more than 395 days before the end of the initial term, the basic terms and conditions of the agreement remain in effect until bargaining has concluded and a new agreement is executed. *See* Exh. 2 at 182. During that window, on January 4, 2023, FEA-SR provided notice of its request to bargain over a new agreement. A true and correct copy of that notice is attached as Exhibit 3.

6.     The most recent collective-bargaining agreement covering ESPs went into effect on March 25, 2010 (the 2010 ESP CBA). A true and correct copy of that agreement is attached as Exhibit 4. The 2010 ESP CBA remained in effect when President Trump issued EO 14251 on March 27, 2025. Article 29 of the 2010 ESP CBA provides for an initial term of four years but

also includes a renewal clause providing that if either party gives notice of intent to bargain over a successor agreement at least 60 but not more than 90 days before the CBA's expiration date, "the Agreement shall remain in full force and effect" until the bargaining concludes and a new agreement is reached, and that "[i]f neither party files such written notice, the Agreement shall be automatically renewed" for one year "on each anniversary date." Exh. 4 at 185. As neither party provided notice in the initial window period before the CBA's expiration, the CBA was renewed from year to year without negotiations over a successor agreement until DODEA provided notice of its intent to open negotiations for a successor agreement on April 28, 2020. A true and correct copy of that notice is attached as Exhibit 5.

7.    In addition to the extension of both the 2019 Certified Educator CBA and 2010 ESP CBA by operation of their respective duration clauses, the provisions of those agreements governing mandatory subjects of bargaining also continued in force by operation of law pending the negotiation of successor CBAs or, failing that, the outcome of Chapter 71's impasse-resolution processes. *See, e.g., Dep't of the Air Force 35th Combat Support Grp.*, 4 F.L.R.A. 22, 23 (Aug. 12, 1980) ("[T]he existing personnel policies and practices and matters affecting working conditions—including negotiated grievance and arbitration procedures—must continue as established upon the expiration of a negotiated agreement …."). *See also U.S. Immigr. & Naturalization Serv.*, 55 F.L.R.A. 69, 72–73 (Jan. 12, 1999) ("[A]n agency is required to delay making proposed changes to working conditions not only while bargaining is ongoing, but also after an impasse in bargaining has been reached, during impasse procedures.")

8.    Both the 2019 Certified Educator CBA and 2010 ESP CBA provide for, among other things, grievance-and-arbitration procedures (which include provisions that protect employees asserting grievances from employer reprisals), payroll deduction of union

membership dues, official time and use of office facilities for union officials engaged in representational work, employee and association rights (including the right of bargaining unit employees to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, an emergency leave bank for educators facing medical emergencies, association-management cooperation, and procedures to bargain impact and implementation for management-initiated changes to conditions of employment resulting from the implementation of new curricula or new educational initiatives. *See* Exh. 2; Exh. 4.

9.      Before President Trump issued EO 14251 on March 27, 2025, FEA-SR had been engaged in bargaining with DODEA over successor agreements to both the 2019 Certified Educator CBA and the 2010 ESP CBA. FEA-SR Director Alan Danahy and I had been leading these negotiations with DODEA for the Certified Educator CBA since the parties finalized an agreement for ground rules for bargaining in December 2023. I had been leading negotiations for the ESP CBA since the parties finalized an agreement for ground rules for bargaining in August 2023. The negotiating teams for FEA-SR and DODEA had completed the initial agreed-upon bargaining schedule and had reached agreement on a majority of the contract articles in both CBAs. We had also worked with mediators from the Federal Mediation Conciliation Service (FMCS) to attempt to conclude the bargaining process for both CBAs. After the EO was issued, however, DODEA refused to continue negotiations.

10.     At the time EO 14251 issued, FEA-SR had numerous pending grievances against DODEA and DDESS.

11.     Many of those grievance concern employee pay. To be specific, there are currently 36 pending grievances filed on behalf of 122 bargaining-unit employees over

DODEA's debt collection practices. These grievances were filed between 2019 and 2025 and are based on both alleged statutory violations and violations of the 2019 Certified Educator CBA that predated EO 14251. These grievances are currently pending at various stages of the arbitration process:

> a. One arbitration, covering 6 grievances and claims on behalf of 20 of the 122 grievants, resulted in an arbitral award in favor of all of the first 8 grievants presented to the arbitrator, with the arbitrator retaining jurisdiction to ensure they are made whole with back pay, interest, and a comprehensive audit. A true and correct copy of this arbitral decision is attached as Exhibit 6. This award was in the process of being implemented when EO 14251 issued.

> b. The same arbitrator has jurisdiction over the remaining 12 grievants' claims, that have yet to be arbitrated. The parties had been engaged in settlement discussions concerning these 12 grievants.

> c. 30 grievances, covering the remaining 102 grievants, have been a topic of settlement discussion with DODEA—either for a full resolution of the claims or to expedite the arbitration process if a comprehensive settlement cannot be reached. On January 23, 2025, I met virtually with DODEA attorneys Carla Eldred and Anitha Vemury to discuss settlement options. During the meeting, I provided DODEA with a list of the pending grievances. DODEA's attorneys indicated they needed additional time to discuss the matter with their client. I informed DODEA's attorneys that I was not opposed to postponing the scheduling of future hearings if a potential resolution was possible. However,

I also made clear that FEA-SR intended to move forward to an arbitration hearing if no settlement could be reached.

12.    In addition to pay grievances detailed above, FEA-SR has a backlog of other grievances that are awaiting arbitration hearings or the implementation of arbitration awards:

   a. Ten grievances—seven class grievances and three filed on behalf of individuals—have been approved by FEA-SR governance to proceed to arbitration but have yet to be scheduled. These grievances were filed on behalf of both certified educators and ESPs and cover issues such as suspensions, denials of reasonable accommodations, compensation for work accomplished outside the workday, and compensation for work performed on extracurricular activities.

   b. An additional two grievances on behalf of certified educators have recently resulted in favorable arbitration awards. On April 16, 2025, FEA-SR received an arbitration award that mitigated a suspension and granted the affected employee several days of back pay. A true and correct copy of this arbitral decision is attached as Exhibit 7. On May 27, 2025, FEA-SR received another arbitration award that reinstated a terminated employee with back pay. A true and correct copy of this arbitral decision is attached as Exhibit 8. As of now, it remains unclear whether DODEA intends to comply with either arbitration award.

13.    FEA-SR has also been a vocal critic of certain policies of the Trump Administration:

a. FEA-SR filed grievances on behalf of both the certified and ESP bargaining units in early 2025 in direct response to two new policies of the Trump Administration:

    i.    On February 26, 2025, FEA-SR filed grievances on behalf of both bargaining units over the "fork in the road" deferred resignation program offer that the Office of Personnel Management (OPM) and DODEA emailed to bargaining unit employees on January 28, 2025. The grievances alleged that this program constituted an unfair labor practice because it changed the conditions of employment without bargaining with FEA-SR. A true and correct copy of these grievances is attached as Exhibit 9.

    ii.    On March 14, 2025, FEA-SR filed grievances on behalf of both bargaining units over the "5 things you did last week" email that OPM and the Department of Defense (DOD) sent bargaining unit employees, which directed them to send a weekly list of 5 tasks they accomplished in the preceding week to DOD. The grievances alleged that this program constituted an unfair labor practice because it changed the conditions of employment without bargaining with FEA-SR. A true and correct copy of these grievances is attached as Exhibit 10.

b. FEA-SR also detailed its advocacy efforts against Trump administration policies in its monthly newsletters in January, February, and March 2025. True and correct copies of these newsletters are attached as Exhibit 11.

14.     DODEA has refused to honor its contractual obligation to engage in the grievance-and-arbitration process for grievances filed under the 2010 ESP CBA and the 2019 Certified Educator CBA. On April 28, 2025, DODEA began sending FEA-SR replies in response to any communications from FEA-SR regarding newly-filed grievances, which state that DODEA has paused any action on grievances because of EO 14251. A true and correct copy of these emails is attached as Exhibit 12.

15.     In addition to refusing to engage in any action on grievances, DODEA responded to EO 14251 by halting negotiations over the successor CBAs. On April 3, 2025, one week after the EO was issued, I received an email from Alexa Rukstele, Chief of DODEA's Labor Management Employee Relations Division, informing FEA-SR that because of the EO, DODEA would "pause labor-relations related activities." A true and correct copy of this email is attached as Exhibit 13. Since that time, I have not received any communications from DODEA Labor Relations personnel who typically provide regular informational notices or notices required under the Chapter 71 regarding changes to employees' conditions of employment, except for two emails from Ms. Rukstele regarding official time. *See* paragraph 20 below.

16.     Because of the EO and DODEA's refusal to engage in further bargaining, FMCS is no longer offering mediation services to help the parties bargain. FMCS last provided mediation services for DODEA and the certified educators' unit on December 16-19, 2024, and for DODEA and the ESP unit on January 13-15, 2025. On June 16, 2025, an FMCS mediator, David Rose, reached back out to FEA-SR to offer additional mediation services. The next day, on June 17, 2025, I responded on behalf of FEA-SR, notifying FMCS about the EO and stating that FEA-SR is "eager to resume bargaining as soon as DoDEA is either willing or directed to re-engage." A true and correct copy of those emails is attached as Exhibit 14. A few hours later,

however, Mr. Rose emailed both Mr. King and Dr. Danahy informing us that because FMCS learned—likely after reaching out to DODEA and receiving DODEA's standard response stating its position that FEA-SR is no longer the bargaining representative—that negotiations "are no longer on-going because of Executive Order 14251…FMCS will close the case." He stated that "the case can be re-opened if and when a court orders the parties to bargain and the parties request mediation." A true and correct copy of that email is attached as Exhibit 15.

17.   Because DODEA, in its implementation of EO 14251, has repudiated its obligations under the CBAs and Chapter 71, FEA-SR members have lost key protections provided by that CBA.

18.   Most notably, FEA-SR members have lost their right to bargain salaries, the length of their workday, and time for certified teachers to prepare for new assignments. *See* Exh. 2 at 94–99, 103–11; Exh. 4 at 92–98, 103–21; *see also Ft. Stewart Schools v. FLRA*, 495 U.S. 641 (1990) (holding that DODEA's stateside educators' pay is not specifically provided by statute, and therefore that such educators' pay is a lawful subject of bargaining under Chapter 71). Unlike most federal agencies, the Department of Defense has broad discretion to change the compensation and work schedules of their employees, meaning that without a collective-bargaining agreement, FEA-SR's members are subject to unilateral pay cuts or extension of hours. FEA-SR members have also lost leave rights, since DODEA employees are not covered by the leave statutes and regulations that apply to most federal employees. *See* Exh. 2 at 112–24; Exh. 4 at 122–40. And they have lost their collectively bargained rights to certain procedural protections in disciplinary actions, rights to grievance and arbitration procedures, and protections regarding reductions in force. *See* Exh. 2 at 134–41, 143–65, 179–82; Exh. 4 at 149–57, 159–83.

19.    In addition, without a new contract, certified educators will not receive their usual annual pay raise. Under the terms of the 2019 Certified Educator CBA, educators received the same percentage increase as federal employees on the "General Schedule – Rest of U.S." pay schedule for each year of the agreement's initial five-year term. *See* Exh. 2 at 103. Due to FEA-SR's January 4, 2023, notice requesting bargaining for a new agreement, *see* Exh. 3, the annual pay increase was extended for an additional year after the January 18, 2024, expiration, *see* Exh. 2 at 103, 182. At this point, however, EO 14251 has prevented the parties from completing negotiations over a new agreement or from otherwise agreeing to extend the pay adjustment in the coming year.

20.    FEA-SR has lost its right to official time for the FEA-SR Director (Dr. Alan Danahy) and local association presidents, as well as its right to union office spaces for its 21 local presidents. *See* Exh. 2 at 12–30; Exh. 4 at 24–37. On April 23, I left a voicemail for Ms. Rukstele requesting to discuss an imminent directive instructing all union officials on official time, including Dr. Danahy, to cease conducting his representational duties remotely and to report to his school of record. A true and correct copy of that directive is attached as Exhibit 16. On April 24, 2025, I received an email from Ms. Rukstele stating: "Due to restrictions associated with EO 14251, I am unable to respond to your voicemail; however, please be advised that additional guidance/direction will be provided to FEA-SR next week." A true and correct copy of this email is attached as Exhibit 17. Then, on April 29, 2025, I received an email from Ms. Rukstele informing FEA-SR that official time was "no longer authorized for any purpose" and directing that "all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school" and must "promptly vacate any office

space used by the union/association." A true and correct copy of that email is attached as Exhibit 18.

21.    DODEA also has unilaterally altered employees' terms and conditions of employment in contravention of DODEA's duty to bargain with FEA-SR over the impact and implementation of such changes under both the collective-bargaining agreements and the FSLMRS.

22.    On May 22, 2025, employees at DDESS schools received an e-mail from DODEA Director Beth Schiavino-Narvaez announcing that in connection with a Department of Defense "optimization of its civilian workforce," DODEA was implementing a "Future-Ready DODEA (FRD) initiative." While the e-mail avoids specificity in favor of phrases like "workforce shaping efforts" and "a strategic plan to streamline and improve student services," it is readily apparent from the letter that DODEA will be eliminating positions for the 2025/2026 school year and that the downsizing of workforce will require a Reduction in Force (RIF). That is made plain by the e-mail's statement that "[a]s part of FRD, DODEA will offer the Voluntary Early Retirement Authority (VERA) and a Voluntary Separation Incentive Payment (VSIP) to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees." A true and correct copy of this e-mail is attached as Exhibit 19.

23.    Later the same day, Ms. Rukstele sent e-mails to Educational Technologists, Speech Assessors, Special Education Assessors, and Office Automation Clerks stating that their positions are "impacted by" the FRD initiative. The e-mail states that DODEA is "working to identify placement and job opportunities for affected employees" but that "[t]his does not guarantee that you will not be involuntarily separated from your position." The e-mails go on to

state that the recipients' positions are "eligible for" VERA and VSIP, provided that the recipient meets the eligibility requirements for those programs. A true and correct copy of this e-mail is attached as Exhibit 20.

24. On May 27, 2025, Amy Bower, Chief of DODEA's Human Resources Division, sent a memorandum to the affected employees DODEA-wide explaining the VERA and VSIP options and eligibility criteria and setting a June 2, 2025, deadline for applications for those early-retirement options. A true and correct copy of this memorandum is attached as Exhibit 21.

25. The reorganization was announced and is being implemented in violation of the collective-bargaining agreements in numerous respects.

   a. First, both agreements require that when DODEA exercises its management rights to make changes to the terms and conditions of bargaining unit employees' employment, DODEA must provide notice to FEA-SR. *See* Exh. 2 at 31–37; Exh. 4 at 40–45. DODEA provided no such notice.

   b. Second, both agreements further provide that if FEA-SR makes a request for bargaining over mid-term changes to terms and conditions of employment, DODEA must bargain over the impact and implementation of DODEA's action. *See id.* Notwithstanding DODEA's failure to provide the required notice, I sent a bargaining demand to DODEA on May 28, 2025, a true and correct copy of which is attached as Exhibit 22. DODEA responded on May 28, 2025, stating "DoDEA acknowledges receipt of FEA-SR's below requests; they will be held in abeyance pending the outcome of litigation over EO 14251." See Exh. 22.

c. Third, both agreements require that DODEA provide notice to FEA-SR of any RIF at least 90 days prior to the effective date of the RIF stating the reasons for the action and the number and types of positions affected. *See* Exh. 2 at 134–41; Exh. 4 at 149–57. A RIF is unavoidable given the sheer number of positions being eliminated for the 2025-2026 school year. The 2025-2026 school year for FEA-SR bargaining unit employees starts as early as July 28, 2025, which simply does not allow time to comply with the notification requirements under the agreements.

I declare under penalty of perjury that the above is true and correct.

Executed this 26th day of June, 2025.

Benjamin Hunter

# Exhibit 7

IN THE MATTER OF ARBITRATION BETWEEN


**FEDERAL EDUCATION ASSOCIATION STATESIDE REGION**
**NEA, AFL-CIO**
**UNION**


**AND**                                    **FMCS CASE # 230426-05608**

                                           **VICEL JONES 5 DAY**
                                           **SUSPENSION**


**DEPARTMENT OF DEFENSE,**
**DOMESTIC DEPENDENT ELEMENTARY AND SECONDARY**
**AGENCY**


<u>**DECISION AND AWARD**</u>


<u>**FOR THE AGENCY**</u>
Jasmine Ross, ESQ.


<u>**FOR THE UNION**</u>
Angelia Wade  Stubbs, ESQ.


**BEFORE:**
Sandra Mendel Furman. ESQ., NAA
ARBITRATOR

**Table of Designations**

Federal Education Association Stateside Region/
National Education Association, AFL-CIO                          Union
Child Abuse Report                                              CAR
Collective bargaining agreement                                 cba/MLA
Electronic gradebook                                           EGB
Exhibit                                                        Ex.
Family Advocacy Program                                        FAP
Joint                                                          Jt.
Merit System Protection Board                                 MSPB
Military Police                                               MP
Page                                                          p
Transcript                                                   T
United States Department of Defense
Department of Education                                      DoDEA or
                                                             Agency

Vicel Jones                                                  Grievant or Jones

## CBA Provisions

## Article 4. Conditions of the agreement

Section 1. Laws, Regulations, Policies, and Prior Agreements.

   a. It is understood and agreed to by the Parties that in the administration of all
      matters covered by this Agreement, except as otherwise specifically provided for
      within this Agreement, the Agency, the Association, and the Agency's employees
      are governed by applicable laws and regulations.

   ...

## Article 25. Disciplinary actions

Section 1. Policy.
a. Discipline is the right and the responsibility of the Agency and will only be taken for
such just and sufficient cause as will promote the efficiency of the service, and the penalty
will fit the offense.
b. Constructive discipline, to be effective, must be timely. The results to be achieved
through this means diminish in proportion to the time allowed to elapse between the
offense and the corrective action. Nevertheless, the Parties agree that sufficient time
should be allowed to complete appropriate investigations and fact-finding and that undue
haste is as undesirable as undue delay. ...
c. Disciplinary actions shall not be arbitrary or capricious.

d. The Agency recognizes the concept of progressive discipline, and generally actions imposed should be the minimum that can be reasonably expected to correct and improve employee behavior and maintain discipline and morale among other employees.
...
Section 3. Formal Disciplinary Actions...
    a. A Letter of Reprimand must state the reason(s) for its issuance, the employee's right to file a grievance under the negotiated grievance of procedure, and the length of time the reprimand will remain in the OF.  A Letter of Reprimand may remain in the OPF for a period of two years...There is no advance notice required before issuing a Letter of Reprimand.

## Article 27. Arbitration
...
Section 9. Arbitrator's Authority
The arbitrator shall have no power to add to subtract from, disregard, alter, or modify any of the express terms of this Agreement...Arbitrators are bound by the holdings and interpretations of the Merit Systems Protection Board, the FLRA, and the Agency's regulations as provided by law.

## INTRODUCTION
    The matter was heard on 2/19/25 via the ZOOM platform.
    All witnesses were sworn.
    A motion for separation of witnesses was granted and the appropriate instructions were provided.
    The following Jt.Ex. were part of the record:

      1- The cba
      2- Notice of proposed suspension
      3- Revised notice of proposed suspension  2/24/22
      4- Union reply to notice of proposed suspension
      5- Employer notice of decision dated 3/22/22
      6- Grievance
      7- FMCS panel request

    The Agency introduced two Exs.: DoDEa AI 1426.01 [disciplinary and adverse actions] and Ex. 2- email correspondence.

    A court reporter prepared and delivered a transcript to counsel and the arbitrator.
    Briefs were submitted and exchanged on the agreed upon dates.
    The decision issued within MLA timelines.

## ISSUE: Whether the  five day suspension of Vicel Jones was for just and sufficient cause as will promote the efficiency of the service? If not, what is the remedy?

**Statement of Facts**[1]

The MLA between the parties  became effective on 1/11/19. Jt.Ex.1.  The parties have been operating under its terms to date.

Jones began her employment with the Agency in 2018 as a teacher. Her primary duties included instructing all subjects including Math, Reading, Writing, Social Studies and Science  for fourth graders.

At all dates relevant Kimberly Dunn was the principal at Dexter Elementary school, where Grievant was employed.

The Superintendent and Dunn's immediate supervisor was Dr. Coleman.

Dunn supervised Grievant from  1/21-5/31/24.

Dunn issued Grievant discipline  on 10/22/21. Jt.Ex.2. The Letter of Reprimand dealt with a variety of alleged deficiencies regarding grading, uploading of grades, failure to respond to parent [Marshall] inquiries; set up of Google classroom; not conducting interventions with a student; not permitting an agreed upon accommodation with a student;  responsiveness to parent concerns about students. There is no response of record to the Letter of Reprimand.

On 11/3/21 Dunn advised Grievant that she needed more grades entered as some subjects were missing. Per Dunn, she again reminded Grievant of her need to enter grades on 11/5/21.  When  a 11/7/21 check was made, the Science and Math grades were still not entered. Grades should have been entered by 11/5/21.

On 11/7/21 it was noted that  Jones' gradebook only reflected grades for English Language Arts (ELA): Reading, Speak/Listen, and Writing. All other areas showed Not Graded (N/G).[2] Grievant's response was that she was having problems logging into her computer and saving Gradespeed data. Per Dunn, Grievant had reported prior problems related to her passwords.

It was reported that  Jones embarrassed  her classroom students two days earlier concerning their performance on an End of Unit assessment. [ It was  a Benchmark  Advance assessment. ]Jt.Ex.2. Jones allegedly announced the names of students and grades aloud in front of the students. Per Dunn, Grievant admitted that she shared her students' performance openly; that most of the class failed and she wanted them to retake the assessment.

Sarah Showalter testified. She is the  school's  Educational Technologist. She was in the classroom  troubleshooting computer issues  when Grievant and the students were discussing a recent test. From the overheard discussion it was apparent to her that "a lot of them did not do well on that test." She described Grievant as trying to reassure the class. She told the class that the grades would not be entered into the

---

[1] The facts are derived  from the T.  Other content is summarized from the Jt. Ex.

[2] Not Graded (N/G) subject areas included Mathematics, Science, and Social Studies.

gradebook and the test would be repeated.  Grievant polled the class about the re-take and the majority of the students raised hands in support of a retake. No  students were called out by name or shamed. Showalter was never interviewed by management personnel.

Per Dunn, Grievant did not deny that she identified the students by name who passed/failed the end  of unit assessment. There were no contemporaneous notes nor recording of this meeting in evidence.

Dunn prepared a CAR which was sent to FAP; Child Protective Services and the MP for this incident. There were no findings against Grievant from this referral.

Grievant was reassigned to a nonteaching position during the pendency of the FAP investigation. She returned to the classroom on 3/6/22.

On/around 10/27/21 Dunn received a report that Grievant contacted a substitute teacher Jenny Marshall  regarding communication issues.  The substitute Jenny Marshall's spouse-Major Marshall contacted Dr. Coleman. At a different date, Jenny Marshall contacted Dunn. Jenny  Marshall complained that Grievant tried to contact her again on 11/2/22 but she avoided the contact as she was leaving the school building.

On 11/7/21 it was reported that Jones approached Jenny Marshall  in the hallway and confronted her about Marshall  reporting issues in Jones'  classroom.  Another contact was reported between Marshall and Grievant on 11/19/22. Grievant allegedly stated that she approached Marshall to discuss her daughter's grades specifically writing skills and spelling. Marshall claimed that Grievant was trying to talk to her about Grievant's Letter of Reprimand.

Per Jenny Marshall, Grievant allegedly contacted Marshall again on 11/29/21. Marshall did not testify. Marshall did not sign a sworn statement. Neither did she testify at the arbitration.

By memorandum dated 2/11/22,  Dunn proposed Grievant's suspension, citing the reported acts of failing to follow grading requirements and engaging in inappropriate conduct while interacting with her fourth grade students and a substitute teacher [Jenny Marshall].  It was a second offense. Per Dunn, the disciplinary options were a five day suspension up to removal.

There are no student statements concerning the allegations of shaming or what was discussed in class regarding the assessment test.

 Before the deciding official Dr. Coleman could make a decision on the proposed suspension, the DDESS Area Service Center advised Dunn to issue Grievant a revised proposed disciplinary action. It was issued and contained minor language changes from the earlier discipline.

Dunn never interviewed any of the students in Grievant's classroom.

Dunn stated that she could have decided to remove Grievant for the allegations.

Dr. Lisa Coleman testified. She has been at different dates Grievant's second line supervisor, dates included in the relevant time period of the events leading up to the discipline.

Coleman never interviewed the complaining parents-the Marshalls. No students were interviewed by Coleman.

Jones described her educational background. At the time of the arbitration, she had seven years teaching experience at the Dexter Elementary school.

She described problems she experienced with input of grades into her computer. Showalter had provided assistance at different times and dates. Grievant did not state with specificity if Showalter was in her classroom the date Showalter overheard her discussion with the students about the test results for the purpose of correcting /assisting with the grade entry glitches.

Grievant claimed that she discussed with Dunn her problems entering her grades for math and science in real time-i.e. on 11/5/21. This conversation occurred after Dunn had contacted her about the delayed grade reporting.

Regarding the alleged shaming of her students regarding grades on the Benchmark Advance Assessment-a weekly test, Grievant denied naming any students based upon test results. She stated that some of the students did not do so well. No names and no grades were announced by her in the classroom. She offered to allow the students to retake the examination; students raised their hands indicating that it was an option they chose. She then advised them that would be the grades that she would enter in Gradespeed. Students are permitted to retake weekly examinations, not end of unit assessments. Grievant had no information as to who reported her alleged calling out of grades in the classroom until the arbitration.

Regarding her interaction with Jenny Marshall, parent of Joy Marshall- a student in her class, Grievant stated that she had that discussion with Marshall in her classroom on 10/27/21. The context was that Marshall had come to pick up Joy. The stated concerns from Grievant were Joy's writing skills. Per Grievant, Marshall was not subbing that date when the discussion occurred. This  conversation occurred after school hours.

 Grievant  denied that she confronted an  unnamed substitute [Marshall] in the hallway. The Agency  did not identify the accuser.

Jones  was served with the disciplinary notice on 2/24/22. She had been removed from her classroom and reassigned to nonteaching responsibilities  since 11/17/21.

Jones described her emotional reaction and embarrassment to these events as well as her concerns for her students' welfare.

Grievant specifically denied engaging in inappropriate conduct as listed in Specification 2 of the proposed suspension.

Jones' Union representative responded to the  disciplinary notice  by letter dated 3/10/22.  The Union alleged that it would not promote the efficiency of the service to suspend Jones without pay four (4) months after the fact for posting grades late due to technical difficulties and that the notice of proposed suspension did not evidence a basis to conclude that Jones engaged in inappropriate conduct.

On 3/11/22  Dr. Coleman  determined that the evidence supported a finding that Jones had engaged in the misconduct and that her suspension was warranted to promote the efficiency of the service. Jt. Ex.5. Dr. Coleman was not able to cite to a table of penalties but she  would consider it a second offense due to the number of times "we [undefined]  have spoken to her and provided her with support." No documentation exists to support these assertions.

On 4/9/22 the Union filed a grievance over the suspension.

On 4/26/23 the Union invoked arbitration.

## AGENCY ARGUMENT[3]

**Standard of Review**

MSPB rulings and decisions should guide Federal sector arbitrators in their decisions. The Employer  is required to make three separate and distinct determinations:  (1) that the misconduct charge is sustained by a preponderance of the evidence; (2) there is a sufficient nexus between the misconduct and the efficiency of the service; and (3) that the penalty imposed by the agency is reasonable in light of the specific facts and circumstances involved.  Arbitrators hearing cases must also apply this 3-step analysis.  MSPB law provides that the MSPB (or arbitrator) will not disturb the selected penalty so long as it does not exceed the maximum reasonable penalty which may be imposed considering all the relevant factors.

**Grievant's  misconduct Is sustained by a preponderance of evidence**

The charges are failure to follow instructions-failure to record one assignment or grade per subject area per week in the  EGB system  in accordance with the 2021-2022 Georgia/Alabama Faculty Handbook and inappropriate conduct.

To prove a charge of failure to follow instructions, the Agency must establish that the employee was given proper instructions and s/he failed to follow the instructions regardless of whether the failure was intentional or unintentional.

The 2021-2022 Georgia/Alabama Faculty Handbook states:

> At a minimum, all teachers are required to record one assignment or grade per subject area per week in the DoDEA Electronic Gradebook (EGB)

**Charge #1: Failure to follow instructions**

The Agency presented the 2021-2022 Georgia/Alabama Faculty Handbook and Progress Reports for each student enrolled in  Jones' class.  Jones was given proper instructions and failed to follow the instructions.

---

[3] Agency arguments are summarized and restated.  Cited case law authority is not discussed herein.

On 11/8/21, Jones alleged experiencing technical difficulties. She acknowledged the failure to record one assignment or grade per subject area by apologizing and stating that all grades were in and updated in Gradespeed.

Jones did not present evidence in support of her claim of experiencing technical difficulties. Dunn testified that Jones reported issues with her password on a couple of occasions throughout the year. Grievant made no such report during the week in question.

When Jones was asked whether she reported any technical difficulties to Dunn, she testified that she verbally notified Dunn, but it may have been before 11/5/21 or after.

**Charge #2: Engaged in inappropriate conduct when Grievant announced the names and grades of students aloud with respect to their performance on a standardized examination**

On 11/7/21, Major Dean Marshall contacted administration to report concerns with Grievant. Marshall reported that on 11/5/21 Jones announced the names and grades of students aloud regarding their performance on an End of Unit Assessment. The Notice of Proposed Suspension states that when Jones was questioned about her interaction with her students, Grievant agreed that she made the statement, but could not recollect which students' names she identified as having passed the assessment.

The Union called Showalter as a witness. Showalter had occasion to go into Grievant's classroom to assist her and her students with technology troubleshooting. When asked whether her time (e.g., 5-10 minutes) in Jones' classroom encompassed the entire conversation regarding the student's performance, Showalter testified that she had no knowledge of whether the conversation started before she arrived or continued after she left.

Jones contends that she only made a general statement (e.g., that some of the students did not perform well). This is indicative of student performance and inappropriate to announce to the entire class.

**Charge #3. Engaged in inappropriate conduct when she confronted a substitute teacher and discussed a personnel action**

On 11/7/21, Major Dean Marshall contacted administration to report concerns with Grievant. Marshall reported that on 11/27/21 Jones approached his wife, Jenny Marshall, a substitute teacher, in the hallway and confronted her about reporting issues that resulted in Jones receiving a Letter of Reprimand.

The complaint was not attached to the Notice of Proposed Suspension. The details of the complaint were discussed when Dunn met with Jones on 11/8/21 and in the proposed suspension.

Jones did not deny the interaction with Marshall. She attempted to justify it by claiming that her motive was to improve communication, and that her conversation was solely in a parent capacity.

The Marshalls would not have known that Jones was disciplined previously. Nor would they have known the specific type of prior discipline unless Jones disclosed this information during her interaction with Jenny Marshal. It would not have been necessary to disclose her prior discipline if her only motive was to discuss academic concerns she had with Marshall's daughter Joy.

There was testimony that parent's contact information is accessible through ASPEN and in the front office. When asked whether she requested. Marshall's contact information from the front office, Jones testified that she did not.

Jones testified that on the date in question, Marshall came by after school to pick her daughter up she was not performing substitute duties. When asked how she knew that Marshall was not performing substitute duties, Jones testified that she did not know for sure.

Dunn testified that Marshall was in the building performing substitute duties; she would not have been in the building if she was not. Assuming for the sake of argument that Marshall was in a parent capacity, it would have still been inappropriate to discuss a personnel action or the underlying reasons for issuance of the personnel action (e.g., lack of communication).

It would never be appropriate for an employee to discuss personnel actions with others per Dunn and Coleman.

Jones committed the acts contained in the charges and specifications by at least the required standard of a preponderance of the evidence.

Dunn is not a criminal investigator with law enforcement experience. This case did not warrant any more of an inquiry than it received. Dunn was trusted with responsibility of resolving matters with as little disruption to the students as possible.

**There is nexus between the misconduct and the efficiency of the service**

The 2021-2022 Georgia/Alabama Faculty Handbook is clear: a teacher's failure to record one assignment or grade per subject area per week in the EGB system is in violation of this policy.

A teacher's inappropriate conduct while interacting with her students and with a substitute teacher during the duty day are offenses which nexus is present.

**The penalty is reasonable**

Dr. Coleman testified regarding her consideration of the evidence in the case prior to sustaining the suspension. Once the Agency has established the considerations leading to its choice of penalty, the MSPB (or Arbitrator) is not free to substitute its judgment on penalty issues. The Agency submits that the Arbitrator need give due deference to Dr. Coleman's determination that a 5 day suspension was the appropriate penalty in this case.

**AGENCY CONCLUSION**

9

The Agency has proven by a preponderance of the evidence that Jones failed to follow instructions when she failed to record one assignment or grade per subject area per week in the EGB.

Grievant engaged in inappropriate conduct when she announced the names and grades of students aloud with respect to their performance on a standardized examination.

Grievant engaged in inappropriate conduct and when she confronted a substitute teacher and discussed a personnel action.

The charges and specifications were established by a preponderance of the evidence standard. The disciplinary action was for just cause.

## UNION ARGUMENT

**Burden of proof**

DoDEA must prove the charged conduct occurred. If the Agency does not prove every element of a particular charge, then that charge fails.

DoDEA must prove a nexus between the discipline administered and the efficiency of the federal service.

Even when the Agency proves the factual elements of its charges, it must prove the reasonableness of its chosen penalty.

Even if the charge is sustained, Grievant's suspension is unreasonable.

**Failure to follow instructions**

DoDEA must establish Grievant was given proper instructions and that she failed to follow the instructions. DoDEA did not prove Grievant failed to input grades in a timely manner. Dunn instructed Grievant to input grades into the system. Grievant did so. There were known issues with her computer which impacted how the grades showed up. Grievant communicated her system's difficulties to Dunn.

Grievant was having technological issues with her computer that week. She had been complaining about her computer not showing her grades after she put them in. Grievant explained to Dunn more than once that there were problems with the grades showing up after they had been put into the system.

Grievant was getting the necessary technical assistance to address why the grades she would put in would not show up the next day.

Showalter was likely in Jones' classroom on the day the students discussed the test, because she was assisting Grievant and troubleshooting Grievant's computer.

Although the grades may not have shown up in the system Jones followed instructions and uploaded her grades.

**Inappropriate conduct**

DoDEA charged Grievant with inappropriate conduct for allegedly shaming students in front of the classroom and approaching a substitute teacher [Jenny Marshall]

who was also a parent, and asking the substitute about her role in a Letter of Reprimand issued to Jones.

Grievant did not shame any students in the classroom because of their grades. The Agency claimed that a parent sent an email complaining that Jones inappropriately announced the names of students and grades in the end of unit assessment. No email or communication was attached to the notice of proposed suspension. Jones was never apprised of a parent complaint.

Jones testified that she did not call out any child's name. DoDEA presented no contrary evidence.

Showalter did not witness Jones call out any students or embarrass them. Showalter testified the students were "kind of upset". Jones was trying to reassure the students. Grievant asked the students who would like to retake the exam. Showalter was in Jones' classroom for a short period of time. There were no statements or interviews of students attached to the proposed suspension. Jones was not made aware of who reported that she allegedly shamed students.

Jones did not shame any students in her classroom. She shared with them that some did not do well. The students had taken the Benchmark Advance Assessment Unit 3, which was a weekly assessment. Jones gave the students the chance to take the exam again. At no time during the discussion of the exam results did Jones say anything inappropriate to the students. The Agency provided no proof to the contrary.

Jones allegedly approached a substitute teacher [Jenny Marshall] in the hallway and confronted her about reporting issues in her classroom. There is no proof this conversation occurred. There is no statement from the parent attached to the proposed suspension indicating what the parent/substitute shared with administration. There was no interview of Marshall.

Grievant testified she did not approach Marshall. Marshall was not in her capacity as a substitute teacher on the day Jones attempted to speak with her about Joy. The discussion took place after school, when the parent was not working. She was in Jones' classroom to pick up her daughter. Jones did not confront Marshall in the hallway.

It is unreasonable to believe Jones and Jenny Marshall would not cross paths at school and not at some point discuss the child Joy who was in Jones' class. Parents and teachers can communicate after hours. The conversation between Marshall and Jones was limited to that concerning the student. Jones did not have a conversation with the sub teacher/parent about Grievant's Letter of Reprimand.

**Efficiency of the service**

The discipline does not promote the efficiency of the service. Jones input the grades in the computer, did not shame students or confront a parent. The Agency supplied no proof she did otherwise.

**Penalty**

If the arbitrator finds Jones engaged in misconduct, it is the Employer's burden to persuade the arbitrator of the appropriate penalty. The penalty is wholly unreasonable.

- Jones communicated her issues with her computer and followed orders to input the grades. She is not responsible when tech issues prevent the grades from showing up in the system.
- She did not shame any students.
- Grievant did not confront Jenny Marshall.
- DoDEA took nearly four months to propose discipline when it was aware of the grade issues and the alleged confrontation and shaming in October and November 2021. There was nothing for them to investigate.
- There was nothing in the record to indicate that FAP was investigating or to advise Jones that FAP's investigation was delaying DoDEA. The Agency waited four months after the alleged incidents to propose discipline. Such delay is untimely and necessitates the suspension be overturned.
- Jones had already been disciplined for some of the dates listed in the proposed suspension. The dates of September 15, 29 and October 12 2021 were all included in the notice of proposed suspension but occurred before Jones received her Letter of Reprimand. DoDEA included dates from the Letter of Reprimand in the suspension. She should not be penalized twice.

## UNION CONCLUSION

The five day suspension is without just cause. DoDEA suspended Jones based on failure to follow instructions. Jones input the required grades in the system and the technical difficulties associated with the grades appearing does not mean Jones did not follow instructions to input the grades.

Jones did not engage in any inappropriate conduct.

The arbitrator must sustain the grievance.

The Agency must pay Jones her back pay within thirty days of the decision becoming final.

The Union also requests that the Arbitrator retain jurisdiction over any question of attorney's fees to which the Union may be entitled. The Union notes that the attorney fee application is a procedure separate and apart from the actual award process.

The Union absent a full denial of the grievance, requests Union counsel is given the opportunity to petition the Arbitrator for reasonable attorney fees.

12

## ANALYSIS AND DECISION

The burden of proof required to sustain the discipline is preponderance of the evidence. Just cause analysis requires application of both the *Douglas* factors and traditional arbitral principles.

The arbitrator's jurisdiction is under the MLA. *Douglas* factors are routinely incorporated in analyzing disciplinary matters involving the federal service. DoDEA Administrative Instruction 1426.01 in place at the time of the discipline  [Agency Ex.Tab 1] clearly indicates that a *Douglas* analysis is required per Section 5; particularly Section 5.1. This was not done in this case from the evidence in the record. No explanation was offered for the failure to provide a *Douglas* analysis.

The arbitrator reviews *Douglas*  factors below.

> **1. The nature and the seriousness of the offense and its relation to Grievant's duties, position and responsibilities. Was the offense intentional, technical or inadvertent; committed maliciously or for gain; or was frequently repeated?**
>
>> There was no claim that Grievant deliberately failed to timely enter her required input to the EGB. Grievant claimed that she had computer issues. This was neither proven nor disproven. Had her efforts in bringing the claimed computer glitches to the appropriate personnel in a timely manner, then her defense would have been complete. As it was, she did ask for an assist, but the timing was ambiguous.
>>
>> At the most, her conduct in failing to enter the grades timely for the math/science sections was negligent or inadvertent. It was a second "offense" as this had been brought to her attention recently by means of the Letter of Reprimand.
>>
>> Regarding any  attempt to talk to Jenny  Marshall-whether in the hallway, the classroom or at pick up time for Joy Marshall, the arbitrator found no evidence of any work rule, policy or procedure allegedly violated in Grievant's attempts to converse with a parent.
>>
>> The arbitrator agrees that discussing Jones' Letter of  Reprimand with a parent would be not a best practice. But no work rule, policy or procedure existed in the record to put Grievant on notice of such a standard or stricture. <u>As importantly, there was no direct evidence that this discussion even occurred-just layers of hearsay.</u>

13

There was no proffered reason that Marshall could not have been present as a witness to discuss what happened. It is fundamentally unfair for Grievant to be disciplined for this allegation without any meaningful attempt to get a firsthand version of what happened. Grievant was unfairly put in the position of defending against an accuser who was not alleged to be unavailable. This flies in the face of basic fairness and is antithetical to just cause.

There was no evidence that Grievant frequently repeated any of the claimed offenses.

## 2. Grievant's job level and type of employment; ... contacts with the public and prominence of the position

Grievant is a professional teacher with advanced degrees and is expected to uphold the principles of her profession. Her contacts with students and teachers and student's parents/guardians is expected to meet professional standards of courtesy, fairness, respect and confidentiality.  There were allegations of unprofessional contact in her alleged acts of discussion of everyone's grades in class.

There was an additional allegation of her lack of professionalism in approaching a student's parent concerning a prior written reprimand.

There is a lack of preponderance of evidence that Grievant inappropriately discussed Joy Marshall's classroom progress at any time.

There was insufficient proof on both allegations. Grievant denied the classroom "shaming" occurred. There were no student witnesses either through then current interviews or arbitration testimony. Showalter's testimony indicated that for her time in the classroom, she overheard no such shaming or belittlement. At most she heard that the test would not be counted as the results were not good-no names mentioned. Her testimony was given no weight by the Agency.

 Grievant denied both  the allegations.

## 3. Grievant's past disciplinary record

Grievant had a current Reprimand in her file received two weeks before the current matters giving rise to the discipline. No other discipline was of record.

## 4. Grievant's past work record

There was no evidence of prior performance issues except as reflected in the then recent Letter of Reprimand. The Letter of Reprimand issues were detailed and many. No evidence existed in the record to challenge the events set forth in the Reprimand. The arbitrator treated those allegations as true.

Grievant had approximately three years tenure at the date of the allegations from October -November 2021.

There was no evidence regarding her ability to get along with other workers.

No job evaluations were in evidence.

## 5. The offense's effect on the employee's ability to perform at a satisfactory level

There was no testimony from either party as to Grievant's general teaching success or failures.

Grievant's supervisor did not testify about her confidence in Grievant's ability to perform assigned functions.

The comments in the Letter of Reprimand are uncontroverted. Other than those, the record is silent.

## 6. Consistency of the level of discipline for other employees with like/similar offenses i.e. Is there evidence of disparate treatment?

There is no evidence in the record on this factor.

## 7. Penalty consistent with the DoDEA penalty table

The penalty range allows for a range of discipline from reprimand to removal.  A five day suspension is consistent but not appropriate under these facts and circumstances.

## 8. Notoriety of the offense/impact on DoDEA's reputation

15

There is no evidence on this factor.

9. **Clear notice to Grievant of rules against the conduct/prior warnings about the conduct**

There was no work rule presented. There was evidence of a prior warning- the Letter of Reprimand from 10/22/21.

10. **Clarity of Grievant's notice of the rules violated in committing the offense**

No evidence was presented on this factor.

11. **Mitigating circumstances**

None were discussed or considered as part of the record.

12. **Adequacy and effectiveness of alternative sanctions to deter future such conduct**

This factor was not analyzed by the Agency as it moved to a progressive discipline following off of the recent Letter of Reprimand.

**Just cause analysis**

The arbitrator lacked understanding as to why either of the Marshalls were not called as Agency witnesses. Dr. Coleman didn't interview either of the parents. Principal Dunn did not "interview" General Marshall; rather she took him at his word about his complaint about what Grievant purportedly had said/done-none of the allegations to which he was a firsthand witness. It was third hand: his wife to him then report to the Principal. That is too many layers of unsworn testimony upon which to support a discipline.

Part of the discipline was imposed for Grievant allegedly talking to Jenny Marshall in the hallway while Marshall was either working/ending work as a substitute or picking up daughter Joy from school. The allegation was that Grievant was attempting to discuss her Reprimand with Marshall. Grievant denied this and said she was talking to Jenny about Joy's classroom's progress.

Not interviewing Jenny Marshall affected the weight of the allegations made by her about the hallway/classroom interactions. Jenny's purported comments were hearsay. These alleged comments were not reduced to a signed written statement. The Marshalls' comments were offered for the truth of the matter asserted. Significant parts of Grievant's discipline was built upon hearsay-and this affects the weight and credibility of the Agency case. There is not a signed written statement in the record from Marshall. This lack of corroboration and general unreliability of hearsay is insufficient for a just

cause finding on the Jenny Marshall-Grievant hallway/classroom interaction. The arbitrator is best persuaded  by sworn in person testimony. That  is the best evidence of what is alleged. No attempt was made to produce Jenny as a witness. This adversely affected the weight of the evidence presented by the Agency.

There was an absence of any training/policies/work rules in place to provide notice to Grievant about the limits/restrictions or parameters of her ability to speak with parents on any subjects. No work rule was introduced, no policies or procedures regarding discussion of student related concerns were in evidence. In the absence of these guidelines, the discipline fails.

Dr.Coleman opined that it was never appropriate for an employee to discuss personnel matters such as discipline with other employees-even a substitute. The arbitrator finds that this overbroad statement impinges upon rights under the MLA. Since Grievant's  alleged conversations with Jenny were part of the discipline, this overbroad "rule" nowhere written nor discussed with employees cannot stand as a basis for discipline.

Grievant never got to confront the accusers. The record contains the least convincing  evidence of what in fact transpired between Grievant and Jenny Marshall. While Grievant may not have explicitly denied the conduct in the hallway, or in the classroom- the allegations were unclear- it fell short of an admission. Just cause requires more weighty evidence of misconduct. Nor does the arbitrator find any evidence of misconduct in the record in regard to any conversations held between Grievant and Jenny Marshall as reported by Grievant.

Adding to the failure of due process and fairness, neither of the school administrators talked to any of the students in Grievant's  classroom where the purported "shaming" occurred. While students were young, presumably between 10-11 years old, some effort should have occurred to determine and confirm what happened. The third hand removed report-from the Marshall child [and /or possibly a few other students-the record is unclear] to the mother and father and then from the father to Dunn, provided Grievant with no opportunity to weigh in and face the accusation. The complaint came anonymously days after the  claimed incident, placing  further strains on the weight of the evidence. Grievant did not admit to this allegation; proof was required by a preponderance.

The arbitrator agrees that discussing individual success/failure in front of the class likely implicates  educational standards and protocol-none of which were in evidence. But in the face of Grievant's denial that this occurred and buttressed further by  Showalter's corroboration that no shaming occurred, this charge fails as well.

The Union argued the discipline was untimely. The first notice of suspension issued  2/11/22, the revised notice issued 2/24/22. The second notice is the basis for the discipline reviewed in arbitration. The differences between the two notices are not significant. The first notice did not refer to an alleged event on 8/15/21; the second

notice did. The first notice had emails attached between Grievant and Principal Dunn; the second did not. There is some underlining in the revised notice as well not present in the first notice. But significantly, there were no substantive changes in the charges/proposed penalties. Notably, events mentioned in the Letter of Reprimand are deemed admitted as that discipline was not grieved.

The MLA does not indicate any timing requirements for notice of proposed discipline to issue. None were cited by the Union. The arbitrator does not find that there is a violation in the issuance of the discipline in terms of timeliness due to a lack of evidence.

Article 25 Section I.b. contains no guidelines as to days elapsed between the alleged offense and the issuance of discipline. The broad language that "sufficient time should be allowed to complete appropriate investigations and fact-finding and that undue haste is as undesirable as undue delay" does not have a timeframe that needs to be followed.

There is no evidence in the record that the time elapsed was excessive or constituted undue delay in light of a record devoid of anything more than the dates themselves. Although the events forming the basis for the discipline ended in early November 2021, the discipline issued almost four months later. Grievant was taken out of the classroom and suffered the embarrassment she described under oath. The Union provided no evidence as to practice at the Agency or under the MLA as to norms. Absent more, the arbitrator does not conclude the timing of the issuance of the discipline was in violation of the MLA.

The alleged technical difficulties with Jones' timely entry of weekly grades in all subjects were somewhat mitigated by the testimony of Showalter, but not entirely. Weekly grade entry for all subjects is neither an onerous nor unreasonable requirement. Grievant had just been warned about this requirement and failed to proactively insure her grades were uploaded and/or that technical difficulties were timely brought to the Principal's attention.

There was a failure of proof on the shaming of students for the reasons discussed above.

There was a failure of proof about Grievant's "confrontation" with Jenny Marshall.

The arbitrator was concerned about the timing of the events supporting the 5 day suspension. Grievant had just received a detailed, multi-faceted Letter of Reprimand on 10/22/21. She then allegedly failed to do some of the steps/corrective actions detailed in the Letter issued just two weeks earlier. She had notice of claimed deficiencies in her performance but was not given a plan of action or real time to get support, correct her behavior or improve performance before discipline and suspension from the classroom quickly followed. The arbitrator finds that weighing all the matters discussed above, the discipline- due to its timing so fast on the heels of the Letter of Reprimand, an absence of any adherence to the *Douglas* factors analysis, as well as the above discussed

failures on the proof of the allegations discussed, requires a modification of the penalty to a one day suspension.

The arbitrator further noted that no remedial measures were offered by the Agency to improve its stated concerns with Grievant. The "corrective" nature of discipline is missing absent any attempt to remediate claimed performance deficiencies.

The table of penalties was not discussed during the arbitration. The two charges are not specifically described within the table. It is not the job of the arbitrator to fit the charges to the table. But applying just cause analysis, the arbitrator concludes based upon the record as a whole that some discipline is merited for Grievant's failure to conform to reporting grades. She has been a teacher for sufficient time to understand that obligation and failed to meet that expectation which is part of her job responsibilities. Computer glitches and failures could be a defense but when some grades entered and others did not, the excuse is weakened by those facts.

As noted in the Letter of Reprimand, Grievant has been warned about issues and concerns about her communications with parents and staying abreast of reporting requirements. This suspension provides further notice. DoDEA's expectations of professionalism and communication are neither onerous, unreasonable or in violation of the MLA. Grievant is a professional with responsibilities that are articulated and known to her. Her success in her position depends upon communication, adherence to professional standards, understanding and seeking assistance as needed.

**AWARD**

**The discipline is modified to a one day suspension. Grievant is to be made whole for four lost days of pay and benefits. Her disciplinary record is to be amended to reflect the one  day suspension in lieu of the five day suspension.**

**The Union requested that the arbitrator retain jurisdiction on attorney fees. Should the Union pursue this request, the parties are to submit  concurrent arguments not exceeding 5 pages on the position each takes on this request. The _Allen_ factors must be addressed. The due date for submission is one week from today.**

**IT IS SO HEREBY  ADJUGED, ORDERED and DECREED.**

_Sandra Mendel Furman_
Sandra Mendel Furman, Esq. NAA

Sent to the parties on April 16, 2025, by electronic mail.
_Sandra Mendel Furman_

# Exhibit 8

IN ARBITRATION

In the Matter of the Arbitration Between:
**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**

and

**FEDERAL EDUCATION ASSOCIATION, STATESIDE REGION**

FMCS Case No. 230426-05607
Before David Vaughn, Arbitrator

Grievance of
**Gregory Nelis**
Removal

### OPINION AND AWARD

This proceeding takes place pursuant to the arbitration provisions of the Master Labor Agreement for Professional Employees, Stateside Region ("MLA" or the "Agreement") between Department of Defense Domestic Dependent Elementary and Secondary Schools, now Department of Defense Education Activity ("DODEA" or the "Agency") and the Federal Education Association Stateside Region ("FEA-SR" or the "Union") (together, the Agency and Union are the "Parties" to the proceeding) to resolve a grievance dated May 5, 2022 and filed by the Union on behalf of high school biology teacher Gregory Nelis ("Nelis" or "Grievant") to protest his April 6, 2022 removal from his employment by the Agency.

The Parties were unable to resolve the grievance through the steps of the negotiated grievance procedure; and the Union invoked arbitration. From a panel of arbitrators provided by Federal Mediation and Conciliation Service, the Parties selected me to arbitrate the dispute.

A hearing was scheduled and conducted online on March 28, 2025, using the Zoom platform. In the proceeding, the Union was represented by General Counsel-Uniserv Director Angela Wade Stubbs and the Agency by Associate General Counsel Robert S. Black.

The Parties stipulated at the outset of the hearing that the matter is properly in arbitration and before me. They were then each afforded full opportunity to present evidence in the form of witness testimony and documents and to cross-examine witesses and challenge documents offered by the other. For the Agency testified

1

Camp LeJeune High School Principal and Proposing Official Dana Southerland, SMD Supervisory Personnel Specialist Tamika Johnson-Alexander, District Superintendent Mid-Atlantic and Deciding Official Ryan Smith and Labor Relations Specialist Angela Harris. At the call of the Union testified General Counsel and Uniserv Director for FEA's Stateside Region Benjamin Hunter and Grievant, who was present at the online hearing and testified on his behalf.

Offered and received into the record were Joint Exhibits 1-12 ("Jt. Exh. __"), Agency Exhibits 1-18 ("A. Exh. __"), less A. Exh. 6, and Union Exhibits 1-2 ("U. Exh. __").

A court reporter was also present at the hearing; by agreement of the Parties, the transcript which she caused to be prepared constitutes the official record. Page references to the Transcript, where necessary, are designated "Tr. __".

At the conclusion of the hearing, the evidentiary record was complete. The Parties elected to close by submitting written briefs. On April 24, 2025, upon receipt of the last post-hearing brief, the record of proceeding closed.

This Opinion and Award is based on the record. It interprets and applies the Agreement, applicable statutes and regulations and precedents.

## ISSUES FOR DETERMINATION

The Parties are in agreement that the issues for determination are:

whether the removal of Mr. Nelis based on an adverse fitness determination was for such just and sufficient cause as will promote the efficiency of the service; and, if not, what shall be the remedy?

2

JA553

**PROVISIONS OF THE MASTER LABOR AGREEMENT**

**ARTICLE 4**
**CONDITIONS OF THE AGREEMENT**

Section 1. **Laws, Regulations, Policies, and Prior Agreements.**
    a.  It is understood and agreed to by the Parties that in the administration of all matters covered by this Agreement, *** the Agency, the Association, and the Agency's employees are governed by applicable laws and regulations. In the event of a conflict between DoDEA/DDESS policy/regulation/handbook and a provision of this Agreement, this Agreement shall take precedence. The Parties further agree that no provisions or terms of this Agreement may be amended, modified, altered, or waived except by written document duly executed by authorized representatives of the Agency and the Association.
    ***

**ARTICLE 5**
**AGENCY RIGHTS**

Section 1. **Statutory Rights, Subsection (a) of Section 7106 of Title 5 United States Code.** Nothing in this Agreement shall affect the authority of any Agency official.
    ***
    b. In accordance with applicable law–
        ***
        (1) To *** remove,*** or take other disciplinary action against such employees.
    ***

**ARTICLE 25**
**DISCIPLINARY ACTIONS**

Section 1. **Policy.**

    a. Discipline is the right and the responsibility of the Agency and will only be taken for such just and sufficient cause as will promote the efficiency of the service, and the penalty will fit the offense.
    ***
    c. Disciplinary actions will not be arbitrary or capricious.
    d. The Agency recognizes the concept of progressive discipline, and generally actions imposed should be the minimum that can reasonably be expected to correct and improve employee behavior and maintain discipline and morale among other employees.
    ***

3

\*\*\*

Section 3.    **Formal    Disciplinary    Actions**. Formal disciplinary actions consist of written reprimands, suspensions, demotions, and removals.  Before formal disciplinary action is initiated, an investigation or inquiry will be made by the immediate supervisor or other official designated by the Agency to ensure himself/herself of the facts of the case.

\*\*\*

a.    \*\*\* letter of Reprimand may remain in the OPF for a period of two(2) years. \*\*\*

\*\*\*

d.    Whenever a unit employee is reduced in pay, removed,\*\*\* the following procedure shall apply:

(1).  Issuance of Advance Notice. The unit employee will be given thirty(30) days advance notice of the proposed adverse action. The advance notice shall:

(a).  State, in detail, the reason(s) for the action;

(b).  Provide the employee with a copy of the material relied upon for the proposed action; \*\*\*

(c).  Inform the unit employee of his/her right to reply orally or in writing or both, within twenty(20) days from receipt of the notice of proposed action, the name and title of the official designated to hear an oral reply and/or receive a written reply;

(d)   State that a final decision of the proposed action will not be made until after receipt of the unit employee's reply or after the twenty (20) day period, whichever comes first; and

(e)   Inform the unit employee of the duty status he/she will remain in pending a decision of the proposed action.

\*\*\*

(3)   Notice of Final Decision. The unit employee shall receive notice of final decision at the earliest possible date following the notice period. The notice of final decision shall be signed and dated and shall inform the employee of the following:

(a)   Which of the reasons in the proposed notice have been found sustained:

(b)   The effective date of the action; and

(c)   His/her rights under the appropriate grievance and/or appeal procedures.

\*\*\*

4

**ARTICLE 27**
**ARBITRATION**

\* \* \*

Section 9. **Arbitrator's Authority.** The arbitrator shall have no power to add to, subtract from, diregard, alter, or modify any of the express terms of the Agreement or any Memorandum of Understanding (MOU) between the Parties.  Additionally, he/she will have no authority to make any decision, recommendations, or award that would require an act inconsistent with  or prohibited by law, rule, or regulation, or that  would violate the terms of this Agreement.  If either party disagrees as to the meaning or application of  the decision, that party may return the decision to the arbitrator with a request for clarification. Arbitrators are bound by the holdings and interpretations of the Merit Systems Protection Board, the FLRA and the Agency's regulations as provided by law.

Section 10. **Attorney's Fees.**

a.   The General Counsel's Office, Department of Defense Education Activity, will provide a written notice to the Association thirty (30) calendar days after an entitlement to payment of attorney's fees to FEA-SR has been established and the attorney's fees have not yet been paid.  The notice to FEA-SR will contain the following information.

   (1) What steps have been taken to obtain payment;

   (2) Status of payment request;

   (3) Steps to be taken to obtain payment; and

   (4) Projected payment date.

b.   If attorney's fees have not been paid within sixty (60) days after the original date of entitlement to payment, the General Counsel will send a follow-up letter to the Association that updates the information contained in the previous letter.

c.   This provision is not limited to the payment of attorney's fees resulting grievances filed under Article 26 of the MLA.

5

## ARTICLE 32
## CHILD ABUSE REPORTING AND EMPLOYEE RIGHTS

Section 1. **Policy**.

    a.    The Parties acknowledge, that pursuant to the requirements of the "Victims of Child Abuse Act of 1990," 42 U.S.C. 13031, the installation Family Advocacy Program (FAP) is the focal point for reporting and referring all allegations or suspicions of child abuse or neglect. *** All DoDEA personnel will participate in the identification of child abuse and the protection of children by promptly reporting all suspected or alleged child abuse to the local FAP officer and to the reporting employee's immediate supervisor, and will cooperate with the Family Advocacy Program process. Thus, a bargaining unit employee who learns of facts that give reason to suspect that a student has suffered an incident of child abuse or neglect, either within or outside of District schools, shall report the matter to the FAP officials immediately, and promptly report the matter to the employee's immediate supervisor.***

Section 2. **Employee Rights**.

    a.    *** The employee has the right to be notified of the allegation(s) made against him/her normally within thirty(30) days of the initial report.

    b.    The employee has the right to have union representation during any investigative interview by Agency personnel if the employee reasonably believes disciplinary action may result against him/her. If requested, the bargaining unit member will be entitled to be represented by a FEA attorney, at no cost to the Agency, and a local Association representative. ***

    ***

    h.    Any discipline of an employee, whether for child abuse or corporal punishment, will be taken in accordance with procedures set forth in the Negotiated Agreement between Parties and applicable laws and regulations.

    ***

## FACTUAL BACKGROUND AND FINDINGS
### The Parties

The Agency is a component of the Department of Defense ("DoD" or the "Department"), whose mission it is to operate schools to

6

JA557

provide education for dependent children of United States military personnel. DoDEA operates schools both in the United States and overseas. One of the stateside schools operated by the Agency is the Camp LeJeune High School ("CLHS"), located at the Camp LeJeune Marine Corps Base in North Carolina.

To carry out its mission, DoDEA employs staff, including teachers. Teachers are hired by the Agency and occupy positions the duties of which are described in A. Exh. 15.

Teachers work directly with children and are required to comply with all statutory, regulatory and contractual obligations and procedures with respect to child abuse.

Teachers are hired into excepted service positions pursuant to 21 USC §2164 and are required to undergo a criminal background check at the outset of their employment and an update periodically thereafter.

The Union is a labor organization which is the exclusive representative of a bargaining unit of teachers employed by DODEA. This dispute involves the Union's Stateside Region and the separate Agreement between the Parties covering Stateside elementary schools and teachers. Jt. Exh. 1. As indicated, the Agency and Union are the Parties to the Agreement.

### Family Advocacy Program

The Department's Family Advocacy Program ("FAP") provides resources and support for military families. Among other areas of responsibility, FAP is the entity to which allegations of child abuse of military dependents are to be reported. Jt. Exh. 1. The FAP's Incident Determination Committee ("IDC") investigates allegations of child abuse and makes findings whether such abuse is substantiated.

7

FAP regulations and Article 32 of the Agreement require, in part, that DoDEA employees who become aware of allegations of child abuse are required to report the allegations to FAP. Employees who engage in child abuse are required to self-report. The report triggers an investigation.  The procedures used to conduct the investigation are not part of the record.

**DOD Personnel Security Management Division**

Determinations of fitness for duty for employees within specified jurisdiction are made by the DoDEA Security Management Division ("SMD"] of the DoDEA Personnel Security and Suitability ("PERSEC") program, which receives requests, conducts investigations and issues determinations as to the fitness of employees for service in federal government positions. A. Exh. 5.

DoDEA teachers are subject to fitness reviews by SMD at the time they are hired and every five years thereafter. Fitness determinations are based on reviews of criminal background checks and may include broader reviews of fitness, based thereon.

Determinations of child abuse by FAP can be, and here were, forwarded to SMD for review of the alleged perpetrator for fitness (the term used for excepted service employees, such as DoDEA teachers).

**Grievant**

Prior to his removal on April 6, 2022, Grievant was employed by the Agency as a teacher and was assigned to CLHS, where he taught biology to ninth grade students. His Supervisor was CLHS Principal Dana Sutherland.

Grievant had begun his employment with DODEA in 2012 and had approximately 10 years of Federal service at the time of his removal. Grievant's performance is not at issue in this proceeding, but he had received prior discipline in the form of a 14-day unpaid

disciplinary suspension in November of 2019 and a February, 2016 five-day unpaid disciplinary suspension. He had been referred to IDC for determination whether he engaged in child emotional abuse in April of 2018, the Committee did not make such a finding.

Grievant had also received letters of reprimand in 2015 and in 2019. As provided in Article 25 of the Agreement, the Letters of Reprimand were all older than two years at all times relevant to this proceeding and were to be removed from Grievant's personnel file, and by clear implication, not to be considered.

**Triggering Incident**

On Friday, February 26, 2021, Grievant was teaching his ninth-grade biology class in the last period of the day (and week).

CLHS has in place a dress code. Grievant testified without refutation that Teachers act within the scope of their authority when they enforce the code.

A female student identified herein only by her initials, RT, showed up in Grievant's class wearing a sweater or shirt whose length Grievant assessed as being too short, in violation of the School's dress code. There is no evidence, direct or indirect, that contravenes that assessment.

Although Grievant had authority to send dress code violators to the office as a disciplinary referral, he testified that he chose not to do so as to not screw up the student's weekend. However, he acknowledged in his testimony at hearing that he said to the student to the effect of "I wish I had a time machine so you could see yourself from a 25 year old perspective." He described the comment as a "joke".

Grievant later, on March 12, 2021, submitted a written statement at the request of the FAP. Jt. Exh. 9, Attachment. It It

9

described in detail the incident and its in-class aftermath:

On Friday [February] 26, 2021, I began class in my R4 period, the last period of the day. I directed students to sit in their seats, particularly student RT. As the student returned to her seat, I noticed that her sweater was not long enough. Noticing that this was a dress code violation, I stated "your shirt is too short." I later said something like "I wish I had a time machine so she could see herself from the twenty-five-year-old perspective." I intended the statement as a joke and in no way meant to offend the student. It did not appear to me that RT was embarrassed or offended by the comment.

A second student, CB, asked "what's this have to do with Biology." I said something to the effect of "clothing matters." CB was clearly agitated so I decided to move on from the subject and began teaching the lesson. A few minutes past and while passing out paper student CB and Student JT asked something like "what clothing had to do with Biology and why I was making a big deal about it." I did not engage with the students.

While beginning notes on protein systhesis, student CB and student JT asked the educational aide permission to leave the classroom. Student RT followed the other two girls a few minutes later. The students all returned later to the classroom, and I completed the notes. CB refused to take notes and appeared to be texting with other students in the classroom.

Following the notes, I started the students on their class assignments and sat down to correct papers. Student RT was seated in the table in front of me. While I was grading, she waved at me and smiled. I asked her if she needed any help with the assignment and if it was going okay. She said it was going fine. I asked her to let me know if she had any questions and I would help out. She cheeriliy replied that she would. It did not appear to me that RT was at all upset. A few minutes later class was then dismissed.

Students JT and CB came up to me after class and told me they did not think I should have commented on RT's wardrobe. I thanked them for letting me know, and they departed.

10

A reasonable interpretation of the comment is that Grievant believed that, if RT were to be able to look at her appearance from a more mature perspective, she would realize the inappropriateness of her clothing choice. Grievant denied that RT got up, ran out of the classroom or otherwise expressed embarrassment at Grievant's statement. There is no evidence that Grievant's comment was part of a repeated pattern toward the student, nor am I persuaded that the comment was "extreme".

On the date of the incident, Teacher Jonathan Delle sent an email to Principal Sutherland describing what he had been told by "several girls" who talked with him. A. Exh. 16. According to Delle's account, Grievant had said about RT "I wish I had a time machine to take you 20 years into the future to see how embarrassed you will be from what you are wearing.  Your pants look weird and are baggy and your shirt is too short." He stated that he had been told that RT "left the class in tears from what he said to her." He advised that there were several girls in the class who could provide more information. He stated that Mrs. Blackstone had told him to bring the incident to Ms. Sutherland's attention.

Principal Sutherland wrote an email to herself later the day of the incident which described the situation and post-incident events. A. Exh. 17. She referenced Mr. Delle's email and requested that someone (from context, apparently RT) come to the office, but the person did not come.  The email was redacted to omit names of students and last names of parents.

Principal Sutherland's email described a telephone call from Tiffany (from context, apparently the mother of one of the girls in the class) that afternoon.  The parent told Principal Sutherland that her daughter said that Grievant made statements in front of the class to RT "your outfit looks stupid" and "you will regret wearing clothes like that years from now" and that "boys wouldn't wear something like that." and described RT as "crying as she ran from the classroom."

11

Principal Sutherland wrote that Christina (apparently the mother of one of the other female students in the class) had told her that she had sent a "hot" email" to Grievant and protested the inappropriateness of Grievant's remark. Principal Sutherland noted that the JT's mother said she would forward the email to the Principal. The Principal wrote that she requested from Ms. Rachel (apparently a third parent of a witness) a statement from her daughter.

Principal Sutherland noted that Rachel said she had a list of witnesses, contacted them and was advised that that they would have the students provide accounts of the incident and email them to her. The additional statements and emails, if any, were not provided to FAP or to SMD, were not provided to Grievant and were not made a part of the record.

Ms. Sutherland wrote that she had reported the incident to to Administration, FAP and Department of Social Services. Grievant was removed from the classroom beginning the Monday morning after the Friday incident.

### The FAP Handling of the Complaint

The FAP referred the report to its Incident Determination Committee ("IDC"), of which Area Superintendent Smith was a Member as DoDEA's representative. The FAP notified Grievant that there was a complaint and requested a statement concerning the February 26th incident. The notice contained no specifics, no charges, no evidence and not potential findings. Grievant duly provided a statement, quoted above. Jt. Exh. 9, Attachment.

It does not appear that Grievant was allowed to participate in any hearing before the IDC, and it cannot be determined who else, if anyone, did so. What happened in the proceeding is not described in the record, but there is no evidence that Grievant was given an opportunity to hear the accusations against him or to challenge - by cross examination or other process. Area Superintendent Smith -

12

subsequently the Deciding official - was present during the IDC's consideration of the referral, but could not recall the procedures used or the evidence - if any - received.

The Committee, which was comprised solely of non-therapists, found the Grievant had committed "child emotional institutional maltreatment." It stated its Determination in a one-page document. Jt. Exh. 2. The Determination did not define "Institutional maltreatment," but from context is maltreatment by an institution - such as a school - or representative thereof (as opposed to maltreatment in a family or other environment).

The term "emotional maltreatment" was also not defined by the IDC in its Determination Notice or elsewhere in the record, but is clinically defined as "a repeated pattern of caregiver behavior or extreme incident(s) to convey to children that they are flawed, unloved, unwanted, endangered, or of value only in meeting another's needs." Jt. Exh. 6, p.2. The definition is accepted for use herein.

When the Complaint was reviewed by the FAP clinical staff meeting, it determined in a finding issued April 7, 2021 that "the case pertaining to [Grievant] was "closed unresolved." U. Exh. 2. The Closure document noted that he "did not complete all educational treatment and follow-up activities. Risk is moderate. Further contact with [him] is not anticipated at this time." That Closing document, which indicates that no further action is contemplated, that the risk was moderate and that - far from a finding of indicated child emotional abuse - the case was closed "unresolved."

The Incident Determination Committee Finding was subject to review, a notice of which was provided to Grievant. Jt. Exh. 2.

The Committee's Determination was provided to Grievant and to Principal Sutherland, who forwarded it to SMD. Insofar as the record indicates, only the one-page Determination was sent to SMD.

13

No other documents were provided; if witnesses were heard or statements considered, they are not a part of any record provided to SMD. Indeed, even Grievant's Statement was not included in the documentation provided to SMD by Principal Sutherland.

## Security Management Division Proceeding

Principal Sutherland - who apparently possessed whatever alleged student statement and emails were received - forwarded to SMD for a review of Grievant's "fitness" only the one-page IDC Determination.

The Closure Notice was provided to Grievant.  It is not apparent whether Principal Sutherland received a copy; but it is not disputed that neither FAP nor Principal Sutherland provided the document to SMD, which, perforce, never had the opportunity to examine or question the document until Grievant submitted the document in response to SMD's notification.

SMD received the IDC Determination and, on May 18, 2021 and issued Grievant a Notice of Intent to review his fitness/suitablity for employment as a Teacher with DoDEA. Jt. Exh. 3. It stated that the IDC's determination of child institutional emotional maltreatment met the criteria for abuse and was "presumptively disqualify[ed]" for employment in the provision of child care services.

Presumptive disqualification criteria under the cited DoD Instruction 1402.05 include "a FAP record that the [employee] met criteria for child abuse . . . or evidence of an act or acts by the [employee] that tend to indicate poor judgment, unreliability, or untrustworthiness in providing childcare services. U. Exh. 1.

SMD requested Grievant to provide a written statement, describing the circumstances surrounding the "derrogatory information" and requested from him "any documentation that could serve to mitigate the security concerns outlined above." At that

14

JA565

point, the only derrogatory information before SMD was the Committee's one-page Determination.

Grievant provided SMD with such a response on June 15, 2021 (Jt. Exh. 4), challenging DoDEA's authority to conduct a general fitness/ suitability adjudication for educators hired under 10 USC §2164. He also provided the package he had submitted to the IDC.

Grievant's Statement also asserted that the review resulted from alleged workplace conduct currently under investigation and that it could not bypass the requirements of the Master Labor Agreement. It pointed out that the Notice of Intent provided no rationale for the IDC finding of abuse and that Grievant had not been provided a copy of the evidence used to reach that determination. Grievant provided SMD with a copy of the statement he had submitted to IDC. Jt. Exh. 4.

### SMD's Finding

On July 29, 2021, SMD issued a Finding (Jt. Exh. 10) that Grievant was unfit for his position because he was guilty of child sexual abuse. No such Finding had been made by FAP or the Committee and no allegations of such abuse had been made against Grievant by anyone.

On July 30, 2021, SMD issued Grievant a "corrected" Determination finding that he was not fit for government employment in a position involving childcare services based on IDC's finding of child institutional emotional treatment. Jt. Exh. 5. The Finding also advised Grievant that he was barred from applying for any position with child care services with DoDEA.

SMD In support of its determination, SMD advised Grievant that it had reviewed the IDC Determination of March 24, 2021 and Grievant's prior discipline: his November, 2019 Reprimand; his June, 2018 14-day suspension; an April 2018 IDC determination of child emotional abuse; his March 2016 five-day suspension nd

15

Letters of Reprimand from September of 2015 and June of 2015. The record contains no reference to a 2018 IDC Determination of Child emotional abuse; and all of the Suspension were more than two years old, which meant that they were not properly in Grievant's Personnel File.

The listed documents were not provided by IDC or by Grievant and were the apparent result of either SMD investigation into Grievant's personnel file (in which the reprimands should not have been retained but were) or were provided by Principal Sutherland.

The Determination notified Grievant of his right to appeal the Determination, which he did. Grievant provided a written response to the Determination on August 27, 2021. Jt. Exh. 6. It referenced back to his May 18, 2021 response and asserted that DoDEA lacked authority to conduct a general fitness adjudication for excepted service employees or to bypass the cause and procedural requirements of 5 USC §7513 and Article 25 of the MLA. He asserted that SMD's purported, but unsupported, Fitness Determination cannot serve to support his removal.

Grievant also maintained that he was not proven to have engaged in institutional emotional maltreatment of a student because his conduct did not meet the clinical definition: there was no pattern of such behavior and no "extreme" statement. He also protested that the Agency failed to provide him with the evidence DoDEA considered in its process, thereby committing harmful error; and pointed out that the Agency had provided no counseling or training following the IDC Determination, notwithstanding Grievant's stated willingness to do so. Finally, protested Grievant, the SMD Fitness Determination improperly considered his prior disciplinary record, which was not relevant to the Agency's investigation of his alleged emotional maltreatment of a studen. He urged that the Fitness Determination be rescinded and that he be provided all evidence the Agency considered.

16

SMD took Grievant's response as an appeal, and on February 3, 2022, issued a Decision in response to Grievant's Appeal. It provided, in part:

> On 27 August 2021, Mr. Hunter (FEA-Stateside Region General Counsel) submitted three documents, entitled: 'Mr. Gregory Nelis - Appeal of July 30 Determination'. After review of your appeal, it is my determination that due to a precedential regulation, the submission provides enough justification to modify the Agency's determination. Certain derogatory files and/or documents that supported the initial determination indicating poor judgment, unreliability, or untrustworthiness in providing childcare services have been removed from your personnel file and therefore, cannot be used to mak an unfavorable determination. Accordingly, you are conditionally found suitable for continued government employment in a position involving childcare services.

The Determination on Appeal provided for his reevaluation one year from the date of the letter and warned that any disqualifying information revealed during the conditional period might netatively affect his future fitness/suitability. The Determination was signed by DoDEA SMD Chief Scott Smith.

The SMD Decision on Appeal, as quoted and issued above, was contravened an hour later on February 3rd by a "corrected" version denying Grievant's Appeal, indicating that nothing provided by Grievant in the Appeal had altered its conclusion that he was unfit to serve in his position. Jt. Exh. 7.

Although the Fitness Determination and Final Determination on Appeal were addressed to Grievant, Principal Sutherland was provided with copies.

## The Removal Process

On February 11, 2022, without having conducted any independent investigation of the charges or the IDC or SMD findings, Principal Sutherland issued Grievant a Notice of Proposed Removal, based on

17

SMD's finding of unfitness for Federal employment. Jt. Exh. 8. The Specification stated:

> . . . you were determined to be unfit for Federal employment in a position involving childcare services as a result of the substantiation of an allegation of child emotional abuse against you by the Family Advocacy Program (FAP).

In support of the Charge, the NPR stated:

> . . . an allegation of child abuse was made against you regarding student JT, who you allegedly teased in front of the class because you thought her shirt was too short. Student felt embarrassed, cried and ran out of the classroom.

> On March 24, 2021, the FAP Incident Determination Committee (IDC) determined that the allegations of child institutional emotional maltreatment by you against JT met the criteria of child emotional abuse and your information was entered into the [DoD] Central Registry database.

> On July 30, 2021, you were issued a letter by the DoDEA Personnel Security (PERSEC) Branch - Security Management Division (SMD) notifying you that you were rendered unfit for government employment in a position involving childcare services and that you were barred from applying for any position with childcare services with DoDEA. You were given 30 calendar days to appeal the determination.

> On August 27, 2021, Mr. Ben Hunter, FEA Stateside Region General Counsel, submitted an appeal of the determination on your behalf. After reviewing your appeal, PERSEC SMD determined that no evidence substantiated the modification of the Agency's decision concerning your fitness for government employment in a position involving childcare services. Therefore, you were notified, via letter, date February 3, 2022, that your appeal was denied.

> 3. In determining that removal is the proper action to propose, I have considered the nature and seriousness of the offense. I have also considered you years of

18

Federal Service.

       * * *

Attached as the evidence was the FAP IDC Letter of March 24, 2021, the Corrected Fitness Determination Letter dated July 30, 2021 and the Final Appeal Determination Letter dated February 3, 2022.

**Grievant's Response to the NPR**

Through FEA-SR Counsel, Grievant responded, asserting that the NPR did not establish just cause, that SMD lacked authority for its proceeding and determination, since it denied Grievant due process and exceeded its authority. Moreover, argued the Union on Grievant's behalf, it pointed to DoD regulations defining "fitness" to reference an employee's character and conduct necessary for the employee to perform work of the agency. It contended that DoDEA was not authorized to remove an employee without meeting the efficiency of the service standard, including articulation of specific charges and supportin specifications, proof of the charges by a preponderance of evidence, nexus between the conduct and the employee's position and proper analysis of the penalty in accordance with *Douglas v. Veterans Admin*, 5 MSPR 280 (1981) ("*Douglas*").

Grievant asserted that the NPR contained no evidence to support the conclusion of just cause; it contended that the fitness determination was simply and Agency investigation, the result of which the Agency could have used to charge Grievant with misconduct warranting discipline, which would have triggered his right to respond to the charges and evidence.

The Union also argued that the allegations do not establish that Grievant engaged in "emotional maltreatment" of IJ, since it did not fit the definition, in that there was no repeated pattern or extreme act. It pointed out that there was no evidence in the materials relied on by the Agency to support the charge. It

19

JA570

contended further that the allegation that Grievant "teased" the student - denied by Grievant - constituted an independent basis to remove him; it asserted that the Agency was required to prove the charge as proposed.

FEA also pointed to the initial February 2, 2022 memorandum issued by SMD that concluded Grievant was conditionally found suitable for continued employment, determining that the procedural regulation justified modification of the Agency's determination was improperly removed from Grievant's personnel file, only to be countermanded by SMD an hour later on the pretext that the Chief had made an "administrative error" and "delivered the wrong message". The Union rejected the SMD description of the issuance, contending it was evidence that DoDEA improperly influenced the determination and thereby committed harmful error when it relied on the February 3, 2022 memorandum.

Moreover, contended FEA, the Agency's July 30, 2021 Fitness Determination improperly relied on Grievant's prior disciplinary record, including letters of reprimand which were time-barred from consideration in future penalty consideration under the MLA and were not, in any event, relevant to the emotional maltreatment determination.

### Grievant's Removal

By a Decision issued on April 6, 2022, the Deciding Official sustained Grievant's removal, based on a finding that he was "unable to peform the duties for which [he was] hired at a satisfactory level, based on his "ineligibility to work around children in a classroom setting." He concluded that Grievant's removal was warranted to promote the efficiency of the service. Jt. Exh. 11.

## The Grievance

By a grievance dated May 5, 2022 (Jt. Exh. 10), Grievant protested his removal as without just cause and not to promote the efficiency service as outlined in his response to the NPR. The grievance requested reinstatement, expungement of the penalty, a make-whole remedy, including back pay and interest, as well as attorneys fees and costs and other appropriate relief.

The Agency denied the grievance; and the Union thereupon invoked arbitration. This proceeding followed.

## POSITIONS OF THE PARTIES

The positions of the Parties were set forth at hearing and in their respective post-hearing briefs.  They are summarized as follows:

**The Agency** acknowledges its burden to prove the charges of unfitness against Grievant, which it contends required it to prove that he was required to meet the conditions applied to him, that he failed to meet the conditions and, to the extent it was within the control of the Agency, that he was given reasonable opportunity to meet the condition. DODEA argues that it met those conditions, thereby meeting its burden. Citing authorities, it points out that, in assessing the sufficiency of its case, the Parties and I are bound by Merit System Protection Board ("MSPB" or the "Board") law, including the Board's deference to Agency requirements.

DODEA argues that Grievant was required to be fit to serve in his position, which included satisfaction of the conditions it applied. It asserts that SMD's adverse fitness determination rendered him unqualified to retain his position. It contends that Grievant was found not to have passed a Tier 1 Investigation, a f favorable verification and a state criminal history check. The Agency contends that the adverse Fitness Determination was properly and appropriately based on the IDC process and result. It points

21

out that the SMD proceeding found Grievant to be unfit for government employment in a childcare position.

The Agency argues that the required nexus between the articulated bases for Grievant's removal and the efficiency of the service were satisfied because the conduct at issue took place at work and impacted the performance of his duties. It maintains that the Board defers to the Agency's assessments in this regard, except insofar as it failed to weigh relevant factors, which it claims it did, or thalt its judgment clearly exceeded the bounds of reasonableness, which it maintains it did not.

As to the penalty, DODEA argues that the record establishes that it considered all relevant factors, particularly the adverse fitness determination.   It points to SMD's conclusion that Grievant was not fit to be around students, which was an essential element of his job. The Agency also points to Grievant's prior disciplinary record, including instances of inappropriate conduct toward students over multiple years.

As to the Union's protests that Grievant was not afforded due process, the Agency asserts that the evidence is that he was given notice of the other proceedings, given opportunity to respond and did respond, submitting statements and being interviewed. It points out, further, that Grievant failed to raise challenges at earlier steps of the process of violations of his due process.

It points out that Grievant admitted having made the statement which is the basis for the determinations made by FAP and SMD.

The Agency asserts that it had full authority to conduct the Fitness Determination, pointing to the testimony of Mr. Hunt.

DODEA urges that the Grievance be denied and Grievant's removal sustained.

**The Union** argues that it was the burden of the Agency to prove that its removal of Grievant was for such just and sufficient cause as would promote the efficiency of the service, a burden required by Article 25 of the Agreement and confirmed by 5 USC 7513. It contends that the Agency failed to meet that burden because it proved none of the three required elements to establish such cause.

The Union argues that the Agency was required to prove the underlying misconduct which led to the adverse fitness determination - Grievant's statement to the student and her alleged consequent response - by a preponderance of the evidence, but failed to do so. Indeed, contends FEA-SR, the Agency failed to provide any witnesses or other evidence to refute Grievant's account. It asserts that the description of the incident provided by Mr. Nellis falls far short of justifying his removal.

The Association argues that the Agency misapplied its own DODI suitability and background checks in subjecting Grievant to a fitness evaluation. It contends that DoDEA lacked authority to perform a criminal background check on Grievant based on the FAP determinationand further maintains that Fitness Determinations under DoDI 1402.05 are limited to the results of criminal history background checks. FEA-SR points out that there was no finding of criminal conduct against Grievant and maintains that the adverse fitness determination could not have been based on any finding of criminal conduct, as there was none. It points out that FAP proceedings are clinical decisions, not criminal determinations.

The Association argues, in addition, that the Agency misapplied DoDI Instruction 1400.25, the Department's suitability and fitness adjudication instruction, rather than the required efficiency of the service/just cause standard and process, which requires articulation and proof of charges, a nexus between Grievant's conduct and the employee's position and the appropriateness of the penalty, citing *Douglas v. Veteran's Administration*, 5 MSPR 280 (1981).

23

JA574

FEA-SR argues that the Agency failed to meet it s obligation because if failed to conduct an investigation of the allegations against Grievant, but relied, instead, on the FAP proceeding, evidence, which it protests were not shared with him, even though it purported to have witness statements and emails regarding the facts of the incident, relying instead solely on the FAP finding and letters from the SMD to support his removal. FEA-SR points out that Deciding Official Smith could not testify as to the specifics of the incident, even though he was present at the FAP meeting at which they were presented.

FEA-SR argues that the Agency was required to prove the actual behavior which led to Grievant's removal. Citing authorities, it contends that, where the Agency relied on a finding of unfitness to hold his position, the Board - and an arbitrator standing in the Board's shoes - has authority to review the merits of such finding. It maintains that the Agency removed Grievant without having conducted its own investigation and did not prove, or seek to prove, the underlying misconduct alleged.

The Union points out that Grievant's testimony as to the events which led to his removal was presented at hearing and was subject to both evaluation and cross-examination. It argues that his testimony described a version essentially benign, lacking the aggravated elements which FAP asserted happened. FEA argues that the Agency failed to introduce any evidence - either witnesses or statements - to refute Grievant's description.

The Association points out that the only document received by SMD from FAP was the single-page Determination; SMD did not receive, and proceeded in the absence of, information as to the evidence, procedures or criteria applied in reaching its determination. Indeed, it points out that SMD was not provided with the FAP notice that the Clinical Committee Staff had closed Grievant's case without resolution. It also points out that SMD did not investigate cases coming before it, but relied on the school's allegations and the FAP findings. Indeed, the finding of "child

24

JA575

emotional abuse" was not defined by FAP and the connection between Grievant's conduct and the term was not established.

The Union argues that the Agency's cited basis for Grievant's proposed removal was the finding by FAP, which led to the adverse fitness determination, without consideration of Grievant's evidence and argument with respect to the underlying offense. It contends that, in addition to other violations, DoDEA's removal of Grievant was in violation of Marine Corps Order 1754.11, which prohibits commanders from disciplining a service member based solely on the ISD for an action of child abuse, which it maintains was the case here.

FEA-SR argues that the Agency failed to meet its burden of showing a nexus between Grievant's conduct and the efficiency of the service. The Union argues that the penalty was far out of proportion to the alleged conduct. It contends that it was DoDEA's burden to convince me of the appropriateness of the penalty based on review of all relevant factors and in the exercise of reasonable discretion. FEA asserts that the Agency failed that burden, even in the total negative assessment of the *Douglas* factors, and imposed instead a penalty which was arbitrary, capricious and unreasonable.

The Association argues, in addition, that Grievant was entitled to procedural due process; but asserts that the Agency acted throughout the process in violation of those rights. It contends that the Agency cannot hide behind the FAP and SMD processes, but having relied on the results of those processes, is responsible for their deficiencies. FEA argues that Grievant's claim of denial of due process met the requirements, in that he was deprived of a Constitutionally-protected interest for which the procedures by which that occurred were constitutionally deficient, having failed at every step to provide the FAP investigation to Grievant or present it at hearing. It maintains that the failures caused the Agency to come to a contrary result than it did and therefore to constitute harmful error.

25

The Union asserts that FAP proceedings are not legal, but clinical, and did not include Grievant's right to testify, present witnesses on his behalf, cross-examine witnesses and challenge statements or otherwise advocate for himself. It points out that SMD did not know, or seek to learn, whether Grievant was entitled to or received due process.

FEA-SR argues that the Agency was required to comply with the Agreement, regardless of the FAP and SMD processes applicable. It asserts that DoDEA's removal was subject to proof of just and sufficient cause, including provision of due process, which is not satisfied by the FAP process or by SMD's reliance on its results.

FEA argues that FAP is part of the Department and was DoDEA's Agent when it conducted its investigation and reached its conclusions. It maintains that Mr. Smith's professed ignorance as to what FAP did is of no avail, as FAP, SMD and DoDEA were all DoD agents acting on behalf of DoDEA in the actions it took against Grievant - and, indeed, Mr. Smith was a member of the IDC and participated in the deliberations - were required to provide him with due process and fair treatment and DoDEA "inherited" errors in such processes. The Association argues that the insertion of SMD between FAP and DoDEA does not insulate the Agency from its obligation to provide due process, which it failed to do.

The Association argues, in particular, that Grievant was denied opportunity to confront his accusers - whom the Agency claims had documents and undisclosed statements - and to cross-examine them on their knowledge of what happened. It maintains that the submission of their unsworn statements without producing them as witnesses warrant adverse inferences and a conclusion that the Agency did not meet its burden of proof.

The Union also argues that the SMD proceeding did not provide Grievant with the required due process. It contends that he was not advised that he was being subjected to a review of his disciplinary history, including expired discipline, or that he was told that SMD

26

JA577

would be evaluating alleged poor judgment or untrustworthiness inappropriately used by SMD without notice to Grievant. FEA-SR points out that it requested SMD to provide information as to the FAP proceedings on which it relied, but that the Agency professed no knowledge as to what was considered.

The Union argues that, since the Agency predicated his removal on SMD's adverse fitness determination based on the FAP determination, it was obligated to provide the FAP documents on which the decision was based.  It urges that the Agency cannot be shielded from its Constitutional, statutory and contractual obligations based on the use of SMD to relay the finding.

The Union urges that the grievance be sustained, based on the Agency's failure to have and prove that Grievant's removal was for just cause. It urges that the removal of Mr. Nelis be rescinded and the be returned to employment in the position he would have been in, but for his improper removal, and made whole for wages and benefits lost. It requests that I retain jurisdiction to consider the Union's entitlement to attorneys fees, a separate procedure.

### DISCUSSION AND ANALYSIS

As an employee of the Federal government in the excepted service, Grievant was entitled under the Constitution of the United States to due process and fair treatment in proceedings which might terminate or otherwise adversely impact his employment. That includes written notice of the charges against him, explanation of the employer's evidence to support those charges and an opportunity to present his side of the story prior to any adverse decision to remove him. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

These Constitutional protections are recognized, and civil service protections codified, in 5 USC §7135, which requires agencies taking adverse action against employees to prove such cause as will promote the efficiency of the service. The Agreement

27

requires the Agency to prove just cause (that standard and the efficiency of the service being functionally the same) for Grievant's removal. The Agency is obligated to prove each element of just cause by a preponderance of the evidence - that is, that it is more likely than not to have occurred. The Agency's obligation to prove cause includes proof that the charged conduct occurred, that there is a nexus between the discipline and the efficiency of the service and that the penalty imposed is reasonable and not an abuse of discretion.

In the instant dispute, the conduct which led to Grievant's removal was making a verbal remark in his classroom to and about a named student, which allegedly caused the student to be embarrassed and to run from the classroom. It was that conduct which the Agency was obligated to prove, establish nexus and establish the reasonableness of the penalty. It was that conduct with respect to which Grievant was entitled to due process and fair hearing. It was the burden of the Agency to prove each of those elements by a preponderance of the evidence. Jt. Exh. 1, Article 25.

### Principal Sutherland's Handling of the Incident

The process which led to Grievant's removal began with Principal Sutherland's receipt of information as to Grievant's alleged conduct. She memorialized the names of the students involved, the accusations they made, the contacts from parents of the students and the witness statements which were to be provided. However, the Principal did not conduct an investigation of Grievant's conduct and did not notify Grievant of the charges against him or get his side of ths story. Insofar as the record indicates, neither she nor anyone on her behalf interviewed witnesses to the incident, gathered statements or made determinations whether the basic accusations were true.

28

## Assessment of the FAP Proceeding

While Principal Sutherland did not conduct an investigation, she considered Grievant's conduct to constitute possible child abuse; and she did refer the allegations to the FAP, as was required. FAP serves the important and legitimate function of investigating allegations of child abuse. It is, as the name states, an advocacy organization on behalf of children. However, neither FAP's mission nor its jurisdiction extend to determining whether just cause exists for discipline of employees whose conduct is reported to it.

The referral of Grievant's alleged conduct to FAP could not and did not waive Grievant's Constitutional, statutory and contractual rights. In the absence of an investigation and determination by Principal Sutherland or someone else in DoDEA that protected Grievant's rights, when FAP stood in the shoes of the Agency for these purposes its procedures must pass muster, including advising Grievant of the charges against him, advise him of the evidence in support of the charges and allow him to hear the evidence and cross-examine his accusers. If the Agency determined to rely on FAP's investigation, the proceeding must pass Constitutional and contractual muster.

The IDC did request a statement from Grievant regarding the incident, which he provided; however, the request did not include any statement of the charges against him, nor of the evidence in support. He did not appear before the IDC and, perforce, did not witness or have opportunity to respond to any evidence against him.

It appears that the FAP, through its IDC, conducted some sort of proceeding. References were made to a witness statement and to emails, but the documents were not identified, were not provided to Grievant and, perforce, he was not given the opportunity to respond to them. Neither was the procedure described, let alone documented, in the arbitration. Superintendent Smith, who was present for the IDC deliberations, did not describe and could not recall the

29

proceedings. While the purpose of the FAP and IDC to protect students from abuse is legitimate, its process serves different purposes; and it cannot substitute for ensuring that Grievant received due process and fair hearing for the charges against him.

The IDC process produced only a conclusory, one-page statement that Grievant "met the criteria" for "child institutional emotional maltreatment". Jt. Exh. 2. The Determination was not accompanied by any reasoned opinion, statement of the evidence relied on or the procedure utilized.   It did not even define the term "child institutional emotional maltreatment". The Determination was clinical, not disciplinary and certainly not criminal. The March 24th IDC Determination preceded the April 7th FAP Clinical Staff determination to close the complaint as "unresolved" and with only "moderate risk". There is no indication that the IDC was provided or took into account the Clinical Staff determination.

The Union provided a definition of "child institutional emotional maltreatment," as quoted above.  It requires a "repeated pattern" of behavior of caregiver behavior or "extreme, unreasonable" incidents. I accept that definition; and I find that the record contains neither a repeated pattern of behavior toward JT, proof of behavior toward JT that she was made to feel "flawed, unloved, unwanted, endangered, endangered or of value only in meeting another's needs." Neither do I find Grievant's behavior to be within the type of behavior described, nor sufficiently extreme to meet the definition.

I find, in short, that the IDC determination was not only made in violation of Grievant's rights to due process and fair treatment and without just cause, but is false on its face and, therefore, invalid for purposes of determining the justness of Grievant's discipline.

### The SMD Proceeding

The process by which the IDC Determination was referred to SMD

30

is not expressly described, but it would appear that Principal
Sutherland provided the single-page IDC Determination - and only
that document - to SMD. Insofar as the record indicates, She did
not provide the Staff Closure document; and insofar as the record
indicates, SMD did not possess, or know about, the document,
notwithstanding its possible exculpatory or mitigating content.
There is no indication that SMD interviewed witnesses or was
provided, or otherwise obtained, any of the statements referenced
in Principal Sutherland's email to herself. The invalidity of the
IDC Determination is not cured by Principal Sutherland's referral
of the IDC Determination to the SMD.

It appears that the SMD accepted the IDC's determination that
Grievant met the criteria for child institutional emotional
maltreatment without conducting any inquiry as to the basis upon
which IDC reached its determination or the position of Grievant
before it. The Determination was not criminal in nature. SMD
therefore proceeded from an invalid premise that Grievant was
guilty of "child institutional emotional maltreatment." This
tainted the SMD proceeding from the outset.

There is no indication that SMD, having assumed jurisdiction
over the IDC Determination, conducted an independent investigation
to determine whether Grievant was, in fact, guilty of "child
institutional emotional maltreatment". It did review Grievant's
personnel file and pulled documentation of prior discipline -
including the expired letters of reprimand, which should have been
removed - and the suspensions, at least the earliest of which was
stale.

While SMD provided Grievant a Notice of Intent and invited
Grievant to submit a response, it did not provide him with notice
of the charges, tell him that he was being investigated for, advise
him that the investigation would go beyond the February 26th
incident or that SMD would be reviewing his prior record or look
for evidence of character flaws. He had no opportunity to review
and respond to the evidence (if any) on which SMD relied, nor to

31

confront his accusers.

I note that the Agency itself acknowledged the improper consideration of parts of Grievant's disciplinary record and momentarily modified SMD's unsuitability on that basis, only to be quickly reversed. That initial February 3rd determination was correct. But even if incorrect, the initial referral was based on an invalid determination and a flawed investigation that did not protect Grievant's Constitutional due process rights or establish just cause for his removal.

The conclusion which follows is that the SMD proceeding was based on an invalid IDC determination and that there was no criminal conduct or other basis on which to investigate poor judgment, unreliability or untrustworthiness. I find the SMD Finding of Unsuitability for Federal employment to have been, therefore, invalid.

### Grievant's Removal

The Agency's basis for Grievant's removal is that he had been found unfit for Federal employment by SMD. As indicated, I have found the referral to SMD from FAP to have been flawed *ab initio* and therefore invalid in result because it was based on an erroneous determination that Grievant was guilty of institutional child emotional abuse.

I also find the SMP determination to have been improper as exceeding the scope of its statutory jurisdiction and in basing its consideration on prior discipline which had expired and was, in any, event, stale. I further find that the SMD determination was not made in a manner which provided Grievant with the due process and fair hearing to which he was entitled.

I am persuaded that the flawed, invalidated processes described produced an invalid Finding of Grievant's Uunfitness. That invalid finding constitutes the stated reason Grievant was

32

proposed for removal and then removed from employment. I hold that the adverse Fitness Finding is invalid and cannot be used as the basis for Grievant's removal.

I note that Mr. Smith's review of the *Douglas* factors (A. Exh. 18) found not a single one to be mitigating; all were either aggravating or neutral. While it is not required that the assessment of *Douglas* factors match what a neutral reviewer would assess, taken in totality (the missing statements and emails, the due process shortcomings in the FAP proceeding, the referral to SMD only of the IRC Determination (without the clinical staff determination), the SMD proceeding, with its momentary decision on appeal) and the *Douglas* factor review by the Deciding Official, suggests a process more driven by outcome than by adherence to required processes.

It is, in any event, Grievant's classroom conduct on February 26, 2021 which underlies the referrals and for which it was DoDEA's responsibility to prove just cause. The Agency cannot insulate its responsibilities by reliance on external FAP and SMD proceedings. Without validating the invalid IDC determination and the improper SMD finding, I find the evidence as to his classroom conduct to be as Grievant stated and testified. The Agency presented no witnesses in the arbitration with first-hand knowledge of the incident; and it provided no reason they were not produced.

Although Principal Sutherland's email to herself referenced witnesses with first-hand knowledge of the incident and noted that witness statements would be provided, none was presented at hearing.Instead, the evidence submitted by the Agency in support of its action consisted, instead, of second and third-hand hearsay. That is not sufficient to bend the record to the Agency's version, let alone meet the Agency's burden of proof. From start to finish, this proceeding the Agency's actions suggest a predetermined conclusion in search of confirmation.

33

## Grievant's Conduct in the Incident

An analysis of Grievant's conduct in the incident, even if the posture of the case allowed such review - which it does not - does not support his removal.

Grievant's concern as to compliance with the School's dress code was appropriate and within the scope of his duties. I accept that Grievant's comment about JT to the entire class was an attempt at humor, but believe it was inappropriate and in bad taste for him to comment on JT's allegedly-improper dress. His comment was, in fact, insensitive to JT and to the charged atmosphere in which ninth-graders operate. It  served as a distraction in the educational environment. He invited the complaints he received from other students.

That said, the evidence of record does not convince me that Grievant made the other comments which Agency witnesses attribute to him. The evidence is also insufficient to establish that JT ran out of the class in embarrassment or that Grievant's comment rose to the level of institutional emotional child abuse.  More to the point, the evidence does not convince me that Grievant's conduct rose to the level of justifying his removal. The Award so reflects.

## Prior Awards

This is not a case of first impression for the Parties. In other cases, Arbitrators Moore, Rafael Gely, Dr. Frank Cornelius and Joshua Javits have also rejected various aspects of the manner in which the Agency proceeded and the result it reached.  There is no reason sufficient to reconsider their holdings.

34

**A W A R D**

The grievance is sustained. The Agency failed to prove that Grievant's Removal was for cause sufficient to be for the efficiency of the service.

Grievant's removal shall be rescinded and he shall be returned to employment in such position as his seniority and qualifications entitle him. He shall be made whole for wages and benefits lost as a result of his removal, including interest in accordance with the Back Pay Act. Grievant's records shall be amended and expunged to remove all reference to his removal.

The Agency shall cause the removal of adverse references in any Department, DSS or other data bases within its control and shall, in any event, disregard them for purposes of Grievant's continued employment with DoDEA.

As the prevailing Party and in the interest of justice, the Association shall be entitled to payment of reasonable attorneys fees incurred. Jurisdiction is retained for purpose of receiving a Petition for such fees and, for a period ending 120 calendar days after the Agreement and bargaining relationship is established or reestablished, to address issues which might arise in the implementation of the Award.

Issued this 24th Day of May, 2025.

M. David Vaughn
Arbitrator

35

JA586

# Exhibit 16

 Outlook

---

## [EXTERNAL] - (FYI) Return to In-Person Work for Union Representatives

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Tue 3/25/2025 2:13 PM

**To** King, Frank Mr. CIV OSD/DoDEA-HQ <Frank.King@dodea.edu>; Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe <muslimah.shabazz@dodea.edu>; Steele, Andre Mr. CIV OSD/DoDEA-Pacific <Andre.Steele@dodea.edu>

**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

📎 1 attachment (292 KB)

[EXTERNAL] - (FYI) Return to In-Person Work for Union Representatives;

·

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

 Outlook

---

**[EXTERNAL] - (FYI) Return to In-Person Work for Union Representatives**

---

**From**   Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date**   Tue 3/25/2025 2:13 PM

**To**    King, Frank Mr. CIV OSD/DoDEA-HQ <Frank.King@dodea.edu>; Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe <muslimah.shabazz@dodea.edu>; Steele, Andre Mr. CIV OSD/DoDEA-Pacific <Andre.Steele@dodea.edu>

**Cc**    Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

📎 1 attachment (157 KB)
Return to In-Person Work for Union Representatives.pdf;

Attached please find a memorandum regarding the impacts of return to in-person work for Union/Association representatives.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office:  (571) 372-1864
Cell:  (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.



**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**HEADQUARTERS**
**4800 MARK CENTER DRIVE**
**ALEXANDRIA, VA  22350-1400**

March 25, 2025

MEMORANDUM FOR FEDERAL EDUCATION ASSOCIATION
           FEDERAL EDUCATION ASSOCIATION – STATESIDE REGION
           OVERSEAS FEDERATION OF TEACHERS
           ANTILLES CONSOLIDATED EDUCATION ASSOCIATION
           AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
             LOCAL 1770
           AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
             CONSOLIDATED UNIT

SUBJECT:    Impact of Return to In-Person Work on Union/Association Representatives

      By email dated January 25, 2025, Dr. Schiavino-Narvaez, Director, notified all DoDEA employees of the Presidential Memorandum (PM), "Return to In-Person Work."  Consistent with the directive that all employees must return to in-person work at their respective duty stations on a full-time basis, Union and Association representatives are required to work from their assigned school.  While representatives are no longer authorized to work any portion of their duty day from an alternate location, they are not precluded from attending grievance meetings, Weingarten meetings, and/or joint labor-management meetings held at other schools or DoDEA facilities on their assigned installation on official time.  This condition is applicable to all representatives including, but not limited to, those on 100% official time, 50% official time/50% leave without pay, and 50% official time/50% duty time.  As a reminder, all official time must be coordinated with a representative's administrator or supervisor in advance and reflect on his/her timesheet.

      Directors for Student Excellence, superintendents and administrators have been notified of this change and are committed to working with impacted representatives to identify and appropriate office spaces within the employee's assigned school.  Union/Association representatives must report full-time in-person no later than April 21, 2025, unless an exception has been approved by DoDEA Headquarters.  Requests and other questions may be directed to me at alexa.rukstele@dodea.edu.

                               Alexa Rukstele
                               Chief, Labor Management and Employee
                                Relations Division

cc:    Directors for Student Excellence
       District Superintendents

# Exhibit 17

 Outlook

---

## [EXTERNAL] - 4/23 VM

---

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Thu 4/24/2025 11:48 AM

**To** Hunter, Benjamin [FEA] <BHunter@nea.org>

**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

📎 1 attachment (73 KB)
[EXTERNAL] - 4/23 VM;

· 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

 Outlook

---

## [EXTERNAL] - 4/23 VM

---

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>
**Date** Thu 4/24/2025 11:48 AM
**To** Hunter, Benjamin [FEA] <BHunter@nea.org>
**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

Ben:

Due to restrictions associated with EO 14251, I am unable to respond to your voicemail; however, please be advised that additional guidance/direction will be provided to FEA-SR next week.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office: (571) 372-1864
Cell: (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION: This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Additionally, please indicate to the sender that you have received this message in error and delete the original message.

# Exhibit 18

 Outlook

---

## [EXTERNAL] - Implementation of EO 14251

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Tue 4/29/2025 9:57 AM

**To** Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; King, Frank Mr. CIV OSD/DoDEA-HQ <Frank.King@dodea.edu>; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe <muslimah.shabazz@dodea.edu>; Steele, Andre Mr. CIV OSD/DoDEA-Pacific <Andre.Steele@dodea.edu>

**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

📎 1 attachment (79 KB)

[EXTERNAL] - Implementation of EO 14251;

•

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

 Outlook

---

**[EXTERNAL] - Implementation of EO 14251**

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Tue 4/29/2025 9:57 AM

**To** Woods, Elgin Mr. CIV OSD/DoDEA-Americas <Elgin.Woods@DODEA.EDU>; King, Frank Mr. CIV OSD/DoDEA-HQ <Frank.King@dodea.edu>; Shabazz, Muslimah Ms. CIV, OSD/DoDEA-Europe <muslimah.shabazz@dodea.edu>; Steele, Andre Mr. CIV OSD/DoDEA-Pacific <Andre.Steele@dodea.edu>

**Cc** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

Union Presidents & Leaders:

Consistent with EO 14251 and subsequent OPM and DoD guidance, **official time is no longer authorized for any purpose**.  Accordingly, all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school.  Representatives who were previously scheduled one (1) instruction-free period per day are no longer authorized to conduct representational work during that time and must coordinate with the school principal to be assigned agency work during that period.  If they are not already doing so, beginning May 5, 2025, all union/association representatives on full- or half-time must engage in agency work for 100% of the duty day, as assigned by the District Superintendent, in coordination with school administrators.  Also, DoDEA must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by unions/associations for representational activities and repurpose those resources for agency business only.  In this regard, representatives will be required to promptly vacate any office space used by the union/association.

Alexa Rukstele
Chief, Labor Management & Employee Relations Division
Department of Defense Education Activity
Office:  (571) 372-1864
Cell:  (703) 459-7490
alexa.rukstele@dodea.edu

CAUTION:  This communication may contain information protected by the Privacy Act of 1974 and is Controlled Unclassified Information (CUI) / For Official Use Only (FOUO). If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information.  Additionally, please indicate to the sender that you have received this message in error and delete the original message.

# Exhibit 22

 Outlook

---

## Re: "Future-Ready" DoDEA initiative

---

**From** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>

**Date** Wed 5/28/2025 6:51 PM

**To**   Hunter, Benjamin [FEA] <BHunter@nea.org>

---

Ben:

DoDEA acknowledges receipt of FEA-SR's below requests; they will be held in abeyance pending the outcome of litigation over EO 14251.

Alexa Rukstele
Chief, Labor Management Employee Relations
Department of Defense Education Activity
571-372-1864
alexa.rukstele@dodea.edu

**From:** Hunter, Benjamin [FEA] <BHunter@nea.org>
**Sent:** Wednesday, May 28, 2025 6:32:06 PM
**To:** Rukstele, Alexa A. Ms. CIV OSD/DoDEA-HQ <Alexa.Rukstele@DODEA.EDU>
**Subject:** "Future-Ready" DoDEA initiative


**\*\*\*This message originated from outside of DoDEA.\*\*\***


Dear Alexa,

FEA-SR has been informed by unit employees that a number of Educational Technologists, Assessors, and Automation Clerks have received notices indicating their positions are impacted by the "Future-Ready" DoDEA initiative. FEA-SR officially requests to bargain over this change in accordance with Article 7 of both the Certified and Classified Master Labor Agreements.

FEA-SR offers the following as initial proposals, while reserving the right to modify or add to these proposals in good faith as additional information about the Agency's initiative becomes available:

- The Agency shall provide the FEA-SR with a comprehensive list of all bargaining unit positions and employees impacted.
- The Agency shall provide the FEA-SR with a list of all current and anticipated vacancies for the 2025–2026 school year.
- Employees will be provided at least two (2) weeks to consider Voluntary Early Retirement Authority (VERA) and/or Voluntary Separation Incentive Payment (VSIP) offers.
- The Agency will provide timely retirement calculations and guidance on retirement and benefits to impacted employees.
- Following the initial offer of VERA/VSIP, the Agency shall provide an updated list to FEA-SR detailing all excessed employees and all remaining or newly created vacancies.

- The parties shall meet and confer to identify additional positions that may be utilized to place excessed employees.
- The Agency shall issue a second round of VERA/VSIP offers to employees occupying positions that could be used for the placement of excessed employees within the same commuting area.
- Excessed employees shall be given the opportunity to rank their preferred placement options by position title for all positions for which they are certified.
- Excessed employees shall be placed in positions within their commuting area for which they are determined to be qualified.
- Placement of excessed employees shall be conducted in Service Computation Date (SCD) order. The most senior qualified employee shall be offered their highest-ranked preference first, followed by the next most senior employee, and so on.
- In the event that excessed employees remain unplaced following the initial placement process, the parties agree to enter into negotiations to determine further excessing procedures and explore additional incentives to avoid implementation of a Reduction in Force (RIF).
- The Agency will consider provisional or emergency certification to support placement of employees with limited certification areas, provided the employee agrees to meet the requisite educational requirements within two (2) years.
- The Agency will offer placement priority and transition assistance for released employees as new DoDEA positions become available.

Please advise whether management is willing to meet to discuss the "Future-Ready" DoDEA initiative and begin the bargaining process.

Sincerely,

Ben Hunter

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL EDUCATION
ASSOCIATION, *et al.*,

     *Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*,

     *Defendants.*

Civil Action No. 1:25-cv-1362

### DECLARATION OF WILLIAM H. FREEMAN

I, Willam Freeman, declare that the following is true and correct:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am employed by the Federal Education Association ("FEA") as the general counsel for the Federal Education Association Europe Area Council ("FEA-Europe"), an affiliated leadership council of the FEA. I have served in this position since 1999.

3.     FEA and FEA-Europe represent educators who work overseas at pre-kindergartern-through-12th-grade schools operated by the Department of Defense Education Activity ("DODEA"). For more than 35 years, FEA-Europe has provided support for bargaining on behalf of DODEA educators stationed in Europe, including by enforcing the collective bargaining agreements ("CBAs") entered into by DODEA and FEA through grievance-and-arbitration proceedings on behalf of FEA-represented DODEA educators stationed in Europe.

1

4.      From 1979 until March 27, 2025, when President Trump issued Executive Order 14251, entitled "Exclusions from Federal Labor-Management Programs" ("Executive Order 14251"), collective bargaining between FEA and DODEA concerning the terms and conditions of overseas educators' employment was governed by the Federal Service Labor-Management Relations Statute ("FSLMRS"), which is codified at Chapter 71 of Title 5 of the U.S. Code.

5.      In my capacity as an attorney for FEA, I have litigated hundreds of cases on behalf of members of FEA's overseas bargaining unit in grievance and arbitration proceedings, in FLRA cases arising from DODEA challenges to arbitral awards and from unfair labor practice complaints filed by FEA, and in federal court proceedings. And before I became an FEA employee, I arbitrated 12 cases on behalf of more than 90 grievants represented by FEA on a contingency basis.

6.      Since the late 1990s, the overwhelming majority of the grievances that FEA has brought on behalf of DODEA's overseas educators—more than 90%—have been ones seeking relief for improper pay practices by DODEA and its pay agent, the Defense Finance Accounting Service ("DFAS"). These pay grievances are of two general types. The first type—comprising most of the pay grievances that FEA has filed and that I have handled since 1998—have arisen due to DODEA's now-decades-long practice of improperly garnishing employees' pay based on claimed debts to the government from overpayments, which are erroneous in most cases, while failing to comply with the procedural protections required by Article 45 of the applicable CBAs and the Debt Collection Act, 5 USC § 5514. The second type consists of claims that DODEA has underpaid educators by, for instance, placing them in the wrong lane or step of the pay scale. Some pay grievances involve both types of claims. To achieve economies of scale, FEA usually litigates these claims as group grievances on behalf of multiple grievants with similar claims.

2

JA601

7.    Over the past three decades, FEA grievances over DODEA's improper pay

practices have resulted in more than 80 arbitration awards in favor of FEA-represented

educators, including more than 15 awards that DODEA contested before the FLRA—virtually all

of which were upheld in whole or in part[1]—awards that DODEA did not contest, and consent

awards resolving grievances short of an arbitrator's award.

8.    Arbitrators who have presided over multiple pay disputes between FEA and

DODEA over this period have often decried DODEA's pay practices. For example, arbitrator

Andrée McKissick, who has heard three cases involving group grievances filed by FEA on

behalf of numerous DODEA educators, stated the following in a 2012 supplemental award in one

such case:

> Based on [the record in the instant proceedings] and my extensive
> experience with these cases, the great majority of debts identified by
> [DODEA and DFAS] have proved to be invalid. [DODEA and DFAS]
> have been routinely violating the Debt Collection Act for more than a

---

[1] *See, e.g.*, *U.S. Dep't of Defense Educ. Activity*, 70 F.L.R.A. 84, 84 (2016) (affirming, in case dating from 2007 that had already resulted in three arbitral awards and one prior FLRA decision, the arbitrator's fourth award concluding "that the Agency had not complied with her previously ordered remedies"); *U.S. Dep't of Defense Dependents Sch. - Eur.*, 66 F.L.R.A. 181 (2011) (affirming award finding "that the Agency violated the Back Pay Act …, the Debt Collection Act …, and the parties' collective bargaining agreement … by its omissions, delays, and administrative errors regarding the pay and earnings, interest, and Thrift Savings Plan … matching funds of named grievants"); *U.S. Dep't of Defense Educ. Activity*, 60 F.L.R.A. 254, 256-57 (2004) (affirming the merits of the award as to all grievants, but modifying the remedy for one grievant so as to confine it to the applicable limitations period and ruling that arbitrator's award of attorney's fees was premature); *U.S. Dep't of Defense Educ. Activity*, 60 F.L.R.A. 24 (2004) (affirming award finding "that the Agency violated the collective bargaining agreement, applicable Federal law, and related arbitration decisions by failing to pay employees correctly and by failing to provide documentation that correct payments had been made for back pay, interest on back pay, TSP matching funds, and lost earnings"); *U.S. Dep't of Defense Educ. Activity*, 59 F.L.R.A. 806 (2004) (affirming award finding "that the Agency violated the Debt Collection Act … and Article 45 of the parties' agreement in recouping overpayments of certain employee benefits" and ordering back pay); *U.S. Dep't of Defense Educ. Activity*, 56 F.L.R.A. 1996 (2000) (affirming award finding that DODEA failed to timely pay greivants' back pay); *U.S. Dep't of Defense Dependents Sch.*, 54 F.L.R.A. 773 (1998) (upholding award of attorneys' fees to FEA incurred in securing interest on delayed payments owed to grievant).

3

decade by illegally collecting 'debts' without due process. On many
occasions, these collections occurred with the grievant not having any way
of knowing.

A true and correct copy of Arbitrator McKissick's 2012 supplemental award is attached as

Exhibit 1. In a 2003 award, Arbitrator John Sands described the DODEA actions at issue in the

case as "a frustrating tale of administrative incompetence, stonewalling, and arrogance" that

"began with a number of errors affecting bargaining unit employees' compensation; it continued

with ineffective attempts to correct those errors that in some cases compounded the problems,

and it concludes with a graceless effort to … leave grievants with no remedy for the harm they

have suffered." *U.S. Dep't of Defense Dependent Sch. v. Fed. Educ. Assn.*, 2003 WL 23469327

(Dec. 22, 2003).[2] Another award from Arbitrator Sands, this one issued in 2017, recounted

DODEA's "consistent history – detailed in past arbitration awards [extensively quoted in the

award] – of disregarding clear and unambiguous requirements of law and contract by illegally

collecting alleged debts from grievants' compensation without even a pretense of following

required procedures" A true and correct copy of the Arbitrator Sands' 2017 award [] is attached

as Exhibit 2.

      9.     Grievance-and-arbitration proceedings concerning the pay of DODEA's overseas

educators tend to be quite protracted. The most significant reasons for this tendency are the

following three.

      a.     First, DODEA's pay system is highly complex. Not only does it require the

application of a reticulated pay scale—replete with lanes, steps, and adjustments based on

credentials—but for overseas educators it also involves items such as allowances for

---

[2] DODEA sought review of this award from the FLRA, which upheld the award in relevant part
*See U.S. Dep't of Defense Educ. Activity*, 60 F.L.R.A. at 256-57 (2004).

4

housing and utilities that change with fluctuations in exchange rates, such that overseas educators' pay usually varies each pay period.

      b.    Second, DODEA's pay calculations—including its deductions from employee pay to recoup purported debts arising from alleged government overpayments—are opaque and plagued by errors and poor record-keeping. The sheer number of pay errors and improper recoveries of alleged debt that DODEA, and its pay agent the Defense Finance Accounting Service ("DFAS"), commit every year swamps the grievance and arbitration system under the parties' CBAs. Consequently, to ensure that FEA-represented educators receive the pay to which they are due, FEA has had to grieve and arbitrate scores of pay errors and procedural violations every year. Over the past 30 years, the continual flood of pay problems with respect to DODEA's overseas educators has led to group-grievance arbitrations on behalf of an average of approximately 50 grievants annually. And the number of arbitrations conducted in a given year would be higher were it not for the fact that DODEA refuses to participate in arbitrations during the summer.

      c.    Third, because of the chronic problems with DODEA's pay practices summarized above, arbitrators deciding FEA's pay grievances have developed procedures unique to these cases designed to ensure that grievants are made whole after the issuance of a back pay award. These procedures were first ordered by Arbitrator McKissick in a 2003 award concluding that a group of grievants represented by FEA were entitled to back pay an interest. A true and correct copy of Arbitrator McKissick's 2003 award is attached as Exhibit 3. In that award, Arbitrator McKissick ordered a multistep post-award process involving among other things that DODEA conduct a full audit of the grievants'

pay history to be submitted within six months of the award as well as retention of jurisdiction to ensure that the grievants are made whole after the audits are submitted and vetted by FEA counsel. Exhibit 3 at 20-21, 27. This procedure—which Arbitrator McKissick refined in the 2012 award quoted above, see Exhibit 1 at 3-5 —has become a standard feature of arbitral practice in cases dealing with pay grievances against DODEA and is commonly referred to by arbitrators and parties alike as the "McKissick full audit" process.

10.    Consequently, not only can it take years for a pay grievance to reach a merits award finding contractual and statutory violations by DODEA, but even after such an award issues, the audit and subsequent review process can take even longer. The lengthy audit reports, routinely submitted by DODEA well past arbitrator-ordered deadlines, are often riddled with problems requiring further arbitral proceedings and supplemental awards before the arbitrations can conclude.

11.    For the reasons summarized in paragraphs 9-10, pay grievances filed by FEA on behalf of more than 800 overseas educators were pending at various stages of the arbitral process when President Trump issued Executive Order 14251. Some of these pending grievances date back as far as 2011. As of March 27, 2025, these pending grievances fall into four categories:

a.    With respect to 493 grievants, arbitrators have issued merits awards, but the grievants have yet to be made whole, either because the audit and audit-vetting processes that followed the merits awards have not yet concluded or DODEA has not yet complied with the awards, thus requiring further arbitral proceedings. Of the 493 grievants who are still waiting to made whole in accordance with merits awards, more than 200 were underpaid by as much as $125,000. The rest had their pay garnished illegally without the

due process protections required by the applicable CBA and by the Debt Collection Act. By way of example, I am attaching true and correct copies of the three most recent such awards: Arbitrator M. David Vaughn's January 31, 2025, award in favor of 25 grievants is attached as Exhibit 4; Arbitrator Joyce Klein's October 30, 2024, award in favor of 21 grievants is attached as Exhibit 5; and Sarah Miller Espinosa's September 6, 2024 award in favor of 25 grievants, is attached as Exhibit 6. Taken together, these three awards ruled in favor of 71 grievants from whom DODEA has improperly garnished pay in amounts ranging from thousands of dollars to tens of thousands of dollars. *See* Exhibit 4 at 21-41; Exhibit 5 at 10-22; Exhibit 6 at 14-32.

    b.    With respect to 18 grievants, arbitrators have held hearings but have yet to issue awards.

    c.    With respect to 19 grievants, arbitrations have been scheduled but had not yet been held.

    d.    With respect to another 300-plus grievants, FEA has invoked arbitration but hearings have not yet been scheduled.

    12.    The pending grievances discussed above all arose either under the current CBA between FEA and DODEA—which entered into force in 2023 and by its terms remains in force until August 1, 2028—or under the prior CBA, entered in 1989, which remained in force until the 2023 CBA was executed. The language governing grievance and arbitration procedures, as well as that governing debt collection procedures is the same in all relevant respects for each of the applicable CBAs.

    13.    Following President Trump's issuance of Executive Order 14252, DODEA has refused to honor its contractual obligation to engage in the grievance-and-arbitration process for

grievances filed under Article 12 of the current CBA in force between FEA and DODEA and those filed under similar provisions of the prior CBA while it was in force. DODEA has done so by refusing to continue participating in scheduled arbitration hearings, by purporting to cancel arbitration hearings and DODEA's contracts for arbitral services, and by asserting that arbitrators lack jurisdiction over any such grievances.

14.    For example, among the arbitrations that were scheduled for hearing after the March 27, 2025 Executive Order issued is one assigned to Arbitrator Lana Flame. That arbitration involves 19 grievants, 16 of whom have since retired or separated from DODEA. The hearing was scheduled for May 15-17, 2025. On April 9, 2025, DODEA's counsel unilaterally purported "to postpone the hearing scheduled to start next week given the ambiguities of late" while also stating, "I understand that the Agency will be required to pay cancellation fee(s)." A true and correct copy of the e-mail from DODEA Associate General Counsel Carla Eldred to Arbitrator Flame and myself is attached as Exhibit 7.

15.    Another illustrative example comes from a pay grievance on behalf of 19 educators that Arbitrator Rosemary Pye heard on March 11 and 12, 2025—weeks before the Executive Order issued. After the hearing had concluded and the Executive Order was issued, DODEA's counsel repeatedly requested that the arbitrator delay or hold in abeyance all further proceedings by reason of the Executive Order, and when the arbitrator denied those requests, DODEA declared that neither the FLRA nor the arbitrator had jurisdiction over the grievances, that the arbitration was cancelled, and that the arbitrator's contract was cancelled and that DODEA would pay the arbitrator for no further contracted work on the grievances. The course of these events is documented in (a) the e-mail traffic between DODEA's counsel, Arbitrator Pye, and myself from April 11-May 6, 2025, a true and correct copy of which is attached hereto as

8

Exhibit 8; and orders issued by Arbitrator Pye on April 28 and May 7, 2025, true and correct copies of which are attaches as Exhibits 9 and 10. A more detailed account of the events is as follows:

     a.    Arbitrator Pye accurately summed up the grievances at issue as follows:

> The Union represents 19 grievants in this case. These grievances were filed in 2011, and the Agency's allegations of claims of debt go back further. This is the first time any of the grievants were able to testify about the alleged agency claims against them, which claims seek to recoup money for overpayments allegedly made to them by the Agency but which the Agency did not discover until a substantial amount of time after the alleged debt accrued. The grievances arose under a collective-bargaining agreement between the parties that has now expired and that has been succeeded by a successor agreement. [Exhibit 9 at 2.]

As Arbitrator Pye further recounted, prior to the hearing, "[t]he parties stipulated that the grievances were arbitrable"; that the issue to be decided was whether DODEA violate the CBA or federal law "by failing to pay and/or demonstrate payment of correct pay, interest, Thrift Savings Plan matching funds, and TSP lost earnings, or by failing to comply with the Debt Collection Act"; and "that the arbitrator would retain jurisdiction only for the purposes of implementing the remedy, if any is ordered." *Id.*

     b.    On April 11, 2025, DODEA's counsel sent a request, via e-mail, that the arbitrator delay all further proceedings pending guidance from DODEA leadership regarding the Executive Order. Exhibit 8 at 14. The arbitrator promptly denied the request on the grounds that "case arose many years ago under a contract from many years ago," that "[a]ll parties have worked hard to bring it to a resolution," and that "under existing law" the case would not be affected by any future implementation of the Executive Order by DODEA. Exhibit 8 at 11. DODEA emailed a further request on April 25, 2025, this one asking that the case be placed in abeyance pending the outcome of litigation over the

validity of the Executive Order. Exhibit 8 at 8. The same day, Arbitrator Pye again denied

the request, stating as relevant here as follows:

> This case is unlikely to be affected by the Executive Orders or the court
> litigation because it involves grievances under prior contracts, and I
> have closed the hearing and closed the case subject to the receipt of
> briefs and issuance of the decision. Those briefs are due soon. It would
> be substantially more difficult for us to resume this case at some distant
> point. It is also a problem for the grievants and for the Union and the
> Agency to have their rights and liabilities remain undecided for an
> indefinite period of time. [Exhibit 8 at 7.]

    c.    In response, DODEA's counsel, in an e-mail the same day, stated as

follows:

> Pursuant to the Department of Defense's designation under this Executive
> Order, the FLRA no longer holds jurisdiction over DoDEA. Consequently,
> DoDEA is relieved of its statutory obligations to engage in collective
> bargaining or to honor existing collective bargaining agreements under the
> Federal Service Labor-Management Relations Statute (FSLMRS).
>
> In line with these exclusions, FEA is no longer the exclusive
> representative, and arbitrators lack jurisdiction to adjudicate disputes
> arising under the Statute. [Exhibit 8 at 6.]

    d.    On April 28, 2025, Arbitrator Pye issued a more formal order "restat[ing

her] earlier orders," explaining as follows:

> This case is governed by *Nolde Bros. v. Bakery & Confectionery Workers Local
> 358*, 430 U.S. 243 (1977) – longstanding U.S. Supreme Court law. *How
> Arbitration Works, Elkouri & Elkouri (Eighth Edition)*, at 3-28, explained the
> principle I have been asserting:
>
>> In its *Nolde* decision, the Court recognized that grievances that arise
>> during the life of the collective bargaining agreement, and are
>> arbitrable under the agreement, do not become nonarbitrable merely
>> because the agreement is terminated before arbitration is requested
>> or commences.
>
> This case presents an even stronger case for going forward than *Nolde*. The
> alleged debts accrued and the grievances were filed during the term of a
> collective-bargaining agreement. The parties went to arbitration and the hearing
> closed, subject only to the submission of briefs on April 30 and Reply briefs on
> May 19. The request from the Agency to hold the case in abeyance based on

10

JA609

> Executive Order 14251 was filed on April 25, with the briefs due on April 30.
> The pending litigation does not in any way implicate the arbitration of a case
> that concerns longstanding grievances accrued under a contract that has long
> since expired and that has been arbitrated with full due process for the parties.
> [Exhibit 9 at 5.]

The arbitrator then *sua sponte* extended the deadline for DODEA to file its brief to May

7. *Id.*

      e.    As recounted in a subsequent order by the arbitrator, that same day, April

28, Arbitrator Pye "received notice from Andrew Golseth, Administrative Officer, Office

of the General Counsel, DoDEA, informing me that the Agency had cancelled this

contract on April 25, 2025, and no work after that date will be compensated." Exhibit 10

at 3.

      f.    On May 6, 2025, counsel for DODEA responded to Arbitrator Pye's April

28, 2025, order as follows:

> While the Agency acknowledges receipt of your April 28, 2025, Order,
> please note that, pursuant to the Agency's April 25, 2025, correspondence,
> it considers this matter cancelled in pursuant to Executive Order 14251 and
> the guidance received. In accordance with the exclusions outlined in the
> Executive Order, the Federal Education Association is no longer recognized
> as the exclusive representative, and jurisdiction before the arbitrator no
> longer exists. Accordingly, I am not authorized to engage in further filings
> or communications regarding this matter. [Exhibit 8 at 2.]

      g.    On May 7. 2025, Arbitrator Pye issued a further order providing DODEA

a final opportunity to submit a post-hearing brief and concluding as follows:

> In keeping with my prior order and my order today, I plan to proceed and
> issue a decision. I adhere to my conviction that this case is governed by
> the U.S. Supreme Court's decision in *Nolde Bros. v. Bakery &
> Confectionery Workers Local 358*, 430 U.S. 243 (1977), which makes the
> self-evident finding that a withdrawal of recognition, even if lawful, does
> not excuse prior obligations that accrued during the term of a collective-
> bargaining agreement. In effect, an agency cannot refuse to remedy its
> prior violations of a collective-bargaining agreement based on subsequent
> conduct. [Exhibit 10 at 3.]

Arbitrator Pye closed her decision as follows:

> I hereby waive my right to any payment for services rendered after April 25, 2025. I have already submitted my invoice to the parties for the two days of hearing. I will not seek any further compensation from either party. It is only by issuing my Decision promptly that I can clearly recall the testimony, and it is important to the parties and the individual grievants to reach a resolution of this case. [Exhibit 10 at 4.]

16.    Given DODEA's refusal to honor its contractual obligations to engage in the grievance-resolution process under the current and prior CBAs—and its express position that Executive Order 14251 "relieve[s DODEA] of its statutory obligations to engage in collective bargaining or to honor existing collective bargaining agreements" and that "the Federal Education Association is no longer recognized as the exclusive representative"—DODEA has plainly repudiated its CBAs. As a result, DODEA cannot be expected to honor its contractual obligations by complying with any arbitration awards issued in grievances arising prior to Executive Order 14251, including the back pay awards already issued in pending cases involving 493 grievants that DODEA had yet to comply with, or with any arbitral awards that have been issued or may yet be issued resolving grievances arising under its CBAs prior to or after the issuance of Executive Order 14251. DODEA's repudiation of its contractual obligations is particularly devastating to those grievants—who constitute the majority of the more than 800 with pending grievances—whose grievances arose from DODEA actions outside the limitations periods applicable in any other forum in which relief could be sought, such as the U.S. Court of Claims (for compensation claims under the Tucker Act) or the Merit Systems Protection Board (for adverse action claims under Civil Service Reform Act).

I declare under penalty of perjury that the foregoing is true and correct.

Signed May 31, 2025, in NEWPORT BEACH, CA

William H. Freeman

# Exhibit 7



**RE: New Cases AG's 12-14 and 15-05**

E

Eldred, Carla J. Ms. CIV OSD/DoDEA   ↩   ↩   ↪   ⊘   ✍   🔲   ...

To: Lana Flame <flame.lana@gmail.com>     Wed 4/9/2025 3:05 PM

Cc: ● Freeman, Bill [NEA]; ⊗ Freeman, William [FEA]; ▶

🛈  You replied on Wed 4/9/2025 3:18 PM

Dear Arbitrator Flame and FEA Counsel,

My sincere apologies for the inconvenience, but I just received guidance to postpone the hearing scheduled to start next week given the ambiguities of late. I can assure you that I have done all of my preparations and would have notified everyone sooner – had I known!

I understand the Agency will be required to pay cancellation fee(s).

Thank you in advance for your understanding.

Carla

Carla J. Eldred
Associate General Counsel
Labor and Litigation
Department of Defense Educational Activity
Office of the General Counsel
(720) 546-2994
carla.eldred@dodea.edu

CAUTION: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the DoDEA Office of the General Counsel.

# Exhibit 8

**Freeman, Bill [NEA]**

| | |
|---|---|
| **From:** | Rosemary Pye <pye.arbitrator@gmail.com> |
| **Sent:** | Wednesday, May 7, 2025 4:18 PM |
| **To:** | Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org>; Freeman, Bill [NEA] <BFreeman@nea.org> |
| **Subject:** | [EXTERNAL] - Briefs Filed by FEA. Second Order Issues |

Dear Ms. Vemury, Ms. Eldred, Mr. William Freeman, and Mr. Bill Freeman,

Please see my Second Order.

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

FEA filed a timely brief.  DoDEA has announced an intent not to file a brief.  Therefore, I am asking FEA to serve DoDEA with its Brief.  I will allow DoDEA to file a reply brief.  I am waiving any compensation from either party except for the two days of hearing.

The Second Order provides greater explanation.  I hope DoDEA reconsiders and files a brief and we can resolve this case.  Alternatively, you should look for a settlement of these claims.

Thank you,
Rosemary Pye

**Freeman, Bill [NEA]**

| | |
|---|---|
| **From:** | Rosemary Pye <pye.arbitrator@gmail.com> |
| **Sent:** | Tuesday, May 6, 2025 1:16 PM |
| **To:** | Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> |
| **Cc:** | Freeman, Bill [NEA] <BFreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org> |
| **Subject:** | Re: [EXTERNAL] - Order Denying Request to Hold Case in Abeyance |

Thank you, Ms. Vemury.  This acknowledges receipt of your email.

Regards,
Rosemary Pye
Arbitrator

---

On May 6, 2025, at 12:59 PM, Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> wrote:

Arbitrator Pye,

While the Agency acknowledges receipt of your April 28, 2025, Order, please note that, pursuant to the Agency's April 25, 2025, correspondence, it considers this matter cancelled in pursuant to Executive Order 14251 and the guidance received. In accordance with the exclusions outlined in the Executive Order, the Federal Education Association is no longer recognized as the exclusive representative, and jurisdiction before the arbitrator no longer exists. Accordingly, I am not authorized to engage in further filings or communications regarding this matter.

Sincerely,
*Anitha Vemury*
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

*Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.*

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

CUI

**Freeman, Bill [NEA]**

| | |
|---|---|
| **From:** | Rosemary Pye <pye.arbitrator@gmail.com> |
| **Sent:** | Tuesday, April 29, 2025 12:05 PM |
| **To:** | Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> |
| **Cc:** | Bill Freeman <BFreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org> |
| **Subject:** | Re: [EXTERNAL] - Order Denying Request to Hold Case in Abeyance |

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Thank you, Ms. Vemury.
Regards,
Rosemary Pye

---

On Apr 29, 2025, at 12:04 PM, Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> wrote:

Good afternoon, receipt acknowledged.

 Sincerely,

*Anitha Vemury*

Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

Caution: This message may contain information protected by the attorney–client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

CUI

**Freeman, Bill [NEA]**

| | |
|---|---|
| **From:** | Freeman, Bill [NEA] <BFreeman@nea.org> |
| **Sent:** | Monday, April 28, 2025 3:57 PM |
| **To:** | Rosemary Pye <pye.arbitrator@gmail.com>; Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org> |
| **Subject:** | Re: [EXTERNAL] - Order Denying Request to Hold Case in Abeyance |

**\*\*\*This message originated from outside of DoDEA.\*\*\***

 Hello Arbitrator Pye,

FEA acknowledges receipt. We mailed a hard copy of our Post Brief to you earlier today. Emailed copy to you will follow shortly.

For subsequent correspondence on this subject, please retain this email thread to remind me of what has transpired.

Thanks,
Bill

William H. Freeman
FEA-Europe General Counsel

---

**From:** Rosemary Pye <pye.arbitrator@gmail.com>
**Sent:** Monday, April 28, 2025 2:55 PM
**To:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org>; Freeman, Bill [NEA] <BFreeman@nea.org>
**Subject:** [EXTERNAL] - Order Denying Request to Hold Case in Abeyance

Dear Ms. Vemury and Mr. Freeman,

Given the Agency's position that it would not file a brief, I wanted to put my Order in a written form — not merely a series of emails.  Please note that I have extended the dates for filing briefs and reply briefs by one week.

Please acknowledge receipt.

Thank you,
Rosemary Pye

•

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

**Freeman, Bill [NEA]**

| | |
|---|---|
| **From:** | Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> |
| **Sent:** | Friday, April 25, 2025 2:59 PM |
| **To:** | Rosemary Pye <pye.arbitrator@gmail.com> |
| **Cc:** | Freeman, William [FEA] <willfreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, Bill [NEA] <BFreeman@nea.org> |
| **Subject:** | RE: [EXTERNAL] - Request to Hold Case in Abeyance, FMCS 1501214 and 180307-00286 |

I understand your position.

The Agency is cancelling this arbitration in accordance with Executive Order 14251 and guidance received. In accordance with the Executive Order exclusions, the Federal Education Association is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

As such, the Agency is not authorized to submit any further pleadings in this matter.

Sincerely,

*Anitha Vemury*

Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

*Caution: This message may contain information protected by the attorney–client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.*

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

==CUI==

---

**From:** Rosemary Pye <pye.arbitrator@gmail.com>
**Sent:** Friday, April 25, 2025 2:46 PM
**To:** Bill Freeman <BFreeman@nea.org>
**Cc:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>
**Subject:** Re: [EXTERNAL] - Request to Hold Case in Abeyance, FMCS 1501214 and 180307-00286

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Dear Ms. Vemury and Mr. Freeman,
I stand by my former two determinations that this case is distinguishable and not impacted by the prospective E.O.
Therefore, I again order that the briefing schedule be followed.
Regards,
Rosemary Pye

On Apr 25, 2025, at 2:15 PM, Freeman, Bill [NEA] <BFreeman@nea.org> wrote:

Hello Arbitrator Pye,
Enough is enough. DoDEA has repeatedly tried to stonewall these Grievants for 12 years. And DoDEA repeatedly asked you not to allow a Reply Brief from FEA. As I understand it DoDEA has yet to notify FEA that they have terminated the CBA. And this case is under the old CBA.

For subsequent correspondence on this subject, please retain this email thread to remind me of what has transpired.
Thanks,
Bill

William H. Freeman
FEA-Europe General Counsel

---

**From:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>
**Sent:** Friday, April 25, 2025 1:55 PM
**To:** Rosemary Pye <pye.arbitrator@gmail.com>; Freeman, Bill [NEA] <BFreeman@nea.org>
**Cc:** Freeman, William [FEA] <willfreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>
**Subject:** Re: [EXTERNAL] - Request to Hold Case in Abeyance, FMCS 1501214 and 180307-00286

Arbitrator Pye,

The legal challenges address the exclusions delineated in Executive Order 14251.

Pursuant to the Department of Defense's designation under this Executive Order, the FLRA no longer holds jurisdiction over DoDEA. Consequently, DoDEA is relieved of its statutory obligations to engage in collective bargaining or to honor existing collective bargaining agreements under the Federal Service Labor-Management Relations Statute (FSLMRS).

In line with these exclusions, FEA is no longer the exclusive representative, and arbitrators lack jurisdiction to adjudicate disputes arising under the Statute.

Therefore, the outcomes of these legal challenges will be determinative of the path forward in this arbitration. DoDEA respectfully requests that you reconsider, and that the arbitration be held in abeyance pending a decision on the validity of Executive Order 14251.

Sincerely,
 *Anitha Vemury*
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

Caution: This message may contain information protected by the attorney–client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

<mark>CUI</mark>

---

**From:** Rosemary Pye <pye.arbitrator@gmail.com>
**Sent:** Friday, April 25, 2025 1:23:42 PM
**To:** Bill Freeman <BFreeman@nea.org>
**Cc:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>
**Subject:** Re: [EXTERNAL] - Request to Hold Case in Abeyance, FMCS 1501214 and 180307-00286

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Thank you, Ms. Vemury and Mr. Freeman.
 I do reaffirm my earlier ruling.  This case is unlikely to be affected by the Executive Orders or the court litigation because it involves grievances under prior contracts and I have closed the hearing and the closed the case subject to the receipt of briefs and issuance of the decision.  Those briefs are due soon.  It would be substantially more difficult for us to resume this case at some distant point.  It is also a problem for the grievants and for the Union and the Department to have their rights and liabilities remain undecided for an indefinite period of time.  Therefore, it is distinguishable from arbitrations where the hearing has not yet been held.

Thank you,
Rosemary Pye
Arbitrator
National Academy of Arbitrators

On Apr 25, 2025, at 12:56 PM, Freeman, Bill [NEA] <BFreeman@nea.org> wrote:

Hello Arbitrator Pye,
I believe you already ruled on this in your separate email thread. And FEA has already finished our Post Brief.


For subsequent correspondence on this subject, please retain this email thread to remind me of what has transpired.
Thanks,
Bill

William H. Freeman
FEA-Europe General Counsel

---

**From:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>
**Sent:** Friday, April 25, 2025 12:49 PM
**To:** Pye.arbitrator@gmail.com <Pye.arbitrator@gmail.com>
**Cc:** Freeman, Bill [NEA] <BFreeman@nea.org>; Freeman, William [FEA] <willfreeman@nea.org>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>
**Subject:** [EXTERNAL] - Request to Hold Case in Abeyance, FMCS 1501214 and 180307-00286

Good afternoon,
The Agency requests that you hold the case in abeyance pending the outcome of litigation regarding the *Executive Order/Exclusions*. Executive Order 14251 (90 Fed. Reg. 14553, Apr. 3, 2025), issued under 5 U.S.C. § 7103(b)(1), excludes DoDEA—from Chapter 71 coverage for national security reasons. At least two federal district court lawsuits have been filed by agencies—including the Department of Defense—seeking declaratory relief. *See U.S. Dep't of Def. v. AFGE Dist. 10*, No. 25-cv-119 (W.D. Tex. filed Mar. 27, 2025); *U.S. Dep't of Treas. v. NTEU, Ch. 73*, No. 25-cv-00049 (E.D. Ky. filed Mar. 28, 2025). Shortly thereafter, various unions commenced actions in federal district court challenging the validity of the Executive Order and seeking declaratory and injunctive relief. *See NTEU v. Trump*, No. 25-cv-00935 (D.D.C. filed Mar. 31, 2025); *AFGE v. Trump*, 25-cv-03070 (N.D. Cal. filed Apr. 3, 2025); *AFSA v. Trump*, 25-cv-01030 (D.D.C. filed Apr. 7, 2025).  As the results of these lawsuits would be determinative of the path forward in this arbitration, DoDEA would request to hold the arbitration in abeyance pending a decision on the validity of Executive Order 14251.
I emailed FEA Counsel yesterday morning and haven't received their position yet.

Sincerely,
*Anitha Vemury*
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

Caution: This message may contain information protected by the attorney–client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

**CUI**

.

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

**Freeman, Bill [NEA]**

| | |
|---|---|
| **From:** | Rosemary Pye <pye.arbitrator@gmail.com> |
| **Sent:** | Monday, April 14, 2025 10:00 AM |
| **To:** | Freeman, Bill [NEA] <BFreeman@nea.org> |
| **Cc:** | Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org> |
| **Subject:** | Re: FMCS 1501214 and 180307-00286 Closing |

Dear Ms. Vemury and Mr. Freeman,

First, I wish you well in the next stage of your career, Ms. Vemury.

Next, the briefs are now due in 5 weeks. I think it is premature to grant a postponement at this time. It would be helpful to understand the answers to the questions asked by Mr. Freeman.

I also want the parties to know that I do not think any prospective action would affect these past accrued rights and obligations.

Finally, I think this is a good time to think about settling this and any other pending cases that arose under the expired contract. If you can settle this case, I will waive any fee.

For the time being, the deadlines are in place. I would not postpone indefinitely. I also will wait until closer to the due date or to a date when you can provide a reasonable extension to make any warranted changes to the briefing schedule.

Regards,

Rosemary Pye

On Apr 14, 2025, at 9:35 AM, Freeman, Bill [NEA] <BFreeman@nea.org> wrote:

Hello Arbitrator Pye,

FEA would ask when Anitha is definitely leaving,, who is taking over for her and what she proposes for a revised schedule.

For subsequent correspondence on this subject, please retain this email thread to remind me of what has transpired.

Thanks,
Bill

William H. Freeman
FEA-Europe General Counsel

**From:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>
**Sent:** Monday, April 14, 2025 9:17 AM
**To:** Rosemary Pye <pye.arbitrator@gmail.com>; Freeman, Bill [NEA] <BFreeman@nea.org>
**Cc:** Freeman, William [FEA] <willfreeman@nea.org>
**Subject:** RE: FMCS 1501214 and 180307-00286 Closing

Arbitrator Pye,

I believe there has been some confusion.

The Agency is asking that all remaining deadlines are delayed until we receive additional guidance, which we do not have to move forward. I also intend to take the deferred resignation and therefore the Agency needs additional time to prepare the closing.

Sincerely,

*Anitha Vemury*

Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400


*Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.*


Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury ([anitha.vemury@dodea.edu](mailto:anitha.vemury@dodea.edu))

**CU**

---

**From:** Rosemary Pye <[pye.arbitrator@gmail.com](mailto:pye.arbitrator@gmail.com)>
**Sent:** Monday, April 14, 2025 8:10 AM
**To:** Bill Freeman <[BFreeman@nea.org](mailto:BFreeman@nea.org)>
**Cc:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <[Anitha.Vemury@dodea.edu](mailto:Anitha.Vemury@dodea.edu)>; Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <[Carla.Eldred@dodea.edu](mailto:Carla.Eldred@dodea.edu)>; Freeman, William [FEA] <[willfreeman@nea.org](mailto:willfreeman@nea.org)>; Clinton, Latisha Ms. CIV OSD/DoDEA-HQ <[Latisha.Clinton@dodea.edu](mailto:Latisha.Clinton@dodea.edu)>
**Subject:** Re: FMCS 1501214 and 180307-00286 Closing

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Dear Ms. Vemury and Mr. Freeman,
I am ordering that the case proceed on schedule.  This case arose many years ago under a contract from many years ago.  All parties have worked hard to bring it to a resolution.  We have held the hearing and both parties have prepared voluminous exhibits and participated in a status conference.  We received the transcript very promptly.  DoDEA has budgeted my fee.  No matter what happens in the future, I do not believe that it will affect this case.  Under existing law, it would not.
Please submit the briefs as scheduled and I will issue a decision promptly.
Thank you,
Rosemary Pye
Arbitrator

---

On Apr 11, 2025, at 1:12 PM, Freeman, Bill [NEA] <[BFreeman@nea.org](mailto:BFreeman@nea.org)> wrote:

Hello Arbitrator Pye,

It sounds like DoDEA is ready to continue as planned.  FEA requests that we do.

For subsequent correspondence on this subject, please retain this email thread to remind me of what has transpired.
Thanks,
Bill

William H. Freeman
FEA-Europe General Counsel

---

**From:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>
**Sent:** Friday, April 11, 2025 1:07 PM
**To:** Freeman, Bill [NEA] <BFreeman@nea.org>; Rosemary Pye <pye.arbitrator@gmail.com>
**Cc:** Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA] <willfreeman@nea.org>; Clinton, Latisha Ms. CIV OSD/DoDEA-HQ <Latisha.Clinton@dodea.edu>
**Subject:** RE: FMCS 1501214 and 180307-00286 Closing

Good afternoon,

The Agency objects to the issuance of an award prior to the opportunity to defend its case with a closing brief.  Assuming continued litigation is allowed, the Agency will submit a closing brief as soon as practicable.  A decision issued prior to closing arguments is premature because the legal issues were to be briefed in the closing.  As Mr. Freeman mentioned during the hearing, the Agency made new defenses in this case.  Additionally, each employee is unique, and several did not request a hearing.

Sincerely,
*Anitha Vemury*
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

CUI

---

**From:** Freeman, Bill [NEA] <BFreeman@nea.org>
**Sent:** Friday, April 11, 2025 12:48 PM
**To:** Rosemary Pye <pye.arbitrator@gmail.com>; Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu>
**Cc:** Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, William [FEA]

<willfreeman@nea.org>; Clinton, Latisha Ms. CIV OSD/DoDEA-HQ <Latisha.Clinton@dodea.edu>
**Subject:** Re: FMCS 1501214 and 180307-00286 Closing

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Hello Arbitrator Pye,
FEA much prefers to continue as planned. Indeed, we think that given your experience with these parties, that you can issue an award now, before any orders from the Administration to stop your work. But we will certainly defer to your judgment.

For subsequent correspondence on this subject, please retain this email thread to remind me of what has transpired.

Thanks,
Bill

William H. Freeman
FEA-Europe General Counsel

---

**From:** Rosemary Pye <pye.arbitrator@gmail.com>
**Sent:** Friday, April 11, 2025 12:37 PM
**To:** Anitha.Vemury@dodea.edu <Anitha.Vemury@dodea.edu>
**Cc:** Carla.Eldred@dodea.edu <Carla.Eldred@dodea.edu>; Freeman, Bill [NEA] <BFreeman@nea.org>; Freeman, William [FEA] <willfreeman@nea.org>; Latisha.Clinton@dodea.edu <Latisha.Clinton@dodea.edu>
**Subject:** Re: FMCS 1501214 and 180307-00286 Closing

Dear Ms. Vemury and Mr. Freeman,
Thank you, Ms. Vemury. I am waiting for Mr. Freeman's position before I respond.
Regards,
Rosemary Pye
Sent from my iPhone

> On Apr 11, 2025, at 12:30 PM, Vemury, Anitha Ms. CIV OSD/DoDEA-HQ <Anitha.Vemury@dodea.edu> wrote:
>
> Good afternoon,
>
> I realize my previous email may have caused some confusion. To clarify, I am requesting that all remaining deadlines—including the deadline for closing arguments—be delayed until the Agency receives further guidance.
>
> Sincerely,
> *Anitha Vemury*
> Associate General Counsel
> Employment and Labor Law Division
> Office of the General Counsel, DoD Education Activity
> 4800 Mark Center Drive, 04D14-03
> Alexandria, VA  22350-1400

**Caution: This message may contain information protected by the attorney–client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.**

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

<mark>CUI</mark>

---

**From:** Vemury, Anitha Ms. CIV OSD/DoDEA-HQ
**Sent:** Friday, April 11, 2025 9:09 AM
**To:** pye.arbitrator@gmail.com
**Cc:** Eldred, Carla J. Ms. CIV OSD/DoDEA-HQ <Carla.Eldred@dodea.edu>; Freeman, Bill [NEA] <BFreeman@nea.org>; Freeman, William [FEA] <willfreeman@nea.org>; Clinton, Latisha Ms. CIV OSD/DoDEA-HQ <Latisha.Clinton@dodea.edu>
**Subject:** FMCS 1501214 and 180307-00286 Closing

Dear Arbitrator Pye,

The Agency requests that you hold any remaining deadlines for this case until the Agency receives guidance on how to move forward.

 Sincerely,

*Anitha Vemury*
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400

**Caution: This message may contain information protected by the attorney–client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel of the Department of Defense Education Activity.**

Controlled by:  DoDEA OGC
CUI Category:  Privilege
Distribution/Dissemination Control:  AWP, AC, FEDCON
POC:  Anitha Vemury (anitha.vemury@dodea.edu)

# Exhibit 9

**FEDERAL MEDIATION AND CONCILIATION SERVICE**
**LABOR PANEL**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**In the Matter of the Arbitration**

      **between**

**Department of Defense Educational Activity**

      **and**

**Federal Education Association**                   **FMCS Case Nos.**
                                              **1501214 and 180307-02286**

                                              **Failure to pay**

**Association Grievances 14-09 and 17-12**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Arbitrator:**
Rosemary Pye, Esq.

**Appearances:**

Employer: Anitha Vemury, Esq.
          Associate General Counsel
          Carla J. Eldred, Esq.
          Associate General Counsel
          Employment and Labor Law Division
          Office of the General Counsel, DoDEA

**Union:** William H. Freeman, Esq.
          FEA Europe General Counsel

## ORDER DENYING REQUEST TO HOLD CASE IN ABEYANCE

On March 11 and 12, 2025, I held an arbitration hearing in FMCS  Case No. 1501214 and 180307-02286, where the parties -- Department of Defense Educational Activity (the Agency, DoDEA) and Federal Education Association (the Union, FEA) --were represented by counsel, witnesses provided sworn testimony, an official transcript was made, and the parties provided voluminous exhibits.

The Union represents 19 grievants in this case.  These grievances were filed in 2011, and the Agency's allegations of claims of debt go back further.  This is the first time any of the grievants were able to testify about the alleged agency claims against them, which claims seek to recoup money for overpayments allegedly made to them by the Agency but which the Agency did not discover until a substantial amount of time after the alleged debt accrued.  The grievances arose under a collective-bargaining agreement between the parties that has now expired and that has been succeeded by a successor agreement.

 The parties stipulated that the grievances were arbitrable and stipulated that the issue is:

Did the Agency violate the collective bargaining agreement or any applicable Federal law, regulation, or decision by failing to pay and/or demonstrate payment of correct pay, interest, Thrift Savings Plan matching funds, and TSP lost earnings, or by failing to comply with the Debt Collection Act?  If so, what shall the relief be?

The parties also stipulated that  the arbitrator would retain jurisdiction only for the purposes of implementing the remedy, if any is ordered.

At the arbitration hearing before me, counsel made opening arguments and were given an opportunity to make closing arguments.  However, counsel for the Agency asked to file briefs. Briefs were set for April 30, 2025, and Reply Briefs were set for May 20, 2025.  I closed the hearing subject to the receipt of briefs.  The transcript issued on March 17, 2025.

On April 11, 2025, Anitha Vemury, Esq., counsel for the Agency, requested that all further deadlines be delayed until she received guidance from agency leadership.   She stated the agency position as follows:

The Agency objects to the issuance of an award prior to the opportunity to defend its case with a closing brief.  Assuming continued litigation is allowed, the Agency will submit a closing brief as soon as practicable.  A decision issued prior to closing arguments is premature because the legal issues were to be briefed in the closing.  As Mr. Freeman mentioned during the hearing, the Agency made new defenses in this case.  Additionally, each employee is unique, and several did not request a hearing.

William Freeman, Esq., counsel for the Union, objected to any delay but deferred to my judgement.

On April 14, I sent the following order to the parties by email:

I am ordering that the case proceed on schedule. This case arose many years ago under a contract from many years ago. All parties have worked hard to bring it to a resolution. We have held the hearing and both parties have prepared voluminous exhibits and participated in a pre-hearing status conference. We received the transcript very promptly. DoDEA has budgeted my fee. No matter what happens in the future, I do not believe that it will affect this case. Under existing law, it would not. Please submit the briefs as scheduled, and I will issue the decision promptly.

Following my order, on April 14, Ms. Vemury, copying co-counsel Carla Eldred and union counsel, William Freeman, responded in an email to the parties and to me:

My request to delay was premature. I apologize for my confusion. The Agency is prepared to move forward with the April 30th deadline.

On April 25, Ms. Vemury, copying Ms. Eldred and Mr. Freeman, emailed me again requesting to hold the case in abeyance. She stated the agency position:

The Agency requests that you hold the case in abeyance pending the outcome of litigation regarding the *Executive Order/Exclusions*. Executive Order 14251 (90 Fed. Reg. 14553, Apr. 3, 2025), issued under 5 U.S.C. § 7103(b)(1), excludes DoDEA—from Chapter 71 coverage for national security reasons. At least two federal district court lawsuits have been filed by agencies—including the Department of Defense—seeking declaratory relief. *See U.S. Dep't of Def. v. AFGE Dist. 10*, No. 25-cv-119 (W.D. Tex. filed Mar. 27, 2025); *U.S. Dep't of Treas. v. NTEU, Ch. 73*, No. 25-cv-00049 (E.D. Ky. filed Mar. 28, 2025). Shortly thereafter, various unions commenced actions in federal district court challenging the validity of the Executive Order and seeking declaratory and injunctive relief. *See NTEU v. Trump*, No. 25-cv-00935 (D.D.C. filed Mar. 31, 2025); *AFGE v. Trump*, 25-cv-03070 (N.D. Cal. filed Apr. 3, 2025)[1]; *AFSA v. Trump*, 25-cv-01030 (D.D.C. filed Apr. 7, 2025). As the results of these lawsuits would be determinative of the path forward in this arbitration, DoDEA would request to hold the arbitration in abeyance pending a decision on the validity of Executive Order 14251.

Mr. Freeman responded requesting me to adhere to my prior ruling and noting that he had already completed the Union's brief, which is due on April 30.

Having heard from both parties, I denied the request to hold the case in abeyance, copying all parties with the following order:

I do reaffirm my earlier ruling. This case is unlikely to be affected by the Executive Orders or the court litigation because it involves grievances under prior contracts, and I have closed the hearing and closed the case subject to the receipt of briefs and issuance of the decision. Those briefs are due soon. It would be substantially more difficult for us

---

[1] I note that, on April 25, 2025, Judge Paul Friedman of the U.S. District Court for the District of Columbia granted a preliminary injunction in this case.

to resume this case at some distant point.  It is also a problem for the grievants and for the Union and the Agency to have their rights and liabilities remain undecided for an indefinite period of time.  Therefore, it is distinguishable from arbitrations where the hearing has not yet been held.

Ms. Vemury, on behalf of the Agency and copying Ms. Eldred and Mr. Freeman, responded to me:

> The legal challenges address the exclusions delineated in Executive Order 14251.
>
> Pursuant to the Department of Defense's designation under this Executive Order, the FLRA no longer holds jurisdiction over DoDEA. Consequently, DoDEA is relieved of its statutory obligations to engage in collective bargaining or to honor existing collective bargaining agreements under the Federal Service Labor-Management Relations Statute (FSLMRS).
>
> In line with these exclusions, FEA is no longer the exclusive representative, and arbitrators lack jurisdiction to adjudicate disputes arising under the Statute.
>
> Therefore, the outcomes of these legal challenges will be determinative of the path forward in this arbitration. DoDEA respectfully requests that you reconsider, and that the arbitration be held in abeyance pending a decision on the validity of Executive Order 14251.

Mr. Freeman, on behalf of the Union and copying Ms. Vemury and Ms. Eldred, responded to me:

> Enough is enough.  DoDEA has repeatedly tried to stonewall these Grievants for 12 years.  And DoDEA repeatedly asked you not to allow a Reply Brief from FEA. As I understand it DoDEA has yet to notify FEA that they have terminated the CBA.  And this case is under the old CBA.

On April 25, I emailed the parties the following order:

> I stand by my former two determinations that this case is distinguishable and not impacted by the prospective E.O.
>
> Therefore, I again order that the briefing schedule be followed.

Ms. Vemury, on April 25, responded to me, copying Ms. Eldred and Mr. Freeman:

> I understand your position.
>
> The Agency is cancelling this arbitration in accordance with Executive Order 14251 and guidance received. In accordance with the Executive Order exclusions, the Federal

Education Association is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

As such, the Agency is not authorized to submit any further pleadings in this matter.

## ORDER

Given the Agency's position that it will not file a brief, I am issuing this restatement of my earlier orders.

This case is governed by *Nolde Bros. v. Bakery & Confectionery Workers Local 358*, 430 U.S. 243 (1977) – longstanding U.S. Supreme Court law.  *How Arbitration Works, Elkouri & Elkouri (Eighth Edition)*, at 3-28, explained the principle I have been asserting:

In its *Nolde* decision, the Court recognized that grievances that arise during the life of the collective bargaining agreement, and are arbitrable under the agreement, do not become nonarbitrable merely because the agreement is terminated before arbitration is requested or commences.

This case presents an even stronger case for going forward than *Nolde*.  The alleged debts accrued and the grievances were filed during the term of a collective-bargaining agreement.  The parties went to arbitration and the hearing closed, subject only to the submission of briefs on April 30 and Reply briefs on May 19.  The request from the Agency to hold the case in abeyance based on Executive Order 14251 was filed on April 25, with the briefs due on April 30.  The pending litigation does not in any way implicate the arbitration of a case that concerns longstanding grievances accrued under a contract that has long since expired and that has been arbitrated with full due process for the parties.

Given the extent of this post-hearing exchange of positions, however, I do think that the parties may need additional time to prepare briefs and reply briefs.  Accordingly, I am, *sua sponte*, extending the time for filing briefs and reply briefs by a week.  The briefs are now due on May 7, 2025, and reply briefs are due on May 27, 2025.

Counsel are on notice that I am prepared to issue a decision based on the record and briefs.  It would be to the benefit of both parties to submit their briefs and reply briefs, as now scheduled.

**SO ORDERED.**

*Rosemary Pye*, Esq.
Arbitrator
National Academy of Arbitrators
April 28, 2025

# Exhibit 10

**FEDERAL MEDIATION AND CONCILIATION SERVICE
LABOR PANEL**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**In the Matter of the Arbitration**

> **between**

**Department of Defense Educational Activity**

> **and**

**Federal Education Association**                    **FMCS Case Nos.**
                                                     **1501214 and 180307-02286**

                                                     **Failure to pay**

**Association Grievances 14-09 and 17-12**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Arbitrator:**
Rosemary Pye, Esq.

**Appearances:**

Employer: Anitha Vemury, Esq.
            Associate General Counsel
            Carla J. Eldred, Esq.
            Associate General Counsel
            Employment and Labor Law Division
            Office of the General Counsel, DoDEA

**Union:** William H. Freeman, Esq.
          FEA Europe General Counsel

**SECOND ORDER DENYING REQUEST TO HOLD CASE IN ABEYANCE**

On March 11 and 12, 2025, I held an arbitration hearing in FMCS Case No. 1501214 and 180307-02286, where the parties -- Department of Defense Educational Activity (the Agency, DoDEA) and Federal Education Association (the Union, FEA) --were represented by counsel, witnesses provided sworn testimony, an official transcript was made, and the parties provided voluminous exhibits.

The Union represents 19 grievants in this case. These grievances were filed in 2011, and the Agency's allegations of claims of debt go back further. The grievances arose under a collective-bargaining agreement between the parties that has now expired and that has been succeeded by a successor agreement.

The parties stipulated that the grievances were arbitrable and stipulated that the issue is:

Did the Agency violate the collective bargaining agreement or any applicable Federal law, regulation, or decision by failing to pay and/or demonstrate payment of correct pay, interest, Thrift Savings Plan matching funds, and TSP lost earnings, or by failing to comply with the Debt Collection Act? If so, what shall the relief be?

On April 28, 2025, I issued *Order Denying Request to Hold Case in Abeyance (Order)*. That *Order* stated:

This case is governed by *Nolde Bros. v. Bakery & Confectionery Workers Local 358*, 430 U.S. 243 (1977) – longstanding U.S. Supreme Court law. *How Arbitration Works, Elkouri & Elkouri (Eighth Edition)*, at 3-28, explained the principle I have been asserting:

In its *Nolde* decision, the Court recognized that grievances that arise during the life of the collective bargaining agreement, and are arbitrable under the agreement, do not become nonarbitrable merely because the agreement is terminated before arbitration is requested or commences.

This case presents an even stronger case for going forward than *Nolde*. The alleged debts accrued and the grievances were filed during the term of a collective-bargaining agreement. The parties went to arbitration and the hearing closed, subject only to the submission of briefs on April 30 and Reply briefs on May 19. The request from the Agency to hold the case in abeyance based on Executive Order 14251 was filed on April 25, with the briefs due on April 30. The pending litigation does not in any way implicate the arbitration of a case that concerns longstanding grievances accrued under a contract that has long since expired and that has been arbitrated with full due process for the parties.

Given the extent of this post-hearing exchange of positions, however, I do think that the parties may need additional time to prepare briefs and reply briefs. Accordingly, I am, *sua sponte*, extending the time for filing briefs and reply briefs by a week. The briefs are now due on May 7, 2025, and reply briefs are due on May 27, 2025.

Counsel are on notice that I am prepared to issue a decision based on the record and briefs. It would be to the benefit of both parties to submit their briefs and reply briefs, as now scheduled.

On May 6, 2025, the day before my extended date for filing briefs was due, I received the following notice from Ms. Vemury, Counsel for DoDEA:

While the Agency acknowledges receipt of your April 28, 2025, Order, please note that, pursuant to the Agency's April 25, 2025, correspondence, it considers this matter cancelled in pursuant to Executive Order 14251 and the guidance received. In accordance with the exclusions outlined in the Executive Order, the Federal Education Association is no longer recognized as the exclusive representative, and jurisdiction before the arbitrator no longer exists. Accordingly, I am not authorized to engage in further filings or communications regarding this matter.

Sincerely,
 *Anitha Vemury*
Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel, DoD Education Activity

On April 28, 2025, I also received notice from Andrew Golseth, Administrative Officer, Office of the General Counsel, DoDEA, informing me that the Agency had cancelled this contract on April 25, 2025, and no work after that date will be compensated.

In my *Order*, I extended the due date for the briefs to May 7, 2025, and the reply briefs to May 27, 2025. I received FEA's Brief and Attachments on April 28. Having reviewed that Brief, I see that FEA has addressed any arguments that DoDEA counsel has identified in the arbitration. FEA stated it would serve its brief on counsel for DoDEA once the DoDEA brief is filed. DoDEA has repeatedly announced its intent not to file a brief. Therefore, FEA should serve its brief and attachments on DoDEA at this time.

Because FEA has addressed the DoDEA arguments, I will provide DoDEA one last opportunity to address those arguments in a reply brief, due on May 27, 2025. I urge DoDEA to seek particularized guidance that considers the posture of this case. It is unlikely a reviewing administrative body or court would excuse the failure to file a brief in a case on the eve of the due date after notice of the consequences.

In keeping with my prior order and my order today, I plan to proceed and issue a decision. I adhere to my conviction that this case is governed by the U.S. Supreme Court's decision in *Nolde Bros. v. Bakery & Confectionery Workers Local 358*, 430 U.S. 243 (1977), which makes the self-evident finding that a withdrawal of recognition, even if lawful, does not excuse prior obligations that accrued during the term of a collective-bargaining agreement. In effect, an agency cannot refuse to remedy its prior violations of a collective-bargaining agreement based on subsequent conduct. I expect that whatever the outcome of the litigation of Executive Order 14251, any judicial review will find that case distinguishable and will adhere to longstanding Supreme Court law – *Nolde Brothers*.

To avoid any conflict of interest or an appearance of a conflict of interest, I hereby waive my right to any payment for services rendered after April 25, 2025. I have already submitted my invoice to the parties for the two days of hearing. I will not seek any further compensation from either party. It is only by issuing my Decision promptly that I can clearly recall the testimony, and it is important to the parties and the individual grievants to reach a resolution of this case.

**SO ORDERED.**

*Rosemary Pye, Esq.*
Arbitrator
National Academy of Arbitrators
May 7, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL EDUCATION
ASSOCIATION, *et al.*,

     *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

     *Defendants*.

Civil Action No. 1:25-cv-1362

## <u>DECLARATION OF ROBIN SMITH</u>

I, Robin Smith, declare that the following is true and correct:

1.     I am a resident of California. I am over the age of 18 and have personal knowledge of all facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I hold a Bachelor of Arts in political science from New York University and a Juris Doctorate from Brooklyn Law School.

3.     I am currently employed by the Federal Education Association ("FEA") as the general counsel for the Federal Education Association Pacific Region.  In that role, I am responsible for handling grievance proceedings for FEA members in my region. I have been employed by FEA for 9 years.

4.     In the wake of President Donald J. Trump's Executive Order 14251 ("EO"), issued on March 27, 2025, the Department of Defense Education Activity ("DODEA") has refused to honor its contractual obligation to engage in the grievance-and-arbitration process

1

JA640

under Article 12 of the Collective Bargaining Agreement ("CBA") between FEA and DODEA

governing the terms and conditions of employment of educators working in DODEA's overseas

schools, which came into force on August 1, 2023 and remains in force by its terms until August

1, 2028. A true and correct copy of the CBA is attached as Exhibit 1. DODEA's abrogation of its

contractual obligations in this regard has occurred in at least two ongoing grievance proceedings

that I am handling.

5.      An egregious example of DODEA's refusal to honor its contractual obligation to

engage in the grievance-and-arbitration process in a case that I am handling is the grievance

proceeding of FEA bargaining member Thomas Selley, filed on January 4, 2021 under the 1989

predecessor CBA. I represent Mr. Selley in the proceedings, over which Arbitrator Michael

Anthony Marr is presiding. Prior to the issuance of the EO, the arbitrator heard pre-hearing

motions and determined that the grievance was arbitrable. Also prior to the issuance of the EO,

the arbitrator, with the parties' assent, scheduled the arbitration hearing for May 19, 20, and 21.

6.      On April 24, 2025, DODEA's counsel Jennifer S. Kehe, relying on the EO,

requested that the proceedings be held in abeyance. FEA objected to such an open-ended delay

and asked instead for a three-week adjournment. On April 29, 2025, the Arbitrator issued an

"Order Denying the Agency's Request for Abeyance of Arbitration Hearing and Association's

Request for Three-Week Adjournment" ("Denial Order"). A true and correct copy of the Denial

Order is attached hereto as Exhibit 2.

7.      The Denial Order ruled that the arbitration hearing would go forward as scheduled

on May 19, 20, and 21, 2025. The Order concluded that "the grievance procedures under the

CBA remain binding and unaffected by the EO. Therefore, in the interest of fairness, arbitral

efficiency, and adherence to public policy, the request for abeyance and for a three-weeks adjournment are respectfully are denied." Ex. 2 at 3.

8.     Also on April 29, 2025, DODEA acknowledged the Arbitrator's order by email. A true and correct copy of the emails between the parties attached as Exhibit 3. That e-mail stated, "In accordance with the exclusions outlined in President Trump's Executive Order 14251, DoDEA no longer recognizes FEA as the exclusive representative and jurisdiction before the arbitrator no longer exists. Accordingly, I am not authorized to engage in further communications regarding this matter until litigation regarding the Executive Order is concluded." Ex. 3 at 5. DODEA reiterated this position in an email on April 30, 2025. *Id.* at 4.

9.     On May 1, 2025, Arbitrator Marr informed counsel via email that he believed he had lacked authority to continue with the Selley Grievance by reason of an email that he had received from DODEA Administrative Officer Andrew Golseth, who handles procurement matters for DOEEA, stating as follows: "'Good morning, Arbitrator Marr. **This hearing has been cancelled and your arbitration services for this case are no longer required. Please provide any invoice(s) for work completed on this case via the WAWF.**'" Ex. 3 at 2. I was not copied on this ex parte email and only learned of its contents from Arbitrator Marr's May 1, 2025, email. After quoting the email from DODEA, Arbitrator Marr stated as follows:

> In light of this communication—at the very least, formally suspending my contract—I do not believe I have the authority to continue with the Selley Grievance. Accordingly, I must withhold finalizing the order and cannot proceed further with the arbitration process, until the contract is reinstated. [Ex. 3 at 2.]

10. On May 1, 2025, I requested the opportunity to respond, and attached to that request a decision from Arbitrator Rosemary Pye in FMCS Case Nos. 1501214 and 180307-02286. A true and correct copy of that request and of the attached arbitration decision is attached hereto as Exhibit 4. Arbitrator Pye's decision, which rejected a similar request by DODEA to hold at case in

3

abeyance, cited the Supreme Court's decision in *Nolde Bros. v. Bakery & Confectionery Workers Local 358*, 430 U.S. 243 (1977), for the proposition that grievances that arise during the life of the collective bargaining agreement, and are arbitrable under the agreement, do not become nonarbitrable merely because the agreement is terminated before arbitration is requested or commences. Ex. 4 at 5. Based on that authority, Arbitrator Pye declined to cancel the arbitration. *Id.* In addition to attaching the decision of Arbitrator Pye, I also informed the Arbitrator that FEA was prepared to pay for its portion of the Arbitrator's fee. Ex. 3 at 1.

11.     On May 1, 2025, the Arbitrator issued an order titled "Order Confirming Arbitration Hearing Scheduled for May 19, 20, and 21, 2025." A true and correct copy of that order is attached hereto as Exhibit 5.

12.     The Arbitrator's order rescinded his email canceling the hearing. Ex. 5 at 5. The Arbitrator concluded that his denial order is the "law of the case," binding on all parties and the Arbitrator. *Id.* The order further stated, "[t]he Agency's decision not to engage at the arbitration hearing will limit the evidence that the Arbitrator considers in determining the merits of the Selley Grievance. The Agency is encouraged to participate." *Id.*

13.     The arbitration hearing was held and concluded on May 19, 2025. DoDEA did not appear at the hearing.

14.     In addition to the arbitration of Mr. Selley, DODEA has failed to participate in the arbitration of Miyoung Cho, before Arbitrator Buckalew. In that case, DODEA unilaterally and ex parte canceled the contract of Arbitrator Buckalew. I was informed of the cancelation only when I reached out to DODEA attorney Douglas Frison after being verbally informed that DODEA would not participate in the case. Attorney Frison forwarded me the email chain between himself and Arbitrator Buckalew. A true and correct copy of the emails between parties

is attached as Exhibit 6. In an email dated May 7, 2025, Attorney Frison stated, "Based on an executive order and guidance received, the Agency cancelled this matter and is cancelling the associated contract." Ex. 6 at 2.

15.     Once I learned that DODEA had attempted to unilaterally and ex parte cancel the contract of Arbitrator Buckalew, I requested that Arbitrator Buckalew provide me with an opportunity to respond to DODEA's efforts to cancel his contract. Ex. 6 at 1. I requested leave until May 29, 2025 to respond to DODEA's purported cancelation of Arbitrator Buckalew's contract. *Id.* Arbitrator Buckalew granted both requests, explaining that he did not realize that DODEA had not copied the Union on its cancellation of the arbitration. *Id.*

16.     By refusing to participate in the grievance of Mr. Selley and Ms. Cho, and by going so far as to attempt to unilaterally cancel their arbitrations by means of its procurement officer's threat to refuse contracted payment for the arbitrator's services, DODEA has abrogated its contractual obligations under the CBA, which predated the EO and which remains in force until August 1, 2028, and repudiated the contractual rights of Mr. Selley and Ms. Cho, which vested prior to the EO. These actions foreshadow that DODEA will further abrogate its contractual obligations by failing to comply with any arbitral award issued in favor of Mr. Selley or Ms. Cho.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ May 29, 2025 _____          Robin Smith

# Exhibit 2

MICHAEL ANTHONY MARR #2580
ATTORNEY, ARBITRATOR & MEDIATOR
111 NORTH KING STREET
SUITE #314
HONOLULU, HAWAI῾I 96817
TELEPHONE: (808) 599-5258
E-MAIL: MmarrADR@aol.com

BEFORE ARBITRATOR MICHAEL ANTHONY MARR

REPUBLIC OF SOUTH KOREA

| | | |
|---|---|---|
| In the Matter of the Arbitration | ) | FMCS NO. 210228-04400 |
| | ) | |
| between the | ) | GRIEVANCE OF THOMAS SELLEY |
| | ) | |
| FEDERAL EDUCATION | ) | ORDER DENYING THE AGENCY'S |
| ASSOCIATION, | ) | REQUEST FOR ABEYANCE OF |
| | ) | ARBITRATION HEARING AND |
| | ) | ASSOCIATION'S REQUEST FOR THREE |
| | ) | WEEK ADJOURNMENT |
| Association, | ) | |
| | ) | CONFERENCES: NOVEMBER 7, 2024 |
| | ) | AND FEBRUARY 4, 2025 |
| and | ) | |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF DEFENSE EDUCATION ACTIVITY, | ) | |
| | ) | |
| Agency. | ) | |

**ORDER DENYING THE AGENCY'S REQUEST <u>FOR ABEYANCE OF ARBITRATION
HEADING AND ASSOCIATION'S REQUEST FOR THREE WEEK ADJOURMENT</u>**

      After reviewing the requests submitted by the Department of Defense Education Activity

(DoDEA) to hold the proceedings in abeyance and the Association's objection to the abeyance

but request for a three-week adjournment, the arbitrator finds and orders the following:

## **BACKGROUND.**

This arbitration pertains to the termination of a teacher who is a bargaining unit member of the DoDEA and is governed by the applicable Collective Bargaining Agreement (CBA). The Arbitrator issued an Order Denying the Agency's Motion to Dismiss on April 12, 2025, and an Order Denying the Association's Motion for the Application of Collateral Estoppel on April 24, 2025. On April 24, 2025, the Agency formally requested that the proceedings be held in abeyance, relying on Executive Order 14251 (E0), which was issued on March 27, 2025, and published in the Federal Register on April 3, 2025. On April 25, 2025, the Association requested that it be given until Monday, April 28, 2025.  On April 25, 2025, the Arbitrator informed the parties that the Association would have until April 28, 2025, to respond to the Agency's request and thereafter, the Arbitrator would rule on the Agency's request. There were no objections to this procedure. On April 28, 2025, the Association objected to an open-ended abeyance and asked for a three-week adjournment.

## **DISCUSSION.**

The Arbitrator concludes that the Agency's request for abeyance and the Association request for a three-week adjournment should be denied based upon the following totality of circumstances:

- **Lack of Specificity in the EO**: Executive Order 14251 does not explicitly or impliedly address arbitration hearings or grievance procedures. Without concrete legal or regulatory provisions negating the grievance process and arbitration hearing provisions, the Collective Bargaining Agreement between the parties remains in full force and effect. It

Page **2** of **4**

is unaffected by the EO.

- **The Association's Request for a Three-Week Adjournment:** The Association objects to an abeyance and asks for a three-week adjournment, primarily because it expects the FLRA to make a determination on an Order to Show Cause concerning the EO and the FLRA may issue a decision on the Hart Grievance in favor of the Association, giving the Hart Grievance final and binding status. These conclusions are very speculative. In addition, given the evidence and record before the Arbitrator, may suggest that the Arbitrator decide to rule in a manner that is inconsistent with Arbitrator Hart.

- **Public Policy Considerations**: The request of an abeyance and the request for an adjournment are both open-ended. The latter gives no specific date as to when an adjournment of three-weeks would begin or when it would end. Resolving the Selley Grievance, now, rather than later, efficiently aligns with public policy objectives, particularly in matters concerning employment and labor rights. There should be no delay, based on speculative conclusions, by either party.

- **Availability of Judicial Review**: Executive Order 14251 does not preclude the Agency or the Association from pursuing judicial review. While no decision on the merits of the grievance has been made at this stage, if judicial review becomes unavailable before the Federal Labor Relations Authority, review of any arbitration award issued by the Arbitrator would be available through other means, by both parties, such as the federal judiciary.

- **Arbitrator McKeever**: Evidently yesterday, Arbitrator McKeever rejected the Agency's request for an abeyance based upon the EO. While the Arbitrator is not privy to the rationale of this decision, the Arbitrator agrees with the outcome.

- **Items 1 through 8 in the Association's Response:** The Arbitrator does not believe that any of these eight items support an adjournment for three-weeks. If anything, they support moving forward with no abeyance and no adjournment.

## <u>CONCLUSION.</u>

Executive Order 14251 is clear and unambiguous. The Arbitrator concludes that the grievance procedures under the CBA remain binding and unaffected by the EO. Therefore, in the interest of fairness, arbitral efficiency, and adherence to public policy, the request for abeyance and for a three-weeks adjournment are respectfully are denied.

Page **3** of **4**

The arbitration shall proceed in accordance with the grievance procedures outlined in the CBA. The hearing will take place on May 19, 20, and 21, 2025, as scheduled, and as agreed to by the parties.

DATED: Honolulu, Hawaii, this 29th day of April, 2025.

*Michael A. Marr*
_____
MICHAEL ANTHONY MARR
ARBITRATOR & MEDIATOR

Page **4** of **4**

# Exhibit 3

**Friday, May 23, 2025 at 09:27:48 Pacific Daylight Time**

---

**Subject:** FW: Selley L1 Yesterday's DoDEA attempt to halt our hearing
**Date:** Friday, May 23, 2025 at 9:27:18 AM Pacific Daylight Time
**From:** Smith, Robin Christine [FEA]

---

**From:** Smith, Robin Christine [FEA] <RSmith@nea.org>
**Date:** Thursday, May 1, 2025 at 5:55 PM
**To:** 'ArbitratorMichaelAnthonyMarr@gmail.com'
<arbitratormichaelanthonymarr@gmail.com>, MmarrADR@aol.com
<mmarradr@aol.com>, Jennifer Kehe <Jennifer.Kehe@DODEA.EDU>
**Cc:** Stephanie Trotter <feapacst@gmail.com>
**Subject:** FW: Selley L1 (FMCS 210228-04400 - Agency request for Abeyance and
Association Response

Good Day Arbitrator Marr,

Can you please give FEA a chance to respond to DoDEA's position before cancelling
the
hearing?


The contract with DoDEA was set up purely for procurement purposes. Yes, it is
true that DoDEA will not pay you if you go forward with the hearing. However, FEA
will pay its share of your fee.

I can submit my opposition by tomorrow at 1000 HI time.

I have attached Arbitrator Pye's decision denying DoDEA's request to hold another
FEA case in abeyance, which cites Supreme Court precedent.

Robin
Robin Smith∗
General Counsel
Federal Education Association
Pacific Region
Tel: (415) 726-8000 (best to e-mail me please)

<mark>Please Reply All to my message. I have included your Association leadership on the Email so
that leadership is aware and can assist in the matter.</mark>


The information contained in this e-mail message may be attorney privileged and

or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.

*Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.

**From:** MmarrADR@aol.com <mmarradr@aol.com>
**Date:** Thursday, May 1, 2025 at 5:29 PM
**To:** 'ArbitratorMichaelAnthonyMarr@gmail.com' <arbitratormichaelanthonymarr@gmail.com>, Smith, Robin Christine [FEA] <RSmith@nea.org>, Kehe, Jennifer Ms. CIV OSD/DoDEA-Pacific <jennifer.kehe@dodea.edu>
**Cc:** Stephanie Trotter <feapacst@gmail.com>
**Subject:** Re: Selley L1 (FMCS 210228-04400 - Agency request for Abeyance and Association Response

Aloha Counsels,

Please note that I drafted a four-page order for the Selley Grievance, similar to my previous orders, with the intention of sending a finalized version following further proofreading later today. As you recall, I was unable to proceed until the Agency secured contract approval for my services with the assistance of Mr. Andrew Golseth. After the approval, we held our first pre-arbitration conference.

This morning, I received an email from Mr. Golseth stating, in pertinent part:
"Good morning, Arbitrator Marr. **This hearing has been cancelled and your services are no longer required. Please provide any invoice(s) for work completed on this case via the WAWF.**" All other portions of the email were reminders on how to use the WAWF and who to contact for assistance if needed.

In light of this communication—at the very least, formally suspending my contract—I do not believe I have the authority to continue with the Selley Grievance. Accordingly, I must withhold finalizing the order and cannot proceed further with the arbitration process, until the contract is reinstated.

I encourage the parties to work toward reinstating the contract. Once this matter is resolved, I remain ready to resume arbitration services.

Thank you for your attention to this matter.

I wish counsels and the parties the absolute best.

Sincerely,

Michael A. Marr
Arbitrator & Mediator
P.O. Box 2731
Honolulu, Hawaii 96803
Telephone: (808) 255-5017


Please note that I completed a rough draft of a four-page order yesterday that I intended to send to the parties after proofreading it again a few more times later today. My orders are similar to those issued by a court of law. The draft was in similar format to the three previous orders that I have issued and sent to you.

As you might recall, I was unable to proceed on this case until the Agency got contract approval for my services. Mr. Andrew Golseth assisted me with this process. After I was notified of contract approval, I contacted the counsels, and we had our first pre-arbitration hearing conference.

This morning, I received an email from Mr. Golseth. It provided in pertinent part: "Good morning, Arbitrator Marr. **This hearing has been cancelled and your services are no longer required. Please provide any invoice(s) for work completed on this case via the WAWF**."

As counsels know, the Arbitrator has provided the parties with arbitration services that are based upon integrity, fairness, and arbitral law. Given Mr. Golseth's email, which is akin, at the very least, to a suspension of the contract, the Arbitrator does not believe he has the authority to work any further on the Selley Grievance, unless the contract is reinstated. Hence, the order shall not be finalized and issued to the parties. I am unable to hold the arbitration hearing.

Counsels are encouraged to get the contract reinstated. Once done, the Arbitrator will resume services to the parties.

I wish counsels and the parties the absolute best.

Thank you.

Sincerely,

Miichael A.Marr
Arbitrator & Mediator
P.O. Box 2731
Honolulu, Hawaii 96803
Telephone: (808) 255-5017

On Wednesday, April 30, 2025 at 08:00:56 PM HST, Kehe, Jennifer Ms. CIV OSD/DoDEA-Pacific <jennifer.kehe@dodea.edu> wrote:

**CUI**

Good Day Arbitrator Marr and Robin,

I am not authorized to further engage on this matter and therefore cannot participate in any hearing.

Respectfully,
Jennifer

Jennifer S. Kehe
Associate General Counsel
DoD Education Activity – Pacific
DSN: (315) 652-5921
Commercial: 011-81-98-953-5921

Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel, Department of Defense Education Activity.

Controlled by: DoDEA OGC
CUI Cateogry: Privilege
Distribution/Dissemination Control: AWP, AC, FEDCON
POC: Jennifer S. Kehe, jennifer.kehe@dodea.edu

**CUI**

**From:** Smith, Robin Christine [FEA] <RSmith@nea.org>
**Sent:** Thursday, May 1, 2025 6:06 AM
**To:** Kehe, Jennifer Ms. CIV OSD/DoDEA-Pacific <Jennifer.Kehe@DODEA.EDU>; MmarrADR@aol.com; 'ArbitratorMichaelAnthonyMarr@gmail.com' <arbitratormichaelanthonymarr@gmail.com>
**Cc:** Stephanie Trotter <feapacst@gmail.com>
**Subject:** Re: Selley L1 (FMCS 210228-04400 - Agency request for Abeyance and Association Response

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Arbitrator Marr, what time would you like to start the hearing on May 19? I am in the process of securing a court reporter and would like to advise her of our start time, as well as witnesses, who are in various time zones.

Thank you,

Robin
Robin Smith*
General Counsel
Federal Education Association
Pacific Region
Tel: (415) 726-8000 (best to e-mail me please)

Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.


The information contained in this e-mail message may be attorney privileged and
or confidential information intended only for the use of the individual or entity named above.
If the reader of this message is not the intended recipient, or agent responsible to deliver it to
the intended recipient, you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited. If you have received this communication in error,
please immediately notify us by telephone. Thank you.

*Admitted in the States of California and New York. Outside of California and New
York, practice is limited to Federal Courts and Agencies.


---

**From:** Kehe, Jennifer Ms. CIV OSD/DoDEA-Pacific <Jennifer.Kehe@DODEA.EDU>
**Date:** Tuesday, April 29, 2025 at 8:29 PM
**To:** MmarrADR@aol.com <mmarradr@aol.com>,
'ArbitratorMichaelAnthonyMarr@gmail.com'
<arbitratormichaelanthonymarr@gmail.com>
**Cc:** Smith, Robin Christine [FEA] <RSmith@nea.org>, Stephanie Trotter
<feapacst@gmail.com>
**Subject:** RE: Selley L1 (FMCS 210228-04400 - Agency request for Abeyance and
Association Response

CUI

Good Day Arbitrator Marr,

Receipt of your Order Denying the Agency's Request for Abeyance of Arbitration Hearing
and Association's Request for Three Week Adjournment is acknowledged.

In accordance with the exclusions outlined in President Trump's Executive Order 14251,
DoDEA no longer recognizes FEA as the exclusive representative and jurisdiction before the
arbitrator no longer exists.  Accordingly, I am not authorized to engage in further
communications regarding this matter until litigation regarding the Executive Order is
concluded.

Respectfully,
Jennifer

Jennifer S. Kehe
Associate General Counsel
DoD Education Activity – Pacific
DSN: (315) 652-5921
Commercial: 011-81-98-953-5921

Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege.  Do not disseminate without the approval of the Office of General Counsel, Department of Defense Education Activity.

Controlled by: DoDEA OGC
CUI Cateogry: Privilege
Distribution/Dissemination Control: AWP, AC, FEDCON
POC: Jennifer S. Kehe, jennifer.kehe@dodea.edu

**CUI**

**From:** MmarrADR@aol.com <mmarradr@aol.com>
**Sent:** Wednesday, April 30, 2025 9:53 AM
**To:** 'ArbitratorMichaelAnthonyMarr@gmail.com' <arbitratormichaelanthonymarr@gmail.com>; Smith, Robin Christine [FEA] <rsmith@nea.org>
**Cc:** Kehe, Jennifer Ms. CIV OSD/DoDEA-Pacific <Jennifer.Kehe@DODEA.EDU>; Stephanie Trotter <feapacst@gmail.com>
**Subject:** Re: Selley L1 (FMCS 210228-04400 - Agency request for Abeyance and Association Response

**\*\*\*This message originated from outside of DoDEA.\*\*\***

Aloha Counsels,

Please find attached an order denying the Agency's request for abeyance and the Assocation's request for an adjournment.

The hearing will proceed as scheduled for May 19, 20, and 21, 2025.

Thank you.

Sincerely,

Michael A. Marr
Arbitrator & Mediator
P.O. Box 2731
Honolulu, Hawaii 96803

Telephone: (808) 255-5017

On Friday, April 25, 2025 at 08:20:05 AM HST, MmarrADR@aol.com <mmarradr@aol.com> wrote:

Aloha Counsels,

Thank you for your emails.

Since the Agency has requested abeyance of the hearing set for May 19, 20, and 21, based upon President Trump's Executive Order 14251, the Association is given until Monday, April 28, 2025, 5 p.m., HST, to respond to the Agency's request. Thereafter, the Arbitrator shall issue an order on the Agency's request for abeyance of the hearing,

Thank you.

Sincerely,

Michael A. Marr
Arbitrator & Mediator
P.O. Box 2731
Honolulu, Hawaii 96803
Telephone: (808) 255-5017

On Friday, April 25, 2025 at 07:29:34 AM HST, Smith, Robin Christine [FEA] <rsmith@nea.org> wrote:

Dear Arbitrator Marr, FEA is considering its response to Ms. Kehe's request. May we have until Monday at 5 p.m. HI time to respond?

Robin
Robin Smith*
General Counsel
Federal Education Association
Pacific Region
Tel: (415) 726-8000 (best to e-mail me please)

<mark>Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.</mark>

The information contained in this e-mail message may be attorney privileged and or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to

deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.

*Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.

---

**From:** Kehe, Jennifer Ms. CIV OSD/DoDEA-Pacific <Jennifer.Kehe@DODEA.EDU>
**Date:** Thursday, April 24, 2025 at 6:57 PM
**To:** 'ArbitratorMichaelAnthonyMarr@gmail.com' <ArbitratorMichaelAnthonyMarr@gmail.com>, MmarrADR@aol.com <mmarradr@aol.com>
**Cc:** Smith, Robin Christine [FEA] <RSmith@nea.org>
**Subject:** [EXTERNAL] - Request to Hold Hearing In Abeyance (FMCS 210228-04400 - In the Matter of the Arbitration Between FEA and DoDEA, Grievance of Thomas Selley)

**CUI**

Good Day Arbitrator Marr,

Based on President Trump's Executive Order 14251 (EO), *Exclusions from Federal Labor-Management Relations*, the Agency requests the arbitration hearing be held in abeyance pending the outcome of litigation regarding this EO.

Regards,
Jennifer

Jennifer S. Kehe
Associate General Counsel
DoD Education Activity – Pacific
DSN: (315) 652-5921
Commercial: 011-81-98-953-5921

Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of General Counsel, Department of Defense Education Activity.

Controlled by: DoDEA OGC
CUI Cateogry: Privilege
Distribution/Dissemination Control: AWP, AC, FEDCON
POC: Jennifer S. Kehe, jennifer.kehe@dodea.edu

**CUI**

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

# Exhibit 4

**FEDERAL MEDIATION AND CONCILIATION SERVICE
LABOR PANEL**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**In the Matter of the Arbitration**

      **between**

**Department of Defense Educational Activity**

      **and**

**Federal Education Association**
                                    **FMCS Case Nos.
1501214 and 180307-02286**

                                                        **Failure to pay**

**Association Grievances 14-09 and 17-12**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Arbitrator:**
Rosemary Pye, Esq.

**Appearances:**

Employer: Anitha Vemury, Esq.
                 Associate General Counsel
                 Carla J. Eldred, Esq.
                 Associate General Counsel
                 Employment and Labor Law Division
                 Office of the General Counsel, DoDEA

**Union:** William H. Freeman, Esq.
             FEA Europe General Counsel

## ORDER DENYING REQUEST TO HOLD CASE IN ABEYANCE

On March 11 and 12, 2025, I held an arbitration hearing in FMCS Case No. 1501214 and 180307-02286, where the parties -- Department of Defense Educational Activity (the Agency, DoDEA) and Federal Education Association (the Union, FEA) --were represented by counsel, witnesses provided sworn testimony, an official transcript was made, and the parties provided voluminous exhibits.

The Union represents 19 grievants in this case. These grievances were filed in 2011, and the Agency's allegations of claims of debt go back further. This is the first time any of the grievants were able to testify about the alleged agency claims against them, which claims seek to recoup money for overpayments allegedly made to them by the Agency but which the Agency did not discover until a substantial amount of time after the alleged debt accrued. The grievances arose under a collective-bargaining agreement between the parties that has now expired and that has been succeeded by a successor agreement.

The parties stipulated that the grievances were arbitrable and stipulated that the issue is:

Did the Agency violate the collective bargaining agreement or any applicable Federal law, regulation, or decision by failing to pay and/or demonstrate payment of correct pay, interest, Thrift Savings Plan matching funds, and TSP lost earnings, or by failing to comply with the Debt Collection Act? If so, what shall the relief be?

The parties also stipulated that the arbitrator would retain jurisdiction only for the purposes of implementing the remedy, if any is ordered.

At the arbitration hearing before me, counsel made opening arguments and were given an opportunity to make closing arguments. However, counsel for the Agency asked to file briefs. Briefs were set for April 30, 2025, and Reply Briefs were set for May 20, 2025. I closed the hearing subject to the receipt of briefs. The transcript issued on March 17, 2025.

On April 11, 2025, Anitha Vemury, Esq., counsel for the Agency, requested that all further deadlines be delayed until she received guidance from agency leadership. She stated the agency position as follows:

The Agency objects to the issuance of an award prior to the opportunity to defend its case with a closing brief. Assuming continued litigation is allowed, the Agency will submit a closing brief as soon as practicable. A decision issued prior to closing arguments is premature because the legal issues were to be briefed in the closing. As Mr. Freeman mentioned during the hearing, the Agency made new defenses in this case. Additionally, each employee is unique, and several did not request a hearing.

William Freeman, Esq., counsel for the Union, objected to any delay but deferred to my judgement.

On April 14, I sent the following order to the parties by email:

I am ordering that the case proceed on schedule. This case arose many years ago under a contract from many years ago. All parties have worked hard to bring it to a resolution. We have held the hearing and both parties have prepared voluminous exhibits and participated in a pre-hearing status conference. We received the transcript very promptly. DoDEA has budgeted my fee. No matter what happens in the future, I do not believe that it will affect this case. Under existing law, it would not. Please submit the briefs as scheduled, and I will issue the decision promptly.

Following my order, on April 14, Ms. Vemury, copying co-counsel Carla Eldred and union counsel, William Freeman, responded in an email to the parties and to me:

My request to delay was premature. I apologize for my confusion. The Agency is prepared to move forward with the April 30th deadline.

On April 25, Ms. Vemury, copying Ms. Eldred and Mr. Freeman, emailed me again requesting to hold the case in abeyance. She stated the agency position:

The Agency requests that you hold the case in abeyance pending the outcome of litigation regarding the *Executive Order/Exclusions*. Executive Order 14251 (90 Fed. Reg. 14553, Apr. 3, 2025), issued under 5 U.S.C. § 7103(b)(1), excludes DoDEA—from Chapter 71 coverage for national security reasons. At least two federal district court lawsuits have been filed by agencies—including the Department of Defense—seeking declaratory relief. *See U.S. Dep't of Def. v. AFGE Dist. 10*, No. 25-cv-119 (W.D. Tex. filed Mar. 27, 2025); *U.S. Dep't of Treas. v. NTEU, Ch. 73*, No. 25-cv-00049 (E.D. Ky. filed Mar. 28, 2025). Shortly thereafter, various unions commenced actions in federal district court challenging the validity of the Executive Order and seeking declaratory and injunctive relief. *See NTEU v. Trump*, No. 25-cv-00935 (D.D.C. filed Mar. 31, 2025); *AFGE v. Trump*, 25-cv-03070 (N.D. Cal. filed Apr. 3, 2025)[1]; *AFSA v. Trump*, 25-cv-01030 (D.D.C. filed Apr. 7, 2025). As the results of these lawsuits would be determinative of the path forward in this arbitration, DoDEA would request to hold the arbitration in abeyance pending a decision on the validity of Executive Order 14251.

Mr. Freeman responded requesting me to adhere to my prior ruling and noting that he had already completed the Union's brief, which is due on April 30.

Having heard from both parties, I denied the request to hold the case in abeyance, copying all parties with the following order:

I do reaffirm my earlier ruling. This case is unlikely to be affected by the Executive Orders or the court litigation because it involves grievances under prior contracts, and I have closed the hearing and closed the case subject to the receipt of briefs and issuance of the decision. Those briefs are due soon. It would be substantially more difficult for us

---

[1] I note that, on April 25, 2025, Judge Paul Friedman of the U.S. District Court for the District of Columbia granted a preliminary injunction in this case.

to resume this case at some distant point. It is also a problem for the grievants and for the Union and the Agency to have their rights and liabilities remain undecided for an indefinite period of time. Therefore, it is distinguishable from arbitrations where the hearing has not yet been held.

Ms. Vemury, on behalf of the Agency and copying Ms. Eldred and Mr. Freeman, responded to me:

> The legal challenges address the exclusions delineated in Executive Order 14251.

> Pursuant to the Department of Defense's designation under this Executive Order, the FLRA no longer holds jurisdiction over DoDEA. Consequently, DoDEA is relieved of its statutory obligations to engage in collective bargaining or to honor existing collective bargaining agreements under the Federal Service Labor-Management Relations Statute (FSLMRS).

> In line with these exclusions, FEA is no longer the exclusive representative, and arbitrators lack jurisdiction to adjudicate disputes arising under the Statute.

> Therefore, the outcomes of these legal challenges will be determinative of the path forward in this arbitration. DoDEA respectfully requests that you reconsider, and that the arbitration be held in abeyance pending a decision on the validity of Executive Order 14251.

Mr. Freeman, on behalf of the Union and copying Ms. Vemury and Ms. Eldred, responded to me:

> Enough is enough. DoDEA has repeatedly tried to stonewall these Grievants for 12 years. And DoDEA repeatedly asked you not to allow a Reply Brief from FEA. As I understand it DoDEA has yet to notify FEA that they have terminated the CBA. And this case is under the old CBA.

On April 25, I emailed the parties the following order:

> I stand by my former two determinations that this case is distinguishable and not impacted by the prospective E.O.

> Therefore, I again order that the briefing schedule be followed.

Ms. Vemury, on April 25, responded to me, copying Ms. Eldred and Mr. Freeman:

> I understand your position.

> The Agency is cancelling this arbitration in accordance with Executive Order 14251 and guidance received. In accordance with the Executive Order exclusions, the Federal

Education Association is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

As such, the Agency is not authorized to submit any further pleadings in this matter.

## ORDER

Given the Agency's position that it will not file a brief, I am issuing this restatement of my earlier orders.

This case is governed by *Nolde Bros. v. Bakery & Confectionery Workers Local 358*, 430 U.S. 243 (1977) – longstanding U.S. Supreme Court law. *How Arbitration Works, Elkouri & Elkouri (Eighth Edition)*, at 3-28, explained the principle I have been asserting:

In its *Nolde* decision, the Court recognized that grievances that arise during the life of the collective bargaining agreement, and are arbitrable under the agreement, do not become nonarbitrable merely because the agreement is terminated before arbitration is requested or commences.

This case presents an even stronger case for going forward than *Nolde*. The alleged debts accrued and the grievances were filed during the term of a collective-bargaining agreement. The parties went to arbitration and the hearing closed, subject only to the submission of briefs on April 30 and Reply briefs on May 19. The request from the Agency to hold the case in abeyance based on Executive Order 14251 was filed on April 25, with the briefs due on April 30. The pending litigation does not in any way implicate the arbitration of a case that concerns longstanding grievances accrued under a contract that has long since expired and that has been arbitrated with full due process for the parties.

Given the extent of this post-hearing exchange of positions, however, I do think that the parties may need additional time to prepare briefs and reply briefs. Accordingly, I am, *sua sponte*, extending the time for filing briefs and reply briefs by a week. The briefs are now due on May 7, 2025, and reply briefs are due on May 27, 2025.

Counsel are on notice that I am prepared to issue a decision based on the record and briefs. It would be to the benefit of both parties to submit their briefs and reply briefs, as now scheduled.

**SO ORDERED.**

*Rosemary Pye*, Esq.
Arbitrator
National Academy of Arbitrators
April 28, 2025

# Exhibit 5

MICHAEL ANTHONY MARR #2580
ATTORNEY, ARBITRATOR & MEDIATOR
111 NORTH KING STREET
SUITE #314
HONOLULU, HAWAIʻI 96817
TELEPHONE: (808) 599-5258
E-MAIL: MmarrADR@aol.com

### BEFORE ARBITRATOR MICHAEL ANTHONY MARR

### REPUBLIC OF SOUTH KOREA

| | | |
|---|---|---|
| In the Matter of the Arbitration | ) | FMCS NO. 210228-04400 |
| | ) | |
| between the | ) | GRIEVANCE OF THOMAS SELLEY |
| | ) | |
| FEDERAL EDUCATION | ) | ORDER CONFIRMING ARBITRATION |
| ASSOCIATION, | ) | HEARING SCHEDULED FOR MAY 19, |
| | ) | 20, AND 21, 2025. |
| | ) | |
| | ) | |
| Association, | ) | |
| | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE UNITED STATES DEPARTMENT | ) | |
| OF DEFENSE EDUCATION ACTIVITY, | ) | |
| | ) | |
| Agency. | ) | |
| | ) | |
| _____ | ) | |

### ORDER CONFIRMING ARBITRATION HEARING
### SCHEDULED FOR MAY 19, 20, AND 21, 2025.

On April 29, 2025, the Department of Defense Education Activity (Agency) sent the

Arbitrator an email stating that the Arbitrator lacked jurisdiction in the above-referenced

grievance. The Arbitrator finds and orders as follows:

Page **1** of **5**

JA667

## BACKGROUND.

This arbitration pertains to the termination of a teacher who is a bargaining unit member of the DoDEA (Agency) and is governed by a Collective Bargaining Agreement (CBA). The Arbitrator issued an Order Denying the Agency's Motion to Dismiss on April 12, 2025, and an Order Denying the Association's Motion for the Application of Collateral Estoppel on April 24, 2025. The hearing on these two motions was held on April 3, 2025 before a court-reporter.

Subsequent thereto, on April 24, 2025, the Agency requested that the proceedings be held in abeyance, relying on President Donald J. Trump's Executive Order 14251 (EO), which was issued on March 27, 2025, and published in the Federal Register on April 3, 2025. On April 25, 2025, the Association requested that it be given until Monday, April 28, 2025.  On April 25, 2025, the Arbitrator informed the parties that the Association would have until April 28, 2025, to respond to the Agency's request and thereafter, the Arbitrator would rule on the Agency's request. There were no objections to this procedure.

On April 28, 2025, the Association objected to an open-ended delay and asked for a three-week adjournment. On April 29, 2025, the Arbitrator issued of an "Order Denying the Agency's Request for Abeyance of Arbitration Hearing and Association's Request for Three-Week Adjournment." (Denial Order). The Denial Order, is incorporated herein by reference, and provided that the arbitration hearing, scheduled for May 19, 20, and 21, 2025, would proceed as scheduled.

Shortly thereafter, on this same day, April 29, 2025, the Arbitrator received an email from the Agency's counsel, stating in pertinent part: "Good Day Arbitrator Marr, Receipt of your Order Denying the Agency's Request for Abeyance of Arbitration Hearing and Association's Request for Three Week Adjournment is acknowledged. In accordance with the exclusions outlined in President Trump's Executive Order 14251, DoDEA no longer recognizes FEA as the exclusive representative and jurisdiction before the arbitrator no longer exists. Accordingly, I am not authorized to engage in further communications regarding this matter until litigation regarding the Executive Order is concluded." (Agency Email).

On April 30, 2025, the Association contacted the Arbitrator with an email that stated in pertinent part: "Arbitrator Marr, what time would you like to start the hearing on May 19? I am in the process of securing a court reporter and would like to advise her of our start time, as well as witnesses, who are in various time zones." Later, that same day, April 30, 2025, Agency counsel announced, by email, in pertinent part: "I am not authorized to engage on this matter and therefore cannot participate in any hearing."

**On May 1, 2025, the Arbitrator received an email from Agency procurement Officer Andrew Golseth. Mr. Golseth assisted the Arbitrator with contract processing and approval to act as Arbitrator in the Selley Grievance. The email in pertinent part provided: "Good morning, Arbitrator Marr. This hearing has been cancelled and your arbitration services for this case are no longer required.  Please provide any invoice(s) for work completed on this case via the WAWF." Based upon this email, the Arbitrator improvidently sent an email to the parties, advising them in pertinent part: "In light of this communication—at the very least,**

Page **3** of **5**

**formally suspending my contract—I do not believe I have the authority to continue with the Selley Grievance. Accordingly, I must withhold finalizing the order and cannot proceed further with the arbitration process, until the contract is reinstated." (First Improvident Email). The Arbitrator also advised the parties that a four-page order that the Arbitrator had prepared, but had not completed proofreading would not be sent to the parties. The order the Arbitrator was referring to is this order, less the additional language which is in bold print.**

**Approximately 30 minutes later, Union Counsel emailed the Arbitrator and asked for the opportunity to respond. The Arbitrator subsequently informed the parties that the Arbitrator's email was null and void unless otherwise reinstated. (Second Improvident Email). The Arbitrator advised Union Counsel to respond and invited Agency Counsel to respond Union Counsel's response.**

**The Arbitrator has revisited the Improvident Email and the Second Improvident Email. They are indeed improvident and should never have been sent. The parties should disregard both of these emails unless inconsistent with this order. The Association indicated that it would respond by tomorrow, to the First Improvident Email by 1000 HST. The Arbitrator does not believe a response from the Association necessary and advises the Association not to respond unless it feels a need to do so.**

The Denial Order is the law of the case (grievance). The Agency had other pre-hearing options but it has chosen not to "engage in further communications regarding this matter until litigation regarding the Executive Order is concluded." This decision is inconsistent with available procedural

Page **4** of **5**

options. Given the Agency's decision of non-engagement, what options does the arbitrator have? The only options the Arbitrator believes he has are (1) punt to a different party or entity, (2) to resign, or (3) to follow the law of the case. The Arbitrator must follow the law of the case. Choices (1) and (2) are inconsistent with the law of the case, the Denial Order, and the Arbitrator's duty to prevent delays.

The Arbitrator's letter/order of November 7, 2024, corrected on November 12, 2024, and revised on November 22, 2024 (Letter Order), is incorporated herein by reference, and remains in full force and effect unless inconsistent with this order, in which case the inconsistency shall be null and void unless otherwise ordered by the Arbitrator. Per the Letter/Order, the arbitration hearing shall proceed, as previously agreed to by the parties, on May 19, 20, and 21, 2025, shall be remote, and shall begin at 12:00 noon, HST. The Agency's decision not to engage at the arbitration hearing will limit the evidence that the Arbitrator considers in determining the merits of the Selley Grievance. The Agency is encouraged to participate.

Respectfully submitted on this 1st day May, 2025.

*Michael A. Marr*

———————————————————
MICHAEL ANTHONY MARR
ARBITRATOR & MEDIATOR

# Exhibit 6

**Thursday, May 29, 2025 at 09:11:40 Pacific Daylight Time**

---

**Subject:** Re: Cho L1 FMCS Case No. 251121-01443
**Date:** Tuesday, May 20, 2025 at 6:25:38 PM Pacific Daylight Time
**From:** Tim Buckalew
**To:** Smith, Robin Christine [FEA]
**CC:** Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific, Stephanie Trotter

I was unaware until this moment that Counsel for the FEA had not been advised of the DoDEA assertion that the Agency intended to cancel its agreement to arbitrate this matter. Frankly, I was waiting for the FEA to respond. Please excuse my oversight.

It seems elementary that both parties to the contract should be able to explain their positions on such a fundamental and critical matter.

For your information, I believe I responded with all the information requested by Mr. Golseth and to the best of my knowledge, a contract covering my engagement as your arbitrator was approved.

Please accept this email as acceptance of your request for an opportunity to respond.

Tim Buckalew

On Tue, May 20, 2025 at 8:34PM Smith, Robin Christine [FEA] <RSmith@nea.org> wrote:

> Arbitrator Buckalew, I was just informed yesterday by DoDEA that DoDEA has attempted to unilaterally cancel the arbitrator's contract.
>
> My last communication with the Arbitrator is below.
>
> *From:* Smith, Robin Christine [FEA] RSmith@nea.org
> *Date:* Friday, April 18, 2025 at 12:21 PM
> *To:* Tim Buckalew ablewasi@gmail.com
> *Cc:* Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific Douglas.Frison@dodea.edu, Stephanie Trotter feapacst@gmail.com, Smith, Robin Christine [FEA] RSmith@nea.org
> *Subject:* Re: Cho L1 FMCS Case No. 251121-01443
>
> *Arbitrator Buckelew, DoDEA has not yet filed its arbitrability motion. FEA is requesting that DoDEA file any motions by May 2, 2025 so that FEA has sufficient time to respond before the hearing. I have another arbitration scheduled in the month of May as well as other matters that I need to juggle.*
>
> *Thank you for your consideration.*

*Robin*

*Robin Smith\**

*General Counsel*

*Federal Education Association*

*Pacific Region*

*Tel: (415) 726-8000 (best to e-mail me please)*

FEA would like the opportunity to formally respond to DoDEA's ex parte request to cancel the arbitrator's contract. My understanding is that is the below was sent to the arbitrator on May 7, 2025. However, FEA was not copied on this email, nor was it forwarded to me until I inquired about the status of the case with Mr. Frison yesterday.

**From:** *Golseth, Andrew CIV OSD/DoDEA-HQ <Andrew.Golseth@dodea.edu>*
**Sent:** *Wednesday, May 7, 2025 9:14 PM*
**To:** *ablewasi@gmail.com*
**Cc:** *Timmons, Lamont A. Mr. CIV OSD/DoDEA-HQ <Lamont.Timmons@dodea.edu>; Henderson, Victoria Ms. CIV OSD/DoDEA-HQ <Victoria.Henderson@dodea.edu>; Malaka, Mundy Mr. CIV OSD/DoDEA-HQ <Mundy.Malaka@DODEA.EDU>*
**Subject:** *CONTRACT CANCELLATION - Arbitrator Buckalew - FMCS Case No. 251121-01443*
**Importance:** *High*

*Good afternoon, Arbitrator Buckalew.*

*I hope this message finds you well.*

*Based on an executive order and guidance received, the Agency cancelled this matter and is cancelling the associated contract. I submitted the contract for approval on April 23, 2025, but it is still pending review.  I will request the cancellation of the review/contract.*

*If there are any outstanding invoices for services rendered, please submit via the Wide Area Workflow (WAWF).*

*The WAWF website is https://wawf.eb.mil.  WAWF is the only means of payment for services.*

*During the registration process in WAWF, you will be asked for your "Cage Number," which is a 5-digit number that was generated at the time you initially registered in SAM.  You should be able to retrieve this number from SAM.  (Note: If you have any problems with WAWF, please call 801-605-7095; Press 1, then 3, for assistance).  I have attached the helpdesk guide for WAWF registration and preparation of your 2-in-1 invoice.  It is imperative that you have your WAWF account set up before submitting your 2-in-1 invoice for payment to the Agency.*

*If you are still unable to complete your necessary uploads via following the instructions in the attachment above, please contact Mr. Lamont Timmons (CC'd: Lamont.Timmons@dodea.edu), our eBusiness specialist for assistance.  He will be able to walk you through the process of submitting the invoice.*

*V/R,*

*Andrew Golseth*

*Administrative Officer*

*Office of the General Counsel*

*Department of Defense Education Activity*

*4800 Mark Center Drive*
*Suite 04E12*

*Alexandria, VA 22350*

*Comm:  571-372-5753*

May FEA have until Wednesday May 28, 2025, ET to respond to Andrew Golseth's message to the arbitrator?

Thank you,

Robin

Robin Smith*

General Counsel

Federal Education Association

Pacific Region

Tel: (415) 726-8000 (best to e-mail me please)

<mark>Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.</mark>

The information contained in this e-mail message may be attorney privileged and or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.

*Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.

---

**From:** Smith, Robin Christine [FEA] <RSmith@nea.org>
**Date:** Friday, April 18, 2025 at 12:21 PM
**To:** Tim Buckalew <ablewasi@gmail.com>
**Cc:** Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific <Douglas.Frison@dodea.edu>, Stephanie Trotter <feapacst@gmail.com>, Smith, Robin Christine [FEA] <RSmith@nea.org>
**Subject:** Re: Cho L1 FMCS Case No. 251121-01443

Arbitrator Buckelew, DoDEA has not yet filed its arbitrability motion. FEA is requesting that DoDEA file any motions by May 2, 2025 so that FEA has sufficient time to respond before the hearing. I have another arbitration scheduled in the month of May as well as other matters that I need to juggle.

Thank you for your consideration.


Robin

Robin Smith*

General Counsel

Federal Education Association

Pacific Region

Tel: (415) 726-8000 (best to e-mail me please)


<mark>Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.</mark>



The information contained in this e-mail message may be attorney privileged and or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.


*Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.



---

**From:** Tim Buckalew <ablewasi@gmail.com>
**Date:** Thursday, April 17, 2025 at 12:52 PM
**To:** Smith, Robin Christine [FEA] <RSmith@nea.org>
**Cc:** Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific <Douglas.Frison@dodea.edu>,

Stephanie Trotter <feapacst@gmail.com>
**Subject:** Re: Cho L1 FMCS Case No. 251121-01443

All Party Representatives:

I understood the parties had accepted the June 9, 2025 date for a remote hearing on arbitrability.  If I am mistaken, please let me know and I will offer additional dates.

Also, please accept this email as a formal inquiry on the status of the arbitrator contract for this case.  I believe I have complied with all the prerequisites for a contract, but I have not received confirmation of that status.

Thank you and best regards,

Tim Buckalew

On Thu, Apr 17, 2025 at 12:22 PM Smith, Robin Christine [FEA] <RSmith@nea.org> wrote:

> Greetings Arbitrator Buckelew and Doug, I am circling back regarding scheduling this arbitration.
>
> I can appear at a remote hearing on either June 9 or 20.
>
> Robin
>
> Robin Smith*
>
> General Counsel
>
> Federal Education Association
>
> Pacific Region
>
> Tel: (415) 726-8000 (best to e-mail me please)

<mark>Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.</mark>

The information contained in this e-mail message may be attorney privileged and or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.

*Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.

---

**From:** Smith, Robin Christine [FEA] <RSmith@nea.org>
**Date:** Wednesday, March 12, 2025 at 7:32 AM
**To:** Tim Buckalew <ablewasi@gmail.com>, Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific <Douglas.Frison@dodea.edu>
**Cc:** Stephanie Trotter <feapacst@gmail.com>
**Subject:** Re: Cho L1 FMCS Case No. 251121-01443

Greetings Arbitrator Buckalew and Doug,

I can appear at a remote hearing on either June 9 or 20.

Robin

Robin Smith*

General Counsel

Federal Education Association

Pacific Region

Tel: (415) 726-8000 (best to e-mail me please)

<mark>Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.</mark>

The information contained in this e-mail message may be attorney privileged or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.

*Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.

---

**From:** Tim Buckalew <ablewasi@gmail.com>
**Date:** Wednesday, March 12, 2025 at 4:39 AM
**To:** Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific <Douglas.Frison@dodea.edu>
**Cc:** Smith, Robin Christine [FEA] <RSmith@nea.org>, Stephanie Trotter <feapacst@gmail.com>
**Subject:** Re: Cho L1 FMCS Case No. 251121-01443

Representatives of the Parties:

I understand the parties expect a remote hearing on the arbitrability issue.  Please correct me if I am wrong.

I also understand that the Agency will take at least six to eight weeks to process a

contract for this case.

I propose a remote hearing conducted under my auspices for either June 9 or June 20.

Please let me know if these dates for the proposed remote hearing are acceptable.


Thank you

Tim Buckalew


On Wed, Mar 12, 2025 at 3:52 AM Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific <Douglas.Frison@dodea.edu> wrote:

> Arbitrator Buckalew:
>
>
> My apologies, but our HQ office has indicated that they need proposed hearing dates before they can initiate the contract process. The lead time for an arbitration contract seems to be at least 6 weeks and probably closer to 8 weeks, so we are probably looking at May or June for the arbitrability decision on the planned agency motion,  and even later for a hearing.  It may be necessary to push the hearing into the next school year (Late August, September). DoDEA teachers are in a non-duty status from mid-June to mid-August, and principals and other non-teachers are generally on leave for the month of July.
>
>
> Sorry for the confusion.
>
>
> Douglas Frison
>
> Associate General Counsel
>
> DoD Education Activity Pacific
>
> DSN: 315-755-1222; Commercial: 011-82-503-355-1222
>
>
> Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of the General Counsel, Department of Defense Education Activity.
>
>
> Controlled by:  DoDEA OGC

CUI Category:  Privilege

Distribution/Dissemination Control:  AWP, AC, FEDCON

POC:  Douglas Frison, Douglas.frison@dodea.edu

**CUI**

---

**From:** Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific
**Sent:** Friday, February 28, 2025 5:28 PM
**To:** Tim Buckalew <ablewasi@gmail.com>; Smith, Robin Christine [FEA] <RSmith@nea.org>
**Cc:** Stephanie Trotter <feapacst@gmail.com>
**Subject:** RE: Cho L1 FMCS Case No. 251121-01443


Mr. Buckalew:


Thank you for your email. The CBA provides that unless there is agreement between the parties, the hearing will be held at the school in which the case arose. The agency does not agree to a remote hearing. The CBA also provides that "If either Party declares a grievance nonarbitrable

or non-grievable, the merits portion of the grievance will be placed in abeyance and the arbitrator will issue a decision on the threshold issue of grievability and/or arbitrability."


The agency will have a motion to dismiss at the appropriate time on the basis or non-arbitrability.


Please do not expend any work or request any documents in this case until we have a contract in place.


Thank you.

Douglas Frison

Associate General Counsel

DoD Education Activity Pacific

DSN: 315-755-1222; Commercial: 011-82-503-355-1222


Caution: This message may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege. Do not disseminate without the approval of the Office of the General Counsel, Department of Defense Education Activity.


Controlled by:  DoDEA OGC

CUI Category:  Privilege

Distribution/Dissemination Control:  AWP, AC, FEDCON

POC:  Douglas Frison, [Douglas.frison@dodea.edu](mailto:Douglas.frison@dodea.edu)


**CUI**

---

**From:** Tim Buckalew <[ablewasi@gmail.com](mailto:ablewasi@gmail.com)>
**Sent:** Thursday, February 27, 2025 12:11 AM
**To:** Smith, Robin Christine [FEA] <[RSmith@nea.org](mailto:RSmith@nea.org)>
**Cc:** Frison, Douglas W. Mr. CIV OSD/DoDEA-Pacific <[Douglas.Frison@dodea.edu](mailto:Douglas.Frison@dodea.edu)>;
Stephanie Trotter <[feapacst@gmail.com](mailto:feapacst@gmail.com)>
**Subject:** Re: Cho L1 FMCS Case No. 251121-01443


**\*\*\*This message originated from outside of DoDEA.\*\*\***

Hence, the need for a remote hearing!

Tim

On Wed, Feb 26, 2025 at 10:07 AM Smith, Robin Christine [FEA] <RSmith@nea.org> wrote:

> Thank you, Arbitrator Buckalew. I just inherited this case for the Union. Mr. Frison is located in S. Korea, where it is just after midnight. Mr. Frison and I will huddle and get back to you.
>
>
> Robin
>
> Robin Smith*
>
> General Counsel
>
> Federal Education Association
>
> Pacific Region
>
> Tel: (415) 726-8000 (best to e-mail me please)
>
>
> ==Please Reply All to my message. I have included your Association leadership on the Email so that leadership is aware and can assist in the matter.==
>
>
>
> The information contained in this e-mail message may be attorney privileged and or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone. Thank you.
>
>
> *Admitted in the States of California and New York. Outside of California and New York, practice is limited to Federal Courts and Agencies.

**From:** Tim Buckalew <ablewasi@gmail.com>
**Date:** Wednesday, February 26, 2025 at 7:04 AM
**To:** Douglas.Frison@dodea.edu <Douglas.Frison@dodea.edu>, Smith, Robin Christine [FEA] <RSmith@nea.org>
**Subject:** [EXTERNAL] - FMCS Case No. 251121-01443, Arbitrability

Party Representatives:


I have received notice that I have been appointed to hear the above-referenced dispute.

Your names were listed as the representatives of the parties.  If you intend to assign other offices to hear the dispute, please forward this email and let me know the identity of the designee.


I am available in April for a remote hearing if that is the parties' agreement.


Let me know if you are available for April hearings or if you have some other time frame in mind.


Thank you.

I look forward to hearing from you and serving as your arbitrator in this dispute.


--

Tim Buckalew

This is a confidential communication intended only for the named recipients.  If you are not an intended recipient, please excuse my error, destroy the message and any attachments, and contact me by email or phone at 508 868 5850

- 

CAUTION: This email originated from outside the NEA. Please verify the sender's identity, and do not open links or attachments unless you recognize the sender and are confident the content is secure.

--

Tim Buckalew

This is a confidential communication intended only for the named recipients.  If you are
not an intended recipient, please excuse my error, destroy the message and any
attachments, and contact me by email or phone at 508 868 5850

--

Tim Buckalew

This is a confidential communication intended only for the named recipients.  If you are not
an intended recipient, please excuse my error, destroy the message and any attachments, and
contact me by email or phone at 508 868 5850

--

Tim Buckalew

This is a confidential communication intended only for the named recipients.  If you are not an
intended recipient, please excuse my error, destroy the message and any attachments, and
contact me by email or phone at 508 868 5850

--
Tim Buckalew

This is a confidential communication intended only for the named recipients.  If you are not an
intended recipient, please excuse my error, destroy the message and any attachments, and contact
me by email or phone at 508 868 5850

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, *et al.*, | ) ) ) |
| *Plaintiffs*; | ) ) |
| v. | ) ) |
| DONALD J. TRUMP, *et al.*, | ) ) ) |
| *Defendants*. | ) ) ) |

Case No. 1:25-cv-1362-PLF

Judge Paul L. Friedman

**DECLARATION OF MICHAEL A. COGAR**

Pursuant to 28 U.S.C. § 1746, I, Michael A. Cogar, declare as follows:

1.       I am the Deputy Assistant Secretary of Defense for Civilian Personnel Policy in the Department of Defense ("DoD" or the "Department"), and I have served in this role since May 19, 2025. In my current role, I am responsible for civilian personnel matters, including the DoD Labor-Management Relations Program. In this capacity, I am responsible for the development and issuance of civilian personnel policies, programs, procedures and guidance, the DoD Labor Management Relations Program, and the effective, efficient and strategic management of DoD's civilian workforce. In addition, my office provides the Office of the Secretary of Defense, Defense Agencies and Field Activities, and Military Departments with policy advice and guidance through the Defense Civilian Personnel Advisory Service and administers the non-appropriated fund personnel system, as well as the foreign national employment program within the Department. I provide this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction in the above-captioned case. I make the following statements based upon my personal knowledge and information provided to me in my official capacity.

2.       I am familiar with Executive Order 14,251, Exclusions from Federal Labor-Management Relations Programs (the "Executive Order"). Section 2 of the Executive Order

1

excludes DoD from coverage under Chapter 71 of Title 5, United States Code, "except for any subdivisions excluded pursuant to Section 4" of the Executive Order.[1] Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14,553, 14,553 (Apr. 3, 2025).

3.    Earlier Executive Orders, issued by prior Presidents, exempted large swaths of DoD from coverage under chapter 71 of title 5, United States Code.

    a.    President Carter exempted numerous components of DoD, including:

        i.    the following agencies or subdivisions of the Department of the Army: (a) Office of Assistant Chief of Staff for Intelligence; (b) U.S. Army Intelligence and Security Command; (c) U.S. Army Foreign Science and Technology Center.; (d) U.S. Army Intelligence Center and School; (e) U.S. Army Missile Intelligence Agency; and (f) Foreign Intelligence Office, U.S. Army Missile Research and Development Command;

        ii.    the following agencies or subdivisions of the Department of the Navy: (a) Office of Naval Intelligence; (b) Naval Intelligence Command Headquarters and Subordinate Commands; (c) Headquarters, Naval Security Group Command; (d) Naval Security Group Activities and Detachments; (e) Fleet Intelligence Center,

---

[1] Section 4 of the Executive Order delegates to the Secretary of Defense authority under 5 U.S.C. § 7103(b)(1) to issue orders suspending the application of the Executive Order to any subdivision of DoD, thereby bringing such subdivisions under the coverage of the FSLMRS. Exec. Order 14,251 § 4. Pursuant to that delegated authority, in April 2025, the Secretary of Defense excepted certain employees in four DoD subdivisions, after determining "that the provisions of the [FSLMRS] can be applied to . . . federal wage system employees in the trades at the [these] DoD component subdivisions in a manner consistent with national security requirements and considerations." DoD, Notice of certification, 90 Fed. Reg. 17,052, 17,052 (Apr. 23, 2025). The four DoD subdivisions are: (a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army; (b) Air Force Test Center, Air Force Materiel Command, Department of Air Force; (c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force; and (d) Fleet Readiness Center Southeast. *Id.* The non-federal wage system employees in these four subdivisions, and the remaining DoD subdivisions, including all subdivisions relevant to this lawsuit, remain subject to EO 14,251 and are thereby excluded from FSLMRS coverage.

Europe and Atlantic (FICEURLANT); (f) Fleet Intelligence Center, Pacific (FICPAC); (g) Units composed primarily of employees engaged in the operation, repair, and/or maintenance of "off line" or "on line" cryptographic equipment; and (h) Units composed primarily of employees of naval telecommunications activities in positions which require a cryptographic authorization;

iii.  the following agencies or subdivisions of the Department of the Air Force: (a) Office of Space Systems, Office of the Secretary of the Air Force; (b) Office of Special Projects, Office of the Secretary of the Air Force; (c) Engineering Office, Space and Missile Systems Organization (Air Force Systems Command); (d) Program Control Office, Space and Missile Systems Organization (Air Force Systems Command); (e) Detachment 3, Space and Missile Systems Organization (Air Force Systems Command); (f) Defense Dissemination Systems Program Office, Space and Missile Systems Organization (Air Force Systems Command); (g) Satellite Data System Program Office, Space and Missile Systems Organization (Air Force Systems Command); (h) Project Office at El Segundo, California, Office of the Secretary of the Air Force; (i) Project Office at Patrick Air Force Base, Florida, Office of the Secretary of the Air Force; (j) Project Office at Fort Myer, Virginia, Office of the Secretary of the Air Force; (k) Air Force Office of Special Investigations; (l) U.S. Air Force Security Service; (m) Foreign Technology Division, Air Force Systems Command, Wright-Patterson Air Force Base; (n) 1035 Technical Operations Group (Air Force Technical Applications Center), Air Force Systems Command, and subordinate units; and (o) 3480 Technical Training

3

Wing, Air Training Command, Goodfellow Air Force Base, Texas;

    iv.    the Defense Intelligence Agency; and

    v.    the Defense Investigative Service.

Exec. Order No. 12171 § 1-2, 44 Fed. Reg. 66,565, 66,565–66 (Nov. 20, 1979).

b.    President Reagan also exempted numerous components of DoD:

    i.    the following agencies or subdivisions of the Department of the Air Force: the Office of the Assistant Chief of Staff, Intelligence; and the Air Force Intelligence Service; and

    ii.    the following agencies or subdivisions under the operational jurisdiction of the Joint Chiefs of Staff (JCS): (a) Intelligence Division (J-2), Headquarters Atlantic Command (LANTCOM); (b) Atlantic Command Electronic Intelligence Center; (c) Intelligence Directorate (J-2), Headquarters U.S. European Command (USEUCOM); (d) Special Security Office (SSO), Headquarters U.S. European Command (USEUCOM); (e) European Defense Analysis Center (EUDAC); (f) Intelligence Directorate (J-2), Headquarters Pacific Command (PACOM); (g) Intelligence Center Pacific (IPAC); (h) Intelligence Directorate (J-2), Headquarters U.S. Southern Command (USSOUTHCOM); (i) Intelligence Directorate (J-2), Headquarters U.S. Readiness Command (USREDCOM)/Joint Deployment Agency; (j) Deputy Chief of Staff/Intelligence, Headquarters Strategic Air Command (SAC); (k) 544th Strategic Intelligence Wing, Strategic Air Command (SAC); (l) Deputy Chief of Staff/Intelligence, Headquarters 15th Air Force, Strategic Air Command (SAC); (m) Deputy Chief of Staff/Intelligence, Headquarters 8th Air Force, Strategic Air Command (SAC); (n) Strategic Reconnaissance Center, Headquarters Strategic Air

4

Command (SAC); (o) 6th Strategic Wing, Strategic Air Command (SAC); (p) 9th Strategic Reconnaissance Wing, Strategic Air Command (SAC); (q) 55th Strategic Reconnaissance Wing, Strategic Air Command (SAC); (r) 306th Strategic Wing, Strategic Air Command (SAC); (s) 376th Strategic Wing, Strategic Air Command (SAC); (t) Deputy Chief of Staff/Operations Plans, Headquarters Strategic Air Command (SAC); (u) the Joint Strategic Target Planning Staff (JSTPS); and (v) the Joint Special Operations Command (JSOC).

Exec. Order No. 12338 §§ 1–2, 47 Fed. Reg. 1,369, 1,369–70 (Jan. 13, 1982); Exec. Order No. 12,410, 48 Fed. Reg. 13,143, 13,143 (Mar. 30, 1983).

c.    President Clinton exempted the Naval Special Warfare Development Group within the Department of the Navy. Exec. Order No. 13,039, 62 Fed. Reg. 12,529, 12,529 (Mar. 14, 1997).

d.    President Obama exempted multiple components of DoD by revising the list of excluded DoD components to include:

    i.    the following agencies or subdivisions of the Department of the Army: (a) Office of the Deputy Chief of Staff, G-2 (Intelligence), and all G-2 Intelligence offices within Army Commands, Army Service Component Commands, and Direct Reporting Units; (b) United States Army Intelligence and Security Command; (c) the following subdivisions of the United States Army Cyber Command (ARCYBER) and Second Army: (1) Headquarters, United States ARCYBER and Second Army; (2) Joint Forces Headquarters— Cyber; (3) Army Cyber Operations and Integration Center; (d) United States Army Intelligence Center of Excellence (USAICoE), United States Army Training and Doctrine Command (TRADOC);

(e) United States Army Cyber Protection Brigade, United States Army Network Enterprise Technology Command; (f) 114th Signal Battalion, 21st Signal Brigade, United States Army Network Enterprise Technology Command; (g) 302nd Signal Battalion, 21st Signal Brigade, United States Army Network Enterprise Technology Command; (h) United States Army Criminal Investigation Command (USACIDC); (i) United States Army Special Operations Command (USASOC); (j) Rapid Equipping Force (REF), United States Army Training and Doctrine Command (TRADOC); (k) Asymmetric Warfare Group (AWG), United States Army Training and Doctrine Command (TRADOC);

ii.   the following agencies or subdivisions of the Department of the Navy: (a) Office of the Director of Naval Intelligence, and all Intelligence offices within Navy Commands, Navy Service Component Commands, and Direct Reporting Units, including the following: (1) Naval Intelligence Activity; (2) Office of Naval Intelligence; (3) Farragut Technical Analysis Center; (4) Nimitz Operational Intelligence Center; (5) Hopper Information Services Center; (6) Kennedy Irregular Warfare Center; (7) Brooks Center for Maritime Engagement; (b) Naval Criminal Investigative Service; (c) United States Fleet Cyber Command; (d) Headquarters, Marine Corps Intelligence Department and subordinate activities, United States Marine Corps; (e) Marine Forces Cyber Command, United States Marine Corps; (f) Naval Computer and Telecommunications Station, San Diego, Detachment, Naval Strategic Communications Unit, Tinker Air Force Base; (g) Naval Information Force Reserve, Navy Reserve Force; (h) Center for

6

Information Warfare Training, Naval Education and Training Command; (i) Naval Special Warfare Command (NSW); (j) Marine Special Operations Command (MARSOC); (k) Navy Information Operations Commands and Detachments; (l) Naval Communications Security Material System;

iii.   the following agencies or subdivisions of the Department of the Air Force: (a) Headquarters, 24th Air Force and Air Forces Cyber, Joint Force Headquarters, Air Force Space Command, and the following elements under its operational control: (1) 67th Cyberspace Wing; (2) 624th Operations Center; (3) the following subdivisions of the 688th Cyberspace Operations Wing: (A) 318th Cyberspace Operations Group; (B) 688th Cyberspace Operations Group; (4) 5th Combat Communications Group; (b) Headquarters, 25th Air Force, Air Combat Command, and the following wings, groups, and elements under the operational control of the 25th Air Force: (1) 70th Intelligence, Surveillance and Reconnaissance Wing; (2) 363rd Intelligence, Surveillance and Reconnaissance Wing; (3) 480th Intelligence, Surveillance and Reconnaissance Wing; (4) 625th Operations Center; (5) the following subdivisions of the 9th Reconnaissance Wing: (A) 9th Operations Group; (B) 69th Reconnaissance Group; (6) 55th Operations Group, 55th Wing; (c) Air Force Technical Applications Center (AFTAC), 25th Air Force, Air Combat Command; (d) Office of the Deputy Chief of Staff, Intelligence, Surveillance and Reconnaissance (A2), Headquarters, United States Air Force, and all A2 staff within Air Force Commands, Air Force Service Component Commands, Field Operating Agencies, and Direct Reporting Units; (e) National Air

7

and Space Intelligence Center and all elements under its operational control; (f) Air Force Special Operations Command (AFSOC), with the exception of the following subdivisions: (1) the following groups of the 1st Special Operations Wing, Hurlburt Field, Florida: (A) Mission Support Group; (B) Medical Group; (2) the following groups of the 27th Special Operations Wing, Cannon Air Force Base, New Mexico: (A) Mission Support Group; (B) Medical Group; (g) Air Force Office of Special Investigations; (h) 17th Training Wing, Air Education and Training Command, Goodfellow Air Force Base, Texas;

iv.  the Defense Intelligence Agency;

v.  the Defense Security Service;

vi.  the following agencies or subdivisions under the authority of the Chairman of the Joint Chiefs of Staff and the Commanders of the Combatant Commands: (a) Office of the Chairman of the Joint Chiefs of Staff (OCJCS) and the Joint Staff; (b) United States Africa Command (USAFRICOM); (c) United States Central Command (USCENTCOM); (d) United States European Command (USEUCOM); (e) United States Pacific Command (USPACOM); (f) United States Southern Command (USSOUTHCOM); (g) North American Aerospace Defense Command (NORAD); (h) United States Northern Command (USNORTHCOM); (i) Headquarters, United States Transportation Command (USTRANSCOM), and its subordinate command, the Joint Enabling Capabilities Command; (j) United States Strategic Command (USSTRATCOM) and all components, centers, or sub-unified commands currently assigned to USSTRATCOM, including the following: (1) United States

Cyber Command (USCYBERCOM); (2) Joint Functional Component Command—Global Strike (JFCC GS); (3) Joint Functional Component Command—Space (JFCC Space); (4) Joint Functional Component Command—Integrated Missile Defense (JFCC IMD); (5) Joint Functional Component Command—Intelligence, Surveillance and Reconnaissance (JFCC ISR); (6) USSTRATCOM Center for Combating Weapons of Mass Destruction (SCC WMD); (7) Standing Joint Force Headquarters for Elimination (SJFHQ-E); (8) Joint Warfare Analysis Center (JWAC); (k) United States Special Operations Command (USSOCOM) and all components and sub-unified commands under its administrative and operational control, including the following: (1) Components: (A) Marine Special Operations Command (MARSOC); (B) Naval Special Warfare Command (NSW); (C) Air Force Special Operations Command (AFSOC), with the exception of the following subdivisions: (i) the following groups of the 1st Special Operations Wing, Hurlburt Field, Florida: (I) Mission Support Group; (II) Medical Group; (ii) the following groups of the 27th Special Operations Wing, Cannon Air Force Base, New Mexico: (I) Mission Support Group; (II) Medical Group; (D) United States Army Special Operations Command (USASOC); (2) Sub-unified Commands: (A) Joint Special Operations Command (JSOC); (B) Special Operations Command Korea (SOCKOR); (C) Special Operations Command Europe (SOCEUR); (D) Special Operations Command South (SOCSOUTH); (E) Special Operations Command Pacific (SOCPAC); (F) Special Operations Command Africa (SOCAFRICA); (G) Special Operations Command Central

(SOCCENT); (H) Special Operations Command North (SOCNORTH);

vii.    the National Geospatial-Intelligence Agency (NGA);

viii.    the Defense Advanced Research Projects Agency;

ix.    the National Reconnaissance Office;

x.    the Office of the Under Secretary of Defense for Intelligence;

xi.    Field Detachment, Defense Contract Audit Agency;

xii.    the Special Programs Directorate, Defense Contract Management Agency;

xiii.    the following subdivisions of the Defense Information Systems Agency: (a) Joint Force Headquarters—Department of Defense Information Networks; (b) White House Communications Agency;

xiv.    the following subdivisions of the Defense Logistics Agency: (a) Defense Logistics Agency Intelligence; (b) Joint Logistics Operations Center; (c) Computer Emergency Response Team and Incident Response Branch; and

xv.    the Strategic Capabilities Office.

Exec. Order No. 13760, § 2, 82 Fed. Reg. 5,325, 5,325–28 (Jan. 17, 2017).

4.    DoD unquestionably has as a primary function intelligence, counterintelligence, investigative, and/or national security work. DoD's national defense budget is approximately $840 billion. The Department has about 3.4 million service members and civilian employees and 4,800 sites in over 160 countries. The overriding mission of DoD is to protect national security. The primary mission of the Department is to provide the military forces needed to deter war and protect the security of the United States. This involves ensuring a strong, ready force capable of both deterring potential adversaries and effectively defending national interests. Additionally, intelligence and counterintelligence functions within DoD play a vital role in national security by providing critical information to policymakers, protecting sensitive information, and mitigating

10

threats from foreign actors. This support enables timely, informed decision-making, enhances operational readiness, and strengthens the nation's defenses.

5.      The Department of Defense Education Activity (DoDEA) is a Department of Defense "Field Activity," which is an organizational entity established by the Secretary of Defense to carry out supply or service functions that are shared across multiple military branches. DoDEA operates under the direction, authority, and control of the Undersecretary of Defense for Personnel and Readiness. DoDEA is responsible for planning, directing, coordinating, and managing prekindergarten through 12th grade educational programs on behalf of DoD. DoDEA is globally positioned, operating 161 accredited schools in 9 districts located in 11 foreign countries, 7 states, Guam, and Puerto Rico. It was established in 1992, combining work previously organized in two separate but parallel systems: the Department of Defense Dependents Schools (Pacific and Europe) overseas, and the Department of Defense Domestic Dependent Elementary and Secondary Schools (Americas) in the United States. Military established schools for the children of service members stationed abroad dates back to shortly after World War II, and schools for children of military members stationed at various bases in the United States dates back ever farther.

6.      America relies on an all-volunteer military, and the support and benefits that DoD provides its service members—including by providing education through DoDEA to children of military personnel—is critical to DoD's ability to recruit and retain military personnel and to DoD's overall warfighting mission. Given that service needs often require service members and their families to be stationed overseas, it would hurt recruitment and retention if the troops who have (or plan on having) children did not have good and reliable schools with English-language instruction to send their children to when stationed overseas or in the other locations where DoDEA operates. In order to focus on their mission, warfighters—including deployed warfighters—must know that their dependents are well cared for and have access to quality education, which is an essential component of the dependents' overall well-being. DoDEA's connection to recruitment and retention efforts contributes to the Nation's overall security by helping to promote a robust, well-staffed, and focused military, which is vital to national security.

7.     DoDEA employs more than 14,000 employees, approximately 8,000 of whom were represented by unions prior to Executive Order 14,251. Plaintiffs include three of the six labor unions previously representing Agency personnel, primarily educators. The three plaintiff unions include: (1) Federal Education Association ("FEA"); (2) Federal Education Association – Stateside Region ("FEA-SR"); and (3) Antilles Consolidated Education Association ("ACEA").

8.     DoDEA has collective bargaining agreements (CBAs) and/or relationships with the Plaintiff unions in this case:

a.     Prior to the Executive Order, FEA represented approximately 3,600 educators located at 92 schools across seven countries spanning Europe, Pacific and Guam. DoDEA entered into a CBA with FEA on August 1, 2023, which has a five-year term (until Aug. 1, 2028). A copy of that CBA is attached to this declaration as Exhibit A ("FEA CBA").

b.     Prior to the Executive Order, FEA-SR represented two units of employees within DoDEA: one consisting of approximately 2,100 professional employees working in DoDEA stateside schools and Guam across 48 schools, and the other consisting of approximately 650 non-professional employees working in 22 schools stateside and four schools in Guam. With respect to the first unit (professional employees), DoDEA, and specifically the Department of Defense Domestic Dependent Elementary and Secondary Schools (DDESS), entered into a CBA with FEA-SR on January 11, 2019, which had an initial term of five years after which the basic terms automatically renewed pending bargaining over a new agreement. A copy of that CBA is attached to this declaration as Exhibit B ("FEA-SR Pro CBA"). With respect to the second unit (non-professional employees), DoDEA, and specifically the DDESS, entered into a Master Labor Agreement with FEA-SR on March 25, 2010, which had an initial term of four years and then automatically renewed thereafter. A copy of that CBA is attached to this declaration as Exhibit C ("FEA-SR Non-Pro CBA").

c. Prior to the Executive Order, ACEA represented approximately 300 educators, including substitute teachers, located at four schools in Puerto Rico. DoDEA, and specifically the DoDEA Department of Defense Domestic Dependent Elementary and Secondary Schools - Puerto Rico, entered into a CBA with ACEA on October 20, 2023, which by its terms continues until July 24, 2028. A copy of that CBA is attached to this declaration as Exhibit D ("ACEA CBA").

9. All of the above-referenced CBAs generally interfere with DoD's ability to execute and implement the President's initiatives related to national security. For example, DoD and DoDEA cannot implement the President's government-wide rules and regulations from the President that conflict with the CBAs (without renegotiation and agreement with the unions). As one example, provisions in the FEA-SR Pro CBA and the ACEA CBA restrict DoDEA's ability to order an educator to work a full duty day at the school. Specifically, per the ACEA CBA the educator works seven hours per day at the school and is allowed to work the eighth hour at an alternate location, arguably contrary to the President's Return to In-Person Work, dated January 20, 2025. Similarly, the FEA-SR Pro CBA restricts the Agency's ability to reassign employees to other duty locations—requiring DoDEA to limit reassignment to their current military installation. The Executive Order removes these obstacles.

10. Plaintiffs' requested preliminary injunction is not limited to the parties in this case, or even DoDEA more broadly (not just with respect to the Plaintiff unions), because it would enjoin the entire Department, not just DoDEA, from "implementing, enforcing, or otherwise giving effect to any guidance or direction that has already issued as to the implementation or enforcement of the Executive Order, including but not limited to the March 27 Memorandum from Charles Ezell to Heads and Acting Heads of Departments and Agencies entitled 'Guidance on Executive Order Exclusions from Federal Labor-Management Programs.'" ECF No. 22-08 (Plaintiffs' proposed order). The Department will suffer the following harms if Plaintiffs' requested preliminary injunction is entered and the Department is forced to return its labor

management operations to the status quo that existed prior to the March 27, 2025, issuance of the Executive Order:

    a.    The preliminary injunction would prevent the Department from complying with the President's directions in the Executive Order, in which the President made national-security determinations entrusted to him by Congress.

    b.    DoD has taken a wide variety of actions to implement the Executive Order to date. If forced to comply with Plaintiffs' request preliminary injunction, the Department would have to undo those actions by: reestablishing the withholding of union dues; restarting the processing of grievances; reengaging on arbitrations that had been held in abeyance; reengaging on matters pending before the Federal Labor Relations Authority; reestablishing the provision of official time to unions under the Statute and in accordance with the provisions of applicable CBAs; reengaging in collective bargaining under the Statute and in accordance with the provisions of applicable CBAs; and otherwise reverting back to full compliance with the terms of applicable CBAs, including, but not limited to: overtime distribution requirements, provision of union office space, and adherence to disciplinary and performance management procedural requirements.

    c.    These efforts would require significant resources to accomplish, including manhours on the part of Human Resources and legal staff, payroll providers and supervisory personnel, as well as costs such as arbitration-related expenses. These are resources that otherwise could be devoted to the implementation of administration priorities related to establishing a high-performance Federal workforce, strengthening probationary periods in the Federal service, and restoring accountability to policy-influencing positions in the Federal workforce—efforts which serve to strengthen the Department's ability to meet its critical national security mission. Complying with the preliminary injunction would divert resources from these critical activities immediately.

d.    Implementation of the Executive Order has enhanced national security by allowing military medical facilities to better utilize their resources in support of warfighters. Specifically, these facilities have been able to move employees into crucial open positions without having to wait two pay periods as required by the Master Labor Agreement Article on Details. This increased flexibility has allowed the facilities to move LPNs and RNs from one floor or unit to another on short notice, thus enhancing continuous care for service members, including some in a deployable-status, and their dependents.

e.    The Executive Order has enabled military medical facilities to react more nimbly to workplace challenges, such as schedule changes, details, and reassignments. Consequently, facilities could provide uninterrupted care for service members in support of DoD's overall national security mission. Plaintiffs' requested preliminary injunction could result in interruptions to and longer wait times for medical care for service members, including those in deployable-status, and their dependents, which would result in harms to warfighter readiness and national security.

f.    As to DoDEA specifically, implementation of the Executive Order has enhanced national security by allowing DoDEA personnel to return to the classroom and focus on educating service member dependents, rather than performing union duties on official time. Moreover, the Executive Order has enabled school and District offices to react more nimbly to workplace challenges, such as schedule changes, details, reassignments, and disciplinary actions. Consequently, schools can better serve the educational needs for the dependents of our service members in support of DoD's overall national security mission.

11.    DoD and DoDEA would face numerous costs and damages if the Court were to enter Plaintiffs' requested preliminary injunction, including the costs of arbitrations and costs of returning to negotiations, among others. One of the largest costs to DoDEA would be the costs

involved in allowing union officials to return to performing union duties on official time. DoD requests that the Court require Plaintiffs to issue a bond of $1,152,000 if the preliminary injunction is limited to DoDEA and the parties in this case. This is the minimum amount needed to cover DoDEA's costs as this represents the average salary of educators multiplied by the 8 positions that DODEA would need to fill if educators are allowed to return to performing union duties on official time. Additional costs that are more difficult to quantify include cost of arbitration (transcripts, court reporter), payment of arbitrator fees, damages, attorney fees, and salaries of other personnel. If, as Plaintiffs request, the preliminary injunction is not limited to DoDEA and the parties in this case, but instead applies to DoD as a whole, DoD requests a bond of at least $15 million.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 22, 2025.

COGAR.MICHAEL.AN THONY.1157111716  Digitally signed by COGAR.MICHAEL.ANTHONY.115 7111716 Date: 2025.07.22 20:36:24 -04'00'

Michael A. Cogar

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, et al.,<br><br>       Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, et al.,<br><br>       Defendants. | Civil Action No. 25-1362 (PLF) |

## ORDER

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that the Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 22] is GRANTED; it is

FURTHER ORDERED that Section 2 of the Executive Order, Exclusions from Federal Labor-Management Relations Programs (Mar. 27, 2025) ("Executive Order"), is unlawful as applied to the Plaintiffs, each of whom exclusively represent Department of Defense Education Activity ("DoDEA") employees, and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that the Office of Personnel Management's Guidance on Executive Order Exclusions from Federal Labor-Management Programs (Mar. 27, 2025) ("OPM Guidance"), on the Executive Order is unlawful as applied to the Plaintiffs and all DoDEA employees represented by any Plaintiff; it is

JA703

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing Section 2 of Executive Order with respect to the Plaintiffs and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing the OPM guidance with respect to the Plaintiffs and all DoDEA employees represented by any Plaintiff; it is

FURTHER ORDERED that, pursuant to Fed. R. Civ. P. 65(c), Plaintiffs shall post with the Court $100 as security for the issuance of this Preliminary Injunction; and it is

FURTHER ORDERED that the parties shall meet and confer and file a joint report on or before September 5, 2025, proposing a schedule for how this case should proceed.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8|14|25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
                                              )
FEDERAL EDUCATION                             )
ASSOCIATION, et al.,                          )
                                              )
            Plaintiffs,                       )
                                              )
      v.                                      )          Civil Action No. 25-1362 (PLF)
                                              )
DONALD J. TRUMP, et al.,                      )
                                              )
            Defendants.                       )
_____)

<u>OPINION</u>

          This matter is before the Court on a motion for a preliminary injunction brought
by Federal Education Association ("FEA"), Federal Education Association Stateside Region
("FEA-SR"), and Antilles Consolidated Education Association ("ACEA") (collectively, "Union
Plaintiffs"). <u>See</u> Plaintiffs' Motion for a Preliminary Injunction ("Mot.") [Dkt. No. 22]. On
March 27, 2025, the President issued an executive order that removed various agencies and
agency subdivisions from coverage of the Federal Service Labor-Management Relations Statute
and Foreign Service Labor-Management Relations Statute. Both statutes – which protect federal
employees' rights to "organize, bargain collectively, and participate through labor organizations
of their own choosing," 5 U.S.C. § 7101(a)(1); 22 U.S.C. § 4101(1) – provide nearly identically
worded provisions that permit the President to exclude components of the federal government
from coverage of the statutes. To invoke these exclusionary provisions, the President must
determine that "the agency or subdivision has as a primary function intelligence,
counterintelligence, investigative, or national security work," and that the statutes' provisions

"cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); see 22 U.S.C. § 4103(b) (same except refers to "any subdivision"). The effect of the Executive Order was substantial: it removed collective bargaining rights from approximately two-thirds of the federal workforce. The Court has issued preliminary injunctions in two related cases. See Nat'l Treasury Emps. Union v. Trump ("NTEU"), Civil Action No. 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025); Am. Foreign Serv. Ass'n v. Trump ("AFSA"), Civil Action No. 25-1030 (PLF), 2025 WL 1387331 (D.D.C. May 14, 2025).

The Court held oral argument on the Union Plaintiffs' motion on August 4, 2025. Upon careful consideration of the parties' written submissions, their oral arguments, and the relevant authorities, the Court grants plaintiffs' motion for a preliminary injunction.[1]

## I.    BACKGROUND

### A.    The Union Plaintiffs

The Department of Defense Education Activity ("DoDEA"), a subdivision of the Department of Defense ("DoD"), "operates schools for the children of uniformed and civilian

---

[1]    The papers reviewed by the Court in connection with this matter include: First Amended Complaint for Declaratory and Injunctive Relief ("Am. Compl.") [Dkt. No. 21]; Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pls.' Mem.") [Dkt. No. 22-1]; Declaration of Richard Tarr ("Tarr Decl.") [Dkt. No. 22-2]; Declaration of Alan Danahy ("Danahy Decl.") [Dkt. No. 22-3]; Declaration of Alexis Gorbea ("Gorbea Decl.") [Dkt. No. 22-4]; Declaration of Ben Hunter ("Hunter Decl.") [Dkt. No. 22-5]; Declaration of William Freeman ("Freeman Decl.") [Dkt. No. 22-6]; Declaration of Robin Smith ("Smith Decl.") [Dkt. No. 22-7]; Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs.' Opp.") [Dkt. No. 27]; Declaration of Michael A. Cogar ("Cogar Decl.") [Dkt. No. 27-1]; Reply Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction (Pls.' Reply") [Dkt. No. 29]; Joint Status Report ("Post-Argument JSR") [Dkt. No. 32]; and Federal Education Association v. Trump, Civil Action No. 25-1362, Transcript of Record (Aug. 4, 2025) [Dkt. No. 33].

DoD personnel stationed in military bases in the United States and abroad." Tarr Decl. ¶ 6.

Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside

Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA") are three

federal labor organizations that represent educators in pre-kindergarten through 12th grade

schools that are operated by DoDEA. See Am. Compl. ¶ 1. FEA is a labor organization that was

first recognized as the collective bargaining representative of DoDEA educators in 1970 – before

the FSLMRS was enacted – pursuant to an executive order issued by President Richard Nixon.

Tarr Decl. ¶ 8; see Exec. Order No. 11491, 34 Fed. Reg. 17605 (Oct. 29, 1969). Today, FEA has

"approximately 5,400 members" – including "classroom teachers, instructional assistants,

information specialists (also known as librarians), counselors, nurses, and classified

employees" – that work at various DoDEA schools "located in military bases in the United

States and in the U.S. Territory of Guam, countries throughout Europe and Asia, and in

Guantanamo Bay, Cuba." Tarr Decl. ¶ 6. FEA-SR, established in 1996, represents "two units of

employees working in stateside DODEA schools" – one unit that consists of "professionally

certified, non-supervisory educators and other professionals," and another unit that consists of

"classified education support professionals." Danahy Decl. ¶ 5. ACEA, established in 1974,

represents "professional educators who work at four DODEA schools in Puerto Rico." Gorbea

Decl. ¶¶ 3, 7.[2]

---

[2]    The work of DoDEA educators and support staff has made DoDEA a "pre-eminent public school district," providing a valuable service to DoD personnel and their families. See Pls.' Mem. at 7-9; see also DoDEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025), https://perma.cc/YC24-G3MV (noting that DoDEA students' scored "higher than corresponding national average scores"); Danahy Decl. ¶¶ 13-16.

### B. *Statutory Background*

The Federal Service Labor-Management Relations Statute, set forth in Title VII of the Civil Service Reform Act, Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (1978) (codified at 5 U.S.C. §§ 7101-35) ("FSLMRS"), provides certain protections of the "right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . ." 5 U.S.C. § 7101(a)(1). In passing the statute, Congress found, based on "experience in both private and public employment," that the protections were necessary to "safeguard[] the public interest," "contribute[] to the effective conduct of public business," and "facilitate[] and encourage[] the amicable settlements of disputes between employees and their employers involving conditions of employment." Id. In sum, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest." Id.

Among other things, the FSLMRS requires federal agencies to collectively bargain "with respect to the conditions of employment affecting such employees." 5 U.S.C. § 7103(a)(12). The statute provides a role for "labor organizations" in this collective bargaining process, stating:

> A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.

5 U.S.C. § 7114(a)(1).

While Congress extended these protections to "many" federal employees, it did not "include the entire federal workforce within this regime." Am. Fed'n of Gov't Emps., AFL-

CIO v. Reagan, 870 F.2d 723, 724 (D.C. Cir. 1989). "The Act itself exempted several federal agencies from coverage," id., including the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency. See 5 U.S.C. § 7103(a)(3). In addition to these explicit exclusions, "Congress also addressed the matter of national security" in Section 7103(b). Soc. Sec. Admin. Baltimore, Maryland (Agency) & Am. Fed'n of Gov't Emps. (Petitioner/Labor Org.), 59 F.L.R.A. 137, 143 (Sept. 12, 2003). Specifically, Congress granted the President the authority to either exclude or suspend certain "agenc[ies] or subdivision[s] thereof" from the statute's coverage. See 5 U.S.C. § 7103(b). Section 7103(b) provides:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –
>
> > (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
> >
> > (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.
>
> (2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

5 U.S.C. § 7103(b). The exclusion provided in Section 7103(b)(1) has been invoked numerous times since the passage of the FSLMRS.[3] As the Union Plaintiffs points out, however,

---

[3]    See Exec. Order No. 12171, 44 Fed. Reg. 66565 (1979); Exec. Order No. 12338, 47 Fed. Reg. 1369 (1982); Exec. Order No. 12410, 48 Fed. Reg. 13143 (1983); Exec. Order No. 12559, 51 Fed. Reg. 18761 (1986); Exec. Order No. 12632, 53 Fed. Reg. 9852 (1988); Exec. Order No. 12666, 54 Fed. Reg. 1921 (1989); Exec. Order No. 12671, 54 Fed. Reg. 11157 (1989); Exec. Order No. 12681, 54 Fed. Reg. 28997 (1989); Exec. Order No. 12693, 54 Fed. Reg. 40629 (1989); Exec. Order No. 13039, 62 Fed. Reg. 12529 (1997); Exec. Order No. 13252, 67 Fed.

Section 7103(b)(1) has never been invoked to exclude an entire cabinet-level department from

the FSLMRS.  See Pls.' Mem. at 11.

### C.  Factual Background

### 1.  The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions

from Federal Labor-Management Relations Programs."  Exec. Order No. 14251, 90 Fed.

Reg. 14553 (Mar. 27, 2025) ("Executive Order").  Section 2 of the Executive Order amends a

previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded

various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b).  See Exec.

Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979).[4]  The March 27, 2025 Executive

Order states that "[t]he agencies and agency subdivisions set forth in section 2 of this order are

hereby determined to have as a primary function intelligence, counterintelligence, investigative,

or national security work," and that it has been "determined that Chapter 71 of title 5, United

States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent

---

Reg. 1601 (2002); Exec. Order No. 13381, § 5(b), 70 Fed. Reg. 37955 (2005); Exec. Order
No. 13467, § 3(d), 73 Fed. Reg. 38107 (2008); Exec. Order No. 13480, §§ 2-6, 73 Fed.
Reg. 73991, 73992 (2008); Exec. Order No. 13741, § 3, 81 Fed. Reg. 68291 (2016); Exec. Order
No. 13760, §2, 82 Fed. Reg. 5325 (2017); Exec. Order No. 13869, §3(b), 84 Fed. Reg. 18130
(2019); see also 5 U.S.C. § 7103, U.S. Government Publishing Office, available at
https://www.govinfo.gov/content/pkg/USCODE-2019-title5/html/USCODE-2019-title5-partIII-
subpartF-chap71-subchapI-sec7103.htm [https://perma.cc/4JFC-SQXY].

4       While the executive order issued by President Carter "exempted large swaths of
DoD from FSLMRS coverage," see Defs.' Opp. at 5, 17, the government in a related action
acknowledged that President Carter's executive order "did not come close to the scope" of the
Executive Order at issue in this case.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, Civil
Action No. 25-3070 (JJD), 2025 WL 1755442, at *5 (N.D. Cal. June 24, 2025) ("It bears
mention that [President Carter's executive order] excluded agency subdivisions plainly related to
national security, most of which were in the Departments of the Army, Navy, and Air Force,
with a number of subdivisions specified at a high level of granularity . . . .").

with national security requirements and considerations."  Executive Order § 1(a).  As relevant to

the Union Plaintiffs, the Executive Order excludes from the FSLMRS the entirety of the DoD,

which includes DoDEA.  <u>See</u> Pls.' Mem. at 11-12.[5]

A "Fact Sheet" was issued by the White House the same day that the Executive

Order was issued.  <u>See</u> Fact Sheet: President Donald J. Trump Exempts Agencies with National

Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025),

https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-

agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/

[https://perma.cc/Y7HR-4W3H] ("Fact Sheet").  The Fact Sheet is divided into three parts.  First,

it lists eight "national security missions" – "National Defense," "Border Security," "Foreign

Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response,"

"Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each

of these missions.  <u>See</u> Fact Sheet.  Second, in a section titled "Ensuring that Agencies Operate

Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal

unions to obstruct agency management," and that this "is dangerous in agencies with national

security responsibilities."  <u>See id.</u>  Finally, in a section titled "Safeguarding American Interests,"

the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to
> national security can execute their missions without delay and
> protect the American people.  The President needs a responsive and
> accountable civil service to protect our national security.

---

[5]        Section 4 of the Executive Order delegates authority to the Secretaries of Defense
and Veterans Affairs "to issue orders suspending the application of" the Executive Order,
"thereby bringing such subdivisions under the coverage" of the FSLMRS.  <u>See</u> Executive
Order § 4; see also Executive Order § 2(b) (excluding "[t]he Department of Defense, except for
any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025,
entitled 'Exclusions from Federal Labor-Management Relations Programs.'").

- Certain Federal unions have declared war on President Trump's agenda.

  o The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.

  o For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration – an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a memorandum titled "Guidance on Executive Order <u>Exclusives from Federal Labor-Management Programs</u>." <u>See</u> Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf [https://perma.cc/QH4A-MQ9F] ("OPM Guidance"). The OPM Guidance states that pursuant to the Executive Order, "covered agencies and subdivisions are no longer subject to the collective-bargaining requirements" of the Statute and "are no longer required to collectively bargain with federal unions." OPM Guidance at 3. The document also states that "Federal unions" "lose their status as the 'exclusively recognized' labor organizations for employees of the agencies and agency subdivisions covered by Exclusions" in the Executive Order. <u>Id</u>. (alterations omitted)

(referencing 5 U.S.C. § 7111(a)); <u>see</u> 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in the election.").

### 2.  The Instant Litigation

On May 5, 2025, the Union Plaintiffs filed this lawsuit.  <u>See</u> Complaint for Declaratory and Injunctive Relief [Dkt. No. 1].  An amended complaint was filed on June 21, 2025.  <u>See</u> Am. Compl.  The Union Plaintiffs bring seven counts:  (1) the Executive Order is <u>ultra</u> <u>vires</u> because it exceeds the President's authority under 5 U.S.C. § 7103(b)(1); (2) the Executive Order reflects retaliation against Union Plaintiffs in violation of its First Amendment rights; (3) the Executive Order violates the Fifth Amendment's Takings Clause and prohibition against "the government's retroactive abrogation of its contracts"; (4) the Executive Order violates the Equal Protection Clause of the Fifth Amendment; (5) the Executive Order violates the Union Plaintiffs' procedural due process rights; (6) actions taken by the DoD and defendant Pete Hegseth related to the Executive Order are arbitrary and capricious in violation of the Administrative Procedure Act ("APA"); and (7) actions taken by the DoD and defendant Hegseth related to the Executive Order are contrary to law in violation of the APA.  <u>See</u> Am. Compl. ¶¶ 100-35.[6]  The Union Plaintiffs seek, <u>inter</u> <u>alia</u>, an injunction enjoining all the defendants from "implementing" the Executive Order and OPM Guidance related to the

---

[6]    The Union Plaintiffs do not seek any preliminary relief in connection with their APA claims.

Executive Order with respect to the Union Plaintiff and their members.  <u>See</u> Am. Compl.

at 49-50.

## II.  JURISDICTION

At the onset, the government essentially recycles the same jurisdictional argument

that it has made in <u>NTEU</u> and <u>AFSA</u>.  More specifically, the government argues that this Court

lacks jurisdiction because Congress created a "special statutory review scheme" in the

FSLMRS – the Federal Labor Relations Authority ("FLRA") – and that such a scheme precludes

this Court's review under <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200 (1994).  <u>See</u> Defs.'

Opp. at 9-14.  As the Court explained at length in <u>NTEU</u> and again in <u>AFSA</u>, this jurisdictional

argument is unavailing.  <u>See</u> <u>NTEU</u>, 2025 WL 1218044, at *4-6; <u>AFSA</u>, 2025 WL 1387331,

at *4-7; <u>see also</u> <u>Am. Fed'n of Gov't Emps., AFL-CIO v. Trump</u> ("<u>AFGE</u>"), Civil Action

No. 25-3070 (JJD), 2025 WL 1755442, at *8-9 (N.D. Cal. June 24, 2025) (rejecting the

government's jurisdictional arguments for the same reasons).

As the Court explained in <u>NTEU</u>,

> The Court concludes that its jurisdiction is not precluded in this case.
> The government's argument is essentially that NTEU must pursue
> its claims using the administrative review scheme created by
> Congress in the FSLMRS – the Federal Labor Relations Authority
> ("FLRA") – rather than by bringing claims in a federal district court.
> <u>See</u> Opp. at 12-13.  The administrative review scheme, however, is
> not available to challenge the Executive Order's exclusions of the
> agencies and subdivisions subject to the Executive Order for the
> simple reason that those agencies and subdivisions have been
> excluded from the FSLMRS's coverage by the very Executive Order
> at issue here.  <u>See</u> Pl.'s Reply at 17 (arguing that the "Executive
> Order has taken away the administrative channels that Defendants
> argue must be used).  The relevant precedents from the FLRA make
> this point clear.  <u>See</u> <u>United States Dep't of the Air Force Air Force</u>
> <u>Materiel Command Warner Robins Air Logistics Ctr. Robins Air</u>
> <u>Force Base, Georgia (Respondent) & Am. Fed'n of Gov't Emps.</u>
> <u>Loc. 987 (Charging Party/union)</u>, 66 F.L.R.A. 589, 598 (Apr. 20,

2012) ("[T]he Authority has determined that an exemption from coverage constitutes a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute"); <u>Department of the Navy, Naval Telecommunications Ctr., Ward Circle and NAVTELCOM Unit Local No. 1, American Federation of Government Employees</u>, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process a representation petition.").

<u>NTEU</u>, 2025 WL 1218044, at *5. It is unnecessary to revisit this analysis, especially where, as here, the government fails to address much of the Court's earlier analysis in <u>NTEU</u> and <u>AFSA</u>. With that said, it is worth emphasizing several points.

First, in direct contradiction to the government's contention in the instant case, on April 30, 2025, DoDEA – in response to an order to show cause issued by the FLRA in an unfair labor practice action – stated that the FLRA lacked jurisdiction over the matter because DoDEA was no longer covered by the FSLMRS pursuant to the Executive Order. <u>See</u> Tarr Decl. ¶ 42. More specifically, DoDEA stated:

> Per the express terms of Executive Order 14251, dated March 27, 2025, issued pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), the Department of Defense, (which includes the above-named Field Activity of the Department of Defense, to wit: Department of Defense Education Activity), is hereby excluded from coverage of the Federal Service Labor-Management Relations Statute. As such, the Authority lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union. Given the Charging Party's submission lacks any reference to the Secretary of Defense suspending the application of the above-cited Executive Order to the subdivision(s) represented by the Charging Party and/or lacks any reference to an applicable court injunction, this matter must be dismissed based on lack of jurisdiction.

Ex. 14 to Tarr Decl. As a result, it appears that DoDEA agrees that actions brought by the Union Plaintiffs now are "expressly outside the FLRA's purview" because DoDEA is not covered by

the FSLMRS.  See Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson, 475 F.3d 341,

348 (D.C. Cir. 2007).

    Second, the government maintains that the Union Plaintiffs' position in this

case – i.e., that the Executive Order is invalid – is somehow relevant to the issue of this Court's

jurisdiction.  See Defs.' Opp. at 9.  More specifically, the government argues that under the

Union Plaintiffs' theory that the Executive Order is invalid, DoDEA would still be covered by

the FSLMRS, and therefore, their claims should be pursued through the FSLMRS's "special

statutory review scheme" – the FLRA.  See id.  The government's argument fundamentally

misunderstands the inquiry required under Thunder Basin.  The Thunder Basin factors are used

to determine whether Congress intended to create a statutory review scheme.  See Am. Fed'n of

Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019) ("To determine whether

Congress has [established an alternative statutory scheme for administrative and judicial review],

we use the two-step framework set forth in Thunder Basin Coal Co. v. Reich, 510 U.S. 200

(1994)); Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (observing that Congress may

create "an alternative scheme of review" "explicitly" or "implicitly").  The Union Plaintiffs'

theory of their case therefore does not provide any relevant information that the Court can use to

discern Congress's intent to create a special statutory review scheme.  See Am. Fed'n of Gov't

Emps., AFL-CIO v. Trump, 2025 WL 1755442, at *9 ("The question of the Court's jurisdiction

is not answered by the plaintiffs' or defendants' beliefs about the merits of the case.  It is

answered by the plain language of the FSLMRS."); see also AFSA, 2025 WL 1387331, at *6

("[A]ssum[ing] that [plaintiff] will prevail on the merits of [its] claim does not change the fact

that there is no dispute between the parties that the agency subdivisions at issue in this case

currently are excluded from the Statute as a result of the Executive Order.") (internal quotation marks omitted).

In sum, because the Executive Order has removed DoDEA from coverage under the FSLMRS, there is no "special statutory review scheme" that is actually available to the Union Plaintiffs for reviewing their claims. Accordingly, the Court has jurisdiction over the Union Plaintiffs' claims. See NTEU, 2025 WL 1218044, at *6; AFSA, 2025 WL 1387331, at *6; Am. Fed'n of Gov. Emps. v. Trump, 2025 WL 1755442 at *8-9.

## III. PRELIMINARY INJUNCTION

### A. Legal Standard

A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting League of Women Voters v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016)); see also Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief" (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008))). Of these, the most important factor is whether a movant has established a likelihood of success on the merits. See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Bailey v. Fed. Bureau of Prisons, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024)

Before the Supreme Court's decision in Winter, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another. Davis v.

Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)); accord Damus v. Nielsen, 313 F. Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction."  Sherley v. Sebelius, 644 F.3d at 392-93 (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1296 (Kavanaugh, J., concurring)); see Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after Winter); Nat'l Treasury Emps. Union v. Vought, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025).  Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also M.G.U. v. Nielsen, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

For each of its claims, the Union Plaintiffs bear the burden of persuasion. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The Union Plaintiffs also "bear[] the burden of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."  Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B. Likelihood of Success on the Merits

For similar reasons as those discussed at length in NTEU and AFSA, the Court determines that the Union Plaintiffs have shown a likelihood of success on the merits of their ultra vires claims.

### 1. The Union Plaintiffs Are Entitled to Ultra Vires Review of the Executive Order

The government argues that ultra vires review of the Executive Order is unavailable.  See Defs.' Opp. at 14-18.  More specifically, the government contends that ultra vires review is "'confined to extreme' errors" in the application of "'specific prohibitions in a statute,'" a situation that is not present here.  Id. at 15 (emphasis omitted) (quoting Fed. Express Corp. v. United States Dep't of Com., 39 F.4th 756, 764 (D.C. Cir. 2022) and Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681 (2025)).  The Court certainly agrees with Justice Kavanaugh that an ultra vires claim is "essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds."  Nuclear Regul. Comm'n v. Texas, 605 U.S. at 681-82 (citation and quotation marks omitted); see Glob. Health Council v. Trump, No. 25-5097, 2025 WL 2326021, at *12 (D.C. Cir. Aug. 13, 2025).  Indeed, as the Court explained in NTEU, an ultra vires claim "is a doctrine of last resort, intended to be of extremely limited scope."  NTEU, 2025 WL 1218044, at *12 (D.D.C. Apr. 28, 2025) (quoting Schroer v. Billington, 525 F. Supp. 2d 58, 65 (D.D.C. 2007)).  Despite the "extremely limited scope" of ultra vires review, the government acknowledges – as it must – that "[w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his authority."  Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996); see id. at 1332 ("[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President claims

that he is acting pursuant [to statutory authority].”); Glob. Health Council v. Trump, 2025 WL 2326021, at *8 n.14 (“[U]ltra vires review remains available to test presidential action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition.”); Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem, Civil Action No. 25-0306 (RDM), 2025 WL 1825431, at *30 (D.D.C. July 2, 2025).

The core of the government’s argument is that Section 7103(b)(1) does not contain a “specific prohibition” but rather “delegates broad authority to the President to exclude parts of the [civil service from 5 U.S.C. Chapter 71] . . . in the interest of national security.” See Defs.’ Opp. at 16 (alterations in original) (quoting Am. Foreign Serv. Ass’n v. Trump, No. 25-5184, 2025 WL 1742853, at *1 (D.C. Cir. June 20, 2025)).  In the absence of such a “specific prohibition,” according to the government, there can be no judicial review to determine if the President acted “in excess of [his] delegated powers and contrary to [the] specific prohibition in the statute.”  See Nuclear Regul. Comm’n v. Texas, 605 U.S. at 681; Defs.’ Opp. at 15-18, 23.

The Court does not agree with the government’s characterization of Section 7103(b)(1) as a “delegat[ion] of broad authority” to the President.  The government cites to several cases where courts have found that a particular statute delegates such authority, concluding that judicial review is either foreclosed or, at a minimum, significantly limited.  See Defs.’ Opp. at 23.  Section 7103(b)(1), however, is far narrower than the broad grants of statutory authority at issue in those cases.  For example, in Webster v. Doe, the Supreme Court found that Section 102(c) of the National Security Act of 1947 was sufficiently broad as to permit the termination of a CIA employee without judicial review of that decision.  See Webster

v. Doe, 486 U.S. 592, 594, 600 (1988).  Section 102(c), however, was indeed a broad grant of

authority, providing that:

> [T]he Director of Central Intelligence may, in his discretion,
> terminate the employment of any officer or employee of the Agency
> whenever he shall deem such termination necessary or advisable in
> the interests of the United States . . . .

Webster v. Doe, 486 U.S. at 594 (quoting 50 U.S.C. § 403(c)).  The Supreme Court found that

the statute "exudes deference" to the Director of the CIA and that it "appear[ed] to [ ] foreclose

the application of any meaningful judicial standard of review."  See id. at 600.

In Trump v. Hawaii, the Supreme Court analyzed 8 U.S.C. § 1182(f), which

provides:

> Whenever the President finds that the entry of any aliens or of any
> class of aliens into the United States would be detrimental to the
> interests of the United States, he may by proclamation, and for such
> period as he shall deem necessary, suspend the entry of all aliens or
> any class of aliens as immigrants or nonimmigrants, or impose on
> the entry of aliens any restrictions he may deem to be appropriate.

Trump v. Hawaii, 585 U.S. 667, 684 (2018) (quoting 8 U.S.C. § 1182(f)).  The Supreme Court

determined that Section 1182(f) also "exudes deference to the President in every clause."  See

Trump v. Hawaii, 585 U.S. at 684.  In Bouarfa v. Mayorkas, the Supreme Court determined that

a statutory provision providing that the Secretary of Homeland Security "may, at any time, for

what he deems to be good and sufficient cause, revoke the approval of any [visa] petition" was a

"broad grant of authority" that similarly "fairly exudes deference."  See Bouarfa v. Mayorkas,

604 U.S. 6, 13-14 (2024) (citations and quotation marks omitted).  In Dalton v. Specter, the

Supreme Court determined that judicial review was inappropriate where the statutory provision

at issue did not "prevent[] the President" from taking the particular action "for whatever reason

he s[aw] fit."  See Dalton v. Specter, 511 U.S. 462, 476 (1994) ("The 1990 Act does not at all

limit the President's discretion . . . ."); see also Chicago & S. Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 106 (1948) (addressing a statutory provision that granted the President "unconditional[]" authority").

Section 7103(b)(1) plainly does not confer the same "broad" grant of authority as was at issue in any of these cases.  Indeed, Section 7103(b)(1) contains not one, but two fairly exacting limitations on the President's authority to invoke the statutory provision.  Specifically, the President must find that (1) the agency or subdivision at issue has as "a primary function intelligence, counterintelligence, investigative, or national security work," 5 U.S.C. § 7103(b)(1)(A), and (2) that the provisions of the FSLMRS "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B).  Such limitations on the President's power to exclude agencies and subdivisions from the FSLMRS create a "clear and specific statutory mandate" that is "susceptible to ultra vires review."  See National Association of Postal Supervisors v. USPS, 26 F.4th 960, 971 (D.C. Cir. 2022) ("So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for ultra vires acts that clearly violate its terms.").  The Court therefore rejects the government's argument that ultra vires review is precluded because Section 7103(b)(1) is a "broad" grant of authority that forecloses such review.  See id.; Chamber of Com. of U.S. v. Reich, 74 F.3d at 1328; Dart v. U.S., 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.  Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior . . . .").

2.   Presumption of Regularity

As the Court explained in NTEU and then again in AFSA, to determine whether the Union Plaintiffs are likely to succeed on their ultra vires claim, the Court must consider whether the Union Plaintiffs have proffered sufficient evidence to rebut the presumption of regularity.  See NTEU, 2025 WL 1218044, at *9-12; AFSA, 2025 WL 1387331, at *9-10; see also Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 727 (D.C. Cir. 1989) ("We deem the familiar presumption of regularity decisive here.").  The "presumption of regularity" "has been recognized since the early days of the Republic," Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727, and has been applied in a variety of contexts where a governmental official's action has been challenged.  See Aram A. Gavoor & Steven A. Platt, In Search of the Presumption of Regularity, 74 FLA. L. REV. 729, 749 (2022) (outlining different categories of examples where the presumption of regularity has been applied).  The "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926); see Latif v. Obama, 677 F.3d 1175, 1178-181 (D.C. Cir. 2011) (same); Paracha v. Trump, Civil Action No. 04-2022 (PLF), 2019 WL 5296839, at *2 (D.D.C. Oct. 18, 2019).  The presumption of regularity, however, is just that, a presumption.  The presumption can be rebutted with "clear evidence" that the official did not discharge his or her official duties properly, see Owlfeather-Gorbey v. Avery, 119 F.4th 78, 86 (D.C. Cir. 2024), a standard which is "higher than

preponderance of the evidence but lower than beyond a reasonable doubt." Paracha v. Trump, 2019 WL 5296839, at *2 (citing Addington v. Texas, 441 U.S. 418, 423-35 (1979)).

The Union Plaintiffs have provided the same evidence – including the White House Fact Sheet and OPM Guidance – on which the Court relied in NTEU and AFSA to conclude that the presumption of regularity had been rebutted. See NTEU, 2025 WL 1218044, at *9-12; AFSA, 2025 WL 1387331, at *9-10. Accordingly, for the same reasons as explained in NTEU and AFSA, the Court concludes that the Union Plaintiffs have rebutted the presumption of regularity. More specifically, the Court reaches this conclusion for three reasons: (1) the Executive Order and the Administration's surrounding statements are at odds with Congress's findings in the FSLMRS; (2) the White House Fact Sheet reflects retaliatory motive; and (3) the Administration's guidance related to the Executive Order – specifically, the OPM Guidance – suggests that the invocation of Section 7103(b)(1) was in furtherance of unrelated policy goals rather than based on the statutory criteria. See NTEU, 2025 WL 1218044, at *9-12.

The Court notes that the "presumption of regularity" has become a frequent subject of litigation since January 20, 2025, the advent of the second Trump Administration. See, e.g., President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec., Civil Action No. 25-11472 (ADB), 2025 WL 1737493, at *17 (D. Mass. June 23, 2025) ("As a last gasp, Defendants argue that the Proclamation should get the 'presumption of regularity' of government activity."); League of United Latin Am. Citizens v. Exec. Off. of the President, Civil Action No. 25-0946 (CKK), 2025 WL 1187730, at *20-21 (D.D.C. Apr. 24, 2025); Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt., Civil Action No. 25-1237 (DLC), 2025 WL 1621714, at *26 & n35 (S.D.N.Y. June 9, 2025); Univ. of California Student Ass'n v. Carter, 766 F. Supp. 3d 114, 122 (D.D.C. 2025); NTEU, 2025 WL 1218044, at *9-12; AFSA,

2025 WL 1387331, at *9-10; Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025

WL 1755442, at *12; Project on Gov't Oversight, Inc. v. Trump, Civil No. 25-0527 (JEB), 2025

WL 1707690, at *6 (D.D.C. June 17, 2025); New York v. Trump, 133 F.4th 51, 73 (1st

Cir. 2025).  The presumption of regularity finds its roots in common law and "has been

recognized since the early days of the Republic."  See Am. Fed'n of Gov't Emps., AFL-CIO v.

Reagan, 870 F.2d at 727; see also League of United Latin Am. Citizens v. Exec. Off. of the

President, 2025 WL 1187730, at *20 (citing Chi., Burlington, & Quincy Ry. Co. v. Babcock, 204

U.S. 585 (1907) (Holmes, J.)).  Justice Story explained the basis for the presumption, stating:

> It is the opinion of the Court, that this objection cannot be maintained.  When the President exercises an authority confided to him by law, the presumption is[] that it is exercised in pursuance of law.  Every public officer is presumed to act in obedience to his duty, [until] the contrary is shown; and, a fortiori, this presumption ought to be favourably applied to the chief magistrate of the Union.  It is not necessary to aver, that the act which he may rightfully do, was so done.

Martin v. Mott, 25 U.S. 19, 32-33 (1827) (Story, J.).

Generations of presidential administrations and public officials have validated this

underlying premise of the presumption of regularity:  their actions writ large have raised little

question that they act "in obedience to [their] duty."  Over the last six months, however, courts

have seen instance after instance of departures from this tradition.  See, e.g., J.O.P. v. United

States Dep't. of Homeland Sec., Civil Action 25-1519, 2025 WL 1431263, at *10 (4th Cir. May

19, 2025) (Gregory, J., concurring) ("As is becoming far too common, we are confronted again

with the efforts of the Executive Branch to set aside the rule of law in pursuit of its goals.  It is

the duty of courts to stand as a bulwark against the political tides that seek to override

constitutional protections and fundamental principles of law, even in the name of noble ends like

public safety."); President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec., 2025

WL 1737493, at *17 (D. Mass. June 23, 2025) ("[T]he Court will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face."); In re Search of One Device and Two Individuals under Rule 41, Search Warrant No. 25-0082 (ZMF), 2025 WL 1587917, at *14 n.10 (D.D.C. May 29, 2025) ("Blind deference to the government? That is no longer a thing. Trust that had been earned over generations has been lost in weeks. Numerous career prosecutors have had to resign instead of taking actions that they believe violated their oath of office, or worse, were fired for upholding that oath."); Washington v. Trump, Civil Action No. 25-0127 (JCC), Verbatim Report of Proceedings (W.D. Wash. Jan. 24, 2025) [Dkt. No. 53] at 13:13-15 ("I've been on the bench for over four decades. I can't remember another case where the question presented was as clear as this one is. This is a blatantly unconstitutional order."); New Hampshire Indonesian Cmty. Support v. Trump, 765 F. Supp. 3d 102, 109 (D.N.H. 2025) ("[T]he Executive Order contradicts the text of the Fourteenth Amendment and the century-old untouched precedent that interprets it."); Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, 774 F. Supp. 3d 86, 89 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue here is clear from its face . . . ."); Pacito v. Trump, Civil Action No. 25-0255 (JNW), 2025 WL 1295660, at *2 (W.D. Wa. May 5, 2025) ("The Government's interpretation is, to put it mildly, 'interpretive jiggery-pokery' of the highest order. It requires not just reading between the lines, but hallucinating new text that simply is not there.") (citation omitted); Associated Press v. Budowich, Civil Action No. 25-0532 (TNM), 2025 WL 1039572, at *10 (D.D.C. April 8, 2025) ("Indeed, the Government has been brazen about this."); Perkins Coie LLP v. U.S. Dep't. of Justice, Civil Action No. 25-716 (BAH), 2025 WL 1276857, at *1 (D.D.C. May 2, 2025) ("In a cringe-worthy twist on the theatrical phrase 'Let's kill all the lawyers,' EO 14230 takes the approach of 'Let's

kill the lawyers I don't like,' sending the clear message:  lawyers must stick to the party line, or else.") (emphasis in original); Abrego Garcia v. Noem, No. 25-1345, 2025 WL 1021113, at *7 (4th Cir. Apr. 7, 2025) ("[T]his is a path of perfect lawlessness, one that courts cannot condone.") (Wilkinson, J., concurring); United States v. Adams, 777 F. Supp. 3d 185, 192 (S.D.N.Y. 2025) (The implication "that public officials may receive special dispensation if they are compliant with the incumbent administration's policy priorities . . . . is fundamentally incompatible with the basic promise of equal justice under law."); LeBlanc v. United States Priv. & C.L. Oversight Bd., Civil Action No. 25-542 (RBW), 2025 WL 1454010, at *35 (D.D.C. May 21, 2025) ("To hold otherwise would be to bless the President's obvious attempt to exercise power beyond that granted to him by the Constitution and shield the Executive Branch's counterterrorism actions from independent oversight, public scrutiny, and bipartisan congressional insight regarding those actions."); D.B.U. v. Trump, Civil Action No. 25-1163 (CNS), 2025 WL 1304288, at *4 (D. Colo. May 6, 2025) ("This sentence [in the government's brief] staggers.  It is wrong as a matter of law and attempts to read an entire provision out of the Constitution."); Ziliang J. v. Noem, Civil Action No. 25-1391 (PJS) (DLM), 2025 WL 1358665, at *2 (D. Minn. Apr. 17, 2025) ("[T]he Court cannot imagine how the public interest might be served by permitting federal officials to flaunt the very laws that they have sworn to enforce."); Widakuswara v. Lake, Civil Action No. 25-1015 (RCL), 2025 WL 1166400, at *14 (D.D.C. Apr. 22, 2025) ("[The defendants] took immediate and drastic action to slash [United States Agency for Global Media], without considering its statutorily or constitutionally required functions as required by the plain language of the [executive order], and without regard to the harm inflicted on employees, contractors, journalists, and media consumers around the world.  It is hard to fathom a more straightforward display of arbitrary and capricious actions than the Defendants'

actions here."); Jenner & Block LLP v. U.S. Dep't of Just., Civil Action No. 25-0916 (JDB), 2025 WL 1482021, at *10 (D.D.C. May 23, 2025) ("In short, the order raises constitutional eyebrows many times over."); Abrego Garcia v. Noem, 348 F.R.D. 594, 601 (D. Md. 2025) ("Defendants have failed to respond in good faith, and their refusal to do so can only be viewed as willful and intentional noncompliance."); Maine v. U.S. Dep't of Agric., 778 F. Supp. 3d 200, 231-32 (D. Me. 2025) ("[The law] imposes numerous steps an agency must take before refusing or terminating funding for noncompliance . . . . [T]he factual record does not indicate the Federal Defendants took any of these actions before freezing Maine's federal funds . . . ."); League of United Latin Am. Citizens v. Exec. Off. of the President, Civil Action No. 25-0946 (CKK), 2025 WL 1187730, at *27 (D.D.C. Apr. 24, 2025) ("This argument fails to persuade because it misconceives (and in one instance misrepresents) the Executive Order, Plaintiffs' claims, the law, and the facts."); Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 50 (D.D.C. 2025) ("[I]t appears that OMB sought to overcome a judicially imposed obstacle without actually ceasing the challenged conduct."); Grundmann v. Trump, 770 F. Supp. 3d 166, 171 (D.D.C. 2025) ("The Government's arguments paint with a broad brush and threaten to upend fundamental protections in our Constitution. But ours is not an autocracy; it is a system of checks and balances."); American Fed'n of Gov't. Emp. v. Trump, 139 F.4th 1020, 1033 (9th Cir. 2025) ("But such a characterization is at best disingenuous, and at worst flatly contradictory to the record."); Rona v. Trump, Civil Action No. 25-3114 (JMF), 2025 WL 2162543, at *7 (S.D.N.Y. July 30, 2025) ("And regardless, Plaintiffs' First Amendment rights cannot be defeated by the Government's professions of good will."); CASA, Inc. v. Trump, No. 25-1153, 2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025) ("It is hard to overstate the confusion and upheaval that will accompany any implementation of the Executive Order."); Am. Fed'n of

Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt., 777 F. Supp. 3d 253, 281 (S.D.N.Y. 2025) ("The defendants' Kafkaesque argument to the contrary would deprive the plaintiffs of any recourse under the law."); Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, Civil Action No. 25-3698 (SI), 2025 WL 1482511, at *2 (N.D. Cal. May 22, 2025) ("[D]efendants want the Court to either declare that nine Presidents and twenty-one Congresses did not properly understand the separation of powers, or ignore how the executive branch is implementing large-scale reductions in force and reorganizations.") (footnote omitted).

          In just six months, the President of the United States may have forfeited the right to such a presumption of regularity. As Magistrate Judge Faruqui put it: "Trust that had been earned over generations has been lost in weeks." See In re Search of One Device and Two Individuals under Rule 41, 2025 WL 1587917, at *14 n.10; see also United States v. Warnagiris, Civil Action No. 21-0382 (PLF), 2025 WL 341990, at *5-6 (D.D.C. Jan. 30, 2025) ("And just because the Proclamation was signed by the President does not transform up into down or down into up as if peering through the looking glass of Alice in Wonderland.").

          3.   The Court Should Consider the Executive Order's Exclusions as a Whole

          Having determined that the presumption of regularity has been rebutted, the Court must determine whether the Union Plaintiffs are likely to succeed on the merits of their claim that the Executive Order is ultra vires. The principal dispute among the parties centers on whether the Union Plaintiffs can succeed on their claim if the government is able to show that the Executive Order's exclusion of one agency or subdivision – in this case, the DoD – comports with Section 7103(b)(1), notwithstanding the fact that the exclusion of other agencies and subdivisions may have exceeded the President's authority. See Defs.' Opp. at 16-18; Pls.' Reply at 16-17; see also Order [Dkt. No. 31] at 1-2 (directing the parties to prepare argument on this

issue).[7]  The government contends that the Court should consider only whether the President

properly exempted the DoD pursuant to Section 7103(b)(1) since the statutory provision permits

the President to exclude "any agency" from the FSLMRS.  See Defs.' Opp. at 16-18.  The Union

Plaintiffs maintain that the Court should consider the "staggering overbreadth" of the Executive

Order, which "render[s] the executive order, as a whole, void."  See Pls.' Reply at 16.  Put

simply, the parties' arguments require the Court to address the following issue:  "should the

Court consider the Executive Order in its entirety or only as it relates to the plaintiffs'

members?"  See Order [Dkt. No. 31].

There are essentially three levels at which the Court could assess whether the

Executive Order is ultra vires.  First, the Court could consider the entirety of the Executive

Order's exclusions made pursuant to Section 7103(b)(1).  If the Court were to consider the

Executive Order in this way, the Union Plaintiffs are likely to succeed on their ultra vires claim

---

[7]         In addition to the arguments discussed in this section, the government briefly
argues that the Court should not rely on the definition of "national security" that was articulated
by the Supreme Court in Cole v. Young, 351 U.S. 536 (1956).  See Defs.' Opp. at 18-20; see also
NTEU, 2025 WL 1218044, at *16 ("[A]s in Cole v. Young, it is 'clear from the statute' that the
term 'national security' 'comprehend[s] only those activities . . . that are directly concerned with
the protection of the Nation from internal subversion or foreign aggression . . . .'") (quoting Cole
v. Young, 351 U.S. at 544).  The government principally argues that Cole v. Young did not
"announce a generally applicable definition of 'national security'" and arose "in an entirely
different statutory context."  See Defs.' Opp. at 19.  It is true that the Supreme Court in Cole v.
Young was not interpreting Section 7103(b)(1).  Nevertheless, for the reasons explained in
NTEU and AFSA, the Court finds many of the concerns motivating the Supreme Court in Cole
v. Young present here – specifically, the concern that a broad interpretation of the term "national
security" risks allowing a narrow exception to swallow the rule.  See Cole v. Young, 351 U.S.
at 547 ("[I]f Congress intended the term to have such a broad meaning that all positions in the
Government could be said to be affected with the 'national security,' the result would be that the
1950 Act, though in form but an exception to the general personnel laws, could be utilized
effectively to supersede those laws."); see also NTEU, 2025 WL 1218044, at *15-16.  Moreover,
the government does not set forth a competing interpretation of how the Court should interpret
the term "national security" in Section 7103(b)(1).  See NTEU, 2025 WL 1218044, at *15
(noting that the FLRA authority the government relied on for its definition of "national security"
adopted the definition set forth in Cole v. Young).

for the same reasons as explained in NTEU – namely, the Union Plaintiffs are likely able to show that the "President has applied an overly broad interpretation" of Section 7103(b)(1), "thereby making the President's Executive Order ultra vires."  See NTEU, 2025 WL 1218044, at *12-16. Second, the Court could consider only the exclusion of the DoD – as the government suggests – since the statute permits the President to exclude "any agency or subdivision" from the FSLMRS.  See 5 U.S.C. § 7103(b)(1) (emphasis added); see also Defs.' Opp. at 16-18.  If the Court were to consider only the exclusion of the DoD as a whole, the Union Plaintiffs may have difficulty prevailing on their claim since the DoD is the quintessential example of an agency that has "a primary function" of "national security work."  See 5 U.S.C. § 7103(b)(1)(A).

Finally, the Court could consider only the Executive Order's exclusion of DoDEA, since DoDEA is the only DoD subdivision at issue in this case.  If the Court were to take this path, the Union Plaintiffs would likely succeed on the merits of their ultra vires claim because concluding that DoDEA has a "primary function" of "national security work" would require "an overly broad interpretation of the term 'primary function.'"  See NTEU, 2025 WL 1218044, at *14.  The government's explanation of DoDEA's "national security" function illustrates this point.  The government asserts in its brief:

> DoDEA has a primary national security function given its role in educating servicemembers children, which is critical to DoD's recruitment and retention efforts.  See Cogar Decl. ¶ 6.  Because the United States relies on an all-volunteer military, the support and benefits it offers its members allow it to recruit and retain military personnel.  Given that service members are often stationed overseas, DoDEA's ability to provide high-quality education and care for their children is a critical benefit.  Id.  DoDEA is crucially connected to DoD ability to maintain "a robust, well-staffed, and focused military, which is vital to national security."  Id.

Defs.' Opp. at 19-20.  The Court acknowledges the importance of DoDEA to military recruitment efforts.  With that said, DoDEA's relationship to recruitment efforts is insufficient to

support the government's argument. Pre-kindergarten to 12th grade educators and support staff may have a function that tangentially benefits "national security work," but such an incidental relationship is hardly sufficient to conclude that DoDEA has a "primary function" of "national security work." See 5 U.S.C. § 7103(b)(1)(A).

As the above discussion illustrates, the Union Plaintiffs likely will succeed on the merits of their ultra vires claim if the Court analyzes their claim from the standpoint of the entirety of the Executive Order's exclusion or from the standpoint of the exclusion of only DoDEA. The government's primary contention is that the Court should consider the Union Plaintiffs' ultra vires claim from the standpoint of the exclusion of only the DoD. See Defs.' Opp. at 16-18.

There are at least two reasons to reject the government's argument and to conclude that the Court should look to the entirety of the Executive Order's exclusions. First, the evidence rebutting the presumption of regularity suggests that the Executive Order should be viewed in its entirety. As discussed at length in NTEU and AFSA, contemporaneous evidence surrounding the Executive Order demonstrates that the entire Executive Order likely was motivated by considerations outside of those identified in the statute: the exclusions were intended as retaliation against labor organizations that have opposed President Trump or in furtherance of unrelated policy goals. See NTEU, 2025 WL 1218044, at *9-11. As the Union Plaintiffs argue, evidence of these improper motives "infect every one of [the Executive Order's] myriad exclusions," see Pls.' Reply at 16, which negate any presumption that an individualized determination was made as to each of the excluded agencies and subdivisions. For the Court to analyze individual exclusions thus appears at odds with the evidence suggesting that the action as a whole was "irregular." The fact that the presumption of regularity is rebutted therefore may be

"decisive here," and warrants considering the Executive Order as a whole.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727; see also Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President, Civil Action No. 25-0917 (RJL), 2025 WL 1502329, at *6-7 & n.4 (D.D.C. May 27, 2025) (explaining that the executive order at issue should be analyzed "as a whole" where "the President's justification for the Order" showed that the different provisions were "inextricably interwoven"), amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President, Civil Action No. 25-0917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025).

Second, there is a functional reason to conclude that the Court should consider the Executive Order's exclusions in their entirety.  The government has argued throughout its briefing in NTEU, AFSA, and in this case, that the determinations required of the President under each prong of Section 7103(b)(1) are "ill-suited to judicial second-guessing" by the Court. See Defs.' Opp. at 24.  As already discussed, however, see supra Section III.B.1, this is not a sufficient reason to conclude that the President's invocation of Section 7103(b)(1) is entirely unreviewable.  See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d at 727-28 (acknowledging that review of the President's invocation of Section 7103(b)(1) is proper if the presumption of regularity is rebutted); see also Chamber of Com. of U.S. v. Reich, 74 F.3d at 1332 (observing that judicial review is required to ensure that the President is not able "to bypass scores of statutory limitations on governmental authority").  After all, had the President excluded the entire federal government from the FSLMRS – rather than just two-thirds of the federal government workforce – judicial review would be required to ensure that the FSLMRS, an act of Congress, has not been effectively repealed by the Executive.

With that said, the government's insistence that the Court must parse through individual exclusions of the overly broad Executive Order seems to invite the same "second-guessing" that the government contends is improper. See Defs.' Opp. at 24. As a result, while there must be judicial review of the President's invocation of Section 7103(b)(1), that review must be of a more limited nature rather than a granular inquiry into the workings of each agency and subdivision at issue. Put another way, while "some form of review is appropriate" to ensure that Section 7103(b)(1) is invoked consistently with the limitations placed on the President by Congress, the Court should avoid performing a more "searching inquiry into the persuasiveness of the President's justifications" for individual exclusions. See Trump v. Hawaii, 585 U.S. at 686. Only by analyzing the Executive Order's exclusions in their entirety – rather than by determining whether individual exclusions are justified – can the Court ensure that it does not perform an overly intrusive inquiry that interferes with the President's authority.

A not-so-hypothetical hypothetical is useful to illustrate this point. Assume that the President had issued an executive order effectively repealing the FSLMRS in its entirety by excluding from the statute every agency and every agency subdivision of the federal government – rather than two-thirds of the federal workforce. Accompanying this hypothetical executive order is the same White House Fact Sheet evincing retaliatory animus. In such circumstances, the President's executive order would almost certainly be ultra vires because it would be tantamount to repealing the statute through the invocation of a narrow exception to the statutory scheme. See Cole v. Young, 351 U.S. at 547 ("[I]f Congress intended the term ['national security'] to have such a broad meaning[,] . . . the result would be that the 1950 Act, though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws."). But under the government's preferred method of analysis here, the

Court would be put in the position of determining, one-by-one, whether each excluded agency or subdivision met the Section 7103(b)(1) criteria, notwithstanding the fact that all the evidence – including the scope of the executive order and the evidence of retaliatory animus – strongly suggests that the President made no such determination himself. This situation would be untenable. While Congress granted to the President authority to make determinations related to national security, there were conditions placed on that authority. Where the evidence points to other motivations for issuing the sweeping executive order, the Court cannot be placed in the position of making these national security determination – agency by agency – in the first instance.

The problem illustrated in the hypothetical above applies equally to this case. The Executive Order excludes two-thirds of the federal workforce from the FSLMRS, including:

> a. The Department of State.
>
> b. The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'
>
> c. The Department of the Treasury, except the Bureau of Engraving and Printing.
>
> d. The Department of Veterans Affairs.
>
> e. The Department of Justice.
>
> f. Agencies or subdivisions of the Department of Health and Human Services:
>
>> i. Office of the Secretary.
>>
>> ii. Food and Drug Administration.
>>
>> iii. Centers for Disease Control and Prevention.
>>
>> iv. Administration for Strategic Preparedness and Response.

v. Office of the General Counsel.

vi. Office of Refugee Resettlement, Administration for Children and Families.

vii. National Institute of Allergy and Infectious Diseases, National Institutes of Health.

g. Agencies or subdivisions of the Department of Homeland Security:

i. Office of the Secretary.

ii. Office of the General Counsel.

iii. Office of Strategy, Policy, and Plans.

iv. Management Directorate.

v. Science and Technology Directorate.

vi. Office of Health Security.

vii. Office of Homeland Security Situational Awareness.

viii. U.S. Citizenship and Immigration Services.

ix. United States Immigration and Customs Enforcement.

x. United States Coast Guard.

xi. Cybersecurity and Infrastructure Security Agency.

xii. Federal Emergency Management Agency.

h. Agencies or subdivisions of the Department of the Interior:

i. Office of the Secretary.

ii. Bureau of Land Management.

iii. Bureau of Safety and Environmental Enforcement.

iv. Bureau of Ocean Energy Management.

i. The Department of Energy, except for the Federal Energy Regulatory Commission.

j. The following agencies or subdivisions of the Department of Agriculture:

      i. Food Safety and Inspection Service.

      ii. Animal and Plant Health Inspection Service.

k. The International Trade Administration, Department of Commerce.

l. The Environmental Protection Agency.

m. The United States Agency for International Development.

n. The Nuclear Regulatory Commission.

o. The National Science Foundation.

p. The United States International Trade Commission

q. The Federal Communications Commission.

r. The General Services Administration.

s. The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

      i. Office of the Chief Information Officer.

      ii. any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

Executive Order § 2.

This extensive list hardly includes only agencies and subdivisions that "plainly relat[e] to national security."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025 WL 1755442, at *5.  Indeed, as the Court explained in NTEU, to conclude that all of these

agencies and subdivisions have a "primary function" of "national security work," see 5 U.S.C. § 7103(b)(1), requires either "overly broad interpretation[s] of the term[s]," or writing "the term[s] out of the statute entirely." See NTEU, 2025 WL 1218044, at *14-16. Outside of the scope of the Executive Order, the contemporaneous evidence reflects motivations for the order that are plainly unrelated to the statutory criteria. The Executive Order and the record in this case negate any inference that an individualized national security determination was made with respect to each agency and subdivision. In such circumstances – like the hypothetical discussed above – it would be perplexing to have the Court consider individual agency and subdivision exclusions where it does not appear that the President considered the agencies and subdivisions individually.

Finally, the government argues that the text of the statute – which provides that "[t]he President may issue an order excluding any agency or subdivision" – suggests that the Court should only consider the President's exclusion of the DoD. See Defs.' Opp. at 16-18. More specifically, the government contends that because (1) the President excluded the entirety of the DoD, and because (2) the statute permits the exclusion of an entire "agency," the proper issue before the Court is whether the President's exclusion of the DoD – and only that exclusion – was ultra vires. See id. The text of Section 7103(b)(1), however, strongly suggests that it is the "order" that the President issues pursuant to Section 7103(b)(1) that is significant, not the individual exclusions made pursuant to that order. See 5 U.S.C. § 7103(b)(1) ("The President may issue an order excluding any agency or subdivision . . . .") (emphasis added). Put differently, while the President may have authority to exclude a series of "agenc[ies] or subdivision[s]" from the FSLMRS, the "order" the President issues pursuant to Section 7103(b)(1) may be ultra vires if the order – as here – reflects an utter disregard for the Section

7103(b)(1) limitations through its all-encompassing set of exclusions.  The government's

argument, despite some surface appeal, is insufficient to overcome the other reasons discussed

above as to why the Executive Order must be viewed in its entirety.

In sum, the Court concludes that the proper inquiry is whether the Executive

Order's exclusions pursuant to Section 7103(b)(1) – taken together as a whole – exceeded the

President's authority.  For the same reasons explained in NTEU, the President's invocation of

Section 7103(b)(1) to exclude two-thirds of the federal workforce – coupled with

contemporaneous evidence reflecting motivations for the Executive Order plainly outside those

contemplated by the statute – represents that the Executive Order patently "disregards [the]

specific and unambiguous statutory directive[s]" in the FSLMRS.  See Changji Esquel Textile

Co. v. Raimondo, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting Fed. Express Corp. v. United

States Dep't of Com., 39 F.4th at 762); see also NTEU, 2025 WL 1218044, at *7-16.

Accordingly, Union Plaintiffs are likely to succeed on the merits of this claim.[8]

*C.  Irreparable Harm*

The next factor to consider is whether the Union Plaintiffs will suffer irreparable

injury without the requested preliminary injunction.  See Archdiocese of Washington v. Wash.

Metro. Area Transit Auth., 897 F.3d at 321.  The D.C. Circuit "has set a high standard for

irreparable injury."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C.

Cir. 2006).  "Not only must the injury 'be both certain and great,' and 'actual and not

theoretical,' but 'the injury must be beyond remediation.'"  Brennan Ctr. for Just. at NYU Sch.

---

[8]    Because the Court concludes that the Union Plaintiffs are likely to succeed on
their ultra vires claims, the Court does not reach the Union Plaintiffs remaining claims on this
motion.

of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (internal citations omitted) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297).  Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.

         As in NTEU and AFSA, the Union Plaintiffs here articulate two general grounds that they assert independently and in tandem establish that they will be irreparably harmed absent a preliminary injunction.  First, the Union Plaintiffs argue that they face significant financial harm as a result of DoDEA's termination of "the statutorily and contractually required payroll deductions" of union dues.  See Pls.' Mem. at 17-20; see also Tarr Decl. ¶ 23; Danahy Decl. ¶ 26; Gorbea Decl. ¶ 13.  The specific evidence related to the financial harm suffered by each union is different.  As to FEA, it appears that the loss of dues creates the sort of injury that is irreparable.  For example, FEA states that the dues revenue makes "up the overwhelming majority of FEA's income, and [that] these funds are used to carry out all of FEA's core activities as a labor organization . . . ."  Tarr Decl. ¶ 24.  Furthermore, FEA argues that because of DoDEA's termination of dues deduction, "it will be nearly impossible to raise the funds needed to sustain the union and provide representational services for our members for the coming school year."  Tarr Decl. ¶ 25.  The injury created by this financial harm appears to be irreparable because it creates serious difficulties for the unions to accomplish their mission of representing their members and indeed may threaten the union's survival.  See Climate United

36

Fund v. Citibank, N.A., Civil Action No. 25-0698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025).

The financial harm suffered by FEA-SR and ACEA is not clearly irreparable. As to FEA-SR, it appears that it has been able to remedy the harm caused by the termination of automatic deductions by "convert[ing] most members to AutoPay or to pay by check . . . ." See Danahy ¶ 30. While FEA-SR argues that it has "been unable to recoup all of the lost revenue" that resulted from DoDEA's initial termination of automatic dues payments, see id., it is not clear whether such financial harm "threatens the very existence" of FEA-SR. See Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). As to ACEA, the union's declaration provides little information as to the effect DoDEA's termination of automatic dues payments has had on its operations. See Gorbea ¶¶ 13-14 (stating only that "ACEA has already experienced a drop in its projected revenue").

Setting aside the issue of whether the loss of union dues sufficiently supports the Union Plaintiffs' contention that they will suffer irreparable harm absent a preliminary injunction, the Union Plaintiffs have sufficiently shown that DoDEA's disregard of important provisions in the respective collective bargaining agreements itself creates irreparable harm. More specifically, the Union Plaintiffs argue that Executive Order significantly diminishes their bargaining power and ability to represent their members as DoDEA has essentially "pause[d] labor relations-related activities . . . ." See Pls.' Mem. at 20-23; see also Hunter Decl. ¶ 9; Danahy Decl. ¶¶ 17-19; Ex. 3 to Gorbea Decl. [Dkt. No. 22-4 at ECF 257] (email from DoDEA's Chief of the Labor Management & Employee Relations Division explaining that as a result of the "EO, the associated White House Fact Sheet, and OPM guidance," DoDEA was "paus[ing] labor relations-related activities pending further instruction from the Department").

The Union Plaintiffs' declarations demonstrate that DoDEA has discontinued negotiations over

successive collective bargaining agreements, see Hunter Decl. ¶¶ 9, 15; Danahy Decl. ¶¶ 17-19;

ceased participation in grievance proceedings, see Tarr Dec. ¶ 39; Freeman Decl. ¶¶ 11-13;

Smith Decl. ¶ 4; Hunter Decl. ¶¶ 13-15; Gorbea Decl. ¶ 17; stopped engaging in arbitral

proceedings on various grievances, see Freeman Decl. ¶ 13; Smith Decl. ¶¶ 9, 14; disallowed

union representation during employee disciplinary meetings and investigatory interviews, see

Tarr Decl. ¶ 49; Danahy Decl. ¶ 44; and eliminated official time and use of agency office spaces

to conduct representation activities.  See Tarr Decl. ¶ 45; Danahy Decl. ¶¶ 25, 36; Gorbea Decl.

¶ 21.  Indeed, the government admits that the "DoD has taken a wide variety of actions to

implement the Executive Order to date," and that

> [i]f forced to comply with Plaintiffs' request preliminary injunction,
> the Department would have to undo those actions by:  reestablishing
> the withholding of union dues; restarting the processing of
> grievances; reengaging on arbitrations that had been held in
> abeyance; reengaging on matters pending before the Federal Labor
> Relations Authority; reestablishing the provision of official time to
> unions under the Statute and in accordance with the provisions of
> applicable CBAs; reengaging in collective bargaining under the
> Statute and in accordance with the provisions of applicable CBAs;
> and otherwise reverting back to full compliance with the terms of
> applicable CBAs, including, but not limited to: overtime distribution
> requirements, provision of union office space, and adherence to
> disciplinary   and   performance   management   procedural
> requirements.

Cogar Decl. ¶ 10.

These actions, taken together, essentially terminate the respective collective

bargaining agreements and thus cause irreparable harm.  As the Court explained in NTEU,

> Courts have long recognized that "the unlawful refusal of an
> employer to bargain collectively with its employees' chosen
> representatives disrupts the employees' morale, deters their
> organizational activities, and discourages their membership in
> unions."  Franks Bros. Co. v. NLRB, 321 U.S. 702, 704 (1944).

"The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." <u>N.L.R.B. v. Electro-Voice, Inc.</u>, 83 F.3d 1559, 1573 (7th Cir. 1996). Furthermore, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished." <u>Id.</u>; <u>see</u> <u>Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. NLRB</u>, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining."). Therefore, any relief a court may provide "must come quickly." <u>In re Am. Fed'n of Gov't Emps., AFL-CIO</u>, 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and quotation marks omitted).

<u>NTEU</u>, 2025 WL 1218044, at *17. The analysis is the same here. As the Union Plaintiffs note, a favorable ruling cannot, for example, "retroactively help the member who has gone into a disciplinary meeting without the counsel of their union." <u>See</u> Tarr Decl. ¶ 30. Furthermore, "[t]he loss of [ ] statutory protections" resulting from the Executive Order strikes at the "heart" of the Union Plaintiffs' primary "purpose and mission," thereby "pos[ing] an existential threat to the union[s]." <u>See id</u>. ¶ 33; Danahy Decl. ¶ 35 (explaining that "DODEA's current implementation measures . . . are an existential threat to the union"); <u>see also</u> <u>League of Women Voters v. Newby</u>, 838 F.3d at 9 ("[O]bstacles unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes both of standing and irreparable harm.").

The government essentially regurgitates arguments that the Court addressed and rejected in its earlier opinions in <u>NTEU</u> and <u>AFSA</u>. <u>See</u> Defs.' Opp. at 37-38; <u>see also</u> <u>NTEU</u>, 2025 WL 1218044, at *17-18; <u>AFSA</u>, 2025 WL 1387331, at *14-15. Outside of those arguments – which the Court rejects for the same reasons as in <u>NTEU</u> and <u>AFSA</u> – the government argues that the Plaintiff Unions' failure to file a motion for preliminary injunction until "months" after the "DoD began taking certain actions pursuant to the Executive Order" "seriously undercuts Plaintiffs' allegations of irreparable harm . . . ." <u>See id</u>. at 35-36. The

government is correct that "[a]n unexcused delay in seeking extraordinary injunctive relief . . . implies a lack of urgency and irreparable harm." Sierra Club v. Env't Prot. Agency, Civil Action No. 25-1112 (RC), 2025 WL 1895609, at *4 (D.D.C. July 9, 2025) (quoting Open Top Sightseeing USA v. Mr. Sightseeing, LLC, 48 F. Supp. 3d 87, 90 (D.D.C. 2014)). But the D.C. Circuit has made clear that such a delay, standing alone, cannot provide a sufficient basis for denying a party's motion for a preliminary injunction. See Gordon v. Holder, 632 F.3d 722, 724-25 (D.C. Cir. 2011) (holding that while a delay in filing cannot be the sole basis for denial of a preliminary injunction, delay can "support a conclusion that the plaintiff cannot satisfy the irreparable harm prong"). Moreover, at oral argument, the Union Plaintiffs explained that their delay in filing the motion for a preliminary injunction was in part a result of the school year not being in session. See Federal Education Association v. Trump, Civil Action No. 25-1362, Transcript of Record (Aug. 4, 2025) [Dkt. No. 33] at 30:12-18. The Union Plaintiffs stated that as its members prepare for the school year, the effects of DoDEA's actions are more acutely felt. See id. The Court therefore concludes that the Union Plaintiffs' delay in filing its motion for preliminary injunction is not a sufficient basis to deny the Union Plaintiffs' motion.

Finally, as in NTEU and AFSA, the government argues that because the "DoD has yet to take any action to terminate a [collective bargaining agreement,]" any "loss of members" or "loss of bargaining power is too speculative a basis for granting relief at this stage." See Defs.' Opp. at 37-38. As the Court has previous explained, while the Union Plaintiffs "have [not] shown that any agency has formally cancelled a collective bargaining agreement," the actions taken by the DoD and DoDEA discussed above demonstrate that the agency has "in essence disregarded critical provisions of the collective bargaining agreements." See Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1444446, at *4

(D.D.C. May 20, 2025).  The fact of the matter is that the collective bargaining agreements have been effectively terminated.  The "DoD has taken a wide variety of other actions to implement the Executive Order to date," including disregarding key provisions in the collective bargaining agreements.  See Defs.' Opp. at 39 (citing Cogar Decl. ¶ 10).  Similarly, DoDEA has argued that the FLRA – the body responsible for adjudicating complaints under the collective bargaining agreements – lacks jurisdiction over cases involving the collective bargaining agreements.  See Tarr Decl. ¶ 42; Ex. 14 to Tarr Decl.   The Court simply cannot accept that where the DoD has admitted to failing to abide by the collective bargaining agreements and has contested the jurisdiction of the FLRA to enforce those agreements that somehow, the collective bargaining agreements are still in force.

The Court concludes that the Union Plaintiffs have sufficiently established that they will suffer irreparable harm absent a preliminary injunction.  See NTEU, 2025 WL 1218044, at *17-18; AFSA, 2025 WL 1387331, at *14-15; Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 2025 WL 1755442, at *13 ("The loss of collective bargaining rights is deemed to be irreparable because 'the value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost.'") (quoting Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1192 (9th Cir. 2011)).

### D. Equities and Public Interest

The remaining preliminary injunction factors – the balance of the equities and assessment of the public interest – weigh in the Union Plaintiffs' favor.  These factors "merge

when, as here, the Government is the opposing party.'"  Singh v. Berger, 56 F.4th 88, 107 (D.C.

Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

   As the Court explained in NTEU, Congress's unequivocal identification of

collective bargaining rights and federal unions as being "in the public interest," coupled with the

public interest "in ensuring that the laws enacted by their representatives are not imperiled by

executive fiat," compel the conclusion that the Union Plaintiffs satisfies the remaining

preliminary injunction factors.  NTEU, 2025 WL 1218044, at *20 (citation and quotation marks

omitted).  The government makes two arguments as to how it will be harmed by a preliminary

injunction.  First, the government cites to the "wide variety of . . . actions to implement the

Executive Order," arguing that reversing course "would require significant resources . . . ."  See

Defs.' Opp. at 39-40.  The Court acknowledges that complying with the statutory requirements

of the FSLMRS is likely costly.  But the mere cost of complying with statutory obligations

cannot outweigh the harm to the Union Plaintiffs and their members in having their collective

bargaining rights cast aside.  After all, "the government 'cannot suffer harm from an injunction

that merely ends an unlawful practice . . . .'"  Cabrera v. U.S. Dep't of Lab., Civil Action

No. 25-1909 (DLF), 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (quoting R.I.L.-R v.

Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); see also Am. Gateways v. U.S. Dep't of Just.,

No. 25-1370 (AHA), 2025 WL 2029764, at *10 (D.D.C. July 21, 2025) ("'[T]here is generally

no public interest in the perpetuation of unlawful agency action.'") (quoting League of Women

Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)).

   Second, as in NTEU and AFSA, the government's primary response is the

assertion that a preliminary injunction "would inflict harm on the public and the President by

interfering with the national-security determinations regarding DoD and entrusted to the

President by Congress." <u>See</u> Defs.' Opp. at 39.  But as Judge Childs observed, "[s]uch vague assertions of harm dependent on the merits of the dispute are insufficient to show irreparable injury."  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, No. 25-5157, 2025 WL 1441563, at *5 (D.C. Cir. May 16, 2025) (Childs, J., dissenting); <u>see</u> <u>also</u> <u>Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget</u>, No. 25-5266, Order (D.C. Cir. Aug. 9, 2025) (<u>per curiam</u>) (Statement of Henderson, J.) ("As has become a theme in the Government's recent emergency motions practice, it spends almost all of its brief arguing the merits.  The Government's opening brief devotes a mere two paragraphs to the issue of irreparable harm, one of which simply repackages its merits argument.") (citation and internal quotation marks omitted).  "At bottom, this case is about whether [the Executive Order] amounts to a structural overhaul that usurps Congress's policymaking prerogatives – and it is hard to imagine deciding that question in any meaningful way <u>after</u> those changes have happened."  <u>Trump v. Am. Fed'n of Gov't Emps.</u>, 145 S. Ct. 2635, 2642-43 (2025) (Jackson, J., dissenting).

As the government acknowledges, it has taken a "wide variety" of actions that drastically change the collective bargaining regime that has existed for over fifty years.  <u>See</u> Defs.' Opp. at 39-40.  Granting the preliminary injunction would merely require the government to function as it has for over half a century; the lack of a preliminary injunction, by contrast, would cause immense and irreparable harm to the Union Plaintiffs.  As such, the Court concludes that the balance of the equities favors the Union Plaintiffs.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1441563, at *5 (Childs, J., dissenting) ("[T]he district court's injunction maintains the state of affairs that has existed for nearly half a century: NTEU has bargained on behalf of federal workers since the 1970s."); <u>Am. Foreign Serv. Ass'n v. Trump</u>,

Civil Action No. 25-1030 (PLF), 2025 WL 1695059, at *2 (D.D.C. June 17, 2025); see also

NTEU, 2025 WL 1218044, at *20-21; AFSA, 2025 WL 1387331, at *15.

### IV. SECURITY

        The government requests that the Court impose a bond pursuant to Rule 65(c) of

the Federal Rules of Civil Procedure. See Defs.' Opp. at 40-41; Post-Argument JSR at 2. More

specifically, the government has requested that bond be set at $1,152,000. See Defs.' Opp. at 41;

Post-Argument JSR at 2. This amount "represents the average salary of educators multiplied by

the eight positions that DoDEA would need to fill if educators are allowed to return to

performing union duties on official time." Defs.' Opp. at 41. Put differently, this is the cost of

complying with the provisions in the collective bargaining agreements – which the government

contends have yet to be terminated, see id. at 37 – pertaining to official time. The amount the

government seeks in security is perplexing. On the one hand, the government argues that the

Union Plaintiffs are not harmed because the collective bargaining agreements are still being

honored; but on the other hand, it requests security to allow for the recovery of costs that are paid

out in official time under the collective bargaining agreements. The collective bargaining

agreements are either in effect – in which case the government must comply with them – or they

are not. See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1441563, at *5 (Childs, J.,

dissenting) ("How can the Government argue that the district court injunction will cause

irreparable injury when the Government itself voluntarily imposed that same constraint?").

        In any event, courts have "broad discretion" in determining "the appropriate

amount of an injunction bond, including the discretion to require no bond at all." Simms v. D.C.,

872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal citation and quotation marks omitted). As the

Court explained in NTEU, requiring a significant bond "would conflict with both the Court's

findings that each of the preliminary injunction factors weigh heavily in [Union Plaintiffs'] favor and the principles of the right to seek judicial review of unlawful government action." NTEU, 2025 WL 1218044, at *21. Furthermore, DoDEA has taken actions that have placed serious financial strain on the Union Plaintiffs, such as by terminating the automatic deduction of dues and reducing the value the Union Plaintiffs can provide their members. See Tarr Decl. ¶ 25 ("[B]ased on our experience thus far, it will be nearly impossible to raise the funds needed to sustain the union . . . ."); Danahy Decl. ¶ 31 "It has been particularly difficult to persuade members to [pay union dues] in light of the fact that DODEA has, in its implementation of EO 14257 . . .[,] impeded FEA-SR's ability to advocate for members."); see also NTEU, 2025 WL 1218044, at *19. "It makes little sense to exacerbate the financial strain by requiring the [Union Plaintiffs] to post bond." See Nat'l Endowment for Democracy v. United States, Civil Action No. 25-0648 (DLF), 2025 WL 2305477, at *7 (D.D.C. Aug. 11, 2025). While the total amount requested by the government is unwarranted, the Court, in its discretion, orders the Union Plaintiffs to post a bond in the amount of $100 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

## V. CONCLUSION

For the foregoing reasons, the Union Plaintiffs' Motion for a Preliminary Injunction [Dkt. No. 22] is hereby GRANTED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 8\14\25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>DONALD J. TRUMP, et al., )<br><br>Defendants. ) | Civil Action No. 25-1362 (PLF) |

## **DEFENDANTS' NOTICE OF APPEAL OF PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's August 14, 2025 Order (Dkt. No.34) and Opinion (Dkt. No. 35) granting Plaintiffs' Motion for a Preliminary Injunction.

Dated: August 18, 2025                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General

                                         YAAKOV M. ROTH
                                         Principal Deputy Assistant Attorney General
                                         EMILY M. HALL
                                         TYLER J. BECKER
                                         Counsel to the Assistant Attorney General
                                         Civil Division

                                         ERIC HAMILTON
                                         Deputy Assistant Attorney General
                                         Civil Division, Federal Programs Branch

                                         ALEXANDER K. HAAS
                                         Director
                                         Civil Division, Federal Programs Branch

                                         JACQUELINE COLEMAN SNEAD
                                         Assistant Branch Director
                                         Civil Division, Federal Programs Branch

_/s/ Lydia J. Jines_
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
SYED AHMAD
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St, NW
Washington, DC 20530
Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

*Counsel for Defendants*

2

JA751