No. 25-5303

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

FEDERAL EDUCATION ASSOCIATION,

*et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,*

*et al.*,

*Defendant-Appellants.*

---

On Appeal from Order of the United States District Court
for the District of Columbia

---

## BRIEF OF AMICI CURIAE FORMER CABINET SECRETARIES, AGENCY HEADS AND OTHER FEDERAL OFFICERS AND EMPLOYEES IN SUPPORT OF PLAINTIFF-APPELLEES AND AFFIRMANCE

---

Harold Craig Becker
Norman L. Eisen
Democracy Defenders Fund
600 Pennsylvania Ave., S.E., No. 15180
Washington, D.C. 20003
(202) 594-9958

Counsel for the Amici Curiae

# Table of Contents

THE IDENTITY OF THE AMICI CURIAE AND THEIR INTEREST IN THE CASE..................................................................................................1

SUMMARY OF THE ARGUMENT ....................................................................2

ARGUMENT ......................................................................................................3

   I.   The extraordinary overbreadth of the Order is evidence that the asserted national security rationale for the Order was a pretext...........................................3

     A.   The extraordinary overbreadth of the Order is illustrated by its contrast with all those issued by prior presidents using the same statutory authority ......4

     B.   The extraordinary overbreadth of the Order is demonstrated by the statutes defining the functions of the covered departments and the entities' self-descriptions ...................................................................................12

CONCLUSION ...................................................................................................28

# Table of Authorities

## CASES

*Am. Fed. of Gov. Employees v. Trump*, 2025 WL 1755442 (N.D. Cal. 2025)..........6

*American Foreign Service Ass'n v. Trump*,
   783 F.Supp.3d 248 (D.D.C. 2025)................................................................ 4, 10

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)...............................................4

*Esteras v. United States*, 145 S. Ct. 2031(2025) .....................................................12

*N.L.R.B. v. Noel Canning* 573 U.S. 513 (2014).......................................................12

*Nat'l Treasury Employees Union v. Trump,* 780 F.Supp.3d 237 (D.D.C. 2025) ......4

*United States v. Robel*, 389 U.S. 258 (1967) ...........................................................1

## STATUTES

5 U.S.C. § 3021 ........................................................................................................28

5 U.S.C. § 7101 ..........................................................................................................7

5 U.S.C. § 7103 .............................................................................. 2, 3, 11, 13, 19

5 U.S.C. § 7112 ........................................................................................................11

6 U.S.C. § 231 ..........................................................................................................22

7 U.S.C. § 1901 ........................................................................................................22

21 U.S.C. § 355 ........................................................................................................23

21 U.S.C. § 387 ........................................................................................................24

21 U.S.C. § 387f ......................................................................................................24

22 U.S.C. § 2151 ......................................................................................................21

22 U.S.C. § 2151a ....................................................................................................21

22 U.S.C. § 2151b-2 ................................................................................................21

22 U.S.C. § 2152h ....................................................................................................21

22 U.S.C. § 4101 ........................................................................................................7

22 U.S.C. § 4103 ........................................................................................................2

29 U.S.C. § 651 ........................................................................................................25

29 U.S.C. § 669 ........................................................................................................25

29 U.S.C. § 670 ........................................................................................................26

29 U.S.C. § 671 ........................................................................................................26

33 U.S.C. §§ 1251 ....................................................................................................16

38 U.S.C. § 301 ........................................................................................................14

38 U.S.C. § 7422 ......................................................................................................13

40 U.S.C. § 101 .............................................................................................. 18, 21

40 U.S.C. § 301 ........................................................................................................18

40 U.S.C. § 501 ............................................................................... 18, 19
42 U.S.C §§ 1251 .................................................................................16
42 U.S.C. § 7112 ..................................................................................15
43 U.S.C. § 1701 ..................................................................................27
43 U.S.C. § 1731 ..................................................................................27
43 U.S.C. § 1732 ..................................................................................27
47 U.S.C. § 151 ....................................................................................16
An Act to Establish the Treasury Department, 1 Stat. 65 (1789). ...........20
Foreign Assistance Act of 1961, Pub. Law 87-195, 75 Stat. 424 (1961) ...............21
Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (1970) .......................15

## REGULATIONS

40 C.F.R. § 1.1 .....................................................................................16
40 C.F.R. § 1.3 .....................................................................................16
40 C.F.R. § 1.43 ...................................................................................16
41 C.F.R. § 105-53 ...............................................................................19
47 C.F.R. § 0.5 .....................................................................................17

## EXECUTIVE ORDERS

Executive Order 12,171, 44 Fed. Reg. 66565 (Nov. 19, 1979) ................. 5, 8, 9, 10
Executive Order 12,338, 47 Fed. Reg. 1369 (Jan. 11, 1982)..................5, 8
Executive Order 12,410, 48 Fed. Reg. 13143 (March 28, 1983) ...........5, 6
Executive Order 12,559, 51 Fed. Reg. 18761 (May 20, 1986) .................5
Executive Order 12,632, 53 Fed. Reg. 9852 (March 23, 1988) ................5
Executive Order 12,666, 54 Fed. Reg. 1921 (Jan. 12, 1989).....................5
Executive Order 12,671, 54 Fed. Reg. 11157 (March 14, 1989) ..............5
Executive Order 12,681, 54 Fed. Reg. 28997 (July 6, 1989) ...................5
Executive Order 12,693, 54 Fed. Reg. 40629 (Sept. 29, 1989)............5, 6
Executive Order 13,039, 62 Fed. Reg. 12529 (March 11, 1997) ..............5
Executive Order 13,252, 67 Fed. Reg. 1601 (Jan. 7, 2002)......................5
Executive Order 13,381, 70 Fed. Reg. 37953 (June 27, 2005) .................5
Executive Order 13,467, 73 Fed. Reg. 38103 (June 30, 2008) .................5
Executive Order 13,480, 73 Fed. Reg. 73991 (Nov. 26, 2008).......... 5, 8, 9
Executive Order 13,741, 81 Fed Reg. 68289 (Sept. 29, 2016).................5
Executive Order 13,760, 82 Fed. Reg. 5325 (Jan. 12, 2017)....................5
Executive Order 13,869, 84 Fed. Reg. 18125 (April 24, 2019) ................5
Executive Order 14,251, 90 Fed. Reg. 14553 (March 27, 2025) ..........1, 7

# OTHER AUTHORITIES

Centers for Disease Control and Prevention,
*CDC Organization and Leadership* ....................................................25
Centers for Medicare and Medicaid Services,
*Fiscal Year 2024 Financial Report I* (Nov. 2024) ..............................26
Department of Agriculture, Animal and Plant Health Inspection Service,
*Laws and Regulations* ......................................................................22
Department of Agriculture, *Memorandum of Agreement Between DHS and USDA*
(Last Modified: July 30, 2025) ............................................................23
Department of Agriculture, *Operational Activities: Protecting Livestock from*
*Predators*, (last modified July 30, 2025) ............................................22
Department of Energy, *About the Office of Indian Energy Policy and Programs*....8
Department of Energy, *Office of Energy Efficiency and Renewable Energy* ..........15
Department of Health and Human Services*, About HHS* .......................................26
Department of the Interior, *About Interior* ...........................................................28
Department of the Interior, *Bureaus and Offices* ..................................................28
Department of the Treasury, *Bureaus* ..................................................................20
Department of the Treasury, *Role of Treasury* .....................................................20
Department of Veterans Affairs, *About the Department* ........................................14
Department of Veterans Affairs,
*VA to reduce staff by nearly 30K by end of FY2025*, (July 8, 2025) ....................11
Department of Veterans Affairs, *Veterans Health Administration* ........................14
Department of Veterans Affairs,
*Veterans Health Administration, About the VHA* ................................................11
Equal Employment Opportunity Commission, *Department of the Treasury* ...........9
Federal Communications Commission, *What We Do* ...........................................17
Food & Drug Administration, *About FDA* ...........................................................24
Food & Drug Administration, *FDA Organizational Charts*, .................................24
Food & Drug Administration, *Oncology Center of Excellence* ..............................24
General Service Administration, *Delivering Value. Delivering Impact. 2024*
*Agency Financial Report* ...................................................................9
General Service Administration*, Fiscal Year 2026 Annual Performance Plan* ......19
Glass, Aurelia, *The Trump Administration Ended Collective Bargaining for 1*
*Million Federal Workers*, CAP (May 22, 2025) ..................................10
Indian Health Service, *Fact Sheet* (Oct. 2024) ....................................................26
Internal Revenue Service, *IRS Budget & Workforce* .............................................9

Kanu, Hassan Ali, *Trump moves to strip unionization rights from most federal workers*, Politico (March 28, 2025),.......................................................................7

National Institutes of Health, *List of Institutes and Centers*....................................26

The White House, *Organization of the National Security Council and Subcommittees, NSPM-1* (Jan. 20, 2025)............................................................28

U.S. Agency for International Development, *USAID Primer What We Do and How We Do It* (Revised Jan. 2006) ..............................................................................10

## THE IDENTITY OF THE AMICI CURIAE AND THEIR INTEREST IN THE CASE

Amici curiae are seven former cabinet secretaries and five Senate-confirmed leaders of agencies, appointed by Republican and Democratic Presidents, and other high-level officers and employees of departments and agencies covered by the Executive Order at issue, Exclusions from Federal Labor-Management Relations Programs, Executive Order 14,251, 90 Fed. Reg. 14553 (March 27, 2025) (the "Order").[1] (A full list of Amici appears in Appendix 1.)

Amici are committed to the vigorous protection of national security, but also the vigorous protection of the constitutional rights to speak, associate, and protest against government action. Amici believe the Order infringes those fundamental rights in a manner that is not plausibly related to protection of national security and that it would be tragic, not simply "ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967).

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amici curiae and their counsel—contributed money that was intended to fund preparing or submitting this brief.

Amici believe the Order is grossly overbroad and either should not cover their former departments and agencies at all or, like all orders issued by prior presidents, should only cover the specific components that have "as a primary function intelligence, counterintelligence, investigative, or national security work." *See* 5 U.S.C. § 7103(b)(1)(A).[2] Amici led and worked at those departments and agencies at a time when they successfully engaged in collective bargaining with their employees "in a manner consistent with national security requirements and considerations." *Id.*, § 7103(b)(1)(B). They submit this brief to explain to the Court the striking overbreadth of the Order.

## SUMMARY OF THE ARGUMENT

Amici argue that the extraordinary overbreadth of the Order is evidence of the President's retaliatory intent. That overbreadth is revealed in two ways.

First, all prior presidents, Republican and Democratic, who have utilized the statutory authority at issue have done so with scalpel-like precision, excluding from collective bargaining only those specific components of departments and agencies that have, as a primary function, protection of national security.[3] In contrast, President Trump, for the first time, has excluded entire departments and

---

[2] The Order cited both 5 U.S.C. § 7103(a)(1) and the parallel 22 U.S.C. § 4103(b).
[3] The relevant statutory language is "intelligence, counterintelligence, investigative, or national security work," 5 U.S.C. § 7103 (b)(1)(A), but we use the term "national security" in this brief as shorthand.

agencies and, in other respects, has issued an order that is vastly more extensive than those of his predecessors. Moreover, the consistent practice of prior presidents was true to Congress' intent because when Congress adopted the Civil Service Reform Act in 1978, granting the right to collectively bargain to federal employees, it chose to wholly exclude only four national security agencies from that mandate, *see* 5 U.S.C. § 7103(a)(3), evidencing its intent *not* to wholly exclude *any* of the departments and agencies wholly excluded by the present Order, all of which existed at that time.

Second, the statutes creating the departments and agencies at issue and vesting them with authority as well as their own current self-descriptions make clear that most of those entities do not have a function of protecting national security and the vast bulk of the work of even those agencies that touch on national security in some manner is wholly unrelated to national security.

## ARGUMENT
### I. The extraordinary overbreadth of the Order is evidence that the asserted national security rationale for the Order was a pretext

The extraordinary and unprecedented overbreadth of the Order is evidence of its retaliatory purpose. That is true because the poor fit of the rationale for government action with the scope of that action, such as the under- or over inclusiveness of a statute or order, "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a

particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). Relying on both the overinclusiveness of the Order as well as direct evidence of a retaliatory motive, the District Court correctly concluded that the President's action had a retaliatory motive, is not entitled to the presumption of regularity, and is *ultra vires*. JA 724, 731.

The extraordinary overbreadth of the Order is strong evidence that the proffered justification—that collective bargaining in the covered departments and agencies threatens national security—was a pretext intended to mask the fact that the President issued the Order to retaliate against the unions that represent the employees for their protected expressive activity, including litigation against the administration. We focus below solely on that overbreadth.[4]

### A. The extraordinary overbreadth of the Order is illustrated by its contrast with all those issued by prior presidents using the same statutory authority

The actions of prior presidents, Republican and Democratic, all no less committed to protecting national security than President Trump, including one

---

[4] The District Court in two parallel cases found that the Order is not only *over*inclusive, it is also revealingly *under*inclusive. *See American Foreign Service Ass'n v. Trump*, 783 F.Supp.3d 248, 264-65 (D.D.C. 2025) (noting that the Order "does not strip collective bargaining rights from the United States Customs and Border Protection ('CBP'), whose union 'endorsed the President in last year's election'"); *Nat'l Treasury Employees Union v. Trump,* 780 F.Supp.3d 237, 256 (D.D.C. 2025) (the Order excludes "police officers, security guards, [and] firefighters," but includes employees of the Federal Bureau of Prisons who are represented by a union that has been critical of the President).

former Director of the Central Intelligence Agency (George H.W. Bush), stand in stark contrast to President Trump's action here.

The overbreadth of the Order is highlighted by the scalpel-like precision of all prior orders, *i.e.*, those issued by Presidents Carter, Reagan, George H.W. Bush, Clinton, George W. Bush, Obama, and even President Trump during his first term. *See* Executive Orders 12,171, 44 Fed. Reg. 66565 (Nov. 19, 1979); 12,338, 47 Fed. Reg. 1369 (Ja. 11, 1982); 12,410, 48 Fed. Reg. 13143 (March 28, 1983); 12,559, 51 Fed. Reg. 18761 (May 20, 1986); 12,632, 53 Fed. Reg. 9852 (March 23, 1988); 12,666, 54 Fed. Reg. 1921 (Jan. 12, 1989); 12,671, 54 Fed. Reg. 11157 (March 14, 1989); 12,681, 54 Fed. Reg. 28997 (July 6, 1989); 12,693, 54 Fed. Reg. 40629 (Sept. 29, 1989); 13,039, 62 Fed. Reg. 12529 (March 11, 1997); 13,252, 67 Fed. Reg. 1601 (Jan. 7, 2002); 13,381, 70 Fed. Reg. 37953 (June 27, 2005); 13,467, 73 Fed. Reg. 38103 (June 30, 2008); 13,480, 73 Fed. Reg. 73991 (Nov. 26, 2008); 13,741, 81 Fed Reg. 68289 (Sept. 29, 2016); 13,760, 82 Fed. Reg. 5325 (Jan. 12, 2017); and 13,869, 84 Fed. Reg. 18125 (April 24, 2019). While prior presidents have used the statutory authority at issue to exempt specific groups of employees, *no* prior president has used it to strip *all* employees of *any* department or agency of their right to engage in collective bargaining—not even employees of the Departments of Defense ("DOD"), Homeland Security ("DHS"), or Justice ("DOJ"). *See* J.A. 710. Rather, only specific components of even those

departments have been excluded by prior presidents. *See, e.g.*, Executive Order 12,693 (excluding only Defense Mapping Agency Reston Center, DOD) (issued by President George H.W. Bush); Executive Order 12,410 (excluding Joint Special Operations Command, DOD) (issued by President Reagan).

President Trump is the first President to exclude an entire department or agency. The Order excludes all of the Departments of Defense, Energy ("DOE") (except for the Federal Energy Regulatory Commission), Justice, State, Treasury ("Treasury") (except for the Bureau of Engraving and Printing), and Veterans Affairs ("VA") (subject to exemption by the Secretary) as well as all of the Environmental Protection Agency ("EPA"), the Federal Communications Commission ("FCC"), the General Services Administration ("GSA"), the National Science Foundation ("NSF"), the Nuclear Regulatory Commission ("NRC"), the U.S. Agency for International Development ("USAID"), and the U.S. International Trade Commission.[5]

One District Court found that the number of employees excluded from bargaining under the Order exceeds those excluded under any prior order, including the original order issued under the statute, by many fold. *See Am. Fed. of Gov. Employees v. Trump*, 2025 WL 1755442 at *12 (N.D. Cal. 2025). The Court

---

[5] For reasons of space, this brief does not discuss DOD, State, DHS, DOJ, National Science Foundation, Nuclear Regulatory Commission, International Trade Administration, or United States International Trade Commission.

below estimated that the Order strips two-thirds of federal employees of their right to collectively bargain. J.A. 706.[6] The President is thus attempting to use a provision designed as an exception to a statute requiring federal departments and agencies to recognize the right of their employees to engage in collective bargaining to swallow that statutory rule, in defiance of the congressional finding that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). *See also* 22 U.S.C. § 4101(1), (3).

Moreover, the prior orders already cover the arguably national security related parts of many of the departments and agencies wholly excluded from collective bargaining by the Order. For example, the Order strips all employees of DOE of their right to engage in collective bargaining. But the orders issued by Presidents Carter, Reagan, and George W. Bush already excluded the specific components of the Department that are engaged in national security-related work—specifically, the National Nuclear Security Administration; the Office of Intelligence; the Office of Counterintelligence; the Office of Intelligence and Counterintelligence; the Albuquerque, Nevada and Savannah River operations

---

[6] Moreover, the Order strips collective bargaining rights from 75 percent of those employees who were represented by a union. *See* Hassan Ali Kanu, *Trump moves to strip unionization rights from most federal workers*, Politico (March 28, 2025), https://www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010. And the Order asks agencies to identify *additional* subdivisions to be excluded. Executive Order 14,251, § 7.

offices; and the Offices of the Assistant Secretary for Defense Programs. *See* Executive Orders 12,171 § 1-210; 12,338, § 3; 13,480, § 2. In contrast, the Order, by excluding the entire Department, strips employees whose work has nothing to do with national security of their rights, for example, employees in the Office of Indian Energy Policy and Programs who "promote Tribal energy development, efficiency and use; reduce or stabilize energy costs; enhance and strengthen Tribal energy and economic infrastructure; and electrify Indian lands and homes."[7]

The Order strips all employees of Treasury (except for those in the Bureau of Engraving and Printing) of their rights, but the orders issued by Presidents Carter and George W. Bush already excluded the specific components of the Department that are engaged in national security-related work—specifically, the Office of Special Assistant to the Secretary (National Security); the Office of Intelligence Support; the Office of the Assistant Secretary (Enforcement Operations); the Office of Criminal Enforcement, Bureau of Alcohol, Tobacco and Firearms; the Office of Investigations, U.S. Customs Service; the Criminal Investigation Division, IRS; the Office of Terrorism and Financial Intelligence; the Financial Crimes Enforcement Network; and the Trade Analysis and Enforcement Division of the Alcohol and Tobacco Tax and Trade Bureau. *See* Executive Orders

---

[7] *See* DOE, *About the Office of Indian Energy Policy and Programs*, https://www.energy.gov/indianenergy/about-office-indian-energy-policy-and-programs (last accessed Aug. 27, 2025).

12,171 § 1-203; 13,480, § 6.[8] In contrast, the instant Order, by excluding the entire Department, strips employees whose work has nothing to do with national security of their rights, for example, employees of the Internal Revenue Service ("IRS") who provide assistance to taxpayers.[9]

Similarly, in contrast to the Order, which excludes all employees of GSA, President Carter's Order excluded only the GSA's Information Security Oversight Office. *See* Executive Order 12,171 § 1-201. By excluding the entire GSA, the Order strips employees whose work has nothing to do with national security of their rights, for example, employees of the Federal Acquisition Service who procure office supplies for federal agencies.[10]

Finally, while the instant Order excludes all employees of USAID, President Carter's Order excluded only the Immediate Office of the Auditor General, the Office of Inspections and Investigations, the Office of Security, and the Office of the Area Auditor General/Washington. *See* Executive Order 12,171, § 1-211. By

---

[8] Some of those components have subsequently been abolished or moved to the Department of Homeland Security.

[9] Over 80 percent of Treasury employees are employed by the IRS, *Compare* U.S. Equal Opportunity Commission, *Department of the Treasury (TREAS)*, https://www.eeoc.gov/federal-sector/department-treasury-treas-0 (last accessed Aug. 27, 2025) (108,110 Treasury employees), *with* IRS, *IRS Budget & Workforce* (90,516 IRS employees), https://www.irs.gov/statistics/irs-budget-and-workforce (last accessed Aug. 27, 2025).

[10] *See* GSA, *Delivering Value. Delivering Impact. 2024 Agency Financial Report*, at 24, https://www.gsa.gov/reference/reports/budget-and-performance/annual-reports/2024-agency-financial-report.

excluding the entire USAID, the Order strips employees whose work has nothing to do with national security of their rights, for example, employees working on agricultural productivity, education reform or disaster relief in one of the technical bureaus in Washington, D.C.[11]

It is also notable that *no* prior president has excluded *any* part of the VA, while the Order excludes the entire VA (while granting authority to the Secretary to suspend application of the Order to any subdivision of the Department[12]). The VA is the second largest department of the federal government, after the DOD, consisting of nearly 500,000 employees and a higher percentage of those employees have exercised their right to organize and engage in collective bargaining than those in any other department.[13] By excluding the entire VA, the Order strips employees whose work has nothing to do with national security of

---

[11] *See* USAID, *USAID Primer What We Do and How We Do It*, at 29 (Revised Jan. 2006), https://web.archive.org/web/20180716223935/https://pdf.usaid.gov/pdf_docs/PDACG100.pdf.

[12] The District Court in a parallel case found that the Secretary has used this authority, as the President used his authority, to permit unions that have supported the President to continue to represent employees while revoking the rights of unions that have opposed the President without regard to whether the employees they represent protect national security. *American Foreign Service Ass'n*, 783 F.Supp.3d at 265.

[13] *See* Aurelia Glass, *The Trump Administration Ended Collective Bargaining for 1 Million Federal Workers*, CAP, Fig. 2 (May 22, 2025), https://www.americanprogress.org/article/the-trump-administration-ended-collective-bargaining-for-1-million-federal-workers/.

their rights, for example, the thousands of workers who process veterans' benefits claims and work in veterans' hospitals as doctors, nurses, dieticians, etc.[14]

The consistent practice of prior presidents is consistent with Congress' intent. When Congress adopted the federal sector collective bargaining law in 1978, it categorically excluded only four specific entities primarily engaged in national security related work: the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the Secret Service. *See* 5 U.S.C. § 7103(a)(3).[15] All of the departments and agencies categorically excluded by the Order—the DOD, Energy (created in 1977), DOJ, State, Treasury, and VA (created as Veterans Administration in 1930) as well as the EPA (created in 1970), the FCC (created in 1934), the GSA (created in 1949), the NRC (created in 1975), the NSF (created in 1950), the USITC (created in 1916 and renamed in 1974), and

---

[14] 371,100 of the VA's 484,000 employees work in hospital and clinics. *See* VA, *Veterans Health Administration, About the VHA*, *https*://www.va.gov/health/aboutvha.asp (last accessed Aug. 29, 2025); VA, *VA to reduce staff by nearly 30K by end of FY2025* (July 8, 2025), *https*://www.va.gov/wilmington-health-care/news-releases/va-to-reduce-staff-by-nearly-30k-by-end-of-fy2025/.

[15] Moreover, Congress permitted agencies to act with even more precision–down to the individual employee level–in protecting national security by providing that no bargaining unit in any department or agency may include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security," 5 U.S.C. § 7112 (b)(6), *i.e.*, even if an employee's agency or subdivision is not excluded, an individual employee engaged in national security work may be excluded. Congress thus eliminated any rationale for the form of overbroad application of § 7103(b)(1) at issue here.

USAID (created in 1961)—existed at that time, but Congress chose *not* to categorically exclude their employees from the protections of the bargaining law. The express exclusion of the four national security agencies, and no others, evidences Congress' intent not to categorically exclude other departments and agencies that existed in 1978 and all prior presidents have respected that intent under the "well-established canon of statutory interpretation: *expressio unius est exclusio alterius*"—in plain English, "expressing one item of [an] associated group or series excludes another left unmentioned." *Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) (citation omitted).

In short, until now, "the President has consistently and frequently interpreted" the statutory authority to exclude components of the federal government from collective bargaining narrowly and, as in separation of powers cases, "the longstanding 'practice of the government,'" should "inform [the Court's] determination of 'what the law is,'" *N.L.R.B. v. Noel Canning* 573 U.S. 513, 514, 525 (2014) (citations and quotations omitted), as well as what is plausibly proper use of the statutory authority.

**B. The extraordinary overbreadth of the Order is demonstrated by the statutes defining the functions of the covered departments and the entities' self-descriptions**

The legislative authority cited as the basis of the Order permits the President to exclude an "agency or subdivision thereof" from the coverage of the bargaining

law only if "(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the bargaining law] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). The "primary function[s]" of departments and agencies are established by Congress. An examination of the statutes vesting authority in several of the departments, agencies, and subparts thereof excluded by the Order as well as how those entities publicly describe themselves demonstrates the extraordinary overbreadth of the Order. While space does not permit a detailed description of all the functions and component parts of each of the covered departments and agencies, given the sprawling coverage of the Order, a few examples are illustrative.

We begin with the departments and agencies wholly excluded by the Order, starting with the largest,[16] the VA.

**VA.** The statutes governing the VA make clear it does not have national security work as a "primary function."[17] The law currently provides that "[t]he

---

[16] As noted above, we do not discuss DOD, which is larger than the VA.

[17] Moreover, Congress made clear its intention *not* to exclude all employees of the VA from the protections of the bargaining law when it adopted legislation in 1991 providing that medical professionals employed by the Veterans Health Administration have the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by them in accordance with chapter 71 of title 5." 38 U.S.C. § 7422(a).

purpose of the Department is to administer the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. §301(b). VA's primary component parts are the Office of the Secretary, the Veterans Health Administration, the Veterans Benefits Administration, the National Cemetery Administration, the Board of Veterans Appeals, the Veterans' Canteen Service, and the Board of Contract Appeals. 38 U.S.C. §301(c). None of those have national security as a primary function.

Indeed, the VA currently describes its "mission" as "to care for those who have served in our nation's military and for their families, caregivers, and survivors."[18] The largest component of the VA is the Veterans Health Administration, which describes itself as "America's largest integrated health care system, providing care at 1,380 health care facilities, including 170 medical centers and 1,193 outpatient sites of care of varying complexity (VHA outpatient clinics), serving 9.1 million enrolled Veterans each year."[19] Providing health care to veterans, while critically important, does not primarily protect national security.

The Order is grossly overbroad as applied to the VA.

---

[18] *See* VA, *About the Department*, https://department.va.gov/about/ (last accessed Aug. 28, 2025).
[19] *See* VA, *Veterans Health Administration*, https://www.va.gov/health/ (last accessed Aug. 28, 2025).

**DOE**. When Congress created the DOE in 1977, it set forth its reasons for creating the new Department, many of which are unrelated to national security, including, to continue "a central energy data collection and analysis program," to "promote the interest of consumers," and to "foster and assure competition among parties engaged in the supply of energy and fuels." *See* 42 U.S.C. § 7112. While specific components of DOE were excluded from collective bargaining by prior presidents, for example, the National Nuclear Security Administration, many of the components of the Department covered by the Order do not have as a primary function protection of national security. For example, the Office of Energy Efficiency and Renewable Energy seeks to "ensure that all Americans benefits from energy innovation" through a variety of programs, including provision of "technical assistance to communities, local, tribal, and state government, building professionals, manufacturers, utility companies, and others to help them form realistic plans to improve their energy infrastructure."[20]

The Order is grossly overbroad as applied to the entirety of DOE.

**EPA.** The EPA was established as an independent agency by Reorganization Plan No. 3 of 1970. Reorganization Plan No. 3 of 1970, 84 Stat. 2086 (1970). *See*

---

[20] *See* DOE, *Office of Energy Efficiency and Renewable Energy*, https://www.energy.gov/eere/office-energy-efficiency-and-renewable-energy (last accessed Aug. 28, 2025).

*also* 40 C.F.R. §§ 1.1 and 1.3. As summarized in the regulations, the Reorganization Act "transferred to EPA a variety of research, monitoring, standard setting, and enforcement activities related to pollution abatement and control to provide for the treatment of the environment as a single interrelated system." 40 C.F.R. § 1.3. The EPA plays a key role in the enforcement of the Clean Water and Clean Air Acts, 33 U.S.C. §§ 1251 *et seq*. and 42 U.S.C §§ 1251 *et seq.* The EPA is centrally concerned with regulating domestic sources of pollution, primarily industrial and agricultural sources. To cite just one example, the Office of Pesticide Programs is responsible for "the overall pesticide activities of the Agency" including "the development of strategic plans for the control of the national environmental pesticide situation." 40 C.F.R. § 1.43(a).

The Order is grossly overbroad as applied to the EPA.

**FCC.** In the Communications Act of 1934, Congress created the FCC for a set of purposes most of which have nothing to do with national security, *e.g.*, "to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151.

In addition to the Commission itself, the FCC is organized into units, including the (1) Office of Managing Director, (2) Office of Engineering and

Technology, (3) Office of General Counsel, (4) Office of Economics and

Analytics, (5) Office of Media Relations, (6) Office of Legislative Affairs,

(7) Office of Inspector General, (8) Office of Communications Business

Opportunities, (9) Office of Administrative Law Judges, (10) Office of Workplace

Diversity, (11) Office of International Affairs, (12) Wireline Competition Bureau,

(13) Wireless Telecommunications Bureau, (14) Space Bureau, (15) Media

Bureau, (16) Enforcement Bureau, (17) Consumer and Governmental Affairs

Bureau, and (18) Public Safety and Homeland Security Bureau. 47 C.F.R. § 0.5

(a)(1)-(17). Only the last is related to national security. The FCC's description of

its "competencies" further illustrates its limited national security role. They are:

- Promoting competition, innovation and investment in broadband services and facilities
- Supporting the nation's economy by ensuring an appropriate competitive framework for the unfolding of the communications revolution
- Encouraging the highest and best use of spectrum domestically and internationally
- Revising media regulations so that new technologies flourish alongside diversity and localism
- Providing leadership in strengthening the defense of the nation's communications infrastructure.[21]

While components of the FCC may have a national security function, even

though no prior President has excluded *any* part of the FCC from bargaining, the

---

[21] *See* FCC, *What We Do*, https://www.fcc.gov/about-fcc/what-we-do (last accessed Aug. 28, 2025).

Order is grossly overbroad as applied to the entire FCC.

**GSA.** GSA was created by the Federal Property and Administrative Services Act of 1949. *See* 40 U.S.C. § 301. The law provides that GSA's "purpose . . . is to provide the Federal Government with an economical and efficient system for the following activities:

> (1)  Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.
> (2)  Using available property.
> (3)  Disposing of surplus property.
> (4)  Records management.

40 U.S.C. § 101. The statute also provides that the GSA "shall procure and supply personal property and nonpersonal services for executive agencies to use in the proper discharge of their responsibilities, and perform functions related to procurement and supply including contracting, inspection, storage, issue, property identification and classification, transportation and traffic management, management of public utility services, and repairing and converting." 40 U.S.C. § 501(b)(1)(A). These functions do not relate to national security.

Moreover, the statute provides that, whenever the Secretary of Defense "determines that an exemption is in the best interests of national security," the

Secretary "may exempt the Department of Defense from an action taken by the" GSA "unless the President directs otherwise." 40 U.S.C. § 501(a)(2). Hence, it is implausible to contend that the bargaining law "cannot be applied to" the GSA or its subdivisions "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(a)(1)(B).

As set forth in regulation, the "GSA formulates and prescribes a variety of government-wide policies relating to procurement and contracting; real and personal property management; transportation, public transportation, public utilities and telecommunications management; automated data processing management; records management; the use and disposal of property; and the information security program. In addition to its policy role, GSA also provides a variety of basic services in the aforementioned areas to other Government agencies." 41 C.F.R. § 105-53.112. The GSA Fiscal Year 2026 Annual Performance Plan further explains:

> The . . . GSA[] was established to promote management best practices and efficient operations across the government. . . .
>
> GSA accomplishes its mission by developing innovative, cost-effective, and collaborative solutions in real estate, acquisition, and technology. GSA also improves government operations by fostering interagency collaboration, promoting shared services, and developing smart policies that allow agencies to focus on mission delivery.[22]

---

[22] *See* GSA*, Fiscal Year 2026 Annual Performance Plan*, at 3, https://www.gsa.gov/reference/reports/budget-and-performance/annual-reports?footer=gsa (last accessed Aug. 28, 2025).

These functions do not relate to national security.

The Order is grossly overbroad as applied to the GSA.

**Treasury.** Treasury was created by an act of Congress in 1789, 1 Stat. 65 §

2 (1789). Today, Treasury describes it duties as:

- Managing federal finances;
- Collecting taxes, duties and monies paid to and due to the U.S. and paying all bills of the U.S.;
- Currency and coinage;
- Managing Government accounts and the public debt;
- Supervising national banks and thrift institutions;
- Advising on domestic and international financial, monetary, economic, trade and tax policy;
- Enforcing federal finance and tax laws;
- Investigating and prosecuting tax evaders, counterfeiters, and forgers.[23]

Ninety-eight percent of Treasury employees are employed in its Bureaus: the

Bureau of Engraving and Printing, the Bureau of Fiscal Services, the Financial

Crimes Enforcement Network, the Inspector General, the Inspector General for

Tax Administration, the IRS, the Comptroller of the Currency, the Mint, and the

Alcohol and Tobacco Tax and Trade Bureau.[24] It is evident that most of those

Bureaus (with the exception of the specific components excluded by prior

executive orders) have nothing to do with national security. Moreover, the largest

---

[23] *See* Treasury, *Role of Treasury*, https://home.treasury.gov/about/general-information/role-of-the-treasury (last accessed Aug. 28, 2025).
[24] *See* Treasury, *Bureaus*, https://home.treasury.gov/about/bureaus (last accessed Aug. 28, 2025).

is the IRS, which "is responsible for determining, assessing, and collecting internal revenue in the United States." *Id*. Tax collection is not primarily a national security function.

While specific components of Treasury were excluded from bargaining by prior presidents, the Order is grossly overbroad as applied to the entirety of the Department.

**USAID:** USAID was created by the Foreign Assistance Act of 1961, Pub. Law 87-195, 75 Stat. 424 (1961). Its goals were:

- the alleviation of the worst physical manifestations of poverty among the world's poor majority;
- the promotion of conditions enabling developing countries to achieve self-sustaining economic growth with equitable distribution of benefits;
- the encouragement of development processes in which individual civil and economic rights are respected and enhanced;
- the integration of the developing countries into an open and equitable international economic system; and
- the promotion of good governance through combating corruption and improving transparency and accountability.

*Id.*, § 101 (codified at 22 U.S.C. § 2151). Congress authorized USAID's pursuit of those broad goals through specific assistance programs, including, for example, programs to promote agricultural development in rural areas, to combat HIV-AIDS, and to secure safe drinking water, 22 U.S.C. §§2151a, 2151b-2, 2152h. While laudable, those programs do not have as a primary function the protection of national security.

While specific components of USAID were excluded from bargaining by prior presidents, the Order is grossly overbroad as applied to the entirety of the agency.

Finally, we turn to the departments and agencies partially excluded by the Order.

**Department of Agriculture ("USDA")**. The Order excludes two components of USDA, the Food Inspection Service and the Animal and Plant Health Inspection Service ("APHIS").

Taking APHIS as an example, it derives its authority from a number of statutes, none of which are primarily intended to protect national security.[25] For example, APHIS has responsibility under the law to promote humane methods for the slaughter of livestock. *See* 7 U.S.C. § 1901. And among APHIS' activities is the protection of livestock from predators. *See id.*[26]

Indeed, following "9/11," any of the duties of APHIS that were arguably related to national security were transferred to U.S. Customs and Border Protection in the newly created DHS by the Homeland Security Act of 2002, 6 U.S.C. § 231.

---

[25] *See* USDA, Animal and Plant Health Inspection Service, *Laws and Regulations*, https://www.aphis.usda.gov/laws-regs (last accessed Aug. 28, 2025).
[26] USDA, *Operational Activities: Protecting Livestock from Predators*, (last modified July 30, 2025), https://www.aphis.usda.gov/operational-wildlife-activities/protect-livestock-from-predators.

In 2003, USDA and DHS entered into an agreement that effectuated the transfer. The Agreement explains:

> Historically, the USDA . . . .APHIS Agriculture Quarantine Inspection (AQI) program has focused mainly on preventing the introduction of harmful pests and diseases into the United States. Now, the threat of intentional introduction of these pests or pathogens as a means of biological warfare or terrorism is an emerging concern that the United States must be prepared to deal with effectively. Guarding against such an eventuality is important to the security of the Nation. . . . The transfer of USDA agriculture inspectors, with their extensive training and expertise in biology and agricultural inspection, provides DHS the capability to recognize and prevent the entry of organisms that might be used for biological warfare or terrorism.[27]

The Order is grossly overbroad as applied to the covered components of USDA.

**HHS**. The Order excludes significant parts of HHS, including the Office of the Secretary, the Office of the General Counsel, the FDA, the CDC, the Administration for Strategic Preparedness and Response, the Office of Refugee Resettlement, and the National Institute of Allergy and Infectious Diseases.

Taking the FDA and CDC as examples, the FDA's primary function is to ensure the safety of Americans' food and drugs. Under the Food Drug and Cosmetics Act, the FDA certifies that new drugs are safe and effective. *See* 21 U.S.C. § 355(d). Under the Family Smoking and Tobacco Control Act, the FDA

---

[27] USDA, *Memorandum of Agreement Between DHS and USDA* (last modified: July 30, 2025), https://www.aphis.usda.gov/plant-protection-quarantine/about/moa.

may impose "restrictions on the sale and distribution of a tobacco product, including restrictions on the access to, and the advertising . . . of, the tobacco product . . . for protection of the public health." *See* 21 U.S.C. §§ 387(e), 387f(d)(1). The Agency states:

> More than 18,000 FDA employees work in all 50 states and internationally to ensure the safety and effectiveness of human and veterinary medicines, biologics, and medical devises. We also regulate the safety of food, cosmetics, devices that emit radiation, and tobacco products.[28]

In addition to headquarters' offices, the FDA consists of nine centers: Center for Biologics Evaluation and Research, Center for Devices and Radiological Health, Center for Drug Evaluation and Research, Center for Tobacco Products, Center for Veterinary Medicine, Human Foods Program, National Center for Toxicological Research, Office of Operations, Office of Inspection and Investigation, Oncology Center of Excellence.[29] To take just one example among the Centers, the Oncology Center of Excellence "leads a variety of research and educational outreach projects and programs to advance the development and regulation of medical products for patients with cancer."[30] While the FDA and its component parts perform critical work, they do not have as a primary function protecting national security.

---

[28] FDA, *About FDA*, https://www.fda.gov/about-fda (last accessed Aug. 28, 2025).
[29] FDA, *FDA Organizational Charts*, https://www.fda.gov/about-fda/fda-organization/fda-organization-charts (last accessed Aug. 28, 2025).
[30] FDA, *Oncology Center of Excellence*, https://www.fda.gov/about-fda/fda-organization/oncology-center-excellence (last accessed Aug. 28, 2025).

An examination of the CDC's components also illustrates the gross overbreadth of the Order. CDC consists of the following centers: Center for Forecasting and Outbreak Analytics; Global Health Center; National Center on Birth Defects and Developmental Disabilities; National Center for Chronic Disease Prevention and Health Promotion; National Center for Emerging and Zoonotic Infectious Diseases; National Center for Environmental Health/Agency for Toxic Substances and Disease Registry; National Center for Health Statistics; National Center for HIV, Viral Hepatitis, STD, and TB Prevention; National Center for Immunization and Respiratory Diseases; National Center for Injury Prevention and Control; National Center for State, Tribal, Local, and Territorial Public Health Infrastructure and Workforce; and National Institute for Occupational Safety and Health (NIOSH).[31] Again, to take one example, NIOSH: NIOSH is statutorily mandated to conduct workplace health and safety research; identify "toxic substances" and set "exposure levels that are safe for various periods of employment;" "publish . . . a list of all known toxic substances;" disseminate information about occupational safety to employers and employees; develop and test "new technologies and equipment designed to enhance mine safety;" and provide compliance assistance for employers. 29 U.S.C. §§ 651; 669(a)(1)-(3),

---

[31] CDC, *CDC Organization and Leadership*, https://www.cdc.gov/about/organization (last accessed Aug. 28, 2025).

(a)(6), (d); 670; 671(c)(2), (h). Clearly, all CDC's components do not have as a primary function protecting national security.

And, correspondingly, the Offices of the Secretary and General Counsel do not have as a primary function protecting national security. HHS describes its mission as striving to "enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services."[32] Most HHS employees work at NIH (at which even the Order excludes only one of 21 Institutes), the Indian Health Service, and the Centers for Medicaid and Medicare Services.[33] Promoting Native American health; administering Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance Marketplaces; and seeking a cure for cancer are, like the functions of the FDA, critical, but they do not primarily protect national security.

The Order is grossly overbroad as applied to the covered components of HHS.

---

[32] HHS, *About HHS*, https://www.hhs.gov/about/index.html (last accessed Aug. 28, 2025).

[33] *See* CMS, *Fiscal Year 2024 Financial Report I* (Nov. 2024), https://www.cms.gov/files/document/cms-financial-report-fiscal-year-2024.pdf; NIH, *List of Institutes and Centers*, https://www.nih.gov/institutes-nih/list-institutes-centers (last accessed Aug. 28, 2025); Indian Health Service, *Fact Sheet* (Oct. 2024), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/factsheets/IHSProfile.pdf.

**Interior**. The Order excludes significant parts of Interior, including the Office of the Secretary, the Bureau of Land Management (BLM), the Bureau of Safety and Environmental Enforcement, and the Bureau of Ocean Energy Management.

Using the BLM as an example, the Federal Land Policy and Management Act of 1976 is the Bureau's primary source of authority. *See* 43 U.S.C. §1731. Congress directed the Secretary to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use," but did not mention protecting national security. *See* 43 U.S.C. § 1701(a)(8). Congress further directed the Secretary to "manage the public lands under principles of multiple use and sustained yield" with no mention of national security. 43 U.S.C. § 1732(a).

And the vast majority of the work of the Office of the Secretary also has nothing to do with national security. The Department explains that it "protects and manages the Nation's natural resources and cultural heritage; provides scientific and other information about those resources; and honors its trust responsibilities or special commitments to American Indians, Alaska Natives, Native Hawaiians, and

affiliated Island Communities."[34] The eleven technical bureaus that constitute the Department, include, for example, the Bureau of Indian Education, the National Park Services, and the U.S. Fish and Wildlife Service.[35] The Secretary oversees all these functions – not national security matters.

The Order is grossly overbroad as applied to the covered components of Interior.

In sum, even this necessarily abbreviated survey of the statutes creating and governing the excluded departments, agencies, and subdivisions thereof and the agencies' own descriptions of their functions and organization, makes clear that the Order is grossly overbroad.[36]

## CONCLUSION

The amici are no less concerned about protecting national security than is President Trump. The same was true of each of the presidents amici served under. Affirming the grant of a preliminary injunction will not compromise that critical

---

[34] *See* Interior, *About Interior*, https://www.doi.gov/about (last accessed Aug. 28, 2025).
[35] Interior, *Bureaus and Offices*, https://www.doi.gov/bureaus (last accessed Aug. 28, 2025).
[36] It is also notable that none of the heads of the departments and agencies discussed above sits on the National Security Council, except the Secretaries of Energy, Interior, and Treasury. *See* 5 U.S.C. § 3021; The White House, *Organization of the National Security Council and Subcommittees, NSPM-1* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/organization-of-the-national-security-council-and-subcommittees/.

objective. Rather, it will leave the President with discretion to use his statutory authority in the same manner as his predecessors, to exclude from collective bargaining only those components of departments and agencies that have as a primary function protecting national security. That will safeguard national security while also respecting the First Amendment.

For the above-stated reasons, this Court should affirm the grant of the preliminary injunction.

Respectfully submitted,

/s/Harold Craig Becker
Harold Craig Becker
Norman L. Eisen
Democracy Defenders Fund
600 Pennsylvania Avenue SE, No. 15180
Washington, D.C. 20003
T: (202) 594-9958
Craig@democracydefenders.org
Norman@democracydefenders.org

Counsel for the Amici Curiae

## Department of Agriculture

- Kathleen A. Merrigan, PhD, Deputy Secretary, 2009-2013; Agricultural Marketing Service Administrator, 1999-2001.
- Kevin Shea, Principal Senior Advisor to the Deputy Secretary, 2024-2025; Administrator of the Animal and Plant Health Inspection Service, 2012-2023; Associate Administrator, 2004-2012.
- Anita Adkins, Chief Human Capital Officer, 2022-2025.
- Roberta Jeanquart, Chief Human Capital Officer, 2015-2017.
- William P. Milton, Chief Human Capital Officer and Human Resources Director, 2012-2015; Deputy Chief Human Capital Officer, 2010-2012; Assistant Administrator of Management, 2003-2008; Director of Labor and Employee Relations, Food Safety Inspection Service, 2000-2003; President, Chief Human Capital Officers Council, 2010-2015.

## Department of Energy

- Jennifer Granholm, Secretary, 2021-2025.
- Kevin Knobloch, Chief of Staff, 2013-2017.
- Sean A. Lev, Acting General Counsel, 2011; Deputy General Counsel for Environment & Nuclear Programs, 2009-2011.
- David Turk, Deputy Secretary, 2021-2025.
- Sam Walsh, General Counsel, 2021-2025.

## Department of Health and Human Services

- Xavier Becerra, Secretary, 2021-2025.
- Kathleen Sebelius, Secretary, 2009-2014.
- Donna Shalala, Secretary, 1993-2001.
- Samuel Bagenstos, General Counsel, 2022-2024.
- William B. Schultz, General Counsel, 2013-2016; Acting General Counsel, 2011-2013.

Department of the Interior

- Bruce Babbitt, Secretary, 1993-2001.
- Deb Haaland, Secretary, 2021-2025.
- Robert T. Anderson, Solicitor, 2021-2025; Counselor to the Secretary, 1997-2000; Associate Solicitor 1995-97.
- John D. Leshy, Solicitor, 1993-2001; Associate Solicitor, 1977-1980.

Department of the Treasury

- Janet L. Yellen, Secretary, 2021-2025.
- Rochelle Granat, Assistant General Counsel (General Law, Ethics and Regulation), 2010-2017; Deputy Assistant Secretary for Human Resources and Chief Human Capital Officer, 2006-2010.
- Ben Harris, Assistant Secretary for Economic Policy, 2021-2023.
- Mark Patterson, Chief of Staff to the Secretary, 2009-2015.
- Sarah Bloom Raskin, Deputy Secretary, 2014-2017.
- Daniel Werfel, Commissioner of Internal Revenue, 2023-2025; Acting Commissioner, 2013.

Department of Veterans Affairs

- Kayla M. Williams, Assistant Secretary of Public and Intergovernmental Affairs, 2021-2022.

Environmental Protection Agency

- Carol M. Browner, Administrator, 1993-2001.
- Gina McCarthy, Administrator, 2013-2017; Deputy Administrator, 2009-2012.
- William K. Reilly, Administrator, 1989-1993.
- Avi Garbow, General Counsel, 2013-2017.
- Gary S. Guzy, General Counsel and Counselor to the Administrator, 1998-2001.

Federal Communications Commission

- Nicholas Johnson, Commissioner, 1966-1973.
- Sean A. Lev, General Counsel, 2012-2013.
- Christopher Wright, General Counsel, 1997-2001; Deputy General Counsel, 1994-1997.

US Agency for International Development

- Samantha Powers, Administrator, 2021-2025.
- Nick M. Gottlieb, Director, Employee and Labor Relations, 2019-2025.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,470 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft in Times New Roman 14-point font, a proportionally spaced typeface.

/s/Harold Craig Becker
Harold Craig Becker